ORAL ARGUMENT NOT YET SCHEDULED

**No. 23-1046**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS ACTION COALITION OF INDIANA, INC.
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

TEXAS GAS TRANSMISSION, LLC,
*Intervenor for Respondent*.

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

## DEFERRED JOINT APPENDIX

MONEEN NASMITH
ANN JAWORSKI
SAMEER DOSHI
RAGHU MURTHY
AARON STEMPLEWICZ
Earthjustice
48 Wall Street, 15th Fl.
New York, NY 10005
Telephone: (212) 845-7384
mnasmith@earthjustice.org

*Counsel for Petitioner Citizens
Action Coalition of Indiana*

MATTHEW R. CHRISTIANSEN
ROBERT H. SOLOMON
SUSANNA Y. CHU
Federal Energy Regulatory
  Commission
Washington, DC 20426
Telephone: (202) 502-8464
Susanna.Chu@ferc.gov

*Counsel for Respondent Federal
Energy Regulatory Commission*

*Additional counsel listed inside
front cover*

MICHAEL E. MCMAHON
Boardwalk Pipeline Partners, LP
9 Greenway Plaza, Suite 2800
Houston, Texas 77046
Telephone: (713) 479-8059
Mike.McMahon@bwpipelines.com

SEAN MAROTTA
A. GREGORY JUNGE
REEDY C. SWANSON
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
sean.marotta@hoganlovells.com

*Counsel for Intervenor Texas Gas
Transmission, LLC*

# TABLE OF CONTENTS

*Unless otherwise noted, the Joint Appendix includes the full text of the listed documents, excluding "immaterial formal matters" per Local Rule 30(d). Each docketed entry begins with the unique Accession Number from FERC.*

20210625-5123: Texas Gas Transmission, LLC submits Abbreviated Application for a Certificate of Public Convenience and Necessity Henderson County Expansion Project under CP21-467 (June 25, 2021) [R2] (excerpt) ............................................................... JA001

20210730-5261: Southern Indiana Gas & Electric Company, Inc. submits comments and requests that the Commission grant the Certificate of Public Convenience and Necessity requested by Texas Gas Transmission, LLC under CP21-467 (July 30, 2021) [R28] ...................................................................... JA013

20210730-5268: Direct Testimony of Angila M. Retherford, Indiana Utility Regulatory Comm'n Cause No. 45564 (Exhibit A to Citizens Action Coalition of Indiana, Inc.'s Protest and Comments under CP21-467) (July 30, 2021) [R30] (excerpt) ................... JA023

20210830-5179: Scoping Comments on Environmental Issues for the Proposed Henderson County Gas Pipeline Expansion Project Submitted by Citizens Action Coalition of Indiana under CP21-467 (Aug. 30, 2021) [R43] (excerpt) ........................................ JA027

20210921-5089: Motion for Leave to Answer and Answer of Texas Gas Transmission, LLC CP21-467 (Sept. 21, 2021) [R50] (excerpt) .............................................................................. JA030

20210928-5080: CenterPoint Energy Ind. South's Resp. to Sunrise Coal's Second Set of Data Requests, Indiana Utility Regulatory Comm'n Cause No. 45564, Response to 2-22 (Exhibit A to Motion for Leave to Reply and Reply of Citizens Action Coalition of Indiana under CP21-467) (Sept. 28, 2021) [R53] (excerpt) .... JA032

20211109-5035: Comments of U.S. Environmental Protection Agency on the Notice of Intent for the Henderson County Expansion Project under CP21-467 (Nov. 9, 2021) [R61] (excerpt) ...................... JA036

20211207-5145: Answer of Texas Gas Transmission, LLC to Scoping Comments under CP21-467 (Dec. 7, 2021) [R68] (excerpt).... JA039

20220201-5201: Direct Testimony of Anna Sommer, Indiana Utility Regulatory Comm'n Cause No. 45564 (Exhibit A to Motion for Leave to Reply and Reply of Citizens Action Coalition of Indiana under CP21-467) (Feb. 1, 2022) [R99] (excerpt)...................... JA041

20220606-5203: CenterPoint 2019-2020 Integrated Resource Plan, Vol. 2 Pt. 1 (Exhibit A to Comments of Citizens Action Coalition of Indiana, Inc. on the Draft Environmental Impact Statement under CP21-467) (June 6, 2022) [R131] (excerpt) ............................ JA045

20220606-5203: 2019-2020 Comments of Citizens Action Coalition of Indiana, Inc. on the Draft Environmental Impact Statement under CP21-467 (June 6, 2022) [R131] (excerpt).............................. JA049

20220606-5203: Cross-examination of Angila M. Retherford (Exhibit F to Comments of Citizens Action Coalition of Indiana, Inc. on the Draft Environmental Impact Statement under CP21-467) (June 6, 2022) [R131] (excerpt) ............................................................ JA063

20220606-5265: Comments of United States Environmental Protection Agency Region 4 under CP21-467 (June 6, 2022) [R132] (excerpt) ........................................................................................ JA068

20220707-5164: Texas Gas Transmission, LLC submits Supplemental Information in Response to FERC's June 27, 2022 Data Request for the Henderson County Expansion Project under CP21-467 (July 7, 2022) [R141] ............................................................ JA071

20220707-5164: Indiana Utility Regulatory Commission Order, Cause No. 45564, June 28, 2022 (Attachment 1 to Texas Gas Transmission, LLC submits Supplemental Information in Response to FERC's June 27, 2022 Data Request for the Henderson County Expansion Project under CP21-467 (July 7, 2022) [R141] ............................................................. JA088

20220825-3038: Final Environmental Impact Statement for Texas Gas Transmission, LLC's Henderson County Expansion Project under CP21-467 (Aug. 25, 2022) [R148] (excerpt) ............................ JA130

20221003-5330: U.S. Environmental Protection Agency Region 4 submits Comments on the Final Environmental Impact Statement for the Henderson County Expansion Project under CP21-467 (Oct. 3, 2022) [R156] ................................................................. JA241

20221004-5151: Answer of Texas Gas Transmission, LLC to Comments by Citizens Action Coalition under CP21-467 (Oct. 4, 2022) [R158] (excerpt) .................................................................... JA245

20221020-3118: Order Issuing Certificate and Granting Abandonment re Texas Gas Transmission, LLC under CP21-467 (Oct. 20, 2022) [R163] ..................................................................................... JA247

20221121-5202: Request for Rehearing of Citizens Action Coalition of Indiana (Nov. 21, 2022) [R165] ................................................ JA306

20221209-5129: Texas Gas Transmission, LLC's Motion for Leave to Answer and Answer to Request for Rehearing of Citizens Actions Coalition of Indiana under CP21-467 (Dec. 9, 2022) [R166] (excerpt) .................................................................... JA356

20221222-3012: Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration re Texas Gas Transmission, LLC under CP21-467 (Dec. 22, 2022) [R170] .......................... JA362

20230221-5232: 2020 CenterPoint 2019-2020 Integrated Resource Plan (Exhibit B to Comments of Citizens Action Coalition of Indiana, Inc. under CP21-467) (Dec. 22, 2022) [R174] (excerpt) .......... JA363

20230608-3019: Notice of Denial of Rehearing by Operation of Law re Texas Gas Transmission, LLC under CP21-467 (June 8, 2023) [R192] ................................................................. JA385

20230608-4004: Statement of Commissioner James P. Danly re Texas Gas Transmission, LLC under CP21-467-001 (June 8, 2023) [R193] ................................................................. JA386

20230608-4005: Statement of Commissioner Mark C. Christie re Texas Gas Transmission, LLC under CP21-467-001 (June 8, 2023) [R194] ................................................................. JA392

20231208-5094: Texas Gas Transmission, LLC submits Weekly Construction/Environmental Progress Report for the period of November 25, 2023, to December 1, 2023, for the Henderson County Expansion Project under CP21-467 (Dec. 8, 2023) (excerpt) ................................................................. JA395



**Henderson County Expansion Project**

**DOCKET NO. CP21-___-000**

**Application**

**Exhibit C – Company Officials**
**Exhibit D – Subsidiaries and Affiliation**
**Exhibit F – Project Facilities**
**Exhibit G – Flow Diagrams**
**Exhibit I – Market Data**
**Exhibit J – Federal Authorizations**
**Exhibit K – Cost of Facilities**
**Exhibit N – Revenues - Expenses - Income**
**Exhibit P – Tariff**
**Exhibit Y – Accounting Treatment of Abandonment**

**Volume I**

**Public Information**

**June 2021**

# UNITED STATES OF AMERICA
# BEFORE THE
# FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| | ) | |
| **Texas Gas Transmission, LLC** | ) | **CP21-___-000** |
| | ) | |

## ABBREVIATED APPLICATION FOR A
## CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY, ABANDONMENT
## <u>AUTHORIZATION AND RELATED AUTHORIZATIONS</u>

Pursuant to Sections 7(b), 7(c) and 7(e) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(b), § 717f(c), § 717f(e), and Part 157, of the regulations of the Federal Energy Regulatory Commission ("Commission" or "FERC"), 18 C.F.R. Part 157, Texas Gas Transmission, LLC ("Texas Gas") submits this abbreviated application for a certificate of public convenience and necessity and abandonment authorization ("Application").

## <u>Introduction</u>

Texas Gas is proposing to construct and operate the Henderson County Expansion Project. The Project is designed to serve new natural gas-fired electric generation turbines to be constructed by Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("CenterPoint") at its A.B. Brown Generating Station ("A.B. Brown Plant") in Posey County, Indiana. CenterPoint is adding the new natural gas turbines as part of its preferred portfolio of electric generation resources, which is designed to facilitate a substantial reduction in greenhouse gas ("GHG") emissions by, among other things, retiring existing coal-fired generating facilities located at the A.B. Brown Plant and adding at least 1,000 megawatt ("MW") of new wind and solar resources. CenterPoint's proposed new gas-fired turbines are fast-ramping combustion turbines that will support the electric grid during periods when

CenterPoint's new intermittent resources are unavailable due to natural fluctuations in wind and solar availability. CenterPoint estimates that the new gas-fired generating turbines will be dispatched only 2%-7% of total available hours per year—the remainder of the year CenterPoint anticipates relying on renewable resources.

Texas Gas' Henderson County Expansion Project along with CenterPoint's project will facilitate a substantial net reduction in overall GHG emissions. CenterPoint's preferred electric generation portfolio is estimated to reduce lifecycle GHG emissions, including methane, by nearly 60% over the next 20 years, with CenterPoint's direct carbon dioxide emissions reduced 75% from 2005 levels by 2035. The Project will also reduce Texas Gas' own emissions. The Henderson County Expansion Project will replace three existing compressor units on Texas Gas system with a new compressor unit with lower emissions. The new 9 parts per million ("ppm") Solar Centaur 50 ("C50") compressor unit will be equipped with Solar Turbines, Incorporated's ("Solar") SoLoNOx package, which is designed to produce lower emissions of nitrogen oxides ("NOx").[1] Overall emissions from Texas Gas' existing compressor station will be reduced, because Texas Gas will: i) retire an existing compressor unit; ii) transition two existing units to standby; and iii) install the Centaur 50 turbine, with an additive electric seal gas booster which will reduce NOx and methane emissions.[2] Texas Gas proposes to operate the C50 to maximize operating flexibility at the Slaughters Compressor Station and should allow for the proposed C50 to operate in lieu of higher-emitting existing compression equipment under a wider range of operating scenarios.

---

[1] The new unit is currently Solar's lowest emitting unit on the market.
[2] Solar's additive electric seal gas booster pump will keep the compressor seals pressurized when the C50 is not running, which will greatly reduce methane emissions.

JA003

The Commission should determine that an environmental impact statement ("EIS") is not necessary to evaluate whether the Project will result in adverse climate change impacts, because *the Project will cause a substantial net reduction in methane, $NO_x$ and Carbon monoxide emissions*, resulting from the retirement and transitioning to standby of existing reciprocating compressor units on Texas Gas' system, and a reduction of indirect, downstream GHG emissions from the replacement of coal-fired generating facilities at CenterPoint's A.B. Brown Plant with new gas-fired turbines and renewable resources. The Commission should conclude in an environmental assessment ("EA") that the Project will not have significant climate change impacts. CenterPoint has entered into a precedent agreement for the entire 220,000 dekatherms per day ("Dth/d") of the lateral's capacity, and the Project is necessary for the implementation of CenterPoint's preferred electric generation portfolio. The Commission should conclude that the Henderson County Expansion Project is required by the public convenience and necessity.

**Project Details**

Texas Gas seeks authority to construct, operate, and maintain (i) approximately 24 miles of new 20-inch diameter natural gas lateral which will parallel an existing Texas Gas pipeline for approximately 47.5% of the route, and auxiliary appurtenant facilities (i.e. tie-in and mainline valve facilities) located in Henderson County, Kentucky and Posey County, Indiana; (ii) a new delivery meter and regulator ("M&R") station with 0.08 miles of new 16-inch interconnecting pipe located in Posey County, Indiana; (iii) upgrades to an existing receipt M&R station located in Johnson County, Indiana; and (iv) a new C50 turbine compressor unit with approximately 4,863 horsepower ("HP"), piping modifications, and other associated auxiliary appurtenant facilities to be installed at Texas Gas' existing Slaughters Compressor Station in Webster

The names, titles, and mailing addresses of the persons to whom communications and correspondence regarding this filing should be addressed are:

Michael E. McMahon
Senior Vice President and General Counsel
J. Kyle Stephens
Vice President, Regulatory Affairs
Juan Eligio Jr.
Supervisor, Regulatory Affairs
Payton Barrientos
Senior Regulatory Analyst
Texas Gas Transmission, LLC
9 Greenway Plaza, Suite 2800
Houston, Texas 77046
Phone: (713) 479-8033
Fax:     (713) 479-1846
Mike.McMahon@bwpipelines.com
Kyle.Stephens@bwpipelines.com
Juan.Eligio@bwpipelines.com
Payton.Barrientos@bwpipelines.com

A. Gregory Junge
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D. C. 20004
Phone: (202) 637-6642
Fax:     (202) 637-5910
greg.junge@hoganlovells.com

Each of these persons is designated to receive service in accordance with 18 C.F.R. § 385.203(b)(3).  Texas Gas requests the Commission to place these persons on the official service list for this proceeding pursuant to 18 C.F.R. § 385.2010.  Texas Gas requests that the Commission waive Rule 203(b)(3) to allow designated service to each of these persons.

## II.
## BACKGROUND, OPEN SEASON & PRECEDENT AGREEMENT

**Background**

Texas Gas is proposing to construct the Henderson County Expansion Project to serve CenterPoint's A.B. Brown Project, which is the product of a multi-year planning process in Indiana.  CenterPoint conducts a planning exercise every three-years to evaluate its electric generation supply needs over a 20-year horizon.  This planning exercise culminates in an Integrated Resource Plan ("IRP").  The IRP summarizes modeling of anticipated demand, market conditions, and generation costs that guide CenterPoint in designing a generation portfolio that

JA005

best balances the cost of serving its customers, ensuring a reliable supply of electricity and a portfolio that is resilient to potential future scenarios.

CenterPoint's two most recent IRPs have indicated that the addition of new gas-fired and renewable generation along with the retirement of a significant amount of its coal-fired generation offers the optimal mix for its generation portfolio. The IRP prepared for 2016 called for construction of a combined cycle gas turbine ("CCGT"). As part of the CCGT project, CenterPoint proposed a new natural gas lateral to transport gas supply to the A.B. Brown Plant, and, following a formal request for proposal ("RFP") process, Texas Gas was selected as the transportation provider. On June 29, 2018, Texas Gas conducted an open season and made a reservation of the necessary capacity that would be needed to serve CenterPoint's CCGT project. Texas Gas and CenterPoint executed a Precedent Agreement ("2018 PA") committing to purchase the entire amount of the project capacity.[3]

CenterPoint received additional direction from the IURC regarding factors it should consider in its IRP process for 2020 prior to selecting replacement generation. CenterPoint conducted and issued a new IRP in June 2020, intended to address the direction from the IURC.[4] CenterPoint's 2020 IRP demonstrates a diversified mix of generation resources that included the

---

[3] Due to terms of the 2018 PA, Texas Gas could not submit its filing to the Commission for certificate authorization for the project until CenterPoint had received a final, non-appealable order issued by the Indiana Utility Regulatory Commission ("IURC") granting a certificate of public convenience and necessity for CenterPoint's 2018 Project. Texas Gas filed with the Commission, in Docket No. RP19-844-000, a Request for Waiver of the capacity reservation provisions of Section 6.20[4] of the General Terms & Conditions ("GT&C") in order to ensure Texas Gas could continue to align its 2018 Project preparation with the requirements of the 2018 PA and the needs to CenterPoint. On April 1, 2019, the Commission granted Texas Gas' request. As discussed below, on April 24, 2019, the IURC issued an order denying a certificate of public convenience and necessity by CenterPoint to build an approximately 700-850 MW combined cycle gas turbine. On May 3, 2019, in conjunction with the termination of the 2018 PA, Texas Gas filed a Termination of Reservation of Capacity due to CenterPoint not obtaining IURC approval for CenterPoint's 2018 Project.

[4] CenterPoint, 2020 Integrated Resource Plan, available at https://tinyurl.com/22u3mwxs ("2020 IRP").

JA006

addition of significant solar and wind energy resources, the retirement or exiting joint operations related to the operation of four coal-fired units, the use of less natural gas generation (as compared to the 2016 IRP), and a continued investment in energy efficiency, as illustrated below, best balance cost and reliability:



*Illustration 1: Source: CenterPoint's 2020 Integrated Resource Plan*

CenterPoint's preferred portfolio in the 2020 IRP includes the retirement or exit of 730 MWs of coal-fired generation and the addition of 700-1,000 MWs of solar energy resources (some connected to battery storage) and 300 MWs of wind resources. The preferred portfolio also includes the addition of two new flexible natural gas-fired combustion turbine units (totaling 460 MW) to enable CenterPoint "to maintain constant electric supply during potentially extended periods of low output from renewable energy sources."[5] The combustion turbine units are designed to "ramp quickly and provide load following capability, complimenting renewable

---
[5] 2019/2020 IRP at 4.

JA007

An air dispersion modeling analysis for the Slaughters Compressor Station can be found in Appendix 9C of the ER. The $NO_x$ emission rate for the proposed turbine varies depending on operating load. In order to provide a comprehensive analysis of the potential $NO_2$ impacts from the Project, the dispersion modeling analysis examines $NO_2$ impacts at full load conditions as well as the worst-case hourly emission rate (which occurs at 40% load). As illustrated in the dispersion modeling analysis found in Appendix 9C of the ER, the modeled concentrations for each criteria pollutant are below the significant impact levels established by the EPA. As outlined in Resource Report 9, the Project is deemed to not cause or contribute to an exceedance of a National Ambient Air Quality Standards, and no further modeling is required.

The existing Slaughters Compressor Station is currently a major source for $NO_x$, CO, VOC, formaldehyde, and total HAP and therefore, operates under a Title V permit issued by the Kentucky Department for Environmental Protection – Division of Air Quality ("KDEP"). As shown in Table 9.2-7, potential emissions from the Slaughters Compressor Station will remain above the Title V major source thresholds upon completion of the Project. As such, Texas Gas submitted an application to KDEP for a minor revision to the Title V permit to authorize construction and authorization of the emission sources to be added with the Project.

## VI.
## ENVIRONMENTAL ASSESSMENT

### *An Environmental Impact Statement Is Not Necessary to Address GHG Emissions*

The Commission should determine that an EIS is not necessary to address the Project's GHG emissions because the Project will result in a net decrease in methane, $NO_x$ and carbon monoxide emissions. The Commission recently determined that it is necessary to prepare an EIS for certain proposed projects to "assist the Commission in its consideration of the Project's

JA008

contribution to climate change."[31]  The Commission's purpose in preparing the EIS appears to be to determine whether increases in GHG emissions related to a proposed project will have a significant adverse effect on climate change.[32]

An EIS is not required to evaluate GHG emissions associated with Texas Gas' proposed Project because the Project *will not have any adverse effect on climate change*.  The Project will result in an *overall net decrease* in GHGs, methane, $NO_x$ and carbon monoxide emissions.  The purpose of the Project is to serve CenterPoint's A.B. Brown Project by transporting natural gas to fuel CenterPoint's proposed new 460 MW natural gas-fired electric generating facilities. CenterPoint's new gas-fired generation facilities are part of CenterPoint's implementation of its preferred electric generation portfolio, which is designed to allow CenterPoint's to (1) integrate up to 1,000 MW of renewable energy resources (wind and solar) into the electric grid, (2) retire 580 MW of coal-fired generating facilities, and (3) to exit CenterPoint's 150-MW stake in another coal plant.  CenterPoint estimates GHG emission reductions of approximately 35 million metric tons of carbon dioxide equivalent ($CO_{2e}$) through 2039 as a result of the A.B. Brown Project.  CenterPoint's preferred electric generation portfolio is estimated to reduce lifecycle greenhouse gas emissions, which includes methane, by nearly 60% over the next 20 years and a reduction in direct carbon dioxide emissions by 75% from 2005 levels by 2035.  The Commission should conclude that Texas Gas' Project will result in a substantial reduction in existing downstream GHG emissions.

---

[31] *See, e.g., Tennessee Gas Pipeline Company, LLC.*, Notice of Intent to Prepare an Environmental Impact Statement for the Proposed East 300 Upgrade Project and Schedule for Environmental Review, Docket No. CP20-493-000 (May 27, 2021).

[32] *See. e.g., Tuscarora Gas Transmission Co.*, 175 FERC ¶ 61,147 (2021) (Chairman Glick and Commissioner Clements dissenting in part on the basis that stating that the Commission should have prepared an EIS to examine a proposed project's GHG emissions and "whether the Project's adverse effect on climate change is significant.") ("*Tuscarora* Dissent").

JA009



**Texas Gas Transmission, LLC**

**Resource Report No. 1**

**General Project Description**

**Henderson County Expansion Project**

**June 2021**

JA010

Centaur 50 turbine compressor unit[1] with approximately 4,863 horsepower (hp)[2], piping modifications, and other auxiliary appurtenant facilities at Texas Gas' existing Slaughters Compressor Station located in Webster County, Kentucky.

In addition, Texas Gas also requests authorization to make the following modifications at its Slaughters Compressor Station: (i) abandon in place Compressor Unit 5, a 1,320-hp Clark HPA-6 unit, and (ii) transition the two other existing 1,320-hp Clark HPA-6 units (Unit 6 and Unit 7) from primary operating units to standby units. Unit 5 to be abandoned is inactive, is now unreliable, and is no longer integral to the Texas Gas system or required to meet its firm transportation obligations in this area. Unit 6 and Unit 7 will transition from primary operating units to standby units to be operated only in limited circumstances during maintenance or unplanned outages scenarios. Neither Unit 6 nor Unit 7 add additional capacity on Texas Gas' Slaughters-Montezuma system or mainline system and, going forward, will not be required to meet its firm transportation obligations in this area.

In support of this Application, Texas Gas has prepared, as applicable, the 12 resource reports per 18 Code of Federal Regulations (CFR) §§ 157.14(a)(6-a), 380.3, and 380.12. Volume I-A contains Resource Reports 1 through 12 along with the publicly available appendices to the resource reports. Texas Gas requests, pursuant to 18 CFR § 388.112, that the information in Volume II be accorded **Privileged** treatment as it includes culturally sensitive resources information and commercially sensitive agreements. Pursuant to Order No. 702, 18 CFR § 388.112, Volume III contains **Critical Energy Infrastructure Information** (CEII) attachments and appendices to the resource reports.

## 1.2    PROPOSED FACILITIES

### 1.2.1   Purpose and Need

CenterPoint's 2020 Integrated Resource Plan (2020 IRP) evaluates its focus on exploring all new and existing supply-side and demand-side resource options to reliably serve its customers over the next 20 years. CenterPoint's 2020 IRP demonstrates that a diversified mix of generation resources, including the addition of significant solar and wind energy resources, the retirement or exit of four coal-fired units, the use of less natural gas generation (as compared to the 2016 IRP), and a continued investment in energy efficiency, would best balance cost and reliability.

---

[1] The new unit is currently Solar Turbines Inc.'s lowest emitting unit on the market.
[2] The listed hp is based on the Site Rate hp. The National Electric Manufacturer Association hp is 5,481, and the International Organization for Standardization (ISO) standard conditions hp is 6,274.

JA011

CenterPoint's Preferred Portfolio is estimated to reduce lifecycle greenhouse gas emissions, including methane, by nearly 60 percent over the next 20 years, with direct carbon dioxide emissions reduced by approximately 75 percent by 2035 when compared to 2005 levels.

Texas Gas' Project will support CenterPoint's AB Brown Project, which will utilize flexible natural gas combustion turbines to support CenterPoint's new intermittent renewable resources and to replace the retiring coal-fired units. The firm transportation service agreement contemplated in the precedent agreement allows CenterPoint to serve its AB Brown Plant with supplies received onto Texas Gas' system at various receipt points of interconnect with other interstate pipelines. This Project supports CenterPoint's 2020 IRP by providing the reliability of intermittent natural gas service to support renewable resources and the diversity of generation resources. The natural gas transportation service Texas Gas provides is critical for this transition and for the economic development and advancement of renewable energy sources.

Upgrades to the existing receipt M&R station will allow additional southbound capacity onto Texas Gas' mainline system, and the additional compression at the Slaughters Compressor Station will allow Texas Gas to increase the northbound capacity on its Slaughters Montezuma system between the Slaughters Compressor Station and the Robards Junction. The proposed Henderson County Lateral will extend from an interconnect with Texas Gas' existing Slaughters-Montezuma System at the Robards Junction to the AB Brown Plant site, and the proposed AB Brown M&R Station will be the custody transfer measurement between Texas Gas and CenterPoint located at the AB Brown Plant site.

### 1.2.2   Location and Description of Facilities

The Project facilities will be located in Henderson and Webster counties, Kentucky and Posey and Johnson counties, Indiana, as depicted in the Project Mapping provided as Appendix 1A. The Project facilities are described in the following sections and are summarized in Table 1.2-1.

JA012

**UNITED STATES OF AMERICA**

**BEFORE THE FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Texas Gas Transmission, LLC | ) | Docket No. CP-21-467-000 |

**COMMENTS OF CENTERPOINT ENERGY INDIANA SOUTH**

Comes now Southern Indiana Gas and Electric Company d/b/a/ CenterPoint Energy Indiana South ("CenterPoint") and respectfully submits comments and requests that the Commission grant the Certificate of Public Convenience and Necessity ("Certificate") requested by Texas Gas Transmission, LLC ("Texas Gas") in this proceeding.

CenterPoint is a vertically integrated retail electric utility serving approximately 145,000 retail customers in Southwestern Indiana. As an Indiana public utility, CenterPoint is subject to the regulation of the Indiana Utility Regulatory Commission ("IURC") with respect to its retail electric operations in Southwestern Indiana. With respect to those operations, CenterPoint is a member and load serving entity within the Midcontinent Independent System Operator ("MISO"). CenterPoint is also a public utility subject to the jurisdiction of this Commission. CenterPoint is a party to this docket.

I. **CenterPoint Supports the Grant of a Certificate for the Henderson County Project.**

CenterPoint supports Texas Gas' application for a certificate of public convenience and necessity to construct a pipeline (the "Henderson County Project") to provide gas service to two combustion turbines ("CTs") CenterPoint plans to construct in Posey County, Indiana. Construction of these CTs are an integral part of CenterPoint's plans to transition its coal-fired generation facilities to a generation fleet composed of 700 to 1,000 megawatts ("MWs") of new

1

renewable resources and 460 MWs from the proposed new CTs.  The CTs play a critical role in this transition by providing a dispatchable generation facility to support the renewables during periods when renewable resources are unable to produce energy.  CenterPoint must move quickly to ensure this transition can be accomplished while maintaining reliability for its retail customers because it must retire its A.B Brown Generating Station ("A.B. Brown Plant") by October, 2023 to avoid making significant capital investments to bring the facility into compliance with environmental regulations—capital investments that CenterPoint's modeling indicates will be more costly to its retail customers than transitioning to renewables supported by quick start and fast ramping CTs.  Commission approval of the Henderson County Project by September 16, 2022 is crucial to ensure timely construction of the gas lateral so that the CTs are available to support renewable resources within a reasonable time after the A.B. Brown Plant's planned retirement.

**II.     CenterPoint's Generation Transition**

For decades, CenterPoint has relied predominantly on its fleet of coal-fired generation facilities to serve the demands of its retail electric customers.  CenterPoint's current generation fleet is comprised of the following facilities:

2

| Unit | Installed Capacity ICAP (MW) | Primary Fuel |
|---|---|---|
| A.B. Brown 1 | 245 | Coal |
| A.B. Brown 2 | 245 | Coal |
| F.B. Culley 2 | 90 | Coal |
| F.B. Culley 3 | 270 | Coal |
| Warrick 4 | 150 | Coal |
| OVEC | ≈32 | Coal |
| A.B. Brown 3 SCGT | 80 | Gas |
| A.B. Brown 4 SCGT | 80 | Gas |
| Blackfoot | 3 | Landfill Gas |
| Benton County PPA | 30 | Wind |
| Fowler Ridge PPA | 50 | Wind |
| Oak Hill Solar | 2 | Sun |
| Volkman Solar | 2 | Sun |
| Troy Solar | 50 | Sun |

During the 2020 calendar year, approximately 94.4% of CenterPoint's electricity was supplied by its coal-fired generation fleet.

CenterPoint's recent Integrated Resource Plans ("IRPs") have demonstrated that customers will benefit from transitioning away from a heavy reliance on coal-fired generation resources. The IURC promulgated rules in 1995 requiring Indiana public utilities to periodically prepare IRPs to evaluate future generation needs.[1] An IRP is designed to evaluate the generation portfolio required to reliably meet customer demands for electricity in a cost-effective manner over a 20-year planning horizon. The demands for generation are driven both by customers' use of the system during peak days and the requirement to satisfy MISO's planning reserve margin requirement

---

[1] See 170 IAC 4-7-1, *et seq.* (2020).

("PRMR").[2]  While the IURC does not approve CenterPoint's IRPs, the Director of its Research, Policy and Planning Department issues a report on each utility's IRP, offering both commentary on the techniques used in the current planning period and recommendations for improvement in future IRPs.  The IRP process also includes significant stakeholder input, including allowing stakeholders to file comments with the IURC's Director.  The IURC focuses on balancing costs borne by customers against ensuring a reliable supply of electricity.  In recent years, the IURC has urged retail electric suppliers to focus on stress testing generation portfolios in various potential future market conditions to evaluate how well a portfolio reliably serves customers across a variety of potential future scenarios.  These futures consider the impact of more rigorous environmental regulations, changing fuel prices, changing electric demand and other model inputs which must be forecasted.

Prior to 2016, CenterPoint's IRPs demonstrated that continuing to rely on its existing coal-fired generating fleet, along with some gas and a small portion of renewables, offered customers the lowest cost option to reliably serve their electricity demands over the applicable 20-year planning period.  Beginning with CenterPoint's 2016 IRP, CenterPoint's analysis demonstrated that continuing to operate its coal fired generation over the 20-year planning period was not the most economical decision for retail customers, particularly given the significant capital investment that was necessary to continue operating the coal plants in compliance with environmental regulations.  CenterPoint's 2016 IRP called for retirement of a large portion of its coal-fired generation fleet starting in 2023 and indicated that replacing that generation with a combined cycle gas turbine ("CCGT") and some additional renewables was a more economical option.

---

[2] MISO's PRMR is based on a loss of load expectation study that determines a reasonable level of capacity beyond what is necessary to meet CenterPoint's peak planning day to ensure the reliability of the transmission system.

Prior to constructing new generation facilities, utilities are required to obtain a certificate of public convenience and necessity ("CPCN") from the IURC. *See* Ind. Code § 8-1-8.5-2 (2020).[3] CenterPoint sought a CPCN to construct a CCGT. In evaluating this request, the IURC urged CenterPoint to consider off-ramps and a more diversified generation portfolio. CenterPoint incorporated the IURC's recommendations in its 2020 IRP. The preferred portfolio from that IRP calls for CenterPoint to retire most of its coal-fired generation as soon as practical and replace that capacity with 700-1000 MWs of renewable energy supported by two new CTs.

### III.    CenterPoint's Generation Transition Provides Significant Benefits to the Public.

The generation transition CenterPoint is pursuing brings significant benefits to both its customers and the public in general. The 2020 IRP concluded that transitioning to the renewable generation resources and CTs offered among the lowest present value revenue requirement and performed well against a several potential future states. *See* 2019/2020 Integrated Resource Plan, Vectren, a CenterPoint Energy Company, pp. 34-36 &.225-226 (available at https://www.in.gov/iurc/files/2019-2020-Vectren-IRP-Volume-1-of-2.pdf) Said differently, the generation transition CenterPoint is pursuing positions its customers to receive reliable electric service at among the lowest cost of reasonable alternatives under a wide variety of potential future regulations, fuel costs and market conditions.

The transition also offers significant benefits to the public from an environmental standpoint. CenterPoint's preferred electric generation portfolio is estimated to reduce lifecycle greenhouse gas emissions, including methane, by nearly 60% over the next 20 years and direct carbon dioxide emissions by 75% from 2005 levels by 2035. Other emissions, ranging from $So_2$ $H_2SO_4$, particulate matter, $NO_x$, and mercury along with coal combustion residual (fly ash, bottom

---

[3] The IURC considers the results of a utility's IRP in weighing whether to grant a CPCN. Ind. Code § 8-1-8.5-3 (2020).

ash and scrubber by-product) and other water pollutants derived from the coal plants will be reduced or completely eliminated. CenterPoint estimates the new gas-fired generating turbines will be dispatched only 2%-7% of total available hours per year—the remainder of the year CenterPoint anticipates relying primarily on renewable resources.

In the future, CenterPoint may be able to further reduce carbon emissions from the CTs by firing them with hydrogen rather than natural gas. The CTs CenterPoint anticipates acquiring are currently able to burn 5%-10% hydrogen and with modifications can currently burn up to 30% hydrogen, further reducing carbon emissions. The CTs manufacturer is conducting research and development efforts to enable the CTs, with modifications, to operate on 100% hydrogen in the future. CenterPoint may be able to utilize a proposed 300 MW solar project located near the CTs to produce green hydrogen for the CTs in the future.

IV.     **Timely Construction of the Henderson County Project is Critical to Execution of CenterPoint's Generation Transition Plan.**

CenterPoint is confronted with timelines for investment in generation that require it to move now to replace its coal fired generation. As CenterPoint moves away from coal towards incorporating significant levels of intermittent, renewable generation resources, the CTs are the most economical option to support this transition from a reliability perspective. The 2020 IRP evaluated other alternatives to reliably support the renewable generation resources including batteries, but found that given the current cost of energy storage technology and the current technological limit of available storage options, the CTs provide a lower cost, more resilient support for renewable energy.

CenterPoint cannot wait for energy storage technologies to mature to offer similar reliability characteristics to CTs with similar economic impacts. Compliance deadlines in the Coal Combustion Residuals ("CCR") rule and the Effluent Limitation Guidelines ("ELG) (both set forth

in 40 C.F.R. 423) require the A.B. Brown Plant's retirement by October 14, 2023. CenterPoint must have reliable support for its renewable transition plan within this time frame to enable its movement away from coal-fired generation. Absent the ability to demonstrate reliability through this transition, CenterPoint may be forced to invest in the A.B. Brown Plant to keep it operating beyond the 2023 deadline.

The timelines to construct the CTs and ensure reliable capacity to support CenterPoint's transition to renewable energy depend on the availability of the Henderson County Project. Indiana law requires CenterPoint to receive a CPCN from the IURC prior to commencing construction on generation resources greater than 80 MWs. Ind. Code § 8-1-8.5-2. CenterPoint has filed for a CPCN to construct the CTs and believes it may receive an order from the IURC addressing that relief in the summer of 2022.[4] *In re Petition of Southern Indiana Gas and Elec. Co. d/b/a CenterPoint Energy Indiana South*, Cause No. 45564 (available at https://iurc.portal.in.gov/docketed-case-details/?id=ab9e3466-6ecf-eb11-bacf-001dd801c642). The CTs are expected to take approximately 15 months for design, fabrication, and delivery. Once the CTs are delivered, the erection process is expected to take approximately eight to twelve months with the checkout, startup, and commissioning processes expected to take an additional four months. CenterPoint expects the CTs will be available by the fourth quarter of 2024. Consequently, CenterPoint is already facing a gap of 12 to 15 months between closing of the A.B. Brown Plant and the ability to rely on the CTs. Capacity can be secured from other resources to bridge this gap, but reliance on bi-lateral capacity markets for longer periods of time presents undue risk considering MISO's projected capacity deficit's for Zone 6—the zone that CenterPoint

---

[4] The IURC has already conducted an evidentiary hearing on CenterPoint's first CPCN request for 400 MWs of solar and CenterPoint is expecting an order by mid-November 2021. *In re Petition of Southern Indiana Gas and Elec. Co. d/b/a CenterPoint Energy Indiana South*, Cause No. 45501 (available at https://iurc.portal.in.gov/docketed-case-details/?id=749578c7-fc75-eb11-a812-001dd8014dad).

is located in.  *See* MISO Update:  What is Resource Adequacy, How is it Addressed and How is the OMS-MISO Survey Used? (Aug. 25, 2020) available at https://www.in.gov/iurc/files/MISO-RA-and-OMS-Survey.pdf).

**V.  Indiana's Reliability Focus Renders the CTs an Important Component of the Transition to Renewables.**

Legislators in Indiana have focused keenly on ensuring that electric utilities operating within the state are able to ensure reliable supplies of electricity.  While there is growing recognition in the Indiana Legislature of the benefits that renewable energy can provide, skepticism about the ability of renewable energy to ensure a reliable supply of electricity linger. *See e.g.* Final Report, 21st Century Energy Policy Development Task Force (Nov. 19, 2020) available at http://iga.in.gov/documents/7b8200b2 ("states such as California that have not established such [reliability] metrics, goals, and mechanisms, and that have simultaneously invested heavily in renewable resources before sufficient system redundancies were in place, and while neglecting to invest in transmission and distribution infrastructure, have experienced rolling brownouts and some of the highest electricity prices in the nation.").  In 2019, the Indiana Legislature established the 21st Century Energy Task Force ("Task Force") to explore the impact that emerging technologies and transition away from fossil fuels might have on Indiana.  *See* INDIANA OFFICE OF ENERGY DEVELOPMENT, 21ST CENTURY ENERGY TASK FORCE, https://www.in.gov/oed/indianas-energy-policy/21st-century-energy-task-force/ (last visited July 9, 2021)*.*  Based on the findings of the Task Force, the Indiana Legislature enacted Ind. Code § 8-1-8.5-13 ("Section 13") in 2021.  Among other things, Section 13 requires CenterPoint (and other IURC-jurisdictional electric utilities) to annually file reports with the IURC designed to demonstrate access to sufficient electric capacity to meet the summer and winter peaking needs of customers over the next three years.  Section 13(h).  Section 13 authorizes the IURC to initiate an

investigation and, if appropriate, compel the public utility to acquire sufficient generation capacity resources to ensure reliability. Sections 13(n) and (o). The Legislature also extended the Task Force into 2021 to continue focusing on reliability.

CenterPoint believes, based on this legislative activity, that the success of its generation transition will be greatly enhanced by constructing the CTs and demonstrating to legislative stakeholders that its transition to renewable energy will be accomplished while ensuring the reliability for its customers.

## VI.    Conclusion

For the foregoing reasons, CenterPoint supports Texas Gas's Certificate.

Respectfully submitted,

/s/ P. Jason Stephenson
Southern Indiana Gas and Electric Company d/b/a/ CenterPoint Energy Indiana South
211 N.W. Riverside Drive
Evansville, IN 47708
(812) 491-4231

**CERTIFICATE OF SERVICE**

I certify that I have, this 30th day of July, 2021, served a copy of the foregoing upon each

person listed in the official service list compiled by the Secretary in this proceeding.

/s/ P. Jason Stephenson
Southern Indiana Gas and Electric Company
d/b/a/ CenterPoint Energy Indiana South
211 N.W. Riverside Drive
Evansville, IN 47708

Attorney for
SOUTHERN INDIANA GAS AND ELECTRIC
COMPANY D/B/A/ CENTERPOINT ENERGY
INDIANA SOUTH

# FERC Docket No. CP21-467-000

# Exhibit A to

# Protest and Comment of Citizens Action Coalition of Indiana

**SOUTHERN INDIANA GAS AND ELECTRIC COMPANY**

**D/B/A**

**CENTERPOINT ENERGY INDIANA SOUTH**


**CAUSE NO.** 45564


**DIRECT TESTIMONY**

**OF**

**ANGILA M. RETHERFORD**

**VICE PRESIDENT, ENVIRONMENTAL AND CORPORATE RESPONSIBILITY**


**ON**


**FEDERAL ENVIRONMENTAL REGULATIONS APPLICABLE TO PETITIONER'S ELECTRIC GENERATION FLEET**


**SPONSORING PETITIONER'S EXHIBIT NO. 4**

1    regulatory initiatives requiring significant reductions in the discharge of pollutants into
2    water bodies through revisions to the applicable wastewater discharge limits, and requiring
3    the closure, and, if necessary, the remediation, of surface impoundments containing
4    CCRs.  The Trump administration sought to reconsider certain of these new regulatory
5    requirements; however, the net effect of these rule reconsiderations was to bring forward
6    by two months the final ash pond disposal cessation deadline under the CCR rule ,
7    effectively requiring completion of all ash handling modifications at the A.B. Brown
8    Generating Station no later than October 2023.
9
10   Q.   **What current federal and state regulations are applicable to Petitioner's electric**
11        **generating units at issue in this proceeding?**
12   A.   In 2015 the U.S. EPA finalized two major federal regulatory initiatives focusing on
13        wastewater discharges and ash handling—the Effluent Limitation Guidelines ("ELG") and
14        CCR rules which established new wastewater discharge limitations, new ash handling
15        requirements and the forced closure of unlined ash ponds that could not meet the
16        requirements set out in the CCR rule. Most recently with respect to air emissions, on March
17        15, 2021, U.S. EPA finalized its Revised Cross-State Air Pollution Rule Update (CSAPR
18        Update), setting new more stringent NOx ozone season limitations for coal-fired
19        generating units in Indiana.
20
21   Q.   **How do these regulations affect the continued use of Petitioner's coal-fired**
22        **generating units?**
23   A.   Compliance with the CCR rule is forcing the closure of Petitioner's A.B. Brown Generating
24        Station because the current cease disposal date for bottom ash and fly ash has come and
25        gone (April 2021).  Petitioner has proposed construction of a small lined CCR compliant
26        pond that is required in order for U.S. EPA to approve the pending extension request to
27        continue to use the existing unlined ash pond through October 12, 2023.  However, the
28        construction of that pond will not affect the larger issue, which, as I describe later is that
29        compliance with the ELG and CCR rules would require additional further significant
30        investment at Petitioner's A.B. Brown Generating Station to continue operation beyond
31        October 15, 2023, because the deadline for prohibition of fly ash transport water under
32        ELG is a firm December 31, 2023, regardless of whether there is a CCR-compliant pond
33        of sufficient size available for further disposal.  Petitioner would also be required to permit

1   request does not have sufficient capacity to handle bottom ash from Units 1 and 2 through
2   December 2025 (i.e. the ELG extension date for bottom ash).  As I mentioned previously,
3   it is not feasible to get a larger pond built within the short CCR Part A Reconsideration
4   time frame given existing space constraints and permitting requirements.  And even if it
5   was feasible to build a larger CCR compliant pond within the time frame required in the
6   CCR Part A Reconsideration rule of sufficient size to continue to receive ash, it simply
7   would <u>not</u> negate the need to complete the dry fly ash conversions by December 2023 (an
8   ELG requirement) and permit and complete construction of new landfill capacity to
9   continue to dispose of scrubber by-product (no later than the end of 2023).  Effectively,
10  the question of the potential capability of continuing to dispose of bottom ash in a lined
11  pond through 2025 under the ELG Reconsideration becomes moot.  The only reason it
12  works at Culley Unit 2 is because Petitioner previously completed the dry fly ash handling
13  conversions and there are no other significant additional environmental projects that would
14  need to be completed to continue to operate Culley Unit 2 through 2025.
15
16  **Q.    In summary, what environmental projects would need to be completed prior to**
17  **October 15, 2023, (when the existing ash pond ceases) in order to keep the Brown**
18  **units in operation?**
19  A.    In summary, it cannot be done.  In order to keep Brown Units 1 and 2 in operation beyond
20        October 15, 2023 Petitioner would be required to cease disposal at the existing ash pond,
21        construct a new lined pond of sufficient size to recirculate the scrubber process water for
22        both units and provide sufficient hydraulic capacity for solids to settle (to comply with
23        current NPDES wastewater discharge limits for Total Suspended Solids),  construct a new
24        wastewater treatment system to ensure continued compliance with the current NPDES
25        wastewater discharge limits for copper, mercury and selenium, complete the ash handling
26        modifications necessary to cease discharge of both fly ash and bottom ash transport water
27        (since there will no longer be an available CCR-compliant ash pond), and design, permit
28        and construct a new CCR-compliant extension of the existing landfill.
29
30  **Q.    Are these CCR and ELG compliance requirements modeled in the Petitioner's**
31  **Integrated Resource Plan for the A.B. Brown Generating Station?**
32  A.    Yes, the compliance requirements detailed above are modeled under the business as
33        usual scenario.

| | | |
|---|---|---|
| | ) | |
| Texas Gas Transmission, LLC | ) | Docket No. CP21-467-000 |
| | ) | |

### SCOPING COMMENTS ON ENVIRONMENTAL ISSUES
### FOR THE PROPOSED
### HENDERSON COUNTY GAS PIPELINE EXPANSION PROJECT
### SUBMITTED BY CITIZENS ACTION COALITION OF INDIANA

Pursuant to the Commission's Notice of Scoping Period Requesting Comments on Environmental Issues issued in this proceeding on July 29, 2021, Citizens Action Coalition of Indiana ("CAC") respectfully submits these comments on the appropriate scope of environmental review that the Federal Energy Regulatory Commission ("FERC" or "Commission") must undertake under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Commission's regulations, 18 C.F.R. pt. 380, in this proceeding that would consider the application of Texas Gas Transmission, LLC ("Texas Gas" or "TGT") for a Certificate of Public Convenience and Necessity ("CPCN") under Section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c). The appropriate scope of environmental review over Texas Gas' proposed pipeline lateral construction and mainline facility upgrades is extensive, and the Commission should carry out its statutory responsibilities with the gravest regard for human health and the quality of the natural environment.

JA027

representations to the Indiana Utility Regulatory Commission that the new gas power plant would run less than 10% of the time, that could certainly change as economic, regulatory, technological, or other conditions warrant.  Ownership of the new gas power plant could change in the future, for one thing.  CenterPoint has not yet applied to Indiana regulatory authorities for an air emissions permit for the proposed new gas generating plant.[5]  The Commission should consider that it would be helping to enable 50 years' worth of gas power plant emissions if it authorizes the projects at issue in this proceeding, and analyze the greenhouse gas emissions accordingly.

The Commission's environmental review should not include any netting of greenhouse gas emissions reductions resulting from the future closure of the A.B. Brown coal-fired generating plant, at the same site as CenterPoint's proposed gas-fired power plant.   The "effects" that FERC is obligated to consider in reviewing this application "do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action."  40 C.F.R. § 1508.1(g)(2).  Here, the A.B. Brown coal power plant will retire in October 2023 regardless of the outcome of this proceeding, or regardless of whether CenterPoint builds the new gas power plant.  CenterPoint has planned the retirement of the A.B. Brown coal plant dating back to its 2016

---

[5] IURC Cause No. 45564, CenterPoint Energy Indiana South's Response to Citizens Action Coalition's Data Request CAC 2-5, August 22, 2021.  A true and correct copy of this document is attached as Exhibit A.

JA028

Integrated Resource Plan[6] submitted to Indiana authorities; CenterPoint also stated its plans to retire A.B. Brown in 2023 in an Indiana Utility Regulatory Commission ("IURC") proceeding[7] in 2018-2019 and again[8] in testimony filed this year at the IURC. In this year's testimony, CenterPoint's Vice President of Environmental Compliance and Corporate Responsibility explained that federal environmental requirements are forcing CenterPoint to close A.B. Brown to close in October 2023 and that the retrofits required to comply with those federal rules "cannot be done."[9] Moreover, the Commission has no authority over the decision of a local Indiana electric utility such as CenterPoint to retire a generating resource. The retirement of the A.B. Brown coal power plant will occur regardless of the outcome of this proceeding. For these reasons, the Commission is prohibited under federal regulations from considering any greenhouse gas effects associated with the retirement of A.B. Brown.

Relatedly, the Commission cannot consider the greenhouse gas effects of "CenterPoint's new preferred portfolio" from its most recent Integrated Resource Plan, as Texas Gas suggests.[10] The Commission is not approving a resource portfolio for an Indiana utility. The Commission is approving a new pipeline lateral

---

[6] Southern Indiana Gas and Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc.: 2016 Integrated Resource Plan, https://www.in.gov/iurc/files/SIGECO-2016-IRP.pdf, at 44.

[7] IURC Cause No. 45052, Direct Testimony of Wayne D. Games on behalf of Southern Indiana Gas and Electric Company, at 13.

[8] IURC Cause No. 45564, Direct Testimony of Ms. Angila M. Retherford (included as Exhibit A to CAC's Protest and Comment dated July 30, 2021 in this proceeding).

[9] *Id.* at 12:19.

[10] TGT Application at 9; Resource Report No. 9 at 9-51.

JA029

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC        )        Docket No. CP21-467-000

**MOTION FOR LEAVE TO ANSWER AND ANSWER
OF TEXAS GAS TRANSMISSION, LLC**

Pursuant to Rule 213 of the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure,[1] Texas Gas Transmission, LLC ("Texas Gas"), submits this Answer to the scoping comments filed by Citizens Action Coalition of Indiana ("CAC") and Sierra Club. The Commission should reject CAC's and Sierra Club's mischaracterizations of Texas Gas' Henderson County Expansion Project ("Project") and the policies that govern the Commission's environmental review of the Project. The Commission should hold that the Project is required by the public convenience and necessity and issue an order authorizing the Project no later than September 16, 2022.

## BACKGROUND

Texas Gas filed, on June 25, 2021, an application to construct the Henderson County Expansion, which is designed to serve the two new natural gas-fired combustion turbines ("CTs") to be constructed by Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("CenterPoint") at its A.B. Brown Generating Station ("A.B. Brown Plant") in Posey County, Indiana.[2] The Project will allow CenterPoint to implement its generation transition initiative, under which CenterPoint plans to substantially reduce greenhouse gas ("GHG") emissions by, among other things, retiring

---

[1] 18 C.F.R. § 385.213 (2021).
[2] *See* Texas Gas Transmission, LLC, Abbreviated Application for a Certificate of Public Convenience and Necessity, Abandonment Authorization and Related Authorizations, Docket No. CP21-467-000 (June 25, 2021) ("Application").

JA030

existing coal-fired generating facilities located at the A.B. Brown Plant and adding 700 to 1,000 megawatt ("MW") of new wind and solar resources in addition to the 460 MW from the new CTs that would be served by Texas Gas' Project.[3] The Project is intended to allow CenterPoint to maintain electric system reliability while also transitioning its generation portfolio to include more renewable resources.[4]

The Commission issued, on July 29, 2021, a notice of scoping period that requested comments on environmental issues for Texas Gas' proposed Henderson County Expansion Project.[5] CAC and Sierra Club, among others, submitted scoping comments on August 30, 2021.[6] Texas Gas submits the instant answer to respond to several mischaracterizations of the facts and legal precedent that relate to the Commission's review of the Project.

## ANSWER

**A.     Texas Gas Supports a "Hard Look" at the Environmental Impacts of the Project.**

The Commission should reject Sierra Club's contention that Texas Gas is "asking that the Commission approve new gas infrastructure without careful NEPA scrutiny."[7] Texas Gas is *not* seeking to avoid a rigorous environmental review of the project.  Texas Gas has specifically stated that "the Commission must take a 'hard look' at the

---

[3] In addition to enabling CenterPoint to retire the coal-fired units at the A.B. Brown Plant, the CTs and additional renewable resources will enable CenterPoint to retire an additional 90 MW coal-fired unit located at its F.B. Culley Generating Station and exit its 150 MW stake in the Warrick coal plant

[4] Texas Gas designed the Project to further reduce emissions by retiring an existing compressor unit; transitioning two existing compressor units to standby; and installing a Centaur 50 turbine, with an additive electric seal gas booster.

[5] Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Henderson County Expansion Project, Docket No. CP21-467-000 (July 29, 2021) ("Scoping Notice").

[6] Scoping Comments on Environmental Issues for the Proposed Henderson County Gas Pipeline Expansion Project Submitted by the Citizens Action Coalition of Indiana, Docket No CP21-467-000 (Aug. 30, 2021) ("CAC Scoping Comments"); Comments of Sierra Club in Response to Notice Requesting Comments on Environmental Issues, Docket No. CP21-467-000 (Aug. 30, 2021) ("Sierra Club Scoping Comments").

[7] Sierra Club Scoping Comments at 3.

JA031

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Texas Gas Transmission, LLC | )<br>)<br>) | Docket No. CP21-467-000 |

**MOTION FOR LEAVE TO REPLY AND REPLY**
**OF CITIZENS ACTION COALITION OF INDIANA**

Pursuant to Rule 212 of the Federal Energy Regulatory Commission's

("Commission" or "FERC") Rules of Practice and Procedure, Citizens Action

Coalition of Indiana ("CAC"), submits this Motion for Leave to Reply and Reply

("Reply") to Texas Gas Transmission, LLC's ("Texas Gas") Answer to the scoping

comments filed by CAC.[1] CAC submits this Reply to correct several misstatements

of law and fact offered in Texas Gas' Answer.[2]

## I.    Texas Gas' Application Potentially Subverts Newly Enacted State Law

Texas Gas' Answer exposes its effort to use this proceeding to potentially

circumvent a state defined process to evaluate the sufficiency of Southern Indiana

Gas and Electric Company d/b/a CenterPoint Energy Indiana South's

("CenterPoint") electric capacity resources. In support of both the Purpose and Need

---

[1] Reply comments may be accepted by the Commission when the comments assist the Commission in its decision-making process. *See, e.g.*, *Independent Energy Producers Ass'n v. California Ind. Sys. Op. Corp.*, 116 FERC ¶ 61,069 at P 23, order on clarification, 116 FERC ¶ 61, 297 (2006), reh'g denied, 119 FERC ¶ 61,266 (2007), order on reh'g, 121 FERC 61,276 (2007), remanded on other grounds; *City of Anaheim v. FERC*, 558 F. 3d 521 (D.C. Cir. 2009), order on remand, 128 FERC ¶ 61, 165 (2009).

[2] Motion for Leave to Answer and Answer of Texas Gas Transmission, LLC, Docket No. CP21-467 (filed September 21, 2021) ("Answer").

1

# FERC Docket No. CP21-467-000

# Reply of Citizens Action Coalition of Indiana
# to Answer of Texas Gas Transmission, LLC

# Exhibit A

**STATE OF INDIANA**

**INDIANA UTILITY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PETITION OF SOUTHERN INDIANA GAS AND ELECTRIC COMPANY d/b/a CENTERPOINT ENERGY INDIANA SOUTH ("CEI SOUTH") FOR (1) ISSUANCE OF A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY PURSUANT TO IND. CODE CH. 8-1-8.5 FOR THE CONSTRUCTION OF TWO NATURAL GAS COMBUSTION TURBINES ("CTs") PROVIDING APPROXIMATELY 460 MW OF BASELOAD CAPACITY ("CT PROJECT"); (2) APPROVAL OF ASSOCIATED RATEMAKING AND ACCOUNTING TREATMENT FOR THE CT PROJECT; (3) ISSUANCE OF A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY PURSUANT TO IND. CODE CH. 8-1-8.4 FOR COMPLIANCE PROJECTS TO MEET FEDERALLY MANDATED REQUIREMENTS ("COMPLIANCE PROJECTS"); (4) AUTHORITY TO TIMELY RECOVER 80% OF THE FEDERALLY MANDATED COSTS OF THE COMPLIANCE PROJECTS THROUGH CEI SOUTH'S ENVIRONMENTAL COST ADJUSTMENT MECHANISM ("ECA"); (5) AUTHORITY TO CREATE REGULATORY ASSETS TO RECORD (A) 20% OF THE FEDERALLY MANDATED COSTS OF THE COMPLIANCE PROJECTS AND (B) POST-IN-SERVICE CARRYING CHARGES, BOTH DEBT AND EQUITY, AND DEFERRED DEPRECIATION ASSOCIATED WITH THE CT PROJECT AND COMPLIANCE PROJECTS UNTIL SUCH COSTS ARE REFLECTED IN RETAIL ELECTRIC RATES; (6) IN THE EVENT THE CPCN IS NOT GRANTED OR THE CTs OTHERWISE ARE NOT PLACED IN SERVICE, AUTHORITY TO DEFER, AS A REGULATORY ASSET, COSTS INCURRED IN PLANNING PETITIONER'S 2019/2020 IRP AND PRESENTING THIS CASE FOR CONSIDERATION FOR FUTURE RECOVERY THROUGH RETAIL ELECTRIC RATES; (7) ONGOING REVIEW OF THE CT PROJECT; AND (8) AUTHORITY TO ESTABLISH DEPRECIATION RATES FOR THE CT PROJECT AND COMPLIANCE PROJECTS ALL UNDER IND. CODE §§ 8-1-2-6.7, 8-1-2-23, 8-1-8.4-1 ET SEQ., AND 8-1-8.5-1 ET SEQ. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CAUSE NO. 45564 |

**CENTERPOINT ENERGY INDIANA SOUTH'S RESPONSE TO SUNRISE COAL'S SECOND SET OF DATA REQUESTS TO CENTERPOINT ENERGY INDIANA SOUTH**

Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("Petitioner," "CenterPoint Indiana South" or "Company") pursuant to 170 IAC 1-1.1-16 and the discovery provisions of Rules 26 through 37 of the Indiana Rules of Trial Procedure, by its counsel, hereby submits the following

JA034

Document Accession #: 20210928-5080          Filed Date: 09/28/2021

2-22.    Please provide all studies, analyses, and estimates performed by or for CEIS related to the construction of a new CCR compliant pond that would allow AB Brown to continue to operate until 2026, 2027, or 2028?

**Response:**

As noted in Petitioner's response to Sunrise Coal DR 2-21, it is not feasible to build a pond with sufficient hydraulic capacity for the interim handling of bottom ash transport water and thus the plant must retire no later than October 2023 (the deadline for ceasing disposal in the existing ash pond).  Operation beyond October 2023 requires the bottom ash and fly ash modifications which were modeled in the IRP under the reference case.

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A
Washington, D.C. 20426

Re: EPA Comments on the Notice of Intent for the Henderson County Expansion Project
    (FERC Docket No. CP21-467-000).

Dear Secretary Bose:

The U.S. Environmental Protection Agency (EPA) has reviewed the referenced Notice of Intent (NOI) consistent with our responsibilities under Section 102(2)(C) of the National Environmental Policy Act (NEPA). The Henderson County Expansion Project would provide up to 220 million standard cubic feet of natural gas per day to Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South (CenterPoint) at its existing AB Brown Generating Station in Posey County, Indiana. The proposed project is located in the Henderson and Webster Counties in Kentucky (KY) and Posey and Johnson Counties, Indiana (IN).

The project proposal in KY involves:
- Henderson County Lateral – Construction of an approximately 24-mile-long, 20-inch-diameter natural gas transmission pipeline extending from a new tie-in facility in Henderson County, to the new AB Brown Metering and Regulation (M&R) Station in Posey County, IN.
- New ancillary facilities including a main line valve and tie-in facility in Henderson County
- Slaughters Compressor Station in Webster County – Installation of a new 4,863-horsepower Solar Centaur 50 turbine compressor unit with piping modifications and other appurtenant facilities, abandonment in place of the existing Compressor Unit 5, and placement on standby of existing Compressor Units 6 and 7.

The project proposal in IN involves:
- AB Brown M&R Station and Point of Demarcation Site in Posey County – Construction of a delivery M&R station, receiver facility, and a 0.08-mile-long, 16-inch-diameter interconnecting pipeline terminating at the new Point of Demarcation Site which would serve as CenterPoint's tie-in for project facilities for its AB Brown Plant.
- Based on Resource Report 1, approximately 1.2-mile-long of 20-inch-diameter new lateral
- Upgrades to an existing M&R station in Johnson County.

The proposed project would affect over 400 acres of land, permanently disturbing about 152 acres, and restoring 250 acres after the proposed construction. Almost fifty percent of the proposed pipeline would be collocated next to existing pipeline, utility, and road rights-of-way.

Based on our review of the NOI, the EPA has scoping comments and recommendations on purpose and need, resources to consider during impacts assessment process, direct, indirect and cumulative impacts, wetlands and waterbodies, environmental justice, air quality, climate change and greenhouse gas,

1

*Nine 8-digit HUCs were identified in KDFWR's CWCS (KDFWR 2005) for having the
highest richness of imperiled mussel specie. Among these nine HUCs, the upper Green
River ranked the highest in the state. Ten 8-digit HUCs were identified as having the highest
richness of imperiled fish and lamprey species across the state. For the fish and lamprey group,
the upper Green River ranked the second highest in the state.*

*The lower region of the Green River Service Area contains the most acreage of remaining
wetland area in Kentucky, despite significant wetland losses in this region. Approximately, 80%
of Kentucky's wetland acreage has been lost. The Green River basin has approximately 88,000
acres of wetlands remaining; the largest concentration of remaining wetland area in the
Commonwealth (The Kentucky Environmental Commission, 1995; KDOW, 2008). U.S. Fish &
Wildlife Service identified a proposed refuge on 23,000 acres of the lower Green River Service
Area known as Scuffletown Bottoms located between Henderson, KY and Evansville, IN. This
area has been cleared and farmed for a number of years. To the west of Henderson, KY KDFWR
owns a significant amount of public land, the Sloughs WMA, which is managed for wetlands. To
the east of Henderson and adjacent to the proposed USFWS refuge in Scuffletown Bottoms, the
Kentucky Division of Forestry owns a large tract of land restored to bottomland hardwood
wetlands. This area was targeted for waterfowl conservation as early as 1958 by the USFWS. It
has been identified again by the North American Waterfowl Management Plan in 1989 as a high
conservation priority for bottomland hardwood wetland restoration. Special use waters in the
Green/Tradewater River Basin Management Unit are designated in parts of 55 streams in 23
counties (40 I KAR 5:026 and 5:030). The majority of special use waters are located in the upper
portion (upstream of the Barren River confluence) of the Green River basin. There are thirty-one
14 digit HUC watersheds in the Green/Tradewater River Basin Management Unit that have been
identified in KDFWR's CWCS (KDFWR, 2005) as having the highest occurrence of aquatic
species with the greatest conservation need."*

**Climate Change and GHG:**  The NOI states that climate change and GHGs will be discussed in the
EIS.

<u>Recommendation</u>: The EPA recommends the DEIS estimate and analyze potential upstream and
downstream GHG emissions to fully disclose the estimated direct and indirect emissions, categorized by
GHG type, associated with the proposed action. We recommend avoiding percentage comparisons
between project-level and national emissions, which inappropriately diminish the significance of
project-level GHG emissions.

Also, include a detailed discussion of the project's GHG emissions in the context of national GHG
emission reduction goals over the anticipated project lifetime, and address the increasing conflict over
time between continued emissions and national GHG emissions reduction goals, including ways to avoid
or mitigate that conflict.

The EPA recommends utilizing the interim SC-GHG estimates established by the Interagency Working
Group on SC-GHG as part of your resources. Monetizing the net climate damages of GHG emissions
from net changes in direct and indirect emissions provides useful information to the public and
decisionmakers.

We recommend the EIS describe potential changes to the affected environment that may result from the

JA037

expected increased frequency, amount, and severity of precipitation events in the project area. Consider including future climate scenarios, such as those provided by the U.S. Global Change Research Program's National Climate Assessment (http://nca2018.globalchange.gov/). Discuss how the project increases resilience to the impacts of climate change. Provide information useful to determine whether the proposal includes appropriate construction and operation resilience and preparedness measures for the impacts associated with increased frequency, amount, and severity of precipitation events in the project area.

**Air Quality:** Impacts to air quality can occur from construction and operation of a natural gas pipeline and associated facilities. For example, air quality impacts may occur from the operation and maintenance of compressor stations required to push gases through pipe bores over considerable distances. Such risks include releases of oxides of nitrogen, metals, formaldehyde and BETX (benzene, ethyl benzene, toluene, and xylenes) from combustion-powered compressors.

The NOI does not disclose whether operation of one or more of the compressor stations would change (e.g., increase number of blowdowns, etc.) due to the construction and/or operation of the proposed project.

Recommendation: The EPA recommends discussing whether the currently proposed project will result in new construction and/or operational changes at other facilities (e.g., compressor stations) that have not been identified as part of this current proposal. The EIS should identify associated impacts (e.g., increase in methane emissions and noise, etc.) and mitigation measures to reduce impacts.

The EIS should also identify and discuss the potential impacts to air quality from construction and operation of the proposed project. The air quality analysis should address and disclose the project's potential effect on 1) all criteria pollutants under the National Ambient Air Quality Standards, including ozone; 2) any significant concentrations of hazardous air pollutants; and 3) public health. Relevant mitigation measures should be identified.

**Environmental Justice**: The NOI mentions EJ among the list of relevant areas to discuss.

Recommendation: The EPA recommends engaging communities with potential EJ concerns where regional environmental and human health impacts may occur. For example, air quality (due to construction and operations) and climate change may have impacts on a broader region than the direct impacts of the proposed action. Also, the project will impact consumer rates, which would affect low-income communities. We recommend the Draft EIS consider and disclose impacts to communities from this project considering impacts from past, present, and reasonably foreseeable planned actions. The EIS should consider whether affected communities may be experiencing burdens from existing pollution, the degree of social or health burdens they may be facing and whether the proposed action may potentially result in disproportionate impact in that context.

We recommend the EIS identify and address the socioeconomic impacts and benefits this project may have on communities. This would include, but is not limited to, identifying the number of workers that would be brought in to construct the project and duration of proposed construction and/or modification activities in the various communities. The EPA notes that there is a small community and a school east of the existing AB Brown Generating Facility site.

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC                    )                    Docket No. CP21-467-000

## ANSWER OF TEXAS GAS TRANSMISSION, LLC

Pursuant to Rule 213 of the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure,[1] Texas Gas Transmission, LLC ("Texas Gas"), submits this Answer to the scoping comments filed by Citizens Action Coalition of Indiana ("CAC"), Sierra Club, and the U.S. Environmental Protection Agency ("EPA") in response to the Commission's Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Henderson County Expansion Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review.[2]  The Commission should reject CAC's and Sierra Club's continued mischaracterizations of Texas Gas' Henderson County Expansion Project ("Project") and the policies that govern the Commission's environmental review of the Project.  The Commission should also address EPA's comments as discussed herein.  Upon completion of its environmental review of the Project, the Commission should conclude that the Project is required by the public convenience and necessity and issue an order authorizing the Project no later than September 16, 2022.

---

[1] 18 C.F.R. § 385.213 (2021).
[2] *Texas Gas Transmission, LLC*, Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Henderson County Expansion Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review, Docket No. CP21-467-000 (Oct. 7, 2021) ("NOI").

JA039

Slaughters Compressor Station and that the proposed changes to this compressor station are designed to significantly mitigate air emissions to facilitate a net improvement in air quality at this location. The proposed new C50 compressor unit at the Slaughters Compressor Station is equipped with the manufacturer's patented SoLoNox combustion technology integral to its design, and Texas Gas has opted to purchase the manufacturer's 9 ppm NOx turbine unit which is its lowest emitting unit.[18] Texas Gas is further proposing to abandon an existing compressor unit, Unit 5, and to transition two existing compressor units, Units 6 and 7, to standby.[19] These overall changes will result in a net reduction of 692.14 tpy of NOx and a net reduction of 206.19 tpy of methane at this location.[20]

The Project will also support additional regional air emission improvements by facilitating CenterPoint's energy transition, which includes the replacement of coal-fired generating facilities at CenterPoint's A.B. Brown Plant with new gas-fired turbines and renewable resources. CenterPoint has explained that "[g]as combustion turbines . . . inherently produce fewer regulated air emissions" as compared to coal-fired generation.[21] This is consistent with the U.S. Energy Information Administration's ("EIA") explanation that "[b]urning natural gas for energy results in fewer emissions of nearly all types of air pollutants and carbon dioxide (CO2) than burning coal or petroleum products to produce

---

[18] *See* Application at 31-32. Emissions will be further mitigated by Texas Gas' proposed installation of additive electric seal gas booster pump to keep the compressor seals pressurized when the unit is not running (which will greatly reduce methane emissions).
[19] *Id.* at 32.
[20] *Id. See also* Table 9.2-7 and Table 9.2-9 of the Environmental Report, attached to the Application as Exhibit F-I, Volume I-A.
[21] *In re Petition of Southern Indiana Gas and Elec. Co. d/b/a CenterPoint Energy Indiana South*, Cause No. 45564, Direct Testimony of Wayne D. Games, Sponsoring Petitioner's Exhibit No. 2 (Public) at 13, available at https://iurc.portal.in.gov/docketed-case-details/?id=ab9e3466-6ecf-eb11-bacf-001dd801c642 (emphasis added).

JA040

FERC Docket No. CP21-467-000

Reply to December 7th Answer
by Citizens Action Coalition of Indiana

Exhibit A

FILED
November 22, 2021
INDIANA UTILITY
REGULATORY COMMISSION

**STATE OF INDIANA**

**INDIANA UTILITY REGULATORY COMMISSION**

| | |
|---|---|
| PETITION OF SOUTHERN INDIANA GAS AND ELECTRIC COMPANY d/b/a CENTERPOINT ENERGY INDIANA SOUTH ("CEI SOUTH") FOR (1) ISSUANCE OF A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY PURSUANT TO IND. CODE CH. 8-1-8.5 FOR THE CONSTRUCTION OF TWO NATURAL GAS COMBUSTION TURBINES ("CTs") PROVIDING APPROXIMATELY 460 MW OF BASELOAD CAPACITY ("CT PROJECT"); (2) APPROVAL OF ASSOCIATED RATEMAKING AND ACCOUNTING TREATMENT FOR THE CT PROJECT; (3) ISSUANCE OF A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY PURSUANT TO IND. CODE CH. 8-1-8.4 FOR COMPLIANCE PROJECTS TO MEET FEDERALLY MANDATED REQUIREMENTS ("COMPLIANCE PROJECTS"); (4) AUTHORITY TO TIMELY RECOVER 80% OF THE FEDERALLY MANDATED COSTS OF THE COMPLIANCE PROJECTS THROUGH CEI SOUTH'S ENVIRONMENTAL COST ADJUSTMENT MECHANISM ("ECA"); (5) AUTHORITY TO CREATE REGULATORY ASSETS TO RECORD (A) 20% OF THE FEDERALLY MANDATED COSTS OF THE COMPLIANCE PROJECTS AND (B) POST-IN-SERVICE CARRYING CHARGES, BOTH DEBT AND EQUITY, AND DEFERRED DEPRECIATION ASSOCIATED WITH THE CT PROJECT AND COMPLIANCE PROJECTS UNTIL SUCH COSTS ARE REFLECTED IN RETAIL ELECTRIC RATES; (6) IN THE EVENT THE CPCN IS NOT GRANTED OR THE CTs OTHERWISE ARE NOT PLACED IN SERVICE, AUTHORITY TO DEFER, AS A REGULATORY ASSET, COSTS INCURRED IN PLANNING PETITIONER'S 2019/2020 IRP AND PRESENTING THIS CASE FOR CONSIDERATION FOR FUTURE RECOVERY THROUGH RETAIL ELECTRIC RATES; (7) ONGOING REVIEW OF THE CT PROJECT; AND (8) AUTHORITY TO ESTABLISH DEPRECIATION RATES FOR THE CT PROJECT AND COMPLIANCE PROJECTS ALL UNDER IND. CODE §§ 8-1-2-6.7, 8-1-2-23, 8-1-8.4-1 ET SEQ., AND 8-1-8.5-1 ET SEQ. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **CAUSE NO. 45564** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**DIRECT TESTIMONY OF ANNA SOMMER**

**ON BEHALF OF**

**CITIZENS ACTION COALITION OF INDIANA, INC.**

**NOVEMBER 19, 2021**

JA042

1 **Q.** **Did the Company consider using the Dogtown lateral and/or the existing gas**

2 **storage to reduce the size of the lateral pipeline it would build to serve the**

3 **proposed CTs?**

4 **A.** Seemingly not.  When asked about these options, the Company appeared to answer

5 the questions as if it were considering only whether each of these in isolation could

6 serve the units[31] and not whether one or both could reduce the size of the new

7 proposed lateral.

8 **Q.** **What options for gas transportation service did CEIS evaluate?**

9 **A.** CEIS has not been clear on this point.  The spreadsheet responsive to OUCC Data

10 Request 6.1(a), "Confidential 2020 IRP Options - ABB Gas Supply Analysis –

11 20191218" (included as Attachment AS-4-Confidential), shows that the only option

12 considered for 2 F-class or 2 H-class simple cycle gas turbines ("SCGTs") during

13 the 2019-2020 IRP was a 20" lateral.  CEIS Witness Paula Grizzle states in her

14 testimony that CEIS engaged in a "formal Request for Proposal ("RFP")…seeking

15 proposals for…desired pipeline services."[32]  When asked about this RFP in

16 discovery, CEIS stated, "The inclusion of the word 'formal' in Witness Grizzle's

17 testimony is in error. The RFP was verbal, with Petitioner contacting pipeline

18 companies and requesting proposals based upon the requirements Petitioner's

19 Witness Grizzle sets forth at Page 4, lines 21-31 of Petitioner's Exhibit No. 8."[33]

---

[31] CEIS Responses to CAC Data Requests 6-3 and 6-4 (included in Attachment AS-7).
[32] Direct Testimony of Paula Grizzle, CEIS Ex. 8, at page 4, lines 19 – 20.
[33] CEIS Response to CAC Data Request 6.14 (included in Attachment AS-7).

1    However, CEIS has not provided any analytical documentation showing

2    that supply configurations other than the proposed 20" lateral are not preferable or

3    capable of meeting the needs of the proposed CTs.

4    **Q.    What requirements did CEIS include in its evaluation of pipeline proposals?**

5    **A.**    In her testimony, Ms. Grizzle says that pipeline companies were asked (verbally)

6    to provide proposals that could offer the following services:[34]

7    • *Desire to replace coal-fired power plant with a natural gas turbine*
8    *power plant.*

9    • *May require new pipeline construction if upstream pipeline does not*
10   *have available capacity.*

11   • *Need quick start up options (20 minutes or less) and non-ratable gas*
12   *flow options.*

13   • *No-Notice firm supply is highly desired since no nomination is needed*
14   *for quick start up.*

15   • *Diverse Supply – ability to provide flexible receipt points from both the*
16   *North and South on pipeline system.*

17   • *Long term agreement – 20 years.*

18   • *Firm mainline capacity to meet full requirements up to 5,417*
19   *MMBTU/hour.*

20   • *Ability to finish build out with first flow in early 2024.*

21   **Q.    Is a flow rate of 5,417 MMBtu per hour required for the proposed F-Class**

22   **CTs?**

23   **A.**    No.  CEIS has provided conflicting information about the required gas flow rate,

24   but it is certainly less than 5,417 MMBtu per hour. It is just not clear exactly what

25   the correct number is.  In its response to Sierra Club Data Request 4-14(a), CEIS

26   stated:

---

[34] Direct Testimony of Paula Grizzle at page 4, lines 21 – 31.

**Attachment 3.1 Stakeholder Materials**





# VECTREN PUBLIC
# STAKEHOLDER MEETING

JUNE 15, 2020



## REMAINING OPTIONS A BETTER OPTION FOR CUSTOMERS THAN CONTINUING COAL OR CONVERSION



Continuing use of the Brown units with Coal or Bridge options (Conversion) did not perform well in our analysis.

- Less Affordable – BAU and Conversion options cost customers more over the twenty year period than 4 remaining portfolios in all scenarios.
  - Higher O&M –requires more people to operate
  - Higher on-going capital expenditures to keep the units running
  - Less flexibility to capture benefits of the market
- Continuing to utilize coal has a higher initial capital investment than remaining options. Conversion has slightly less upfront capital investment. Due to On-going capital expenditures to keep these options running, the remaining book life of these assets do not fully depreciate
- Less Flexible – slow start time (8-24 hrs.) and slow ramp rate (2-3 MW/Min) do not position us well to support our customers in a future with high solar penetration
- Less Reliable – converted units continue to utilize old equipment that is prone to break down more than new equipment
- Less efficient – conversion is of units designed to burn coal has a worse heat rate (11,200) than modern combustion turbines. New CTs (9,900) have a better heat rate than existing Brown coal units (10,500) and existing peaking units (12,200)

JA047

# OPTIMIZED PORTFOLIO BUILDOUTS & RETIREMENTS



| Year | Reference Case | Renewables + Flexible Gas | Renewables 2030 | High Technology |
|---|---|---|---|---|
| **2021-23** | 1.25% Energy Efficiency | 1.25% Energy Efficiency | 1.25% Energy Efficiency | 1.25% Energy Efficiency |
| **2022** | New Wind (300 MW) | New Wind (300 MW) | New Wind (300 MW) | New Wind (300 MW) |
| **2023** | New Solar (731 MW), New Storage (126 MW) | New Solar (731 MW) New Storage (126 MW) | New Solar (731 MW) New Storage (278 MW) | New Solar (731 MW) New Storage (126 MW) |
| **2023** | Retire ABB1, ABB2, FBC2, Exit Warrick (730 MW) | Retire ABB1, ABB2, FBC2, Exit Warrick (730 MW) | Retire ABB1, ABB2, FBC2, Exit Warrick (730 MW) | Retire ABB1, ABB2, FBC2, Exit Warrick (730 MW) |
| **2024** | New Combustion Turbine (236 MW) | New Combustion Turbine (236 MW) | - | New Combustion Turbine (236 MW) |
| **2024** | New Solar (415 MW) and Demand Response | New Solar (415 MW) and Demand Response | New Solar (415 MW) and Demand Response | New Solar (415 MW) and Demand Response |
| **2024-26** | 0.75% Energy Efficiency | 0.75% Energy Efficiency | 1.00% Energy Efficiency | 0.75% Energy Efficiency |
| **2025** | | - | - | New Combustion Turbine (236 MW) |
| **2027-39** | 0.75% Energy Efficiency | 0.75% Energy Efficiency | 1.00% Energy Efficiency | 0.75% Energy Efficiency |
| **2029-32** | - | - | Retire FBC3, ABB3, ABB4 (427 MW), New Storage (360 MW), Solar (700 MW) | - |
| **2033-39** | New Solar (250 MW) | Retire FBC3 (270 MW), New Combustion Turbine (236 MW) | New Solar (450 MW) | New Storage (50 MW) |
| **2024-39** | Average Annual Capacity Market Purchases (137 MW) | Average Annual Capacity Market Purchases (135 MW) | Average Annual Capacity Market Purchases (170 MW) | Average Annual Capacity Market Purchases (4 MW) |

34

JA048

|  |  |  |
|---|---|---|
| | ) | |
| Texas Gas Transmission, LLC | ) | Docket No. CP21-467-000 |
| | ) | |

## COMMENTS ON THE
## DRAFT ENVIRONMENTAL IMPACT STATEMENT
## OF CITIZENS ACTION COALITION OF INDIANA

Pursuant to the Federal Energy Regulatory Commission's ("Commission" or "FERC") Notice of Availability dated April 14, 2022, Citizens Action Coalition of Indiana ("CAC") submits these Comments on the Draft Environmental Impact Statement ("Draft EIS" or "DEIS") published by the Commission on April 14, 2022. The DEIS was conducted in relation to the application of Texas Gas Transmission, LLC ("Texas Gas" or "TGT") for a Certificate of Public Convenience and Necessity ("CPCN") under Section 7 of the Natural Gas Act ("NGA") for a new 24-mile pipeline lateral located in Henderson County, Kentucky and Posey County, Indiana with associated infrastructure (collectively, the "Project"). The Project would supply two new gas combustion turbines ("CTs") to be built by Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("CenterPoint") at the site of an existing, and soon to retire, coal power plant called "A.B. Brown" near Evansville, Indiana. Citizens Action Coalition of Indiana respectfully asks that the Commission address the issues detailed below through a supplemental DEIS, and ensure that these issues are resolved in the Final EIS.

JA049

C.  *The Final EIS Must Evaluate the Record Evidence of Appropriate and Reasonable Non-Gas Energy Alternatives.*

The Commission has detailed evidence at its disposal outlining the options for alternatives to new gas-fired generating capacity to serve CenterPoint's electric load.  The Final EIS must evaluate the potential for these non-gas energy alternatives to reduce the environmental harm of the Project as proposed.

For one, as we stated in our Additional Scoping Comments, in CenterPoint's own 2021 Integrated Resource Plan, the selected "High Technology" portfolio, which includes the proposal for the new combustion turbines, was not the lowest-cost portfolio on a net present value basis; the *"Renewables + Flexible Gas"* portfolio (entailing construction of *one* new gas combustion turbine in 2024 and the second combustion turbine in 2033[30]) had a lower cost.  As demonstrated by CenterPoint, this alternative is able to meet its objectives; is technologically feasible and practical; is economically advantageous; and is capable of providing environmental advantage relative to the proposed Project.  Thus, the Final EIS should consider this non-gas energy alternative as a potentially preferable alternative to the Project as proposed.

Additionally, CenterPoint IRP's "Renewables 2030" portfolio (which entails *no* new gas combustion turbines; more aggressive energy efficiency measures starting in 2027; 1,150 MW of additional solar installations starting in 2033; 170

---

[30] Southern Indiana Gas and Electric Company d/b/a Vectren a CenterPoint Energy Company (n/k/a CenterPoint), 2019-2020 IRP, Att. 3.1, Vectren Public Stakeholder Meeting (June 15, 2020), at 34, https://www.in.gov/iurc/files/Public-2019-2020-Vectren-IRP-Volume-2-part-1-Redacted-030121.pdf (373rd PDF page), attached as Exhibit A.

JA050

MW of annual capacity market purchases; and around 600 MW more storage deployment[31]) has the third-cheapest mean cost (excluding the Reference Case) under a stochastic analysis[32] and outperforms the High Technology scenario in terms of cost under two future scenarios envisioning relatively aggressive environmental regulation.[33] Again, this is a potentially preferable alternative to the Project—it meets objectives, is technologically and economically feasible and practical, and is capable of providing significant environmental advantage—and this alternative must be evaluated in the Final EIS.

In comparing these alternatives to TGT's proposed scenario where a new pipeline supports a new gas power plant, FERC must consider that CenterPoint's modeling assumptions in its Integrated Resource Plan ("IRP") were inappropriately skewed to disfavor renewable resource options. In proceedings before the Indiana Utility Regulatory Commission ("IURC"), expert witness Anna Sommer provided comments and testimony describing the flaws in CenterPoint's modeling. Witness Sommer has nearly two decades of experience in electric utility regulation, participated in over one hundred utility planning exercises, and testified as an expert before several utility commissions. Witness Sommer has particular expertise in planning modeling, across several modeling software packages, including those relied on by CenterPoint to develop resource plans.

---

[31] *Id.*

[32] Vectren a CenterPoint Energy Company, 2019-2020 IRP (June, 2020), at 251, https://www.in.gov/iurc/files/2019-2020-Vectren-IRP-Volume-1-of-2.pdf (253rd PDF page).

[33] *Id.* at 244 (246th PDF page).

JA051

Witness Sommer's report describes numerous flaws in CenterPoint's modeling. For example, the seasonal capacity factor assumed for wind and solar was too low; the number of solar projects from the recent Request for Proposals ("RFP") that could be selected within the IRP model was unnecessarily limited; wind, solar, and storage resources were prevented from selection until 2025; and capital costs for solar, wind, storage, and hybrid options were inappropriately inflated.[34] And CenterPoint's analysis also undervalued distributed energy resources ("DERs"),[35] directly conflicting with FERC's recognition of DERs' significant role in our existing and future energy grids.[36]

If not for these erroneous constraints, additional portfolios could have been constructed to meet CenterPoint's electric resource needs while avoiding significant environmental harms. These energy alternatives can meet the Project objectives, are technically and economically feasible, and avoid or lessen environmental impact. FERC must not compound CenterPoint's mistake of ignoring or arbitrarily constraining these resources in considering potential alternatives to meet the Project's stated purpose of supporting the new intermittent renewable resources and replacing the retiring coal-fired units in southern Indiana.

---

[34] *See*, generally, CAC et al., Report on Southern Indiana Gas and Electric Company d/b/a Vectren a CenterPoint Energy Company's 2019-2020 IRP (Nov. 13, 2020), https://www.in.gov/iurc/files/Public-Version-of-CACEJVIRP.pdf, at 12-25, attached as Exhibit B.

[35] DERs include behind-the-meter generation, energy storage, inverters, virtual power plants and controlled loads, demand response or demand management/demand flexibility technologies, electric vehicles, and microgrids.

[36] Implemented through "Reports on Demand Response and Advanced Metering", "National Assessment & Action Plan on Demand Response", and Orders 719, 745, 845, 2222.

JA052

Additional evidence also has emerged since the scoping comments were submitted that illustrates the problems with TGT's modeling. On November 22, 2021, expert witness Sommer provided additional testimony to the Indiana Utility Regulatory Commission expounding in more detail on IRP modeling issues.

Witness Sommer stated, among other things, that CenterPoint's modeling information was not transparent. Witness Sommer explained CenterPoint's refusal to provide the entirety of its modeling files—not even under non-disclosure agreements and confidentiality protections—prevented peer review and constrained expert scrutiny. Without that transparency, Witness Sommer explained that, modeling exercises are untestable and unverifiable black boxes—the antithesis of credible technical evidence.[37]

---

[37] *Petition of Southern Indiana Gas and Electric Company D/B/A Centerpoint Energy Indiana South ("CEI South") For (1) Issuance Of A Certificate of Public Convenience and Necessity Pursuant To Ind. Code Ch. 8-1-8.5 for the Construction of Two Natural Gas Combustion Turbines ("CTS") Providing Approximately 460 MW of Baseload Capacity ("CT Project"); (2) Approval of Associated Ratemaking and Accounting Treatment for the CT Project; (3) Issuance of A Certificate of Public Convenience and Necessity Pursuant to Ind. Code Ch. 8-1-8.4 for Compliance Projects to Meet Federally Mandated Requirements ("Compliance Projects"); (4) Authority to Timely Recover 80% of the Federally Mandated Costs of the Compliance Projects Through CEI South's Environmental Cost Adjustment Mechanism ("ECA"); (5) Authority to Create Regulatory Assets to Record (A) 20% of the Federally Mandated Costs of the Compliance Projects and (B) Post-Inservice Carrying Charges, Both Debt and Equity, and Deferred Depreciation Associated with the CT Project and Compliance Projects Until Such Costs Are Reflected in Retail Electric Rates; (6) In the Event The CPCN Is Not Granted or the CTs Otherwise Are Not Placed in Service, Authority to Defer, As A Regulatory Asset, Costs Incurred in Planning Petitioner's 2019/2020 IRP and Presenting this Case for Consideration for Future Recovery Through Retail Electric Rates; (7) Ongoing Review of the CT Project; and (8) Authority to Establish Depreciation Rates for the CT Project and Compliance Projects All Under Ind. Code §§ 8-1-2-6.7, 8-1-2-23, 8-1-8.4-1 Et Seq.,and 8-1-8.5-1 Et Seq.*, Indiana Utility Regulatory Commission, Cause No. 45564, CAC Exhibit 2 (Nov. 22, 2021) ("IURC Cause No. 45564"), https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/cda6dbcc-cf4b-ec11-8c62-001dd802fdcd/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45564--%20CAC%20Exhibit%202%20-PUBLIC--11-19-21FINAL.pdf at 17 ("[I]f modeling files are shielded from review in a regulatory docket, it is not appropriate to rely upon those results to inform a regulatory decision."); *see also* IURC Cause No. 45564, CAC Exhibit 4 (Nov. 22, 2021),

JA053

Witness Sommer presented an alternative resource portfolio called the "CAC High Technology" portfolio, which adjusts capital costs of different resource types based on market surveys, and also relaxes inappropriately tight modeling constraints on annual renewable installations.[38] The portfolio selected by the modeling software under these assumptions consists mainly of new solar, storage, and demand response (with some wind) resources, with no new gas additions, while still meeting CenterPoint's customer needs.[39] The CAC High Technology portfolio performed similarly to the Company's preferred "High Technology" portfolio at a clearly lower cost.[40]

On the same date in the same IURC proceeding, CAC also submitted additional evidence on non-gas alternatives and demand response potential in CenterPoint's service territory, from expert witness Josh Keeling, showing almost 250 MW of untapped demand response potential as an alternative to new gas infrastructure.

Witness Keeling has more than a decade of experience in the energy industry, focused on demand-side management and integration of distributed energy resources. Witness Keeling has particular expertise in demand response, being

https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/d1c74d6d-644c-ec11-8c62-001dd802f091/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45564--CAC%20Exhibit%204-PUBLIC--11-22-2021FINAL.pdf at 7, attached as Exhibit C ("Siemens and the Company have shrouded a full and transparent review of the modeling"). To be clear, FERC does not have authority to approve or disapprove construction of the proposed new gas power plant, but FERC must consider the integrity of the analysis that led to the notion that a new gas plant is the best way to accomplish the purpose of the Project at issue here.

[38] IURC Cause No. 45564, CAC Exhibit 2 at 23-25.

[39] *Id.* at 27-29.

[40] IURC Cause No. 45564, CAC Exhibit 4 at 8.

JA054

involved with development of award-winning demand response programs. In fact, CenterPoint itself has acknowledged Witness Keeling's expertise in demand response: a CenterPoint market potential study relied heavily on one of Witness Keeling's demand response potential studies. Witness Keeling testified that according to recent studies by demand response analysts, CenterPoint has cost-effective maximum achievable potential of 123 MW for residential and commercial customers; and the implied demand response potential for the whole CenterPoint customer base including industrial customers (prorated from a statewide study) is 227 MW.[41] Despite this, for the past five years, actual peak demand savings under CenterPoint's interruptible tariffs for industrial customers is *0 megawatts*,[42] and in 2020, actual demand response savings, including residential and small commercial customers, was 0% of peak load.[43] Witness Keeling outlined peer utilities within Midcontinent Independent System Operator that have achieved far greater demand response savings than CenterPoint, and explained opportunities for improving the attractiveness of CenterPoint's residential and industrial demand response programs (for example, the CenterPoint's current interruptible tariff's existing minimum curtailment amount is too large and the notification time is too short, compared to peer utilities).[44] Despite these shortcomings of the present demand

---

[41] IURC Cause No. 45564, CAC Exhibit 3 (Nov. 19, 2021), https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/dc7f9998-cf4b-ec11-8c62-001dd802fdcd/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45564--%20CAC%20Exhibit%203--11-19-21FINAL.pdf at 9–10, attached as Exhibit D.

[42] *Id.* at 13.

[43] *Id.* at 15.

[44] *Id.* at 15-24, 34-37.

JA055

response enrollment, CenterPoint's faulty 2021 IRP modeling did not include *any* incremental demand response resources beyond the current portfolio.[45]  This is compared to Witness Keeling's modeling which included the cost-effective addition of 250 MW of incremental demand response (as a conservative estimate; this analysis excluded certain forms of demand response), or over half the total size of the proposed new gas combustion turbines.[46]  In light of this evidence, the Commission's analysis should carefully consider whether non-gas energy resources including demand response could comprise an alternative to the gas power plant that the Project is meant to support.

D. *The Final EIS Must Better Evaluate System Alternatives and Lateral Route Alternatives.*

Another set of alternative options is alternatives to the pipeline itself, even assuming that the two new gas CTs would actually be built (which is not an appropriate assumption for FERC to make).  The DEIS does not adequately consider the potential for system alternatives or lateral route alternatives to lessen the Project's environmental impacts as proposed.

First, the DEIS fails to meaningfully evaluate the potential to increase capacity and pressure on the existing interconnection between Texas Gas' system and the A.B. Brown plant site.  The DEIS acknowledges that "Texas Gas' existing pipeline system supplies natural gas to the AB Brown Power Plant through an interconnection with CenterPoint's local distribution system," but concludes that

---

[45] *Id.* at 26.

[46] *Id.* at 28-31.

JA056

existing interconnection has inadequate capacity or pressure to serve the proposed turbines.[47]  However, the DEIS entirely fails to acknowledge or evaluate the potential to increase the capacity and pressure of the existing Dogtown lateral, thereby avoiding the need to build a second interconnection between Texas Gas' system and the A.B. Brown plant site.  Further, it is unclear whether any evidence supports the DEIS statement questioning the adequacy of CenterPoint's distribution system.  The Final EIS should be corrected to include an evaluation of the relative environmental impact of increasing the capacity and pressure of the existing interconnection between Texas Gas and the A.B. Brown plant.

Second, the Final EIS should consider CenterPoint's failure to solicit alternatives from other pipeline systems, and the related absence of evidence on the availability of system and route alternatives.  CenterPoint did not conduct a public Request for Proposals, as that term is traditionally understood, to solicit a wide variety of offers for the new pipeline infrastructure.  A formal Request for Proposals is necessary to gather market information on the availability and price of all possible pipelines, and to ensure that CenterPoint has chosen the pipeline at least cost and least environmental impact.  While CenterPoint initially referred in its IURC testimony to "a formal Request for Proposal,"[48] it later clarified that CenterPoint's outreach to potential pipeline counterparties was in fact not "formal"

---

[47] DEIS at 3-6.

[48] IURC Cause No. 45564, CenterPoint Exhibit 8, Direct Testimony of Paula J. Grizzle (June 17, 2021), https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/e5751f15-edcf-eb11-bacf-001dd801c642/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45564%20CEIS%20Petitioners%20Exhibit%20No%208%20Direct%20Tesimony%20of%20Paula%20Grizzle.pdf, at 4.

JA057

but was instead merely "verbal, with [CenterPoint] contacting pipeline companies and requesting proposals based on the requirements [in Petitioner's testimony]."[49] CenterPoint contacted only four pipeline companies, of which only two (including TGT) offered proposals.[50] CenterPoint's official in charge of contracting with the pipeline company confirmed during cross-examination at the IURC that the Company decided which four pipeline companies to contact for quotes, and never published a publicly-available written request for proposals.[51] CenterPoint, the sole customer of the proposed new pipeline, cannot credibly claim that a handful of phone calls or e-mails is a comprehensive consideration of "alternatives" to the pipeline approach proposed by Texas Gas, within the meaning of relevant laws.

While the DEIS considers alternatives to the proposed pipeline route, it explicitly disavows consideration of other vendors, stating that "the EIS cannot direct other companies to design or construct a project to take the place of what has been proposed."[52] However, TGT has not provided sufficient information on other vendor options to allow the Commission to consider a reasonable range of alternatives that could satisfactorily inform an EIS.

---

[49] Exhibit A to CAC's Additional Scoping Comments, at 13 (IURC Cause No. 45564, CenterPoint response to data request CAC 6-14 (dated August 23, 2021)).

[50] IURC Cause No. 45564, CenterPoint Exhibit 8, at 5.

[51] IURC Cause No. 45564, Transcript of January 26, 2022, Evidentiary Hearing, at C-13–C-14.

[52] DEIS at 3-4.

*E. FERC's Rejection of the Alternative of Using an Electric-Fired Compressor Is Unjustified.*

In addition to adopting an irrationally narrow definition of the need for the Project, leading to an arbitrary and capricious rejection of the no-action alternative, FERC makes several arbitrary and capricious conclusions in its rejection of using an electric-fired compressor station. Critically, the DEIS never analyzes the benefits that would result from the use of an electric-fired compressor, particularly with regard to environmental justice communities, as discussed further in Section IV(D). Thus, it has no real basis for comparing the environmental costs of the electric-fired alternative—which the DEIS summarizes only as a loss of a further four acres of land, with no further explanation or detail—with the costs of the gas-fired alternative. Moreover, the Commission's stated reasons for adopting this alternative are based on illogical and unsupported assumptions that do not provide a rational basis for FERC's decision.

First, FERC rejects using an electric-fired compressor station based in part on the assertion that power to the compressor station could be knocked out if the "grid is non-operational."[53] This line of reasoning is deeply disturbing, because it is a justification for never electrifying compressor stations, a position that is at total odds with the Commission's desire to mitigate the greenhouse gas ("GHG") emissions from the facilities it regulates.[54] In addition, the DEIS does not support

---

[53] DEIS at 3-3.

[54] *See, e.g.,* Updated Certificate Policy Statement, at 51, Docket No. PL18-1-000 (Feb. 18, 2022), Accession No. 20220218-3034 ("The Commission expects applicants to structure their projects to avoid, or minimize, potential adverse environmental impacts. Additionally, we expect applicants to

JA059

FERC's argument.  Although the DEIS notes that back-up gas-fired generators are not an option here, it fails to discuss why other means of back-up generation such as solar panels and storage are not feasible, nor does it explain why continued operation of the compressor would be necessary to fuel a grid that is, at that moment, non-operational.  Moreover, while the DEIS acknowledges that interruptions in gas service also are possible, it dismisses those concerns, because "[t]he Project would provide natural gas as a reliable and diversified backup to power generation at the AB Brown Plant that will be primarily powered by renewable resources."[55]  This explanation makes no sense.  If the A.B. Brown Plant is being powered primarily by renewables, then the impact of an interruption of service at the Slaughters Compressor Station—whether caused by an electric or a gas outage—should have the same minimal effect.  The potential for an electric outrage, therefore, does not provide a rational basis for rejecting the electric-fired compressor station alternative.

Second, the DEIS makes an entirely unsupported argument that the GHG and air pollution benefits of electrification should be ignored, because the compressor station would be powered by the electric grid and result in higher emissions from electric power generating stations.[56]  But the DEIS fails to demonstrate that those higher emissions would result in *more* adverse impacts than

---

propose measures for mitigating impacts, and we will consider those measures—or the lack thereof—in balancing adverse impacts against the potential benefits of a proposal").

[55] DEIS at 3-3.

[56] DEIS at 3-4.

JA060

generating power at the individual compressor station.[57]  FERC has shown that it is capable of evaluating the indirect effects of power generation,[58] and, with no explanation, fails to do so here.  In addition, this argument appears to be deeply inconsistent with assertions made in the DEIS that this Project is supposed to help clean up the electric grid by supporting new renewable generation.[59]  If CenterPoint's electric load in Indiana, which is part of the same MISO zone (Local Resource Zone 6) that includes Webster County, Kentucky, is going to be mostly served by renewables, then why is the Commission assuming that the power the compressor station will draw upon is so dirty?  Moreover, as the nation's electric supply is expected to become cleaner and shift towards renewables in the coming years,[60] the Commission lacks a rational basis to conclude that the environmental benefits over the entire lifespan of the Project will be greater using a gas-powered compressor station.  In addition to being baseless,  FERC's position here would justify refusing to electrifying any compressor station in portions of the country where the electric grid does not run mostly on renewables, even where renewables are expected to soon grow more dominant.  If the Commission has any intention of following through on its stated commitments to reduce GHG and air pollution from

---

[57] DEIS 3-3 to 3-4.

[58] *See, e.g.*, Final Environmental Impact Statement of Annova LNG, at 3-20 to 3-22, 4-185 to 4-186, Docket No. CP16-480-000 (Apr. 2019), Accession No. 20190419-3027; Final Environmental Impact Statement for the Freeport LNG Project, at F-7, Docket No. CP12-509 (June 2014), Accession No. 20140616-4003.

[59] *See, e.g.*, DEIS at 3-3.

[60] *See* DOE, *Building a Better Grid Initiative* (Jan. 12, 2022), https://rb.gy/kuamiu, at 4.

JA061

petition at the IURC for the costs associated with the retirement of A.B. Brown.[87] CenterPoint's witnesses in this securitization proceeding reiterated the Company's decision, stating that "CEI South plans to retire the A.B. Brown Units 1 & 2 on or around October 15, 2023" and "the Company made the decision to retire Brown Units 1 & 2[.]"[88] Just prior to CenterPoint's filing of that securitization case, the Chief Financial Officer of CenterPoint stated in a federally regulated discussion with investors that the securitization filing is expected, if approved, to lead to "a bond issuance in the first quarter of 2023."[89]

In addition, CenterPoint has publicly stated that certain new *solar* projects[90] already approved by the IURC are to "replace the capacity currently supplied by the 150 MWs of CenterPoint's share of Warrick Unit #4, co-owned with Alcoa and currently operated and maintained by Alcoa, and a portion of the capacity produced

---

[87] *Petition of Southern Indiana Gas and Electric Company D/B/A Centerpoint Energy Indiana South Pursuant to Indiana Code Ch. 8- 1-40.5 for (1) Authority to (A) Issue Securitization Bonds; (B) Collect Securitization Charges; and (C) Encumber Securitization Property with a Lien and Security Interest; (2) A Determination of Total Qualified Costs And Authorization of Related Accounting Treatment; (3) Authorization of Accounting Treatment Related to Issuance Of Securitization Bonds and Implementation of Securitization Charges; (4) Approval of Proposed Terms and Structure for the Securitization Financing; (5) Approval of Proposed Tariffs to (A) Implement the Securitization Charges Authorized by the Financing Order in this Proceeding, (b) Reflect a Credit for Accumulated Deferred Income Taxes, and (C) Reflect a Reduction in Petitioner's Base Rates and Charges to Remove Any Qualified Costs from Base Rates; and (6) Establishment of a True-Up Mechanism Pursuant to Indiana Code § 8-1-40.5-12(c)*, IURC Cause No. 45722 (May 10, 2022)("IURC Cause No. 45722").

[88] IURC Cause No. 45722, Testimony of Richard C. Leger (CenterPoint Ex. 1) at 10; *id.* Testimony of Jessica L. Thayer (CenterPoint Ex. 4) at 12.

[89] CenterPoint Energy Inc., Q1 2022 Earnings Call Transcript (May 3, 2022), https://investors.centerpointenergy.com/static-files/915538cc-d869-43d4-9b46-306cf6a42651, at 17.

[90] Specifically, the Posey County Solar Project and Warrick County Solar Project.

JA062

1 **CROSS-EXAMINATION OF MS. ANGILA M. RETHERFORD, (Continuing)**

2     **QUESTIONS BY MR. DOSHI:  (Continuing)**

3 Q    Ms. Retherford, could you look at the exhibit we

4 marked as CAC Cross Exhibit 25, which is pages from the

5 A.B. Brown extension application?

6 A    Yes.

7 Q    And looking at the first four pages, have you seen

8 this before?

9 A    Yes.

10 Q    Is this the cease receipt extension date request you

11 submitted to U.S. EPA in November 2020 for the A.B. Brown

12 ash pond?

13 A    Yes.

14 Q    And to your knowledge, is that under the same

15 regulatory structure as the Culley submission we looked at

16 a few minutes ago?

17 A    Under the CCR Part A, yes.

18 Q    Thank you.

19     What cease receipt date did CenterPoint request

20 in this application for the A.B. Brown ash pond?

21 A    The cease receipt date for the A.B. Brown ash pond

22 would be I think October 31st or 23rd.  I can't remember.

23     Late October of 2023.

24 Q    Thank you.

25     On Page 1 of this exhibit, if you look at the second

F- 18

JA063

1 full paragraph text, I think you'll find the date in there.
2          Would you mind taking a look?
3 A    Of the text?
4 Q    The second full paragraph of the cover letter on Page
5 1.
6 A    Oh, all right.  I got it.
7          October 15th of 2023.
8 Q    Thank you.
9    You mentioned earlier in our discussion that on
10 January 11th of this year, 2022, U.S. EPA issued a series
11 of incompleteness decisions and proposed decisions for
12 other coal ash [inaudible] similar applications.
13          Did U.S. EPA issue any proposed decisions or
14 findings on the A.B. Brown ash pond application?
15 A    No decision on the merits of the extension request,
16 but similar to Culley, we got a letter confirming that our
17 application was complete and that the April 11, 2021 cease
18 receipt date is tolled.
19 Q    Thank you.
20          Do you expect U.S. EPA to issue a proposed
21 decision on your application for the Brown --
22 A    At some point, yes.
23 Q    Thank you.
24          Would you agree that it's possible that U.S. EPA
25 could approve your application or not approve it?

1 A    Yes, similar to Culley, and they also have approved

2 with conditions, too.

3         I believe the Maysville determination was an

4 approval with conditions.

5 Q    Thank you.

6         Is there a range of potential cease receipt dates for

7 the Brown ash pond that you are preparing for that could

8 result from U.S. EPA's final decision?

9 A    Well, the generation transition plan that we have been

10 working toward and that, you know, the Brown units are

11 before the agency right now, we do not currently plan to do

12 the bottom ash or the fly ash modifications, so we do not

13 have alternative cease receipt dates for Brown --

14 Q    Okay.

15 A    -- without completing the ash modifications; we would

16 have to complete the ash modifications.

17 Q    Could you explain what the ash modifications are?

18 A    Sure.  So the -- we would have to do the bottom ash

19 conversions at Brown because we still handle bottom ash

20 with wet sluicing, and it still goes to the ash pond, and

21 we still do a certain portion of the fly ash handled wet,

22 too, that would have to be modified in order to cease

23 sending that material to the ash pond.

24 Q    Thank you.

25         I think you just mentioned two different

F- 20

1 projects -- potential projects related to bottom ash

2 conversion and fly ash handling modification; is that

3 correct?

4 A    That's correct.

5 Q    And have you started either of those projects?

6 A    No.  We've not sought authorization for those

7 projects.

8 Q    And what would be the time line of each of those two

9 potential projects?

10 A    Well, similar to the bottom ash, it's about a 36-month

11 on average construction -- design and construction time

12 line.

13 Q    Thank you.

14 A    That's why those were not selected as the fastest,

15 technically feasible alternatives.

16 Q    Thank you.

17    If you look at Page 7 of this CAC Cross Exhibit 25, if

18 you look at the last line of text under "Startup &

19 Commissioning" -- I should say that Page 7 is the second to

20 last page in the exhibit; it says "Page 2 of 2" at the

21 bottom.

22 A    Okay.

23 Q    So if you look at the last line under "Startup &

24 Commissioning", can you tell us when is the expected

25 initial operation date of the new 10-acre ash pond at the

F- 21

1 A.B. Brown site?

2 A      That would be July of 2023.

3 Q      Thank you.

4        The font is very small, but would you agree, subject

5 to check, that it says June 30 of 2023?

6 A      I think that's right, yes.

7 Q      Okay, thank you.

8 A      You're making me switch glasses back and forth.

9 Q      Sorry about that.

10       When is CenterPoint planning to retire the A.B.

11 Brown coal generating units?

12 A      October of 2023.

13 Q      Thank you.

14       So hypothetically, if U.S. EPA issued a proposed

15 decision on your extension application sometime this year

16 followed by comments and a final decision and it was a

17 denial, and if that denial decision required cessation of

18 receipt of waste at the Brown ash pond by again let's say

19 December 1, 2022 -- just to make up a date -- would you

20 agree that leaves a time period of seven months in my

21 example until the new 10-acre A.B. Brown ash pond would be

22 ready?

23 A      No.

24       MS. CLOSE:  Your Honor -- Your Honor, I was going

25 to impose an objection.



June 6, 2022

The Honorable Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street NE, Room 1A
Washington, D.C. 20426

> Re: EPA Comments on the Draft Environmental Impact Statement (DEIS) for the Henderson
> County Expansion Project, FERC CP21-467-000. CEQ No. 20220054

Dear Secretary Bose:

The U.S. Environmental Protection Agency has reviewed the Federal Energy Regulatory
Commission's DEIS for the Henderson County Expansion Project proposed by Texas Gas
Transmission, LLC (Texas Gas). The DEIS was reviewed pursuant to the National Environmental
Policy Act, the Council on Environmental Quality regulations (40 CFR Parts 1500-1508), and the
EPA's authority under Section 309 of the Clean Air Act.

Texas Gas proposes to construct 23.5 miles of new 20-inch-diameter pipeline, a new tie-in facility, a
mainline valve, and modifications to its existing Slaughters Compressor Station in Henderson County,
Kentucky (KY). This project will provide 220,000 dekatherms per day to CenterPoint Energy Indiana
South to service the proposed project[1] at AB Brown Generating Station in Posey County, Indiana (IN).
Texas Gas also proposes to build a new 0.5-mile 16-inch-diamater pipeline between the AB Brown
Meter and Regulating (M&R) Station to the Brown Power Plant and other appurtenant facilities in
Posey County, IN. In addition to the proposed action alternative, the DEIS evaluates a no-action
alternative, system alternatives, and other siting/route and design alternatives based on the purpose and
need. It identifies the proposed action as the preferred alternative and analyzes the potential
environmental impacts associated with constructing, modifying, operating, and maintaining pipeline
and appurtenant facilities located in Kentucky and Indiana.

On November 9, 2021, the EPA submitted comments during the scoping period including concerns
regarding purpose and need, climate change and greenhouse gas emissions, wetlands, air, environmental
justice and public involvement, methane leakage and construction. On March 31, 2022, we submitted
additional comments as a cooperating agency regarding purpose and need, alternatives, noise, safety,
wetlands, environmental justice and socioeconomics, air, emissions, climate change, drilling,

---

[1] The CenterPoint proposed project entails two new natural gas units to be built at the A.B. Brown site. The proposed project is currently before the
Indiana Utility Regulatory Commission (IURC). A similar previous project was denied by IURC in 2019.

new requirements. We also suggest considering using pig ramp technologies, vacuum, and compression technology (for zero emissions), and inert gas to purge the pig launcher among other proven remedies.

**4.9.2.9 State Air Quality Regulations and 4.9.3 Construction Emissions Impacts and Mitigation:** These sections discuss temporary construction emissions from the Project. Also included are open burning activities that may occur to clear vegetation and debris. The EPA previously commented on open burning activities.

Recommendation: This project is in a nonattainment area for sulfur dioxide and should avoid additional emissions. Additional restrictions should be considered to avoid any incremental emissions (even temporary), and open burning to clear vegetation in this area should be avoided.

**4.9.3 and 4.9.4 Construction & Operational Emissions Impacts and Mitigation:** The DEIS includes estimates of emissions from the Project's construction and operation. Tables 4.9.3-1, 4.9.3-2 and 4.9.4-1 provide emissions from the modified Slaughter compressor station as well as new emissions from the new lateral and associated facilities. While we appreciate the quantification of potential construction and operational emissions from the Project described in the above tables, the EPA noticed that the emissions from the new AB Brown Power Plant are missing. The DEIS has emphasized that the Henderson project is projected to be a component of the AB Brown Power Plant modifications and as such, the EIS should estimate all emissions.

Additionally, the draft EIS does not present projected emissions of each individual GHG ($CO_2$, nitrous oxide, or methane); it only expresses GHG emissions in terms of $CO_2$ equivalent values. The damage of each individual gas varies over time, so it is important to have these disaggregated in a way that is transparent to the public.

Recommendation: Please include the estimated emissions from the new gas turbines shown in Table 4.9.4-2 and add them to the total emissions from the Henderson Project.

Additionally, the EPA reiterates the importance of minimizing fugitive emissions such as methane from these units. We strongly recommend adopting the many technologies available to address fugitive methane emissions from compressor stations (e.g., centrifugal and reciprocating). FERC should conduct technical evaluations for each type of emission source (i.e., compressor, pigging) and recommend the most appropriate technologies. We highly recommend exploring additional technologies such as:
• capture/recover/injection technologies,
• unit depressurization to allow for the capture of blowdown emissions,
• recompression that recovers leaks across seals and reinjects it back into the system.

Regarding individual GHGs, the EPA recommends reporting each of the gasses, by year. This will ensure that the subsequent analysis and valuation can be replicated, and that the public is aware of the location and timing of emissions.

**Greenhouse Gas Emissions and Climate-Related Impacts:** The DEIS expresses project-level emissions as a percentage of national or state emissions. Conveying the information in this way inappropriately diminishes the significance of project-level greenhouse gas (GHG) emissions.

Texas Gas has specific supply sources such as Gulf South's Perryville Exchange, Lebanon, Henry Hub, and Carthage among others. Texas Gas should know where the present supply is coming from and could evaluate upstream emissions by considering present sources.

Recommendation: The EPA reaffirms the suggestion that the Commission avoid expressing project-level emissions as a percentage of national or state emissions. Instead, the EPA continues to recommend disclosing the increasing conflict between GHG emissions and national, state, and local GHG reduction polices and goals, and whether there are ways to address that conflict in projects that expand and lock-in fossil fuel consuming infrastructure. These disclosures should be complemented by evaluation of inconsistencies with policy and energy use trajectories that would achieve national 2030 and 2050 GHG reduction targets, for example those in the recently published Long Term Strategy of the United States[4]. Further, EPA reaffirms the suggestion that the EIS quantify all upstream and downstream GHG emissions by activity associated with the proposed Henderson project, as supported by the Council on Environmental Quality's preamble to the notice of proposed rulemaking[5].

To evaluate the emissions impacts, the EPA recommends conducting an analysis that captures the present gas supply from Texas Gas to the AB Brown Generating Station and demand responses in various related markets that would result from the project. Further, we suggest the assessment of downstream emissions account for market-induced changes in the amount of natural gas used for winter heating, while the upstream emissions assessment would account for the net change in the number of wells and their associated emissions. This analysis would be most useful if it is developed consistent with the assumptions and methods used to evaluate the benefits of the proposed Project required by the Certificate Policy under the Natural Gas Act.

*Upstream Emissions:* Regarding the missing upstream emissions, the DEIS notes that "the specific sources of natural gas to be transported by the Project are unknown and would likely change throughout the Project's operational lifetime. Because the source of the gas is unknown and may change throughout the life of the Project, the environmental impacts and regulatory oversight of upstream natural gas production, including hydraulic fracturing activities, are outside the scope of this EIS." However, even if this is the case, it should be possible to get a rough estimate of upstream impacts. Based on an estimate of 220,000 dekatherms per day, the EPA estimates an upper bound of 0.415 MMT of upstream $CO_2$ emissions and 0.01 MMT of $CH_4$ emissions. Note that this is based on data from the EPA's GHG Inventory and national figures, so regional figures may vary, especially if upstream providers take efforts to reduce fugitive emissions, as suggested.

---

[4] https://www.whitehouse.gov/wp-content/uploads/2021/10/US-Long-Term-Strategy.pdf

[5] "[A]ir pollution, including greenhouse gas emissions, released by fossil fuel combustion is often a reasonably foreseeable indirect effect of proposed fossil fuel extraction that agencies should evaluate in the NEPA process, even if the pollution is remote in time or geographically remote from a proposed action. And even where an agency does not exercise regulatory authority over all aspects of a project, it may be appropriate to consider and compare the air pollution and greenhouse gas emission effects that the proposal and the reasonable alternatives would have on the environment, even if the agency does not have control over all of the emissions that the alternatives would produce. The consideration of such effects can provide important information on the selection of a preferred alternative; for example, an agency decision maker might select the no action alternative, as opposed to a fossil fuel leasing alternative, on the basis that it best aligns with the agency's statutory authorities and policies with respect to greenhouse gas emission mitigation." 86 FR 55757, 55763 (2021).

 

9 Greenway Plaza
Suite 2800
Houston, TX 77046
713.479.8000

July 7, 2022

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Re:    Texas Gas Transmission, LLC**
**Henderson County Expansion Project**
**Docket No. CP21-467-000**
**Response to June 27, 2022 Data Request**

Dear Ms. Bose:

Texas Gas Transmission, LLC ("Texas Gas") hereby submits for filing with the Federal Energy Regulatory Commission ("Commission") its response to the Commission's Data Request issued on June 27, 2022, in the captioned proceeding ("Data Request"). Pursuant to the provision of the Commission's Rules of Practice and Procedure, 18 C.F.R. §385.2010, a copy is being served to each person whose name appears on the official service list for this proceeding.

The undersigned is the authorized representative and should be considered the respondent to the Data Request. If you have any questions or need additional information, please contact me at (713) 479-3480.

Sincerely,

*/s/ Juan Eligio Jr.*

Juan Eligio Jr.
Manager, Regulatory Affairs

cc:   J. Keith Rodgers (FERC)
      Jennifer McCoy (Edge – FERC Third Party Contractor)
      All Parties

STATE OF TEXAS )
                       )     ss.
COUNTY OF HARRIS )


Juan Eligio Jr, Manager, Regulatory Affairs for Texas Gas Transmission, LLC deposes and verifies that I have read the filing and know the contents of the electronic filing; the contents as stated in the electronic filing are true to my best knowledge and belief; and that I possess full power and authority to execute and file the attached documents.

_____
Juan Eligio Jr.


Subscribed and sworn to me on this 7th day of July 2022.


(Personalized Seal)

JOVITA LOPEZ SMITH
Notary ID #6480676
My Commission Expires
March 29, 2026

_____
Notary Public's Signature
State of Texas



Texas Gas Transmission, LLC

# Henderson County Expansion Project

**Docket No. CP21-467-000**

**RESPONSE TO THE FEDERAL ENERGY REGULATORY COMMISSION'S ENVIRONMENTAL INFORMATION REQUEST Issued June 27, 2022**

**PUBLIC INFORMATION**

**July 2022**

1.    Provide an update to table 1.7-1 that identifies any authorizations received to-date or submittals since issuance of the draft EIS. Also, provide updates on the status of CenterPoint's permit applications for modification of the facility's existing air permit, as well as any other applicable approvals, if known.

**Response:**

*Table 1.7-1 has been updated and is provided below.  On June 28, 2022, the Indiana Utility Regulatory Commission (IURC) issued an order granting CenterPoint (CEI South) "a certificate of public convenience and necessity under Ind. Code ch. 8-1-8.5 to construct two natural gas combustion turbines (CTs) providing approximately 460 megawatt (MW) of capacity to be located at CEI South's existing A.B. Brown site."  The IURC Order is attached (**Attachment 1**).*

*Among other things, the IURC Order states:*

- *"The record demonstrates that the CT Project is consistent with the Preferred Portfolio identified in Petitioner's 2019/2020 IRP."  IURC Order at 15.*

- *"The Preferred Portfolio identified through the 2019/2020 Integrated Resource Plan (IRP) called for the retirement or exit of energy provided by coal-burning units at the Brown and Culley generating stations. . . . The Preferred Portfolio mapped a shift from a generating fleet of predominantly coal-burning resources to one of intermittent renewable resources supported by gas generation to ensure reliability.  One early step in implementing the Preferred Portfolio was the addition of solar generating resources approved by the Commission in Cause Nos. 45501 on October 27, 2021 and 45600 on May 4, 2022.  A next step is the addition of the two new CTs requested in this Cause."  IURC Order at 16.*

- *"Based on the evidence of record, we find that CEI South's proposal to build the two CTs, which are flexible, controllable resources that will support the increasing use of renewables by CEI South and other Indiana electric utilities, is consistent with the Commission's energy analysis, including the 2018 Statewide Analysis and developments since that report was issued." IURC Order at 16-17.*

- *"Sunrise Coal's proposal to continue burning coal at Brown for several more years does not provide the same level of flexibility in support of system reliability."  IURC Order at 18.*

- *"Due to the intermittency of the renewable resources in the Preferred Portfolio, resources with quick ramp capabilities are necessary to complement the addition of such intermittent resources to the system to ensure reliability."  IURC Order at 18.*

- *"As noted elsewhere herein, renewables such as wind and solar are dependent upon weather conditions and are, therefore, not as controllable as other sources of generation." IURC Order at 18.*

2

JA074

- *"We agree that, while battery storage is an emerging technology, it is currently not a viable and reliable alternative to the proposed CTs." IURC Order at 19.*

- *"[W]e decline to accept a recommendation that relies on [demand response] that does not currently exist and, in light of Ms. Harris's testimony, appears unlikely to exist in the future in Petitioner's service territory." IURC Order at 19.*

- *"We find that the two proposed CTs are an efficient and cost-effective solution and compare favorably among the other options proposed to follow net load. The evidence of record demonstrates that the CTs can start and ramp up or down quickly and therefore can be dispatched for short periods several times a day or for prolonged periods, whichever is necessary, to cover shortfalls." IURC Order at 20.*

- *"We are concerned about the risks of further delay that would be caused by rejecting Petitioner's selection in favor of further study (beyond that already performed as part of the 2019/2020 IRP process) of the options proposed by the other parties. None of the options being proposed by the OUCC, CAC, Sierra Club, or Sunrise Coal would address the concerns raised by the NERC and MISO to encourage the development of flexible, controllable resources, such as the CTs proposed here, to complement the transition to intermittent, renewable resources. In the event of a denial, Petitioner would still need to secure the capacity offered by the CTs." IURC Order at 21.*

- *"Ultimately, CEI South's 2019/2020 IRP has shown that the proposed construction of two new CTs at the A.B. Brown site is a reasonable, least-cost resource to support Petitioner's Generation Transition Plan and meet customers' needs for electricity. The CTs are capable of cycling reliably in response to the MISO market and will partially replace the retiring coal units with more efficient and controllable load-following capacity." IURC Order at 22.*

- *"Based on our review of the evidence of record, we are satisfied with CEI South's decision to secure transportation capacity pursuant to the Precedent Agreement with [Texas Gas] rather than pursuing some combination of alternatives, including use of the Dogtown lateral, an alternative [Texas Gas] route, or on-system storage. The evidence of record supports a finding that the Dogtown lateral is incapable of supporting the CT demand or pressure requirements. A different route would have required additional improvements to [Texas Gas'] system to meet capacity and pressure requirements and would have involved a more congested route for the lateral." IURC Order at 28.*

- *"The evidence is unrefuted that Petitioner will require service from a lateral pipeline to serve the two CTs. Further, we find that the evidence supports that the proposed [Texas Gas] pipeline will provide the required service to the two CTs." IURC Order at P 28.*

*CEI South is also working to finalize the air permit modification application necessary to transfer Vectren's permit for the A.B. Brown Coal Generating Facilities to the new CTs. In transferring the permit, Indiana Department of Environmental Management will evaluate the existing permit and the emissions under the new CTs to ensure the CTs' emissions are lower than the existing*

JA075

*coal-fired generation. The permit modifications must be finalized prior to CEI South starting construction as the modified permit functions as a Prevention of Significant Deterioration construction permit. CEI South has no other updates at this time.*

| Table 1.7-1 Federal and State Permits and Approvals | | | |
|---|---|---|---|
| **Agency or Organization** | **Permit/Approval** | **Submittal/ Anticipated Submittal** | **Received/ Anticipated Receipt** |
| **Federal** | | | |
| Federal Energy Regulatory Commission | Certificate of Public Convenience and Necessity | June 25, 2021 | January 2023 |
| U.S. Army Corps of Engineers – Louisville City District | *Clean Water Act*, Section 404 Nationwide Permit 12 | June 25, 2021 | 4th Quarter 2022 |
| U.S. Fish and Wildlife Service – Kentucky Ecological Services Field Office | *Endangered Species Act*, Section 7 Consultation; *Migratory Bird Treaty Act* Consultation | June 25, 2021 | 3rd Quarter 2022 |
| U.S. Fish and Wildlife Service – Bloomington Ecological Services Field Office | | June 25, 2021 | 3rd Quarter 2022 |
| **State of Kentucky** | | | |
| Kentucky Energy and Environment Cabinet – Department of Environmental Protection | Section 401 Water Quality Certification | June 25, 2021 | 4th Quarter 2022 |
| | Permit to Construct Across or Along a Stream (Floodplain Construction Permit) (Individual) | June 25, 2021 | July 14, 2021 |
| | NPDES General Stormwater Construction Activities General Permit | 3rd Quarter 2022 | 3rd Quarter 2022 |
| | Temporary Authorization for Water Withdrawal Permit | 4th Quarter 2022 | 4th Quarter 2022 |
| | NPDES General Permit for Discharge of Hydrostatic Test Water | 4th Quarter 2022 | 4th Quarter 2022 |
| | Title V Permit (Minor Revision) | June 24, 2021 | March 23, 2022 |
| Kentucky Department of Fisheries and Wildlife Resources | State Threatened and Endangered Species Consultation | June 25, 2021 | Concurrence Received July 23, 2021 |

4

| Table 1.7-1 Federal and State Permits and Approvals | | | |
|---|---|---|---|
| **Agency or Organization** | **Permit/Approval** | **Submittal/ Anticipated Submittal** | **Received/ Anticipated Receipt** |
| Kentucky Heritage Council | *National Historic Preservation Act*, Section 106 Consultation | August 2021 | Concurrence Received December 3, 2021 |
| **State of Indiana** | | | |
| Indiana Department of Environmental Management (IDEM) | 401 Water Quality Certification General Permit | June 25, 2021 | October 2, 2021 |
| | IDEM NPDES General Permit by rule for Discharge of Hydrostatic Test Water, 326 IAC 15-11 | 4th Quarter 2022 | 4th Quarter 2022 |
| Indiana Department of Natural Resources | Construction in a Floodway Permit | Project qualifies for coverage without prior notification. | |
| | State Threatened and Endangered Species Consultation | June 25, 2021 | Concurrence Received July 26, 2021 |
| Indiana Division of Historic Preservation | *National Historic Preservation Act*, Section 106 Consultation | June 25, 2021 | Concurrence Received November 22, 2021 |

JA077

2.    To assist the Federal Energy Regulatory Commission (FERC) staff with addressing comments provided by the U.S. Environmental Protection Agency (USEPA) (under FERC accession number 20220606-5265), provide responses to all issues raised by that agency, including but not limited to those comments regarding non-jurisdictional power lines; emergency shut-down procedures; hydrostatic testing; and cathodic protection.

**Response:**

*Texas Gas Transmission, LLS (Texas Gas) filed responses to the U.S. Environmental Protection Agency's comments regarding the alternatives, noise impacts, pigging mitigation, and greenhouse gas emissions on June 22, 2022 [Accession No. 20220622-5124].  Comments that were not previously addressed are discussed below.*

   a.    <u>Comment:</u>
The EPA suggests that FERC delay their determination of "whether the project is in the public convenience and necessity," until the AB Brown Project obtains IURC's approval. The DEIS's description and purpose of the Henderson project indicates that the need for Henderson project is dependent upon the AB Brown Project's approval and FERC should consider recent rate hikes and the impact that has had on consumers as part of the decision-making process.

Response:
*See Response to Question 1 above for further details.  On June 28, 2022, the IURC issued an order granting CEI South a certificate of public convenience and necessity (see Environmental Information Response #1), which is attached (**Attachment 1**).  The IURC "finds that the evidence supports that the proposed [Texas Gas] pipeline will provide the required service to the two CTs."  IURC Order at P 28.*

*Additionally, as stated in Texas Gas' response to comments filed on June 22, 2022, Texas Gas' Project is designed to meet demand, as CEI South has new demand for natural gas to fuel its proposed new natural gas combustion turbines and for the pipeline transportation needed to deliver those gas supplies.  Should the Henderson County Expansion Project (Project) not be constructed, CEI South's new demand for natural gas transportation would not be met.*

   b.    Comment:
Please estimate the land to be disturbed by the construction and maintenance of the electrical power lines needed for the project.

Response:
*The power line for the mainline valve (MLV) will connect from an existing overhead power line located along the east side of Highway 60 and will extend approximately 160 feet northeast to a new power drop at the MLV.  The power line for the AB Brown Meter & Regulator (M&R) Station will extend for approximately 800 feet from an existing overhead power line to a new power drop located at the M&R station.  Texas Gas anticipates a 10-foot-wide ground easement with a 25-foot aerial easement.  Therefore, land disturbed*

JA078

*for the construction and maintenance of the electrical power line for the MLV is approximately 0.04 acre. The land disturbed for the construction and maintenance of the power line to the AB Brown M&R Station is approximately 0.18 acre.*

c.    Comment:

The EPA recommends that the project utilize smaller rights-of-way especially in environmentally sensitive areas. We recommend minimizing impacts to no more than 50 feet in these areas, if possible. Also, we noticed the need for private storage facilities, and we suggest finding disturbed land for any additional temporary workspaces outside the construction right-of-way. Options could include renting parking areas or utilizing disturbed private land that could be ecological restored at the end of the Project.

Response:

*Texas Gas will adhere to the Federal Energy Regulatory Commission (FERC) Wetland and Waterbody Construction and Mitigation Procedures (Procedures) in regards to siting within wetlands. Additionally, Texas Gas selected a storage yard that has been utilized for staging/storage/laydown on previous Texas Gas projects. Therefore, temporary impacts associated with the proposed storage yard during construction of the proposed Project will be consistent with prior impacts in this previously disturbed area.*

d.    Comment:

The EPA has expressed concerns regarding the potential impacts of withdrawing water from Pond Bayou, and we recommended exploring other options for acquiring water, such as via truck. When testing, we recommend using filters/nets at the end of pipes prior to discharging hydrostatic water to avoid metal residues contamination into receiving waters. To reduce the amount of water required for hydrostatic testing, we recommend recycling the tested water.

Response:

*Texas Gas has contacted the Kentucky Energy and Environment Cabinet regarding mitigation measures for water withdrawal from Pond Bayou and consultation is ongoing. Texas Gas will additionally implement measures, as outlined in the FERC Procedures, when withdrawing water from Pond Bayou. Any fluids that are utilized for hydrostatic testing will be collected and reused to the extent practicable as conditions and schedule allow before proper discharge or disposal in accordance with all federal, state, and local requirements.*

e.    Comment:

In the Final EIS, please describe the input and engagement from communities with environmental justice concerns and describe how that input has been used in the suite of proposed mitigation options or to further avoid or minimize impacts to human health and the environment.

Response:

*Texas Gas has outlined the measures utilized to obtain input and engagement from the communities with environmental justice (EJ) concerns and has described how that input*

*has been utilized in the Environmental Information Request dated December 21, 2021 and filed on January 19, 2022 (Accession No. 20220120-5172) and in the comments filed on the Draft Environmental Impact Statement (DEIS) (Accession No. 20220606-5251). Texas Gas' landowner and stakeholder outreach strategies provide a framework for how to effectively communicate with EJ communities that are directly impacted by the Project. The notices provided to these individuals characterized and were dependent upon the direct impacts caused by the Project thus providing the most relevant information to those individuals in order to assist them when making the most appropriate choice of how to respond.*

f.     Comment:
This project is in a nonattainment area for sulfur dioxide and should avoid additional emissions. Additional restrictions should be considered to avoid any incremental emissions (even temporary), and open burning to clear vegetation in this area should be avoided.

Response:
*As stated in the Environmental Information Request dated December 21, 2021 and filed on January 19, 2022 (Accession No. 20220120-5172), no open burning is proposed for any Project areas aside from Henderson County, and no burning is proposed within the city limits of Henderson. Contractors that are qualified in open burning practices will ensure that all open burning is conducted using acceptable practices and in accordance with state regulations including 401 Kentucky Administrative Regulations 63:005. Texas Gas will commit to notifying all affected landowners prior to the brush burning activities on any given property. Texas Gas will make the landowner aware that smoke may be generated. Texas Gas will continue to monitor, address and report landowner comments and issues in the construction/environmental progress report submitted to FERC.*

g.     Comment:
Please include the estimated emissions from the new gas turbines shown in Table 4.9.4-2 and add them to the total emissions from the Henderson Project.

Additionally, the EPA reiterates the importance of minimizing fugitive emissions such as methane from these units. We strongly recommend adopting the many technologies available to address fugitive methane emissions from compressor stations (e.g., centrifugal and reciprocating). FERC should conduct technical evaluations for each type of emission source (i.e., compressor, pigging) and recommend the most appropriate technologies. We highly recommend exploring additional technologies such as:
• capture/recover/injection technologies,
• unit depressurization to allow for the capture of blowdown emissions,
• recompression that recovers leaks across seals and reinjects it back into the system.

Response:
*Table 4.9.4-2 presents the emissions changes calculated by FERC staff associated with changes at CEI South facilities. These facilities are not owned or operated by Texas Gas, nor are they located in the same state air quality jurisdiction as the Slaughters Compressor Station. As such, emission changes at CEI South facilities should not be aggregated with*

JA080

*the emission changes at Texas Gas facilities (i.e., the Slaughters Compressor Station). Table 4.9.4-2 should stand alone as information assessing the emission changes from CEI South facilities, separate and apart from the projected emission changes at Texas Gas facilities. Any changes in emissions at CEI South facilities is more accurately described as "downstream emissions" rather than direct project emissions for Texas Gas' Henderson County Expansion Project. Downstream emissions are discussed separately in the DEIS.*

*Additionally, Texas Gas utilizes multiple technologies to identify, capture, and prevent the release of fugitive methane emissions, including but not limited to the implementation of directed inspection and maintenance programs to identify and repair leaks, reduce blowdown emissions by implementing pipeline pump-down techniques, eliminate the need to blowdown pipe using hot taps, sleeves and composite wraps to repair pipelines, and installing no-bleed controllers (in new service).*

h.      Comment:
The EPA understands the pipeline would be shut down remotely during emergencies, and we recommend explaining how the pipeline would be shut down if the remote shutdown were to malfunction.

Response:
*Remote controlled valves are set up in Texas Gas' Control System as safety critical. If these Gas Control Systems detect loss of communication, there is an immediate call out to restore that functionality. Additionally, if a remote-controlled valve does not close when directed remotely, a manual closure would be implemented by immediately mobilizing local operations to close the valve.*

i.      Comment:
The DEIS describes some issues regarding cathodic protection. The EPA noticed that the cathodic protection was only mentioned for the Henderson lateral in KY. We recommend extending this protection to *Underwater Cathodic* protection when installing pipe under the Ohio River.

Response:
*Texas Gas will install cathodic protection to service the entirety of the Project pipeline facilities, including the segment beneath the Ohio River. The original proposed location for the cathodic protection anode bed was in Kentucky, but was removed at the request of the landowner. The revised location is still under final engineering design and has yet to be determined. Texas Gas will file the updated cathodic protection anode bed location with the Implementation Plan and request FERC approval of this location with the Notice to Proceed. Once the anode bed location has been installed and the Henderson County lateral is in service, the low electrical current generated by the cathodic protection will travel the entirety of the new pipeline lateral (including into Indiana) in order to prevent corrosion of the pipeline.*

JA081

j.      Comment:

The EPA recommends planning for targeted-tree removal around the construction area, particularly near the Ohio River to lessen the possibility of bank erosion and in forested wetlands.

Response:

*As stated in Texas Gas' response to comments on the DEIS filed on June 22, 2022, Texas Gas filed a revised drawing at the Ohio River crossing in response to FERC's recommendation to limit the size of ATWS-198, ATWS-199, and ATWS-150. This revision reflected a reduction in workspace to accommodate temporary water withdrawal from the Ohio River. As such, very few trees adjacent to the Ohio River will be cleared for the Project, and any temporary areas that are cleared for construction would be allowed to return to pre-construction conditions. Additionally, Texas Gas will facilitate reestablishment, where necessary, via guidelines established in the FERC Upland Erosion Control, Revegetation, and Maintenance Plan (Plan) and Procedures.*

JA082

3.　Clearly state Texas Gas' intent to implement recommendation of the Indiana Department of Natural Resources in response to the draft EIS (under FERC accession number 20220606-5265), to use erosion control blankets that are heavy-duty, biodegradable, and net free or loose-woven/Leno-woven netting to minimize impacts on wildlife.

**Response:**

*Texas Gas will utilize commercially available erosion control blankets typically used in standard pipeline installation practices.  Additionally, Texas Gas will implement best management practices as recommended by the U.S. Fish and Wildlife Service (USFWS) and adhere to the FERC Plan and Procedures during construction.*

JA083

4.   Clearly state Texas Gas' intent to implement the Kentucky Department of Energy and Environment (under FERC accession number 20220520-5041) recommendation to notify Morganfield Waterworks and Alcan Ingot in case of release of drilling fluids and fuels, or any other construction or pipeline operation activities that may impact water quality within traversed source water protection areas. Provide copies of any revised construction plans (for example, Texas Gas' Horizontal Directional Drill Monitoring, Inadvertent Return Response, and Contingency Plan or Spill Prevention and Response Procedures Plan, as applicable).

**Response:**

*Texas Gas will notify the Morganfield Waterworks and Alcan Ingot Source Water Protection Areas in the event of an inadvertent release of drilling fluids and fuels or any other construction or pipeline operation activities that may impact water quality within these areas. The Horizontal Directional Drill Monitoring, Inadvertent Return Response, and Contingency Plan and the Spill Prevention and Response Procedures Plan have been revised and are provided in* **Attachment 2***.*

JA084

5.    To assist FERC staff with addressing comments provided by the U.S. Department of Interior (under FERC accession number 20220603-5012), provide an update on the habitat surveys for the Indiana bat in Indiana, including when the report will be provided to FERC and the USFWS, and specify when Texas Gas anticipates completing its voluntary payment to the Imperiled Bat Conservation Fund (IBCF) for the proposed tree-clearing in Kentucky. In addition, given the pending reclassification of the Northern long eared bat provide the date at which all tree clearing would occur.  Provide updated correspondence with the USFWS concerning this relationship.

**Response:**

*Texas Gas conducted bat habitat surveys on June 28 through 30, 2022, and the Habitat Assessment will be provided to FERC and the USFWS by late July 2022.  Texas Gas anticipates completing its voluntary payment to the Imperiled Bat Conservation Fund by 3rd Quarter 2022.  Texas Gas also attempted to contact both USFWS offices associated with the Project regarding the pending reclassification of the northern long-eared bat.  Texas Gas will provide updated information on this coordination with its Habitat Assessment Report to be filed by late July 2022.*

JA085

6.  In response to its comments on the Draft EIS, coordinate with the Indiana Department of Natural Resources regarding its request for site-specific bat monitoring for the tri-colored bat prior to tree-clearing outside of the summer occupancy period in Indiana.

**Response:**

*Texas Gas utilized the Indiana Department of Natural Resources Endangered, Threatened, and Rare Species by County list to determine the state listed species that could potentially occur in the Project area. The tri-colored bat was listed as potentially occurring in Johnson County, Indiana, and no tree clearing will occur within Johnson County. The tri-colored bat was not listed as potentially occurring in Posey County, Indiana where tree clearing will occur. Therefore, Texas Gas does not propose any site-specific monitoring for tri-colored bat within the Project area.*

JA086

7.   File revised alignment sheets that reflect the changes in additional temporary workspaces depicted on the site-specific horizontal directional drill diagrams provided in response to our recommendations in the draft EIS. In addition, clearly state whether Texas Gas would clear trees to support placement of water withdrawal hoses or guide wires for horizontal directional drill construction, and if so, if the clearing would be selective and limited to only that necessary for hose or guide wire placement.

**Response:**

*Revised alignment sheets reflecting the changes in additional temporary workspaces are provided in* **Attachment 3**. *As stated in the Environmental Information Request dated December 21, 2021 and filed on January 19, 2022, hand-clearing will only be conducted to the extent necessary for the path of the hose or guide wires.*

JA087

**Attachment 1**

**Indiana Utility Regulatory Commission Order**

JA088



| Commissioner | Yes | No | Not Participating |
|---|---|---|---|
| Huston | √ | | |
| Freeman | √ | | |
| Krevda | √ | | |
| Ziegner | √ | | |

## STATE OF INDIANA

### INDIANA UTILITY REGULATORY COMMISSION

PETITION OF SOUTHERN INDIANA GAS AND ELECTRIC COMPANY d/b/a CENTERPOINT ENERGY INDIANA SOUTH ("CEI SOUTH") FOR (1) ISSUANCE OF A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY PURSUANT TO IND. CODE CH. 8-1-8.5 FOR THE CONSTRUCTION OF TWO NATURAL GAS COMBUSTION TURBINES ("CTs") PROVIDING APPROXIMATELY 460 MW OF BASELOAD CAPACITY ("CT PROJECT"); (2) APPROVAL OF ASSOCIATED RATEMAKING AND ACCOUNTING TREATMENT FOR THE CT PROJECT; (3) ISSUANCE OF A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY PURSUANT TO IND. CODE CH. 8-1-8.4 FOR COMPLIANCE PROJECTS TO MEET FEDERALLY MANDATED REQUIREMENTS ("COMPLIANCE PROJECTS"); (4) AUTHORITY TO TIMELY RECOVER 80% OF THE FEDERALLY MANDATED COSTS OF THE COMPLIANCE PROJECTS THROUGH CEI SOUTH'S ENVIRONMENTAL COST ADJUSTMENT MECHANISM ("ECA"); (5) AUTHORITY TO CREATE REGULATORY ASSETS TO RECORD (A) 20% OF THE FEDERALLY MANDATED COSTS OF THE COMPLIANCE PROJECTS AND (B) POST-IN-SERVICE CARRYING CHARGES, BOTH DEBT AND EQUITY, AND DEFERRED DEPRECIATION ASSOCIATED WITH THE CT PROJECT AND COMPLIANCE PROJECTS UNTIL SUCH COSTS ARE REFLECTED IN RETAIL ELECTRIC RATES; (6) IN THE EVENT THE CPCN IS NOT GRANTED OR THE CTs OTHERWISE ARE NOT PLACED IN SERVICE, AUTHORITY TO DEFER, AS A REGULATORY ASSET, COSTS INCURRED IN PLANNING PETITIONER'S 2019/2020 IRP AND PRESENTING THIS CASE FOR CONSIDERATION FOR FUTURE RECOVERY THROUGH RETAIL ELECTRIC RATES; (7) ONGOING REVIEW OF THE CT PROJECT; AND (8) AUTHORITY TO ESTABLISH DEPRECIATION RATES FOR THE CT PROJECT AND COMPLIANCE PROJECTS ALL UNDER IND. CODE §§ 8-1-2-6.7, 8-1-2-23, 8-1-8.4-1 *ET SEQ.*, AND 8-1-8.5-1 *ET SEQ.*

```
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
```

CAUSE NO. 45564

APPROVED: JUN 28 2022

# ORDER OF THE COMMISSION

**Presiding Officers:**
**James F. Huston, Chairman**
**Stefanie N. Krevda, Commissioner**
**Jennifer L. Schuster, Senior Administrative Law Judge**

On June 17, 2021, Southern Indiana Gas & Electric Company d/b/a CenterPoint Energy Indiana South ("Petitioner" or "CEI South") filed its Verified Petition with the Indiana Utility Regulatory Commission ("Commission") seeking, among other relief, a certificate of public convenience and necessity ("CPCN") for two new natural gas combustion turbines ("CTs") providing 460 megawatts ("MW") of capacity ("CT Project") pursuant to Ind. Code ch. 8-1-8.5, CPCNs for certain environmental projects related to a subset of Petitioner's generation facilities pursuant to Ind. Code ch. 8-1-8.4, and associated ratemaking and accounting treatment for these projects.

Also on June 17, 2021, Petitioner filed the testimony, attachments, and, for certain witnesses, workpapers, of the following (all of whom are employees of Petitioner except as otherwise noted): Steven C. Greenley, Senior Vice President of Generation Development for CenterPoint Energy, Inc. (Petitioner's Exhibit 1); Wayne D. Games, Vice President, Power Generation Operations (Petitioner's Exhibit 2); Erin M. Carroll, Senior Vice President, PowerAdvocate (Petitioner's Exhibit 3); Angila M. Retherford, Vice President, Environmental and Corporate Responsibility (Petitioner's Exhibit 4); Matthew A. Rice, Director of Indiana Electric Regulatory and Rates (Petitioner's Exhibit 5); Nelson Bacalao, Principal Consultant, Siemens PTI (Petitioner's Exhibit 6); Jason A. Zoller, Chief Engineer, Black & Veatch ("B&V") (Petitioner's Exhibit 7); Paula J. Grizzle, Director of Gas Supply and Portfolio Optimization (Petitioner's Exhibit 8); Kara R. Gostenhofer, Director and Assistant Controller (Petitioner's Exhibit 9); Rina H. Harris, Director of Energy Solutions and Business Services (Petitioner's Exhibit 10); and F. Shane Bradford, Director of Power Supply Services (Petitioner's Exhibit 11).

Petitions to intervene were filed by the Citizens Action Coalition of Indiana, Inc. ("CAC"), CenterPoint Energy Indiana South Industrial Group ("Industrial Group"), Sierra Club, Hoosier Chapter ("Sierra Club"), and Sunrise Coal, LLC ("Sunrise Coal"), all of which were granted.

A public field hearing was held in Evansville, Indiana on October 13, 2021, during which members of the public presented testimony related to the relief sought in this Cause.

On November 19, 2021, the Indiana Office of Utility Consumer Counselor ("OUCC") filed the testimony of its witnesses, all of whom are employees of the OUCC's Electric Division: Peter M. Boerger, Ph.D., Senior Utility Analyst (Public's Exhibit 1); Anthony A. Alvarez, Utility Analyst (Public's Exhibit 2); Cynthia M. Armstrong, Senior Utility Analyst (Public's Exhibit 3); and Kaleb G. Lantrip, Utility Analyst (Public's Exhibit 4). Also on that date, intervenors filed the testimony and attachments of their witnesses, including the following: Michael P. Gorman, Managing Principal, Brubaker and Associates, Inc. (Industrial Group's Exhibit 1); Kerwin L. Olson, Executive Director of CAC (CAC's Exhibit 1); Anna Sommer, Principal, Energy Futures Group (CAC's Exhibit 2); Josh Keeling, Director, Cadeo Group (CAC's Exhibit 3); Michael

JA090

Goggin, Vice President, Grid Strategies, LLC (Sierra Club's Exhibit 1); Emily S. Medine, Principal, Energy Ventures Analysis, Inc. (Sunrise Coal's Exhibit 1); Michael J. Nasi, Partner, Jackson Walker LLP (Sunrise Coal's Exhibit 2); and Tommy L. Sutton, Engineering Manager, Sunrise Coal, LLC (Sunrise Coal's Exhibit 3).

The OUCC also filed written consumer comments with its prefiled evidence on November 19, 2021 (Public's Exhibit 5) and additional consumer comments on January 19, 2022 (Public's Exhibit 6). The CAC filed supplemental testimony of Ms. Sommer (CAC's Exhibit 4) on November 22, 2021, and Sunrise Coal filed supplemental testimony of Mr. Sutton (Sunrise Coal's Exhibit 4) on December 17, 2021.

On December 20, 2021, CEI South filed the rebuttal testimony, attachments, and workpapers of Mr. Greenley (Petitioner's Exhibit 1-R), Mr. Games (Petitioner's Exhibit 2-R), Ms. Retherford (Petitioner's Exhibit 4-R), Mr. Rice (Petitioner's Exhibit 5-R), Ms. Grizzle (Petitioner's Exhibit 8-R), Ms. Gostenhofer (Petitioner's Exhibit 9-R), Ms. Harris (Petitioner's Exhibit 10-R), Mr. Bradford (Petitioner's Exhibit 11-R) and Steven A. Hoover, Petitioner's Regional Director of Gas Engineering (Petitioner's Exhibit 12-R).

On January 14, 2022, the Commission issued a docket entry requesting that Petitioner provide certain attachments to its Engineering, Procurement, and Construction ("EPC") Agreement filed as Attachment WDG-R4 to Petitioner's Exhibit 2-R. Petitioner filed its response to this docket entry on January 18, 2022 (Petitioner's Exhibit 13).

On January 21, 2022, the Presiding Officers granted the unopposed motion filed by intervenors seeking a remote evidentiary hearing due to the ongoing COVID-19 pandemic.

The evidentiary hearing in this matter commenced on January 26, 2022 at 10:30 a.m. via WebEx, at which time evidence was offered by CEI South, the OUCC, CAC, Sierra Club, Sunrise Coal, and the Industrial Group. Among the evidence offered at the hearing were certain stipulations between Petitioner and various intervenors with respect to certain facts and admissibility of specific exhibits.

Based upon the applicable law and the evidence of record, the Commission finds:

**1.    Notice and Jurisdiction.** Due, legal, and timely notice of the public field hearing and evidentiary hearing in this Cause was given and published as required by law. Petitioner is a "public utility" as defined in Ind. Code § 8-1-2-1(a) and Ind. Code § 8-1-8.5-1, an "energy utility" as defined in Ind. Code § 8-1-8.4-3, and an "eligible business" as defined in Ind. Code § 8-1-8.8-6. Pursuant to Ind. Code chs. 8-1-8.4 and 8-1-8.5, Petitioner may seek Commission approval of the CPCNs requested in this Cause. Under applicable law, the Commission has jurisdiction over the relief sought by Petitioner in this Cause.

**2.    Petitioner's Characteristics.** Petitioner is a public utility incorporated under Indiana law and has its principal office at 211 NW Riverside Drive, Evansville, Indiana. CEI South owns, operates, manages, and controls, among other things, plant, property, equipment, and facilities which are used and useful for the production, storage, transmission, distribution, and furnishing of electric service to approximately 145,000 electric consumers in southwestern

3

Indiana. Its service territory is spread throughout Pike, Gibson, Dubois, Posey, Vanderburgh, Warrick, and Spencer counties.

**3.    Background.** In Cause No. 45052, filed on February 20, 2018, CEI South requested, among other things, approval of a CPCN for a new 850 MW combined gas cycle turbine ("CCGT") generation facility to be located at its A.B. Brown generating station located on the Ohio River in Posey County, Indiana ("A.B. Brown" or "Brown"). On April 24, 2019, we issued our final order in that case ("45052 Order"), which, among other things, denied CEI South's requested CPCN for the CCGT and discussed the reasons for the denial. The 45052 Order explained in detail how CEI South could improve its planning prior to future CPCN requests. We noted that, while CEI South's request in Cause No. 45052 was "'consistent' with its 2016 [Integrated Resource Plan ("IRP")], the subsequent modeling for this case effectively screened out multiple less-expensive alternatives." 45052 Order at 26. We also found CEI South's risk analysis to be inadequate for multiple reasons, including its failure to update the risk modeling from its 2016 IRP prior to filing and failure to account for material risks associated with the preferred portfolio identified in the 2016 IRP. *Id.* at 27.

In addition, we stated in the 45052 Order that CEI South failed to consider that "[t]he acquisition of an 850 MW generation facility represents approximately 77 percent of the 2019 peak load and just under 71 percent of the summer peak load for 2036[,]" making us "hard pressed to see how reliance on one facility for so much of the [CEI South] system requirements is consistent with maintaining flexibility to respond to changing market conditions and technological change." *Id.* at 28. We concluded that CEI South's request

> does not adequately consider the relative risk of other methods for providing reliable, efficient, and economical electric service. The proposed large scale single resource investment for a utility of [CEI South's] size does not present an outcome which reasonably minimizes the potential risk that customers could sometime in the future be saddled with an uneconomic investment or serve to foster utility and customer flexibility in an environment of rapid technological innovation. As a result, we find that Vectren South has not demonstrated through the evidence of record that the public convenience and necessity require the building of an 850 MW CCGT.

*Id.*

**4.    Relief Requested.** In this Cause, CEI South has requested the Commission issue a CPCN pursuant to Ind. Code ch. 8-1-8.5 for two CTs to be located at the A.B. Brown site, approve associated ratemaking and accounting treatment for the two CTs, establish a depreciation rate for the CT Project, and grant its request for ongoing review of the CT Project. If the CPCN for the two CTs is not granted or the CTs are otherwise not placed in service, CEI South requests that the Commission authorize it to defer, as a regulatory asset, costs incurred in planning its 2019/2020 IRP and presenting this case for consideration, for future recovery through retail electric rates.

4

CEI South has also requested the Commission issue CPCNs pursuant to Ind. Code ch. 8-1-8.4 for the construction of equipment and facilities necessary to comply with the United States Environmental Protection Agency's ("EPA") Coal Combustion Residuals ("CCR") rule for the handling and disposal of dry ash (the "Dry Ash Compliance Project") and to construct two new small ponds (one at A.B. Brown and one at Petitioner's F.B. Culley generating station in Warrick County, Indiana ("Culley")) to handle coal-pile runoff, flue gas desulfurization ("FGD") wastewater, and other flows such as stormwater and landfill leachate in compliance with the EPA's CCR rule (the "Pond Compliance Project") (collectively with the Dry Ash Compliance Project, the "CCR Compliance Projects"). CEI South also has requested that the Commission approve accounting and ratemaking treatment for the CCR Compliance Projects and establish a depreciation rate for the CCR Compliance Projects.

5. **The Parties' Evidence.**

A. **Petitioner's 2019/2020 IRP.** Mr. Rice described how CEI South developed the portfolios modeled in the 2019/2020 IRP. He testified that, following the 45052 Order, CEI South, with the help of Burns & McDonnell, conducted an all-source request for proposals ("All-Source RFP") to gather resource availability and pricing information for various resources, including resources such as solar, solar plus storage, and standalone storage. Mr. Bradford testified that 22 individual respondents submitted complete responses to the All-Source RFP, resulting in 110 proposals, 91 of which were for projects located in Indiana. The proposals included eight for battery storage, two for coal, seven for combined cycle, one Load Modifying Resource ("LMR")/Demand Response ("DR"), 57 solar, 19 solar plus storage, three system energy, and 13 wind.

Mr. Rice summarized the 15 optimized portfolios examined and explained the carbon dioxide and gas prices used within the scenario modeling. Each portfolio was evaluated utilizing simulated dispatch in the reference case, which led to the exclusion of several portfolios from further consideration. The remaining ten portfolios were then evaluated using a balanced scorecard approach. From this analysis, CEI South identified the Preferred Portfolio, which includes a diverse mix of resources including energy efficiency, wind resources, solar and solar plus storage, and the CT Project. Mr. Rice also explained Petitioner's Generation Transition Plan and how the Preferred Portfolio offers future flexibility, should the future turn out different than expected. He testified that CEI South incorporated stakeholder input throughout the process.

Dr. Bacalao testified that Siemens PTI developed and managed Petitioner's IRP modeling (including some input development), strategic consulting, participation in the stakeholder process, and scorecard development. He stated that Siemens PTI used a balanced scorecard approach to illustrate the reasonableness of the Preferred Portfolio.

Mr. Rice testified that the Preferred Portfolio performed well across multiple risk factors in the balanced scorecard and stated that the Preferred Portfolio avoids long-term reliance on the capacity market or heavy reliance on emerging technology. He opined that the fast start and ramping capability of the two CTs that are part of the Preferred Portfolio allows for high penetration of low-cost renewable energy resources, which were consistently selected in all portfolios, regardless of potential future events. He noted that the CT Project will allow CEI South to build renewable resources with the confidence that dispatchable resources such as the CTs will

5

be available when needed, particularly in winter months where multi-day periods of cloud cover and no wind are possible.

The OUCC's position is that refueling A.B. Brown with natural gas is preferable to the proposed CTs. Dr. Boerger testified that gas conversions can be completed at a very low capital cost compared to the cost of a new CT. He discussed the net present value of revenue requirements ("NPVRR") values for the gas conversion and presented his analysis of CEI South's modeled operation and maintenance ("O&M") costs for gas-converted units. He opined that NPVRR values for the gas conversion portfolios incorporate a significant overestimation of O&M costs, based on the reduction in O&M costs AES Indiana experienced after converting its Harding Street Station units to burn gas.

Testifying on behalf of the CAC, Ms. Sommer stated that she found errors in CEI South's 2019/2020 IRP and opined that correcting for these errors would result in the selection of a plan that is lower cost, includes more renewables and battery storage, and avoids the construction of the CT Project. She explained that she had transparency concerns with CEI South's modeling because she could not access all of the Siemens PTI data to run her own modeling. Even though CEI South and Siemens provided an analyst to perform additional Aurora simulations, Ms. Sommer did not find this to be a satisfactory resolution to her transparency concerns. She questioned the veracity of CEI South's industrial sales and load forecast and suggested the Commission add a condition that if the additional industrial load upon which the IRP modeling was based fails to materialize, the Commission should disallow certain costs.

Ms. Sommer also testified that her analysis of additional modeling runs performed by Siemens PTI on behalf of CAC, CAC High Tech, and CAC Renewables by 2030 supported using a combination of DR, solar, wind, and storage to replace retiring coal. Ms. Sommer also raised concerns with the stochastic gas price analysis, again citing an inability to independently verify the modeling results without full access to all data.

Mr. Gorman, testifying for the Industrial Group, opined that CEI South has not demonstrated that constructing two CTs to serve its capacity needs is reasonable, arguing that the 2019/2020 IRP did not demonstrate that the capacity offered by both CTs would be needed until 2033. He acknowledged that CEI South has reported some increases in projected industrial load, which may support the need for additional capacity relative to the IRP load studies, but noted that CEI South has not rerun its IRP to show these new load changes. He also opined that potential changes since the IRP (such as increased gas prices) may affect the reasonableness of building the CT Project.

Testifying for the Sierra Club, Mr. Goggin opined that, if Petitioner's 2019/2020 IRP were conducted today using updated cost assumptions, the modeling would likely select even greater amounts of wind, solar, and storage instead of gas capacity. Mr. Goggin explained why he believes batteries have superior technical capabilities to gas CTs and opined that CEI South's increasing reliance on gas poses significant economic and reliability risks. He opined that CEI South's 2019/2020 IRP called for significantly more solar and storage capacity. He opined that imports and exports are an efficient tool for integrating large amounts of wind and solar generation and can help meet reliability needs, including during extreme weather events. He also testified that the capacity value of renewable and storage resources is understated. He also noted economic and

6

reliability risks associated with dependence on natural gas and CEI South's plan to eventually operate the CT Project on hydrogen. He recommended the Commission deny the CPCN for the CT Project.

Ms. Medine, testifying on behalf of Sunrise Coal, opined that, due to changes in the natural gas and power markets after the 2019/2020 IRP, continued use of the A.B. Brown plant to burn coal for several more years is a superior alternative to the proposed CT Project and a better exit ramp to incorporating more renewable options in Petitioner's generation portfolio.

On rebuttal, Mr. Rice responded to the non-utility parties' concerns with gas prices, stating that the Preferred Portfolio performed well on multiple objectives, including cost, which considered the full range of probable gas price forecasts. He testified that recently volatile gas prices appear to be returning to expected levels.

Regarding criticisms of CEI South's load forecasts, Mr. Rice stated that CEI South has lost nearly all industrial DR since filing the 2019/2020 IRP. He also disagreed with Mr. Goggin's testimony regarding relying on imports and exports for reliability, noting that CEI South, as a North American Electric Reliability Corporation ("NERC") Load Serving Entity ("LSE") within the Midcontinent Independent System Operator ("MISO") footprint, has responsibility to provide adequate resources to meet its load. He opined that, if MISO and CEI South relied solely upon imports to serve the system load during peak times, CEI South would subject its customers to significant reliability and price risks. He stated that inadequate transmission system voltage can cause partial and cascading grid collapse, but the CT Project alleviates this issue.

Mr. Rice discussed the OUCC's proposal that CEI South convert the existing A.B. Brown units to natural gas, noting that Dr. Boerger ultimately agreed in deposition that his calculations show that gas conversion will cost more than the Preferred Portfolio. Mr. Rice explained how the OUCC's position that the cost of the conversion at A.B. Brown could be $78.2 million less was miscalculated. He also discussed how the capital cost recovery for the CTs was not assumed to have a 100-year life, as implied in Dr. Boerger's testimony; CEI South assumed a 30-year life. Mr. Rice also stated that Dr. Boerger was incorrect to estimate the depreciation rate by subtracting the discount rate from the capital cost recovery factor. He testified that the capital cost recovery factor is a multiplier that is used to determine the annuity that needs to be recovered to obtain a return on the capital invested and repay the original capital. He stated the 8.64% reported corresponds to a 30-year life and a discount rate of 7.71%. Thus, Mr. Rice concluded that the OUCC's calculation of a $47.8 million impact is incorrect. Mr. Rice stated that the impact, when correctly calculated, is zero. Mr. Rice also responded to Dr. Boerger's statement that the cost of removal was not included in the Preferred Portfolio, noting that it was included in confidential attachments to Dr. Boerger's own testimony.

Mr. Bradford stated that, although Mr. Alvarez testified that a refueled A.B. Brown would receive the same nameplate capacity as it had when run on coal, MISO's Independent Market Monitor ("IMM") had made different recommendations for MISO capacity accreditation in the 2020 State of the Market Report ("IMM Report"). Mr. Bradford explained that the IMM ultimately recommended that MISO move away from unforced capacity ("UCAP"), because "it does not recognize that inflexible resources with long lead times are less valuable than more flexible resources" and "[t]his reflects reality because MISO often does not see tight conditions coming

7

day-ahead or many hours in advance, which causes long-lead time offline units to contribute less to overall reliability than online or quick start resources." Petitioner's Exhibit 11-R, Attachment FSB-R1 at 91; Petitioner's Exhibit 11-R at 22. He said that, under the IMM's recommended available capacity ("ACAP"), the nameplate capacity of a converted Brown would be approximately 25% lower than when it was run on coal.

Mr. Bradford disagreed with Mr. Gorman's testimony that the most recent IRP did not demonstrate that the capacity offered by both CTs would be needed until 2033, citing Table FSB-R2 attached to his rebuttal testimony, which shows a capacity deficit as early as 2028, requiring additional generation or capacity to meet CEI South's needs.

Mr. Bradford also responded to Mr. Goggin's assertion that CEI South should rely on capacity market purchases rather than the CTs to meet its capacity needs. He opined that Mr. Goggin incorrectly extrapolates MISO Planning Reserve Auction ("PRA") clearing prices as the future cost to CEI South to cover its capacity requirements. Mr. Bradford stated that MISO is fundamentally not a long-term capacity market, as evidenced by the fact that the auction for capacity during a given planning year running from June-May is conducted only a few months prior to the start of the planning year. The 2021 Organization of MISO States ("OMS") Survey Report shows Zone 6, including CEI South's service territory, as having the greatest potential capacity shortage across all zones in the 2026 outlook and as being critically dependent on potential new resources to meet local clearing requirements by 2026. To the extent potential new generation is critical to meeting its local resource requirements, the CTs are already included in the OMS survey results as part of the potential capacity needed to ensure reliability.

**B.    CT Project.** Mr. Games testified that CEI South's generation portfolio heavily relies on coal generation, totaling 1,032 MW. He stated that growth of renewable energy sources and low natural gas prices have negatively affected MISO's dispatch of CEI South's coal-fired units. Instead of running continuously, CEI South's coal-fired units are now cycled up and down throughout the day or are shut down altogether, decreasing unit efficiency, increasing wear and tear on the units, and enhancing environmental compliance risk. He testified that the A.B. Brown generation units, at a net 245 MW each, are among the smallest and least efficient coal units remaining in Indiana and do not provide the flexibility required to reliably provide the back-up for a large renewable portfolio in an economic manner.

Mr. Games testified on direct that the estimated cost of the CT Project was approximately $323 million; this estimate was updated on rebuttal to approximately $334 million following Petitioner's execution of the EPC contract with Kiewit Power Constructors Co. ("Kiewit") on November 30, 2021. He stated that the proposed two F-Class natural gas CTs would have an output of approximately 460 MW and would replace the A.B. Brown coal plant and support the 700-1,000 MW of solar and solar plus storage and 300 MW of wind in Petitioner's generation portfolio. He testified that CEI South considered a range of natural gas CT options, but found that the proposed F-Class turbines are among the most efficient units currently available in this class, with the lowest capital cost per kilowatt ("kW") versus other new natural gas options evaluated. He stated that the F-Class CTs together will be able to ramp up at a rate of 80 MW per minute.

Ms. Retherford discussed the federal regulations, such as Effluent Limitation Guidelines ("ELG"), CCR, and the cross-state air pollution rule ("CSAPR"), that impact CEI South's coal-

8

generating units. She testified that CEI South must cease operations by December 31, 2023 to comply with the firm deadline for prohibition of fly ash transport by water under ELG. She explained that CEI South's Preferred Portfolio avoids additional incremental compliance costs for CCR and ELG at A.B. Brown by retiring the two coal-fired units and replacing them with renewables and the CT Project.

Mr. Bradford described how the CT Project fits within the overall capacity composition forecast for the MISO footprint and explained congestion impacts. He opined that, for consistent reliable generation to Indiana customers, renewable generation must be supported by dispatchable generation, such as the proposed CTs that have the ability to quickly ramp up and down. He stated that the CT Project will thus support renewables in CEI South's service territory and in and around MISO Zone 6.

Dr. Boerger opined that the OUCC's proposed alternative to the CT Project, refueling A.B. Brown with natural gas, would minimize capital outlays for CEI South customers, provide the dispatchable capacity CEI South indicates it needs, and provide needed flexibility. Mr. Alvarez also testified that refueling the A.B. Brown units would require low capital outlay, which would serve to protect ratepayer interests in existing assets. Ms. Armstrong explained that gas conversion will qualify for the same air permits and emissions netting benefits as the new gas CTs.

Mr. Olson of the CAC testified that CEI South has some of the highest bills in the country and that the CT Project is not in the best interest of ratepayers. Ms. Sommer opined that the gas pipeline proposal is oversized relative to its need. Mr. Keeling testified that untapped DR potential in CEI South's electric service territory exists, and he suggested changes to CEI South's interruptible tariff language necessary to access this untapped potential.

As noted above, Mr. Gorman testified on behalf of the Industrial Group that CEI South has not demonstrated that both CTs would be needed prior to 2033.

Testifying on behalf of the Sierra Club, Mr. Goggin opined that CEI South failed to correctly account for declining electricity demand, the capacity surplus in Indiana and elsewhere in the MISO footprint, and the large capacity value contributions of renewable and storage resources in proposing the CT Project. He argued that the extremely low capacity factors in CEI South's modeling indicate that the proposed CT Project, and particularly the second proposed CT, are uneconomic and not needed for reliability. He also noted a risk that one or both of the proposed CTs will become stranded assets.

Ms. Medine, testifying on behalf of Sunrise Coal, noted that the viability of the CT Project is unclear due to the Federal Energy Regulatory Commission ("FERC") requirement for an environmental impact statement ("EIS") for the pipeline project. She interpreted the FERC's decision to prepare an EIS for the pipeline extension as an apparent repudiation of Petitioner's position that the CT Project would have a net benefit on the environment (allowing for the retirement of A.B. Brown's coal units) and that the CT Project is necessary for CEI South to serve its customers. Ms. Medine also stated that continuing to burn coal at A.B. Brown would not require expensive scrubber replacement and ELG compliance investment, as claimed by Petitioner, as long as coal burning ends by 2028. She opined that the only impediment to continuing to burn coal at A.B. Brown for several more years relates to CCR compliance.

9

Mr. Nasi, also on behalf of Sunrise Coal, opined that CEI South did not examine all reasonable alternatives in its filing to the EPA for an extension to continue to use the Brown pond past the original April 2021 cease disposal date and described additional alternatives which he said would allow A.B. Brown to continue operation through October 2026. He testified that the timing for the cessation of the operation of the boilers depends on the amount of time it takes to complete closure of the surface impoundment.

On rebuttal, Mr. Greenley testified that, if CEI South's request for a CPCN for the CT Project is denied, CEI South risks losing, among other things, the benefits of the signed EPC contract for the CT Project, the interconnection rights from building new generation at the A.B. Brown site, and the benefits of environmental netting. He opined that a denial would subject CEI South customers to risk from a higher cost portfolio and potentially volatile swings in the price of energy and capacity while awaiting further analysis.

Mr. Games explained why the OUCC's alternate proposal of refueling A.B. Brown with natural gas is not viable, stating that refueling will not provide the dispatchable power needed to ensure a reliable supply of electricity as CEI South and others in MISO's footprint transition generation to renewable energy resources. He noted that, while there are many benefits to adopting renewable energy, the intermittent nature of renewable resources necessitates incorporating resources like the proposed CTs that can react and ramp up quickly to provide power when renewable resources cannot. Mr. Rice identified a number of errors in Dr. Boerger's analyses leading to the OUCC's recommendation that CEI South refuel A.B. Brown with natural gas.

Ms. Retherford discussed why Sunrise Coal's proposal to burn coal at A.B. Brown beyond October 2023 is not feasible, noting that this would require significant expenditures for environmental compliance and the termination of the existing A.B. Brown Ash Pond Compliance Plan approved by the Commission in Cause No. 45280. She opined that Sunrise Coal's proposal oversimplifies the extension mechanisms provided in the CCR Part A Reconsideration Rule and fails to consider the full suite of environmental compliance requirements applicable to the A.B. Brown coal units.

Ms. Retherford also addressed FERC's decision to prepare an EIS for the gas lateral to serve the CT Project, stating that Ms. Medine's interpretation of that decision as a repudiation of the need for the CT Project is incorrect. Ms. Retherford testified that FERC has begun preparing an EIS rather than the less-robust environmental assessment ("EA") in an increasing number of pipeline cases to lessen the likelihood of FERC orders being overturned by courts. Ms. Retherford noted that this will reduce risk for project developers who rely on FERC orders when investing significant amounts of money on new projects.

Mr. Rice responded to the Sierra Club's suggestion that the capacity market can be used to support large amounts of renewables, stating that MISO and CEI South cannot rely solely on imports to maintain reliability. He noted that the basic concepts of interconnected grid operations are based on generation and load being equal in real time, which stabilizes the operational frequency of the grid at 60 hertz ("Hz"). According to Mr. Rice, if MISO and CEI South were to rely solely on imports to serve the system load during peak times, they would be subjecting customers to significant reliability and price risks. He also noted that, when operating, the CTs automatically provide dynamic reactive power to the system at a point close to the system load.

10

JA098

Mr. Rice addressed the CAC's claims that DR programs could be utilized in place of the CTs. He testified that DR involves risk and requires that customers voluntarily sign up for DR programs. In emergency DR programs, customers can choose not to participate during peak conditions. He stated that DR is similar to wind or solar resources in that it may not be present when most needed.

Ms. Harris also discussed the prospects for additional DR, addressing customer and industrial DR, assumptions, and modeling inputs in the market potential study and CEI South's industrial load forecast. She testified that she disagreed with Mr. Keeling's conclusion that CEI South could achieve an additional DR of 200 MW, noting that CEI South's customer makeup does not lend itself to achieving this level of DR. She stated that CEI South only has seven customers with more than 10 MW of load, and many of those customers are not in industries that readily permit idle manufacturing operations for curtailment. According to Ms. Harris, even if CEI South could achieve an additional 200 MW of DR, it would still need the two CTs, as DR programs are only issued during emergency MISO events, and the CTs more broadly support reliability.

Mr. Bradford discussed the NERC 2021 Long-Term Reliability Assessment (December 2021) (the "NERC 2021 LTRA" or "NERC Assessment"), which is included in Petitioner's Exhibit 13-R as Workpaper MAR-R3. He opined that the NERC Assessment supports CEI South's request to install fast-starting, quick-ramping generation via the CTs in order to support the growing portfolio of renewable resources and maintain reliable service. He testified that MISO's IMM, Potomac Economics, noted in the IMM Report that "MISO has correctly concluded that the availability and flexibility of its nonintermittent resources will be paramount in maintaining its ability to operate the system reliably." Petitioner's Exhibit 11-R at 4.

## C.    Federally Mandated CCR Compliance Projects.

i.    **Dry Ash Compliance Project.** Mr. Games discussed the Dry Ash Compliance Project, which will involve the construction of a dry fly ash loading facility at the Archer Daniels Midland ("ADM") site in Evansville, Indiana on the Ohio River. The Dry Ash Compliance Project consists of three components: (1) a silo for accepting ash from Brown and Culley, (2) a facility to load ash onto barges for transport to Missouri for beneficial reuse, and (3) a new dry ash handling system since the previous conveyor system was converted for handling of ponded ash.

Ms. Retherford described the CCR rule, a self-implementing regulation under Subtitle D of the Resource Conservation and Recovery Act ("RCRA"), which prohibits ash from being placed in unlined ash ponds after April 2021, unless an extension is granted. She also described the EPA's ELG rule under Section 201 of the Clean Water Act, which (1) prohibits the discharge of fly ash transport water at existing facilities, (2) prohibits the discharge of bottom ash transport water at existing facilities, and (3) sets stringent new arsenic, mercury, selenium, and nitrate/nitrite discharge limits for scrubber wastewater.

Mr. Games discussed the cost estimate for the Dry Ash Compliance Project, including $12 million in estimated capital costs and annual estimated O&M expenses of $1.35 million for 2021 through 2023 and $680,000 for 2024 and beyond. He described the EPC agreement with Penta

11

Engineering for this project. He also discussed the various alternatives for dry ash disposal considered by Petitioner, the site that was chosen for the project, and the estimated project schedule.

> **ii.** **Pond Compliance Project.** Ms. Retherford discussed Petitioner's request for a CPCN to construct a lined CCR-compliant pond at Culley and a lined CCR-compliant pond at A.B. Brown to handle coal pile runoff, FGD wastewater, and other flows such as stormwater and landfill leachate in compliance with EPA's CCR rule.

Ms. Retherford described the recent modification to the CCR Rule ("Part A Reconsideration") requiring Petitioner to pursue the fastest technically feasible option to obtain alternative disposal capacity. She explained that the Pond Compliance Project is necessary to demonstrate to the EPA that Petitioner is complying with the CCR Part A Reconsideration. She testified there were no alternative plans considered to the Pond Compliance Project because CEI South found no other options that would achieve compliance with the "fastest technically feasible" requirement of the Part A Reconsideration.

Mr. Games discussed the cost estimate for the Pond Compliance Project, including $19 million in estimated capital costs and annual estimated O&M expenses of $350,000.

Ms. Armstrong of the OUCC testified that Petitioner's request for a CPCN for the Pond Compliance Project should be denied because CEI South has not adequately shown continuing to operate A.B. Brown Units 1 and 2 and Culley Unit 2 until October 2023 is the most reasonable, least-cost option for meeting resource needs. She stated that CEI South did not provide reasonably adequate cost estimates for the Pond Compliance Project and expressed concern that Class 5 estimates such as those presented by Petitioner could increase by 30% to 100%. She also opined that the proposed Pond Compliance Project should be denied (or recovery reduced to 50%) due to uncertainty that the EPA will grant CEI South's extension request.

Mr. Nasi, testifying on behalf of Sunrise Coal, opined that CEI South could have extended the use of coal at the A.B. Brown Units 1 and 2 if CEI South converted only the fly ash handling system to dry handling and then constructed a pond to receive only FGD and bottom ash wastewater. He asserted that this option would have allowed A.B. Brown Units 1 and 2 to continue burning coal until October 17, 2028.

Ms. Retherford opined on rebuttal that no lower cost, viable alternatives to the Pond Compliance Project exist. She stated that, if Petitioner followed the OUCC's suggestion to retire A.B. Brown Units 1 and 2 and Culley Unit 2, it would require the immediate shutdown of approximately 900 MW of CEI South's 1,200 MW of generation capacity without any replacement.

In response to Mr. Nasi's proposal, Ms. Retherford explained that the CCR Part A Reconsideration Rule provides two extension mechanisms: (1) a site-specific alternative deadline under 40 C.F.R. § 257.201(f)(1), which requires a demonstration that the development of alternative capacity is technically infeasible by April 2021; and (2) permanent cessation of a coal-fired boiler by a date certain under 40 C.F.R. § 257.103(f)(2). CEI South filed its request for

JA100

extension under 40 C.F.R. § 257.201(f)(1) for the Pond Compliance Project, which requires a demonstration what is the fastest technically feasible alternative.

Due to the voluminous nature of the parties' evidence, additional evidence will be discussed as relevant below.

**6.    Commission Discussion and Findings on CT Project.** CEI South's request for a CPCN for the CT Project is the end result of the process that began with our denial of its requested CPCN for an 850 MW CCGT, which would have cost an estimated $781 million, in Cause No. 45052. CEI South followed the guidance we issued in the 45052 Order and engaged in a thorough RFP process in which it considered many potential options for generation resources. This process ultimately resulted in CEI South's 2019 IRP and Preferred Portfolio, including the two CTs requested here. The Preferred Portfolio calls for the addition of a significant amount of renewable generation from 2022 through 2024, including approximately 300 MW of wind and up to 1,000 MW of universal solar and battery storage. *See* Petitioner's Exhibit 5, Attachment MAR-1 (2019/2020 IRP) at 53. The flexible and controllable nature of the gas CTs will support the intermittent nature of the renewable generation in the Preferred Portfolio to ensure system reliability. We believe that this step of implementing the Preferred Portfolio, moving forward on the two CTs, is the best economic decision for CEI South's customers. In addition, MISO, the operator of the electric grid in which CEI South is a participant, has indicated a system-wide need for controllable resources such as the CTs to ensure system reliability as more intermittent resources are added to the system.

Thus, for the reasons explained further below, we grant the requested CPCN for the CT Project.

**A.    Request for CPCN for Two CTs Under Ind. Code § 8-1-8.5-5.** Ind. Code § 8-1-8.5-2 states that a public utility must obtain a CPCN from the Commission prior to constructing, purchasing, or leasing a facility for the generation of electricity. Ind. Code § 8-1-8.5-5 sets forth the criteria for approving a utility-specific generation proposal. In granting a CPCN, the Commission must make findings on the best estimate of the project's cost based on the record, whether the proposal is consistent with our statewide analysis or a utility-specific proposal, and whether public convenience and necessity require the project. The Commission must also consider the items set forth in Ind. Code § 8-1-8.5-4. We address the required findings and review each factor in Ind. Code § 8-1-8.5-4 below.

**i.    Best Estimate of Costs.** Under Ind. Code § 8-1-8.5-5(b)(1), a CPCN may be granted only if the Commission makes a finding "as to the best estimate of construction, purchase, or lease costs based on the evidence of record[.]"

Mr. Games described CEI South's RFP for an EPC contractor and for the purchase of major equipment. He stated that CEI South, B&V, and Power Advocate reviewed and analyzed bids received in response to the RFP to ensure compatibility with the different phases of the project. Mr. Games and Ms. Carroll both discussed how Kiewit was chosen as the EPC contractor. Mr. Games described the project schedule.

As noted above, Mr. Games testified on direct that the estimated cost of the CT Project was approximately $323 million; this estimate was updated on rebuttal to approximately $334 million following execution of the EPC contract with Kiewit on November 30, 2021. According to Table WDG-4 in Mr. Games's direct testimony, explaining the breakdown of the original $323 million estimate, the EPC estimate was $188 million, including the cost for Kiewit to engineer, procure, and construct the two CTs and the direct and indirect costs of EPC overhead and profit, escalation, bonding, warranty, and builder's risk insurance. $70 million of the estimate was the owner's cost, including allowances for the owner's project management teams, the owner's engineer, support engineering and training, environmental and other permitting activities, legal fees, construction utilities, regulation and code changes, price escalation, the owner's contingency, and unresolved work scope items and terms and conditions. The cost estimate for internal labor and loadings to support the CT Project from planning through completion was $10 million. Administrative and general overhead and allowance for funds used during construction ("AFUDC") were estimated to be $35 million, and critical and long-lead-time spare parts were estimated to cost $8 million. The estimate also included $12 million in study and pre-work costs, including costs associated with CEI South's 2019/2020 IRP process (2016-2019) and preparation starting in 2019 for the filing in this Cause. The estimate did not include pipeline costs. Mr. Games opined that the estimate is consistent with Petitioner's 2019/2020 IRP.

Changes to the components of the cost estimate following the execution of the Kiewit contract are confidential and are included in Mr. Games's rebuttal testimony in confidential Table 1. Petitioner's Exhibit 2-R at 33. On rebuttal, Mr. Games testified that the adjusted base price estimate for the CT Project is $317 million, which is lower than the initial $323 million base price estimate. He identified an estimated range of the total CT Project cost between $317 and $351.4 million, with $334 million in the mid-point of this range.

In his direct testimony, Mr. Games stated that the terms of the agreement with Kiewit that remain to be resolved include indemnification, limitations of liability and consequential damages, the definition of material change, and excused delays. However, Mr. Games stated that the majority of the EPC contract price is firm. Mr. Games provided the signed agreement in Petitioner's Exhibit No. 2-R, Confidential Attachment WDG-R3.

Ms. Sommer, on behalf of the CAC, opined that "[k]ey commodity indices show concerning levels of escalation that appear to be more significant than [CEI South] has assumed in its project cost estimate." CAC's Exhibit 2 at 66. On rebuttal, Mr. Games explained that CEI South negotiated pricing adjustment mechanisms to address escalation concerns rather than accept a large firm price increase including large contingencies in order to cover a worst-case scenario. He stated that the overall base price under the executed EPC contract is lower than in the original estimate, but remains subject to price adjustments. During cross-examination, Mr. Games testified that he was reasonably confident the project would not exceed this high end of the range of costs presented in his rebuttal.

Mr. Alvarez of the OUCC opined that CEI South's estimate for the CT Project was unrealistically low. He stated that he calculated a higher capital cost of $720 per kW (compared to Mr. Games's $702 per kW estimate) for the CT Project. Mr. Alvarez evaluated the estimate using Lazard's Levelized Cost of Energy Analysis Version 14.0 (2020) ("Lazard Study") and the United States Energy Information Administration ("EIA") Annual Energy Outlook. Mr. Alvarez testified

14

that the Lazard Study shows a range of capital cost per kW of $700 (for a 240 MW peaking unit) to $925 (for a 50 MW peaking unit). Mr. Alvarez also took issue with the fact that the CT Project cost estimate did not include the costs necessary to build the gas lateral.

On rebuttal, Mr. Games noted that CEI South's initial cost estimate was within the range of negotiated outcomes. He observed that the Lazard Study cited by Mr. Alvarez actually demonstrated that the proposed CTs are at the lower end of the range of potential capital cost per kW for peaking units, which Mr. Games attributed to the large size and efficiency of the F Class CTs proposed for the CT Project.

After reviewing the evidence of record, we find that CEI South has submitted extensive evidence supporting its cost estimate, and the other parties' evidence addressing the best cost estimate does not call CEI South's estimate into question. Thus, based on the evidence of record, we find that $334 million is the best estimate of the costs of the two CTs.

**ii.** **Consistency with Petitioner's 2019/2020 IRP.** Ind. Code § 8-1-8.5-5(b)(2) provides that a CPCN shall be granted only if the Commission has made a finding that either:

(A) the construction, purchase, or lease will be consistent with the commission's analysis (or such part of the analysis as may then be developed, if any) for expansion of electric generating capacity; or

(B) the construction, purchase, or lease is consistent with a utility specific proposal submitted under [Ind. Code § 8-1-8.5-3(e)(1)] and approved under subsection (d).

Ind. Code § 8-1-8.5-3(e)(1) provides that a public utility may submit "a current or updated integrated resource plan as part of a utility specific proposal as to the future needs for electricity to serve the people of the state or the area served by the utility[.]" Mr. Rice sponsored Petitioner's 2019/2020 IRP as Petitioner's Exhibit 5, Attachments MAR-1 and MAR-2 (Confidential). Thus, we find that CEI South has submitted a utility-specific proposal under Ind. Code § 8-1-8.5-3(e)(1).

The record demonstrates that the CT Project is consistent with the Preferred Portfolio identified in Petitioner's 2019/2020 IRP. Consistent with direction from the Commission in the 45052 Order, CEI South engaged in an IRP planning process to evaluate how different portfolios performed under a range of future potential market conditions and uses and to determine the optimal mix of supply or demand resources to provide electricity to CEI South's customers. As part of its 2019/2020 IRP process, CEI South engaged in a detailed resource planning analysis and worked with several industry experts to conduct an All-Source RFP, to develop scenarios, to conduct technical modeling, and to conduct risk assessments. The record reflects that, within this process, CEI South considered 110 proposals comprising different generation resources for modeling, including battery storage, coal, combined cycle gas, load modification and demand response, solar, solar plus storage, system energy, and wind. From this analysis, 15 portfolios comprising a mix of supply- and demand-side resources were developed and modeled. CEI South also engaged and considered stakeholder input throughout the process.

15

The Preferred Portfolio identified through the 2019/2020 IRP called for the retirement or exit of energy provided by coal-burning units at the Brown and Culley generating stations. The Preferred Portfolio and the associated 2019/2020 IRP short term action plan which describes the early steps to pursue it, calls for CEI South to make changes to its generation portfolio in the next three years. The Preferred Portfolio mapped a shift from a generating fleet of predominantly coal-burning resources to one of intermittent renewable resources supported by gas generation to ensure reliability. One early step in implementing the Preferred Portfolio was the addition of solar generating resources approved by the Commission in Cause Nos. 45501 on October 27, 2021 and 45600 on May 4, 2022. A next step is the addition of the two new CTs requested in this Cause.

We have previously stated that, "[i]nherently, integrated resource plans are performed at a point in time and use modeled scenarios to show how resources perform over a variety of alternative future conditions." *Northern Indiana Public Service Co., LLC*, Cause No. 45462, at 62 (May 5, 2021). The evidence demonstrates, and the Commission has previously found, that Petitioner "utilized an array of best practices, including basing model inputs on its All-Source RFP, which allowed for an informed forecast at that time." *Southern Indiana Gas & Elec. Co.*, Cause No. 45501, at 29 (Oct. 27, 2021).

Several intervenors criticized CEI South's 2019/2020 IRP process and modeling and argued in favor of alternative resources to support the Generation Transition Plan instead of the two CTs identified, as discussed further above. However, after considering the evidence of record, we find that the resource planning and selection process used by CEI South for selecting the Preferred Portfolio and Generation Transition Plan, including the two CTs requested here, is consistent with its 2019/2020 IRP, which was conducted in a manner consistent with the Commission's direction in the 45052 Order, and is therefore consistent with CEI South's utility-specific proposal under Ind. Code § 8-1-8.5-3(e)(1).

**iii.** **Consistency with Commission's Energy Analysis.** Ind. Code § 8-1-8.5-3(a) provides that "the commission shall develop, publicize, and keep current an analysis of the long-range needs for expansion facilities for generation of electricity." The Commission issued its 2018 Report on the Statewide Analysis of Future Resource Requirements for Electricity ("2018 Statewide Analysis") in October 2018. *See* Petitioner's Exhibit 5, Attachment MAR-16.

The data and analysis underlying CEI South's proposal and the state of the overall electric industry have continued to develop since the 2018 Statewide Analysis. Mr. Rice noted on rebuttal that all Indiana utilities that submitted IRPs in 2021 (Duke Energy Indiana, LLC, Indiana Michigan Power Company, and Northern Indiana Public Service Company LLC) propose to retire all coal generation over the full planning period and add a large amount of solar and wind resources, supported by gas CTs, CCGTs, and some battery storage. The record in this Cause contains findings by MISO's IMM (Petitioner's Exhibit 5-R, Attachment MAR-R1; Petitioner's Exhibit 11-R, Attachment FSB-R1) and the NERC (Petitioner's Exhibit 13-R, Workpaper MAR-R3) supporting the need for flexible, controllable resources to pair with increasing levels of renewable generation to ensure reliability.

Based on the evidence of record, we find that CEI South's proposal to build the two CTs, which are flexible, controllable resources that will support the increasing use of renewables by

16

CEI South and other Indiana electric utilities, is consistent with the Commission's energy analysis, including the 2018 Statewide Analysis and developments since that report was issued.

**iv.  Public Convenience and Necessity.** Under Ind. Code § 8-1-8.5-5(b)(3), before granting a CPCN, the Commission must make "a finding that the public convenience and necessity require or will require the construction, purchase, or lease of the facility[.]" "The public convenience and necessity criterion is common in public utility matters and generally concerns whether the proposal is fitted or suited to the public need." *Indiana Michigan Power Co.*, Cause No. 44871, at 30 (March 26, 2018). CEI South contends the CTs are suited to the public need because they are necessary to follow CEI South's load and meet adequate reserve margins. Based on the evidence of record, we agree, as explained further below.

Our determination of public convenience and necessity under Ind. Code § 8-1-8.5-5(b)(3) is also guided by Ind. Code § 8-1-8.5-4(b), which provides that the Commission must, in acting on any petition for the construction, purchase, or lease of any facility for the generation of electricity, consider the following:

> (1) The applicant's current and potential arrangement with other electric utilities for:
>> (A) The interchange of power;
>> (B) The pooling of facilities;
>> (C) The purchase of power; and
>> (D) Joint ownership of facilities.
> (2) Other methods for providing reliable, efficient, and economical electric service, including the refurbishment of existing facilities, conservation, load management, cogeneration and renewable energy sources.

We address these considerations below.

**1.  Ind. Code § 8-1-8.5-4(b)(1).** Mr. Rice testified that CEI South approached other electric utilities in Indiana about joint owning generation, and no partnership opportunities materialized. In addition, we note that CEI South, as a MISO participant, is already involved in the interchange of power, pooling of facilities, purchase of power, and sharing of capacity resources through MISO's market-based systems. The evidence of record shows that CEI South's participation in MISO was specifically considered in the development of the Preferred Portfolio, including the two CTs proposed here, as a result of the Commission's directive in denying the CPCN in Cause No. 45052.

Thus, the evidence of record supports the conclusion that Petitioner's current and potential options for entering arrangements with other utilities related to the interchange of power, pooling of facilities, purchase of power, and joint ownership of facilities have been evaluated, and Ind. Code § 8-1-8.5-4(b)(1) has been satisfied.

**2.  Ind. Code § 8-1-8.5-4(b)(2).** We now analyze "[o]ther methods for providing reliable, efficient, and economical electric service, including the

17

refurbishment of existing facilities, conservation, load management, cogeneration, and renewable energy sources."

The other parties' proposed alternatives to the CT Project are as follows:

- OUCC: Refuel A.B. Brown with natural gas;
- CAC: Use a combination of demand response, renewables, and battery storage;
- Sierra Club: Use a combination of capacity purchases, renewables, and battery storage;
- Industrial Group: Approve at most one CT, not the two proposed (based on the argument that a second CT will not be required until 2033); and
- Sunrise Coal: Continue to burn coal at A.B. Brown for several more years, assuming regulatory requirements can still be met or amended as needed.

   **a.    Reliability.** As it did in Cause No. 45052, the OUCC argues that Petitioner should modify Brown to burn natural gas. In response to our direction in the 45052 Order, CEI South's 2019/2020 IRP thoroughly evaluated this option, but it was not selected in the Preferred Portfolio, and the evidence of record supports a finding that it will not satisfy the need for reliability as well as the proposed CTs. Similarly, Sunrise Coal's proposal to continue burning coal at Brown for several more years does not provide the same level of flexibility in support of system reliability. In the IMM Report, MISO's IMM noted that "older gas steam and coal-fired resources . . . have long notification and start-up times. These resources provide much lower reliability value to the system because they cannot be utilized if fluctuations in intermittent resources, unexpected changes in loads, or generation outages lead to tight conditions when they happen to be offline." Petitioner's Exhibit 11-R, Attachment FSB-R1, at 120. Due to the intermittency of the renewable resources in the Preferred Portfolio, resources with quick ramp capabilities are necessary to complement the addition of such intermittent resources to the system to ensure reliability. We disagree with the OUCC and Dr. Boerger that fast start and quick ramp capabilities are not significantly relevant to these proceedings; the NERC advises otherwise. *See* Petitioner's Exhibit 13-R, Workpaper MAR-R3 (NERC 2021 LTRA), at 9-11. Refueled Brown units would not be capable of cold starts and producing energy quickly enough to satisfy the usually short-term demand periods discussed above and, thus, could not effectively follow net load.

   The CAC and Sierra Club opined that the Preferred Portfolio should include more renewables and battery storage and avoid the construction of the CTs. As noted elsewhere herein, renewables such as wind and solar are dependent upon weather conditions and are, therefore, not as controllable as other sources of generation.

   Regarding the use of storage, Mr. Rice explained on rebuttal that the long-duration battery storage that would be needed to replace the proposed CTs is not yet cost effective. Dr. Boerger of the OUCC testified that battery storage is not yet ready to be implemented at a utility-scale level because it is not yet economically feasible and noted technical challenges in incorporating batteries into the grid and maintaining reliability. NERC's 2021 LTRA also indicates that battery storage at the level relied upon for CAC's preferred plan will not be a viable solution until after 2030. *See*

18

Petitioner's Exhibit 13-R, Workpaper MAR-R3 (NERC 2021 LTRA), at 7. The three Indiana IRPs that have been completed in 2021 have preferred portfolios with storage additions constituting a modest inclusion of approximately 5% of the total capacity additions in the next six years. *See* Petitioner's Exhibit 5-R at 11 (Figure 3). We agree that, while battery storage is an emerging technology, it is currently not a viable and reliable alternative to the proposed CTs.

CAC witness Mr. Keeling opined that there is untapped DR potential in CEI South's electric service territory and suggested changes to CEI South's interruptible tariff language to access this potential. However, Ms. Harris refuted this contention, noting that Petitioner's industrial customers are much more heterogeneous than other customer segments. She stated that extrapolating results such as those presented by Mr. Keeling for industrial customers fails to account for nuances associated with this unique customer group, such as their ability and willingness to participate. In addition, the CAC's recommendation to rely on DR comes at a time when CEI South has recently lost nearly all of its industrial DR. Thus, we decline to accept a recommendation that relies on DR that does not currently exist and, in light of Ms. Harris's testimony, appears unlikely to exist in the future in Petitioner's service territory. Even so, we encourage CEI South to continue engaging its industrial customers in discussions concerning DR despite the current lack of participation to better understand barriers to such participation.

While several parties criticized Petitioner's load forecasts and used those criticisms to question the need for the CT Project, Messrs. Rice and Bradford explained that the two CTs are needed by 2025 to meet MISO's Planning Reserve Margin Requirement ("PRMR"). Anticipated load additions were shown to be far less speculative than Ms. Sommer suggested, as an executed contract with a large new customer was admitted into the record confidentially as CAC's Exhibit 9-C. We also find that Mr. Gorman's suggestion that the second CT could be delayed until as late as 2033 is not a realistic option, given the updates to the load forecast from the increased load from the new customer and loss of demand response from another.

Sierra Club witness Mr. Goggin suggested that CEI South might rely on imports to meet its reliability needs, including during extreme weather events. However, Mr. Bradford identified several significant reasons that Petitioner cannot rely on the capacity market in the long term to ensure reliability. First, he noted that Mr. Goggin extrapolated selected, low-cost MISO PRA clearing prices to conclude that market capacity should be available just as inexpensively in the future, when prices on the capacity market have, at times, been much higher than the figures utilized by Mr. Goggin in his calculations. Mr. Bradford also noted that MISO is fundamentally not a long-term capacity market, as evidenced by the fact that the auction for capacity during a given planning year running from June to May is conducted only a few months prior to the start of the planning year. Mr. Bradford also discussed MISO's position that LSEs such as Petitioner should not "free ride" on the capacity investments of other LSEs without incurring any meaningful risk. He stated that MISO has identified several consequences of "free riding," including unreasonable cost shifts, long-term harm to reliability, and decreased efficacy of the PRA as a tool to address important resource adequacy needs in MISO. He also referred to recent OMS data indicating that Zone 6 of MISO, which includes Petitioner's service territory, has the greatest potential capacity shortage across all zones.

After considering the evidence of record, we find that the CT Project is needed, consistent with the 2019/2020 IRP, and shown to be a reasonable cost-effective solution to address reliability.

19

**b.** **Efficiency.** We find that the two proposed CTs are an efficient and cost-effective solution and compare favorably among the other options proposed to follow net load. The evidence of record demonstrates that the CTs can start and ramp up or down quickly and therefore can be dispatched for short periods several times a day or for prolonged periods, whichever is necessary, to cover shortfalls. As discussed in more detail above, Mr. Games explained how the proposed F-Class CTs are much more efficient than older gas combustion units and explained why the proposed CTs are a better option as opposed to refueling A.B. Brown with natural gas, as suggested by the OUCC. Petitioner's IRP modeling concluded that repowering the Brown units with natural gas would result in higher costs from frequent energy purchases and inefficient operation.

**c.** **Economical Electric Service.** The Preferred Portfolio is among the lowest net present value of any of the proposals, as illustrated in Petitioner's 2019/2020 IRP. The 2019/2020 IRP results also support the conclusion that continuing to run A.B. Brown on coal or refueled with natural gas would be less affordable to customers in the near term due to high O&M and ongoing capital expenditures to keep the units running. According to Mr. Games, refueled Brown units, which cannot be started or ramped up quickly to operate only when needed to follow net load, would need to operate at an economic loss much of the time in order to be available when called on. Thus, refueled units would have a higher capacity factor than the CTs even though they theoretically are far less efficient than the CTs. A CT can run when the price of energy is high enough for the CT to be profitable and then it can quickly shut down during other less profitable hours, whereas refueled units would need to run for longer periods of time, such as 24 or 48 hours, including hours in which they operate at a loss, in order to be online during that one hour of high energy prices.

As previously noted, other parties raised issues with various aspects of CEI South's modeling. We addressed the load forecast arguments of the Industrial Group and CAC above in finding that the record supports as realistic CEI South's anticipated large customer additions and anticipated capacity shortfall by 2025 absent the two CTs. The CAC also suggested an alleged lack of transparency in Petitioner's modeling. However, the evidence reflects that CEI South offered reasonable accommodations for the CAC and other stakeholders to analyze its proprietary data, and we find that none of the parties were prejudiced by the reasonable proprietary constraints and resulting lack of a full release of the Aurora model.

Dr. Boerger and Mr. Alvarez of the OUCC criticized the cost assumptions associated with the coal-to-gas conversion as compared to the CT Project. On rebuttal, Mr. Rice addressed Dr. Boerger's analysis, noting that Dr. Boerger agreed that, even after incorporating certain changes for which he had calculated a specific dollar value effect, his calculations showed that coal-to-gas conversion of the Brown units costs customers more than the Preferred Portfolio. Regarding Dr. Boerger's concern over the discount rate used in Siemens's modeling, he acknowledged this issue would overvalue costs and benefits in the near term.

Mr. Goggin, testifying for the Sierra Club, opined that the Renewables 2030 Portfolio, which includes no CTs, had a lower cost than the Preferred Portfolio. However, CEI South noted on rebuttal that Mr. Goggin did not consider in his analysis that portfolio's performance across the full range of probabilistic futures. When doing so, the Renewables 2030 Portfolio had a higher cost and cost risk than the Preferred Portfolio.

The Industrial Group and Sierra Club suggested that the CT Project is not cost justified based on recent high gas prices. On rebuttal, Mr. Rice responded that the Preferred Portfolio performed well on multiple objectives, including cost, which considered the full range of probable gas price forecasts. The evidence also supports the reasonableness of the reference case gas price forecast in CEI South's 2019/2020 IRP.

Sunrise Coal advocated the continued operation of Brown as coal units, at least temporarily. However, the evidence of record demonstrates that CEI South cannot operate A.B. Brown as coal units beyond October 2023 without making significant expenditures for environmental compliance. The environmental regulatory requirements and timelines for completion of various actions demonstrate that continued operation of Brown without interruption is not feasible. In addition, it would require abandoning the Commission-approved settlement reached on these issues in Cause No. 45280. The evidence of record indicates that the cost to upgrade Brown to comply with CCR and ELG regulations and continue operating beyond October 2023 would be greater than the projected cost of procuring capacity in the event the CT Project were delayed beyond its anticipated in-service date. In addition, as discussed above, continuing to run A.B. Brown on coal or refueled with natural gas would be less affordable to customers in the near term due to high O&M and ongoing capital expenditures to keep the units running. We do not find that it would be prudent to attempt to keep Brown operating on coal when it is clearly not in the best interest of customers or the public to do so.

While we have indicated in previous CPCN cases that least-cost planning is an essential component of our CPCN law, we have also recognized that least-cost planning does not require selection of the absolute lowest cost alternative. *See, e.g., Indianapolis Power & Light Co.*, Cause No. 44339, at 20 (May 14, 2014) (quoting *Southern Indiana Gas & Elec. Co.*, Cause No. 38738, at 5 (Oct. 25, 1989)). We have defined least-cost planning as a planning approach that will find the set of options most likely to provide utility services at the lowest cost once appropriate service and reliability levels are determined. We also consider the risk created by future uncertainty. Ind. Code ch. 8-1-8.5 does not require a utility to ignore its obligation to provide reliable service or to disregard its exercise of reasonable judgment on how best to meet its obligation to serve. If a utility reasonably considers and evaluates the statutorily required options for providing reliable, efficient, and economic service, then the utility should, in recognition that it bears the service obligations of Ind. Code § 8-1-2-4, be given some discretion to exercise its reasonable judgment in selecting options to implement which minimize the cost of providing such services. *Id.*

We are concerned about the risks of further delay that would be caused by rejecting Petitioner's selection in favor of further study (beyond that already performed as part of the 2019/2020 IRP process) of the options proposed by the other parties. None of the options being proposed by the OUCC, CAC, Sierra Club, or Sunrise Coal would address the concerns raised by the NERC and MISO to encourage the development of flexible, controllable resources, such as the CTs proposed here, to complement the transition to intermittent, renewable resources. In the event of a denial, Petitioner would still need to secure the capacity offered by the CTs. In addition, other variables, such as the cost of iron and steel, could result in increased cost if the requested CPCN is denied. For example, CAC's Exhibit CX-1 shows the significant growth in the Producer Price Index for Metal and Metal Products: Iron and Steel. As discussed above, Mr. Games testified that Petitioner's proposal is protected against this inflation as a result of the EPC contract that has already been negotiated. None of the other options being urged by the various stakeholders would

be similarly protected by contract. In light of the evidence of record, we find that CEI South has exercised its reasonable judgment in selecting an option that both minimizes the risks of future cost uncertainty and will allow it to meet its obligation to provide reliable service to its customers.

**3. Conclusion.** Petitioner conducted an All-Source RFP to meet its capacity needs, and the RFP responses enabled CEI South to consider a variety of alternatives, described above. Given the foregoing evidence, the Commission finds that Petitioner has satisfied the requirement under Ind. Code § 8-1-8.5-4 that it consider alternative methods for providing reliable, efficient, and economical electric service, including the refurbishment of existing facilities, conservation, load management, cogeneration, and renewable energy sources. Ultimately, CEI South's 2019/2020 IRP has shown that the proposed construction of two new CTs at the A.B. Brown site is a reasonable, least-cost resource to support Petitioner's Generation Transition Plan and meet customers' needs for electricity. The CTs are capable of cycling reliably in response to the MISO market and will partially replace the retiring coal units with more efficient and controllable load-following capacity.

Therefore, based on the evidence of record, the Commission finds that Petitioner has shown a need for the proposed CT Project and that public convenience and necessity require or will require Petitioner's construction of the CT Project.

**v. Competitive Procurement.** Ind. Code § 8-1-8.5-5(b)(5) requires us to make certain findings under Ind. Code § 8-1-8.5-5(e) if the proposed facility has a generating capacity of more than 80 MW, as is the case here:

Before granting a certificate to the applicant, the commission:
(1)     must, in addition to the findings required under subsection (b), find that:
    (A)     the estimated costs of the proposed facility are, to the extent commercially practicable, the result of competitively bid engineering, procurement, or construction contracts, as applicable; and
    (B)     if the applicant is an electricity supplier (as defined in IC 8-1-37-6), the applicant allowed or will allow third parties to submit firm and binding bids for the construction of the proposed facility on behalf of the applicant that met or meet all of the technical, commercial, and other specifications required by the applicant for the proposed facility so as to enable ownership of the proposed facility to vest with the applicant not later than the date on which the proposed facility becomes commercially available; and
(2)     shall also consider the following factors:
    (A)     Reliability.
    (B)     Solicitation by the applicant of competitive bids to obtain purchased power capacity and energy from alternative suppliers.
The applicant, including an affiliate of the applicant, may participate in competitive bidding described in this subsection.

Petitioner conducted two RFPs for EPC bids and major equipment purchases and utilized Power Advocate to administer the RFP process. These RFPs informed Petitioner's best estimate of the costs for the CT Project. Accordingly, we find Ind. Code § 8-1-8.5-5(e)(1)(A) has been satisfied and that the cost estimates of the proposed facility are, to the extent commercially

practicable, the result of competitively bid engineering, procurement, or construction contracts. The EPC contractor was selected as a result of this RFP process, and the executed EPC contract was admitted into the record on a confidential basis. Petitioner's Exhibit 2-R, Attachment WDG-R4 (Confidential). The contract for construction of the CT Project was the result of competitive bidding in satisfaction of Ind. Code § 8-1-8.5-5(e)(1)(B).

Regarding Ind. Code § 8-1-8.5-5(e)(2), we have found herein, based on the evidence of record, that the proposed CT Project is reliable. The record has also established that Petitioner engaged in an All-Source RFP process to inform its Generation Transition Plan. Thus, we have considered reliability and solicitation by CEI South of competitive bids to obtain purchase power capacity and energy from alternative suppliers, and we find that the requirements of Ind. Code § 8-1-8.5-5(e) are satisfied.

> **vi.**     **Gas Pipeline Lateral.** Intervenors and the OUCC raised concerns about the gas lateral pipeline to be constructed by Texas Gas Transmission, LLC ("TGT") pursuant to the Precedent Agreement between CEI South and TGT. We recognize that the pipeline and the ability to secure adequate gas on that pipeline are both critical to CEI South's ability to operate the CTs as proposed.

However, we note that ruling on the public convenience and necessity of natural gas-fired generation before the establishment of the gas supply to serve it is not unprecedented. In Cause No. 44339, in which Indianapolis Power & Light ("IPL") sought a CPCN for its Eagle Valley CCGT, IPL initially pursued constructing the natural gas lateral itself, but eventually changed its plans and sought bids from several companies to build the lateral. In other words, we issued the CPCN without evidence that IPL had even entered a contract for the gas supply lateral. *See Indianapolis Power & Light Co.*, Cause No. 44339, at 23-24 (May 14, 2014).

However, it is possible that the assured cost recovery provided by the CPCN statute could enable CEI South to begin incurring significant costs to construct the CTs before FERC approval of the pipeline. The contracts that CEI South has with TGT for the pipeline and Kiewit for EPC matters are not dependent on one another; the timing and conditions precedent within them could allow for the progression of one without the other. If the FERC does not approve the pipeline, Petitioner will have incurred CT construction costs for a facility that cannot be built and operated in its proposed location.

The EPC contract includes a feature that allows for different notice to proceed ("NTP") issuance dates and associated deliverables, which balance the price and time to build risk between Kiewit and CEI South as the NTP date is delayed. After the Final Anticipated NTP issuance date (which is confidential), the contractual arrangements between Petitioner and Kiewit will be subject to further negotiation. Given that the pipeline contract with TGT cannot proceed until FERC approves the pipeline, and the unknown of when and even if that will occur is outside this Commission's control, we find that Petitioner shall utilize the EPC contract's NTP feature to minimize risk to the greatest extent possible in order to coordinate the construction of the CTs with FERC approval of the pipeline. If applied reasonably, this will limit potential sunk costs incurred before FERC pipeline approval with the delayed in-service date of the CTs. For these reasons, our approval of the requested CPCN for the CT Project is conditioned on the requirement that Petitioner issue the NTP under the EPC contract with Kiewit no earlier than the Final Anticipated

JA111

NTP issue date or the date of FERC approval of the TGT pipeline, whichever is earliest. Under this condition, the CT construction might still proceed before FERC approval of the pipeline, but potential CT construction costs will be limited to the greatest extent possible, should the pipeline not be authorized by the FERC.

Should Petitioner reach the conclusion that it should not move forward with the NTP because of emergent concerns not considered herein, it shall submit a compliance filing in this docket describing its decision no later than 15 days before the Final Anticipated NTP date. In addition, Mr. Greeley, in response to a question from the bench during the hearing, noted the possibility of Petitioner considering some form of "limited" NTP, if needed. Should such a limited NTP be issued, Petitioner is directed to submit a compliance filing in this docket within 15 days of the issuance of a limited NTP.

**vii.** **Conclusion on CPCN for CT Project.** Ind. Code § 8-1-8.5-5(d) requires us to "consider and approve, in whole or in part, or disapprove a utility specific proposal . . . jointly with an application for a certificate under this chapter[, but] solely for the purpose of acting upon the pending certificate for the construction, purchase, or lease of a facility for the generation of electricity."

In the 45052 Order, the Commission discussed in detail the reasons the CPCN was denied in that case and how CEI South could improve its planning prior to future CPCN requests, including by incorporating flexibility and removing restrictions that might screen out multiple less-expensive alternatives. In this case, CEI South lessened the restrictions on its RFP, considered refueling and other potential options, and considered the diversity of its generation fleet. The 2019/2020 IRP process resulted in a Preferred Portfolio with a mix of generation resources that have flexibility for changing circumstances. In Cause No. 45052, CEI South sought approval of an 850 MW CCGT generation facility, as opposed to the two CTs for which a CPCN is sought in this case, which have a combined generation capacity of 460 MW. It appears that CEI South has considered and implemented the guidance of the 45052 Order in its 2019/2020 IRP and the requests made in this Cause.

Based upon the evidence of record, the Commission finds that CEI South has met the requirements of Ind. Code ch. 8-1-8.5 and that the public convenience and necessity require construction of the CT Project. Therefore, we grant CEI South's request for a CPCN for its CT Project, subject to the findings and conditions of this order.

**B.** **Ongoing Review of CT Project Under Ind. Code § 8-1-8.5-6(a).** Ind. Code § 8-1-8.5-6(a) addresses the Commission's review of facilities under construction as follows:

> In addition to the review of the continuing need for the facility under construction . . . the commission shall, at the request of the public utility, maintain an ongoing review of such construction as it proceeds. The applicant shall submit each year during construction, or at such other periods as the commission and the public utility mutually agree, a progress report and any revisions in the cost estimates for the construction.

24

CEI South requested that the Commission conduct ongoing review of the CT Project, proposing to submit construction progress reports, any revisions to the cost estimates, and other information regarding the CT Project to the Commission on an annual basis during construction.

We find that CEI South shall report, at least semi-annually, to the Commission a summary of the information related to the CT Project, including safety, scope, schedule, and owner's cost contingency, as well as the: (1) manufacturer, model number, and operational characteristics of the turbine generator; (2) anticipated total annual MW-hour ("MWh") output for the CT Project; (3) revisions to the cost estimate; and (4) update on the natural gas transportation and lateral pipeline.

The initial CT Project report shall be filed on or before December 30, 2022 as a compliance filing in this Cause. The final project report shall contain the following information: (1) the actual total cost of construction; (2) the total MW output for the facility; and (3) the actual in-service (commercial operation) date for the facility.

In addition, due to recent global supply chain issues that could potentially limit the availability of components necessary to build the CTs, Petitioner shall provide an update on any supply-chain-related challenges and/or delays on December 30, 2022 and continuing on a semi-annual basis thereafter until both CTs are placed into commercial operation. Such updates shall be filed under this Cause.

      **C.**    **Accounting and Ratemaking for CT Project**. CEI South is not seeking to adjust customers' rates to recover the costs of the CT Project before its next base rate case. CEI South requests accounting authority, starting with the date the CT Project is placed in service, for the deferral of depreciation and financing costs, including post in-service carrying costs ("PISCC"), related to the CT Project investment until such time as those costs and the CT Project's investment is reflected in CEI South's retail electric rates. The estimated construction costs for the CT Project are approximately $334 million compared to an estimated electric rate base as of December 31, 2020 of $1.5 billion.

Ms. Gostenhofer testified that CEI South proposed applying its approved depreciation rate for combustion turbines to the CT Project, resulting in a 3.44% annual depreciation rate, including the cost of removal. She stated that CEI South may evaluate adjustments to this depreciation rate in its next base rate case as part of a depreciation study. No party presented any evidence specifically opposing the application of this depreciation rate.

According to Ms. Gostenhofer, an estimated $11.1 million of annual depreciation expense and $20.7 million of incremental financing costs will be unrecoverable through rates due to the timing of recovery of the financing costs associated with the plant being placed in service. She also stated that, in addition to the new capital investments made in the CT Project, CEI South is making other large investments to comply with environmental regulations. She opined that the proposed accounting treatment helps mitigate the negative impact on income the CT Project would have between the period it is placed in service and until it is recovered in rates. She said that deferral and recovery of PISCC and depreciation expense helps Petitioner manage its increased carrying costs during a period of increased investments.

Industrial Group witness Mr. Gorman opined that recovery of the deferred costs in CEI South's next rate case should be contingent on CEI South proving that: (1) the revenues CEI South collected in existing rates during the deferral period were not adequate for it to recover its cost of service during the deferral period; and (2) CEI South made every reasonable effort to coordinate the timing of its rate case with the in-service date of the CT Project. He stated that, because CEI South can file a rate case utilizing a future test year, CEI South should be permitted to defer cost recovery for no more than six months.

Petitioner's request for deferral of PISCC and depreciation is not novel. We have frequently heard and granted such requests, and the test we have consistently applied is whether the cessation of AFUDC and commencement of depreciation will cause severe earnings erosion. *See, e.g., Indianapolis Power & Light Co.*, Cause No. 44339 (May 14, 2014). The evidence of record demonstrates that CEI South will suffer severe earnings erosion during the time between the date the two CTs are placed in service and CEI South's next rate case order authorizing recovery of a return on the CTs and depreciation expense. During this interim period, CEI South will also not be recovering carrying costs of the construction project. CEI South's requested accounting treatment would allow it to offset the erosion to monthly pre-tax earnings by approximately $2.65 million due to the deferral of the depreciation expense and continuation of the $20.7 million of financing costs incurred by the utility and previously recovered through AFUDC. The additional conditions Mr. Gorman seeks to impose on this accounting relief are inconsistent with the earnings erosion standard.

Therefore, we authorize CEI South to: (1) apply the 3.44% depreciation rate discussed above; (2) accrue PISCC, at CEI South's currently approved weighted average cost of capital ("WACC"), on the two CTs beginning with the month after the in-service date of each individual CT Project asset until the date CEI South's base rates include a return on the CT Project; (3) record the depreciation expense on each individual CT Project asset beginning with the month after its in-service date; (4) record deferred PISCC and depreciation in a regulatory asset in Account 182.3, Other Regulatory Assets, through the date CEI South's base rates include a return on the CT Project and recovery of the depreciation expense; (5) amortize the regulatory asset as a recoverable expense for ratemaking purposes over the estimated life of the CTs commencing on the date of the order authorizing recovery in CEI South's rates of a return on the CTs and depreciation expense; and (6) include the unamortized portion of the regulatory asset in CEI South's rate base upon which it is permitted to earn a return.[1]

Petitioner also sought authority to capitalize allocable costs of preparing the IRP and preparing this case to the costs of the CT Project and to amortize these costs over the life of the asset.[2] Mr. Lantrip of the OUCC recommended that the Commission follow the 45052 Order and reject CEI South's proposed treatment of the CT Project's planning costs, including the $5 million in IRP planning costs. He testified that IRP planning costs are a non-recurring cost of doing business, and there is no Commission precedent allowing for the separate recovery of IRP planning costs. Similarly, Mr. Gorman testified for the Industrial Group that CEI South has not proven that its IRP costs are properly capitalized to the CT Project, as opposed to expensing those costs

---

[1] We have previously held that WACC is the appropriate rate for post-in-service carrying charges. *See, e.g., Indianapolis Power & Light Co.*, Cause No. 44339, at 35 (May 14, 2014) (citing orders).

[2] Petitioner also sought in the alternative to defer such costs as a regulatory asset to be recovered through rates in the event the CPCN for the CT Project is denied. Because we have issued the CPCN, this part of the request is moot.

JA114

currently as ongoing system planning costs. He stated that CEI South has offered no proof that the IRP costs could not be recovered via rate revenue in the year the cost was incurred.

On rebuttal, Ms. Gostenhofer testified that all the planning costs, including the $5 million in IRP planning costs identified by Mr. Lantrip, to be included in the CT Project are incremental expenditures specifically related to the CT Project and must be incurred as part of the construction of the CTs. She stated these costs initially meet the criteria to be deferred on the balance sheet, in accordance with FERC 183 or FERC 107, as applicable, and are therefore not considered operating costs of CEI South in accordance with the FERC Uniform System of Accounts ("USOA"). She explained that CEI South's IRP generation asset planning pool costs that are the subject of Petitioner's deferral request do not include any costs stemming from CEI South's request for a CPCN for the CCGT that was denied in Cause No. 45052. She stated that, after the 45052 Order was issued in April 2019, CEI South reviewed all planning costs deferred for future recovery in the generation asset planning pool to identify any costs that related to activities supporting a large-scale gas generation asset, such as the then-proposed and ultimately denied CCGT, that would not be applicable to future assets developed under the IRP that would need to be either charged to a regulatory asset or to operating expense. She stated that the remaining costs in the generation asset planning pool had been in support of smaller-scale options. Thus, she opined that it was reasonable to expect the studies and activities for those costs to become used and useful in support of the construction of assets resulting from the IRP, such as the CT Project at issue in this Cause.

After considering the evidence of record, we find that Petitioner's best estimate of costs includes an estimate of $12 million in planning costs. About $5 million of that total consists of Generation Asset Planning Pool costs that relate to Petitioner's request for a CPCN for the CT Project. This consists of costs as described by Ms. Gostenhofer related to the 2016 and 2019 IRPs, excluding costs related to a large-scale generating asset such as a CCGT that was denied in Cause No. 45052. We have adopted the FERC USOA by rule. 170 IAC 4-2-1.1(a). FERC 183B provides, "This account shall also include costs of studies and analyses mandated by regulatory bodies related to plant in service. If construction results from such studies, this account shall be credited and the appropriate utility plant account charged with an equitable portion of such study costs directly attributable to new construction." The costs at issue in Petitioner's Generation Asset Planning Pool fit this definition, and the evidence of record indicates that Petitioner has allocated an equitable portion to the CT Project. Thus, we find that Petitioner's proposal to include these costs in the capital costs of the CT Project is consistent with the FERC USOA and is appropriate.

**D.** **Other Gas Pipeline Lateral Issues.** As mentioned previously, several of the parties' witnesses expressed concern regarding various issues related to the gas pipeline lateral. CAC witness Ms. Sommer opined that TGT's proposed pipeline is oversized and that CEI South is acquiring gas transmission capacity that greatly exceeds that which is needed to supply the proposed CTs. She opined that a smaller pipeline could serve the CTs at a lower cost.

Industrial Group witness Mr. Gorman testified that he believed CEI South did not make every reasonable effort to reduce the $27.3 million annual cost burden on ratepayers. He also opined that CEI South has not demonstrated that it has structured the arrangement with TGT to facilitate sales of unused capacity on the lateral to third parties. He stated that CEI South has not established that the proposed location of the lateral pipeline is the most prudent and least cost

JA115

option. Mr. Gorman also took issue with the binding nature of the agreement and the timing of the construction of the pipeline.

Sunrise Coal witness Ms. Medine noted the lack of certainty that the pipeline will be approved by the FERC, noting the EIS requirement imposed by FERC. Mr. Nasi, also testifying on behalf of Sunrise Coal, opined that it would not be prudent to proceed with the CT project prior to resolution of the FERC matter.

In response to criticism of the pipeline's location, Mr. Hoover testified on rebuttal that TGT decided that, to obtain the most effective balance of pipeline pressure, reliability, and capacity, the optimal location for the lateral interconnection to the TGT mainline system was near Robards, Kentucky. While some of TGT's interstate pipelines extend into Indiana, Mr. Hoover stated that necessary improvements to those pipelines for capacity and pressure requirements, additional compression to meet the pressure requirements, and more congested routes make them less economically feasible as the interconnection location for the lateral. He noted that the existing Dogtown lateral is of insufficient size and operating pressure to serve the CTs, and the other TGT interstate pipelines are routed north through the east side of Vanderburgh County, making them farther from A.B. Brown than the Robards, Kentucky location. Using those pipelines would also require a lateral to be installed through much more populated and congested areas.

Mr. Hoover also responded to Ms. Sommer's assertion that TGT's proposed pipeline is oversized, stating that a 20-inch lateral is required to provide the required gas flow rate and pressure to the combustion turbines. He said that the 16-inch lateral size does not have adequate margin, and installation of an undersized lateral cannot be easily or cheaply remediated. He testified that TGT informed CEI South that the price for demand on the lateral would be the same for all of the capacity or a portion of it; given this, CEI South contracted for the full pipeline capacity.

Based on our review of the evidence of record, we are satisfied with CEI South's decision to secure transportation capacity pursuant to the Precedent Agreement with TGT rather than pursuing some combination of alternatives, including use of the Dogtown lateral, an alternative TGT route, or on-system storage. The evidence of record supports a finding that the Dogtown lateral is incapable of supporting the CT demand or pressure requirements. A different route would have required additional improvements to TGT's system to meet capacity and pressure requirements and would have involved a more congested route for the lateral.

The evidence is unrefuted that Petitioner will require service from a lateral pipeline to serve the two CTs. Further, we find that the evidence supports that the proposed TGT pipeline will provide the required service to the two CTs. Accordingly, it is appropriate that Petitioner should receive reasonable cost recovery for the expenses it incurs for the service it receives from the TGT pipeline.[3] However, the specific amount and the means of that cost recovery will be subject to further proceedings as discussed below.

---

[3] We have previously allowed a utility to recover fuel costs associated with a CCGT in its FAC mechanism. In Cause No. 44339, IPL proposed to recover fuel costs associated with its Eagle Valley CCGT and Harding Street Refueling projects through its FAC, which has now occurred. *Indianapolis Power & Light Co.*, Cause No. 38703 FAC 127, at 3 (June 3, 2020) ("[T]he cost of gas generation contains the delivered cost of natural gas including firm transportation.").

JA116

The Industrial Group also disputed CEI South's proposal to recover the costs associated with the gas lateral through its FAC. Mr. Gorman testified that fixed pipeline capacity costs and the gas lateral costs should not be recovered through CEI South's FAC because customers should pay for the CTs in line with the benefits provided, which are related to system capacity and not energy. He proposed that the TGT fixed costs be allocated to CEI South customers based on their contribution to system capacity needs. He stated that the fixed costs of the gas delivery pipeline, while not varying with electricity generated from the CTs, are critical capital costs needed so the CTs can be available to support system reliability when called upon. Mr. Gorman opined that allocation of the CT Project capacity costs in this way, including the TGT fixed gas lateral costs, produce price signals that would encourage customers to make efficient consumption decisions.

Once FERC decides whether TGT is permitted to build the pipeline, the question of how the costs of that gas service should be recovered from CEI South's customers can be addressed by the Commission. Mr. Rice noted on rebuttal and during the hearing that a subdocket could be opened to investigate the appropriate allocation for cost recovery purposes of the cost of the gas lateral throughout the term of the Precedent Agreement. We agree and find that such a subdocket shall be opened within 30 days of FERC approval of the pipeline. Petitioner shall notify the Commission within five business days of the FERC's final order regarding the pipeline lateral and file a copy of that order under this Cause. To the extent that reasonable pipeline costs allocated to Petitioner's customers are not ultimately recovered through Petitioner's fuel adjustment clause ("FAC") mechanism, we grant CEI South's alternative request for deferral of such costs until such costs are recovered through base rates following a general rate case.

### 7. Commission Discussion and Findings on CCR Compliance Projects.

**A. CPCN Request for CCR Compliance Projects.** CEI South also seeks CPCNs for the CCR Compliance Projects (the Dry Ash Compliance Project and the Pond Compliance Project), both of which are "federally mandated" projects under Ind. Code ch. 8-1-8.4.

When considering a petition under Ind. Code § 8-1-8.4-7, the Commission must grant the CPCN if it:

> (1) made a finding that public convenience and necessity will be served by the proposed compliance project;
> (2) approved the projected federally mandated costs associated with the proposed compliance project; and
> (3) made a finding on each of the factors set forth in [Ind. Code § 8-1-8.4-6(b)].

Ind. Code § 8-1-8.4-7(b).

The factors we must consider in Ind. Code § 8-1-8.4-6(b) are as follows:

> (1) The following, which must be set forth in the energy utility's application for the certificate sought, in accordance with section 7(a) of this chapter:
> > (A) A description of the federally mandated requirements, including any consent decrees related to the federally mandated requirements, that the

29

energy utility seeks to comply with through the proposed compliance project.

>(B) A description of the projected federally mandated costs associated with the proposed compliance project, including costs that are allocated to the energy utility:
>
>>(i) in connection with regional transmission expansion planning and construction; or
>>
>>(ii) under a Federal Energy Regulatory Commission approved tariff, rate schedule, or agreement.
>
>(C) A description of how the proposed compliance project allows the energy utility to comply with the federally mandated requirements described by the energy utility under clause (A).
>
>(D) Alternative plans that demonstrate that the proposed compliance project is reasonable and necessary.
>
>(E) Information as to whether the proposed compliance project will extend the useful life of an existing energy utility facility and, if so, the value of that extension.
>
>(2) Any other factors the commission considers relevant.

**i.      Federally Mandated Requirements (Ind. Code § 8-1-8.4-6(b)(1)(A)).** Ind. Code § 8-1-8.4-5 defines a federally mandated requirement to include "a requirement that the commission determines is imposed on an energy utility by the federal government[,]" including, but not limited to, "[t]he federal Water Pollution Control Act (33 U.S.C. 1251 et seq.)" and "[a]ny other law, order, or regulation administered or issued by the United States Environmental Protection Agency, the United States Department of Transportation, the Federal Energy Regulatory Commission, or the United States Department of Energy."

Petitioner has proposed to undertake the CCR Compliance Projects to comply with the EPA's CCR and ELG rules. No party has disputed that these rules constitute federally mandated requirements under Ind. Code § 8-1-8.4-5. Thus, we find that Petitioner has satisfied the requirements of Ind. Code § 8-1-8.4-6(b)(1)(A).

**ii.      Projected Costs (Ind. Code § 8-1-8.4-6(b)(1)(B)).** Energy utilities seeking recovery of federally mandated costs must establish that the costs are incurred in connection with a compliance project, including capital, operating, maintenance, depreciation, tax, or financing costs, and describe the costs to be recovered. Ind. Code § 8-1-8.4-4. Mr. Games testified about the costs of the CCR Compliance Projects.

No party disputed Petitioner's cost estimates for the Dry Ash Compliance Project. However, Ms. Armstrong of the OUCC opined that CEI South did not provide reasonably adequate cost estimates for the Pond Compliance Project, given that the estimates were Class 5 and could increase by 30% to 100%. However, we note that, under Ind. Code § 8-1-8.4-7(c)(3), "[a]ctual costs that exceed the projected federally mandated costs of the approved compliance project by more than twenty-five percent (25%) shall require specific justification by the energy utility and specific approval by the commission before being authorized in the next general rate case filed by

the energy utility with the commission." Ind. Code § 8-1-8.4-7(c)(3). If Petitioner's actual costs prove to be 30% to 100% more than its estimates, CEI South will be required to justify them.

Thus, based on the evidence of record, we find that CEI South has identified federally mandated costs (as defined by Ind. Code § 8-1-8.4-4) for the CCR Compliance Projects and reasonably described those costs. The total capital costs for the CCR Compliance Projects are estimated at $31 million ($12 million for the Dry Ash Compliance Project and $19 million for the Pond Compliance Project). Annual O&M costs for the Dry Ash Compliance Pond are estimated at $1.35 million through 2023 and $0.68 million for 2024 and beyond; annual O&M costs for the Pond Compliance Project are estimated at $350,000.

. We find that these estimated costs are reasonable and are therefore approved.

### iii. How the Proposed Projects Allow Compliance with Federally Mandated Requirements (Ind. Code § 8-1-8.4-6(b)(1)(C)).
Ms. Retherford testified that the CCR Compliance Projects are required to comply with the CCR and ELG rules, which prohibit the continued wet sluicing of fly ash transport water for disposal in an unlined ash pond.

**1.** **Dry Ash Compliance Project.** Petitioner presented evidence that the Dry Ash Compliance Project will allow it to remain in compliance with the CCR and ELG rules and continue to load dry fly ash for transport and shipment for beneficial reuse, as dry fly ash can no longer be disposed of in the ash ponds. Ms. Retherford testified that dry fly ash cannot be loaded at the Ohio River loading facility located at A.B. Brown, as that system has been converted to load-ponded ash under the CCR closure plan. With the conversion of the loading facility at A.B. Brown, Petitioner was required to find an alternative loading facility for dry fly ash in order to remain in compliance with the CCR and ELG rules' prohibition against disposal of dry fly ash in an unlined ash pond. The Dry Ash Compliance Project will ensure that Petitioner can continue to burn coal and beneficially reuse fly ash through the retirement of the coal-fired units at A.B. Brown in October 2023 and the continued operation of F.B. Culley Generating Station's Units 2 and 3 through their retirement dates. The Dry Ash Compliance Project also supports the Part A Reconsideration extension requests under the CCR rule for both Brown and Culley. The Dry Ash Compliance Project also directly provides alternative disposal capacity for dry fly ash and supports the extension request for the remainder of the CCR waste streams. No party disputed that the Dry Ash Compliance Project will allow CEI South to comply with the CCR and ELG rules, and we therefore find that Ind. Code § 8-1-8.4-6(b)(1)(C) is satisfied for this project.

**2.** **Pond Compliance Project.** The Pond Compliance Project will consist of two lined CCR-compliant ponds, one each at Culley and Brown. Ms. Retherford testified that construction of the ponds will serve to provide CCR-compliant wastewater containment between closure of the east ash pond and completion of the ELG wastewater treatment upgrades approved in Cause No. 45052. Given the small quantity of bottom ash generated by Culley Unit 2, one of the new lined CCR-compliant ponds provides Petitioner with the opportunity to use the new lined pond for short-term bottom ash disposal if Petitioner chooses to continue to operate Culley Unit 2 through December 2025 under the ELG Reconsideration rule. She stated that construction of the lined CCR-compliant ponds will serve to provide CCR-compliant wastewater containment for landfill runoff leachate, storm water, coal pile runoff until

31

decommissioning is complete, wastewater treatment, and continued mercury treatment of ash pond water during dewatering and ash pond closure activities. However, the new CCR-compliant ponds will not have sufficient size to permit effective hydraulic capacity and settling capacity for the additional ash flows currently entering the ash pond. The new lined CCR pond at Brown will serve as the stormwater pond for the CT Project.

The only disputed issue regarding the Pond Compliance Project concerns the deadline for achieving compliance. The CCR rule was finalized in 2015, and it contains three tests that require the closure of an ash pond if the tests are not satisfied. At the time of promulgation, the CCR rule required a pond failing the tests to cease receipt of materials by April 2017 and for closure be initiated within 30 days. All three of CEI South's ponds triggered closure requirements.[4] Under the original CCR rule, a utility could take five one-year self-implementing extensions of the final cessation deadline if there was no alternative capacity available. In July 2018, the EPA revised the final cessation deadline for cessation of receipt of materials to October 2020. In August 2020, the final cessation deadline was again revised to April 11, 2021, in what is known as the Part A Reconsideration Rule. The Part A Reconsideration Rule also eliminated the self-implementing annual extension option and replaced it with a new mechanism, which requires a utility to file a formal extension request with the EPA that would extend the cessation deadline to no later than October 15, 2023. In order to qualify for an extension, the utility must demonstrate it has no alternative capacity and that it is actively pursuing alternative disposal capacity in the technically feasible timeframe for each individual CCR waste stream. The evidence reflects that CEI South submitted a timely application for an extension under the Part A Reconsideration Rule, but the EPA has not yet ruled on this request. The Pond Compliance Project is the alternative disposal capacity that CEI South has been "actively pursuing" in accordance with the requirements for pond extension under the Part A Reconsideration.

Although the OUCC acknowledged that CEI South filed timely requests for extension, Ms. Armstrong argued that the proposed Pond Compliance Project should be denied (or recovery reduced to 50%) because of uncertainty regarding whether the EPA will grant CEI South's extension request. Ms. Retherford responded that the EPA has recently indicated that it may not finalize completeness reviews until late spring 2022, and she opined that CEI South has no viable alternative but to continue to implement the CCR compliance strategies as proposed in its extension packages.

No party disputed Petitioner's position that the Pond Compliance Project will allow compliance with the CCR Rule. We need not address at this time any consequences if EPA ultimately denies Petitioner's request for an extension of time. We find that the Pond Compliance Project will allow CEI South to comply with federally mandated requirements and that Ind. Code § 8-1-8.4-6(b)(1)(C) is satisfied for this project.

        **iv.**       **Alternative Plans (Ind. Code § 8-1-8.4-6(b)(1)(D)).** Mr. Games discussed potential alternative options to the Dry Ash Compliance Project, which were summarized in Table WDG-8 in his testimony. Options considered included the modification of

---

[4] The west pond at Culley has already been closed. CEI South has requested an extension from the EPA for the east pond at Culley while it completes the ELG upgrades for Culley Unit 3 that were authorized in Cause No. 45052. The Brown ash pond is being excavated for beneficial reuse as authorized in Cause No. 45280.

JA120

an existing landfill or building a new landfill; depositing ash in a coal mine; utilizing a municipal landfill; using separate ponded and dry loading systems at Brown; using a common loading system at Brown; constructing a loading system at Culley; and pugging or adding and mixing water to dry ash before shipping with ponded ash. After considering these options, CEI South identified the construction of a new dry fly ash loading facility at the ADM site as the best viable solution.

Ms. Retherford testified that no reasonable alternatives exist to the proposed Pond Compliance Project because CEI South is required to implement the alternative disposal capacity as fast as technically feasible. She stated that CEI South investigated five other options, none of which would achieve compliance because they cannot be completed more quickly than the ponds. She provided evidence of the extensive review of alternatives and links to thousands of pages of information submitted to the EPA regarding alternatives.

Ms. Armstrong of the OUCC argued that the Pond Compliance Project should be denied because CEI South has not adequately demonstrated that continuing to operate Brown Units 1 and 2 and Culley Unit 2 until October 2023 is the most reasonable, least-cost option for meeting resource needs. On rebuttal, Ms. Retherford responded that this alternative would require more immediate retirement of Brown Units 1 and 2 and Culley Unit 2, as suggested by Ms. Armstrong, but also the immediate shut down of Culley Unit 3 which must continue to use the Culley East ash pond until the completion of the wastewater treatment upgrades approved in Cause No. 45052 that are not scheduled to be completed until March 2023. Ms. Retherford stated that the OUCC's alternative option would require the immediate shutdown of approximately 900 MW of CEI South's 1,200 MW of generation capability with no approved replacement capacity. She opined that the OUCC's position that CEI South's proposed CCR Compliance Ponds should not be approved because CEI South did not provide a comparison between the costs associated with the immediate replacement of 900 MW of capacity and the costs to construct two small extension ponds is not reasonable. She stated that the OUCC's recommended approach would jeopardize CEI South's ability to meet its obligation to provide safe and reliable service to its customers.

Sunrise Coal witness Mr. Nasi proposed that Petitioner could extend the use of coal at the Brown Units if CEI South converted only the fly ash handling system to dry handling and then constructed a pond to receive only FGD and bottom ash. In his view, this option would allow Brown to continue burning coal until October 17, 2028. On rebuttal, Ms. Retherford opined that this is not a feasible option. The CCR Part A Reconsideration Rule provides two extension mechanisms: (1) a site-specific alternative deadline under 40 C.F.R. § 257.201(f)(1), which requires a demonstration that the development of alternative capacity is technically infeasible by April 2021; and (2) permanent cessation of a coal-fired boiler by a date certain under 40 C.F.R. § 257.103(f)(2). 40 C.F.R. § 257.201(f)(1), which applies to the Pond Compliance Project, requires a demonstration of what is the fastest technically feasible alternative. Mr. Nasi did not address how his proposal could be achieved more quickly than the Pond Compliance Project.

Based on the evidence of record, we find that CEI South considered alternative plans for compliance with the ELG and CCR rules and selected the most reasonable options in the CCR Compliance Projects. The evidence demonstrates that the CCR Compliance Projects are reasonable and necessary.

JA121

**v.** **Extension of Useful Life of Existing Facility (Ind. Code § 8-1-8.4-6(b)(1)(E)).** No party disputes that the issuance of CPCNs for the CCR Compliance Projects will extend the useful life of coal-burning units at Brown and Culley. Based on the evidence presented, we find that CEI South has satisfied the requirements of Ind. Code § 8-1-8.4-6(b)(1)(E).

**vi.** **Conclusion.** As discussed above, we find that Petitioner has satisfied all five subsections of Ind. Code § 8-1-8.4-6(b)(1), and we find that there are no additional factors that need to be considered under Ind. Code § 8-1-8.4-6(b)(2). We find that the public convenience and necessity will be served by the CCR Compliance Projects, approve the projected federally mandated costs associated with the CCR Compliance Projects, and issue the requested CPCNs for the CCR Compliance Projects.

The only remaining issue that has been raised is Ms. Armstrong's request that we only allow CEI South to recover 50% of the federally mandated costs. However, having made the required findings, the statute directs that we "shall . . . grant a certificate." Ind. Code § 8-1-8.4-7(b). A certificate having been granted, the statute directs that 80% of the approved costs shall be recovered through a periodic rate adjustment, with 20% of approved costs deferred. There is no authority under any relevant statute to deny recovery as Ms. Armstrong has proposed, absent any evidence that the federally mandated costs could have been reduced by 50% through some alternative course of action.

**B.** **Accounting and Ratemaking for Federally Mandated CCR Projects.**

**i.** **Recovery of Federally Mandated Costs (Ind. Code § 8-1-8.4-7).** Ind. Code § 8-1-8.4-7(c) states:

> If the commission approves under subsection (b) a proposed compliance project and the projected federally mandated costs associated with the proposed compliance project, the following apply:
>
> (1) Eighty percent (80%) of the approved federally mandated costs shall be recovered by the energy utility through a periodic retail rate adjustment mechanism that allows the timely recovery of the approved federally mandated costs. The Commission shall adjust the energy utility's authorized net operating income to reflect any approved earnings for purposes of IC 8-1-2-42(d)(3) and IC 8-1-2-42(g)(3).
>
> (2) Twenty percent (20%) of the approved federally mandated costs, including depreciation, allowance for funds used during construction, and post in service carrying costs, based on the overall cost of capital most recently approved by the commission, shall be deferred and recovered by the energy utility as part of the next general rate case filed by the energy utility with the commission.
>
> (3) Actual costs that exceed the projected federally mandated costs of the approved compliance project by more than twenty-five percent (25%) shall require specific justification by the energy utility and specific approval by the commission before being authorized in the next general rate case filed by the energy utility with the commission.

JA122

CEI South requests authority to include the costs of the CCR Compliance Projects in its annual environmental cost adjustment ("ECA") rate adjustment mechanism pursuant to Ind. Code § 8-1-8.4-7 for the timely and periodic recovery of 80% of the federally mandated costs, with the remaining 20% of the revenue requirement to be deferred and recovered by CEI South as part of its next general base rate case. Ind. Code § 8-1-8.4-7 provides that an energy utility may, in a timely manner, recover 80% of all federally mandated costs through a periodic rate adjustment mechanism. Ind. Code § 8-1-8.4-4 provides that such costs may include capital, AFUDC, O&M, depreciation, tax, and financing costs.

Ms. Gostenhofer described how the eligible costs associated with the CCR Compliance Projects will be incorporated into Petitioner's annual ECA mechanism. She testified that CEI South will prepare in each annual filing a revenue requirement calculation which will accumulate all eligible costs incurred through December 31 of the previous calendar year. Those eligible costs will include return on new capital investments, calculated as the new capital investments in plant related to the CCR Compliance Projects, multiplied by the applicable rate of return for the ECA, plus incremental expenses, which will include depreciation, O&M, property tax expenses, and other costs associated with the CCR Compliance Projects. The revenue requirement on the CCR Compliance Projects will represent the basis for the recovery of 80% of the eligible revenue requirement requested in each annual ECA filing and deferral of 20% of the eligible revenue requirement for future recovery.

According to Ms. Gostenhofer, CEI South proposes to include in the revenue requirement for new capital investments the gross plant specific to the new capital investments for the CCR Compliance Projects, both in service and construction work in progress ("CWIP"). The project costs for these new capital investments will include various direct and indirect costs and financing costs incurred during construction, commonly referred to as AFUDC. She also described CEI South's proposal to defer and subsequently recover depreciation expense and costs associated with CCR Compliance Projects through the ECA. CEI South will amortize the cumulative deferred balances in the regulatory asset and include the amortization amount in the ECA revenue requirements. Specific to deferred depreciation expense, CEI South proposes to amortize the deferred balance through the ECA over the remaining life of the assets that generated the depreciation expense. She stated that CEI South has incurred and will continue to incur costs associated with the development of the solutions which generated the design and implementation of the CCR Compliance Projects. These costs have been and will continue to be debited to FERC Account 107, Construction Work in Progress, and included for recovery within the ECA.

CEI South proposes to accrue PISCC on all eligible new capital investment, beginning with the month after the investment is placed in service until the date when the investment is included in rates for recovery. The deferred PISCC balance accumulating in the regulatory asset will be included as new capital investment and will be multiplied by the pre-tax rate of return within the ECA revenue requirement. Ms. Gostenhofer stated that the PISCC rate used is the WACC required by the ECA revenue requirement.

Ms. Gostenhofer stated that CEI South will calculate a revenue requirement for the ECA mechanism in each annual ECA filing. The revenue requirement will be shown on Schedule 1 and will include the return on new capital investments, property tax, depreciation, and O&M associated with the CCR Compliance Projects, by category of investment, and the recovery of the regulatory

35

assets recorded through the interim deferral of depreciation expense, plan development expense, and PISCC. CEI South will then multiply the annual revenue requirement by 80% to calculate the recoverable portion of the revenue requirement for approved investments in the ECA. The recoverable amounts for the approved investments will be aggregated and included in CEI South's annual ECA rates and charges based on annualized billing determinants. She stated that CEI South is not proposing an ECA revenue requirement amount for recovery in this proceeding.

Ms. Gostenhofer testified that, pursuant to Ind. Code § 8-1-8.4-7, CEI South will seek timely recovery of all federally mandated costs associated with the CCR Compliance Projects, including capital costs, AFUDC, PISCC, O&M, depreciation expense, property tax expense, and other taxes, with 80% recovered through the ECA and the balance deferred for recovery in CEI South's next rate case.

Ms. Gostenhofer also stated that CEI South proposes to implement CWIP ratemaking treatment related to the recovery of financing costs incurred during construction of eligible CCR Compliance Project investments. Under this proposal, CEI South will recover, through the ECA, financing costs incurred during the construction period attributable to eligible capital investments. CWIP ratemaking treatment allows a utility to recover its costs in a timely manner and avoid the impacts of regulatory lag by recovering financing costs as the capital costs are being incurred. In connection with CWIP ratemaking treatment, CEI South will remove from the AFUDC-eligible balance the amount of investment included in the revenue requirement for the ECA, such that only the amount of CCR Compliance Project investment not currently being recovered in ECA rates or deferred in a regulatory asset for future recovery in base rates would be eligible for AFUDC.

None of the other parties in the case opposed CEI South's proposed recovery of federally mandated costs for the CCR Compliance Projects.

Based on the evidence of record, we find that CEI South's request for approval to adjust its authorized net operating income to reflect approved earnings associated with the CCR Compliance Projects for the purposes of Ind. Code §§ 8-1-2-42(d)(3) and 8-1-2-42(g)(3) is consistent with Ind. Code § 8-1-8.4-7(c)(1). CEI South is authorized to defer and recover 80% of the approved federally mandated costs incurred in connection with the CCR Compliance Projects through the ECA mechanism pursuant to Ind. Code § 8-1-8.4-7, including capital, O&M, depreciation, taxes, financing, and carrying costs based on the current overall WACC and AFUDC. In addition, CEI South is authorized to utilize CWIP ratemaking treatment for the CCR Compliance Projects through the ECA mechanism. CEI South is authorized to defer post-in-service costs of the CCR Compliance Projects, including carrying costs based on the current overall WACC, depreciation, taxes, and O&M expenses, on an interim basis until such costs are recognized for ratemaking purposes through CEI South's ECA mechanism or otherwise included for recovery in CEI South's base rates in its next general rate case. CEI South's proposed cost allocation factors are also approved.

CEI South is not seeking authority to accrue and subsequently recover in the next base rate case PISCC on the balance of the 20% deferred revenue requirement included in the regulatory asset discussed previously.

ii.    **Depreciation.** CEI South proposes to include for recovery the depreciation expense associated with the new capital investments for the CCR Compliance Projects at the current applicable depreciation rate for the asset class. To the extent the new investment associated with the CCR Compliance Projects results in the retirement of an existing asset, depreciation expense included in the revenue requirement will be reduced by the depreciation expense attributed to those retired assets. In its next base rate case, CEI South will evaluate adjustments to current depreciation rates as part of its formal depreciation study.

While no party opposed CEI South's proposed depreciation rate for the investments required for the CCR Compliance Projects, the OUCC took issue with CEI South's proposed accounting treatment for retired assets. Mr. Lantrip recommend excluding the costs of removal from CEI South's proposed retirement adjustment because the cost of removal is already considered as part of the process of establishing the depreciation rates approved in CEI South's base rate cases. He testified that the OUCC's recommendation is consistent with the Commission's order in *Indiana Michigan Power Company*, Cause No. 44182 (July 17, 2013).

On rebuttal, Ms. Gostenhofer testified that CEI South follows the FERC USOA "Electric Plant Instruction" 10(B)(2), which requires that the retirements of utility plant be recorded against the accumulated depreciation applicable to such property and that any incremental cost of removal and any salvage proceeds be charged or credited to the same account. The accounting treatment results in no change to overall rate base. Ms. Gostenhofer testified that Petitioner is not requesting to deviate from the FERC USOA for the accounting treatment of retirement. She stated that, when the FERC accounting for retirements, including the cost of removal, is applied, the retirement of an asset does not result in a change in net rate base, but results in a reclassification from plant in service to accumulated depreciation. She stated that CEI South intends to record any incurred cost of removal associated with the retired assets to accumulated depreciation, as required by FERC.

According to Ms. Gostenhofer, when depreciation expense, inclusive of cost of removal, is recorded, the balance of the amounts expensed for cost of removal aggregates in accumulated depreciation and ultimately decreases the net book value of the asset. She said that recording depreciation expense with the cost of removal both reduces rate base and also results in an accumulated depreciation reflecting a net credit balance on the plant asset or an over-depreciated asset equal to the total estimated cost of removal at the end of an asset's life. She testified that, when the actual costs of removal are incurred, the utility charges accumulated depreciation in accordance with the USOA, reducing the net plant balance to zero after incurring the cost of removal, assuming the estimated cost of removal in depreciation expense is equal to the actual costs of removal. Ms. Gostenhofer explained that any over- or under-recovery of the cost of removal will remain in accumulated depreciation, will continue to increase or decrease rate base, and will eventually be reflected in future depreciation rates determined in CEI South's next depreciation study.

Ms. Gostenhofer confirmed on rebuttal that it is not CEI South's intent to reflect in its rate adjustment mechanism the costs of removal associated with retired property. She testified that the ECA will recover the incremental capital spend and does not include an adjustment, or additional recovery, for the costs of removal.

JA125

We find that the ECA to recover the federally mandated costs associated with the approved CCR Compliance Projects should not include cost of removal for associated retirements. Based on the evidence presented, we find CEI South's depreciation proposal is reasonable and is approved.

**8.    Collaborative Process.** In the Commission's order in Cause No. 45109, in which we reviewed CenterPoint Energy, Inc.'s acquisition of Indiana Gas Company, Inc. and Southern Indiana Gas and Electric Company, we encouraged consideration of an engagement of interested stakeholders in a collaborative process to develop open and transparent dialogue on utility operational efficiency. *Indiana Gas Company, Inc.*, Cause No. 45109, at 12 (Jan. 16, 2019). We further that encouragement here with a directive.

The Commission views the collaborative process as an opportunity for all parties to communicate on how to review utility operations. A collaborative process is currently in place for all Indiana investor-owned electric utilities except Petitioner. We believe performance metrics can be of significant value to CEI South, its customers, and the Commission. Thus, we find that CEI South shall facilitate a meeting with interested stakeholders within 12 weeks of the effective date of this order to collaborate on a path for moving forward with a performance metrics initiative. We anticipate that this process will enable an analysis of CEI South's performance over time and comparison with similarly situated utilities.

Because the ongoing collaborative effort will not be occurring in the context of an open docket, the Commission's technical staff should actively participate in the process. For purposes of 170 IAC 1-1.5, the Commission's technical staff shall be authorized to participate in the collaborative without being subject to 170 IAC 1-1.5-3 and 1-1.5-4. So that the Commission and interested stakeholders may stay apprised of the collaborative process, we direct CEI South to make a progress update filing in this Cause within 90 days of the initial meeting of the collaborative. We also direct CEI South to file quarterly reports for the first year and an annual report one year from the date of this order and on that date every year thereafter until otherwise indicated by the Presiding Officers.

**9.    Confidentiality.** CEI South filed motions for protection and nondisclosure of confidential and proprietary information on June 17, 2021, December 7, 2021, and December 20, 2021. The Industrial Group also filed a motion for protection and nondisclosure of confidential and proprietary information on November 19, 2021. All of these motions related to information CEI South claimed to be trade secrets and protected from disclosure under Ind. Code §§ 8-1-2-29 and 5-14-3-4. Docket entries were issued on July 1, 2021 and January 11, 2022, finding such information to be preliminarily confidential and protected from disclosure under Ind. Code §§ 8-1-2-29 and 5-14-3-4. The confidential information was subsequently submitted under seal. The Commission finds the information that is the subject of these motions is confidential pursuant to Ind. Code § 8-1-2-29 and Ind. Code ch. 5-14-3, is exempt from public access and disclosure by Indiana law, and shall continue to be held by the Commission as confidential and protected from public access and disclosure.

**IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that:**

JA126

1.    CEI South is issued a certificate of public convenience and necessity under Ind. Code ch. 8-1-8.5 to construct two natural gas CTs providing approximately 460 MW of capacity to be located at CEI South's existing A.B. Brown site. This Order constitutes the certificate. This certificate is subject to the limitations described herein regarding the Notice to Proceed date under Petitioner's contract with Kiewit.

2.    Should Petitioner reach the conclusion that it should not move forward with the NTP under the contract with Kiewit because of emergent concerns not considered herein, it shall submit a compliance filing in this Cause describing its decision no later than 15 days before the Final Anticipated NTP date.

3.    If Petitioner issues a "limited" NTP to Kiewit as discussed herein, Petitioner shall submit a compliance filing in this Cause within 15 days of the issue date.

4.    CEI South's estimated total cost of the CT Project in the amount of $334 million is approved as set forth herein.

5.    CEI South's request for ongoing review of the CT Project is approved. CEI South shall file reports as described herein for the purpose of ongoing review in accordance with Ind. Code § 8-1-8.5-6.

6.    CEI South shall file supply chain updates as described herein.

7.    CEI South is authorized to depreciate the CT Project at the depreciation rate identified herein.

8.    CEI South is authorized to defer depreciation and to accrue PISCC related to the CT Project, including carrying costs based on its weighted average cost of capital, until such costs are recognized for ratemaking purposes through CEI South's base rates in its next general rate case.

9.    To the extent that reasonable pipeline costs allocated to CEI South's customers are not ultimately recovered through CEI South's FAC mechanism, we grant its alternative request for deferral of such costs until such costs are recovered through base rates following a general rate case

10.    CEI South is issued a certificate of public convenience and necessity for the CCR Compliance Projects pursuant to Ind. Code ch. 8-1-8.4. This Order constitutes the certificate.

11.    The CCR Rule and the ELG Rule constitute federally mandated requirements as defined by Ind. Code § 8-1-8.4-5.

12.    The CCR Compliance Projects constitute compliance projects as that term is defined in Ind. Code § 8-1-8.4-2, and the costs incurred in connection with the CCR Compliance Projects are federally mandated costs as that term is defined in Ind. Code § 8-1-8.4-4. The federally mandated costs are eligible for ratemaking treatment described in Ind. Code § 8-1-8.4-7.

JA127

13.     CEI South's cost estimates for the CCR Compliance Projects set forth above are approved.

14.     CEI South is authorized to timely recover 80% of the approved federally mandated costs incurred in connection with the CCR Compliance Projects through its existing ECA mechanism pursuant to Ind. Code § 8-1-8.4-7, including capital, O&M, depreciation, taxes, financing, and carrying costs based on its weighted average cost of capital.

15.     CEI South is authorized to utilize CWIP ratemaking treatment for the CCR Compliance Projects through its ECA mechanism.

16.     CEI South is authorized to accrue AFUDC relating to the CCR Compliance Projects until such time as the projects included in the CCR Compliance Projects are placed into service or receive ratemaking treatment.

17.     CEI South is authorized to accrue PISCC related to the CCR Compliance Projects, including carrying costs based on its WACC, and to defer depreciation, taxes, and O&M expenses on an interim basis until such costs are recognized for ratemaking purposes through CEI South's ECA or otherwise included for recovery in CEI South's base rates in its next general rate case.

18.     CEI South is authorized to adjust its authorized net operating income to reflect any approved earnings associated with the CCR Compliance Projects for the purposes of Ind. Code § 8-1-2-42(d)(3), as allowed under Ind. Code § 8-1-8.4-7(c)(1).

19.     CEI South is authorized to defer 20% of the federally mandated costs incurred in connection with the CCR Compliance Projects for recovery in its next general rate case.

20.     CEI South is authorized to depreciate the individual projects included in the CCR Compliance Projects according to depreciation rates set forth herein.

21.     CEI South is authorized to record all PISCC and deferred depreciation authorized herein as regulatory assets in Account 182.3, Other Regulatory Assets.

22.     A subdocket shall be created to address cost recovery and allocation issues related to the costs incurred pursuant to the Precedent Agreement with TGT as discussed herein. In the event CEI South is ultimately not permitted to reflect the fixed lateral demand charge in its FAC as a result of such subdocket, CEI South is authorized to defer as a regulatory asset for future recovery the demand costs it incurs until such time as such costs are recovered through CEI South's base rates.

23.     Within five business days of the FERC order regarding the construction of the gas lateral, CEI South shall file a copy of the order under this Cause.

24.     CEI South shall establish a collaborative process as discussed herein.

40

25.     The Confidential Information submitted under seal in this Cause pursuant to the parties' requests for confidential treatment is determined to be confidential trade secret information as defined in Ind. Code § 24-2-3-2 and shall continue to be held as confidential and exempt from public access and disclosure under Ind. Code §§ 8-1-2-29 and 5-14-3-4.

26.     This Order shall be effective on and after the date of its approval.

**HUSTON, FREEMAN, KREVDA, AND ZIEGNER CONCUR:**

**APPROVED: JUN 28 2022**

**I hereby certify that the above is a true and correct copy of the Order as approved.**

Dana
Kosco

Digitally signed by
Dana Kosco
Date: 2022.06.28
14:12:34 -04'00'

**Dana Kosco**
**Secretary of the Commission**

41



*Federal Energy Regulatory Commission*

**Office of Energy Projects**

---

**FERC/EIS – 0317F**                                               **August 2022**

# HENDERSON COUNTY EXPANSION PROJECT
## FINAL ENVIRONMENTAL IMPACT STATEMENT

Texas Gas Transmission, LLC                             Docket No. CP21-467-000

**Abstract:**

The staff of the Federal Energy Regulatory Commission (Commission) prepared a final Environmental Impact Statement (EIS) for the Henderson County Expansion Project proposed by Texas Gas Transmission, LLC (Texas Gas). Texas Gas proposes to construct and operate approximately 23.5 miles of 20-inch-diameter pipeline and 0.1 mile of 16-inch-diameter pipeline between Henderson County, Kentucky and Posey County, Indiana; a new tie-in facility and mainline valve in Henderson County, Kentucky; and a new meter and regulating station and Point of Demarcation in Posey County, Indiana. In addition, Texas Gas would modify its existing Slaughters Compressor Station (Webster County, Kentucky) and existing meter and regulating station (Johnson County, Indiana). The U.S. Environmental Protection Agency participated as a cooperating agency in the preparation of the EIS. With implementation of Texas Gas's impact avoidance, minimization, and mitigation measures, as well as adherence to Commission staff's recommendations, Commission staff conclude that project effects would be reduced to less than significant levels, except for climate change impacts that are not characterized in this EIS as significant or insignificant.

**Cooperating Agency**



U.S. Environmental Protection Agency

Contact: Office of External Affairs, (866) 208-FERC
Estimate of Staff's Time Spent in the Preparation of this EIS: $37,834.67.
There were no direct contract or travel costs.
Cooperating agency cost (U.S. Environmental Protection Agency): $15,750.00.

Federal Energy Regulatory Commission
Office of Energy Projects
888 First Street NE, Washington, DC 20426

OFFICE OF ENERGY PROJECTS

<u>In Reply Refer To:</u>
OEP/DG2E/Gas Branch 4
Texas Gas Transmission, LLC
Henderson County Expansion Project
Docket No. CP21-467-000

TO THE INTERESTED PARTY:

The staff of the Federal Energy Regulatory Commission (FERC or Commission) has prepared a final Environmental Impact Statement (EIS) for the Henderson County Expansion Project (Project), proposed by Texas Gas Transmission, LLC (Texas Gas) in the above-referenced docket.  Texas Gas requests a Certificate of Public Convenience and Necessity and Abandonment Authorization to construct, operate, and maintain new facilities, and to abandon certain natural gas transmission pipeline facilities in Henderson and Webster Counties, Kentucky and Posey and Johnson Counties, Indiana.  The Project purpose is to provide up to 220,000 dekatherms per day of new firm transportation service to CenterPoint Energy Indiana South's (CenterPoint) AB Brown Generating Station in Posey County, Indiana.

The final EIS assesses the potential environmental effects of the construction and operation of the Project in accordance with the requirements of the National Environmental Policy Act (NEPA).  FERC staff concludes that approval of the proposed Project, with the mitigation measures recommended in the EIS, would result in some adverse environmental impacts; however, with the exception of potential impacts on climate change, we conclude that impacts would be reduced to less than significant levels.  Regarding climate change impacts, the EIS is not characterizing the Project's greenhouse gas emissions as significant or not significant because the Commission is conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations going forward.[1]

The U.S. Environmental Protection Agency participated as a cooperating agency in the preparation of the EIS.  Cooperating agencies have jurisdiction by law or special expertise with respect to resources potentially affected by the proposal and participate in the NEPA analysis.  Although the U.S. Environmental Protection Agency provided input to the conclusions and recommendations presented in the final EIS, the agency may present its own conclusions and recommendations in any applicable Records of Decision or other documentation for the Project.

---

[1] *Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022); 178 FERC ¶ 61,197 (2022).

The final EIS addresses the potential environmental effects of the construction and operation of the following Project facilities:

- Henderson Lateral – Construction of an approximately 23.5-mile-long, 20-inch-diameter natural gas transmission pipeline extending from a new tie-in facility in Henderson County, Kentucky to the new AB Brown Meter and Regulating (M&R) Station in Posey County, Indiana.

- AB Brown M&R Station and Point of Demarcation Site (Posey County, Indiana) – Construction of a delivery M&R station, receiver facility, and a 0.1-mile-long, 16-inch-diameter interconnecting pipeline terminating at the new Point of Demarcation Site, which would serve as CenterPoint's tie-in for Project facilities for its AB Brown Generating Station.

- Slaughters Compressor Station (Webster County, Kentucky) – Installation of a new 4,863-horsepower Solar Centaur 50 turbine compressor unit with piping modifications and other appurtenant facilities, abandonment in place of an existing compressor unit (Unit 5), and placement on standby of two existing compressor units (Unit 6 and Unit 7).

- New ancillary facilities including a mainline valve and tie-in facility in Henderson County, Kentucky and upgrades to an existing M&R station in Johnson County, Indiana.

The Commission mailed a copy of the *Notice of Availability of the Final Environmental Impact Statement for the Proposed Henderson County Expansion Project* to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American Tribes; potentially affected landowners and other interested individuals and groups; and newspapers and libraries in the Project area. The final EIS is only available in electronic format. It may be viewed and downloaded from the FERC's website (www.ferc.gov), on the natural gas environmental documents page (https://www.ferc.gov/industries-data/natural-gas/environment/environmental-documents). In addition, the final EIS may be accessed by using the eLibrary link on the FERC's website. Click on the eLibrary link (https://elibrary.ferc.gov/eLibrary/search) select "General Search" and enter the docket number in the "Docket Number" field, excluding the last three digits (i.e., CP21-467). Be sure you have selected an appropriate date range. For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or toll free at (866) 208-3676, or for TTY, contact (202) 502-8659.

Additional information about the Project is available from the Commission's Office of External Affairs, at **(866) 208-FERC**, or on the FERC website (www.ferc.gov) using the eLibrary link. The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

JA132

In addition, the Commission offers a free service called eSubscription that allows you to keep track of all formal issuances and submittals in specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents. Go to https://www.ferc.gov/ferc-online/overview to register for eSubscription.

JA133

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................... ES-1
  PROPOSED ACTION ............................................................................................ ES-1
  PUBLIC INVOLVEMENT ...................................................................................... ES-2
  PROJECT IMPACTS AND MITIGATION.............................................................. ES-3
    Geology................................................................................................................ ES-3
    Soils ..................................................................................................................... ES-4
    Water Resources .................................................................................................. ES-4
      Groundwater .................................................................................................ES-4
      Surface Water...............................................................................................ES-4
      Wetlands ......................................................................................................ES-5
    Vegetation, Fisheries, Wildlife, and Special Status Species............................. ES-6
    Land Use .............................................................................................................. ES-8
    Environmental Justice ......................................................................................... ES-8
    Cultural Resources ............................................................................................ ES-10
    Air Quality ........................................................................................................ ES-11
    Noise ................................................................................................................. ES-12
    Reliability and Safety ....................................................................................... ES-12
    Cumulative Impacts .......................................................................................... ES-12
    Alternatives....................................................................................................... ES-13
  CONCLUSIONS.................................................................................................... ES-14

1.0     INTRODUCTION .......................................................................................1-1
  1.1    PURPOSE AND NEED.................................................................................1-2
  1.2    PURPOSE AND SCOPE OF THIS EIS .......................................................1-3
    1.2.1  Federal Energy Regulatory Commission .....................................1-4
    1.2.2  U.S. Environmental Protection Agency.......................................1-4
  1.3    PUBLIC REVIEW.........................................................................................1-5
    1.3.1  Summary of Submitted Alternatives, Information, and Analyses ...........1-6
  1.4    PERMITS, APPROVALS, AND REGULATORY REQUIREMENTS.............1-9
    1.4.1  Bald and Golden Eagle Protection Act ......................................1-11
    1.4.2  Clean Air Act ..............................................................................1-11
    1.4.3  Clean Water Act...........................................................................1-12
    1.4.4  Endangered Species Act ..............................................................1-12
    1.4.5  Migratory Bird Treaty Act ..........................................................1-12
    1.4.6  National Historic Preservation Act .............................................1-13

2.0     DESCRIPTION OF THE PROPOSED ACTION .............................................2-1
  2.1    PROPOSED FACILITIES.............................................................................2-1
    2.1.1  Pipeline Facilities..........................................................................2-2
    2.1.2  Aboveground Facilities.................................................................2-4
    2.1.3  Non-jurisdictional Facilities.........................................................2-4
    2.1.4  Land Requirements .......................................................................2-5
      2.1.4.1    Pipeline Facilities..........................................................2-6
      2.1.4.2    Aboveground Facilities..................................................2-10
    2.1.5  General Pipeline Construction Procedures .................................2-12

      2.1.6   Special Pipeline Construction Procedures ............................................ 2-18
         2.1.6.1     Waterbody Crossings............................................................ 2-18
         2.1.6.2     Wetlands ............................................................................... 2-21
         2.1.6.3     Road and Railroad Crossings.............................................. 2-21
         2.1.6.4     Agricultural Areas ................................................................ 2-22
         2.1.6.5     Residential Areas .................................................................. 2-23
         2.1.6.6     Foreign Utility Crossing ...................................................... 2-23
         2.1.6.7     Steep Slope and Side Slope Construction................................ 2-23
         2.1.6.8     Winter Construction ............................................................. 2-24
      2.1.7   Aboveground Facilities.............................................................. 2-24
2.2      CONSTRUCTION SCHEDULE AND WORKFORCE ..................................... 2-24
2.3      ENVIRONMENTAL COMPLIANCE AND MONITORING ......................... 2-25
2.4      OPERATION AND MAINTENANCE........................................................ 2-25

3.0      **ALTERNATIVES**.................................................................................................. **3-1**
3.1      INTRODUCTION .................................................................................. 3-1
3.2      NO-ACTION ALTERNATIVE................................................................. 3-2
3.3      ENERGY ALTERNATIVES ..................................................................... 3-3
3.4      COMPRESSOR ALTERNATIVES ........................................................... 3-3
3.5      SYSTEM ALTERNATIVES ..................................................................... 3-5
3.6      LATERAL ROUTE ALTERNATIVES .................................................... 3-8
3.7      ALTERNATIVES CONCLUSIONS........................................................ 3-11

4.0      **ENVIRONMENTAL ANALYSIS**........................................................................... **4-1**
4.1      BASELINE ENVIRONMENTAL TRENDS AND PLANNED
      ACTIVITIES......................................................................................... 4-2
4.2      GEOLOGY ........................................................................................... 4-4
      4.2.1   Geologic Setting........................................................................ 4-4
      4.2.2   Geotechnical Investigation ...................................................... 4-5
      4.2.3   Mineral Resources ................................................................... 4-7
      4.2.4   Paleontological Resources....................................................... 4-8
      4.2.5   Geologic Hazards..................................................................... 4-8
         4.2.5.1     Seismicity, Ground Rupture, and Soil Liquefaction.................... 4-8
         4.2.5.2     Landslides ............................................................................. 4-9
         4.2.5.3     Land Subsidence and Karst Terrain...................................... 4-10
         4.2.5.4     Flooding and Scour.............................................................. 4-10
         4.2.5.5     Blasting ................................................................................. 4-11
4.3      SOILS .................................................................................................. 4-11
      4.3.1   Soil Characteristics ................................................................. 4-11
         4.3.1.1     Prime Farmland and Farmland of Statewide Importance ......... 4-11
         4.3.1.2     Soil Compaction and Hydric Soils ....................................... 4-14
         4.3.1.3     Highly Erodible Soils ........................................................... 4-15
         4.3.1.4     Low Revegetation Potential.................................................. 4-16
         4.3.1.5     Shrink-Swell Soils ................................................................ 4-17
         4.3.1.6     Shallow Bedrock .................................................................. 4-17
      4.3.2   Inadvertent Spills or Discovery of Contaminants................... 4-17
      4.3.3   Impacts and Mitigation .......................................................... 4-18

JA135

4.4     WATER RESOURCES ........................................................................... 4-19
        4.4.1   Groundwater Resources ................................................. 4-19
                4.4.1.1     Designated Sole Source Aquifers ..................... 4-20
                4.4.1.2     Wellhead Protection Areas ............................... 4-20
                4.4.1.3     Water Supply Wells ......................................... 4-20
                4.4.1.4     Groundwater Impacts and Mitigation .............. 4-21
        4.4.2   Surface Water Resources ............................................... 4-23
                4.4.2.1     Impaired and Sensitive Waterbody Crossings ........... 4-24
                4.4.2.2     Surface Water Impacts and Mitigation ..................... 4-28
                4.4.2.3     Water Use ......................................................... 4-32
        4.4.3   Wetlands ....................................................................... 4-35
                4.4.3.1     Wetland Impacts and Mitigation ..................... 4-36
4.5     FISHERIES, VEGETATION, WILDLIFE, AND SPECIAL STATUS
        SPECIES ............................................................................................ 4-39
        4.5.1   Fisheries and Aquatic Resources ................................... 4-39
                4.5.1.1     Fisheries of Special Concern ........................... 4-39
                4.5.1.2     Fisheries Impacts and Mitigation .................... 4-40
        4.5.2   Vegetation .................................................................... 4-42
                4.5.2.1     Special Vegetation Communities ..................... 4-44
                4.5.2.2     Noxious and Invasive Weeds ........................... 4-44
                4.5.2.3     Vegetation Impacts and Mitigation ................. 4-44
        4.5.3   Wildlife ........................................................................ 4-47
                4.5.3.1     Managed and Sensitive Wildlife Areas ................... 4-48
                4.5.3.2     Wildlife Impacts and Mitigation ..................... 4-48
                4.5.3.3     Migratory Birds ............................................... 4-49
        4.5.4   Special Status Species ................................................... 4-51
                4.5.4.1     Federally Listed Species ................................. 4-52
                4.5.4.2     State-listed Species ......................................... 4-59
4.6     LAND USE, SPECIAL INTEREST AREAS, AND VISUAL
        RESOURCES ..................................................................................... 4-60
        4.6.1   Land Use ....................................................................... 4-63
                4.6.1.1     Agricultural Land ............................................ 4-63
                4.6.1.2     Open Land ....................................................... 4-65
                4.6.1.3     Forested Land .................................................. 4-65
                4.6.1.4     Developed Land ............................................... 4-65
        4.6.2   Residential Land and Planned Developments ................. 4-66
        4.6.3   Public Land, Recreation, or Sensitive Land Areas .............. 4-67
        4.6.4   Visual Resources ........................................................... 4-70
4.7     SOCIOECONOMICS AND ENVIRONMENTAL JUSTICE ......................... 4-72
        4.7.1   Socioeconomics ............................................................ 4-72
                4.7.1.1     Employment and Tax Revenue .......................... 4-72
                4.7.1.2     Housing and Public Services ............................. 4-73
                4.7.1.3     Transportation ................................................ 4-73
        4.7.2   Environmental Justice ................................................... 4-76
                4.7.2.1     Meaningful Engagement and Public Involvement ........ 4-77
                4.7.2.2     Identification of Environmental Justice Communities .............. 4-80

4.4     WATER RESOURCES ........................................................................... 4-19
        4.4.1   Groundwater Resources ................................................. 4-19
                4.4.1.1     Designated Sole Source Aquifers ..................... 4-20
                4.4.1.2     Wellhead Protection Areas ............................... 4-20
                4.4.1.3     Water Supply Wells ......................................... 4-20
                4.4.1.4     Groundwater Impacts and Mitigation .............. 4-21
        4.4.2   Surface Water Resources ............................................... 4-23
                4.4.2.1     Impaired and Sensitive Waterbody Crossings ........... 4-24
                4.4.2.2     Surface Water Impacts and Mitigation ..................... 4-28
                4.4.2.3     Water Use ......................................................... 4-32
        4.4.3   Wetlands ....................................................................... 4-35
                4.4.3.1     Wetland Impacts and Mitigation ..................... 4-36
4.5     FISHERIES, VEGETATION, WILDLIFE, AND SPECIAL STATUS
        SPECIES ............................................................................................ 4-39
        4.5.1   Fisheries and Aquatic Resources ................................... 4-39
                4.5.1.1     Fisheries of Special Concern ........................... 4-39
                4.5.1.2     Fisheries Impacts and Mitigation .................... 4-40
        4.5.2   Vegetation .................................................................... 4-42
                4.5.2.1     Special Vegetation Communities ..................... 4-44
                4.5.2.2     Noxious and Invasive Weeds ........................... 4-44
                4.5.2.3     Vegetation Impacts and Mitigation ................. 4-44
        4.5.3   Wildlife ........................................................................ 4-47
                4.5.3.1     Managed and Sensitive Wildlife Areas ................... 4-48
                4.5.3.2     Wildlife Impacts and Mitigation ..................... 4-48
                4.5.3.3     Migratory Birds ............................................... 4-49
        4.5.4   Special Status Species ................................................... 4-51
                4.5.4.1     Federally Listed Species ................................. 4-52
                4.5.4.2     State-listed Species ......................................... 4-59
4.6     LAND USE, SPECIAL INTEREST AREAS, AND VISUAL
        RESOURCES ..................................................................................... 4-60
        4.6.1   Land Use ....................................................................... 4-63
                4.6.1.1     Agricultural Land ............................................ 4-63
                4.6.1.2     Open Land ....................................................... 4-65
                4.6.1.3     Forested Land .................................................. 4-65
                4.6.1.4     Developed Land ............................................... 4-65
        4.6.2   Residential Land and Planned Developments ................. 4-66
        4.6.3   Public Land, Recreation, or Sensitive Land Areas .............. 4-67
        4.6.4   Visual Resources ........................................................... 4-70
4.7     SOCIOECONOMICS AND ENVIRONMENTAL JUSTICE ......................... 4-72
        4.7.1   Socioeconomics ............................................................ 4-72
                4.7.1.1     Employment and Tax Revenue .......................... 4-72
                4.7.1.2     Housing and Public Services ............................. 4-73
                4.7.1.3     Transportation ................................................ 4-73
        4.7.2   Environmental Justice ................................................... 4-76
                4.7.2.1     Meaningful Engagement and Public Involvement ........ 4-77
                4.7.2.2     Identification of Environmental Justice Communities .............. 4-80

JA136

|  | 4.7.2.3 | Impacts on Environmental Justice Communities ...................... 4-86 |
|  | 4.7.2.4 | Environmental Justice Impact Mitigation ........................... 4-97 |
|  | 4.7.2.5 | Determination of Disproportionately High and Adverse Impacts on Environmental Justice Communities ..................... 4-98 |
| 4.8 | CULTURAL RESOURCES | ...................................................................... 4-99 |
|  | 4.8.1 | Cultural Resource Investigations ...................................................... 4-99 |
|  | 4.8.1.1 | Survey Results .......................................................... 4-100 |
|  | 4.8.2 | Native American Consultations ................................................... 4-100 |
|  | 4.8.3 | Unanticipated Discovery Plan ...................................................... 4-101 |
|  | 4.8.4 | Compliance with the National Historic Preservation Act ................ 4-101 |
| 4.9 | AIR QUALITY AND CLIMATE CHANGE | ................................................. 4-102 |
|  | 4.9.1 | Existing Air Quality ...................................................................... 4-103 |
|  | 4.9.2 | Regulatory Requirements ............................................................... 4-104 |
|  | 4.9.2.1 | Prevention of Significant Deterioration and Nonattainment New Source Review ................................................. 4-104 |
|  | 4.9.2.2 | Class I Areas and Visibility ...................................... 4-104 |
|  | 4.9.2.3 | Title V Permitting ................................................... 4-104 |
|  | 4.9.2.4 | New Source Performance Standards ......................... 4-105 |
|  | 4.9.2.5 | National Emission Standards for Hazardous Air Pollutants .... 4-106 |
|  | 4.9.2.6 | General Conformity ................................................. 4-107 |
|  | 4.9.2.7 | Mandatory Greenhouse Gas Reporting Rule ............ 4-108 |
|  | 4.9.2.8 | Methane Challenge Program / Leak Detection and Repair ..... 4-108 |
|  | 4.9.2.9 | State Air Quality Regulations ................................... 4-108 |
|  | 4.9.3 | Construction Emissions Impacts and Mitigation ............................... 4-109 |
|  | 4.9.4 | Operational Emissions Impacts and Mitigation ................................ 4-113 |
|  | 4.9.4.1 | Non-Jurisdictional Facilities ................................... 4-117 |
|  | 4.9.4.2 | Downstream Emissions ............................................ 4-119 |
|  | 4.9.5 | Air Quality Modeling .................................................................... 4-119 |
|  | 4.9.5.1 | Impacts on Human Health ........................................ 4-120 |
|  | 4.9.6 | Climate Change ............................................................................. 4-121 |
| 4.10 | NOISE | .................................................................................................... 4-134 |
|  | 4.10.1 Federal Noise Regulations ............................................................. 4-134 |
|  | 4.10.2 Ambient Noise Conditions ............................................................ 4-135 |
|  | 4.10.3 Construction Noise Impacts and Mitigation .................................. 4-136 |
|  | 4.10.4 Operational Noise Impacts and Mitigation .................................... 4-139 |
| 4.11 | RELIABILITY AND SAFETY | .............................................................. 4-143 |
|  | 4.11.1 Safety Standards .......................................................................... 4-144 |
|  | 4.11.2 Project Design Requirements ........................................................ 4-144 |
|  | 4.11.2.1 | Pipeline Safety ........................................................ 4-144 |
|  | 4.11.2.2 | Compressor Station Design ...................................... 4-146 |
|  | 4.11.3 Emergencies ................................................................................ 4-146 |
|  | 4.11.4 Pipeline Accident Data ................................................................ 4-147 |
|  | 4.11.5 Impact on Public Safety ............................................................... 4-149 |
| 4.12 | CUMULATIVE IMPACTS | ..................................................................... 4-151 |
|  | 4.12.1 Projects and Activities Considered ............................................... 4-154 |
|  | 4.12.2 Potential Cumulative Impacts by Resource ................................... 4-165 |

|  | 4.12.2.1 | Geology and Soils.................................................. 4-165 |
|  | 4.12.2.2 | Water Resources ................................................. 4-166 |
|  | 4.12.2.3 | Vegetation, Wildlife, and Fisheries ........................ 4-169 |
|  | 4.12.2.4 | Special Status Species .......................................... 4-170 |
|  | 4.12.2.5 | Land Use and Visual Resources ............................. 4-171 |
|  | 4.12.2.6 | Socioeconomics ................................................. 4-172 |
|  | 4.12.2.7 | Air Quality ....................................................... 4-172 |
|  | 4.12.2.8 | Noise ............................................................... 4-174 |
|  | 4.12.3 | Conclusions on Cumulative Impacts .................................... 4-175 |

**5.0 CONCLUSIONS AND RECOMMENDATIONS ................................ 5-1**
  5.1 SUMMARY OF THE ENVIRONMENTAL ANALYSIS................................ 5-1
  5.2 FERC STAFF'S RECOMMENDED MITIGATION......................... 5-1

## LIST OF APPENDICES

| Appendix A | Distribution List |
| Appendix B | Comments Received in Response to the Notice of Scoping |
| Appendix C | Topographic Maps |
| Appendix D | Alignment Sheets |
| Appendix E | Additional Temporary Workspace Justification |
| Appendix F | Waterbodies Crossed or Impacted by the Project |
| Appendix G | Wetlands Crossed or Otherwise Impacted by the Project |
| Appendix H | Road and Railroad Crossings |
| Appendix I | Construction Typicals |
| Appendix J | Major Utility Crossings |
| Appendix K | Locations of Steep Slopes by Milepost Crossed by the Project |
| Appendix L | Oil and Gas Wells Located within 0.25 mile of the Project |
| Appendix M | Site-Specific Waterbody Construction Diagrams and HDD Diagrams |
| Appendix N | Birds of Conservation Concern with Potential to Occur within the Project Area |
| Appendix O | Federal and State-Listed Threatened and Endangered Species Potentially Occurring within the Project Area |
| Appendix P | U.S. Fish and Wildlife Service Confirmation of 4(d) Usage for Northern Long-eared Bat |
| Appendix Q | Texas Gas Project Outreach |
| Appendix R | Noise Sensitive Areas |
| Appendix S | Response to Comments on the Draft Environmental Impact Statement |
| Appendix T | References |
| Appendix U | List of Preparers |

JA138

# LIST OF TABLES

Table 1.3-1    Environmental Issues Identified During the Public Scoping Process ................................................................ 1-7
Table 1.4-1    Environmental Permits, Approvals, and Consultations ............................ 1-10
Table 2.1.4-1  Project Area Land Requirements ................................................ 2-6
Table 2.1.4-2  Collocation of the Henderson Lateral with Existing Rights-of-Way .............................................................. 2-8
Table 2.1.4-3  Access Roads Proposed for the Project ........................................ 2-9
Table 2.1.5-1  Texas Gas' Requested Alternative Measures to FERC's Procedures ........................................................... 2-13
Table 2.1.6-1  Summary of Horizontal Directional Drill Locations for the Project ............................................................ 2-20
Table 3.6-1    Major Route Alternatives to the Project ..................................... 3-10
Table 3.6-2    Moderate Consequence Areas along the Co-location Alternative ............... 3-11
Table 4.2.2-1  Horizontal Directional Drill Summary Table of the Project ................... 4-5
Table 4.3-1    Soil Characteristics and Limitations for the Project (acres) ................ 4-12
Table 4.4.1-1  Water Supply Wells Within 150 Feet of Project Construction Work Areas .......................................................... 4-21
Table 4.4.2-1  Watersheds Crossed by the Project ............................................ 4-23
Table 4.4.2-2  100-Year Floodplains and Regulatory Floodways Crossed by the Project ......................................................... 4-27
Table 4.4.2-3  Hydrostatic Test and HDD Water Source and Discharge Locations for the Project ....................................... 4-33
Table 4.4.3-1  Wetland Impact Summary of the Project ........................................ 4-36
Table 4.5.2-1  Acreage of Construction and Operation Impacts on Vegetation ................. 4-43
Table 4.6-1    Land Use Affected by Construction and Operation (in Acres) of the Project ........................................................ 4-61
Table 4.6.2-1  Structures Within 50 Feet of Construction Workspace .......................... 4-66
Table 4.6.3-1  Public Land and Designated Recreation or Scenic Areas within 0.25 Mile of the Project .......................................... 4-68
Table 4.7.1-1  Traffic Volumes on Major Roadways in the Project Area ....................... 4-75
Table 4.7.2-1  Minority Populations by Race and Ethnicity and Low-Income Populations in the Project Area ................................. 4-82
Table 4.9.3-1  Construction Emissions (tons per 10-month construction duration) ........................................................... 4-111
Table 4.9.3-2  Comparison of Construction Emissions for the Project to General Conformity Thresholds ................................... 4-112
Table 4.9.4-1  Potential Operational Emissions for the Project (tons per year) ............. 4-115
Table 4.9.4-2  Potential Net Change in Emissions from the CenterPoint Facilities after the Proposed Modifications (tons per year) ........ 4-118
Table 4.9.5-1  Predicted Air Quality Impacts of the Modified Slaughters Compressor Station ($\mu g/m^3$) ................................... 4-120
Table 4.9.6-1  Individual Greenhouse Gas Emissions for the Project .......................... 4-132
Table 4.10.3-1 Noise Analysis for 24-Hour HDD Operations .................................... 4-137
Table 4.10.4-1 Noise Analysis for Full-Load Operation of the Slaughters Compressor Station ........................................... 4-141

Table 4.10.4-2    Noise Analysis for the Operation of the M&R Stations ........................... 4-142
Table 4.11.4-1    Natural Gas Transmission Pipeline Significant Incidents by
                  Cause (2001 – 2020) ................................................................... 4-148
Table 4.11.4-2    Excavation, Outside Force, and Natural Force Incidents by
                  Cause (2001 – 2020) ................................................................... 4-149
Table 4.11.5-1    Injuries and Fatalities – Natural Gas Transmission Pipelines ................. 4-150
Table 4.11.5-2    Nationwide Accidental Deaths ................................................. 4-150
Table 4.12-1      Geographic Scope by Resource for Cumulative Impacts
                  Associated with the Henderson County Expansion Project .................... 4-152
Table 4.12.1-1    Projects and Resources Considered in the Cumulative Impacts
                  Analysis for the Henderson County Expansion Project ......................... 4-155
Table 4.12.1-2    Watersheds Crossed by the Henderson County Expansion
                  Project and Other Projects included in the Cumulative Analysis............. 4-167
Table 4.12.2-1    Summary of Estimated Annual Emissions from Operation of the
                  Henderson County Expansion Project and Modifications at the
                  AB Brown Power Plant .............................................................. 4-174

## LIST OF FIGURES

Figure 2.1-1      Henderson County Expansion Project Overview Map ................................ 2-3
Figure 2.1-2      Typical Pipeline Construction Sequence ........................................ 2-7
Figure 3.5-1      System Alternatives ............................................................. 3-6
Figure 3.6-1      Lateral Route Alternatives ..................................................... 3-9
Figure 4.7.2-1    Minority Communities within 1 mile of the Proposed Project.................. 4-85
Figure 4.7.2-2    Low-income Communities within 1 mile of the Proposed Project............. 4-87
Figure 4.12.1-1   Henderson County Expansion Project Actions Considered in the
                  Cumulative Impacts Analysis ................................................... 4-163

# TECHNICAL ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| "g" | acceleration of a falling object due to gravity |
| $\mu g/m^3$ | micrograms per cubic meter |
| 2020 IRP | CenterPoint's 2020 Integrated Resource Plan |
| AB Brown Generating Station | AB Brown Power Plant |
| Agreement | Paris Climate Agreement |
| ATWS | additional temporary workspaces |
| BCC | Birds of Conservation Concern |
| BGEPA | Bald and Golden Eagle Protection Act |
| BMP | best management practice |
| CAA | Clean Air Act |
| CAC | Citizens Action Coalition of Indiana |
| CenterPoint | CenterPoint Energy Indiana South |
| CEQ | Council on Environmental Quality |
| Certificate | Certificate of Public Convenience and Necessity |
| CFR | Code of Federal Regulations |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalents |
| Conservation Strategy | Conservation Strategy for Forest-Dwelling Bats in the Commonwealth of Kentucky |
| CWA | Clean Water Act |
| dB | decibel |
| dBA | decibel on the A-weighted scale |
| Dth/d | dekatherms per day |
| EI | environmental inspector |
| EIA | U.S. Energy Information Administration |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |
| FERC Plan | FERC's *Upland Erosion Control, Revegetation, and Maintenance Plan* |
| FERC Procedures | FERC's *Wetland and Waterbody Construction and Mitigation Procedures* |
| ft-bgs | feet below ground surface |
| GHG | greenhouse gases |
| GWP | global warming potential |
| HAP | hazardous air pollutant |
| HCA | high consequence area |
| HDD | horizontal directional drill |

JA141

| | |
|---|---|
| HDD Plan | Horizontal Directional Drill Monitoring, Inadvertent Return Response, and Contingency Plan |
| hp | horsepower |
| HUC | hydrologic unit code |
| IAC | Indiana Administrative Code |
| IBCF | Imperiled Bat Conservation Fund |
| IDEM | Indiana Department of Environmental Management |
| IDNR | Indiana Department of Natural Resources |
| IGWS | Indiana Geological and Water Survey |
| INDOT | Indiana Department of Transportation |
| IPaC | Information for Planning and Consultation |
| IURC | Indiana Utility Regulatory Commission |
| KAR | Kentucky Administration Regulations |
| KDFWR | Kentucky Department of Fish and Wildlife Resources |
| KDOW | Kentucky Energy and Environment Cabinet, Division of Water |
| KEEC | Kentucky Energy and Environment Cabinet |
| KGS | Kentucky Geological Survey |
| KYDEP | Kentucky Department of Environmental Protection – Energy and Environment Cabinet |
| $L_{dn}$ | day-night sound level |
| $L_{eq}$ | 24-hour equivalent sound level |
| M&R | Meter and Regulating |
| MAOP | maximum allowable operating pressure |
| MBTA | Migratory Bird Treaty Act |
| MCA | moderate consequence area |
| MLV | mainline valve |
| MMBtu | metric million British thermal unit |
| MMI | Modified Mercalli Intensity |
| MP | milepost |
| MW | megawatts |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| NGA | Natural Gas Act |
| NHPA | National Historic Preservation Act |
| NNSR | Nonattainment New Source Review |
| $NO_2$ | nitrogen dioxide |
| NOA | *Notice of Availability of the Draft Environmental Impact Statement for the Proposed Henderson County Expansion Project* |

JA142

| | |
|---|---|
| NOI | *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Henderson County Expansion Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review* |
| $NO_x$ | nitrogen oxides |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Properties |
| NSA | noise sensitive area |
| NSPS | New Source Performance Standards |
| NSR | New Source Review |
| NWI | National Wetlands Inventory |
| OEP | Office of Energy Projects |
| $^oF$ | degrees Fahrenheit |
| OPP | Office of Public Participation |
| PAR | permanent access road |
| PEM | palustrine emergent |
| PFO | palustrine forested |
| PGA | peak ground acceleration |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PIC | potential impact circle |
| $PM_{10}$ | particulate matter less than or equal to 10 microns in aerodynamic diameter |
| $PM_{2.5}$ | particulate matter less than or equal to 2.5 microns in aerodynamic diameter |
| Project | Henderson County Expansion Project |
| *Promising Practices* | *Promising Practices for EJ Methodologies in NEPA Reviews* |
| PSD | Prevention of Significant Deterioration |
| psi | pounds per square inch |
| PSS | palustrine scrub-shrub |
| RC | Radio Control |
| SCC | social cost of carbon |
| Secretary | Secretary of the Commission |
| SHPO | State Historic Preservation Offices |
| $SO_2$ | sulfur dioxide |
| SPRPP | Spill Prevention and Response Procedures Plan |
| SWPA | Source Water Protection Areas |
| SWPPP | Stormwater Pollution Prevention Plan |
| TAR | temporary access road |

JA143

| | |
|---|---|
| TETCO | Texas Eastern Transmission Company |
| Texas Gas | Texas Gas Transmission, LLC |
| tpy | tons per year |
| U.S.C. | United States Code |
| Unanticipated Discovery Plan | Plan for the Unanticipated Discovery of Historic Properties or Human Remains During Construction |
| USACE | U.S. Army Corps of Engineers |
| USDA | U.S. Department of Agriculture |
| USDOT | U.S. Department of Transportation |
| USEPA | U.S. Environmental Protection Agency |
| USFS | U.S. Forest Service |
| USFWS | U.S. Fish and Wildlife Service |
| USGCRP | U.S. Global Change Research Program |
| USGS | U.S. Geological Survey |
| VOC | volatile organic compound |

# EXECUTIVE SUMMARY

The staff of the Federal Energy Regulatory Commission (FERC or Commission) has prepared this final Environmental Impact Statement (EIS) to fulfill the requirements of the National Environmental Policy Act of 1969 (NEPA), and the Commission's regulations at Title 18 of the Code of Federal Regulations Part 380 (18 CFR 380). On June 25, 2021, Texas Gas Transmission, LLC (Texas Gas), filed an abbreviated application with the FERC, under Sections 7(b) and 7(c) of the Natural Gas Act (NGA) and Part 157 of the Commission's regulations, requesting authorization to construct and operate certain interstate natural gas facilities in Henderson and Webster Counties, Kentucky and Posey and Johnson Counties, Indiana.

The purpose of the EIS is to inform FERC decision makers, the public, and the permitting agencies about the potential environmental impacts of the proposed Project and its alternatives and recommend mitigation measures that would reduce adverse impacts to the extent practicable. We[1] prepared our analysis based on information provided by Texas Gas and further developed from data requests; Texas Gas' field investigation reports; scoping; literature research; and contacts with, or comments from, federal, state, and local agencies, Native American Tribes, and individual members of the public.

The FERC is the federal agency responsible for authorizing interstate natural gas transmission facilities under the NGA, and is the lead federal agency for preparation in compliance with the requirements of NEPA.[2] The U.S. Environmental Protection Agency is participating as a cooperating agency in the preparation of the EIS. A cooperating agency has jurisdiction by law or has special expertise with respect to environmental resource issues with a project.[3]

## Proposed Action

In general, as described by Texas Gas, the purpose and need for the Henderson County Expansion Project (Project) is to provide up to 220,000 dekatherms per day of new firm transportation service to CenterPoint Energy Indiana South (CenterPoint) to serve its AB Brown Generating Station (AB Brown Power Plant) in Posey County, Indiana. CenterPoint plans to modify its AB Brown Power Plant to utilize natural gas combustion turbines to support its new intermittent renewable resources, which would replace coal-fired units. The Indiana Utility Regulatory Commission issued an order authorizing CenterPoint's use of natural gas compression turbines on June 28, 2022.

The Project would involve a new 23.5-mile-long, 20-inch-diameter natural gas transmission pipeline extending from a new tie-in facility in Henderson County, Kentucky to the new AB Brown Meter and Regulating (M&R) Station, a new 0.1-mile-long, 16-inch-diameter AB Brown Interconnecting Pipe, and Point of Demarcation Site in Posey County, Indiana. Texas Gas further proposes modifications and expansion of its existing Slaughters Compressor Station in Webster County, Kentucky, including installation of one new 4,863-horsepower Solar Centaur 50 turbine compressor unit with piping modifications and other appurtenant facilities, abandonment

---

[1] "We," "us," and "our" refer to the environmental and engineering staff of the FERC's Office of Energy Projects.
[2] 40 CFR 1501.7.
[3] 40 CFR 1501.8.

in place of the existing Compressor Unit 5, and placement on standby of existing Compressor Units 6 and 7. The Project also includes a new mainline valve in Henderson County, Kentucky and upgrades to an existing M&R station in Johnson County, Indiana.

The Henderson Lateral would be installed within a 90-foot-wide construction right-of-way, except across wetlands where Texas Gas would use a 75-foot-wide construction corridor to minimize wetland and waterbody impacts. The AB Brown Interconnecting Pipe would be constructed in an 85-foot-wide right-of-way. In addition to the construction corridor, Texas Gas would utilize additional temporary workspace, a storage yard, and 14 temporary access roads during construction. During Project operation, Texas Gas would maintain a 50-foot-wide permanent right-of-way centered over the proposed pipelines along with four permanent access roads serving Project facilities.

**Public Involvement**

On July 29, 2021, the FERC issued a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Henderson County Expansion Project*, and on October 7, 2021, the FERC issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Henderson County Expansion Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review* (NOI) which were published in the *Federal Register* on August 5, 2021, and October 14, 2021, respectively. The Notice of Scoping and NOI were mailed to the parties on our environmental mailing list, which included federal and state resource agencies; elected officials; environmental groups and non-governmental organizations; Native American Tribes; potentially affected landowners; local libraries and newspapers; and other stakeholders who had indicated an interest in the Project. Issuance of the Notice of Scoping and NOI opened separate 30-day formal scoping periods which expired on August 30, 2021, and November 8, 2021, respectively.

The Commission received comments from the Cherokee Nation and Pokagon Band of Potawatomi Indians; agencies including the U.S. Environmental Protection Agency, U.S. Fish and Wildlife Service, Natural Resources Conservation Service, Indiana Department of Natural Resources, Kentucky Department of Environmental Protection – Energy and Environment Cabinet; organizations including the Citizens Action Coalition of Indiana, Consumer Energy Alliance, Midcontinent Independent System Operator, and Sierra Club; nine members of the public; and CenterPoint Energy Indiana South.[4] The environmental comments received are addressed, as applicable, in relevant sections of the EIS. Non-environmental comments, such as those declaring general support for the Project, or that focused on general energy policy concerns (such as comments requesting that CenterPoint AB Brown's Power Plant should consider other methods of power generation, or that FERC should consider cumulative impacts of alternative energy sources of the AB Brown Power Plant) were noted but are considered outside the scope of the EIS.

On April 14, 2022, the Commission issued a *Notice of Availability of the Draft Environmental Impact Statement for the Proposed Henderson County Expansion Project* (Notice of Availability). This notice established a closing date of June 6, 2022 for receiving comments on

---

[4] Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South.

the draft EIS. In response to the draft EIS, we received 439 comment letters from agencies and local government including the U.S. Environmental Protection Agency, the U.S. Department of the Interior, the U.S. Department of Agriculture – Natural Resources Conservation Service, Indiana Department of Natural Resources, Kentucky Energy and Environment Cabinet, and Posey County Board of Commissioners; organizations including the Citizens Action Coalition of Indiana, Sierra Club, and Teamsters National Pipeline Labor Management Cooperation Trust; and 423 members of the public. Many of the comments (412 of the 439 letters) filed by members of the public were form letters or petitions expressing similar concerns regarding Project-related impacts. In addition, Texas Gas provided comments on the draft EIS, and the American Gas Association requested intervenor status on the Project (but did not file environmental comments). Comments were received expressing both opposition and support of the Project. All substantive comments received are addressed in the relevant resource sections of the EIS and in appendix S.

## Project Impacts and Mitigation

Construction and operation of the Project could result in impacts on environmental resources, including geology, soils, groundwater, surface water, wetlands, vegetation, wildlife, fisheries, special status species, land use, visual resources, socioeconomics, environmental justice, cultural resources, air quality, noise, and safety. In section 3.0 of this final EIS, we include a discussion of potential alternatives to the Project and evaluate the no-action alternative.

We evaluate the impacts of the Project, taking into consideration Texas Gas' proposed avoidance, minimization, and mitigation measures. Our analysis of impacts on environmental resources is summarized below and is discussed in detail in section 4.0 of this final EIS. Where necessary, we recommend additional mitigation measures to reduce impacts on specific resources. Section 5.2 of this final EIS contains a compilation of our recommended mitigation measures.

### Geology

Potential geologic hazards in the Project area include seismicity, landslides, and flood hazards. We conclude that Texas Gas' implementation of design criteria to minimize potential impacts from geologic hazards would avoid and minimize risk from geologic hazards.

Texas Gas would cross sensitive resources (wetlands and waterbodies, including the Ohio River) as well as energy infrastructure in the vicinity of the AB Brown Power Plant, via horizontal directional drill (HDD). Texas Gas conducted a geotechnical investigation and assessed the risk of hydrofracture for each location where HDD installation of the Henderson Lateral is proposed and has determined that installation of the pipeline via HDD is feasible. Texas Gas also requested the flexibility to reverse HDD entry and exit points during construction if site-specific conditions require; reversal of the HDD entry and exit points is not expected to affect the feasibility of HDD construction. Texas Gas also determined the risk of hydrofracture to be low, but the potential is higher at the exit location of each HDD, and Texas Gas would implement the measures in its HDD Monitoring, Inadvertent Return Response, and Contingency Plan (HDD Plan) during construction to minimize the potential for hydrofracture and incidental returns of drilling fluid. Overall, we conclude that implementation of Texas Gas' HDD Plan would adequately minimize and mitigate potential adverse impacts associated with HDD construction and we find the measures outlined in the HDD Plan to be acceptable.

**Soils**

Project construction activities such as clearing, grading, excavation, backfilling, and heavy equipment traffic could result in adverse impacts on soil resources in temporary work areas, on access roads, and at aboveground facilities. Construction and operation of the aboveground facilities and permanent access roads would permanently convert soils to an industrial use. The Project would result in the loss of 9.7 acres of prime farmland and farmland of statewide importance that would be encumbered by aboveground facilities and access roads (though most access roads are existing). Impacts on soils would be minimized by implementation of the FERC *Upland Erosion Control, Revegetation, and Maintenance Plan* (FERC Plan) and the *Wetland and Waterbody Construction and Mitigation Procedures* (FERC Procedures)[5], which have been adopted by Texas Gas with certain approved alternative measures; these plans are referred to in the EIS as the Texas Gas Plan and Procedures. The Texas Gas Plan and Procedures include measures to segregate topsoil in agricultural areas and unsaturated wetlands; use timber mats in wetlands as necessary; install and maintain erosion and sediment control measures; and revegetation practices. We conclude that Texas Gas' adherence to measures in its Plan and Procedures during construction and restoration, in addition to implementation of the Project-specific plans, would adequately minimize impacts on soils.

**Water Resources**

**Groundwater**

The Project does not overlie designated sole source aquifers or wellhead protection areas. Two water supply wells (one domestic groundwater well and one irrigation well) were identified within 150 feet of the Henderson Lateral. Texas Gas would prohibit refueling activities and storage of hazardous liquids within 200 feet of private wells and has committed to offering pre- and post-construction evaluations of water quality and well yield for wells within 150 feet of construction workspaces. In the event that impacts on private wells occur as a result of construction, Texas Gas would provide an alternative water source and repair any permanent damage, or otherwise restore the landowners' water source. Due to Texas Gas' proposed mitigation measures, including implementation of its Plan, Procedures, and Spill Prevention and Response Procedures Plan (SPRPP), the Project would not result in significant impacts on groundwater resources in the Project area.

**Surface Water**

The construction workspace for the Henderson Lateral would cross a total of 88 waterbodies (21 perennial, 17 intermittent, 49 ephemeral, and 1 natural pond). Texas Gas proposes to cross 4 waterbodies (including the Ohio River) via HDD and 15 waterbodies via conventional bore; the remainder of the waterbody crossings along the Henderson Lateral would be installed by traditional (wet open-cut) or dry-ditch (dam-and-pump) methods. Texas Gas would cross two major waterbodies, Brushy Slough and Sandy Slough, by either open-cut or dry-ditch (dam-and-

---

[5] The FERC Plan and Procedures are a set of baseline construction and mitigation measures developed to minimize the potential environmental impacts of construction on upland areas, wetlands, and waterbodies. The Plan and Procedures can be viewed on the FERC website at: www.ferc.gov/industries/gas/enviro/plan.pdf and www.ferc.gov/industries/gas/enviro/procedures.pdf.

pump) methods depending on the presence of water or flow at the time of construction in accordance with site-specific waterbody crossing diagrams. Texas Gas would install the pipeline across waterbodies in accordance with the measures in its Procedures, HDD Plan, SPRPP, and Stormwater Pollution Prevention Plan (SWPPP) to minimize impacts from waterbody disturbance, sedimentation, and potential contamination.

In addition, 2 ephemeral waterbodies would be within the storage yard; temporary and permanent access roads would cross 10 ephemeral waterbodies; 1 ephemeral waterbody would be within the temporary workspace associated with the tie-in facility; and 3 ephemeral waterbodies would be within the temporary workspace associated with modification of the Slaughters Compressor Station. Where proposed temporary and permanent access roads cross waterbodies, Texas Gas would use existing or new culverts to maintain waterbody flow. Where waterbodies are within temporary workspace associated with the storage yard, the new tie-in facility, and the Slaughters Compressor Station, Texas Gas would cross each feature using equipment mats or culverts.

Based on a review of available data in Kentucky, the Henderson Lateral would cross the hydrologic boundary for the Morganfield Waterworks Source Water Protection Area (SWPA). In addition, the Henderson Lateral, Slaughters Compressor Station, and new tie-in facility would be within the hydrologic boundary for the Alcan Ingot, Sebree Aluminum Plant SWPA. Each of these SWPAs is designated to protect a surface source of drinking water. Texas Gas would minimize potential impacts within the SWPAs by implementing best management practices including the measures in its Plan, Procedures, SPRPP, HDD Plan, and SWPPP.

Texas Gas proposes to withdraw water from the Ohio River and one wetland containing standing water (Pond Bayou) to support hydrostatic testing, HDD operations, and dust control. We have recommended that Texas Gas provide further justification for water withdrawals from Pond Bayou (or file revised water use plans to exclude withdrawals from Pond Bayou). In accordance with our recommendation in the draft EIS, Texas Gas refined construction workspaces within the path of HDDs associated with water withdrawals to minimize disturbance in riparian corridors between HDD entry and exit locations.

With implementation of Texas Gas' Procedures, SWPPP, SPRPP, and HDD Plan, as well as applicable permit conditions and our recommendations, we conclude Texas Gas would minimize and mitigate impacts on surface waters to the extent practicable, and that impacts would not be significant.

**Wetlands**

Construction of the Project would impact 23 wetlands, including palustrine forest (1.5 acres), shrub-scrub (0.1 acre), and emergent (0.6 acre) wetlands. Temporary construction impacts on wetlands could include the loss of vegetation; soil disturbance associated with grading, trenching, and stump removal; and changes in the hydrological profile, and would be greatest during and immediately following construction. The majority of these effects would be short-term in nature and would cease when or shortly after the wetlands are restored or revegetated. While emergent wetlands would likely revegetate within 1 to 3 years, woody vegetation in scrub-shrub and forest wetlands would take longer (up to several decades) to reestablish. In order to

JA149

compensate for the permanent conversion of forest wetlands within the operational right-of-way, Texas Gas would develop a Project-specific compensatory wetland mitigation plan to mitigate for permanent wetland conversion, which would be subject to approval by the U.S. Army Corps of Engineers as part of its Clean Water Act Section 404 Nationwide Permit 12 review. While long-term and permanent effects on wetlands would occur, adherence to Texas Gas' Procedures would ensure that impacts are not significant.

### Vegetation, Fisheries, Wildlife, and Special Status Species

The Project is primarily within previously disturbed areas or vegetated habitats that would be allowed to revert to pre-construction land use and vegetation cover following construction. As mentioned above, Texas Gas has proposed to withdraw hydrostatic test water from a wetland (Pond Bayou) that supports sensitive vegetation; therefore, we have recommended that Texas Gas further justify this water withdrawal or revise its plans to exclude water withdrawal from the wetland. Clearing vegetation and exposing the soil during construction could make conditions suitable for erosion and the establishment of noxious weeds. Texas Gas would implement measures outlined in its Plan and Procedures, as well as its Revegetation and Exotic and Invasive Species Control Plans, to minimize impacts on vegetation. Therefore, impacts on vegetation would not be significant.

The Henderson Lateral would cross 22 warmwater perennial waterbodies, including the Ohio River, which contains significant and sensitive fisheries. The Ohio River would be crossed by HDD to minimize potential impacts on fisheries, and the risk of inadvertent return was determined to be low. The remaining perennial waterbodies would be crossed by traditional open-cut methods, timber mat, dam-and-pump, or bore. With implementation of Texas Gas' Procedures, SWPPP, SPRPP, and HDD Plan, we conclude that the Project would not have a significant impact on fisheries and aquatic resources.

Construction-related impacts on wildlife would include loss, conversion, degradation, or fragmentation of habitat as well as the potential for increased rates of stress, injury, and mortality of individuals due to collisions with vehicles, construction of facilities, and crushing of nests/burrows. Impacts could also include wildlife avoidance and displacement from increased noise, lighting, and human presence. Texas Gas has indicated that it would need to clear about 14.6 acres of forested land outside of the U.S. Fish and Wildlife Service (USFWS)-recommended clearing window, designated for the protection of migratory birds, and has proposed to conduct pedestrian nest surveys to identify and avoid active nests during construction. We have recommended that Texas Gas provide records of correspondence with the USFWS regarding Texas Gas' pedestrian bird survey protocols. No sensitive wildlife habitat would be affected by the Project, and the aboveground facilities would predominantly be constructed within and adjacent to disturbed lands. In addition, there is abundant similar habitat in the surrounding areas. Therefore, we conclude that the Project would have no significant or population-level impacts on wildlife, including migratory birds.

Federal agencies are required by the Endangered Species Act Section 7(a)(2) to ensure that any action authorized, funded, or carried out by the agency would not jeopardize the continued existence of a federally listed threatened or endangered species, or species proposed for listing, or result in the destruction or adverse modification of designated critical habitat. Fifteen federally

listed species were identified as potentially occurring in the Project area: the gray, Indiana, and northern long-eared bats, and 12 species of freshwater mussels (including the clubshell, fanshell, fat pocketbook, northern riffleshell, orange pimpleback, pink mucket, purple cat's paw, rabbitsfoot, ring pink, rough pigtoe, sheepnose mussel, and spectaclecase). In addition, one candidate species, the monarch butterfly, was identified. No designated critical habitat is present in the Project area.

Texas Gas has indicated that it would clear forested habitat during the active period for the Indiana bat and northern long-eared bat; therefore, it determined that the proposed Project is likely to adversely affect the Indiana bat and northern long-eared bat. In correspondence dated June 13, 2022, the USFWS – Kentucky Field Office confirmed that, with implementation of appropriate conservation measures, the proposed Project is consistent with the *Biological Opinion: Kentucky Field Office's Participation in Conservation Memoranda of Agreement for the Indiana Bat and/or Northern Long-eared Bat*, indicating that any incidental take of Indiana bats resulting from forested habitat removal is not prohibited and is not likely to jeopardize the continued existence of the Indiana bat in Kentucky; we have recommended that Texas Gas complete its conservation measure prior to construction. Coordination with the Indiana Field Office is ongoing for the clearing of suitable habitat in Indiana. While the Project is likely to adversely affect the northern long-eared bat, any incidental take would not be prohibited by the current 4(d) rule. However, because the USFWS anticipates reclassifying the northern long-eared bat as endangered prior to the proposed construction period for the Project, consultation is ongoing for this species. To ensure compliance with our responsibilities under Endangered Species Act Section 7(a)(2), we have recommended that construction of the Project not commence until we have completed our consultation with the USFWS on the Indiana and northern long-eared bats and provided Texas Gas with written notification to proceed.

Texas Gas also determined that the Project would have no effect on the gray bat and four species of federally listed mussels, based on lack of suitable habitat, and that the Project may affect, but is not likely to adversely affect eight species of federally listed mussels that potentially occur in the Ohio River. On September 8, 2021, in response to our Notice of Scoping, and after review of the Project evaluation provided by Texas Gas on June 25, 2021, the USFWS agreed with the no effect and not likely to adversely affect determinations identified by Texas Gas. However, with respect to the federally listed mussels in the Ohio River, our assessment in the draft EIS also considered the potential for an inadvertent return of drilling fluids within the Ohio River. The draft EIS included a request for the USFWS to concur with our determination of *not likely to adversely affect* for federally listed mussels; on June 3, 2022, the USFWS concurred with this determination, thus consultation is complete for the fanshell, fat pocketbook, northern riffleshell, pink mucket, ring pink, rough pigtoe, sheepnose mussel, and spectaclecase. We also agree with the determinations for the gray bat, and four species of mussels (clubshell, orange pimpleback, purple cat's paw, and rabbitsfoot) and consider consultation complete for these species. We have also determined that the Project is unlikely to result in a trend towards federal listing for the monarch butterfly based on the routine disturbance in much of the Project workspace and Texas Gas' proposed revegetation methods.

Potentially suitable habitat was identified within the Project area for 14 state-listed species, including the bald eagle, hooded merganser, least bittern, upland sandpiper, Dukes' skipper, tri-colored bat, pocketbook mussel, Eastern mud turtle, copperbelly watersnake, cylindric fruited

seedbox, devil's-bit, green flatsedge, large bur reed, and river bulrush. In consideration of state correspondence, the habitat in the Project area, and Texas Gas' commitment to adhere to the USFWS National Bald Eagle Management Guidelines if bald eagles were observed during construction, we have determined that the Project would not have significant impacts on state-listed species.

### Land Use

Land use in the Project area can be characterized as open and rural with much of the area in agricultural use for cultivated crops, hay, and pastureland. The area north of the Ohio River is characterized as industrial with a variety of uses, including pipeline systems, compressor stations, electric lines, access roads, and the AB Brown Power Plant. No residential lands such as residential lawns, gardens, and yards and residential subdivisions would be crossed by the Project. The nearest residence to the Project is 68 feet from workspace for the Henderson Lateral near milepost 16.1. The Project is not within 0.25 mile of any National Wild and Scenic Rivers, National Park Service Lands, Wildlife Management Areas, state forests, Native American reservations, or lands held in the Wetland Reserve Program, Emergency Conservation Program, or Grassland Reserve Program. However, the Project would cross land enrolled in U.S. Department of Agriculture easements and a scenic byway. Texas Gas has consulted with the Kentucky Transportation Cabinet regarding the Project, and the agency had no concerns for the Project to impact the byway. Consultation with U.S. Department of Agriculture – Natural Resources Conservation Service and applicable landowners regarding the crossing of lands held in private conservation easements is ongoing. We have recommended that, prior to construction, Texas Gas file documentation of this consultation and identify the specific measures it would implement when crossing these easements. Construction of the Project would have minimal effects on existing land use as agricultural use would be allowed to continue within the pipeline right-of-way and new aboveground Project facilities would be added adjacent to an existing natural gas facility or within an existing industrial site.

### Environmental Justice

According to the U.S. Census Bureau information, two census block groups in the Project area have a higher population of minority (Census Tract 208, Block Group 1) and low-income (Census Tract 404, Block Group 3) residents than the respective county, and therefore are considered environmental justice communities. These include the census block group containing the new tie-in facility and about 4.9 miles of the Henderson Lateral, and the census block group where the AB Brown M&R Station, Point of Demarcation, AB Brown Interconnecting Pipe, and about 1.1 mile of the Henderson Lateral would be located. Potential impacts on residents within these census block groups may include traffic delays during construction, changes in the existing viewsheds during construction, and operation of the Project including air emissions and noise. The Project area is predominately characterized as open and rural with much of the area in agricultural use for cultivated crops, hay, and pastureland. The area north of the Ohio River (in Indiana) is characterized as industrial with a variety of uses, including pipeline systems, compressor stations, electric lines, rail lines, access roads, and the AB Brown Power Plant and the Green Plains Mt. Vernon fuel supplier. The closest residences within the environmental justice communities are found 0.1 mile north of the new tie-in facility, 0.3 mile southwest of the AB Brown M&R Station, and about 300 feet east of the Henderson Lateral near milepost 22.4. Visual impacts associated

with construction and operation of these facilities would be predominately borne by these residences; however, we find these impacts would not be significant, given the Project facilities would be installed adjacent to existing industrial facilities, would be similar in size or substantially smaller than other components at these sites, and would not be readily visible from nearby residences.

Regarding Project impacts on traffic, the movement of construction personnel, equipment, and materials would result in short-term impacts on roadways, and Texas Gas would employ traffic control measures and work with local school districts to identify school routes and commute times with the goal of minimizing construction traffic along these routes during peak use periods. With respect to air emissions, exhaust emissions and fugitive dust would result in short-term, localized impacts in the immediate vicinity of construction work areas. Texas Gas would comply with applicable state fugitive dust requirements and generally limit the areas of ground disturbance. Texas Gas would also reduce vehicle and equipment speed in construction work areas and on access roads to account for adverse weather conditions (e.g., high wind velocities, dry soil conditions, etc.), use water for control of dust, cover open-bodied trucks, clean tracked soil from roads, and by limiting vehicle and equipment idling.

Texas Gas completed air quality dispersion modeling for the Slaughters Compressor Station (which is not within an environmental justice community) that demonstrated compliance with the National Ambient Air Quality Standards (NAAQS). Emissions at the Project facilities within environmental justice communities would be limited to fugitive releases from operation of a condensate storage tank at the AB Brown M&R Station, pigging activities, and new piping components and are not expected to cause or contribute to an exceedance of the NAAQS. Based on the emissions estimates, modeling results, and mitigation measures proposed by Texas Gas, we conclude that air quality impacts from construction and operation of Project facilities would not result in a significant impact on local or regional air quality for environmental justice communities. Regarding noise impacts, the closest defined noise sensitive areas (NSA) are at least 0.1 mile away from proposed aboveground Project components within environmental justice communities; however, construction of the pipelines would involve HDD construction within about 300 feet of residences within an environmental justice community. Texas Gas would generally limit most construction activities to 7:00 a.m. to 7:00 p.m. Texas Gas would also restrict equipment deliveries to daytime hours, and construction crews working at aboveground facility sites during nighttime hours would be restricted to specific activities and use handheld tools and pipe-lifting equipment (forklifts). During HDD construction, Texas Gas would implement noise control measures or may offer relocation to residents affected by nighttime construction prior to the installation and operation of the HDD equipment as documented in the Plan for Reducing Noise Impacts from HDD Operations. We also recommend that Texas Gas file a final mitigation plan to reduce noise levels to no more than a day-night sound level of 55 decibels on the A-weighted scale at the NSAs prior to HDD construction. Therefore, we determined that the temporary nature of construction activities would not result in significant noise impacts on NSAs during construction. Noise levels associated with operation of the AB Brown M&R Station are estimated to increase by 0.1 decibel, which is less than a perceptible increase in existing noise levels (3 decibels) at the closest NSAs within the identified environmental justice community.

The Project consists of construction of new facilities and modifications to existing natural gas facilities in areas that are generally distanced from nearby residences, commercial areas,

JA153

schools, and churches.  No new employees would be hired to operate the modified facilities.  The closest school to the Project is the AB Chandler Elementary School, which is about 0.6 mile south of the proposed new mainline valve site.  Therefore, we believe that impacts on socioeconomics resources within the environmental justice communities (e.g., population, housing demand, or the provision of community services such as police, fire, or schools) would be minor and temporary, as there would be a negligible change from current conditions.  Environmental justice concerns are similarly not indicated for other resource areas such as geology, wetlands, wildlife impacts, etc., due to the minimal overall impact the Project would have on these resources and the lack of any suggested connection between such resources and environmental justice communities.

We conclude that impacts on the environmental justice communities containing the new tie-in facility and the AB Brown M&R Station, Point of Demarcation, and the AB Brown Interconnecting Pipe would be disproportionately high and adverse, as the impacts from construction and operation of these facilities would be predominantly borne by environmental justice communities.  However, based on our analysis in this EIS, we determined that the identified impacts on environmental justice communities would be less than significant.

Regarding environmental justice communities, we have determined environmental justice communities in the study area would experience cumulative impacts on visual resources, socioeconomics, transportation, air quality, and greenhouse gas (GHG) related to the Project and the additional projects within the respective geographic scopes of the Project.  Cumulative impacts on environmental justice communities related to these resources would be less than significant.

**Cultural Resources**

Texas Gas submitted archaeological survey reports to the Kentucky and Indiana State Historic Preservation Offices (SHPO) and FERC.  In Kentucky, the field survey resulted in the identification of 39 newly recorded sites, 25 isolated finds, and the revisit of 20 previously recorded site locations.  On December 3, 2021, the Kentucky SHPO accepted Texas Gas' revised survey report and agreed with its recommendation that no historic properties would be affected.  In Indiana, the field survey resulted in the identification of two newly recorded sites, three isolated finds, and the revisit of four previously recorded site locations.  On November 22, 2021, the Indiana SHPO accepted Texas Gas' revised report and concurred with Texas Gas' recommendation that no historic properties would be affected.  We agree with the SHPOs and have determined that the Project would have no effect on historic properties.  On May 9, 2022, we also received formal comments from the Indiana SHPO in response to the draft EIS.  The SHPO concurred with our findings that no historic properties would be affected by the proposed Project under the condition that the proposed Project activities remain within areas disturbed by previous construction or cleared by archaeological investigation.  Accordingly, FERC has completed its compliance requirements with Section 106 of the National Historic Preservation Act for the Project.

Texas Gas provided a plan to address the unanticipated discovery of cultural resources and human remains.  We requested minor revisions, including the division of the plan into separate plans for both Indiana and Kentucky.  Texas Gas provided revised plans, which we accept.

On July 29, 2021, we sent our Notice of Scoping to 24 federally recognized Native American Tribes and informed them about the Project. The contacted Tribes included: the Eastern Shawnee Tribe of Oklahoma, Miami Tribe of Oklahoma, Peoria Tribe of Oklahoma, Delaware Tribe of Indians, Pokagon Band of Potawatomi Indians, Eastern Band of Cherokee Indians, Cherokee Nation, United Keetoowah Band of Cherokee Indians, Chickasaw Nation, Absentee-Shawnee Tribe of Indians of Oklahoma, Shawnee Tribe, Delaware Nation, Wyandotte Nation, Tunica Biloxi Tribe of Louisiana, Muscogee Creek Nation, Seneca Cayuga Tribe of Oklahoma, Cayuga Nation, Tuscarora Nation, Onondaga Nation, Oneida Nation of Wisconsin, Stockbridge-Munsee Band of Mohican Nation of Wisconsin, Saint Regis Mohawk Tribe, Seneca Nation, and the Tonawanda Seneca Nation. On October 7, 2021, we sent our NOI to the previously listed Tribes. The notices introduced the Project and provided Project mapping. To date, we have received correspondence from two Tribes, the Pokagon Band of Potawatomi Indians on September 8, 2021, and the Cherokee Nation on July 28, 2021. Both Tribes indicate that sensitive tribal resources would not be impacted by the Project but request to be contacted should unanticipated discoveries of cultural resources be made during construction.

On January 13, 2022, we formally invited 20 of the 24 federally recognized Tribes listed above to participate in the Section 106 review process. In addition, we invited two more federally recognized Tribes to participate, including the Quapaw Tribe of Indians and the Osage Nation. To date, only the Quapaw Tribe has responded requesting Project materials, which FERC staff provided, and requesting to be notified in the event of an inadvertent discovery.

**Air Quality**

Construction activities along the pipelines and at each aboveground facility would result in temporary, localized dust and combustion emissions that would last the duration of construction activities. Emissions would last the duration of construction at the Slaughters Compressor Station and new and modified aboveground facilities (up to 10 months), and would be intermittent at points along the pipeline during active construction. Texas Gas would conduct open burning of vegetation debris in accordance with applicable regulations, implement dust control measures, establish a policy limiting vehicle and equipment idling, use best management practices for the operation and maintenance of equipment, and use grid-based or renewable electricity instead of diesel generators when practicable. Therefore, with the mitigation measures proposed by Texas Gas, we conclude that air quality impacts from construction, including impacts on visibility within the regional airshed, would be temporary and not result in significant impacts on local or regional air quality.

The Project would primarily generate air emissions from operation of the new turbine at the Slaughters Compressor Station. Operating the Project's facilities would also result in fugitive emissions from minor leaks associated with piping components and valves at the aboveground facilities as well as along the pipeline routes. The combined total of existing background and maximum modeled concentrations are less than the applicable NAAQS for all pollutants for the modified Slaughters Compressor Station, and operation of the remaining facilities would not be expected to significantly impact ambient air quality. Therefore, operation of the Project would not cause or significantly contribute to a degradation of ambient air quality. The Project would result in continued compliance with the NAAQS, which are established to be protective of human health.

JA155

**Noise**

Construction activities along the pipelines and at each aboveground facility would result in temporary, localized impacts that would take place on an intermittent basis. Impacts would last the duration of construction activities (10 months), but would be intermittent at any one location during that time. Texas Gas would conduct most construction activities during daylight hours; nighttime construction would be limited to specific activities (such as welding, pore piping installation, electrical work, flange torquing, hydrostatic testing at the Slaughters Compressor Station, and HDD installation of the Henderson Lateral). HDD installation of the Henderson Lateral across the Ohio River has the potential to exceed a day-night sound level of 55 decibels on the A-weighted scale at the nearest NSA; reversal of HDD entry and exit points results in the potential for the Ohio River and AB Brown HDDs to exceed that sound level. Therefore, we have included a recommendation that Texas Gas provide final plans to ensure potential noise associated with HDD construction is adequately mitigated.

During operations, the modified Slaughters Compressor Station and new and modified M&R Stations would generate sound up to 24-hours a day. Texas Gas has committed to installing noise control equipment at the Slaughters Compressor Station and, based on Texas Gas' estimated noise analysis and our evaluation of impacts, noise from operation of the new or modified aboveground facilities would not exceed our 55 decibel sound-level requirements at the nearest NSAs or, for the operating Slaughters Compressor Station, noise would not exceed existing operational sound levels. However, we have included recommendations for Texas Gas to verify the actual noise levels from operation of the Slaughters Compressor Station, existing M&R Station, and AB Brown M&R Station at full-load.

**Reliability and Safety**

The Project would be designed, constructed, operated, and maintained to meet the U.S. Department of Transportation's (USDOT) *Minimum Federal Safety Standards* in 49 CFR 192 and other applicable federal regulations. These regulations include specifications for material selection and qualification; minimum design requirements; and protection of the pipeline from internal, external, and atmospheric corrosion. Texas Gas would also design, modify, operate, and maintain the facilities in accordance with modern engineering practices that meet or exceed the USDOT safety standards.

Texas Gas' construction and operation of the Project would represent a minimal increase in risk to the nearby public. We conclude that with Texas Gas' implementation of safety design criteria, including that required by the USDOT's Pipeline and Hazardous Materials Safety Administration, the Project would be constructed and operated safely.

**Cumulative Impacts**

We analyzed cumulative impacts of the Project, in addition to other projects that may occur within the same area of geographic scope and timeframe. The other projects we examined include modification of the AB Brown Power Plant; non-jurisdictional Project-related facilities; other energy projects; transportation or road projects; and other commercial/residential/industrial development projects.

Most of the impacts resulting from construction and operation of the Project would be temporary and localized, contained within the right-of-way and extra workspaces, and when added to the impacts of other projects are not expected to result in significant cumulative impacts. However, some permanent cumulative impacts would occur due to removal of vegetation and wildlife habitats associated with new aboveground facility construction of the proposed Project and other projects within the geographic scope (including solar farms, which span larger open-space tracts), as well as air and noise impacts associated with the operation of the proposed facilities. Given the best management practices, design features, and federal, state, and local permit requirements that would be implemented during construction and operation of Texas Gas' proposed Project, and our recommendations regarding water withdrawals and noise impacts, we anticipate that the Project would contribute a negligible to minor cumulative impact when the effects of the Project are added to past, present, and reasonably foreseeable projects within the geographic scope. Refer to the discussions of Environmental Justice, above, for a summary of cumulative impacts associated with those resources.

**Alternatives**

In accordance with NEPA and FERC policy, we evaluated the no-action alternative, system alternatives, a routing alternative, and a compressor technology alternative that could achieve the Project objectives. We evaluated the no-action alternative and conclude that although it would result in less impacts on the environment, it would not allow Texas Gas to meet the objectives of the Project and would likely result in CenterPoint continuing to produce electricity by other means of fossil-fuel generation. Therefore, we do not recommend the no-action alternative. We received comments regarding system alternatives to the proposed Project and as a result we evaluated three system alternatives. We evaluated the Texas Gas system, as well as two other nearby interstate natural gas transmission systems. While the Texas Gas system currently provides service to CenterPoint, the local service provider that supplies natural gas to the small peaking units at the AB Brown Power Plant, there is no capacity on the CenterPoint line to provide additional natural gas to the power plant. Further evaluation of the Texas Gas system, as well as route alternatives, would require greater impacts on the environment. Additionally, the other system alternatives evaluated do not provide direct service to the power plant and therefore could not meet the purpose and need of the Project without also having to construct new lateral and facilities to provide natural gas, assuming any have supply and capacity to do so. Given the greater distance from the power plant, compared to the proposed Project, the system alternatives would likely also require greater impacts on the environment.

General comments were received about reducing impacts caused by the proposed lateral. We reviewed one route alternative to the lateral that would increase the amount of co-location, but concluded that it did not decrease impacts compared to the proposed Project. We assessed the feasibility of using an electric-driven compressor unit for the compressor station modifications but similarly concluded that it would not offer a significant environmental advantage over the proposed gas-driven turbine. Because the new aboveground facilities would be within or adjacent to other existing natural gas facility or industrial sites, or within an agricultural field, and because we did not receive any comments regarding the siting of the new facilities, we did not identify or evaluate any aboveground facility site alternatives for the Project.

**Conclusions**

For most resources, the construction and operation of the Project would result in limited adverse environmental impacts. Most adverse environmental impacts would be temporary or short-term during construction, but some long-term and permanent environmental impacts would occur on some forested lands, including forested wetlands. This determination is based on our review of the information provided by Texas Gas and further developed from environmental information requests; scoping; literature research; a consideration of potential alternatives; and contacts with federal, state, and local agencies, and other stakeholders. With the exception of potential impacts on climate change, we conclude that impacts would be reduced to less than significant levels through implementation of Texas Gas' proposed avoidance, minimization, and mitigation measures as well as our Project-specific recommendations (noted in bulleted bold type throughout this EIS, and summarized in section 5.2). We recommend that these recommendations be attached as conditions to any Certificate of Public Convenience and Necessity issued by the Commission.

Additionally, construction and operation of the Project would increase the atmospheric concentration of greenhouse gases, in combination with past and future emissions from all other sources and would contribute to climate change. This EIS is not characterizing the Project's greenhouse gas emissions as significant or insignificant because the Commission is conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations going forward.[6]

---

[6] *Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022); 178 FERC ¶ 61,197 (2022).,178 FERC ¶ 61,197 (2022).

# 1.0    INTRODUCTION

In accordance with the Natural Gas Act (NGA, Title 15 United States Code § 717 [15 U.S.C. 717]), the Federal Energy Regulatory Commission (FERC or Commission) is responsible for deciding whether to authorize the construction and operation of interstate natural gas transmission facilities. The National Environmental Policy Act (NEPA, 42 U.S.C. 4321 et seq.) requires that the Commission consider the environmental impacts of a proposed project prior to making a decision. The Commission's natural gas program's environmental staff has prepared this draft Environmental Impact Statement (EIS) so that the FERC can comply with NEPA, and to assess the potential environmental impacts that could result from the construction and operation of the Henderson County Expansion Project (Project), as proposed by Texas Gas Transmission, LLC (Texas Gas) in Docket No. CP21-467-000. On June 25, 2021, Texas Gas filed an application with the FERC pursuant to Sections 7(b) and 7(c) of the NGA, as amended. Texas Gas is seeking a Certificate of Public Convenience and Necessity (Certificate) and Abandonment Authorization to construct, operate, and maintain, and abandon certain natural gas transmission pipeline facilities in Henderson and Webster Counties, Kentucky and Posey and Johnson Counties, Indiana. The FERC issued a Notice of Application for the Project on July 9, 2021, and the notice appeared in the *Federal Register* on July 15, 2021.

Texas Gas' Henderson County Expansion Project would consist of the following facilities:

- Henderson Lateral – Construction of an approximately 23.5-mile-long, 20-inch-diameter natural gas transmission pipeline extending from a new tie-in facility in Henderson County, Kentucky to the proposed new AB Brown Meter and Regulating (M&R) Station in Posey County, Indiana.

- AB Brown M&R Station and Point of Demarcation Site (Posey County, Indiana) – Construction of a delivery M&R station, receiver facility, and a 0.1-mile-long, 16-inch-diameter interconnecting pipeline terminating at the proposed new Point of Demarcation Site, which would serve as CenterPoint's tie-in for Project facilities for its AB Brown Generating Station (AB Brown Power Plant).

- Slaughters Compressor Station (Webster County, Kentucky) Upgrades – Installation of a new 4,863-horsepower Solar Centaur 50 turbine compressor unit with piping modifications and other appurtenant facilities at the existing Slaughters Compressor Station, abandonment in place of an existing compressor unit (Unit 5), and placement on standby of two existing compressor units (Unit 6 and Unit 7).

- New ancillary facilities including a mainline valve and tie-in facility in Henderson County, Kentucky and upgrades to an existing M&R station in Johnson County, Indiana.

The proposed Project would allow Texas Gas to provide up to 220,000 dekatherms per day (Dth/d) of new firm transportation service to CenterPoint Energy Indiana South (CenterPoint) to serve its AB Brown Power Plant in Posey County, Indiana. According to Texas Gas, its Project would support CenterPoint's retirement of four existing coal-fired units across its power generation portfolio and implementation of new intermittent renewable resources (i.e., solar and

JA159

wind) by providing the reliability of intermittent natural gas service during natural fluctuations in wind and solar availability.

> The vertical line in the margin identifies text that is new or modified in the final EIS and differs materially from corresponding text in the draft EIS. Changes were made to address comments from agencies and other stakeholders on the draft EIS.

## 1.1   Purpose and Need

The Council on Environmental Quality's (CEQ) regulations for implementing NEPA at Title 40 of the Code of Federal Regulations § 1502.13 (40 CFR 1502.13) recommends that an EIS should briefly address the underlying purpose and need for a project. Texas Gas states that CenterPoint's 2020 Integrated Resource Plan (2020 IRP) demonstrated that a diversified mix of generation resources, including the addition of significant solar and wind energy resources, the retirement or exit of four coal-fired units, the use of less natural gas generation (as compared to the 2016 IRP), and a continued investment in energy efficiency, would best balance cost and reliability.

Texas Gas states that its Project would support CenterPoint's AB Brown Project, which would utilize flexible natural gas combustion turbines to support CenterPoint's new intermittent renewable resources, which would replace the retiring coal-fired units. The proposed Project would support CenterPoint's 2020 IRP by providing the reliability of intermittent natural gas service to support renewable resources and the diversity of generation resources.

Texas Gas further indicates that upgrades to the existing M&R station would allow additional southbound capacity onto Texas Gas' mainline system, and the additional compression at the Slaughters Compressor Station would allow Texas Gas to increase the northbound capacity on its Slaughters-Montezuma System between the Slaughters Compressor Station and the existing Robards Junction Facility near Robards, Kentucky. The proposed Henderson Lateral would extend from an interconnect with Texas Gas' existing Slaughters-Montezuma System at the Robards Junction to the AB Brown Power Plant site, and the proposed AB Brown M&R Station would be the custody transfer measurement between Texas Gas and CenterPoint at the AB Brown Power Plant site. CenterPoint has entered into a precedent agreement for the entire 220,000 Dth/d of the proposed Project's capacity. On June 28, 2022, the Indiana Utility Regulatory Commission (IURC) issued an order granting a certificate of public convenience and necessity to CenterPoint for construction of its proposed natural gas combustion turbines (IURC 2022).

The Commission's role in reviewing the details of any project is to make a determination of whether the project is in the public convenience and necessity. Under Section 7(c) of the NGA, the Commission determines whether interstate natural gas transportation facilities are in the public convenience and necessity and, if so, grants a Certificate to construct and operate them. Section 7(b) of the NGA specifies that no natural gas company shall abandon any portion of its facilities subject to the Commission's jurisdiction without the Commission first finding that the abandonment would not negatively affect the present or future public convenience or necessity. The Commission bases its decisions on both economic issues, including need, and environmental

JA160

impacts, based on the Commission's Policy Statement.[7]  The Commission does not direct the development of the gas industry's infrastructure regionally or on a project-by-project basis, or redefine an applicant's stated purpose.  The Commission decision, in its Order, would review the need for Texas Gas' proposed Project.

## 1.2    Purpose and Scope of this EIS

Our[8] principal purposes in preparing this EIS are to:

- identify and assess the potential impacts on the natural and human environment that would result from the construction and operation of the proposed Project;

- describe and evaluate reasonable alternatives to the proposed Project that would avoid or minimize adverse impacts on environmental resources;

- recommend mitigation measures, as necessary, that could be implemented by Texas Gas to reduce impacts on specific environmental resources; and

- encourage and facilitate involvement by the public and interested agencies in the environmental review process.

This EIS addresses topics including Project alternatives; geology; soils; water resources; wetlands; vegetation; wildlife and aquatic resources; special status species; land use, recreation, special interest areas, and visual resources; socioeconomics; environmental justice; cultural resources; air quality and noise; greenhouse gas (GHG) emissions and climate change; and reliability and safety.  This EIS describes the affected environment as it currently exists and analyzes the environmental consequences of the proposed Project.  This EIS also presents our conclusions and recommended mitigation measures.

Our description of the affected environment is based on a combination of data sources, including desktop resources such as scientific literature and regulatory agency reports, information from resource and permitting agencies, scoping comments and comments received in response to the draft EIS, and field data collected by Texas Gas and its consultants.  As of May 2021, Texas Gas has completed environmental surveys for all identified Project workspace areas, except for the storage yard (where a review of available desktop data is complete) and non-jurisdictional powerlines and AB Brown Power Plant.

On July 29, 2021, and October 7, 2021, respectively, we sent our *Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Henderson County Expansion Project* and *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed*

---

[7] See *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), clarified in 90 FERC ¶ 61,128, and further clarified in 92 ¶ 61,094 (2000); and *Certification of New Interstate Natural Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Updated Policy Statement).  We note that on March 24, 2022, in an *Order on Draft Policy Statements* in Docket No. PL18-1-001, 178 FERC ¶ 61,197 (2022), the Commission indicated that it will not apply the Updated Draft Policy Statement to pending applications.

[8] The pronouns "we," "us," and "our" refer to the environmental staff of the Federal Energy Regulatory Commission's Office of Energy Projects.

1-3

JA161

*Henderson County Expansion Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review* (NOI) to various federal and state resource agencies that might have an interest in cooperating in the production of the EIS for the Project, as defined in 40 CFR 1501.8. Following receipt of comments during the scoping period for the Project, FERC staff requested that the U.S. Environmental Protection Agency (USEPA) participate as a cooperating agency to provide technical expertise in developing the analysis in this EIS. The USEPA confirmed its participation as a cooperating agency on February 14, 2022; Regions 4 and 5 are participating in the review, with Region 4 acting as the lead region. The role of the USEPA as a cooperating agency in the review and authorization process is described below. A cooperating agency has jurisdiction by law over part of a project and/or has special expertise with respect to environmental issues. Cooperating agencies play a role in the environmental analyses of projects and assist in developing mitigation plans or other measures. They participate in the NEPA process by reviewing the application and related materials, and by reviewing administrative drafts of the overall EIS or the specific portions related to agency permitting or special expertise.

## 1.2.1    Federal Energy Regulatory Commission

The FERC is an independent federal regulatory agency that regulates the interstate transportation of natural gas, among other industries, in accordance with the NGA. Pursuant to the Energy Policy Act of 2005 Section 313(b)(1), the FERC is the lead federal agency for the coordination of all applicable federal authorizations. Thus, the FERC is the lead federal agency for preparation of this EIS to comply with NEPA, as described in the CEQ's regulations at 40 CFR 1501.7, and in keeping with the May 2002 Interagency Agreement with other federal agencies.[9]

As the lead federal agency, we prepared this EIS to assess the environmental impacts that could result from constructing and operating the Project. This document was prepared in compliance with the requirements of the CEQ's regulations at 40 CFR 1500-1508, and the FERC's regulations for implementing NEPA at 18 CFR 380. As applicable, this EIS is also intended to support subsequent conclusions and decisions made by the Commission. The Commission would consider the analysis and conclusions of the EIS, as well as non-environmental issues, in its decision on whether to issue a Certificate to Texas Gas.

## 1.2.2    U.S. Environmental Protection Agency

The USEPA is the federal agency responsible for protecting human health and safeguarding the natural environment. It sets and enforces national standards under a variety of environmental laws and regulations in consultation with state, tribal, and local governments. The USEPA has delegated water quality certification (Section 401 of the Clean Water Act [CWA]) to the jurisdiction of many individual state agencies, but may assume this authority if the state program is not functioning adequately, or at the request of the state. The USEPA also oversees the issuance of National Pollutant Discharge Elimination System (NPDES) permits by the state agency for point-source discharge of used water into waterbodies (Section 402 of the CWA). The

---

[9] May 2002 Interagency Agreement on Early Coordination of Required Environmental and Historic Preservation Reviews Conducted in Conjunction With the Issuance of Authorizations to Construct and Operate Interstate Natural Gas Pipelines.

JA162

USEPA shares responsibility for administering and enforcing Section 404 of the CWA with the U.S. Army Corps of Engineers (USACE) and has authority to veto USACE permit decisions.

The USEPA also has jurisdictional authority to control air pollution under the Clean Air Act (CAA) (42 U.S.C. 85) by developing and enforcing rules and regulations for all entities that emit toxic substances into the air. Under this authority, the USEPA has developed regulations for major sources of air pollution. The USEPA has delegated the authority to implement these regulations to most of the states and local agencies, while state and local agencies are allowed to develop their own regulations for non-major sources. The USEPA also establishes general conformity applicability thresholds; a federal agency can use these thresholds to determine whether a specific action requires a general conformity assessment. In addition to its permitting responsibilities, the USEPA is responsible for implementing certain procedural provisions of NEPA (e.g., publishing the Notices of Availability of the draft and final EISs in the *Federal Register*) to establish statutory timeframes for the environmental review process, and it is charged under Section 309 of the CAA to review the EIS of other federal agencies and to comment on the adequacy and the acceptability of the environmental impacts of the proposed action.

## 1.3    Public Review

Texas Gas filed its formal FERC application on June 25, 2021, in Docket No. CP21-467-000. As a part of its Project development, Texas Gas contacted federal, state, and local governmental agencies to inform them about the Project and discuss Project-specific issues. Texas Gas also contacted affected landowners to inform them about the Project and to obtain permission to perform environmental surveys. On July 9, 2021, the FERC issued a Notice of Application for the Project, which described two ways to become involved in the Commission's review of the Project. One way is to become an intervenor, or party to the proceeding. This is a legal position that carries certain rights and responsibilities, and gives parties legal standing to request a rehearing and challenge a Commission decision in court. The second way to participate is to file comments with the Secretary of the Commission (Secretary). The comment period to respond to the Notice of Application closed on July 30, 2021. The following companies and organizations have filed for intervenor status: Southern Indiana Gas & Electric Company, Inc.; Chevron U.S.A. Inc.; Natural Gas Supply Association; Center for Liquified Natural Gas; Western Tennessee Municipal Group, Jackson Energy Authority, City of Jackson, Tennessee, and the Kentucky Cities; Sierra Club; Duke Energy Ohio Inc., and Duke Energy Kentucky, Inc.; Duke Energy Indiana, LLC; the Citizen's Action Coalition of Indiana (CAC); Atmos Energy Corporation; and the American Gas Association.

On July 29, 2021, FERC issued its Notice of Scoping which was published in the *Federal Register* on August 5, 2021. On October 7, 2021, the FERC issued the NOI which was published in the *Federal Register* on October 14, 2021. These notices were mailed to the parties on our environmental mailing list, which included federal and state resource agencies; elected officials; environmental groups and non-governmental organizations; Native Americans Tribes; potentially affected landowners (as defined in the Commission's regulations at 18 CFR 157.6); local libraries and newspapers; and other stakeholders who had indicated an interest in the Project. Issuance of the notices opened separate 30-day formal scoping periods which expired on August 30, 2021, and November 8, 2021, respectively.

JA163

On April 14, 2022, the Commission issued a *Notice of Availability of the Draft Environmental Impact Statement for the Proposed Henderson County Expansion Project* (NOA). This notice established a closing date of June 6, 2022 for receiving comments on the draft EIS. The NOA was mailed to federal, state, and local government agencies; elected officials; Native American Tribes; affected landowners; local libraries and newspapers; intervenors in the FERC's proceeding; and other interested parties (i.e., individuals who provided scoping comments or asked to be on the mailing list). The draft EIS was also filed with the USEPA, and the NOA was published in the *Federal Register* on April 20, 2022 (87 FR 23516). FERC also held two virtual public comments sessions to receive comments on the draft EIS, on May 18 and 19, 2022. No comments were received during the virtual meetings. The distribution list for the NOA for the final EIS is provided in appendix A.

### 1.3.1    Summary of Submitted Alternatives, Information, and Analyses

We received 42 unique comment letters and intervention requests during the scoping period. Of those, 10 were intervention requests (only one of which contained environmental comments). Links to all scoping comments filed are presented in appendix B. The Commission received comments from the Cherokee Nation and Pokagon Band of Potawatomi Indians; agencies including the USEPA, U.S. Fish and Wildlife Service (USFWS), U.S. Department of Agriculture – Natural Resources Conservation Service (USDA-NRCS), Indiana Department of Natural Resources (IDNR), Kentucky Department of Environmental Protection – Energy and Environment Cabinet (KYDEP); organizations including the CAC, Consumer Energy Alliance, Midcontinent Independent System Operator, and Sierra Club; nine members of the public; and CenterPoint. The environmental comments received during the scoping period are addressed, as applicable, in relevant sections of this EIS, as shown in table 1.3-1.

In response to the draft EIS, we received 439 comment letters from agencies and local government including the USEPA, the U.S. Department of the Interior, the USDA-NRCS, IDNR, KYDEP, and Posey County Board of Commissioners; organizations including the CAC, Sierra Club, and Teamsters National Pipeline Labor Management Cooperation Trust; and 423 members of the public (see appendix S). We also received one intervention request, which did not include environmental comments. Many of the comments (412 of the 439 letters) filed by members of the public were form letters or petitions expressing similar concerns regarding Project-related impacts. In addition, Texas Gas provided comments on the draft EIS and the American Gas Association requested intervenor status on the Project (but did not file environmental comments). Comments were received expressing both opposition and support of the Project. Our responses to the comments received on the draft EIS are presented in appendix S. Comments warranting further discussion are addressed in sections 3 and 4 of this EIS, as applicable.

JA164

**Table 1.3-1**
**Environmental Issues Identified During the Public Scoping Process**

| Issue | EIS Section Addressing Issue |
|---|---|
| Air quality, health impacts, greenhouse gases, and climate change (including methane, fugitive emissions, and downstream emissions) | Section 4.9 |
| Alternatives (including energy alternatives, route realignments, system alternatives) | Section 3.0 |
| Aquatic resources (including impacts on freshwater ecosystems from degradation and water withdrawals) | Section 4.5.1 |
| Cultural Resources (including impacts on historic farm homes) | Section 4.8 |
| Land use, and visual impacts (including impacts on the productivity of agricultural fields following construction and conservation easements) | Section 4.6 |
| Noise (including horizontal directional drilling noise) | Section 4.10 |
| Safety of new and existing natural gas infrastructure (including climate resiliency) | Section 4.11 |
| Socioeconomic impacts (including impacts on local communities, school age children, and environmental justice communities) | Section 4.7 |
| Soils (including erosion control best management practices, prime and important farmland, historical and Project-related spills, waste, and contamination) | Section 4.3 |
| Special Status Species (including impacts on mussels in the Ohio River, bald eagles, listed bats, and state-listed species) | Section 4.5.4 |
| Vegetation (including invasive species, pollinator plants, and impacts on forested areas) | Section 4.5.2 |
| Water resources (including groundwater, surface water, and wetlands, including water withdrawals, erosion and sediment controls, contamination, and inadvertent releases of drilling fluid) | Sections 4.4.1, 4.4.2, and 4.4.3 |
| Wildlife (including impacts on migratory birds, pollinators, wildlife habitat, and Sloughs Wildlife Management Area) | Section 4.5.3 |

Non-environmental comments, such as those declaring opposition or support for the Project, those supporting use of union laborers, or that focused on general energy policy concerns (such as comments requesting that CenterPoint's AB Brown Power Plant should consider other methods of power generation, comments regarding the effect of CenterPoint's AB Brown Power Plant conversion on utility costs, comments on financial stability of the natural gas market, or comments that FERC should consider cumulative impacts of alternative energy sources of the AB Brown Power Plant) are noted but are considered outside the scope of the EIS. Therefore, these comments are not addressed further in this EIS, but may be addressed in any Order the Commission may issue for this Project. The Sierra Club and CAC requested that FERC issue a supplemental draft EIS to address further comments, particularly with regard to climate change and air quality impacts associated with the Project, as well as to address energy alternatives as they relate to the Project's purpose and need. This final EIS responds to relevant comments issued in response to the draft EIS, and interested parties, stakeholders, and the general public will have an opportunity to review the final EIS. The Sierra Club also commented that the EIS cannot make significance determinations where mitigation is not final and where permitting actions carried out by other agencies are in-progress. We disagree; agencies with jurisdiction over those resources have final discretion for the determination of required mitigation measures (including but not limited to the USFWS for protected bats and the USACE for wetland and water resources). Construction of the

JA165

Project, if approved, would be subject to permit conditions imposed to avoid and minimize resource impacts and could not proceed without issuance of applicable federal permits or authorizations, thereby ensuring adequate mitigation. Therefore, issuance of a supplemental draft EIS is not warranted.

As discussed above, our NOI and NOA established scoping and comment periods, each with a concluding date. However, we continued to consider comments received after the close of the scoping and comment periods, up until the time we completed our reviews of the application and finalized this EIS. All filed comments are available for public review on the Commission's website as outlined in the Cover Letter to this EIS.

Commentors during the scoping period, including the USEPA, expressed concerns regarding the Project purpose and need. Further, the USEPA recommended that FERC revise Texas Gas' stated purpose and need based on input from agencies and the public, and to include a well-defined purpose and need that would address the underlining need for this Project while balancing the benefits and impacts of the Project. In comments on the draft EIS, Mr. Norrick recommended that FERC reject the Project due to a lack of public need. Also in response to the draft EIS, the USEPA recommended that the Commission delay issuance of an Order until modifications to CenterPoint's AB Brown Power Plant are approved, and that the Commission should consider the impact of potential rate changes associated with CenterPoint's proposal. On June 28, 2022, the IURC issued an order granting a certificate of public convenience and necessity to CenterPoint for construction of its proposed natural gas combustion turbines. In response to the draft EIS, the CAC contended that FERC's proposed interpretation of the Project's purpose and need is too narrow because it does not allow for non-gas energy alternatives to fulfill the need of the Project, and that FERC should not adopt Texas Gas' stated purpose and need for the Project. Similarly, the CAC also contended that Texas Gas has not sufficiently demonstrated the need for the Project. This EIS discloses the applicant's stated purpose and need in order to define the scope of our NEPA analysis and range of alternatives to consider; the overall need for the Project is a policy issue that would be addressed by the Commission in the Order and is outside the scope of this document. As described in section 1.1, above, the Commission bases its decisions on both economic issues, including need, and environmental impacts, based on the Commission's Policy Statement.

Comments on alternatives were received during scoping and in response to the draft EIS from the USEPA, IDNR, CAC, Sierra Club, and private citizens. Most of the comments centered on alternative energy sources (primarily renewables) and not using natural gas combustion turbines. Additionally, the USEPA commented on the need to review existing pipeline systems in the area that could meet the Project's needs without construction of the proposed lateral; and the IDNR emphasized the review of alternatives to the lateral route that could generally minimize impacts on resources such as wetlands, forests, and drainages. The CAC stated the Commission's scoping process for the Project must incorporate meetings and discussions with affected landowners, with a close examination of the impacts on these landowners from previous Texas Gas pipelines, especially farmers. Mr. Denton, whose farm is currently crossed by Texas Gas' 10-inch-diameter pipeline and is also within the proposed route of the Henderson Lateral, expressed similar concerns in his initial comments, raising concerns regarding previous restoration of his farm (which he stated was improperly done), and that he had concerns about Texas Gas'

JA166

willingness or ability to properly restore his land after construction of the current Project.[10] Subsequently, Mr. Denton filed a letter stating that he had met with representatives from Texas Gas several times to discuss his concerns and identify mitigation measures to be implemented on his property during construction and restoration of this Project.[11]

In his scoping comments, Mr. Porter stated that the Project is proposed to connect to a plant in Posey County, Indiana that is not currently approved. To clarify, CenterPoint's AB Brown Power Plant is an existing facility currently in operation. However, we recognize the transition of energy sources at the AB Brown Power Plant (from coal to renewable sources, with natural gas as an intermittent back-up source, as needed) would need approval from the IURC prior to implementation, in addition to modification of the existing air permit for operation of the AB Brown Power Plant for changes to emissions at the facility and modification of the facility's existing NPDES permit. As described above, the IURC issued an order authorizing CenterPoint's proposed natural gas compression turbines on June 28, 2022.

During the draft EIS comment period, individual commentors requested that FERC hold a public hearing to discuss the Project, with some comments specifically requesting a meeting in Evansville, Indiana. In addition, Mr. Rosenquist requested that the comment period be extended if a public hearing could not be scheduled prior to June 6. As discussed above, FERC issued several notices requesting public comments on the Project; the notices were also mailed to the environmental mailing list, which includes federal, state, and local government agencies; elected officials; Native American Tribes; affected landowners; local libraries and newspapers; intervenors in the FERC's proceeding; and other interested parties. FERC also held two virtual public comments sessions to receive comments on the draft EIS, on May 18 and 19, 2022. The 45-day comment period established for the draft EIS is the standard period of time provided to comment on EISs for natural gas projects and provides a reasonable amount of time for the public to review and comment on a project of this scope. Further, as a matter of standard practice, we review comments received after the close of the comment period to the extent possible.

As described above, all comments received since issuance of the draft EIS, regardless of whether they were filed in the comment period, were evaluated, and our responses to relevant environmental comments are included in the resource sections of this EIS.

## 1.4    Permits, Approvals, and Regulatory Requirements

A list of major federal and state environmental permits, approvals, and consultations for the Project is provided in table 1.4-1. Examples of permits and consultations include the Bald and Golden Eagle Protection Act (BGEPA), CAA, CWA, Endangered Species Act (ESA), Migratory Bird Treaty Act (MBTA), and the National Historic Preservation Act (NHPA). Each of these statutes has been taken into account in the preparation of this EIS, as discussed below. Texas Gas would be responsible for obtaining all permits and approvals required to construct and operate the Project, regardless of whether or not they appear in this table.

---

[10] Available on eLibrary under accession no. 20210719-5152.

[11] Available on eLibrary under accession no. 20211019-5080.

# Table 1.4-1
## Environmental Permits, Approvals, and Consultations

| Agency | Permit/Approval/Consultation | Application Date and Status |
|---|---|---|
| **FEDERAL** | | |
| FERC | Certificate of Public Convenience and Necessity under Section 7(c) of the NGA. | Texas Gas' FERC application filed on June 25, 2021 – pending. |
| USACE – Louisville District | CWA Section 404 and Rivers and Harbors Act Section 10, Nationwide Permit 12 | Texas Gas' pre-construction notification filed on June 25, 2021. Anticipated receipt Q4 2022. |
| USFWS – Kentucky Ecological Services Field Office | ESA – Section 7 Consultation, MBTA, BGEPA. | Texas Gas submitted its request for consultation on June 25, 2021. Consultation is ongoing for the Indiana bat and northern long-eared bat. |
| USFWS – Indiana Ecological Services Field Office | | |
| **STATE OF KENTUCKY** | | |
| KYDEP | Section 401 Water Quality Certification | Texas Gas submitted its pre-construction notification on June 25, 2021. A stream construction permit was issued on July 14, 2021 and receipt of the Water Quality Certification is anticipated in Q4 2022. |
| | Permit to Construct Across or Along a Stream (Floodplain Construction Permit; Individual) | Texas Gas submitted its pre-construction notification on June 25, 2021. A stream construction permit was issued on July 14, 2021. |
| | NPDES Stormwater Construction General Permit | Texas Gas anticipates submittal in Q3 2022. |
| | Temporary Authorization for Water Withdrawal Permit | Texas Gas anticipates submittal in Q4 2022. |
| | NPDES General Permit for Discharge of Hydrostatic Test Water | Texas Gas anticipates submittal in Q4 2022. |
| | Title V Permit (Minor Revision) | Texas Gas submitted its request for permit modification at the Slaughters Compressor Station on June 24, 2021. Received March 23, 2022. |
| Kentucky Department of Fish and Wildlife Resources (KDFWR) | State Threatened and Endangered Species Consultation | Texas Gas submitted its request for consultation on June 25, 2021. Concurrence received July 23, 2021. |
| Kentucky Heritage Council | Section 106 of the NHPA | Texas Gas submitted its request for consultation in August 2021. Concurrence received December 3, 2021. |

JA168

| Table 1.4-1 (continued) Environmental Permits, Approvals, and Consultations | | |
|---|---|---|
| **Agency** | **Permit/Approval/Consultation** | **Application Date and Status** |
| **STATE OF INDIANA** | | |
| IDEM | Section 401 Water Quality Certification General Permit | Texas Gas submitted its pre-construction notification on June 25, 2021.  Received October 2, 2021. |
| | IDEM NPDES General Permit by rule for Discharge of Hydrostatic Test Water, 326 IAC 15-11 | Texas Gas anticipates submittal in Q4 2022. |
| IDNR | Construction in a Floodway Permit | The Project qualifies for coverage without prior notification. |
| | State Threatened and Endangered Species Consultation | Texas Gas submitted its request for consultation on June 25, 2021.  Concurrence received July 26, 2021. |
| Indiana Division of Historic Preservation | Section 106 of the NHPA | Texas Gas submitted its request for consultation on June 25, 2021.  Concurrence received November 22, 2021. |

As described above, the non-jurisdictional AB Brown Power Plant received approval from the IURC for the proposed transition of energy sources at the facility on June 28, 2022.  Texas Gas states[12] that CenterPoint plans to submit a permit application for modification of the existing air permit for the facility to transfer operation of the facility from the coal generating facilities to the proposed new combustion turbines; the timeframe for submittal of the permit application is pending, but CenterPoint would be required to receive authorization from the Indiana Department of Environmental Management (IDEM) prior to construction of the new turbines.  Texas Gas also states[13] that CenterPoint would coordinate modification of its NPDES permit with the IDEM.

## 1.4.1   Bald and Golden Eagle Protection Act

The BGEPA (16 U.S.C. 668) was originally passed by Congress in 1940, and amended in 1962 to also protect golden eagles.  The BGEPA prohibits taking without a permit, or taking with wanton disregard for the consequences of an activity, any bald or golden eagle or their body parts, nests, chicks, or eggs, which includes collection, molestation, disturbance, or killing.  The BGEPA includes limited exceptions to its prohibitions through a permitting process.  This EIS discusses compliance with the BGEPA in section 4.5.

## 1.4.2   Clean Air Act

Congress originally passed the CAA (42 U.S.C. 85) in 1963, and made major revisions to it in 1970, 1977, and 1990.  The primary objective of the CAA is to establish federal standards for various pollutants from both stationary and mobile sources, and to provide for the regulation of

---

[12] As indicated in Texas Gas' July 7, 2022 submittal, which is available for public review on eLibrary under accession no. 20220707-5164.

[13] As indicated in Texas Gas' January 19, 2022 submittal, which is available for public review on eLibrary under accession no. 20220120-5172.

polluting emissions via state implementation plans. In addition, the CAA was established to prevent significant deterioration in certain areas where air pollutants exceed national standards and to provide for improved air quality in areas that do not meet federal standards (nonattainment areas).

The USEPA has regulatory authority to administer the CAA. Section 309 of the CAA directs the USEPA to review and comment in writing on environmental impacts associated with all major federal actions. Section 4.9 has a detailed discussion of air quality issues.

## 1.4.3 Clean Water Act

The CWA (33 U.S.C. 1251 et seq.) establishes the basic structure for regulating discharges of pollutants into the Waters of the United States and regulating quality standards for surface waters. Section 404 of the CWA outlines procedures by which the USACE can issue permits for the discharge of dredged or fill material into Waters of the United States, including wetlands. The USEPA also independently reviews Section 404 CWA applications and has veto power for individual permits issued by the USACE. Section 4.4 of this EIS discusses impacts on water resources that may be applicable to compliance with the CWA. The USACE also has jurisdiction over Section 10 of the Rivers and Harbors Act, which requires authorization for excavation, fill, or modification within or beneath navigable waterways. Texas Gas filed its pre-construction notification for use of Nationwide Permit 12 to cross Section 404 CWA and Section 10 of the Rivers and Harbors Act jurisdictional wetlands and waterbodies concurrently.

## 1.4.4 Endangered Species Act

Section 7 of the ESA (16 U.S.C. 1536) requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of endangered or threatened species, or result in the destruction or adverse modification of the critical habitat of such species. As previously stated, the FERC, as the lead federal agency for the Project, is required to determine whether any federally listed or proposed endangered or threatened species or their designated critical habitat occur in the vicinity of the proposed Project, and conduct consultations with the USFWS and/or National Marine Fisheries Service, if necessary. Additional information regarding compliance with the ESA can be found in section 4.5.

## 1.4.5 Migratory Bird Treaty Act

The MBTA (16 U.S.C. 703-712) dates back to 1918 but has been amended many times. The MBTA implements various treaties and conventions between the United States, Mexico, Canada, Japan, and Russia for the protection of migratory birds. Birds protected under the MBTA include all common songbirds, waterfowl, shorebirds, hawks, owls, eagles, ravens, crows, native doves and pigeons, swifts, martins, swallows, and others, including their body parts (feathers, plumes, etc.), nests, and eggs. The MBTA makes it unlawful to pursue, hunt, take, capture, or kill; attempt to take, capture, or kill; possess, offer to or sell, barter, purchase, deliver, or cause to be shipped, exported, imported, transported, carried, or received any migratory bird, part, nest, egg, or product, manufactured or not. This EIS discusses compliance with the MBTA in section 4.5.

JA170

### 1.4.6   National Historic Preservation Act

Congress passed the NHPA in 1966 (54 U.S.C. 300101 et seq.), which has been amended multiple times, most recently in 2014. The NHPA created the National Register of Historic Properties (NRHP), established the Advisory Council on Historic Preservation, and directed states to appoint State Historic Preservation Offices (SHPO).

Section 101(d)(6) of the NHPA states that properties of religious and cultural importance to an Indian tribe may be determined to be eligible for the NRHP. In meeting our responsibilities under the NHPA, and our tribal trust obligations, the FERC consulted on a government-to-government basis with Indian Tribes that may have an interest in the Project and its potential effects on traditional cultural properties. The current status of government-to-government consultations regarding the identification of historic properties in the area of potential effect that may have religious or cultural significance to Indian Tribes is further discussed in section 4.8.

Section 106 of the NHPA requires the FERC to take into account the effects of its undertakings on historic properties, and afford the Advisory Council on Historic Preservation an opportunity to comment. Historic properties include prehistoric or historic sites, districts, buildings, structures, objects, or properties of traditional religious or cultural importance that are listed or eligible for listing on the NRHP. In accordance with the regulations for implementing Section 106 at 36 CFR 800, the FERC, as the lead agency, is required to consult with the appropriate SHPOs, interested Indian Tribes, and other consulting parties; identify historic properties in the area of potential effect; assess project effects on historic properties; and resolve adverse effects. Texas Gas, as a non-federal party, is assisting the FERC in meeting its obligations under Section 106 by preparing the necessary information and analyses as allowed under Part 800.2(a)(3). However, the FERC remains responsible for all findings and determinations. The status of our compliance with the NHPA is summarized in section 4.8.

JA171

## 2.0    DESCRIPTION OF THE PROPOSED ACTION

### 2.1    Proposed Facilities

Texas Gas' Project would consist of the construction and operation of the following facilities (or, in some cases, decommissioning and abandonment of existing facilities), in Henderson and Webster Counties, Kentucky and Posey and Johnson Counties, Indiana (see figure 2.1-1 and appendices C and D):

The new pipeline facilities would include:

- about 23.5 miles of 20-inch-diameter lateral pipeline in Henderson County, Kentucky and Posey County, Indiana (Henderson Lateral); and

- about 0.1 mile of 16-inch-diameter interconnecting pipeline in Posey County, Indiana (AB Brown Interconnecting Pipe).

The aboveground facilities would include the installation of new facilities and the modification of existing facilities, including the:

- New Robards Junction Tie-in Facility (Henderson County, Kentucky)

  o  tie-in between the proposed Henderson Lateral and Texas Gas' existing Slaughters-Montezuma and mainline systems;

  o  a pig[14] launcher to facilitate in-line inspections of the Henderson Lateral; and

  o  modify piping valve, and electrical systems at the adjacent Robards Junction Facility to accommodate the new tie-in facility.

- New Mainline Valve (Henderson County, Kentucky)

  o  a mainline valve within the permanent right-of-way of the Henderson Lateral.

- New AB Brown M&R Station (Posey County, Indiana)

  o  install metering and flow control facilities, regulator skid, filter separator, communication equipment, and appurtenant facilities;

  o  remote terminal units/electronic gas measurement and gas chromatograph buildings; and

  o  a pig receiver to facilitate in-line inspections of the Henderson Lateral.

- New Point of Demarcation Site (Posey County, Indiana)

  o  install a new rise, valve, and blowoff to serve as the tie-in between the proposed Project and CenterPoint's AB Brown Power Plant.

---

[14] A "pig" is a tool that the pipeline company inserts into and pushes through the pipeline for cleaning the pipeline, conducting internal inspections, or other purposes.

JA172

- Existing Slaughters Compressor Station (Webster County, Kentucky)

  - install a new Solar Centaur 50 turbine compressor unit (4,863 horsepower [hp]);

  - abandon in place an existing Clark HPA-6 compressor unit (Unit 5, 1,320 hp);

  - move two existing Clark HPA-6 compressor units (Units 6 and 7, 1,320 hp each) from primary operations to standby operations;

  - install new station piping;

  - install new auxiliary equipment (gas coolers/heaters, oil cooler, M&R skid, and pressure control skid); and

  - refurbish and replace the existing reciprocating compressor hydraulic valve control system (including pumps, hoses, actuators, and other components).

- Existing M&R Station (Johnson County, Indiana)

  - install new meter facilities and ancillary equipment (filter separator, meter and regulator skids, gas heater and measurement equipment, remote terminal units, a gas chromatograph, and communication equipment); and

  - modify existing M&R facilities to accommodate additional capacity on Texas Gas' mainline system.

### 2.1.1    Pipeline Facilities

The proposed 20-inch-diameter Henderson Lateral would begin at the new Robards Junction Facility, tie in to Texas Gas' existing mainline system in Henderson County, Kentucky, and run generally northwest for about 12.6 miles before turning north for about 9.5 miles and crossing the Ohio River into Posey County, Indiana. The Henderson Lateral would cross Posey County for about 1.2 miles before ending at the AB Brown M&R Station. One mainline valve would be installed within the permanent right-of-way near milepost (MP) 12.6 in Henderson County. The proposed 16-inch-diameter AB Brown Interconnecting Pipe would extend about 0.1 mile between the AB Brown M&R Station to the Point of Demarcation Site, at CenterPoint's AB Brown Power Plant. These pipeline facilities (collectively, "the pipeline") would provide transportation capacity of 220,000 Dth/d. The pipeline materials are rated for 1,170 pounds per square inch (psi), but would have an estimated maximum operating pressure of 945 psi, and would normally operate between 600 and 945 psi.

JA173



**Legend**

- Henderson Lateral
- AB Brown M&R Interconnecting Pipe
- CenterPoint AB Brown Generating Station
- Point of Demarcation Site
- Robards Junction Tie-In Facility
- Slaughters Compressor Station
- Proposed M & R Station
- Existing M & R Station
- Proposed Mainline Valve
- Storage Yard

0   2.5   5
Miles

Scale: 1:250,000

Basemap Source: Esri, DeLeLorme, NAVTEQ, USGS, Intermap, iPC, NRCAN, Esri Japan, METI, Esri China, Esri Thailand, Tom Tom, 2013

**Henderson County Expansion Project**

Project Overview

**FIGURE 2.1-1**

JA174

### 2.1.2    Aboveground Facilities

Texas Gas proposes to construct two new facilities (Robards Junction Tie-in Facility and AB Brown M&R Station) and a mainline valve along the Henderson Lateral, as well as perform modifications at its existing Slaughters Compressor Station and M&R station. The new Robards Junction Tie-in Facility would include a new tie-in between the proposed Henderson Lateral and Texas Gas' existing systems; a new pig launcher to facilitate in-line inspections of the Henderson Lateral; and modification of existing piping and electrical systems at the adjacent Robards Junction Facility. The new AB Brown M&R Station would include metering and flow control facilities, regulator skid, filter separator, communication equipment, remote terminal units/electronic gas measurement and gas chromatograph buildings, and a pig receiver. The new Point of Demarcation Site would include installation of a new riser, valve, and blowoff.

At the existing Slaughters Compressor Station, Texas Gas would install a new Solar Centaur 50 turbine compressor unit (4,863 hp), new station piping, and new auxiliary equipment (gas coolers/heaters, oil cooler, M&R skid, and pressure control skid). Texas Gas would also move two existing Clark HPA-6 compressor units (Units 6 and 7, 1,320 hp each) from primary operations to standby operations and refurbish and replace the existing reciprocating compressor hydraulic valve control system (including pumps, hoses, actuators, and other components). The existing Clark HPA-6 compressor unit (Unit 5, 1,320 hp) would be abandoned in place.

Modifications at the existing M&R station would include new meter facilities and ancillary equipment (filter separator, meter and regulator skids, gas heater and measurement equipment, remote terminal units, a gas chromatograph, and communication equipment). Texas Gas would also modify the existing M&R facilities to accommodate additional capacity on its mainline system.

### 2.1.3    Non-jurisdictional Facilities

Occasionally, proposed projects have associated facilities that do not come under the jurisdiction of the Commission. These non-jurisdictional facilities may be integral to the need for the proposed facilities (e.g., a gas-fueled power plant at the end of a jurisdictional pipeline) or they may be minor, non-integral components of the jurisdictional facilities that would be constructed and operated as a result of the proposed facilities. Under Section 7 of the NGA, the Commission is required to consider, as part of its decision to authorize jurisdictional facilities, all factors bearing on the public convenience and necessity.

The proposed Project is in response to CenterPoint's plans to install two new natural gas-fired turbines and retire two coal-fired generation units at the AB Brown Power Plant. CenterPoint would also retire two coal-fired units at other power plants and increase reliance on renewable electric generation sources (such as solar and wind power); however, these changes to CenterPoint's facilities to retire existing units or install electric generation sources are not causally related to the proposed Project. In a petition to the IURC under Cause No. 45564, CenterPoint indicated the proposed natural gas-fired turbines would be designed to provide fast start and ramp-up capacity to complement renewable energy capacity across CenterPoint's service area to provide reliable energy service when intermittent renewable energy sources are not available. The IURC issued an order granting CenterPoint's petition to install natural gas-fired turbines on June 28,

JA175

# 3.0 ALTERNATIVES

## 3.1 Introduction

In accordance with NEPA and Commission policy, we considered and evaluated alternatives to the proposed action, including the no-action alternative. Our evaluation criteria for selecting potentially preferable alternatives are:

- ability to meet the objectives of the proposed action;

- technical and economic feasibility and practicality; and

- significant environmental advantage over the proposed action.

Our evaluation of alternatives for Texas Gas' proposed Henderson County Expansion Project is based on the above approach, taking into consideration the specific environmental impacts described and evaluated in section 4 of this EIS. Comments on the draft EIS were filed by CAC and the Sierra Club in response to this approach and specifically regarding the "narrow view of the Project purpose," which the commentors contend leads to a lack of consideration of non-gas alternatives to the Project and leads to an incomplete analysis of the no-action alternative. As stated in section 1.3, this EIS discloses the applicant's stated purpose and need in order to define the scope of our NEPA analysis and range of alternatives to consider; the need for the Project would be addressed by the Commission in the Order and is outside the scope of this environmental document. As described in section 1.1, the Commission bases its decisions on both economic issues (including need) and environmental impacts, based on the Commission's Policy Statement.[18]

Because the new aboveground facilities would be within or adjacent to other existing natural gas facility or industrial sites, or within an agricultural field, and because we did not receive any comments regarding the siting of the new facilities or identify in our review any environmental issues that would lead us to seek alternative sites, we did not evaluate any aboveground facility site alternatives for the Project. During Project planning and design, Texas Gas considered an alternate site for the AB Brown M&R Station, but because the proposed site is adjacent to existing infrastructure and within the AB Brown Power Plant property, and the alternate site did not confer an obvious environmental advantage over the proposed siting, the initially considered alternate site was not developed further or carried into the EIS review.[19]

As a part of its initial Project development, Texas Gas also considered several minor routing options for the Henderson Lateral. These were incorporated into the proposed lateral route and are described more fully in Texas Gas' formal application with the FERC.[16] We received general comments regarding alternative routing in an effort to reduce impacts on various resources

---

[18] See *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), clarified in 90 FERC ¶ 61,128, and further clarified in 92 ¶ 61,094 (2000); and *Certification of New Interstate Natural Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Updated Policy Statement). We note that on March 24, 2022, in an *Order on Draft Policy Statements* in Docket No. PL18-1-001, 178 FERC ¶ 61,197 (2022), the Commission indicated that it will not apply the Updated Draft Policy Statement to pending applications.

[19] Available on eLibrary under accession nos. 20210625-5123 and 20219823-5944, Resource Report 10.

JA176

such as wetlands, forested lands, and waterbodies; however, no specific alternate routes were identified for discussion. In addition to these minor route variations, shifts in the lateral route may be required prior to and during construction to accommodate currently unforeseeable site-specific constraints related to engineering, landowner, and environmental concerns. Any such alignment shifts that would be necessary outside of the permanent right-of-way would be subject to review and approval by the FERC in accordance with our recommendation no. 5 in section 5 of this EIS (Conclusions and Recommendations).

Comments on alternatives were received from the USEPA, IDNR, CAC, Sierra Club, and private citizens during scoping and in response to the draft EIS. Most of the comments centered on alternative energy sources (primarily renewables) and not using natural gas combustion turbines. Additionally, the USEPA commented on the need to review existing pipeline systems in the area that could meet the Project's needs without construction of the proposed lateral; and the IDNR emphasized the review of alternatives to the lateral route that could generally minimize impacts on resources such as wetlands, forests, and drainages.

## 3.2    No-Action Alternative

Under the no-action alternative, Texas Gas would not construct or operate the Henderson County Expansion Project, and none of the impacts associated with the Project would occur. Consequently, Texas Gas would be unable to meet the objectives of the Project. Texas Gas would not provide natural gas to CenterPoint's AB Brown Power Plant, and CenterPoint's stated goal to diversify its portfolio of energy sources, including renewable sources and natural gas, would not be met by this Project. In its comment letter provided during the scoping period for the proposed Project, CenterPoint indicated that its plan is to discontinue coal-based power generation. Comments in response to the draft EIS from CAC and Sierra Club stated that FERC based conclusions in the draft EIS regarding the significance of environmental impacts and the analysis of alternatives on an assumption that the coal-based generation would continue if the Project were not approved. To the contrary, as stated above, it is clear that CenterPoint plans to discontinue coal-based power generation; CenterPoint had further indicated as substantiation of that decision, that continued power production by burning coal would require large capital investments to comply with environmental regulations, which would in turn be more costly to its customers. The proposed natural gas turbines would support power generation during times when CenterPoint's renewable sources are unable to produce power.

As described in section 1.1, the IURC issued an order authorizing CenterPoint's proposed natural gas compression turbines on June 28, 2022. Until natural gas is provided (whether from Texas Gas or some other source), Texas Gas has stated that CenterPoint would likely continue to produce electricity by other means of fossil-fuel generation, which could result in higher emissions of certain types, as well as other environmental impacts. However, the specific sources of energy replacement have not been identified, as it was determined by CenterPoint that natural gas was the better option to provide a source of reliable back-up power generation, as approved by the IURC. In its comments on the Project, CenterPoint stated that it also considered supporting its renewable energy generation through use of batteries but found the natural gas turbines would be lower cost and more reliable based on energy storage costs and technological limitations. CenterPoint has also indicated the potential to modify the turbines in the future to burn 100 percent hydrogen gas;

however, the technology and timing of these potential modifications, as well as the source of hydrogen, has not been fully determined.

Commentors on this Project have protested the stated purpose and need of the Project and raised concerns regarding the continued use of fossil fuels. The commentors are concerned with an increase in GHGs from the continued use of natural gas at the AB Brown Power Plant. Additionally, concerns were raised that the continued reliance on natural gas and other fossil fuels will only further delay the transition to generating power by means of renewable sources. We acknowledge that this Project was not developed to serve new demand, and would involve new sources of a fossil fuel (natural gas) replacing another fossil fuel (coal) for power generation. Texas Gas states that the Project was developed to increase CenterPoint's diversity of supply sources in order to improve reliability of supply and achieve an operationally superior peak-shaving strategy. The concerns expressed by commentors about the Project purpose and general U.S. energy policy are beyond the scope of this environmental document. However, the Commission may consider these issues in making its determination of public need.

Under the no-action alternative, other natural gas transmission companies could propose to construct other facilities with the intent to deliver natural gas to CenterPoint or otherwise increase reliability of service in the market area. Such actions could result in impacts similar to or greater than the proposed Project and would not meet the Project's objectives within the proposed time frames. Therefore, we have concluded that the no-action alternative would not satisfy the stated Project objectives, and it was not carried forward for additional analysis.

## 3.3    Energy Alternatives

We received several comments during the scoping and draft EIS comment periods regarding the use of alternative energy sources to meet the energy demand of the region, primarily about the use or reliance on renewable energy sources over fossil fuels. CenterPoint is diversifying its power generation, which includes renewable sources already within its portfolio. The stated purpose of the Project is to provide a reliable back-up source of power generation. CenterPoint determined that other non-gas renewables would be either cost prohibitive or not technologically advanced such that they are not able to provide the energy required. The concerns expressed by commentors about the use of renewable energy sources, or for assessing other possible mechanisms for addressing U.S. energy needs, are beyond the scope of this environmental document. Detailed evaluation of other power generation alternatives  like the use of wind and solar power or increased energy efficiency are entirely separate questions from evaluating alternatives that meet the defined purpose and need for the Project.

## 3.4    Compressor Alternatives

Based on comments received during scoping and in response to the draft EIS about reducing air emissions and GHGs, we assessed the feasibility of using an electric motor-driven compressor unit in lieu of the proposed natural gas-fired compressor unit at the Slaughters Compressor Station. Several factors were considered, including:  proximity to existing electric power sources; the need for new or modified electric power sources or transmission facilities; the need for additional ancillary facilities, such as substations; and additional environmental impacts associated with construction of new facilities.

JA178

The USEPA has noted a trending decrease in GHG emissions from the power generating sector since 2011 (33 percent), with coal-generation going offline and more power being generated by renewable resources (USEPA 2020a). Commentors have expressed the desire to lower emissions, and overall emissions will decrease with the retirement of CenterPoint's coal-driven units and with more generation being produced from renewable sources. The natural gas, as stated above, is being proposed as a backup to the renewable sources, not as the primary generator of power.

Although technically feasible, Texas Gas has indicated that use of electric units would require a dedicated 35 kilovolt service line from the local electric utility Co-Op in Webster County, Kentucky; the use of existing electric infrastructure in the area would not be able to supply the power needed. The new electric service line would require 12.3 miles of new electric transmission line construction and would require an additional 4 acres for a new electric substation that would be required to transform the electricity to the required voltage needed at the compressor station. While other facilities for the Project would require new electrical service (the mainline valve and the AB Brown M&R Station), these facilities are able to use existing service infrastructure in the area and only require minimal new power line construction (less than 1,000 feet in total) compared to the greater construction impacts associated with providing electric power to the Slaughters Compressor Station to operate electric drive units.

Natural gas-driven engines do not rely on a third party for operation and are not subject to electrical outage. If the sources of generation are reliant on the electric grid, which is powered primarily by renewable sources, and the grid is non-operational, natural gas-driven units would be able to continue to produce power. Texas Gas indicated that gas-driven emergency generators with capacity to power electric motor-driven compressors would be infeasible and would be significantly larger than the proposed turbines. Natural gas generation can experience interruptions from maintenance shutdowns, or from unforeseen instances that could see a stop in operations; however, it should be noted that this Project would provide natural gas as a reliable and diversified backup to power generation at the AB Brown Plant that will be primarily generated by renewable resources.

The USEPA notes that electric compressor stations require less land, do not release air pollutants during operations, reduce the number of natural gas-related accidents, and reduce noise impacts (which may adversely affect environmental justice communities). The Slaughters Compressor Station is an existing facility designed for natural gas compression; modification of the existing station reduces new land requirements and the potential need for electric transmission lines or other infrastructure that would be needed to support electric compressors (as described above). Further, the proposed natural gas compression at the Slaughters Compressor Station would comply with applicable regulations and would not result in an exceedance of the NAAQS (see EIS section 4.9.5). The Slaughters Compressor Station is not located within an environmental justice community, and the noise attributable to the Project modifications at the Slaughters Compressor Station under the worst-case scenario (operation of the entire facility) would decrease or remain the same at the nearest noise sensitive areas (NSA) (see EIS section 4.10.4). Finally, as described in section 4.11.2.2, design and operation of the compressor station would be subject to applicable federal safety standards. For the reasons discussed above, we find there is insufficient evidence to conclude that an electric motor-driven compressor unit at the Slaughters Compressor Station would offer a significant environmental advantage over the proposed gas-driven turbine.

JA179

### 3.5 System Alternatives

We received comments from the USEPA, CAC, Sierra Club, and private citizens requesting analysis of existing pipeline infrastructure systems capable of providing the stated capacity required without the need of constructing the proposed Henderson County Expansion Project pipeline lateral. In general, system alternatives involve use of existing, modified, or other planned/proposed pipeline systems to meet the purpose and need of a proposed project. Implementation of a favorable system alternative may deem it unnecessary to construct all or part of a proposed project, potentially reducing impacts. However, modifications or additions to other systems (e.g., additional compression or constructed pipeline) are typically necessary to make the alternative viable and able to meet the objective of a proposed project. Such modifications or additions could result in environmental impacts that are less than, similar to, or greater than those associated with construction and operation of a proposed project.

For our purposes, such system alternatives are speculative since the EIS cannot direct other companies to design or construct a project to take the place of what has been proposed. However, to the extent possible, we can attempt to identify (i.e., disclose to the public and the FERC Commission) other systems in the vicinity of the Henderson County Expansion Project that could conceptually meet the objective of delivering natural gas to the AB Brown Power Plant. Additionally, in response to the draft EIS, we received a comment from CAC to consider CenterPoint's process of contracting a natural gas provider in terms of system alternatives. While FERC oversees how interstate natural gas pipelines are sited and constructed, state utility commissions have authority over electric utility providers, and therefore, how CenterPoint chooses which company provides service is not a part of the Commission's jurisdiction and is outside the scope of this EIS. With that in mind, we identified and evaluated three system alternatives to the Henderson County Expansion Project to determine whether the environmental impacts associated with construction and operation of the Project could be avoided or reduced while still meeting the objectives of the Project (see figure 3.5-1).

Texas Gas operates one of the primary natural gas transmission pipelines within the region, including its Slaughters-Montezuma System and mainline system. Texas Gas' existing pipeline system supplies natural gas to the AB Brown Power Plant through an interconnection with CenterPoint's local distribution system. This supply of natural gas comes from Texas Gas' 8-inch-diameter Dogtown Lateral and supplies the two small peaking generators at the AB Brown Power Plant. The Dogtown Lateral is authorized to transport 36,000 metric million British thermal units (MMBtu) per day at a maximum allowable operating pressure (MAOP) of 1,066 pounds per square inch gauge. CenterPoint subscribes to 9,000 MMBtu of the 50,000 MMBtu capacity from the Dogtown Lateral to meet its residential, commercial, and industrial needs (including the AB Brown Power Plant). The Dogtown Lateral is fully subscribed and lacks the size and pressure to serve the new proposed turbines. Additionally, the CenterPoint distribution system is not of an adequate size to serve the new proposed turbines.

JA180



**Legend**

⭐ CenterPoint AB Brown Generating Station

[CS] Slaughters Compressor Station

Proposed Route

ANR

TETCO

Texas Gas Transmission Corp.

Centerpoint Southwest Division Lateral

0    5    10
Miles

N

Scale: 1:450,000

Basemap Source:  Esri, DeLorme, NAVTEQ, USGS, Intermap, iPC, NRCAN, Esri Japan, METI, Esri China, Esri Thailand, Tom Tom, 2013

**Texas Gas Transmission, LLC**
**Henderson County Expansion Project**

System Alternatives

**FIGURE 3.5-1**

JA181

In response to the draft EIS, the USEPA suggested Texas Gas review an option of constructing a single 12-inch-diameter lateral that would tie in with the existing Texas Gas Slaughters-Evansville pipeline to replace the Dogtown Lateral and CenterPoint's Southwest Division Lateral, which currently serves the power plant. In a review of its pipeline system in the region, Texas Gas determined that either due to capacity or piping and compression constraints, the use of its existing system would require construction of a 20-inch-diameter diameter pipeline along more miles of right-of-way compared to the proposed Project (see section 3.6 below, Co-location Alternative). Additionally, the Slaughters-Evansville pipeline has been abandoned for 50 years with some sections being removed or sold, and would also require at least 16 miles of new pipeline construction from Robards Junction to the Dogtown Lateral to make the Slaughters-Evansville pipeline system operational. In summary, Texas Gas reviewed its system within a 30-mile radius of the power plant and determined it does not have a viable existing (or minimally modifiable) system alternative that could meet the purpose and need of the proposed Project without the construction of the new Henderson Lateral and installation of additional compression at the Slaughters Compressor Station.

Texas Eastern Transmission Company (TETCO) operates a 24-inch-diameter natural gas transmission pipeline in the region. The TETCO pipeline is about 20 to 25 miles north of the AB Brown Power Plant. As with the Texas Gas system to the south, the TETCO pipeline does not provide direct service to the power plant and could not meet the purpose and need of the Project without also having to construct new laterals, and possibly construction or upgrade of additional facilities (such as M&R or compressor stations), to provide natural gas, even if it had the supply and capacity to do so. However, the unsubscribed capacity on the existing system at this location is not sufficient to meet the Project purpose and need (Texas Eastern Transmission, LP 2022). Further, given the similar distance from the AB Brown Power Plant as the Texas Gas system, impacts would be similar at best and would not appear to offer an environmentally superior alternative to the proposed Project.

TC Energy operates the ANR Pipeline in the region carrying natural gas from the Gulf Coast region to the Great Lakes region. The 30-inch-diameter ANR Pipeline is about 25 to 30 miles south and east of the AB Brown Power Plant. As with the Texas Gas system and the TETCO system, the ANR Pipeline does not provide direct service to the power plant and could not meet the purpose and need of the Project without also having to construct a new lateral, and possibly construction or upgrade of additional facilities (such as M&R or compressor stations), to provide natural gas, assuming it has supply and capacity to do so. However, given the slightly greater distance from the AB Brown Power Plant compared to the Texas Gas system, impacts would likely be greater and would not appear to offer an environmentally superior alternative to the proposed Project.

Without any other pipeline systems in the area and the lack of a viable system alternative on the Texas Gas or the TETCO systems, we did not carry forward any system alternatives for additional analysis.

JA182

## 3.6    Lateral Route Alternatives

A major route alternative deviates from a relatively large segment of a proposed pipeline alignment for a substantial length and distance in an effort to reduce overall environmental impacts. While a major route alternative should connect the supplier and the corresponding recipient of the natural gas to be transported by a proposed project, the alternatives could follow routes significantly different from the proposed pipeline. Major route alternatives would not modify or make use of an existing pipeline system, but would involve the installation of a new pipeline; system alternatives are addressed in section 3.5, above.

Texas Gas' proposed Henderson County Expansion Project route was selected to connect its existing supply of natural gas to CenterPoint's AB Brown Power Plant with the least amount of environmental impacts while being cost effective and using technologically proven construction methods. Texas Gas developed a proposed lateral route that follows existing rights-of-way, where feasible. Locating a new pipeline adjacent to existing rights-of-way serves to reduce construction and operational impacts and is generally preferable to constructing a new pipeline routed entirely through undisturbed areas.

Based on the potential to reduce overall impacts on the environment and residences, and based on comments from the IDNR and others to reduce impacts on wetlands, forested lands, and waterbodies, a major route alternative for the Henderson County Expansion Project was identified and analyzed. Figure 3.6-1 shows the proposed lateral route, as well as the Co-location Alternative; table 3.6-1 provides a comparison of environmental impacts of the Proposed Route and the alternative.

The Co-location Alternative was developed to increase the overall amount of co-location with existing utility corridors in an effort to reduce environmental impacts. Based on engineering analysis by Texas Gas, the Co-location Alternative would require the construction of a new pipeline lateral and two pipeline loops totaling 29.3 miles in length. The first pipeline loop required for this route alternative would be along Texas Gas' existing Slaughters-Hymera pipeline. The Slaughters-Hymera Loop would begin at the existing Robards Junction Facility in Henderson County, Kentucky and extend north for 15.5 miles to the start of the Dogtown Lateral Loop. The second loop would require 9.4 miles of 20-inch diameter natural gas pipeline loop of Texas Gas' Dogtown Lateral originating just south of the Ohio River and extending to the origin of the new lateral associated with this alternative in Vanderburgh County, Indiana. The new lateral would require the construction of 4.4 miles of new 20-inch-diameter natural gas pipeline lateral extending from Texas Gas' existing Dogtown Lateral in Vanderburgh County, Indiana to the AB Brown Power Plant. This alternative is about 97 percent adjacent or collocated within existing utility corridors and rights-of-way, compared to just less than 50 percent for the proposed lateral route. The alternative would also affect about 3 fewer acres of wetlands. However, the Co-location Alternative results in more acreage of overall land affected by construction and more forested acreage (more than 40 additional acres) would be required to be cleared compared to the proposed lateral route. The Co-location Alternative would be closer to 19 residences and 1 additional environmental justice community when compared to the proposed lateral route.

JA183



**Legend**

⭐ CenterPoint AB Brown Generating Station

🟪 Slaughters Compressor Station

━━ Proposed Route

━━ Co-location Alternative

━━ Texas Gas Transmission, LLC

0     2.5     5
Miles

N

Scale: 1:250,000

**Texas Gas Transmission, LLC
Henderson County Expansion Project**

Lateral Route Alternatives

Basemap Source: Esri, DeLeLorme, NAVTEQ, USGS, Intermap, iPC, NRCAN, Esri Japan, METI, Esri China, Esri Thailand, Tom Tom, 2013

**FIGURE 3.6-1**

JA184

| Table 3.6-1 Major Route Alternatives to the Project | | |
|---|---|---|
| **Resource** | **Proposed Route[a]** | **Co-location Alternative** |
| Lateral length (miles) | 23.5 | 29.3 |
| Length of adjacent right-of-way (miles) | 11.2 | 28.3 |
| Length of adjacent right-of-way (percentage) | 48% | 97% |
| Construction acres[b] | 256.6 | 321.5 |
| Operation acres[c] | 142.5 | 178.6 |
| Federal or state lands crossed (number) | 0 | 0 |
| Residential structures within 50 feet of the construction right-of-way | 0 | 19 |
| Environmental Justice communities crossed (number) | 2[d] | 3 |
| PHMSA-defined MCAs crossed (number) | 0 | 8 |
| Acres of wetland impacted (construction/operation)[b,c] | 7.2/4.0 | 4.0/2.2 |
| Acres of forested wetlands impacted (construction/operation)[b,c] | 5.5/3.0 | 2.3/1.1 |
| Acres of forested upland impacted (construction/operation)[b,c] | 14.1/9.4 | 57.6/31.7 |
| Acres of agricultural land impacted (construction/operation)[b,c] | 223.4/122.6 | 221.7/122.9 |
| Number of waterbodies crossed (minor/intermediate/major/lakes or ponds) | 10/5/1/3 | 7/3/1/2 |

[a]  The data provided for the Proposed Route is based on desktop data to allow for consistent comparison of data types between the Proposed Route and the alternative.

[b]  Construction acres estimated based on an assumed 90-foot-wide construction right-of-way.

[c]  Operation acres estimated based on an assumed 50-foot-wide permanent easement.

[d]  The number of environmental justice communities crossed is based on the most current U.S. Census information available, as reported in section 4.7.2, rather than Texas Gas' analysis in its application which only indicated one such community for the Proposed Route.

Additionally, eight moderate consequence areas (MCA) have been identified along the Co-location Alternative.  As described in 49 CFR 192.3, an MCA includes an area within a potential impact circle containing five or more buildings for human occupancy or any portion of a paved road surface that is a designated interstate, freeway, expressway, or other major arterial roadway with four or more lanes.  Table 3.6-2 provides a list of each MCA by milepost along the Co-location Alternative.  No MCAs are crossed by the Proposed Route.

| Table 3.6-2 | | | |
|:---:|:---:|:---:|:---:|
| **Moderate Consequence Areas along the Co-location Alternative** | | | |
| **Approximate Milepost** | | **Distance from Pipeline (miles)** | **Description** |
| **Start** | **End** | | |
| 0.27 | 0.50 | 0.44 | Five or more occupied structures (maximum 14 occupied structures within a potential impact circle ["PIC"]) |
| 1.20 | 1.70 | 1.10 | Five or more occupied structures (maximum 14 occupied structures within a PIC) |
| 4.36 | 4.60 | 3.30 | Interstate |
| 5.40 | 5.60 | 4.24 | Five or more occupied structures (maximum 14 occupied structures within a PIC) |
| 9.02 | 9.13 | 7.36 | Major 4-Lane Parkway |
| 13.33 | 13.70 | 10.80 | Five or more occupied structures (maximum 14 occupied structures within a PIC) |
| 14.05 | 14.35 | 10.79 | Five or more occupied structures (maximum 14 occupied structures within a PIC) |
| 18.08 | 18.27 | 8.51 | Major 4-Lane Parkway |

While the Co-location Alternative would avoid some of the resources crossed by the Proposed Route, impacts associated with the alternative route in many cases would be greater. The alterative would be longer than the Proposed Route, would result in greater overall construction impacts, and would be in proximity to more residences, including an additional environmental justice community, as well as eight MCAs. Based on these factors, the alternative was not found to provide an environmental advantage to the Proposed Route; therefore, it was eliminated from further analysis.

## 3.7    Alternatives Conclusions

We considered alternatives to Texas Gas' proposal, and conclude that no system, route, or other alternative would provide a significant environmental advantage over the Project as proposed. Therefore, we conclude that the proposed Project, with our recommended mitigation measures, is the preferred alternative to meet the Project objectives.

# 4.0    ENVIRONMENTAL ANALYSIS

The following sections discuss the Project's potential impacts on environmental resources as well as their potential effects on baseline trends. When considering the environmental consequences of the proposed Project, the duration and significance of any potential impacts are described below according to the following four levels: temporary, short-term, long-term, and permanent. Temporary impacts generally occur during construction, with the resources returning to pre-construction conditions almost immediately. Short-term impacts could continue for up to 3 years following construction. Long-term impacts would require more than 3 years to recover, but eventually would recover to pre-construction conditions. Permanent impacts could result because of activities that modify resources to the extent that they would not return to pre-construction conditions during the life of the Project, such as with the construction of an aboveground facility. An impact would be considered significant if it would result in a substantial adverse change in the physical environment.

The analysis contained in this draft EIS is based upon Texas Gas' application and supplemental filings, our experience with the construction and operation of natural gas transmission infrastructure, and input from applicable agencies and stakeholders. Additionally, if the Project is approved and proceeds, it is not uncommon for a project proponent to request minor modifications (e.g., minor changes in workspace configurations). These changes are often identified by a project proponent once on-the-ground implementation of work is initiated. Any Project modifications would be subject to review and approval by FERC and any other applicable permitting/authorizing agencies with jurisdiction.

As part of its proposal, Texas Gas developed certain mitigation measures to reduce the environmental impact of the Project. In some cases, we determined that additional mitigation measures could further reduce the Project's impacts. Our additional mitigation measures appear as bulleted, boldfaced paragraphs in the text of this section and are also included in section 5.2. We will recommend to the Commission that these measures be included as specific conditions in any Order the Commission may issue authorizing this Project. The conclusions in the EIS are based on our analysis of the environmental impact and the following assumptions:

- Texas Gas would comply with all applicable laws and regulations;

- the proposed facilities would be constructed and operated as described in section 2.0 of the EIS;

- Texas Gas would implement the mitigation measures included in its application and supplemental submittals to the FERC, and in other applicable permits and approvals; and

- Texas Gas would comply with our recommended mitigation measures that become conditions in any Commission authorization.

JA187

## 4.1    Baseline Environmental Trends and Planned Activities

The Project is in rural areas of northwest Kentucky, and northeast and southwest Indiana, with a combined population of 238,000 people (U.S. Census Bureau 2019a). The climate in the Project region in northwest Kentucky and southwest Indiana is characterized as subtropical, with cold winters and hot summers, while the climate in northeast Indiana is a humid continental type. Over the course of a year, the temperatures in Kentucky and Indiana typically vary from average lows of 23 °F and 15 °F in January and average highs of 95 °F and 100 °F in July, respectively. Annual rainfall in Indiana and Kentucky is about 42 and 45 inches, respectively; both states receive snow in the winter months (Weather Atlas 2021a, b).

The Project area is generally dominated by agriculture and forested hills, and is characterized primarily by corn and soybean crops, unimproved pastures, existing utility rights-of-way, and forested areas with deciduous tree species. Henderson and Webster Counties, Kentucky and Posey County, Indiana are generally characterized by open hills and irregular plains; elevations range from between 650 and 990 feet above sea level (U.S. Forest Service [USFS] 2021a). The existing M&R station in Johnson County, Indiana is in an area with elevations around 2,000 feet or less and is characterized by flat land (National Park Service [NPS] 2018a).

CenterPoint's existing AB Brown Power Plant is east of the proposed sites for the AB Brown M&R Station, AB Brown Interconnecting Pipe, and Point of Demarcation Site. Based on aerial review, this facility affects about 450 acres of land, spread over about a 1.3 square mile area. By October 2023, CenterPoint plans to transition its coal-fired generation facilities to a generation fleet composed of 700 to 1,000 megawatts (MW) of new renewable resources, with 460 MW of back-up generation from the two natural gas combustion turbines that would be supplied by the proposed Project. Transition of the AB Brown Power Plant would also result in the closure of a 150-acre coal combustion residual pond and final closure of the existing by-product landfill.

Planned development in the Project area may influence the environmental baseline in which the Project would be constructed. Three planned solar projects would affect a total of about 3,741 acres of land, predominately in Henderson County, Kentucky. The Unbridled and Sebree Solar Projects would be 0.7 and 0.5 mile southwest of the Henderson Lateral near MP 1.1 and 2.2, respectively, with the Unbridled Solar Project extending into Webster County, Kentucky. The third solar project, (Henderson County Solar) would be 3.1 miles east of the Henderson Lateral near MP 12.2. A fourth solar farm, in Indiana (the Posey Solar Farm), was proposed to be sited on 2,400 acres, but a recent downsize of the project has resulted in a reduced footprint of 1,000 acres (Posey Solar Project 2022). The Posey Solar Farm would be about 0.9 mile northwest of Texas Gas' proposed AB Brown M&R Station.

Based on the estimated construction start dates for these projects (2022-2023), it is likely that construction could intersect with the construction of the Project. Impacts from the construction of solar facilities in the Project area could temporarily affect waterbodies and wetlands, fisheries, vegetation, and wildlife, and would alter the visual landscape of the region. Operation of these solar facilities would permanently remove vegetation and wildlife habitat, and the solar panels would permanently change the viewshed for visual receptors. Construction impacts on waterbodies and wetlands from the proposed Project would generally be temporary or short-term, although some permanent conversion of vegetation and wetland types would occur

JA188

On October 7, 2021, we sent our NOI to the previously listed Tribes. The letters introduced the Project and provided Project mapping. To date, we have received correspondence from two Tribes, the Pokagon Band of Potawatomi Indians on September 8, 2021, and the Cherokee Nation on July 28, 2021. Both Tribes indicate that sensitive tribal resources would not be impacted by the Project but request to be contacted should unanticipated discoveries of cultural resources be made during construction.

On May 20, 2021, Texas Gas sent formal consultation letters via the U.S. Postal Service to the 24 federally recognized Tribes listed above. Follow-up letters were sent by email on June 22, 2021. To date, return correspondence has been received from seven of the contacted Tribes including the Miami Tribe of Oklahoma, Chickasaw Nation, Seneca Nation, Seneca Cayuga Nation of Oklahoma, Delaware Nation, the Muscogee Creek Nation, and the Cherokee Nation. On June 15, 2021, the Chickasaw Nation indicated the Project was outside of its area of interest. On June 22, 2021, the Miami Tribe of Oklahoma indicated the Project activities would not affect its resources but requested to be notified in the event the Unanticipated Discovery Plan is applied. On June 23, 2021, both the Seneca Nation and the Seneca Cayuga Nation of Oklahoma indicated no tribal interests in the Project and that no further consultations were warranted. On July 7, 2021, the Delaware Nation determined that the Project would have no effect on its known tribal resources or properties. On August 3, 2021, the Muscogee Creek Nation indicated the Project was outside of its area of interest and cited that the Project would not affect its resources. On August 23, 2021, the Cherokee Nation indicated the Project was outside of its area of interest but wished to be contacted in the event that significant resources were discovered.

On January 13, 2022, we formally invited 20 of the 24 federally recognized Tribes listed above to participate in the Section 106 review process. In addition, we invited two more federally recognized Tribes to participate, the Quapaw Tribe of Indians and the Osage Nation. On February 11, 2022, the Quapaw Tribe requested SHPO comments on completed work. In response we furnished copies of all SHPO correspondence received to date in both Kentucky and Indiana. On March 21, 2022, the Quapaw Tribe concurred with the SHPO determinations that no further cultural resources investigations be required and that no historic properties would be affected by the Project. They requested to be notified in the event of an inadvertent discovery.

### 4.8.3    Unanticipated Discovery Plan

Texas Gas provided a plan to address the unanticipated discovery of cultural resources and human remains. We requested minor revisions, including the division of the plan into separate plans for both Indiana and Kentucky. Texas Gas provided revised plans, which we accept.

### 4.8.4    Compliance with the National Historic Preservation Act

Cultural resources surveys and consultation with the Kentucky and Indiana SHPOs have been completed. The SHPOs have commented on the survey reports and agree with Texas Gas that no historic properties would be affected by the proposed Project. We agree. Accordingly, FERC has completed its compliance requirements with Section 106 of the NHPA for the Project.

JA189

## 4.9    Air Quality and Climate Change

The term "air quality" refers to relative concentrations of pollutants in the ambient air. Local and regional air quality in the Project area would potentially be affected by construction and operation of the Project. This section summarizes federal and state air quality regulations that are applicable to the proposed facilities. This section also characterizes the existing air quality and describes potential impacts the facilities may have on air quality regionally and locally, as well as the Project's potential impacts on climate change.

Ambient air quality is protected by the CAA of 1970, as amended in 1977 and 1990. The USEPA oversees the implementation of the CAA and establishes the NAAQS to protect human health and welfare.[54] NAAQS have been developed for seven "criteria air pollutants" including nitrogen dioxide ($NO_2$), carbon monoxide (CO), ozone, $SO_2$, particulate matter less than or equal to 2.5 microns in aerodynamic diameter ($PM_{2.5}$), particulate matter less than or equal to 10 microns in aerodynamic diameter ($PM_{10}$), and lead, and includes levels for short-term (acute) and long-term (chronic) exposures. Ozone is not directly emitted into the atmosphere from an emissions source. Ozone develops as a result of a chemical reaction between nitrogen oxides ($NO_x$) and VOCs in the presence of sunlight.

As well as being the reactant to form ozone, VOCs are a subset of organic compounds that are emitted during fossil-fuel combustion and can cause a variety of health effects, from irritation to more serious health impacts. Fossil fuels would be used in construction equipment for the Project and during operation of the modified facilities at the Slaughters Compressor Station. HAPs are also emitted during fossil-fuel combustion and contain compounds that are known or suspected of causing cancer and other serious health effects.

The NAAQS include two standards, primary and secondary. Primary standards establish limits that are considered to be protective of human health and welfare, including sensitive populations such as children, the elderly, and asthmatics. Secondary standards set limits to protect public welfare, including protection against reduced visibility and damage to crops, vegetation, animals, and buildings (USEPA 2021e). Under the CAA, each state prepares a State Implementation Plan to demonstrate the state's air quality management program to attain or maintain the NAAQS. States must adopt standards that are at least as stringent as the NAAQS. At the state level, the States of Kentucky and Indiana have adopted standards which are equivalent to the NAAQS for CO, ozone, $SO_2$, $PM_{2.5}$, $PM_{10}$, and lead, as codified under 401 KAR 53:010, Section 4 and 326 IAC 1-3-4.

The term "greenhouse gases" refers to the gases and aerosols that occur in the atmosphere both naturally and as a result of human activities, such as the burning of fossil fuels. GHGs are non-toxic and non-hazardous at normal ambient concentrations; however, they were identified as pollutants by the USEPA due to the impacts on the global climate. The primary GHGs that would be emitted by the Project are carbon dioxide ($CO_2$), methane, and nitrous oxide. During construction and operation of the Project, these GHGs would be emitted from the majority of construction equipment, the operation of the modified Slaughters Compressor Station, and at

---

[54] The current NAAQS are listed on the USEPA's website at https://www.epa.gov/criteria-air-pollutants/naaqs-table.

JA190

valves and other aboveground appurtenances associated with the Henderson Lateral and other aboveground facilities.

Emissions of GHGs are typically quantified and regulated in units of carbon dioxide equivalents ($CO_2e$). The $CO_2e$ takes into account the global warming potential (GWP) of each GHG. The GWP is the measure of a particular GHG's ability to absorb solar radiation as well as its residence time within the atmosphere. The GWP allows comparison of global warming impacts between different gases; the higher the GWP, the more that gas contributes to climate change in comparison to $CO_2$. For comparison, $CO_2$ has a GWP of 1, methane has a GWP of 25, and nitrous oxide has a GWP of 298 (USEPA 2021f).[55] There are no applicable ambient standards or emission limits for GHG under the CAA.

## 4.9.1    Existing Air Quality

The Project area for this air analysis includes Henderson and Webster Counties, Kentucky, and Posey and Johnson Counties, Indiana. The climate of the Project area is impacted by the movement of polar fronts where moist low-pressure systems travel from the western Gulf region to the northeast in the winter and spring. Summer and early autumn generally have less severe impacts; however, snowfall, temperature, and precipitation may vary greatly depending upon the path and frequency of these storms. The maximum daily average temperatures peak at about 88.5 °F in July near Evansville, Indiana (36 miles north of the Slaughters Compressor Station), and minimum average daily temperatures are typically lowest in January at 24.0 °F. Precipitation in the area varies, with an average monthly high of 5.36 inches in May and an average monthly low of 3.05 inches in September (National Oceanic and Atmospheric Administration 2020).

The USEPA and state and local agencies have established a network of ambient air quality monitoring stations to measure concentrations of criteria pollutants across the United States. The data are then averaged over a specific time period and used by regulatory agencies to determine compliance with the NAAQS and to determine if an area is in attainment (criteria pollutant concentrations are below the NAAQS), nonattainment (criteria pollutant concentrations exceed the NAAQS), or maintenance (area was formerly nonattainment and is currently in attainment). Portions of Henderson and Webster Counties in Kentucky are designated as nonattainment for the 2010 $SO_2$ standard. The Slaughters Compressor Station is in the attainment portion of Webster County; however, the Henderson Lateral extends across both the nonattainment and attainment portions of Henderson County. All counties in the Project area are in attainment for all other criteria pollutants (USEPA 2021g, h). Additional pollutants, such as VOCs and HAPs, are emitted during fossil-fuel combustion. These pollutants are regulated through various components of the CAA that are discussed further in section 4.9.2, below.

---

[55] These GWPs are based on a 100-year time period. We have selected their use over other published GWPs for other timeframes because these are the GWPs the USEPA has established for reporting of GHG emissions and air permitting requirements. This allows for a consistent comparison with these regulatory requirements.

### 4.9.2	Regulatory Requirements

#### 4.9.2.1	Prevention of Significant Deterioration and Nonattainment New Source Review

New or modified air pollutant emission sources must undergo a New Source Review (NSR) prior to construction or operation. Through the NSR permitting process, federal and state regulatory agencies review and approve project emissions increases or changes, emissions controls, and various other details to ensure air quality does not deteriorate as a result of new or modified existing emission sources. The three basic categories of NSR permitting are Prevention of Significant Deterioration (PSD), Nonattainment New Source Review (NNSR), and minor source NSR. PSD, NNSR, and minor source NSR are applicable depending on the size of the proposed project, the projected emissions, and if the project is proposed in an attainment area or nonattainment/maintenance area. KYDEP administers the NSR and PSD program in Kentucky, except in Jefferson County (outside the Project area; USEPA 2021i). The IDEM administers the program in Indiana (IDEM 2021b).

PSD regulations define a major source as any source type belonging to a list of named source categories that have a potential to emit 100 tons per year (tpy) or more of any regulated pollutant, or 250 tpy for sources not among the listed source categories. The Slaughters Compressor Station is an existing major PSD source; however, the modifications at the compressor station would not exceed the PSD major source modification thresholds for any pollutants, nor have potential emission rates of any pollutant for which a NNSR would be required. Therefore, the proposed construction and operation of the modified Slaughters Compressor Station does not meet the threshold for review of PSD or NNSR. No other major sources are proposed for construction or modification as part of the Henderson County Expansion Project.

#### 4.9.2.2	Class I Areas and Visibility

Under the PSD program, mandatory federal Class I areas are designated by the USEPA to protect certain areas (e.g., wilderness areas, national parks, national forests) to ensure that deterioration of existing air quality-related values, such as visibility, is minimized in these areas. Relative to Class II and III areas, Class I areas have the most restrictive allowable PSD air quality increments. For a new major source or major modification within 62 miles (100 kilometers) of a Class I area, the facility is required to notify the appropriate federal land manager and assess the impacts of that project on the nearby Class I area. There are no Class I areas within 62 miles (100 kilometers) of the Slaughters Compressor Station. The Mammoth Cave National Park, the nearest Class I area, is about 70.8 miles (114 kilometers) from the station.

#### 4.9.2.3	Title V Permitting

Title V is an operating air permit program run by each state for each facility that is considered a "major source." The major source threshold for an air emission source within an attainment area, or within a marginal or moderate nonattainment area, is 100 tpy for criteria pollutants, 10 tpy for any single HAP, and 25 tpy for total HAPs. For sources within serious ozone or $PM_{10}$ nonattainment areas, the thresholds are 50 tpy for VOC or $NO_x$ and 70 tpy for $PM_{10}$. Sources may not be required to obtain a Title V permit on the basis of GHG emissions alone, per the Supreme Court's ruling in *Utility Air Regulatory Group v. EPA*, and federal regulations that

JA192

required a Title V permit have been vacated as a result of this and other legal proceedings in the D.C. Circuit Court of Appeals. The Slaughters Compressor Station is an existing Title V major source for NO$_x$, CO, VOC, formaldehyde, and total HAP emissions, and Texas Gas would be required to modify the existing Title V permit for this station. Texas Gas submitted an application to KYDEP for a minor revision to its Title V permit in June of 2021 and has committed to submit a copy of the finalized revision to FERC once the permit is issued by KYDEP.

### 4.9.2.4    New Source Performance Standards

The USEPA promulgates New Source Performance Standards (NSPS) for new, modified, or reconstructed stationary sources to control emissions to the level achievable by the best-demonstrated technology for stationary source types or categories as specified in the applicable provisions. The NSPS also establish fuel, monitoring, notification, reporting, and recordkeeping requirements.

NSPS Subpart GG sets emission standards from existing stationary combustion turbines. NSPS Subpart GG would continue to apply to the existing Slaughters Compressor Station turbines that were constructed or modified prior to February 18, 2005. Turbines constructed or modified after February 18, 2005 are subject to Subpart KKKK, described below.

NSPS Subpart KKKK sets emission standards from new stationary combustion turbines. Subpart KKKK would apply to the new turbine at the Slaughters Compressor Station.

On November 15, 2021, the USEPA issued in the *Federal Register* the proposed rule "*Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for existing Sources: Oil and Natural Gas Sector Climate Review*" (proposed rule).[56]

The proposed rule included three distinct groups of actions under the CAA that are each severable from the other. First, pursuant to CAA 111(b)(1)(B), the USEPA reviewed, and is proposing revisions to, the standards of performance for the Crude Oil and Natural Gas source category published in 2016 and amended in 2020, codified at 40 CFR 60 Subpart OOOOa— *Standards of Performance for Crude Oil and Natural Gas Facilities for which Construction, Modification or Reconstruction Commenced After September 18, 2015* (2016 NSPS OOOOa). Specifically, the USEPA proposes to update, strengthen, and expand the current requirements under CAA section 111(b) for methane and VOC emissions from sources that commence construction, modification, or reconstruction after November 15, 2021. These proposed standards of performance will be in a new subpart, 40 CFR 60 Subpart OOOOb (NSPS OOOOb), and include standards for emission sources previously not regulated under the 2016 NSPS OOOOa.

Second, pursuant to CAA 111(d), the USEPA proposed the first nationwide emission guidelines for states to limit methane pollution from designated facilities in the Crude Oil and Natural Gas source category. The proposed emission guidelines will be in a new subpart, 40 CFR 60 Subpart OOOOc. The emission guidelines are designed to inform states in the development,

---

[56] *Federal Register* 63110, https://www.federalregister.gov/documents/2021/11/15/2021-24202/standards-of-performance-for-new-reconstructed-and-modified-sources-and-emissions-guidelines-for

submittal, and implementation of state plans that are required to establish standards of performance for GHGs from their designated facilities in the Crude Oil and Natural Gas source category.

Third, also as part of the proposed rule, the USEPA took several related actions stemming from the joint resolution of Congress, adopted on June 30, 2021, under the Congressional Review Act, disapproving the USEPA's final rule titled, "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review," 85 *Federal Register* 57018 (Sept. 14, 2020) ("2020 Policy Rule"). The USEPA proposes amendments to the 2016 NSPS OOOOa to address: (1) certain inconsistencies between the VOC and methane standards resulting from the disapproval of the 2020 Policy Rule; and (2) certain determinations made in the final rule titled "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration," 85 *Federal Register* 57398 (September 15, 2020) (2020 Technical Rule), specifically with respect to fugitive emissions monitoring at low production well sites and gathering and boosting stations. With respect to the latter, the USEPA proposes to rescind provisions of the 2020 Technical Rule that were not supported by the record for that rule, or by its subsequent information and analysis. The regulatory text for these proposed amendments is included in the USEPA Docket ID EPA-HQ-OAR-2021-0317.

In addition, the USEPA proposed to update the NSPS OOOO and NSPS OOOOa provisions in the CFR to reflect the Congressional Review Act resolution's disapproval of the final 2020 Policy Rule, specifically, the reinstatement of the NSPS OOOO and NSPS OOOOa requirements that the 2020 Policy Rule repealed but that came back into effect immediately upon enactment of the June 30, 2021 Congressional Review Act resolution. These updates to the CFR text are also included in the USEPA Docket ID EPA-HQ-OAR-2021-0317.

According to the proposed rule, the requirements of 40 CFR 60 Subpart OOOOa will apply to new, modified, or reconstructed sources commencing construction after September 18, 2015 and on or before November 15, 2021, the requirements of 40 CFR 60 Subpart OOOOb will apply to new, modified, or reconstructed sources commencing construction after November 15, 2021, and the requirements of 40 CFR 60 Subpart OOOOc will apply to sources existing on or before November 15, 2021. Therefore, the Project would be subject to all applicable requirements of 40 CFR 60 OOOOb upon issuance of the final rule.

Texas Gas would be required to comply with all applicable requirements of these NSPS.

### 4.9.2.5   National Emission Standards for Hazardous Air Pollutants

The 1990 CAA amendments established a list of 189 HAPs, resulting in the promulgation of National Emission Standards for Hazardous Air Pollutants (NESHAP). The NESHAPs regulate HAP emissions from specific source types at major or area sources of HAPs by setting emission limits, monitoring, testing, record keeping, and notification requirements. The Slaughters Compressor Station is an existing major source of HAPs, and the modified compressor station would have the potential to emit more than the combined HAP total threshold of 25 tpy and single HAP threshold of 10 tpy. Therefore, it is considered a major source of HAPs.

40 CFR 63 Subpart YYYY applies to stationary combustion turbines at major sources that are installed after January 14, 2003. Per 40 CFR 63.6095(d), gas-fired stationary combustion

turbines are only required to comply with the notification requirements of §63.6145 until the USEPA publishes a final action in the *Federal Register*. The Project's new turbine would be at a major source and would be installed after the applicable date; therefore, Texas Gas would be required to comply with all applicable requirements of this rule for the Project's proposed turbine. Texas Gas has committed to comply with any applicable requirements pending the USEPA's final action.

### 4.9.2.6    General Conformity

The General Conformity Rule was developed to ensure that federal actions in nonattainment and maintenance areas do not impede states' attainment of the NAAQS. The General Conformity Rule is codified in 40 CFR 51, Subpart W and 93 Subpart B, *Determining Conformity of General Federal Actions to State or Federal Implementation Plans*. A conformity determination must be conducted by the lead federal agency if a federal action's unpermitted construction and/or operational activities are likely to result in generating direct and indirect emissions that would exceed the conformity threshold (*de minimus*) levels of the pollutant(s) for which an area is in nonattainment or maintenance.

Conforming activities or actions should not, through additional air pollutant emissions:

- cause or contribute to new violations of the NAAQS in any area;

- increase the frequency or severity of any existing violation of any NAAQS; or

- delay timely attainment of any NAAQS or interim emission reductions.

The General Conformity Rule entails both an applicability analysis and a subsequent conformity determination, if applicable. A General Conformity Determination must be completed when the total direct and indirect emissions of a project would equal or exceed specified pollutant thresholds on a calendar year basis for each nonattainment or maintenance area.

Estimated emissions for the Project subject to review under the general conformity thresholds include construction emissions and operational emissions not subject to major or minor NSR permitting. Operational emissions from the modified Project facilities that are not subject to NSR permitting are limited to minor fugitive releases and blowdown/vented emissions, and these emissions would not exceed general conformity applicability thresholds. Detailed construction emissions are presented in table 4.9.3-1, and a comparison of the construction emissions to applicable general conformity thresholds are presented in table 4.9.3-2, below.[57] Construction emission estimates for the Project would not exceed general conformity applicability thresholds; therefore, a General Conformity Determination is not required.

---

[57] Detailed emissions calculations for the emission estimates identified in tables 4.9.3-1 and 4.9.4-1 were filed in Texas Gas' January 19, 2022 submittal and are available for public review on eLibrary under accession no. 20220119-5190.

#### 4.9.2.7 Mandatory Greenhouse Gas Reporting Rule

The USEPA's Mandatory Reporting of Greenhouse Gases Rule requires reporting GHG emissions if applicable sources emit greater than or equal to 25,000 metric tons of GHG (as $CO_2e$) in one year. The Mandatory Reporting Rule does not require emission control devices and is strictly a reporting requirement for stationary sources based on actual emissions. Although the rule does not apply to construction emissions, we have provided GHG construction emission estimates in table 4.9.3-1, as $CO_2e$, for accounting and disclosure purposes. Operational GHG emission estimates for the Project are also presented, as $CO_2e$, in table 4.9.4-1. Based on the emission estimates presented, actual GHG emissions from operation of the modified Slaughters Compressor Station would likely exceed the 25,000-tpy reporting threshold and reporting requirements for the Mandatory Reporting Rule would therefore be applicable to the Project.

#### 4.9.2.8 Methane Challenge Program / Leak Detection and Repair

In August 2016, the USEPA officially approved the One Future Commitment Option under the Natural Gas STAR program. As part of the Natural Gas STAR program, a participating company reports annual pipeline and aboveground facility methane releases, conducts leak surveys at its facilities as needed, and implements certain recommended technologies on Project sources to reduce fugitive releases. Texas Gas is not currently a participating member of the Methane Challenge Program; however, Texas Gas is a member of the USEPA Natural Gas STAR program and ONE Future Coalition.

As described in section 4.9.2.4 above, pending regulations under NSPS Subpart OOOOb may become applicable to the Project. NSPS OOOOb proposed regulations include leak detection and repair requirements including quarterly monitoring on new, modified, and/or reconstructed sources and requirements regarding the repair of any leak sources that are discovered as a result of the monitoring. In response to the draft EIS, the USEPA recommended that mitigation measures for pigging facilities associated with the Project be included to prevent fugitive emissions and in anticipation of new requirements that may become applicable to the Project. Texas Gas has stated that it operates portable compressors that can be used to recover gas from pipeline pigging operations when feasible and safe. Further, Texas Gas would be required to comply with applicable requirements at the Slaughters Compressor Station.

#### 4.9.2.9 State Air Quality Regulations

This section discusses the potentially applicable state air regulations for the Project. Emissions resulting from the Project are subject to Kentucky air quality standards, codified in the KAR, and Indiana air quality standards, codified in the IAC. Specific regulations and their applicability are reviewed below. Texas Gas submitted a state permit application addressing applicable federal and state requirements in June 2021,[58] as further described below.

---

[58] Copies of the state permit application packages are available for public review on eLibrary under accession no. 20210625-5123.

**Kentucky**

Air pollution control regulations are promulgated in Title 401, Chapters 50 through 53 of the KAR. Federal programs that are incorporated into Kentucky's code include NESHAP, NSPS, and NSR. Kentucky has full delegation from the USEPA for air permitting programs. Permit modifications from KYDEP are required prior to construction of the facilities at the Slaughters Compressor Station, which is a major source subject to NSR permitting review. In comments on the draft EIS, KYDEP recommended that Texas Gas should comply with any applicable air permitting requirements codified in Title 401 Chapter 52 of the KAR and identified applicable state regulations regarding open burning and fugitive emissions. KYDEP also recommended consideration of compliance with applicable local regulations. Texas Gas filed its Application for Minor Revision to Title V Permit V-15-033 RY in June of 2021, for the modifications at the Slaughters Compressor Station. The final permit issuance from KYDEP is pending. Local regulations or ordinances that apply to construction and operation emissions from the Project facilities have not been identified to date; however, Texas Gas stated that it would comply with any requirements that apply at the time of construction.

In addition, 401 KAR 63:005 includes requirements and restrictions on open burning, which are applicable to construction of the Project. Texas Gas has committed to following good open burning practices and would meet the opacity and seasonal burning requirements within 401 KAR 63:005. Requirements for the control of fugitive particulate matter emissions including taking action if fugitive emissions are a nuisance, covering trucks, and not depositing earth onto a road or paved street are codified in 401 KAR 63:010. Texas Gas commits to comply with the state's fugitive dust requirements

**Indiana**

Air pollution control regulations are promulgated in Title 326 of the IAC. Federal programs that are incorporated into Indiana's code include NESHAP, NSPS, and NSR. Indiana has full delegation from the USEPA for air permitting programs. However, the Project does not include activities which would require permits from the State of Indiana. In addition to controls for combustion emission sources, Texas Gas would be required to comply with 326 IAC 6-4-6(3) which requires dust control measures to limit emissions of particulate matter from construction and materials handling. Texas Gas has stated the measures it would implement to limit emissions of particulate matter in its Dust Control Plan.

## 4.9.3 Construction Emissions Impacts and Mitigation

Constructing the Project would result in temporary and localized emissions that would last the duration of construction activities at the Slaughters Compressor Station and at points where construction is actively occurring along the Henderson Lateral, AB Brown Interconnecting Pipe, and associated aboveground facilities. Exhaust emissions would be generated by the use of heavy equipment and trucks powered by diesel or gasoline engines. Exhaust emissions would also be generated by delivery vehicles and construction workers commuting to and from work areas. Open burning may occur to clear vegetation and debris.

Construction activities would also result in the temporary generation of fugitive dust (large particles as well as $PM_{10}$ and $PM_{2.5}$) due to land clearing and grading, ground excavation, and driving on unpaved roads. The amount of dust generated would be a function of construction activity, soil type, soil moisture content, wind speed, precipitation, vehicle traffic and types, and roadway characteristics. Emissions would be greater during dry periods and in areas of fine-textured soils subject to surface activity.

Construction emission estimates are based on the fuel type and anticipated frequency, duration, capacity, and levels of use of various types of construction equipment. Construction emissions were estimated using emission factors provided in AP-42 data (USEPA 1992, 1995a, 1996, 1998b), USEPA MOVES3 off-road emission factors (USEPA 2021j), GWP factors found in 40 CFR 98 (USEPA 2021f), and the California Air Resources Board EMFAC2014 Database (CARB 2014).

Table 4.9.3-1 provides the total Project construction emissions, including exhaust emissions and fugitive dust from on-road and off-road construction equipment and vehicles, exhaust emissions from construction worker vehicles for commuting, and vehicles used to deliver equipment/materials to the Project construction sites.

Construction emissions shown in table 4.9.3-1 are not expected to result in a violation or degradation of ambient air quality standards and would not exceed applicable general conformity standards (see table 4.9.3-2). Texas Gas would minimize construction emissions by following federal, state, and local emission standards and air quality regulations, limiting vehicle and equipment idling, employing BMPs for the operation and maintenance of equipment, and using grid-based or renewable electricity instead of diesel generators when practicable. The inclusion of low- or zero-emitting construction equipment would be requested in construction bids and vehicles and equipment that exceed federal standards to support Project construction would be encouraged, dependent upon the availability of such equipment.

| Table 4.9.3-1 Construction Emissions (tons per 10-month construction duration)[a] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Activity** | **NOx** | **SO₂** | **CO** | **PM₁₀** | **PM₂.₅** | **VOC** | **Total HAP[b]** | **CO₂e** |
| **Slaughters Compressor Station (Webster County, Kentucky)** | | | | | | | | |
| Non-road equipment combustion emissions | 0.46 | <0.01 | 0.29 | 0.04 | 0.04 | 0.06 | 0.03 | 219.65 |
| On-road equipment combustion emissions | 0.37 | <0.01 | 0.33 | <0.01 | <0.01 | 0.02 | <0.01 | 183.29 |
| Fugitive dust[c] | - | - | - | 1.52 | 0.26 | - | - | - |
| Open burning | - | - | - | - | - | - | - | - |
| **Slaughters Compressor Station Total** | **0.83** | **<0.01** | **0.62** | **1.56** | **0.31** | **0.08** | **0.03** | **402.94** |
| **Henderson Lateral, AB Brown M&R Station, Existing Receipt M&R Station, and Other Appurtenant Facilities (Henderson County, Kentucky; Posey and Johnson Counties, Indiana)** | | | | | | | | |
| Non-road equipment combustion emissions | 14.17 | 0.02 | 4.52 | 0.72 | 0.70 | 1.03 | 0.45 | 6,739.30 |
| On-road equipment combustion emissions | 1.68 | <0.01 | 0.68 | 0.02 | 0.01 | 0.08 | 0.02 | 412.34 |
| Fugitive dust[c] | - | - | - | 57.14 | 5.81 | - | - | - |
| Open burning | 3.44 | - | 120.39 | 14.62 | 14.62 | 16.34 | 16.34 | 2,793.10 |
| **Henderson Lateral and Associated Facilities Total** | **19.29** | **0.02** | **125.59** | **72.51** | **21.14** | **17.45** | **16.81** | **9,944.74** |
| **Total Project** | **20.12** | **0.03** | **126.21** | **74.07** | **21.46** | **17.53** | **16.84** | **10,347.68** |

[a]  Sum of columns may not add to total due to rounding.

[b]  Based on the assumption that VOC emissions from fossil fuel-fired construction equipment consist substantially of VOC HAPs, e.g., formaldehyde, benzene, toluene, xylenes, 1,3-butadiene, acetaldehyde, acrolein, and naphthalene.  HAP emissions from open burning are conservatively assumed to equal total VOC emissions.

[c]  Emissions of total suspended particulate from Project construction, which includes dust particles of any size including those greater than PM₁₀, would be considerably greater than the estimates for PM₁₀ and PM₂.₅, and would depend on efficacy of Texas Gas' implemented dust control methods.

| Table 4.9.3-2 Comparison of Construction Emissions for the Project to General Conformity Thresholds[a] | | | | |
|---|---|---|---|---|
| Air Pollutant | Designated Area | Threshold (tpy) | Pollutant or Precursor | Construction Emissions (tpy) |
| $SO_2$ | Henderson County, Kentucky | 100 | $SO_2$ | 0.008 |

[a] General Conformity is only applicable to nonattainment or maintenance areas. Portions of Henderson and Webster Counties, Kentucky are in nonattainment for $SO_2$; however, because the Slaughters Compressor Station is in the attainment portion of Webster County, it is not included in the total above. Eight miles of the Henderson Lateral are in the Henderson County nonattainment area and their reported emissions are included.

The USEPA and KYDEP also recommended that Texas Gas implement dust control measures and comply with applicable state requirements regarding the control of fugitive emissions from construction of the Project. Emissions of total suspended particulate from Project construction, which includes dust particles of any size including those greater than $PM_{10}$, would be considerably greater (in terms of total tons emitted) than the estimates for $PM_{10}$ and $PM_{2.5}$ in table 4.9.3-1, and would depend on the efficacy of Texas Gas' implemented dust control mitigation measures, the degree to which construction vehicle speeds are limited, and weather conditions. Although based on limited data gathering, USEPA AP-42 Section 13.2.3 estimates that total suspended particulate emissions from "heavy construction operations" could be as high as 1.2 tons per acre-month. This emission factor assumes construction activity occurs 30 days per month, which is conservative, and is best utilized for medium-level construction activities in a semi-arid climate with moderate silt content. The moisture content and rainfall in the Project area is higher than in a semi-arid environment; therefore, particulate matter emissions from disturbed soil would be expected to be lower than for semi-arid regions. Texas Gas would take measures in its Dust Control Plan to reduce fugitive emissions, including:

- applying dust suppressants (e.g., water from municipal sources and surface waterbodies) to storage piles, disturbed work areas, and unpaved access roads;

- reducing vehicle speeds on unpaved roads and when hauling material and operating non-earthmoving equipment to prevent material spillage;

- removing spilled or tracked dirt and construction debris from paved streets;

- installing and maintaining construction entrances to free debris from vehicle tires/ tracks prior to egress to paved roads;

- covering trucks which transport materials which may produce dust; and

- revegetating of areas that are not graveled or paved following completion of construction.

One commentor on the draft EIS (Mr. Alaniz) expressed concern that soil bacteria could cause adverse health effects if they become airborne (for example, as fugitive dust) during construction. The dust control measures described above would minimize the potential for exposure to fugitive dust and any potential associated health effects.

The USEPA and KYDEP recommended measures to minimize air emissions from construction of the Project, including use of alternatively fueled or zero-emission equipment and low-sulfur fuel, newer tier equipment, diesel emissions controls, and strategies and technologies to reduce idling time as practicable. In response to the draft EIS, KYDEP and the USEPA reiterated these recommendations. Texas Gas states it would include provisions regarding alternatively fueled or zero-emission equipment and low-sulfur fuel or newer tier equipment as part of its contractor bidding process. To minimize combustion emissions from construction equipment, Texas Gas would comply with USEPA mobile and non-road emission specifications in 40 CFR Parts 85, 86, and 89 for federal design standards for equipment at the date or manufacture, would purchase commercial diesel fuel products which are regulated, and would establish a policy to generally limit equipment idling times.

The USEPA recommended that Texas Gas avoid open burning for vegetation clearing where the Henderson Lateral is in an area in nonattainment for the 2010 $SO_2$ standard, and notes that air quality is currently unhealthy in the nonattainment area. To minimize emissions from open burning, Texas Gas would comply with 401 KAR 63:010. as described above, which limits opacity to 40 percent, and would allow fires to be set by qualified personnel only. Texas Gas proposes to conduct open burning of cleared vegetation along the pipeline right-of-way within Henderson County, Kentucky but would not conduct any open burning within the City of Henderson or State of Indiana. Texas Gas would notify affected landowners prior to burning vegetation on their property. As presented in table 4.9.3-2, emissions from construction of the Project (including open burning) would not exceed general conformity applicability thresholds.

Construction emissions would take place over the duration of construction and at different times and locations throughout the Project area. In general, construction emissions would be minor and would result in temporary, localized impacts in the immediate vicinity of the Project facilities. With the mitigation measures proposed by Texas Gas, we conclude that air quality impacts from construction, including impacts on visibility within the regional airshed, would be temporary and not result in significant impacts on local or regional air quality.

## 4.9.4 Operational Emissions Impacts and Mitigation

Several individuals provided comments on the draft EIS that identify concerns related to existing air quality concerns and pollution sources in the Project vicinity (specifically, southwest Indiana). The Project would primarily generate air emissions from operation of the new turbine at the Slaughters Compressor Station. Operating the Project's facilities would also result in fugitive emissions from minor leaks associated with piping components and valves at the Slaughters Compressor Station as well as along the Henderson Lateral, AB Brown Interconnecting Pipe, and associated aboveground facilities. All emissions estimates presented in this analysis provide an upper-bound of facility operations since they assess full-time operation and the new natural gas-fired turbines at the AB Brown Power Plant that would receive natural gas transported by the Project are only projected to be operational between 2 and 7 percent of available hours per year.

At the Slaughters Compressor Station, Texas Gas would install one new Solar Centaur 50-6200 LS natural gas-fired stationary combustion turbine (Turbine 4), would abandon in place one existing 1,320-hp Clark HPA-6 reciprocating compressor engine (Compressor Engine 5), and would place two other existing 1,320-hp Clark HPA-6 compressor engines (Compressor Engines

6 and 7) in standby, reducing the hourly usage of each to 500 hours per year or less. A new blowdown vent and additional piping would also be installed. The new turbine would emit $NO_x$ emissions 9 parts per million by volume dry at 15 percent oxygen at 50 percent or greater load capacity. If operating at 40 percent of its rated load capacity, which may occur periodically, the $NO_x$ emissions would be 20 parts per million by volume dry at 15 percent oxygen or less; therefore, maximum $NO_x$ emissions would occur when operating at 40 percent of its rated load capacity. All other emission rates would be highest at 100 percent of its load capacity.

Table 4.9.4-1 estimates the potential annual emissions at the modified Slaughters Compressor Station as well as new emissions from the Henderson Lateral and associated facilities. These emissions are based on manufacturers' data; USEPA AP-42 and other emission factor data (USEPA 1995b); engineering calculations; GHG emission methodology found in 40 CFR 98; Texas Gas' commitment to abandon in place one existing turbine and limit two existing turbines to 500 operating hours per year; and the assumption that the remaining existing and proposed Project sources at the Slaughters Compressor Station would operate as previously permitted.

Compressor unit blowdowns (gas venting) can occur during initial construction and testing, operational startup and shut-down, maintenance activities, and during emergency purposes. Texas Gas estimates 12 blowdowns per year would occur during operations of the Slaughters Compressor Station; emissions are quantified in table 4.9.4-1. Texas Gas does not expect this Project to alter the blowdown frequencies or fugitive emissions at other Texas Gas facilities.

In addition to the new and modified compressor units, Texas Gas would install a combustion-powered gas heater at the existing M&R station. Texas Gas would also install at 450-gallon condensate tank at the AB Brown M&R Station.

Multiple commentors during scoping and in response to the draft EIS (including the USEPA and the Sierra Club) expressed concerns regarding emissions associated with fugitive releases of methane and other pollutants from the Project facilities. Further, the USEPA recommended in scoping comments that the EIS identify practicable energy efficiency measures and Project-specific best practices to reduce methane emissions during construction and operations. Texas Gas would implement measures to reduce fugitive emissions, including implementing operation and preventative maintenance practices consistent with manufacturer recommendations and by following any applicable requirements for leak detection monitoring as described in section 4.9.2.8. Texas Gas has stated its intent to use vent gas recovery equipment similar to that which they have used at other operating facilities to minimize potential emissions from small blowdowns.

| Table 4.9.4-1 Potential Operational Emissions for the Project (tons per year)[a] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Emission Source | NO$_x$ | SO$_2$ | CO | PM$_{10}$ | PM$_{2.5}$ | VOC | Total HAP | CO$_2$e |
| **Slaughters Compressor Station** | | | | | | | | |
| Turbine 4 Solar Centaur 50-6200LS | 11.89 | 0.11 | 14.17 | 1.53 | 1.53 | 1.22 | 0.14 | 27,251.00 |
| Fugitive Equipment Leaks – New Components | - | - | - | - | - | 0.03 | - | 79.00 |
| Turbine 4 Compressor Blowdowns | - | - | - | - | - | 0.07 | - | 173.00 |
| *Subtotal, New Sources* | *11.89* | *0.11* | *14.17* | *1.53* | *1.53* | *1.33* | *0.14* | *27,503.00* |
| Removed Compressor Engine 5 | -243.96 | -0.03 | -32.50 | -2.52 | -2.52 | -6.26 | -0.88 | -7,997.00 |
| Reduction in Emissions from Engine 6[b] | -230.03 | -0.03 | -30.65 | -2.38 | -2.38 | -5.90 | -0.83 | -7,541.00 |
| Reduction in Emissions from Engine 7[b] | -230.03 | -0.03 | -30.65 | -2.38 | -2.38 | -5.90 | -0.83 | -7,541.00 |
| *Subtotal, Modified Sources* | *-704.02* | *-0.09* | *-93.80* | *-7.28* | *-7.28* | *-18.06* | *-2.54* | *-23,079.00* |
| *Subtotal, All Slaughters Compressor Station Modifications* | *-692.13* | *0.02* | *-79.63* | *-5.75* | *-5.75* | *-16.73* | *-2.40* | *4,424.00* |
| Existing Equipment | 2,003.40 | 0.98 | 458.26 | 35.90 | 35.90 | 104.85 | 45.24 | 216,050.00 |
| **Total, Modified Slaughters Compressor Station** | **1,311.26** | **1.00** | **378.63** | **30.15** | **30.15** | **88.12** | **42.83** | **220,474.00** |
| **New Project Sources at the Henderson Lateral and Associated Facilities[c]** | | | | | | | | |
| **Existing Receipt M&R Station** | | | | | | | | |
| Gas Heater | 5.65 | 0.04 | 4.99 | 0.50 | 0.50 | 1.45 | 0.13 | 7,695.00 |
| Fugitive Equipment Leaks – New Components[d] | - | - | - | - | - | 0.04 | 0.04 | 105.61 |
| **AB Brown M&R Station** | | | | | | | | |
| Condensate Storage Tank | - | - | - | - | - | <0.01 | <0.01 | - |
| Pigging Activities | - | - | - | - | - | <0.01 | <0.01 | 4.76 |
| Fugitive Equipment Leaks – New Components[d] | - | - | - | - | - | 0.02 | 0.02 | 43.18 |
| **Robards Junction Tie-In Facility** | | | | | | | | |
| Fugitive Equipment Leaks – New Components[d] | - | - | - | - | - | 0.01 | 0.01 | 31.99 |
| Pigging Activities | - | - | - | - | - | <0.01 | <0.01 | 4.76 |

| Table 4.9.4-1 (continued)<br>Potential Operational Emissions for the Project (tons per year)[a] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Emission Source | NOx | SO2 | CO | PM10 | PM2.5 | VOC | Total HAP | CO2e |
| **Point of Demarcation Site** | | | | | | | | |
| Fugitive Equipment Leaks – New Components[d] | - | - | - | - | - | <0.01 | <0.01 | 3.70 |
| **Mainline Valve** | | | | | | | | |
| Fugitive Equipment Leaks – New Components[d] | - | - | - | - | - | 0.01 | 0.01 | 11.02 |
| *Subtotal, Henderson Lateral* | *5.65* | *0.04* | *4.99* | *0.50* | *0.50* | *1.54* | *0.21* | *7,900.02* |
| Total for Modified Slaughters Compressor Station (including existing sources) and Henderson Lateral | 1,316.91 | 1.04 | 383.62 | 30.65 | 30.65 | 89.66 | 43.05 | 228,374.02 |
| **Total for Project Modifications at Slaughters Compressor Station (excluding existing sources) and Henderson Lateral** | **-686.48** | **0.06** | **-74.64** | **-5.25** | **-5.25** | **-15.19** | **-2.19** | **12,324.02** |

[a]  Sum of columns may not add to total due to rounding.

[b]  The estimates for operational emissions are based on Texas Gas' operating hour limits, consistent with KYDEP air quality permit.

[c]  HAP emissions have been conservatively assumed to be equal to VOC emissions for Henderson Lateral sources except the Gas Heater at the existing Receipt M&R

[d]  The fugitive release estimates include emissions from valves and fittings associated with the proposed Henderson Lateral.

    In response to the draft EIS, the USEPA recommended that FERC conduct technical evaluations for each potential fugitive emissions source and recommended appropriate technologies for minimizing emissions. Texas Gas would implement emissions controls in accordance with permit requirements to minimize air quality impacts from the Project. These measures include using natural gas as the fuel for all combustion devices; using dry low NOx combustion technology to control NOx and CO emissions from the new turbine, and by using an electric seal gas booster pump system which would maintain pressure at the seals when not operating which would reduce the number of blowdowns. Texas Gas has also stated that it implements inspection and maintenance programs to identify and repair leaks, and implements measures to reduce blowdown emissions. Further, as discussed in section 4.9.2.8, Texas Gas participates in the Natural Gas STAR program. As part of this program, Texas Gas would report annual pipeline and aboveground facility methane releases, conduct leak surveys at its facilities as needed, and implement certain recommended technologies on Project sources to reduce fugitive releases.

JA204

#### 4.9.4.1 Non-Jurisdictional Facilities

Natural gas delivered by the Project to CenterPoint's AB Brown Power Plant would provide fuel for two new natural gas turbines (460 MW) which, in combination with the addition of solar and wind energy generation, would allow the removal of two power plant boilers which currently generate electricity using a coal-fired energy generation process. CenterPoint's facility changes would have a beneficial effect on air quality during operation by reducing the emissions associated with power plant operations due to the retirement of existing, coal-fired generation units. As noted in Section 1.4, Texas Gas states that CenterPoint plans to submit a permit application for modification of the existing air permit for the facility, which would quantify the projected change in criteria pollutant emissions as applicable; however, emissions estimates from CenterPoint's permit were not available at the time of final EIS publication. However, for informational purposes, we provide in table 4.9.4-2 an estimate of the approximate net change in emissions of criteria pollutants, HAPs, and $CO_2e$ from operation of the CenterPoint facilities based on available operating emissions and standard emissions factors. This estimate is based on controlled potential emissions for the existing sources, as well as uncontrolled potential emissions for the new natural gas turbines operating at full-load, and assumes no GHG emissions from other replacement sources of energy generation associated with the AB Brown Power Plant.

In comments on the draft EIS, the USEPA recommended that emissions from the new gas turbines proposed at the AB Brown Power Plant be included with the emissions estimates for the proposed Project provided in table 4.9.4-1, as well as construction emissions presented in table 4.9.3-1. While the modifications at the AB Brown Power Plant are not subject to FERC review and approval, a cumulative impacts assessment that considers concurrent construction and operation of the Project facilities with the AB Brown Power Plant is included in section 4.12 of this EIS.

We also received comments on the draft EIS (including from the CAC and Sierra Club) recommending that Texas Gas not receive "credit" for emissions reductions associated with the retirement of CenterPoint's facilities. Commentors further stated that CenterPoint's retirement of the coal-fired generation units is not causally related to or dependent upon the Project, and that inclusion of this analysis caused the draft EIS to rely on the wrong baseline for emissions estimates. The estimate in table 4.9.4-2 is included to provide context for the emissions associated with the proposed Project given the expected modifications to CenterPoint's non-jurisdictional AB Brown Power Plant and is not used to determine Project impacts or establish a baseline for comparison with proposed Project emissions. However, modifications to the AB Brown Power Plant are outside the Commission's jurisdiction and are subject to separate authorizations (including for any new emissions sources, as applicable). As stated in section 3.2, CenterPoint plans to retire the existing coal-powered boiler units, and Texas Gas has stated that CenterPoint would likely continue to produce electricity by other means of fossil-fuel generation if the proposed Project were not constructed, which could result in higher emissions of certain types, as well as other environmental impacts. However, the specific sources of energy replacement have not been identified as it was determined that natural gas was the better option to provide a source of reliable back-up power generation, as approved by the IURC. The proposed Project would support CenterPoint's 2020 IRP by providing the reliability of intermittent natural gas service to support renewable resources and the diversity of generation resources. On June 28, 2022, the IURC issued

an order granting a certificate of public convenience and necessity to CenterPoint for construction of its proposed natural gas combustion turbines.

<table>
<tr><td colspan="9" align="center"><strong>Table 4.9.4-2<br>Potential Net Change in Emissions from the CenterPoint Facilities after the Proposed Modifications (tons per year)</strong></td></tr>
<tr><td><strong>Emissions Source</strong></td><td><strong>NOx</strong></td><td><strong>SO2</strong></td><td><strong>CO</strong></td><td><strong>PM10</strong></td><td><strong>PM2.5</strong></td><td><strong>VOC</strong></td><td><strong>Total HAP</strong></td><td><strong>CO2e</strong></td></tr>
<tr><td>Existing Coal Boiler Unit 1[a]</td><td>-827.16</td><td>-7,619.93</td><td>-908.26</td><td>-27.67</td><td>-7.22</td><td>-59.47</td><td>-58.91</td><td>-2,286,329</td></tr>
<tr><td>Existing Coal Boiler Unit 2[a]</td><td>-906.66</td><td>-7,656.24</td><td>-912.59</td><td>-111.22</td><td>-29.01</td><td>-59.75</td><td>-59.20</td><td>-2,297,225</td></tr>
<tr><td><strong>Total Emissions from Units 1 and 2[b]</strong></td><td><strong>-1,733.82</strong></td><td><strong>15,276.17</strong></td><td><strong>-1,820.85</strong></td><td><strong>-138.89</strong></td><td><strong>-36.23</strong></td><td><strong>-119.22</strong></td><td><strong>-118.11</strong></td><td>-4,583,554</td></tr>
<tr><td>New Natural Gas Turbines[c]</td><td>2,123.00</td><td>68.54</td><td>321.67</td><td>141.53</td><td>141.53</td><td>45.03</td><td>45.03</td><td>2,507,951</td></tr>
<tr><td><strong>Potential Net Change in Emissions</strong></td><td>389.18</td><td>-15,207.63</td><td>-1,499.18</td><td>2.64</td><td>105.30</td><td>-74.19</td><td>-73.08</td><td>-2,075,603</td></tr>
</table>

[a] Based on controlled potential emissions obtained from the Significant Permit Modification No.: 129-44601-00010 public notice 20220210 package as posted online by the IDEM. All estimates above are for general informational purposes only and do not contradict any determination made by the IDEM. Consult the IDEM Permit Renewal for specific emissions determinations, limits, and permitting requirements. $CO_2e$ emissions were not included in the draft permit package and were provided by Texas Gas. $CO_2e$ emissions are available for public review on eLibrary under accession no. 20220322-5179.

[b] For reference, emission inventory data for the full AB Brown Power Plant site in 2019, the most recent year available on the IDEM website found at: https://www.in.gov/idem/airquality/reporting/emissions-summary-data/, shows 2,422.27 tpy $NO_x$, 3,958.75 tpy $SO_2$, 315.27 tpy CO, 158.71 tpy $PM_{10}$, 80.02 tpy $PM_{2.5}$, and 36.62 tpy VOC. GHG emissions for 2020, which is the most recent year available from USEPA's FLIGHT tool found at: http://ghgdata.epa.gov/ghgp were 2,386,473 metric tons for the site, or 2,630,609.19 tons. GHG emissions for the coal boiler units in 2020, combined, were 2,371,964.40 metric tons, or 2,614,616.36 tons, from Emissions by Unit and Fuel Type found at: https://www.epa.gov/ghgreporting/data-sets.

[c] Criteria pollutant emissions calculated based upon factors found in AP-42 Chapter 3.1. $NO_x$ and CO lean-premix emission factors used based on dry low $NO_x$ control as shown in the 2020 IRP. $PM_{10/2.5}$ conservatively assumed to equal total PM. Assumes all VOC emissions are classified as HAPs. $CO_2e$ emissions were provided by Texas Gas and are available for public review on eLibrary under accession no. 20220322-5179. Turbine use was conservatively assumed to occur 8,760 hours per year and is based on the heat input capacity provided under accession no. 20220322-5179; no emissions controls are included in the assessment and actual operations would be subject to permit conditions.

Further, table 4.9.4-2 presents potential emissions from operation of the existing coal-powered units and replacement gas-fired units; however, actual emissions from 2020 were about 52 percent of potential emissions for the existing coal-powered units. Therefore, the reduction in actual emissions associated with CenterPoint's planned retirement of the coal-powered units may be lower. Also, the new natural gas-fired turbines at the AB Brown Power Plant that would receive natural gas transported by the Project are only projected to be operational between 2 and 7 percent of available hours per year; other renewable energy sources would also provide electricity after abandonment of the coal-powered units. Therefore, the actual emissions reductions during foreseeable future operation of CenterPoint's modified AB Brown Power Plant would depend upon actual energy use and the frequency with which the natural gas turbines would operate.

JA206

#### 4.9.4.2    Downstream Emissions

When emissions are calculated based upon the combustion of the upper-bound Project capacity of 220,000 Dth/day of gas transported by the Project under full-load operating conditions, as opposed to emissions resulting from the operation of the site equipment presented in table 4.9.4-2, it is estimated that the combustion would emit 4.3 million metric tons of $CO_2e$ annually.

However, natural gas delivered by the Project to the AB Brown Power Plant would be associated with conversion of two coal-fired boilers at the AB Brown Power Plant, along with two coal-fired boilers at other facilities with a total capacity of 730 MW, to generating electricity using solar generation (700 to 1,000 MW), wind generation (300 MW), and two natural gas-fired turbines (460 MW). The natural gas-fired turbines would be used as back-up generation capacity to support renewable energy sources. Overall, this would have a beneficial effect on air quality during operation of the modified non-jurisdictional AB Brown Power Plant. According to Texas Gas, and based on CenterPoint's 2020 IRP,[59] the fuel switch from coal to natural gas and renewables would result in a projected net GHG emissions reduction of 7.2 million tons (6.5 million metric tons) of $CO_2e$ annually when compared against the pre-Project emissions baseline; that estimate includes planned changes across CenterPoint's system, and is not limited to proposed modifications at the AB Brown Power Plant. When lifecycle emissions are included, as assessed in CenterPoint's 2020 IRP, the planned changes across CenterPoint's system could reduce $CO_2e$ emissions by about 4 million tons (3.6 million metric tons) annually.

### 4.9.5    Air Quality Modeling

Texas Gas completed air quality dispersion modeling to determine the impacts of emissions from the proposed modifications to the Slaughters Compressor Station on regional air quality. The analyses were conducted using the USEPA, AERMOD model version 21112 using AERMOD-ready meteorological datasets obtained from the Kentucky Division of Air Quality. Texas Gas performed two analyses: one assumed that the new turbine would be running at full capacity, thus, the model estimated the maximum predicted concentrations of criteria pollutants emitted from the new turbine using conservative assumptions, and another model run assumed that the turbine would be running at 40 percent load conditions, which is expected to produce maximum $NO_x$ emissions (actual emissions would be lower). Both model runs resulted in equivalent impacts. Background concentrations from the nearest air monitors were then added to the maximum predicted concentrations from the model and the total was compared to the NAAQS. The model results are provided in table 4.9.5-1.

---

[59] CenterPoint's 2020 IRP, Volume I at P258 – 259, Available online at: https://midwest.centerpointenergy.com/irp.

**Table 4.9.5-1**

**Predicted Air Quality Impacts of the Modified Slaughters Compressor Station ($\mu g/m^3$)**

| Pollutant | Averaging Period | Existing Ambient Background Concentration ($\mu g/m^3$)[a] | Maximum Modeled Concentration ($\mu g/m^3$)[b] | Combined Background and Maximum Modeled ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|
| $NO_2$[c] | 1-hour | -- | 155.9 | 155.9 | 188 |
| | annual | -- | 46.3 | 46.3 | 100 |
| CO | 1-hour | 605.7 | 364.7 | 970.4 | 40,000 |
| | 8-hour | 300 | 270 | 570 | 10,000 |
| $PM_{10}$ | 24-Hour | 27.33 | 10.3 | 37.63 | 150 |
| $PM_{2.5}$ | 24-hour | 19.75 | 6.8 | 26.55 | 35 |
| | annual | 8.45 | 1.09 | 9.54 | 12 |
| $SO_2$ | 1-Hour | 54.88 | 0.41 | 55.29 | 196.5 |
| | 24-Hour | 11.21 | 0.22 | 11.43 | 365 |
| | Annual | 1.65 | 0.02 | 1.67 | 80 |

$\mu g/m^3$ = micrograms per cubic meter

[a] Background concentrations for CO obtained from Mammoth Cave National Park, KY monitor ID 21-061-0501; $NO_2$ and $SO_2$ from Owensboro, KY monitor ID 21-059-0005; $PM_{2.5}$ from Hopkinsville, KY monitor ID 21-047-0006; $PM_{10}$ from Evansville, IN monitor ID 18-163-0021. $NO_2$ modeled concentration includes seasonal and hourly ambient background values.

[b] Based on maximum emission rates for all modeled sources.

[c] AERMOD Tier 2 (ARM2 method to calculate $NO_x$ to $NO_2$ conversion) was assumed for the modeling.

The results in table 4.9.5-1 indicate that the combined total of existing background and maximum modeled concentrations for the site post modification are less than the applicable NAAQS for all pollutants for the modified Slaughters Compressor Station at all points outside the fenceline boundary. Therefore, the Project would not cause or significantly contribute to a degradation of ambient air quality for nearby populations. Based on the estimated emissions from operation of the proposed Project facilities and review of the modeling analyses, we find that the Project would not cause or contribute to a violation of the NAAQS. While the Project would have minor impacts on local air quality during operation, we have determined that the Project would not result in significant impacts on air quality.

### 4.9.5.1 Impacts on Human Health

We received scoping comments and comments in response to the draft EIS from the USEPA, Sierra Club, and individuals concerned with air quality in the vicinity of the Project and the health effects associated with Project-related emissions. Comments on the draft EIS identified concerns related to existing pollution sources in the Project vicinity, the frequency of high ozone days in the Project vicinity, and the potential for higher temperatures associated with climate change to result in a higher rate of conversion of nitrous oxides to ozone. Generally, natural gas is composed of about 90 percent methane. When combusted, methane forms $CO_2$ and water vapor, comprising the majority of compressor station emissions. The $CO_2$ emissions, combustion-related emissions, including $NO_x$ and CO, and the emissions associated with the majority of the remaining 10 percent of natural gas composition are shown in table 4.9.3-1. With the exception of $CO_2e$ (as defined above), all of the compounds identified in table 4.9.3-1 have known health impacts, and

JA208

are therefore regulated by the USEPA through various components of the CAA.  As described above, under the CAA, the USEPA established the NAAQS to protect human health and to be protective of human health and public welfare, including sensitive populations such as infants, children, pregnant women, the elderly, and those with compromised respiratory function, e.g., asthmatics.  The air quality modeling completed by Texas Gas indicates that the modified compressor station would not result in emissions that exceed the NAAQS or significantly contribute to a degradation of ambient air quality, including for the reactants that form ozone (modeling results shown in table 4.9.5-1).  The air quality model evaluates pollutant concentrations from the facility fenceline to a 5-kilometer (3.1-mile) radius from the emissions source, where impacts from the Project are no longer expected to be measurable, and accounts for existing pollution in the Project vicinity via the inclusion of ambient pollutant levels.  Lastly, in order to ensure compliance with the CAA, Texas Gas must obtain an air quality permit through KYDEP, as described above.  Based on our analysis above, we conclude that construction and operation of the Project would not have a significant impact on air quality or human health.

## 4.9.6    Climate Change

We received multiple comments on the draft EIS expressing concerns regarding GHG emissions and climate change effects resulting from the Project (such as damage to wildlife, flooding, and crop damage that could be exacerbated by climate change, as well as economic and health impacts of climate change), including recommendations that FERC deny the Certificate. As stated in section 1.1 of this EIS, the FERC Commission (not environmental staff) ultimately determines whether interstate natural gas transportation facilities are in the public convenience and necessity and, if so, grants a Certificate to construct and operate them.  The Commission bases its decisions on economic issues (including need) and environmental impacts, typically presented by staff in an environmental document such as an EIS.  Commentors also contend that a full environmental review, including the Project's contribution to climate change and quantified GHG emissions resulting from the Project, be included in the EIS.  This section describes the reasonably foreseeable potential for the Project to contribute to climate change.

Climate change is the variation in the Earth's climate (including temperature, precipitation, humidity, wind, and other meteorological variables) over time.  Climate change is driven by accumulation of GHGs in the atmosphere due to the increased consumption of fossil fuels (e.g., coal, petroleum, and natural gas) since the early beginnings of the industrial age and accelerating in the mid- to late-20th century.[60]  The GHGs produced by fossil-fuel combustion are $CO_2$, methane, and nitrous oxide.

---

[60] Intergovernmental Panel on Climate Change, United Nations, *Summary for Policymakers* of Climate Change 2021: The Physical Science Basis.  (Valerie Masson-Delmotte et al., eds.) (2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM.pdf (IPCC Report) at SPM-5.  Other forces contribute to climate change, such as agriculture, forest clearing, and other anthropogenically driven sources.

In 2017 and 2018, the U.S. Global Change Research Program (USGCRP)[61] issued its *Climate Science Special Report: Fourth National Climate Assessment*, Volumes I and II.[62] This report and the recently released report by the Intergovernmental Panel on Climate Change, Climate Change 2021: The Physical Science Basis, state that climate change has resulted in a wide range of impacts across every region of the country and the globe. Those impacts extend beyond atmospheric climate change alone and include changes to water resources, agriculture, ecosystems, human health, and ocean systems.[63] According to the Fourth Assessment Report, the United States and the world are warming; global sea level is rising and oceans are acidifying; and certain weather events are becoming more frequent and more severe.[64] These impacts have accelerated throughout the end of the 20th and into the 21st century.[65]

GHG emissions do not result in proportional local and immediate impacts; it is the combined concentration in the atmosphere that affects the global climate. These are fundamentally global impacts that feed back to local and regional climate change impacts. Thus, the geographic scope for cumulative analysis of GHG emissions is global rather than local or regional. For example, a project 1 mile away emitting 1 ton of GHGs would contribute to climate change in a similar manner as a project 2,000 miles distant also emitting 1 ton of GHGs.

Climate change is a global phenomenon; however, for this analysis, we will focus on the existing and potential cumulative climate change impacts in the Project area. The USEPA recommended that the EIS include an assessment of climate change impacts on the Project area. The USGCRP's Fourth Assessment Report notes the following observations of environmental impacts are attributed to climate change in the Southeast region of the United States (which includes the Project area in Kentucky, where the majority of the Project is proposed):[66]

- The decade of 2010 through 2017 has been warmer than any previous decade since 1920 for average daily maximum and average daily minimum temperature.

- Since 1960, there have been lower numbers of days above 95 °F compared to the pre-1960 period but during the 2010s the number of nights above 75 °F has been nearly

---

[61] The U.S. Global Change Research Program is the leading U.S. scientific body on climate change. It comprises representatives from 13 federal departments and agencies and issues reports every 4 years that describe the state of the science relating to climate change and the effects of climate change on different regions of the United States and on various societal and environmental sectors, such as water resources, agriculture, energy use, and human health.

[62] U.S. Global Change Research Program, Climate Science Special Report, Fourth National Climate Assessment | Volume I (Donald J. Wuebbles et al. eds) (2017), https://science2017.globalchange.gov/downloads/CSSR2017_FullReport.pdf (USGCRP Report Volume I); U.S. Global Change Research Program, Fourth National Climate Assessment, Volume II Impacts, Risks, And Adaptation In The United States (David Reidmiller et al. eds.) (2018), https://nca2018.globalchange.gov/downloads/NCA4_2018_FullReport.pdf (USGCRP Report Volume II).

[63] IPCC Report at SPM-5 to SPM-10.

[64] USGCRP Report Volume II at 73-75.

[65] *See, e.g.,* USGCRP Report Volume II at 99 (describing accelerating flooding rates in Atlantic and Gulf Coast cities).

[66] USGCRP Report Volume I and II.

double the average over 1901 – 1960.  The length of the freeze free season was 1.5 weeks longer on average in the 2010s compared to any other historical period on record.

- The number of days with 3 or more inches of rain has been historically high over the past 25 years.  The 1990s, 2000s and 2010s rank first, third and second, respectively in number of events.

- Summers have been either increasingly dry or extremely wet, depending on location.

The USGCRP's Fourth Assessment Report[67] notes the following projections of climate change impacts in the Southeast United States with a high or very high level of confidence:[68]

- Climate models project nighttime temperatures above 75 °F and daytime maximum temperatures above 95 °F become the summer norm.  Nights above 80 °F and days above 100 °F, which are now relatively rare, would become common.

- Lowland coastal areas are expected to receive less rainfall on average, but experience more frequent intense rainfall events followed by longer drought periods.

- Drought and sea level rise will create stressful conditions for coastal trees that are not adapted to higher salinity levels.

- Other coastal species may also be stressed by sea level rise and warmer temperatures, prompting migration out of the area.

- Tropical storms and hurricanes may become more intense.

The USGCRP's Fourth Assessment Report notes that the following observations of environmental impacts are attributed to climate change in the Midwest region (which includes the Project area in Indiana):[69]

- Increases in warm-season absolute humidity and precipitation have eroded soils, created favorable conditions for pests and pathogens, and degraded the quality of stored grain.

- Threats from a changing climate are interacting with existing stressors such as invasive species and pests to increase tree mortality and reduce forest productivity.

---

[67] USGCRP Report Volume II.

[68] The report authors assessed current scientific understanding of climate change based on available scientific literature.  Each "Key Finding" listed in the report is accompanied by a confidence statement indicating the consistency of evidence or the consistency of model projections.  A high level of confidence results from "moderate evidence (several sources, some consistency, methods vary and/or documentation limited, etc.), medium consensus." A *very* high level of confidence results from "strong evidence (established theory, multiple sources, consistent results, well documented and accepted methods, etc.), high consensus." https://science2017.globalchange.gov/chapter/front-matter-guide/

[69] USGCRP Report Volume I and II.

- Stormwater management systems, transportation networks, and other critical infrastructure are already experiencing impacts from changing precipitation patterns and elevated flood risks.

- At-risk communities in the Midwest are becoming more vulnerable to climate change impacts such as flooding, drought, and increases in urban heat islands and tribal nations are especially vulnerable because of their reliance on threatened natural resources for their cultural, subsistence, and economic needs.

The USGCRP's Fourth Assessment Report notes the following projections of climate change impacts in the Midwest with a high or very high level of confidence:[70]

- Projected changes in precipitation, coupled with rising extreme temperatures before mid-century, will reduce Midwest agricultural productivity to levels of the 1980s without major technological advances.

- Impacts will result in the loss of economically and culturally important tree species, such as paper birch and black ash, and are expected to lead to the conversion of some forests to other forest types or even to non-forested ecosystems by the end of the century.

- Climate change is expected to worsen existing conditions and introduce new health threats by increasing the frequency and intensity of poor air quality days, extreme high temperature events, and heavy rainfalls; extending pollen seasons; and modifying the distribution of disease-carrying pests and insects.

- The annual cost of adapting urban stormwater systems to more frequent and severe storms is projected to exceed $500 million for the Midwest by the end of the century.

It should be noted that while the impacts described above taken individually may be manageable for certain communities, the impacts of compound events (such as simultaneous heat and drought, wildfires associated with hot and dry conditions, or flooding associated with high precipitation on top of saturated soils) can be greater than the sum of the parts.[71] The USEPA expressed concern regarding the climate resiliency of pipeline infrastructure, given the projected regional impacts of climate change, which is discussed in section 4.11.2.

The GHG emissions associated with construction and operation of the Project were identified and quantified in sections 4.9.3 and 4.9.4 of the EIS. Emissions of GHGs are typically expressed in terms of $CO_2e$.[72] Construction of the Project may result in emissions of up to about

---

[70] USGCRP Report Volume II.

[71] USGCRP Report Volume II.

[72] GHG gases are converted to $CO_2e$ by means of the GWP; the measure of a particular GHG's ability to absorb solar radiation; and its residence time within the atmosphere, consistent with the USEPA's established method for reporting GHG emissions for air permitting requirements that allows a consistent comparison with federal regulatory requirements.

9,385.2 metric tons of $CO_2e$.[73]  Operation and downstream emissions based upon the combustion of all potential natural gas throughput would result in emissions of up to 4.3 million metric tpy of $CO_2e$.  Alternatively, operation of the new emission sources and downstream emissions from combustion of natural gas transported by the Project based upon the equipment specifications and potential emissions presented in table 4.9.4-2, above, would result in estimated emissions of up to 2.3 million metric tpy of $CO_2e$.[74]  The estimate for operational emissions are based on Texas Gas' operating hour limits, consistent with KYDEP air quality permit.  Texas Gas commits to limit operations of two existing compressor units to 500 hours per year.  The estimate includes blowdowns and fugitive emissions from proposed compressor station equipment and piping, as well as fugitive emissions from the pipeline, valves, and ancillary facilities.  However, this estimate does not account for emissions reductions associated with the conversion of the AB Brown Power Plant.

Construction and operation of the Project would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts.  To assess impacts on climate change associated with the Project, Commission staff considered whether it could identify discrete physical impacts resulting from the Project's GHG emissions or compare the Project's GHG emissions to established targets designed to combat climate change.

The Sierra Club and CAC both commented that FERC must evaluate the significance of the GHG emissions associated with the Project.  To date, Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs.  Without the ability to determine discrete resource impacts, Commission staff are unable to assess the Project's contribution to climate change through any objective analysis of physical impact attributable to the Project.  Additionally, Commission staff have not been able to find an established threshold for determining the Project's significance when compared to established GHG reduction targets at the state or federal level.  Ultimately, this EIS is not characterizing the Project's GHG emissions as significant or insignificant because the Commission is conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations going forward.[75]  However, as we have done in prior NEPA analyses, we disclose the Project's GHG emissions in comparison to national and state GHG emission inventories.  In comments on the draft EIS, Mr. Rosenquist stated that delays in the Commission's generic proceeding have allowed environmental harm by delaying potential requirements for methane emission controls that could be imposed on the natural gas industry.  The Sierra Club and CAC issued similar comments on the draft EIS; the Sierra Club also commented that the EIS should explain whether and how the emissions influenced the Public Convenience and Necessity determination for the Project.  In addition, commentors recommended

---

[73] See table 4.9.3-1.  Figures presented here are converted from U.S. tons to metric tons.  A metric ton is about equal to 1.1 ton.

[74] See table 4.9.4-1 and 4.9.4-2.  Figures presented here are converted from U.S. tons to metric tons.  A metric ton is about equal to 1.1 ton.  The range in potential emissions associated with downstream emissions results from the difference between the maximum natural gas transportation capacity of the pipeline and the total, maximum heat input design capacity identified for CenterPoint's facilities.

[75] *Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022); 178 FERC ¶ 61,197 (2022).

that issuance of the EIS should be delayed until the generic proceeding has concluded, and the Commission has issued a new policy regarding GHG emissions.

Emissions from operation of the Project, including methane emissions from fugitive releases would be subject to emissions controls in accordance with applicable regulations (see section 4.9.2, above). The status of the Commission's proceeding, which has included public involvement and stakeholder outreach, is outside the scope of this EIS. Further, the EIS does not represent the Commission's decision document or determination regarding whether the Project is in the Public Convenience and Necessity. The Commission decision, in its Order, would review the need for Texas Gas' proposed Project.

In order to provide context of the Project emissions on a national level, we compare the Project's GHG emissions to the total GHG emissions of the United States as a whole. At a national level, 5,222.4 million metric tons of $CO_2e$ were emitted in 2020 (inclusive of $CO_2e$ sources and sinks) (USEPA 2022). Construction emissions from the Project could potentially increase $CO_2e$ emissions based on the national 2020 levels by 0.0002 percent; in subsequent years, the Project operations based on the combustion of the maximum natural gas throughput could potentially increase emissions by 0.08 percent based on the national 2020 levels. Project operations including downstream emissions based upon the use of two turbines as proposed by CenterPoint could potentially increase emissions nationally by 0.04 percent.

In order to provide context of the Project emissions on a state level, we compare the Project's GHG emissions to the Kentucky and Indiana GHG inventories. At the state level, Kentucky energy related $CO_2$ emissions in 2019 were 115.4 million metric tons, while Indiana's emissions in 2019 were 176.1 million metric tons (EIA 2022a, b). Because Project emissions estimates were not presented on a state-by-state basis, we cannot determine the amount of emissions to attribute to each state. If all emissions from the Project were to occur in Kentucky, Project construction could potentially increase $CO_2e$ emissions based on the Kentucky 2019 levels by 0.008 percent; in subsequent years, Project operations could potentially increase emissions by 0.01 percent. If all emissions from the Project were to occur in Indiana, Project construction could potentially increase $CO_2e$ emissions based on the Indiana 2019 levels by 0.005 percent; in subsequent years, Project operations could potentially increase emissions by 0.006 percent. Downstream combustion of gas transported by the Project in Indiana (i.e., at the AB Brown Power Plant) along with operations could potentially increase emissions in Indiana by 2.4 percent based on 2019 levels, when it is assumed that the maximum daily proposed throughput is burned at all times.

However, retirement of coal-fired generation at the AB Brown Power Plant based on their potential to emit combined with new natural gas turbine generation presented in table 4.9.4-2 could potentially reduce emissions in Indiana by 1.1 percent based on 2019 levels. According to a high-level estimate in CenterPoint's 2020 IRP, $CO_2$ emissions across CenterPoint's planned system changes (including modifications at the AB Brown Power Plant and other facilities) could reduce actual and lifecycle annual $CO_2e$ emissions by about 7.2 million tons (6.5 million metric tons) and 4 million tons (3.6 million metric tons), respectively, or about 3.7and 2.0 percent of emissions in Indiana based on 2019 levels. As described in section 4.9.4.1, the CAC and Sierra Club recommended that Texas Gas not receive "credit" for emissions reductions associated with the retirement of CenterPoint's facilities, and that the above analysis be removed from the EIS.

JA214

Emissions reductions associated with CenterPoint's 2020 IRP are not the direct cause of the Henderson County Expansion Project and are provided only for informational purposes.

We also typically compare a project's operational emissions in the context of state GHG reduction goals. However, currently, neither Kentucky nor Indiana have set statewide goals for GHG emissions reduction targets.[76]

The USEPA, Sierra Club, CAC, and an individual submitted scoping comments that the EIS should estimate and analyze all potential upstream and downstream GHG emissions associated with the proposed Project. The USEPA reaffirmed this suggestion in comments on the draft EIS, as did the Sierra Club and CAC. In response to the draft EIS, several individuals requested that the EIS address lifetime GHG emissions associated with the proposed Project, and Mr. Rosenquist expressed concerns regarding fugitive emissions and natural gas leaks associated with oil and gas production and delivery. In addition, the CAC and Sierra Club commented during the scoping period that emissions reductions from retirement of coal generating units at the AB Brown Power Plant should not be considered for the Project.

Above, we discuss the Project's potential downstream emissions, which are quantified separately, in addition to considerations of emissions reductions associated with the AB Brown Power Plant and other changes planned across CenterPoint's system as documented in CenterPoint's 2020 IRP. Related to comments on upstream emissions impacts, the specific sources of natural gas to be transported by the Project are unknown and would likely change throughout the Project's operational lifetime. Because the source of the gas is unknown and may change throughout the life of the Project, the environmental impacts and regulatory oversight of upstream natural gas production, including hydraulic fracturing activities, are outside the scope of this EIS.

In response to the draft EIS, the USEPA recommended that the EIS provide a rough estimate of upstream GHG emissions based on emissions data in the USEPA's GHG Inventory. The USEPA provides an upper-bound estimate of 0.42 million metric tons of $CO_2$ and 0.01 million metric tons of methane emissions would be associated with Project operations. The USEPA also recommended that FERC staff consider present sources of upstream natural gas supply by analyzing the present gas supply from Texas Gas to the AB Brown Generating Station and assessing demand responses in various related markets that would result from the Project. The USEPA also recommended that FERC assess upstream and downstream emissions in a manner that accounts for market-induced changes in the amount of natural gas used for winter heating, as well as the net change in the number of wells and their associated emissions. The Sierra Club and CAC provided similar comments on the draft EIS. As the Commission has previously concluded in numerous natural gas infrastructure proceedings, the environmental effects resulting from natural gas production are likely neither caused by a proposed project nor are they reasonably foreseeable consequences of its approval of a project, as contemplated by CEQ regulations.[77] Changes in downstream natural gas use beyond that which is transported by the Project are also

---

[76] We reviewed the U.S. State Greenhouse Emission Targets site for individual state requirements at: https://www.c2es.org/document/greenhouse-gas-emissions-targets/.

[77] *Birckhead*, 925 F.3d at 516-17. *See, e.g., Double E Pipeline, LLC*, 173 FERC 61,074 at P 97 (2020), *Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33 – 49 (2012), *petition for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 F. App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion).

likely not causally related or reasonably foreseeable consequences of the Commission's approval of a Project. To date, the Commission has not found upstream emissions to be an effect of any proposed project, primarily because of the following unknown factors: the location of the supply source; whether transported gas would come from new or existing production; and whether there would be any potential associated development activities, and if so, its location.[78] However, the Commission is conducting a generic proceeding to determine whether and how the Commission will consider upstream emissions going forward.[79] The CAC also stated that the pending status of the Commission's generic proceeding is not justification for failing to quantify upstream GHG emissions in the draft EIS. This EIS was developed in accordance with applicable NEPA regulations and current Commission policy and guidance. Fugitive emissions associated with operating the Project's facilities are described in section 4.9.4, above.

Texas Gas recommended the EIS not use percentage comparisons between Project-level and national emissions to avoid overstating emissions. Conversely, the USEPA recommended that the EIS avoid percentage comparisons to avoid diminishing the significance of emissions in comments issued during the scoping period and in response to the draft EIS. The Commission has stated in recent orders that the comparisons provide additional context in considering a project's potential impact on climate change.[80] Accordingly, we have included those comparisons in our NEPA analysis.

The USEPA commented during the scoping period that the EIS should include a discussion of the Project's GHG emissions in the context of national GHG emission goals, considering the U.S. 2030 GHG reduction target, 2050 net-zero pathway, and end date of the Project's expected lifetime, and that the EIS should address any increasing conflict over time between continued emissions and national GHG emissions reduction goals, including ways to avoid or mitigate that conflict. The USEPA reiterated this comment in response to the draft EIS. We note that on January 20, 2021, President Biden issued the Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis (EO 13990); and on January 27, 2021, he issued the Executive Order on Tackling the Climate Crisis at Home and Abroad (EO 14008). Amongst other objectives, the EOs call for a net-zero emission economy and a carbon-free electricity sector. In addition, on January 20, 2021, President Biden announced that the United States will rejoin the Paris Climate Agreement (Agreement), enabling the United States to be a party to the Agreement on February 19, 2021. The Agreement aims to limit global warming to well below 2 degrees Celsius, and preferably to 1.5 degrees Celsius, compared to preindustrial levels (UNFCCC 2021).[81] On April 20, 2021, the United States set a U.S. economy-wide target of reducing net GHG emissions by 50 to 52 percent below 2005 levels by 2030 (The United States

---

[78] *See also Birckhead*, 925 F.3d at 517 (finding the Commission appropriately did not consider upstream emissions a project effect because the record did not contain any information establishing a causal relationship between the proposed project and upstream development).

[79] *Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022); 178 FERC ¶ 61,197 (2022).

[80] *See* Order Issuing Certificates and Approving Abandonment, 178 FERC ¶ 61,199 (2022) at P89; and Order Issuing Certificate, 178 FERC ¶ 61,198 (2022) at P48.

[81] United Nations Framework Convention on Climate Change (UNFCCC). 2021. The Paris Agreement: What is the Paris Agreement? Available online at: https://unfccc.int/process-and-meetings/the-parisagreement/the-paris-agreement. Accessed October 2021.

of America Nationally Determined Contribution 2021).[82]  In November 2021, the U.S. Department of State published The Long-Term Strategy of the United States: Pathways to Net-Zero Greenhouse Gas Emissions by 2050, which identifies a pathway to meet these targets.[83]  The Commission has stated in recent orders that it is unable to determine how individual projects will affect international, national, or statewide GHG emissions reduction targets or whether a project's GHG emissions comply with those goals or laws.[84]

The USEPA, Sierra Club, and CAC filed comments during the scoping period that the EIS should use the social cost of GHGs (also referred to as the "social cost of carbon" [SCC]) to assess climate impacts generated by each additional ton of GHGs emitted or saved by the Project.  In response to the draft EIS, the Sierra Club and CAC reiterated these comments and stated that the SCC or some other method should be used to determine the significance of Project emissions.  The USEPA recommended that the SCC estimate include upstream emissions; however, upstream emissions are outside the scope of this EIS, as described above.  Alternatively, Texas Gas submitted comments on the draft EIS recommending that the EIS should note that the SCC analysis does not show the benefits associated with fossil-fuel use, that the tool was not designed for the evaluation of individual projects, that the tool does not associate the particular GHG from the Project with specific effects, and that the SCC analysis in the EIS does not account for any emissions reductions associated with CenterPoint's planned retirement of coal-fired generation at the AB Brown Power Plant.

We note there is pending litigation challenging federal agencies' use of the Interagency Working Group (IWG) on Social Cost of Greenhouse Gases' interim values for calculating the social cost of GHGs.[85]  In addition, the CEQ noted that it is working with representatives on the GHG IWG to develop additional guidance regarding the application of the SCC tool in federal decision-making processes, including in NEPA analyses.[86]  The Commission has not determined which, if any, modifications are needed to render the SCC tool useful for project-level analyses.[87]  However, in response to the USEPA, Sierra Club, and CAC comments, we are disclosing an

---

[82] The United States of America Nationally Determined Contribution. 2021. Available online at: https://www4.unfccc.int/sites/ndcstaging/PublishedDocuments/United%20States%20of%20America%20First/United%20States%20NDC%20April%2021%202021%20Final.pdf. Accessed May 2021.

[83] The Long-Term Strategy of the United States: Pathways to Net-Zero Greenhouse Gas Emissions by 2050.  2021. Published by the United States Department of State and the United States Executive Office of the President, Washington D.C. November 2021.  Available online at:  https://www.whitehouse.gov/wp-content/uploads/2021/10/US-Long-Term-Strategy.pdf

[84] See Order Issuing Certificates and Approving Abandonment, 178 FERC ¶ 61,199 (2022) at P89; and Order Issuing Certificate, 178 FERC ¶ 61,198 (2022) at P48.

[85] Missouri v. Biden, 8th Cir. No. 21-3013; Louisiana v. Biden, No. 21-cv-1074-JDC-KK (W.D. La).  On February 11, 2022, the U.S. District Court for the Western District of Louisiana issued a preliminary injunction limiting federal agencies' employment of estimates of the social costs of GHGs and use of the IWG's interim estimates.  On March 16, 2022, the U.S. Court of Appeals for the Fifth Circuit issued a stay of the district court's preliminary injunction, finding among other things that the federal agency defendants' continued use of the interim estimates was lawful.  Louisiana v. Biden, No. 22-30087 (5th Cir. Mar. 16, 2022).

[86] See Council on Environmental Quality's May 27, 2021 Comments filed in Docket No. PL18-1-000, at 2.

[87] See Order Issuing Certificates and Approving Abandonment, 178 FERC ¶ 61,199 (2022) at footnote 141.

estimate of the social cost of GHGs associated with construction and operation (direct and downstream emissions) of the Project using the calculations described below.

As both USEPA and CEQ participate in the IWG, Commission staff used the methods and values contained in the IWG's current draft guidance but note that different values will result from the use of other methods.[88] The downstream emissions estimate used to calculate the social cost of GHGs is based on combustion of the upper-bound Project capacity (220,000 Dth/day); however, the actual emissions associated with downstream use of natural gas transported by the Project would depend upon actual energy use and the frequency with which CenterPoint's natural gas turbines would operate. Accordingly, Commission staff calculated the social cost of carbon dioxide, nitrous oxide, and methane. For the analysis, staff assumed discount rates of 5 percent, 3 percent, and 2.5 percent,[89] assumed the Project will begin service in 2024 and that the Project's emissions will be at a constant rate throughout the life of the 20-year contract. Construction emissions are assumed to take place in 2023 and 2024 evenly. Noting these assumptions, the emissions from construction and operation of this Project and the downstream emissions is calculated to result in a total social cost of GHGs equal to $1,050,198,150, $4,028,217,341, and $6,111,229,782, respectively (all in 2020 dollars).[90] Using the 95th percentile of the social cost of GHGs using the 3 percent discount rate,[91] the total social cost of GHGs from the Project is calculated to be $12,247,770,730 (in 2020 dollars). This estimate does not account for any emissions reductions associated with CenterPoint's retirement of coal-fired power generation units.

In comments on the draft EIS, the USEPA commented that the emissions used to generate the estimate of the social cost of GHGs are unclear, and that the EIS should quantify emissions for each individual GHG (rather than presenting $CO_2e$ only) by year, and to clearly state gross and net emissions per year. Table 4.9.6-1 provides the individual (speciated) GHG emissions estimated for construction and operation of the Project, based on information provided by Texas Gas and described in sections 4.9.3 and 4.9.4, above, in tons per year and metric tonnes per year. The emissions used to quantify operational and downstream GHG from the Project (4.3 million metric tons per year) are based on operational emissions (see table 4.9.6-1) and the emissions from full-burn combustion of 220,000 dekatherms of natural gas that would be transported by the Project

---

[88] *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, February 2021 (IWG Interim Estimates Technical Support Document).

[89] IWG Interim Estimates Technical Support Document at 24. To quantify the potential damages associated with estimated emissions, the IWG methodology applies consumption discount rates to estimated emissions costs. The IWG's discount rates are a function of the rate of economic growth where higher growth scenarios lead to higher discount rates. For example, IWG's method includes the 2.5 percent discount rate to address the concern that interest rates are highly uncertain over time; the 3 percent value to be consistent with OMB circular A-4 (2003) and the real rate of return on 10-year Treasury Securities from the prior 30 years (1973 through 2002); and the 5 percent discount rate to represent the possibility that climate-related damages may be positively correlated with market returns. Thus, higher discount rates further discount future impacts based on estimated economic growth. Values based on lower discount rates are consistent with studies of discounting approaches relevant for intergenerational analysis. *Id.* at 18-19, 23-24.

[90] The IWG draft guidance identifies costs in 2020 dollars. *Id.* at 5 (Table ES-1).

[91] This value represents "higher-than-expected economic impacts from climate change further out in the tails of the [social cost of $CO_2$] distribution." *Id.* at 11. In other words, it represents a higher impact scenario with a lower probability of occurring.

annually. Emissions reductions associated with the change in CenterPoint's operating scenarios are described in section 4.9.4.2, above, to provide context for the Project. However, our analysis in this EIS is based on the emissions from Texas Gas' proposed facilities and the natural gas that would be transported by the Henderson County Expansion Project.

One individual filed scoping comments that the Project would create dependence on fossil-fuel infrastructure (often termed "carbon lock-in," which is the tendency for carbon-intensive technological systems to persist over time, "locking out" lower-carbon alternatives). In response to the draft EIS, the CAC stated that FERC should address carbon lock-in by considering whether the Project would disincentivize the adoption of energy alternatives or trigger other, separate investments for the continued reliance on fossil fuels, particularly given the Project would operate over multiple decades. In section 3.2, we acknowledge that this Project would involve new sources of a fossil fuel (natural gas) replacing another fossil fuel (coal) for power generation. As stated in section 1.1, the Commission does not direct the development of the gas industry's infrastructure regionally or on a project-by-project basis, or redefine an applicant's stated purpose. The concerns expressed by commentors about the Project purpose and general U.S. energy policy are beyond the scope of this EIS. Further, any future actions (such as induced production or development) are outside the scope of this EIS. Texas Gas has stated that the need for the Project is based on specific demand by CenterPoint to support transitioning the AB Brown Power Plant away from coal (see section 1.1). However, in the event that they are no longer used to transport natural gas, abandonment of the Project facilities falls under the jurisdiction of the Commission in accordance with Section 7(b) of the NGA. Abandonment of natural gas service must be completed according to applicable FERC Certificate conditions and is subject to NEPA review.

<table>

| | Emissions (tons per year) | | | | Emissions (metric tonnes per year) | | | |
|---|---|---|---|---|---|---|---|---|
| **Emission Source** | CO₂ | CH₄ | N₂O | CO₂e | CO₂ | CH₄ | N₂O | CO₂e |

**Table 4.9.6-1**
**Individual Greenhouse Gas Emissions for the Project[a]**

| Emission Source | Emissions (tons per year) | | | | Emissions (metric tonnes per year) | | | |
|---|---|---|---|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
| **Construction Emissions** | | | | | | | | |
| *Slaughters Compressor Station* | | | | | | | | |
| Non-road equipment combustion emissions | 219.04 | <0.01 | <0.01 | 219.65 | 198.71 | <0.01 | <0.01 | 199.26 |
| On-road equipment combustion emissions | 182.52 | 0.01 | <0.01 | 183.28 | 165.58 | 0.01 | <0.01 | 166.27 |
| **Slaughters Compressor Station Total** | **401.56** | **0.01** | **<0.01** | **402.92** | **364.29** | **0.01** | **<0.01** | **365.53** |
| *Henderson Lateral, AB Brown M&R Station, Existing Receipt M&R Station, and Other Appurtenant Facilities (Henderson County, Kentucky; Posey and Johnson Counties, Indiana)* | | | | | | | | |
| Non-road equipment combustion emissions | 6,721.84 | 0.06 | 0.05 | 6,739.30 | 6,097.95 | 0.05 | 0.05 | 6,113.79 |
| On-road equipment combustion emissions | 410.11 | 0.03 | 0.01 | 412.34 | 372.04 | 0.02 | <0.01 | 374.06 |
| Open burning | 2,736.00 | 0.93 | 0.12 | 2,793.00 | 2,482.06 | 0.84 | 0.11 | 2,533.77 |
| **Henderson Lateral and Associated Facilities Total** | **9,867.94** | **1.01** | **0.18** | **9,944.63** | **8,952.05** | **0.92** | **0.16** | **9,021.62** |
| **Total Project Construction Emissions** | **10,269.51** | **1.02** | **0.18** | **10,347.56** | **9316.34** | **0.93** | **0.17** | **9,387.15** |
| **Operation Emissions** | | | | | | | | |
| *Slaughters Compressor Station* | | | | | | | | |
| Turbine 4 Solar Centaur 50-6200LS | 27,185.00 | 2.00 | 0.05 | 27,251.00 | 24,661.82 | 1.81 | 0.05 | 24,721.70 |
| Fugitive Equipment Leaks – New Components | -- | 3.14 | -- | 78.62 | -- | 2.85 | -- | 71.32 |
| Turbine 4 Compressor Blowdowns | -- | 6.94 | -- | 173.00 | -- | 6.30 | -- | 156.94 |
| *Subtotal, New Sources* | *27,185.00* | *12.08* | *0.05* | *27,502.62* | *24,661.82* | *10.96* | *0.05* | *24,949.96* |
| Removed Compressor Engine 5 | -6,103.00 | -75.63 | -0.01 | -7,997.00 | -5,536.55 | -68.61 | -0.01 | -7,254.76 |
| Reduction in Emissions from Engine 6[b] | -5,754.00 | -71.32 | -0.01 | -7,541.00 | -5,219.94 | -64.70 | -0.01 | -6,841.08 |
| Reduction in Emissions from Engine 7[b] | -5,754.00 | -71.32 | -0.01 | -7,541.00 | -5,219.94 | -64.70 | -0.01 | -6,841.08 |
| *Subtotal, Modified Sources* | *-17,611.00* | *-218.27* | *-0.03* | *-23,079.00* | *-15,976.44* | *-198.01* | *-0.03* | *-20,936.92* |
| **Total, Modified Slaughters Compressor Station** | **9,574.00** | **-206.19** | **0.02** | **4,423.62** | **8,685.39** | **-187.05** | **0.02** | **4,013.04** |

<table>
<thead>
<tr><th rowspan="2">Emission Source</th><th colspan="4">Emissions (tons per year)</th><th colspan="4">Emissions (metric tonnes per year)</th></tr>
<tr><th>$CO_2$</th><th>$CH_4$</th><th>$N_2O$</th><th>$CO_2e$</th><th>$CO_2$</th><th>$CH_4$</th><th>$N_2O$</th><th>$CO_2e$</th></tr>
</thead>
<tbody>
<tr><td colspan="9"><strong>New Project Sources at the Henderson Lateral and Associated Facilities[c]</strong></td></tr>
<tr><td colspan="9"><em>Existing Receipt M&R Station</em></td></tr>
<tr><td>Gas Heater</td><td>7,687.00</td><td>0.15</td><td>0.01</td><td>7,695.00</td><td>6,973.53</td><td>0.13</td><td>0.01</td><td>6,980.79</td></tr>
<tr><td>Fugitive Equipment Leaks – New Components[d]</td><td>--</td><td>4.22</td><td>--</td><td>105.61</td><td>--</td><td>3.83</td><td>--</td><td>95.81</td></tr>
<tr><td colspan="9"><em>AB Brown M&R Station</em></td></tr>
<tr><td>Pigging Activities</td><td>--</td><td>0.19</td><td>--</td><td>4.76</td><td>--</td><td>0.17</td><td>--</td><td>4.32</td></tr>
<tr><td>Fugitive Equipment Leaks – New Components[d]</td><td>--</td><td>1.73</td><td>--</td><td>43.18</td><td>--</td><td>1.57</td><td>--</td><td>39.17</td></tr>
<tr><td colspan="9"><em>Robards Junction Tie-In Facility</em></td></tr>
<tr><td>Fugitive Equipment Leaks – New Components[d]</td><td>--</td><td>1.28</td><td>--</td><td>31.99</td><td>--</td><td>1.16</td><td>--</td><td>29.02</td></tr>
<tr><td>Pigging Activities</td><td>--</td><td>0.19</td><td>--</td><td>4.76</td><td>--</td><td>0.17</td><td>--</td><td>4.32</td></tr>
<tr><td colspan="9"><em>Point of Demarcation Site</em></td></tr>
<tr><td>Fugitive Equipment Leaks – New Components[d]</td><td>--</td><td>0.44</td><td>--</td><td>11.02</td><td>--</td><td>0.40</td><td>--</td><td>10.00</td></tr>
<tr><td colspan="9"><em>Mainline Valve</em></td></tr>
<tr><td>Fugitive Equipment Leaks – New Components[d]</td><td>--</td><td>0.44</td><td>--</td><td>11.02</td><td>--</td><td>0.40</td><td>--</td><td>10.00</td></tr>
<tr><td><em>Subtotal, Henderson Lateral</em></td><td><em>7,688.47</em></td><td><em>8.35</em></td><td><em>0.01</em></td><td><em>7,900.02</em></td><td><em>6,974.86</em></td><td><em>7.57</em></td><td><em>0.01</em></td><td><em>7,166.78</em></td></tr>
<tr><td><strong>Total Operation Emissions for Project Modifications at Slaughters Compressor Station (excluding existing sources) and Henderson Lateral</strong></td><td><strong>17,262.47</strong></td><td><strong>-197.85</strong></td><td><strong>0.03</strong></td><td><strong>12,323.64</strong></td><td><strong>15,660.25</strong></td><td><strong>-179.48</strong></td><td><strong>0.03</strong></td><td><strong>11,179.82</strong></td></tr>
</tbody>
</table>

[a] The numbers in this table have been rounded for presentation purposes. As a result, the totals may not reflect the sum of the addends. Any minor discrepancies between this table and other tables in Section 4.9 are due to rounding.

[b] The estimates for operational emissions are based on Texas Gas' operating hour limits, consistent with KYDEP air quality permit.

[c] HAP emissions have been conservatively assumed to be equal to VOC emissions for Henderson Lateral sources except the Gas Heater at the existing Receipt M&R.

[d] The fugitive release estimates include emissions from valves and fittings associated with the proposed Henderson Lateral.

Overall, the cumulative impacts on land use and visual resources of the Project when considered with other projects would be temporary (during construction of the buried or temporary Project components) to permanent (within aboveground facility footprints), and minor given the large geographic scope (over 987,400 acres of land) and that the proposed new and modified aboveground facilities would be within or adjacent to existing natural gas facilities or industrial sites/facilities.

Impacts from the Project would be minimized or mitigated to the greatest extent practicable through the use of Project-specific construction plans (for example, Texas Gas' Plan) and consultation with federal agencies, state agencies, and landowners. Other projects in the geographic scope would primarily affect existing, developed sites, and we anticipate that these other projects would be required to implement similar construction and restoration practices to minimize impacts on land use.

### 4.12.2.6 Socioeconomics

The geographic scope for the assessment of cumulative impacts on socioeconomic resources includes Johnson and Posey Counties, Indiana, and Henderson and Webster Counties, Kentucky. All of the projects identified in table 4.12.1-1 would be within these counties. Although the timing of many of these projects is uncertain, impacts on population and employment, demand for housing and public services, transportation, and government revenue from sales and payroll taxes would generally be temporary and primarily limited to the period of construction. These impacts would increase if more than one project is built at the same time.

Twelve transportation projects and expansion of an existing warehouse facility were identified in proximity to Texas Gas' existing Receipt M&R Station in Johnson County, Indiana (which is about 137 miles northeast of the Henderson Lateral). Given the limited scope of work proposed by Texas Gas to modify the existing station, it is not anticipated to noticeably contribute to the cumulative impacts of the 12 transportation projects, as transportation projects limited to the geographic scope for socioeconomics, and the potential for cumulative impacts on tax revenue, employment, and traffic can be considered negligible, given the local setting typical of ongoing urban/metropolitan development.

With the exception of the solar projects, the other projects in the cumulative impacts area are generally small and would likely utilize a local workforce, which would not alter housing, transportation, and public service demands. Construction of the Henderson County Expansion Project would be brief (about 10 months) and require a small workforce spread across the Project area, such that the Project's cumulative impacts, in addition to the other projects listed in table 4.12.1-1, on communities in area and socioeconomic characteristics of the Project area would not be significant.

Cumulative impacts on environmental justice communities are discussed in detail in section 4.7.2.3.

### 4.12.2.7 Air Quality

The geographic scope for assessment of cumulative impacts on air quality during construction of the proposed Project is the area within 0.25 mile of all active construction because

JA222

construction emissions would be highly localized, while operational air emissions are assessed at 50 kilometers (about 31.1 miles) from aboveground compression facilities. The AB Brown Project is the most likely to contribute to cumulative air impacts. Ongoing work at active wells and associated gathering lines may also contribute to ongoing air emissions in the vicinity of the Project; however, such projects would have to meet state and federal standards.

Air emissions in the vicinity of the proposed Henderson County Expansion Project would be additive. Construction activities for the Project, the non-jurisdictional facilities associated with the Project, and the AB Brown Power Plant modifications would involve the use of heavy equipment that would generate emissions of air contaminants and fugitive dust. Open burning is also proposed for vegetation cleared during Project construction along the Henderson Lateral in Kentucky. Modification of the AB Brown Power Plant is expected to be in-progress during installation of the proposed Project facilities. The potential for the Project to contribute to cumulative air quality impacts during construction would be greatest during clearing and grading when fugitive dust production would likely be at its peak. However, Texas Gas would implement the measures in its Dust Control Plan and comply with regulatory requirements for emissions controls. Other Projects under construction at the same time as the proposed Project would also be subject to applicable regulations for vehicle emissions, dust control, and open burning. Construction emissions would diminish with distance from the source. Therefore, any potential cumulative impacts from construction would be limited to the duration of the construction period, and would be temporary and minor.

Air dispersion modeling conducted for the Slaughters Compressor Station indicates that air emissions would not exceed the significant impact levels for the proposed new compressor units; in addition, operation of the modified compressor station would not cause an exceedance of the NAAQS at the station fenceline. Therefore, while operation of the Slaughters Compressor Station is expected to cause a localized increase in air pollutants, it is not expected to cause or contribute to an exceedance of air quality standards. No pending new or recently issued major source (PSD) permits were identified within 50 kilometers of the Slaughters Compressor Station; such projects would have the greatest potential to cause an exceedance of applicable air quality standards due to the volume of associated emissions. Therefore, while other projects within the geographic scope (such as new barge fleeting areas), could cause an increase in air pollutant emissions concurrent with Project operations, those projects would be subject to applicable regulations and are not expected to cause or contribute to an exceedance of the NAAQS.

Section 4.9 provides additional information on the air quality analysis that was completed specifically for the proposed Henderson County Expansion Project. In section 4.9.4.1, we provide an estimate of the change in emissions that could occur based on CenterPoint's planned modifications to the AB Brown Power Plant; overall operational emissions from that facility are projected to decrease following the retirement of coal-fired generation units and installation and operation of new natural gas-fired turbines (though these actions are not subject to Commission review). Although the AB Brown Power Plant is immediately east of Texas Gas' AB Brown M&R Station, AB Brown Interconnecting Pipe, and Point of Demarcation Site, Texas Gas does not propose to install combustion-powered equipment in Posey County, Indiana; and emissions from Texas Gas' facilities would be limited to negligible fugitive emissions and/or minor leaks from piping components, a condensate storage tank at the AB Brown M&R Station, and during pigging activities.

JA223

In response to the draft EIS, the USEPA recommended that the EIS include the estimated emissions from the new natural gas turbines associated with the AB Brown Power Plant along with emissions from operation of the proposed Project. Total emissions from concurrent operation of the Project and CenterPoint's planned new natural gas turbines at the AB Brown Power Plant facilities are presented in table 4.12.2-1. Operation of these new facilities would result in increased emissions of criteria pollutants, HAPs, and $CO_2e$. Operation of the AB Brown Power Plant would be subject to the requirements of the CAA, and is not expected to result in an exceedance of the NAAQS. Further, other reasonably foreseeable future activities at the AB Brown Power Plant (i.e., the retirement of coal-fired generation units as quantified in table 4.12.2-1), though not causally related to the proposed Project, would reduce emissions and benefit local and regional air quality. Therefore, while concurrent operation of the AB Brown Power Plant and Henderson County Expansion Project would result in a cumulative increase in emissions of air pollutants, we conclude that the Project would not result in significant cumulative impacts on regional air quality. Climate change is discussed in detail in section 4.9.6.

| Table 4.12.2-1 Summary of Estimated Annual Emissions from Operation of the Henderson County Expansion Project and Modifications at the AB Brown Power Plant[a] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Source | NOx | CO | SO2 | VOC | PM10 | PM2.5 | HAPs |
| Total for Project Modifications at Slaughters Compressor Station (excluding existing sources) and Henderson Lateral[a] | -686.48 | 0.06 | -74.64 | -5.25 | -5.25 | -15.19 | -2.19 |
| New Natural Gas Turbines[b] | 2,123.00 | 68.54 | 321.67 | 141.53 | 141.53 | 45.03 | 45.03 |
| **Total, New and Modified Natural Gas-Related Emissions Sources** | **1,436.52** | **68.6** | **247.03** | **136.28** | **136.28** | **29.84** | **42.84** |
| Total Emissions Reductions from Retirement of Coal Boiler Units 1 and 2[b] | -1,733.82 | 15,276.17 | -1,820.85 | -138.89 | -36.23 | -119.22 | -118.11 |
| **Total Net Reasonably Foreseeable Future Emissions** | **-297.3** | **15,344.77** | **-1,573.82** | **-2.61** | **100.05** | **-89.38** | **-75.27** |

[a] Refer to table 4.9.4-1 for the basis of this emissions estimate.
[b] Refer to table 4.9.4-2 for the basis of this emissions estimate.

### 4.12.2.8 Noise

The geographic scope for assessment of cumulative noise impacts during construction of the proposed Project is generally within 0.25 mile of all active construction or within 0.5 mile of a compressor station or HDD installation, while operational noise is assessed for NSAs within 1 mile of noise-emitting aboveground facilities. The AB Brown and Posey Solar projects are the most likely to contribute to cumulative noise impacts. Ongoing work at active wells and associated gathering lines may also contribute to ongoing noise impacts in the vicinity of the Project; however, noise would be greatest during active drilling activities and would be minimal during well operations.

JA224

# 5.0    CONCLUSIONS AND RECOMMENDATIONS

## 5.1    Summary of the Environmental Analysis

The conclusions and recommendations presented in this EIS are those of the Commission's environmental staff. Our conclusions and recommendations are based on input from the USEPA, as a cooperating agency in the preparation of this EIS. The USEPA's input on this EIS has no effect on its authority under Section 102(2)(C) of the NEPA, Section 309 of the CAA, or the CWA.

We conclude that construction and operation of the Henderson County Expansion Project would result in limited adverse environmental impacts. Most adverse environmental impacts would be temporary or short-term during construction and have minimal effects on existing land use as new and to be modified Project facilities would be added within or adjacent to existing natural gas facility or industrial sites/facilities. This determination is based on a review of the information provided by Texas Gas and further developed from data requests; scoping; literature research; alternatives analysis; and contacts with federal, state, and local agencies as well as individual members of the public.

Overall, Commission staff conclude that approval of the Project would not result in significant environmental impacts, with the exception of potential impacts on climate change. This EIS is not characterizing the Project's GHG emissions as significant or insignificant because the Commission is conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations going forward.[96] We also conclude that no system, route, or other alternative would provide a significant environmental advantage over the Project as proposed. Therefore, we conclude that the proposed Project, with our recommended mitigation measures, is the preferred alternative to meet the Project objectives.

## 5.2    FERC Staff's Recommended Mitigation

If the Commission authorizes the Project, we recommend that the following measures be included as specific conditions in the Commission's Order. We have determined that these measures would further mitigate the environmental impacts associated with Project construction and operation as proposed. The section number in parentheses at the end of a condition corresponds to the section number in which the measure and related resource impact analysis appears in the EIS.

1. Texas Gas shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order. Texas Gas must:

   a. request any modification to these procedures, measures, or conditions in a filing with the Secretary;

   b. justify each modification relative to site-specific conditions;

---

[96] *Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022); 178 FERC ¶ 61,197 (2022).

JA225

    c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d. receive approval in writing from the Director of OEP, or the Director's designee, **before using that modification**.

2. The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Project. This authority shall allow:

    a. the modification of conditions of the Order;

    b. stop-work authority; and

    c. the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Project construction and operation.

3. **Prior to any construction**, Texas Gas shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, EIs, and contractor personnel would be informed of the EI's authority and have been or would be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4. The authorized facility locations shall be as shown in the EIS. **As soon as they are available, and before the start of construction**, Texas Gas shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

    Texas Gas' exercise of eminent domain authority granted under NGA Section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations. Texas Gas' right of eminent domain granted under NGA Section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5. Texas Gas shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any

JA226

other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

    a. implementation of cultural resources mitigation measures;

    b. implementation of endangered, threatened, or special concern species mitigation measures;

    c. recommendations by state regulatory authorities; and

    d. agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6. **Within 60 days of the acceptance of the authorization and before construction begins**, Texas Gas shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee. Texas Gas must file revisions to the plan as schedules change. The plan shall identify:

    a. how Texas Gas would implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

    b. how Texas Gas would incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

    c. the number of EIs assigned, and how the company would ensure that sufficient personnel are available to implement the environmental mitigation;

    d. company personnel, including EIs and contractors, who would receive copies of the appropriate material;

    e. the location and dates of the environmental compliance training and instructions Texas Gas would give to all personnel involved with construction and restoration (initial and refresher training as the Project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

f. the company personnel (if known) and specific portion of Texas Gas' organization having responsibility for compliance;

g. the procedures (including use of contract penalties) Texas Gas would follow if noncompliance occurs; and

h. for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

   i. the completion of all required surveys and reports;

   ii. the environmental compliance training of on-site personnel;

   iii. the start of construction; and

   iv. the start and completion of restoration.

7. Texas Gas shall employ at least one EI per construction spread. The EI shall be:

   a. responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

   b. responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

   c. empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

   d. a full-time position, separate from all other activity inspectors;

   e. responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

   f. responsible for maintaining status reports.

8. Beginning with the filing of its Implementation Plan, Texas Gas shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete. On request, these status reports would also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

   a. an update on Texas Gas' efforts to obtain the necessary federal authorizations;

   b. the construction status of the Project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

c. a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d. a description of the corrective actions implemented in response to all instances of noncompliance;

e. the effectiveness of all corrective actions implemented;

f. a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

g. copies of any correspondence received by Texas Gas from other federal, state, or local permitting agencies concerning instances of noncompliance, and Texas Gas' response.

9. Texas Gas shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP, or the Director's designee. The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the Project and restoration of the right-of-way. **Prior to construction**, Texas Gas shall mail the complaint procedures to each landowner whose property would be crossed by the Project.

a. In its letter to affected landowners, Texas Gas shall:

  i. provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

  ii. instruct the landowners that if they are not satisfied with the response, they should call Texas Gas' Hotline; the letter should indicate how soon to expect a response; and

  iii. instruct the landowners that if they are still not satisfied with the response from Texas Gas' Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

b. In addition, Texas Gas shall include in its **biweekly** status report a copy of a table that contains the following information for each problem/concern:

  i. the identity of the caller and date of the call;

  ii. the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

5-5

iii. a description of the problem/concern; and

iv. an explanation of how and when the problem was resolved, would be resolved, or why it has not been resolved.

10. Texas Gas must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Project facilities.** To obtain such authorization, Texas Gas must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11. Texas Gas must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project into service**. Such authorization would only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

12. **Within 30 days of placing the authorized facilities in service**, Texas Gas shall file an affirmative statement with the Secretary, certified by a senior company official:

    a. that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities would be consistent with all applicable conditions; or

    b. identifying which of the conditions in the Order Texas Gas has complied with or would comply with. This statement shall also identify any areas affected by the Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13. **Within 5 days of the final determination of the use of the Nationwide Permit 12 issued by the United States Army Corps of Engineers**, Texas Gas shall file the complete water quality certification issued categorically by the KYDEP and IDEM, including all conditions, and all conditions attached to the water quality certification constitute mandatory conditions of this Certificate Order. **Prior to construction**, Texas Gas shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its Project design necessary to comply with the water quality certification conditions.

14. **Prior to any water withdrawals from Pond Bayou (wetland WP7012)**, Texas Gas shall consult with KDOW regarding the site-specific justification and mitigation measures for water withdrawals from Pond Bayou. Texas Gas shall file with the Secretary documentation of the consultation and the proposed mitigation measures it will adopt, for review and written approval by the Director of OEP or the Director's designee. Alternatively, Texas Gas shall file revised water use plans that exclude withdrawals from Pond Bayou, for review and written approval by the Director of OEP or the Director's designee. *(section 4.4.2.3)*

15. **Prior to construction**, Texas Gas shall file with the Secretary records of updated consultation with the USFWS regarding its review of Texas Gas' pedestrian survey protocols for nesting birds, including any USFWS recommendations for modifications to the survey protocols. In addition, Texas Gas shall identify any USFWS-recommended

measures that it does or does not propose to implement based on the results of this consultation. *(section 4.5.3.3)*

16. Texas Gas shall **not begin construction** of the Project **until**:

    a. FERC staff completes Section 7 consultation with the USFWS; and

    b. Texas Gas has received written notification from the Director of OEP, or the Director's designee, that construction and/or use of mitigation (including implementation of any conservation measures) may begin. *(section 4.5.4.1)*

17. **Prior to construction**, Texas Gas shall file with the Secretary documentation that conservation measures are complete for incidental take of the Indiana bat in Kentucky. *(section 4.5.4.1)*

18. **Prior to construction**, Texas Gas shall file documentation with the Secretary regarding Texas Gas' consultation with the USDA-NRCS on any applicable restrictions or special mitigation measures required by the USDA-NRCS to maintain enrollment in conservation easements. Texas Gas shall identify the specific restrictions and measures it would implement when crossing the conservation easements, for review and written approval by the Director of OEP, or the Director's designee. *(section 4.6.3)*

19. **Prior to installation of the Henderson Lateral via HDD**, if noise attributable to the HDD is projected to exceed an $L_{dn}$ of 55 dBA at any NSA (either for daytime-only or 24-hour construction) or result in a 10 dB or greater increase above ambient noise levels, Texas Gas shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, a mitigation plan incorporating the final design of noise mitigation measures to reduce the projected noise levels to no more than an $L_{dn}$ of 55 dBA at the NSAs, or less than 10 dB increase over ambient. During drilling operations, Texas Gas shall implement the approved plan, monitor noise levels, and document the noise levels in the **biweekly** status reports. *(section 4.10.3)*

20. Texas Gas shall file a noise survey with the Secretary **no later than 60 days** after placing the authorized unit at the Slaughters Compressor Station in service. If a full-load condition noise survey is not possible, Texas Gas shall provide an interim survey at the maximum possible horsepower load and file the full-load survey **within 6 months**. The survey(s) should demonstrate that noise from the modified compressor station under interim or full horsepower load conditions does not exceed the previously existing noise levels that are at or above an $L_{dn}$ of 55 dBA at any nearby NSA. If any of these noise levels are exceeded, Texas Gas shall file a report with the Secretary on what changes are needed to reduce the operating noise level at the NSAs to or below the previously existing noise level and install additional noise controls to meet that level **within 1 year** of the in-service date. Texas Gas shall confirm compliance with this requirement by filing a second full power load noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls. *(section 4.10.4)*

JA231

21. Texas Gas shall file noise surveys with the Secretary **no later than 60 days** after placing the new AB Brown M&R Station and modified existing receipt M&R station into service. If a full-load condition noise survey is not possible, Texas Gas shall provide an interim survey at the maximum possible power load and provide the full power load survey **within 6 months**. If the noise attributable to the operation of the meter stations at interim or full power load conditions exceeds 55 dBA $L_{dn}$ at any nearby NSAs, Texas Gas shall file a report with the Secretary on what changes are needed and install additional noise controls to meet that level **within 1 year** of the in-service date. Texas Gas shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls. *(section 4.10.4)*

JA232

Document Accession #: 20220606-5203    Filed Date: 06/06/2022

II.    Key Conclusions in the DEIS Are Incorrect, Because FERC's
       Assumption that Closing the Coal Plant Is Causally Related to the
       Project Is Wrong.

CO2-7

Multiple conclusions drawn in the DEIS, including findings regarding the

Project's overall greenhouse gas and air pollution impacts, rest on the flawed

premise that the proposed gas power plant to be built by CenterPoint at the A.B.

Brown site near Evansville would *cause* or *allow* retirement of the existing two coal

power generating units at the same site"[62] The Commission expressly and

inappropriately adopts TGT's claims that:

> Until natural gas is provided (whether from Texas Gas or some other
> source), Texas Gas has stated that CenterPoint would likely continue to
> produce electricity by other means of fossil-fuel generation, which could
> result in higher emissions of certain types, as well as other
> environmental impacts.[63]

> However, as CAC stated in its previous filings in this proceeding, this

assumption is fundamentally wrong. According to multiple public statements made

by CenterPoint during the past twelve months, CenterPoint has already decided to

close the A.B. Brown coal generating units in or around October 2023, largely

because there is no feasible way for CenterPoint to build the environmental

compliance projects needed to keep the units in operation past that date that are

required under both the federal Coal Combustion Residuals Rule ("CCR Rule")[64]

[62] *See, e.g.,* DEIS at 4-109 (stating that the new 460 MW gas turbines "in combination with the
addition of solar and wind energy generation, would allow the removal of two [coal-fired] power plant
boilers"); *id.* at 4-110 ("gas delivered by the Project to the AB [sic]Brown Power Plant would be
associated with conversion of two coal-fired boilers at the AB [sic] Brown Power Plant.").
[63] *Id.* at 3-2.
[64] 40 C.F.R. Part 257, Subpart D.

25

JA-233

CO2-7    Section 3.2 of the EIS has been revised to clarify CenterPoint's intent
to discontinue coal-based power generation at the AB Brown Power
Plant. The replacement of coal-fired generation by other sources of
energy was not expanded upon, as the IURC determined that natural
gas was the better option to provide a source of reliable back-up
power generation at the AB Brown Power Plant.

# Companies and Organizations

# CO2 - Jennifer Washburn, Citizens Action Coalition of Indiana

Document Accession #: 20220606-5203    Filed Date: 06/06/2022

comparisons have long since shown to show a severe lack of understanding of the nature of the collective action problem posed by climate change and have been summarily rejected by reputable science.[127]

CO2-12 Cont.

In addition, as is discussed in more detail in Section II, the coal plant is not being retired because of the Project or the construction of any potential as-yet approved gas units. Thus, it is inappropriate to net the new greenhouse gas emissions from the retirement of the A.B. Brown coal generating units.[128] The DEIS notes that "these emissions reductions are not the direct cause of the Henderson County Expansion Project and are provided only for informational purposes."[129] But given the lack of causal effect, any consideration of "netting" GHG reductions is irrelevant and misleading for the purposes of the DEIS. FERC must therefore strike the language on page 4-117 beginning with "however, retirement of coal-fired generation . . ." through to the bottom of the page.

CO2-13

Finally, the Commission's failure to assess the significance of the Project's greenhouse gas impacts entirely ignores the fact that the emissions from the Project will last multiple decades. Although the DEIS quoted a comment that "the Project would create dependence on fossil-fuel infrastructure (often termed carbon lock-in), this is the tendency for carbon-intensive technological systems to persist over time, 'locking out' lower-carbon alternatives,"[130] it fails entirely to meaningfully engage

CO2-14

---

[127] Natural Resources Defense Council et al., Joint Comments at 9–12, 16, Docket No. PL18-1-000 (May 26, 2018), Accession No. 20180526-5241.
[128] DEIS at 4-117. Although not stated clearly in the DEIS, the GHG reduction figures presented are *net* reductions, based on CenterPoint's preferred portfolio from its 2019-2020 IRP.
[129] *Id.*
[130] DEIS at 4-120.

42

JA234

CO2-13    Emissions reductions associated with CenterPoint's 2020 IRP are not the direct cause of the Henderson County Expansion Project and are provided only for informational purposes, as noted in the comment; the emissions reductions are not used to determine Project impacts or establish a baseline for comparison with proposed Project emissions. The EIS was revised to specify that CenterPoint's facility changes would have a beneficial effect on air quality (refer to the EIS at sections 4.9.4.1 and 4.9.6).

CO2-14    Refer to the EIS at section 4.9.6 for a discussion of carbon lock-in; we acknowledge that this Project would involve new sources of a fossil fuel (natural gas) replacing another fossil fuel (coal) for power generation. Any future actions (such as induced production or development) are outside the scope of this EIS.

Document Accession #: 20220606-5203     Filed Date: 06/06/2022

Similarly, FERC cannot rationally dismiss the no-action and non-gas energy alternatives without discussing the benefits to environmental justice communities that would be realized if the Project did not go forward and additional gas generating units are not added to the A.B. Brown Plant. While the DEIS makes much of the net decrease in air emissions from the independent decision to retire the facility's coal boilers, selecting the no-action alternative would avoid the following: 2,123 tons per year of $NO_x$, 68.54 tons per year of $SO_2$, 321.67 tons per year of CO, 141.53 tons per year of $PM_{10}$, 141.53 tons per year of $PM_{2.5}$, 45.03 tons per year of VOCs, and 45.03 tons per year of total HAPs.[154] The same is true for CenterPoint's "Renewables 2030" alternative portfolio, discussed in Section I(C), which is a technically and economically feasible means to meet the Project purpose without requiring *any* new gas supply infrastructure; and to a lesser extent, CenterPoint's alternative "Renewables + Flexible Gas" portfolio, which is technically feasible, economically advantageous, and would require gas supply to just a single new combustion turbine, avoiding up- and down-stream emissions associated with a second combustion turbine. The health effects of these air pollutants are well-documented,[155] and FERC's failure to accurately balance the avoided costs of those health effects before rejecting the no-action alternative is arbitrary and capricious.

CO2-22

[154] DEIS at 4-110.
[155] See, *e.g.*, Gottlieb, supra note 152.

52

JA235

CO2-22    Refer to the EIS at section 3.1 regarding the Commission's Order, which will address need for the Project.   Refer to the EIS at section 3.2 regarding the purpose of the Project to provide a reliable compliment to CenterPoint's diverse supply of power generation that is primarily renewables based.  Further, the no-action alternative discussion presented in section 3.2 has been updated to reflect the IURC's June 28, 2022 order authorizing CenterPoint's proposed natural gas compression turbines.

## Companies and Organizations
## CO3 - Tony Mendoza, Sierra Club

Document Accession #: 20220606-5263     Filed Date: 06/06/2022

baseline of emissions. The Draft EIS wrongly assumes that the construction of the Project

would facilitate the retirement of two coal-burning units even though those units are likely

to retire even if the Project is not built. The Draft EIS's failure to scrutinize Texas Gas's

representations regarding CenterPoint's generation portfolio renders the entire air impacts

section of the Draft EIS fundamentally flawed and useless for FERC's ultimate

determinations under NEPA and the Natural Gas Act.

**CO3-3 Cont.**

4. The Draft EIS's construction of the "no action" alternative is incorrect because FERC

Staff accepted Texas Gas's inaccurate statements that approval of the Project is necessary

to allow for the retirement of the A.B. Brown coal units and the construction of the new

CenterPoint renewables projects. This error renders multiple sections of the Draft EIS,

including its Environmental Justice analysis, arbitrary and unreasonable. The A.B. Brown

coal units are already planned for retirement, and CenterPoint itself has identified non-

fossil fuel alternatives to the proposed gas plants to replace them. The environmental

impacts associated with "no action" alternative must therefore be revised.

**CO3-4**

5. The Draft EIS failed to fully characterize harms to environmental justice communities.

The Draft EIS fails to consider alternatives or mitigation strategies to address the

acknowledged "disproportionately high and adverse" impacts to environmental justice

communities from the proposed Project, instead accepting as a *fait accompli* that these

communities will continue to suffer from excessive air and noise impacts.[2] The

environmental justice analysis in the Draft EIS is also flawed because the Commission's

determinations with respect to air pollution impacts are improperly limited to determining

whether the Project and the associated gas-burning generating units will lead to a violation

**CO3-5**

---
[2] Draft EIS at ES-9.

*Comments of Sierra Club on Draft EIS*          Page 2 of 22
*in Texas Gas Pipeline, CP21-467*               June 6, 2022

JA236

**CO3-4**     Section 3.2 of the EIS has been revised to clarify CenterPoint's intent to discontinue coal-based power generation at the AB Brown Power Plant. The EIS acknowledges the coal-fired units are being closed and that CenterPoint could only keep them operational with a substantial, and ultimately prohibitive, cost; therefore, CenterPoint is seeking a supply of natural gas to replace the coal-fired units. Further, the no-action alternative discussion presented in section 3.2 has been updated to reflect the IURC's June 28, 2022 order authorizing CenterPoint's proposed natural gas compression turbines.

**CO3-5**     Refer to the EIS at sections 4.7.2.3, 4.7.2.4, and 4.7.2.5. As discussed in these sections, we find that with Texas Gas' proposed construction measures and mitigation, impacts from construction and operation of the Project would not significantly affect environmental justice communities, and other than insignificant impacts on environmental justice communities from certain Project facilities, impacts would not be disproportionately high and adverse.

# Companies and Organizations

## CO3 - Tony Mendoza, Sierra Club

Document Accession #: 20220606-5263    Filed Date: 06/06/2022

flawed for at least two reasons.

First, there is no record evidence that FERC attempted to document the GHG emissions and other harms associated with natural gas extraction required to serve the Project. If the harms from hydraulic fracturing in different basins that send gas through Texas Gas systems were found to be similar, the precise source of the gas would have been found to be irrelevant. The Draft EIS does not appear to have attempted this evaluation. Second, even if harms (e.g., methane leaking) from the various production basins were found to be different, the Draft EIS could have characterized a range of harms associated with production in the several productions basins. Again, the Draft EIS does attempt this evaluation.

As an excuse for not evaluating these upstream harms, the Draft EIS states that "the Commission is conducting a generic proceeding to determine whether and how the Commission will consider upstream emissions going forward."[17] But a pledge to comply with the law for some other future gas pipeline project is no defense against the failure to characterize these emissions here. FERC must review the EIS to include documentation of the harms caused by natural gas extraction in the various production basins that serve Texas Gas's system and, after having done that, weigh these harms, in combination with other harms, against any purported benefits of the Project.

**III. The Draft EIS's Review of Air Quality Impacts and GHGs Emissions Rely on an Improper Baseline.**

The Draft EIS incorrectly finds that construction of the Project "would have a beneficial effect on air quality during operation" by facilitating the retirement of CenterPoint's coal-

---

[17] Draft EIS at 4-118.

**CO3-12**    Section 3.2 of the EIS has been revised to clarify CenterPoint's intent to discontinue coal-based power generation at the AB Brown Power Plant.

Emissions reductions associated with CenterPoint's 2020 IRP are not the direct cause of the Henderson County Expansion Project and are provided only for informational purposes, as noted in the comment; the emissions reductions are not used to determine Project impacts or establish a baseline for comparison with proposed Project emissions. The EIS was revised to specify that CenterPoint's facility changes would have a beneficial effect on air quality (refer to the EIS at sections 4.9.4.1 and 4.9.6).

Refer to the EIS at section 1.3.1 for a discussion of the Project purpose and need. On June 28, 2022, the IURC issued an order granting a certificate of public convenience and necessity to CenterPoint for construction of its proposed natural gas combustion turbines.

JA237

Document Accession #: 20220714-5126     Filed Date: 07/14/2022

I.  **TGT's Responsive Comments on Non-Gas Energy Alternatives Fail to Justify Significant Omissions in the Draft EIS.**

CO4-2

TGT's reply comments do not provide a justification for FERC's failure to include a full discussion of all reasonable alternatives, including non-gas energy alternatives, in the DEIS. There is no reasonable basis for the Commission to arbitrarily pick and choose among alternatives and ignore viable non-gas energy alternatives that will cause fewer environmental harms than the Project. There also is no justification for refusing to further evaluate the option of using an electric-fired compressor. TGT's reply comments fail entirely to explain these deficiencies or to meaningfully address the evidence before the Commission that there are a number of alternatives available here that would better protect the environment and serve the public convenience and necessity.

For purposes of analyzing the environmental impacts of the proposed new pipeline, no action alternatives must include non-gas energy alternatives.[3] Contrary to TGT's claims in its reply comments, FERC's analysis and public disclosure of the potential for non-gas energy alternatives to lessen the environmental harms of TGT's newest pipeline would not encroach upon the authority of CenterPoint or its state regulator.[4] While FERC may not be

_____

[3] The Commission's Guidance Manual states that the Commission's alternatives analysis "options should include the use of . . . non gas energy alternatives, and/or energy conservation or efficiency, as applicable." FERC, Guidance Manual for Environmental Report Preparation (Feb. 2017) at 4-135-136, https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[4] Demonstrating the distinct nature of FERC's NEPA analysis, since the issuance of the Draft EIS, the Indiana Utility Regulatory Commission issued an order (Cause No. 45564, June 28, 2022), granting CenterPoint's requested certificates of public convenience and

4

JA238

CO4-2     Section 3.2 of the EIS has been revised to clarify CenterPoint's intent to discontinue coal-based power generation at the AB Brown Power Plant. The replacement of coal-fired generation by other sources of energy was not expanded upon, as the IURC determined that natural gas was the better option to provide a source of reliable back-up power generation at the AB Brown Power Plant.

Document Accession #: 20220714-5128    Filed Date: 07/14/2022

**II.    The Project Will Not "Allow" CenterPoint to Remove Existing Air Emissions from the A.B. Brown Coal Generating Units.**

CO4-3

In its Reply Comments, Texas Gas fails to refute the arguments previously presented by CAC and Sierra Club that the Commission's environmental impact analysis should start with the baseline circumstance of no coal generation at the A.B. Brown site.[14] Texas Gas argues that the new gas combustion turbines ("CTs") proposed by CenterPoint "will facilitate the [A.B. Brown] coal retirements by allowing CenterPoint to maintain electric reliability despite those retirements."[15] TGT's use of "facilitate" stretches the word beyond its rational meaning. It is true that the coal generating units at the A.B. Brown site are retiring due to the infeasibility of complying with environmental requirements,[16] and CenterPoint will need new electric resource capacity to meet its customers' needs beginning in 2024. Any new capacity that CenterPoint adopts could be said at the time of energization to have, retroactively, "facilitated" the coal units' retirement, but that would crucially misstate the chain of causality. Indeed, it is the coal units' retirement that compels the procurement of new electric capacity, which could be either gas-fired generation sure to create upstream and downstream air pollution, or clean resources that can equally meet the utility's load needs.

---

[14] *See, e.g.*, CAC DEIS Comments at 25-32; Sierra Club Comments on Draft Environmental Impact Statement for the Henderson County Expansion Project, at 9-13, Docket No. CP21-467-000 (June 6, 2022), Accession No. 20220606-5263.

[15] TGT Reply Comments at 12.

[16] As stated in more detail in CAC's DEIS Comments, the Brown coal units would need to complete numerous infrastructure upgrades, which are now impossible to timely begin and complete, in order to meet compliance deadlines under the federal Coal Combustion Residuals Rule and Effluent Limitations Guidelines.

8

JA-239

CO4-3    Section 3.2 of the EIS has been revised to clarify CenterPoint's intent to discontinue coal-based power generation at the AB Brown Power Plant. Emissions reductions associated with CenterPoint's 2020 IRP are not the direct cause of the Henderson County Expansion Project and are provided only for informational purposes, as noted in the comment; the emissions reductions are not used to determine Project impacts or establish a baseline for comparison with proposed Project emissions. The EIS was revised to specify that CenterPoint's facility changes would have a beneficial effect on air quality (refer to the EIS at sections s 3.2, 4.9.4.1 and 4.9.6).

Document Accession #: 20220809-5051    Filed Date: 08/09/2022

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC )
) Docket No. CP21-467-000
)

COMMENT OF CITIZENS ACTION COALITION OF INDIANA

Pursuant to Rule 212 of the Federal Energy Regulatory Commission

("Commission") Rules of Practice and Procedure and 40 C.F.R. § 1502.9(d), Citizens

Action Coalition of Indiana ("CAC") requests that the Commission supplement its

Draft Environmental Impact Statement ("DEIS") for the Henderson County

Expansion Project ("Project") to address significant new information bearing on the

Project's purpose and need and environmental impacts.

On July 25, 2022, the board for the Midcontinent Independent System

Operator ("MISO") approved a $10.3 billion portfolio of eighteen transmission

projects for the Upper Midwest.[1] This new transmission plan will make utility-scale

renewable projects cheaper and more abundant, buttress system reliability, *and

ease the integration of renewable projects.*[2] "The decision marks the most U.S. power

lines ever approved at once . . . ."[3] MISO's newly approved transmission portfolio

therefore provides significant new information which undermines the stated

---

[1] *See* MISO press release, "MISO Board Approves $10.3B in Transmission Projects,"
July 25, 2022, https://www.misoenergy.org/about/media-center/miso-board-
approves-$10.3-in-transmission-projects (emphasis added).
[2] *See* Miranda Willson, "MISO approves large grid expansion, paving way for
renewables," E&E News, July 26, 2022, https://www.eenews.net/articles/miso-
approves-large-grid-expansion-paving-way-for-renewables.
[3] *Id.*

1

**CO5-1**

CO5-1    Refer to the EIS at section 3.0 regarding the various alternatives that were considered. The alternatives analysis in the draft EIS (section 3.0) is consistent with FERC policy and the CEQ's guidance for assessing alternatives. The EIS discusses alternatives to the applicant's proposed action, including the no-action alternative, energy alternatives, compressor alternatives, system alternatives, and route alternatives.

As discussed in section 3.3, assessing possible other mechanisms for addressing U.S. energy needs is out of scope for our NEPA review. Detailed evaluation of other alternatives to the proposed Project like the use of wind and solar power or increased energy efficiency may be reasonable policies, but these are entirely separate questions from evaluating alternatives that meet the defined purpose and need for the Project. The EIS concluded that the proposed Project, with Staff's recommended mitigation measures, is the preferred alternative to meet the Project objectives.

Further, as stated in section 1.3, this EIS discloses the applicant's stated purpose and need in order to define the scope of our NEPA analysis and range of alternatives to consider; the need for the Project would be addressed by the Commission in the Order and is outside the scope of this environmental document.

CenterPoint is diversifying its power generation, which includes renewable sources already within its portfolio, and the IURC determined that natural gas was the better option to provide a source of reliable back-up power generation at the AB Brown Power Plant.

Finally, section 1.3.1 of the EIS was revised to acknowledge requests for a supplemental draft EIS to address comments made on the draft EIS. The final EIS responds to relevant comments issued in response to the draft EIS.



Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission 888 First
Street N.E., Room 1A
Washington, D.C.  20426

      Re: EPA Comments on the Final Environmental Impact Statement (FEIS) for the
      Henderson County Expansion Project, FERC CP21-467-000. CEQ No. 20220124

Dear Secretary Bose:

The U.S. Environmental Protection Agency has reviewed the Federal Energy Regulatory
Commission (FERC) FEIS for the Henderson County Expansion Project proposed by Texas Gas
Transmission, LLC (Texas Gas). The FEIS was reviewed consistent with our responsibilities
under Section 102(2)(C) of the National Environmental Policy Act, the Council on
Environmental Quality regulations (40 CFR Parts 1500-1508), and the EPA's authority under
Section 309 of the Clean Air Act.

Texas Gas proposes to construct 23.5 miles of new 20-inch-diameter pipeline, a new tie-in facility,
a mainline valve, and modifications to its existing Slaughters Compressor Station in Henderson
County, Kentucky (KY). Texas Gas also proposes to build a 0.5-mile 16-inch-diamater pipeline
between the AB Brown Meter and Regulating (M&R) Station to the Brown Power Plant and other
appurtenant  facilities in Posey County, IN. This project will provide 220,000 dekatherms per day to
CenterPoint Energy Indiana South to service the proposed project[1] at AB Brown Generating Station
in Posey County, Indiana (IN). In addition to the proposed action alternative, the FEIS evaluated a
no-action alternative, system alternatives, and other siting/route and design alternatives. FERC
identifies the proposed action as the preferred alternative and analyzed the potential environmental
impacts.

On November 9, 2021, the EPA submitted comments during the scoping period including concerns
regarding purpose and need, climate change and greenhouse gas emissions, wetlands, air, environmental
justice and public involvement, methane leakage and construction. On March 31, 2022, we submitted
additional comments as a cooperating agency regarding purpose and need, alternatives, noise, safety,
wetlands, environmental justice and socioeconomics, air, emissions, climate change, drilling,
greenhouse gas and energy efficiency. On June 6, 2022, the EPA submitted comments on the draft EIS

---

[1] The CenterPoint proposed project entails two new natural gas units to be built at the A.B. Brown site. The proposed project is currently before the
Indiana Utility Regulatory Commission (IURC). A similar previous project was denied by IURC in 2019.

highlighting important issues to consider such as the analysis of greenhouse gas emissions and climate, noise, alternatives, land assessment, air, emergency facility operation, and impacts analysis. The EPA appreciates FERC's responses to our recommendations regarding the purpose and need, alternatives, emergency facility operations, land assessment, pipeline facilities, additional emissions data, map, construction safety, energy efficiency, emissions from construction equipment, and social cost.

Based on our review of the FEIS, the EPA remains concerned about water use and hydrostatic testing, noise, Environmental Justice, and greenhouse gas emissions and climate-related impacts. The EPA's concerns and associated recommendations are detailed in the enclosure for your consideration. We request that the recommendations be considered during the development of the Record of Decision and the environmental commitment for the Applicant's final design plans.

We appreciate the opportunity to review the FEIS and to serve as a cooperating agency on the proposed project. If you have any questions regarding our comments, please contact Maria R. Clark at clark.maria@epa.gov or (404) 562-9513.

Sincerely,

NTALE KAJUMBA

Digitally signed by NTALE KAJUMBA
Date: 2022.10.03 16:51:08 -04'00'

Ntale Kajumba
Acting Director
Strategic Programs Office

Enclosure

**Enclosure**
**Henderson County Expansion Project Final Environmental Impact Statement**
**Kentucky and Indiana**
**FERC Docket Number: CP21-467-000. CEQ No. 20220124**

**(1) Water Use** (Section 4.4.2.3): The EPA expressed concerns regarding the potential impacts of withdrawing water from Pond Bayou, which is a regionally important natural resource and recommended that other options be explored for acquiring water. The EPA acknowledges the recommendation that FERC incorporated into the FEIS. Specifically, according to Pages 4-33 and 4-34 of the FEIS, the FERC is recommending the following:

> *"Prior to any water withdrawals from Pond Bayou (wetland WP7012), Texas Gas should consult with KDOW regarding the site-specific justification and mitigation measures for water withdrawals from Pond Bayou. Texas Gas should file with the Secretary documentation of the consultation and the proposed mitigation measures it would adopt, for review and written approval by the Director of Office of Energy Projects (OEP) or the Director's designee. Alternatively, Texas Gas should file revised water use plans that exclude withdrawals from Pond Bayou, for review and written approval by the Director of OEP or the Director's designee."*

Recommendation: The EPA recommends that Texas Gas's consultation with the Kentucky Division of Water and any documentation filed with the Secretary regarding the site-specific justification and mitigation measures for water withdrawals from Pond Bayou include an environmental evaluation of other feasible options for acquiring water.

**(2) Construction Noise Impacts and Mitigation** (Section 4.10.3): Page 4-93 states,

> *"Texas Gas' proposed mitigation would reduce sound from HDD construction to below 55 decibels on the A-weighted scale (dBA) day-night sound level ($L_{dn}$). Noise control measures would include a combination of noise barriers, partial enclosure around equipment, low-noise equipment, and/or silencers. Texas Gas has also indicated that it may offer relocation to residents affected by nighttime construction, in lieu of implementing noise mitigation, as documented in the Plan for Reducing Noise Impacts from HDD Operations and subject to site-specific justification and Commission approval."*

Recommendation: The EPA recommends avoiding 24-hour construction (nighttime construction) near residential areas and especially around overburdened communities.

**(3) Environmental Justice** (Section 4.7.2.3): Page ES-10 of the FEIS states,

> *"We conclude that impacts on the environmental justice communities containing the new tie-in facility and the AB Brown M&R Station, Point of Demarcation, and the AB Brown interconnecting Pipe would be disproportionately high and adverse, as the impacts from construction and operation of these facilities would be predominantly borne by environmental justice communities. However, based on our analysis in this EIS, we*

JA243

*determined that the identified impacts on environmental justice communities would be less than significant."*

The FEIS does not discuss any targeted outreach to the potentially impacted communities with environmental justice concerns, to engage them and to document community-identified or supported mitigation.

Recommendation: The EPA recommends that the FERC implement community engagement activities targeted specifically to the potentially affected minority community (Census Tract 208, Block Group 1) and low-income community (Census Tract 404, Block Group 3) prior to construction and operation of the facilities. This should include continued efforts to meaningfully engage them on the suite of proposed mitigation options and available opportunities to further avoid or minimize impacts to human health and the environment. We further recommend the FERC consider convening meetings that are local and convenient for potentially affected minority and low-income communities.

**(4) Climate Change and Greenhouse Gas Emissions** (Section 4.9.6): The EPA's draft EIS comment letter reaffirmed our previous suggestion that the FERC avoid expressing project-level emissions as a percentage of national or state emissions. We also continued to recommend disclosing the increasing conflict between greenhouse gas emissions and national, state, and local greenhouse gas reduction polices and goals. We further recommended disclosing whether there are ways to address that conflict in projects that expand and lock-in fossil fuel consuming infrastructure.

The FEIS continues to express project-level emissions as a percentage of national or state emissions and those comparisons are included in the NEPA analysis. Page 4-128 of the FEIS states, "*The Commission has stated in recent orders that the comparisons provide additional context in considering a project's potential impact on climate change. Accordingly, we have included those comparisons in our NEPA analysis.*"

Recommendation: The EPA recommends the FERC reconsider the EPA's suggestion to avoid expressing project-level emissions as a percentage of national or state emissions.

JA244

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC           )                 Docket No. CP21-467-000

**ANSWER OF TEXAS GAS TRANSMISSION, LLC TO COMMENTS OF
CITIZENS ACTION COALITION OF INDIANA**

Pursuant to Rule 213 of the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure,[1] Texas Gas Transmission, LLC ("Texas Gas") submits this Answer to the comments filed by Citizens Action Coalition of Indiana ("CAC") on September 26, 2022, in which CAC requests that the Commission supplement its Final Environmental Impact Statement ("FEIS") for Texas Gas' Henderson County Expansion Project ("Project").[2] CAC's September 26 Comments are yet another example of CAC's effort to clog the Commission's docket with irrelevant arguments in an attempt to delay the Commission's review of the Project. The Commission should conclude that CAC's Comments raise no issues that would warrant the Commission to supplement its FEIS and issue an order finding that Texas Gas' Project is required by the public convenience and necessity.

CAC contends that the recent enactment of the Inflation Reduction Act ("IRA")[3] constitutes "significant new information bearing on the Project's purpose and need and the Commission's analysis of the alternatives to the Project, as well the potential environmental impacts of the Project in comparison to its alternatives."[4] This contention

---

[1] 18 C.F.R. § 385.213 (2022).
[2] Comments of Citizens Action Coalition of Indiana, Docket No CP21-467-000 (Sep. 26, 2022) ("Comments" or "CAC September 26 Comments").
[3] P.L. 117-169 ("IRA").
[4] CAC September 26 Comments at 1.

1

JA245

overreliance of the market for both energy and capacity services."[11]  Texas Gas' Project is needed to allow CenterPoint to support the integration of renewables and maintain electric reliability on its system, and the IRA has not changed that need.  The Commission should reject CAC's continued attempt to delay the Project, which would defer the Project's benefits and harm the public interest.

Even if it were the Commission's role to second guess CenterPoint's and the IURC's selection of electric generation resources, CAC's September 26 Comments have not raised any new alternatives that have not already been considered.  CAC merely notes that the IRA includes economic incentives for wind, solar, and battery storage investments.[12]  The IURC Order already ruled out these alternatives to the CTs for reasons other than simply cost, specifically rejecting CAC's proposal that CenterPoint "should include more renewables and battery storage and avoid the construction of the CTs."[13]  The IURC explained that "renewables such as wind and solar are dependent upon weather conditions and are, therefore, not as controllable as other sources of generation."[14]  Regarding battery storage, the IURC cited testimony which "noted technical challenges in incorporating batteries into the grid and maintaining reliability," and the IURC held that "while battery storage is an emerging technology, it is currently not a viable and reliable alternative to the proposed CTs."[15]  The IURC concluded:

> [CenterPoint] has satisfied the requirement under Ind. Code § 8-1-8.5-4 that it consider alternative methods for providing reliable, efficient, and economical electric service, *including the refurbishment of existing facilities, conservation, load management, cogeneration, and renewable*

---

[11] Letter from Eric J. Holcomb, Governor of Indiana, to FERC, Docket No. CP21-467-000 (Sep. 29, 2022) (emphasis added).
[12] *See* CAC September 26 Comments at 2-5.
[13] IURC Order at 18.
[14] *Id*.
[15] *Id*. at 18-19.

181 FERC ¶ 61,049
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
James P. Danly, Allison Clements,
Mark C. Christie, and Willie L. Phillips.

| | |
|---|---|
| Texas Gas Transmission, LLC | Docket No.  CP21-467-000 |

ORDER ISSUING CERTIFICATE AND GRANTING ABANDONMENT

(Issued October 20, 2022)

1.      On June 25, 2021, Texas Gas Transmission, LLC (Texas Gas) filed an application pursuant to sections 7(b), 7(c), and 7(e) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] for authorization to abandon, construct, operate, and maintain certain natural gas facilities in Henderson and Webster Counties, Kentucky, and Posey and Johnson Counties, Indiana (Henderson County Expansion Project).  The project is designed to provide up to 220,000 MMBtu per day (MMBtu/d) of new firm transportation service to Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South's (CenterPoint) new natural gas-fired electric generation turbines at CenterPoint's existing A.B. Brown Generating Station (A.B. Brown Plant) in Posey County, Indiana.  For the reasons discussed below, we will grant the requested authorizations, subject to certain conditions.

**I.      Background and Proposal**

2.      Texas Gas, a limited liability company organized under the laws of Delaware,[3] is a natural gas company as defined by section 2(6) of the NGA.[4]  Texas Gas is authorized to do business in and has pipelines in the states of Texas, Louisiana, Arkansas, Mississippi, Tennessee, Kentucky, Indiana, Illinois, and Ohio.  Texas Gas is an open-access pipeline company that provides transportation and storage services in those nine states.

---

[1] 15 U.S.C. § 717f(b), (c), (e).

[2] 18 C.F.R. pt. 157 (2021).

[3] Texas Gas is a wholly owned subsidiary of Boardwalk Pipelines, LP, which is wholly owned by Boardwalk Pipeline Partners, LP.

[4] 15 U.S.C. § 717a(6).

JA247

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

3.      Texas Gas proposes to provide up to 220,000 MMBtu/d of new firm transportation service to CenterPoint's new natural gas-fired electric generation turbines at the A.B. Brown Plant in Posey County, Indiana.[5]  The Henderson County Expansion Project will consist of construction of a new lateral and upgrades to Texas Gas' mainline facilities, as well as abandonment of one compressor unit and the transition of two other units to standby.  Texas Gas anticipates that construction of the project would commence as soon as the project is approved, subject to the receipt of necessary permits and regulatory approvals, and that construction would take about ten months.  Based on this schedule, Texas Gas anticipates placing the facilities in service in May 2024.[6]

## A.      Lateral Facilities

4.      The proposed Henderson County lateral facilities consist of:  (i) approximately 24 miles of new 20-inch-diameter natural gas delivery lateral in Henderson County, Kentucky, and Posey County, Indiana and (ii) a new delivery meter and regulator (M&R) station with 0.08 miles of new 16-inch-diameter interconnecting pipe beginning at the M&R station and terminating at the interconnection with the A.B. Brown Plant and associated auxiliary facilities located in Posey County, Indiana.  The 20-inch-diameter delivery lateral will extend from an interconnect tie-in with Texas Gas' existing Slaughters-Montezuma System[7] at the Robards Junction to CenterPoint's A.B. Brown Plant site in Posey County, Indiana.  The proposed delivery M&R station will be located on CenterPoint property at the A.B. Brown Plant site and will be the custody transfer point for measurement between Texas Gas and CenterPoint.  Texas Gas estimates that the lateral facilities will cost approximately $82,000,000.

## B.      Mainline Facilities

5.      The proposed upgrades to Texas Gas' mainline facilities include:  (i) uprating an existing receipt M&R station (Franklin REX) located in Johnson County, Indiana, from 95,000 MMBtu/d to 160,000 MMBtu/d and (ii) installing a new 4,863-horsepower Solar Centaur 50 turbine compressor unit with piping modifications and other

---

[5] Texas Gas states that CenterPoint is retiring two existing coal-fired electric generating units located at the A.B. Brown Plant, totaling 490-MW, and replacing that generation capacity by installing new natural gas turbines, to reduce the plant's greenhouse gas (GHG) emissions.

[6] Final Environmental Impact Statement (EIS) at 2-24.

[7] The Slaughters-Montezuma system extends north from the Slaughters Compressor Station, which lies on the mainline system.  The Henderson County Lateral will extend northwest from its interconnection with the Slaughters-Montezuma system to the A.B. Brown Plant.

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

appurtenant facilities, at the existing Slaughters Compressor Station located in
Webster County, Kentucky. The proposed compression will be located within the
existing Slaughters Compressor Station and will increase the northbound capacity on
Texas Gas' existing mainline Slaughters-Montezuma System by 140,000 MMBtu/d.[8]
Texas Gas estimates that the upgrades to these mainline facilities will cost approximately
$36,200,000.

### C.    Abandonment

6.       At the Slaughters Compressor Station, Texas Gas requests authorization to:
(i) abandon in place Unit 5, a 1,320 HP reciprocating compressor unit, and (ii) transition
two other existing 1,320 HP units, Units 6 and 7, from primary operating units to standby
units. According to Texas Gas, Unit 5 is inactive, unreliable, and no longer integral to
the Texas Gas system or required to meet transportation obligations in this area. Due to
the advanced age of Units 6 and 7, Texas Gas proposes placing the units on standby as
operational spare units for use during maintenance or unplanned outages. Going forward,
after installation of the new compressor unit, Units 6 and 7 would not be required to meet
Texas Gas' firm transportation obligations in the area. Thus, the horsepower associated
with Units 6 and 7 would not be included in the certificated horsepower for the
Slaughters Compressor Station and will not be used in a manner that would result in the
station exceeding its certificated capacity.[9] Texas Gas further avers that the proposed
modifications at the Slaughters Compressor Station will enhance the station's operational
efficiency and reliability and will lower maintenance costs associated with the upkeep of
the older units.

### D.    Precedent Agreement

7.       Texas Gas held a binding open season from December 23 through December 31,
2020. CenterPoint, an unaffiliated entity, was the only shipper to submit a conforming
binding bid. As a result of the open season, CenterPoint and Texas Gas executed a
precedent agreement with a 20-year term for 100% of the new lateral capacity
(220,000 MMBtu/d) and approximately 92.9% of the additional firm transportation
capacity on the Slaughters-Montezuma system (130,000 MMBtu/d). Texas Gas
explained that transportation of gas to the Henderson County Lateral will be provided
using the incremental capacity to be created on the Slaughters-Montezuma system and

---

[8] The amount of incremental capacity being added to the Slaughters-Montezuma
System will vary seasonally with 140,000 MMBtu/d available in the winter and
134,000 MMBtu/d in the summer. Application at 20. *See also* Texas Gas Sept. 6, 2022
Data Response at 4.

[9] The project will increase the total horsepower at the Slaughters Compressor
Station from 42,448 hp to 43,351 hp.

reserved capacity on other parts of Texas Gas' mainline, in equal parts from the northern region (43,334 MMBtu/d Zone 3), from the southern region (43,333 MMBtu/d Zone SL), and storage (43,333 MMBtu/d Zone 3).[10]  The precedent agreement includes CenterPoint's and Texas Gas' executed conforming service agreements under the following rate schedules:  (i) for the capacity on the Henderson County lateral, Firm Lateral Service – Firm Transportation Service (FLS-FT) for 220,000 MMBtu/d; and (ii) for capacity on the mainline and the Slaughters-Montezuma System, Zone 3-3 Winter No-Notice Service (3-3 WNS) for 43,334 MMBtu/d, Zone SL-3 Winter No-Notice Service (SL-3 WNS) for 43,333 MMBtu/d, Zone 3-3 Summer No-Notice Service (3-3 SNS) for 43,334 MMBtu/d, and Zone SL-3 Summer No-Notice Service (SL-3 SNS) for 43,333 MMBtu/d.  According to Texas Gas, no new tariff provisions are required to facilitate the terms and conditions of service under Rate Schedules FLS-FT, WNS and SNS for the project.  CenterPoint has elected to pay negotiated rates.

8.      As further explained below, Texas Gas proposes to establish incremental rates for service on the Henderson County Lateral Facilities.  Texas Gas proposes to use its existing, applicable mainline rates as the recourse rates for firm transportation service on the mainline facilities, which include the Slaughters-Montezuma system, because the illustrative incremental cost-based rates for the project's upgrades to the mainline facilities would be less than Texas Gas' existing approved maximum applicable transportation rates.

## II.    **Notice, Interventions, and Request for Public Hearings**

9.      Notice of Texas Gas's application in Docket No. CP21-467-000 was published in the *Federal Register* on July 15, 2021,[11] with comments, interventions, and protests due July 30, 2021.  CenterPoint, Citizens Action Coalition of Indiana (CAC), Chevron U.S.A. Inc., Natural Gas Supply Association, Center for Liquefied Natural Gas, The Western Tennessee Municipal Group,[12] Jackson Energy Authority, City of Jackson, Tennessee,

---

[10] Application at 20.  These three transportation amounts add up to 130,000 MMBtu/d.  Texas Gas reserved the following existing mainline capacity for use by Texas Gas in addition to the mainline capacity being created by the project facilities: 43,333 MMBtu/d of Eunice to Slaughters mainline segment; 43,333 MMBtu/d of Hardinsburg to Slaughters mainline segment; 43,334 MMBtu/d of Indianapolis to Hardinsburg segment on the Hardinsburg-Indianapolis Market Lateral; 260,000 MMBtu of Cost-Based Seasonal storage; and 43,334 MMBtu/d of Cost-Based Storage Daily Deliverability.  Application at 11.

[11] 86 Fed. Reg. 37,322 (July 15, 2021).

[12] The Western Tennessee Municipal Group consists of the following municipal distributor-customers of Texas Gas:  City of Bells, Gas & Water, Bells, Tennessee;

Document Accession #: 20221020-3118     Filed Date: 10/20/2022

The Kentucky Cities,[13] Sierra Club, Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., Duke Energy Indiana, LLC, and Atmos Energy Corporation, and American Gas Association filed timely, unopposed motions to intervene.  Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.[14]

10.     Shipper, CenterPoint, and the State of Indiana filed comments in support of the project.  Eric N. Denton, Jean M. Webb, and Niles Rosenquist filed comments, citing concerns regarding safety, health, and environmental impacts.  Elizabeth Toombs[15] filed a comment indicating that the Cherokee Nation was interested in acting as a consulting party and that the Nation did not foresee the project impacting Cherokee cultural resources.  The U.S. Fish and Wildlife Service (FWS) filed comments recommending best management practices to minimize environmental impacts and included a list of federally listed species that have the potential to occur within the project area.  On July 30, 2021, CAC and Sierra Club filed separate protests raising arguments regarding project need and environmental concerns.  Comments raising environmental issues were addressed in the final Environmental Impact Statement (EIS) prepared by Commission staff.

11.     CAC also requests that the Commission schedule public hearings to hear from concerned residents.  Commission staff hosted a public telephonic scoping meeting on May 18, 2022.[16]  In addition, stakeholders were provided multiple opportunities to submit

---

Brownsville Utility Department, City of Brownsville, Brownsville, Tennessee; City of Covington Natural Gas Department, Covington, Tennessee; Crockett Public Utility District, Alamo, Tennessee; City of Dyersburg, Dyersburg, Tennessee; First Utility District of Tipton County, Covington, Tennessee; City of Friendship, Friendship, Tennessee; Gibson County Utility District, Trenton, Tennessee; Town of Halls Gas System, Halls, Tennessee; Humboldt Gas Utility, Humboldt, Tennessee; Town of Maury City, Maury City, Tennessee; City of Munford, Munford, Tennessee; City of Ripley Natural Gas Department, Ripley, Tennessee.

[13] The Kentucky Cities are the cities of Carrollton and Henderson, Kentucky. Both cities are municipal distributor customers of Texas Gas.

[14] 18 C.F.R. § 385.214(c) (2021).

[15] Elizabeth Toombs is the Tribal Historic Preservation Officer in the Cherokee Nation Tribal Historic Preservation Office.

[16] The Commission conducted telephonic meetings in lieu of in-person meetings in response to the pandemic.  The Commission uses this public scoping process to gather

written comments on the application, the draft EIS, and final EIS.[17] We received
48 unique written comments, plus several form letters and petitions. While CAC requests
public hearings, no commenter alleges that they were denied an opportunity to comment.
Therefore, we conclude that the public was afforded an adequate opportunity to review
and comment on the project.

12.    To the extent commenters are requesting a trial-type hearing on whether the
project is in the public convenience and necessity, we deny that request. An evidentiary,
trial-type hearing is necessary only where there are material issues of fact in dispute that
cannot be resolved based on the written record.[18] As demonstrated by the discussion
below, the existing written record provides a sufficient basis to resolve the issues relevant
to this proceeding and the Commission has satisfied the hearing requirement by giving all
interested parties a full opportunity to participate through evidentiary submission in
written form.

13.    On August 12, 2021, Texas Gas filed a joint motion for leave to answer and an
answer to CAC and Sierra Club's protests. Texas Gas argues that Sierra Club's
contention regarding project need is immaterial because it calls on the Commission to
second-guess CenterPoint's determination to replace its retiring coal-fired facilities with
gas-fired units and renewables. Texas Gas also addressed CAC and Sierra Club's
environmental concerns which are discussed in greater detail in the final EIS.

14.    On August 27, 2021, Sierra Club filed a response to Texas Gas' August 12, 2021
answer. Sierra Club reiterates that Texas Gas has not demonstrated a need for the
proposed project, noting that Texas Gas has not identified a market study nor other
potential customers for the capacity should CenterPoint's proposed generation facilities
not materialize. Sierra Club highlights that the Indiana Utility Regulatory Commission
(IURC) previously denied CenterPoint's prior petition for a certificate to construct
gas-fired power units at the same proposed site.

---

input from the public to take into account concerns the public may have about proposals
and the environmental impacts. This gathering of public input is referred to as "scoping."

    [17] In 2021, the Commission established the Office of Public Participation (OPP) to
support meaningful public engagement and participation in Commission proceedings.
OPP provides members of the public, including environmental justice communities, with
assistance in Commission proceedings—including navigating Commission processes and
activities relating to the project.

    [18] *See*, e.g., *S. Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988);
*Dominion Transmission, Inc.*, 141 FERC ¶ 61,183, at P 15 (2012).

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

15.    Although the Commission's Rules of Practice and Procedure do not permit answers to protests or answers to answers, we will accept Texas Gas and Sierra Club's answer and response because they provide information that will assist us in our decision-making.[19]

## III.    Discussion

16.    Because the proposed project includes the abandonment of an existing compressor unit and the construction and operation of facilities that will be used to transport natural gas in interstate commerce subject to the Commission's jurisdiction, the proposal is subject to the requirements of subsections (b), (c), and (e) of section 7 of the NGA.[20]

### A.    Abandonment

17.    Section 7(b) of the NGA provides that an interstate pipeline company may abandon jurisdictional facilities or services only if the Commission finds the abandonment is permitted by the present or future public convenience or necessity.[21] When an applicant proposes to abandon jurisdictional facilities, the continuity and stability of existing services are the primary consideration in assessing whether the public convenience or necessity permit the abandonment.[22]  If the Commission finds that an applicant's proposed abandonment for particular facilities will not jeopardize continuity of existing gas transportation services, the Commission will defer to the applicant's business judgment.[23]

18.    Here, Texas Gas proposes to abandon in place Unit 5 because it is inactive, unreliable, and no longer integral to the Texas Gas system or required to meet transportation obligations in the area.  Texas Gas also proposes to transition Units 6 and 7 from primary operating units to standby units due to their advanced age.  After installation of a new compressor unit, Units 6 and 7 would not be required to meet Texas Gas' firm transportation obligations in the area.  Texas Gas asserts that the proposed modifications will enhance the station's operational efficiency and reliability

---

[19] 18 C.F.R. § 385.213(a)(2) (2021).

[20] 15 U.S.C. § 717f(b), (c), (e).

[21] *Id.* § 717f(b).

[22] *See*, e.g., *Tex. E. Transmission, LP*, 176 FERC ¶ 61,206, at P 11 (2021) (citing *El Paso Natural Gas Co., L.L.C.*, 148 FERC ¶ 61,226, at P 12 (2014)).

[23] *See*, e.g., *Tex. E. Transmission, LP*, 176 FERC ¶ 61,206, at P 11 (citing *Trunkline Gas Co.*, 145 FERC ¶ 61,108, at P 65 (2013)).

and will lower maintenance costs associated with the upkeep of the older units.
Texas Gas has not proposed any changes that will adversely impact the operations of its
system or continuity of service. Accordingly, we find Texas Gas' proposed abandonment
is permitted by the public convenience or necessity.

### B.    Certificate Policy Statement

19.    The 1999 Certificate Policy Statement provides guidance for evaluating proposals
to certificate new construction.[24]  The 1999 Certificate Policy Statement establishes
criteria for determining whether there is a need for a proposed project and whether the
proposed project will serve the public interest. The 1999 Certificate Policy Statement
explains that, in deciding whether and under what terms to authorize the construction of
new pipeline facilities, the Commission balances the public benefits against the potential
adverse consequences. The Commission's goal is to appropriately consider the
enhancement of competitive transportation alternatives, the possibility of overbuilding,
subsidization by existing customers, the applicant's responsibility for unsubscribed
capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded
exercise of eminent domain in evaluating new pipeline construction.

20.    Under this policy, the threshold requirement for pipelines proposing new projects
is that the applicant must be prepared to financially support the project without relying on
subsidization from its existing customers. The next step is to determine whether the
applicant has made efforts to eliminate or minimize any adverse effects the project might
have on the applicant's existing customers, existing pipelines in the market and their
captive customers, and landowners and communities affected by the construction. If
residual adverse effects on these interest groups are identified after efforts have been
made to minimize them, the Commission will evaluate the project by balancing the
evidence of public benefits to be achieved against the residual adverse effects. This is
essentially an economic test. Only when the benefits outweigh the adverse effects on
economic interests will the Commission proceed to complete the environmental analysis
where other interests are addressed.

---

[24] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC
¶ 61,227 (1999), *corrected,* 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128
(2000), *further clarified*, 92 FERC ¶ 61,094 (2000) (1999 Certificate Policy Statement).
To clarify, on March 24, 2022, the Commission suspended the effectiveness of the
updated *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,128 (2022)
and *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project
Revs.*, 178 FERC ¶ 61,108 (2022), issued on February 18, 2022, to replace the
1999 Certificate Policy Statement. *Certification of New Interstate Nat. Gas Facilities*,
178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

## 1.    No Subsidy Requirement and Project Need

21.     Texas Gas' proposal satisfies the threshold requirement that it financially support the project without subsidization from its existing customers.   Texas Gas states that existing transportation customers on Texas Gas' system will not subsidize the costs of the project due to the proposed separate lateral rate design to recover the costs of the Henderson County lateral facilities that will apply only to service on the lateral, and Texas Gas' proposal to charge its existing system-wide rates for the expanded service on its mainline facilities.[25]   Therefore, we find that Texas Gas' existing customers will not subsidize the Henderson County Expansion Project and that the threshold no-subsidy requirement is met.

22.     The project is designed to provide firm transportation service to CenterPoint's two new natural gas-fired combustion turbines (CT) at its A.B. Brown Plant as part of CenterPoint's preferred electric generation portfolio plan.   Texas Gas asserts that the natural gas turbines will support electric reliability when CenterPoint's intermittent renewable resources are unavailable[26] and will also allow CenterPoint to retire coal-fired generating facilities.[27]   Texas Gas entered into a binding precedent agreement with CenterPoint, an unaffiliated shipper, for 100% of the new lateral capacity and approximately 92.9% of the additional firm transportation capacity on the Slaughters-Montezuma system.   A precedent agreement for almost 100% of the project's capacity is significant evidence of the need for the proposed project.[28]

---

[25] The cost-based rates of the new expansion service would be lower than the system-wide rates and the expected revenues exceed project costs, as discussed in more detail below.

[26] Application, Resource Report 1 at 1-1.  *See also* CenterPoint July 30, 2021 Comments at 1-2.

[27] Application at 34.  *See also* CenterPoint July 30, 2021 Comment at 1-2 ("Construction of these CTs are an integral part of CenterPoint's plans to transition its coal-fired generation facilities to a generation fleet composed of 700 to 1,000 megawatts (MWs) of new renewable resources and 460 MWs from the proposed new CTs.  The CTs play a critical role in this transition by providing a dispatchable generation facility to support the renewables during period when renewable resources are unable to produce energy.")

[28] *See*, e.g., *Enable Gas Transmission, LLC*, 175 FERC ¶ 61,183, at P 30 (2021) (finding a long-term precedent agreement for approximately 67% of the project's capacity demonstrated a need for the proposed project); *Double E Pipeline, LLC*, 173 FERC ¶ 61,074, at P 35 (2020) (finding the 10-year, firm precedent agreements for

23.     Sierra Club and CAC argue that Texas Gas has not identified any market studies to demonstrate market need or identified other potential customers should CenterPoint's proposed generation facilities not materialize.[29]  Where, as here, the applicant has supported its application with evidence of capacity subscribed under precedent agreements, our policy is to condition the certificate on the applicant's executing contracts for the level of service and for the terms of service represented in the precedent agreements before commencing construction.[30]  Because we ultimately balance a project's demonstrated benefits against its adverse impacts, the requirement that final service agreements be executed prior to the commencement of construction helps to ensure that the evidence of need relied upon in assessing the balance was not illusory. This requirement will safeguard against the scenario where the project is ultimately not needed because the shipper's intended project for which the shipper secured gas supply, is ultimately not built.

24.     Sierra Club and CAC also assert additional claims arguing essentially that the Henderson County Expansion Project is not needed because there is not a need for CenterPoint's proposed gas-fired CTs.[31]  Similarly, CAC also argues that the enactment

---

approximately 74% of the project's capacity adequately demonstrated that the project was needed).

[29] CAC July 30, 2021 Comment at 4-5; *see also* Sierra Club Aug. 27, 2021 Comment at 1 (noting that the Indiana Utility Regulatory Commission (IURC) previously denied CenterPoint's permit application for the gas-fired power).  On June 28, 2022, IURC issued an order authorizing CenterPoint's proposed natural gas CTs at the A.B. Brown Plant.  Indiana Utility Regulatory Commission, Cause No. 45564 (June 28, 2022).

[30] *See Tenn. Gas Pipeline Co., L.L.C.*, 170 FERC ¶ 61,141, at P 9 (2020).

[31] *See* CAC July 30, 2021 Comment at 6-11; Sierra Club Aug. 30, 2021 Comment at 10 (claim that the coal units at the A.B. Brown Plant will be retired regardless of whether the proposed project is built); Sierra Club Aug. 30, 2021 Comment at 10 (asserting that CenterPoint's proposed gas-fired units are not needed because the coal-burning units could instead be replaced with clean energy at equivalent cost); CAC Aug. 30, 2021 Comment at 19 (arguing that the region's energy needs could be met by increasing capacity purchases from the Midcontinent Independent System Operator (MISO) market, energy efficiency programs, demand response resources, and battery storage resources in lieu of CenterPoint's proposed gas-fired units); CAC Aug. 9, 2022 Comment at 1, 5 (claiming MISO's transmission upgrade initiative undermines the need for the project because the new transmission lines, by enabling the interconnection of numerous new renewable generators, may eliminate or significantly modify the need for CenterPoint's gas-fired units); *cf* MISO Oct. 21, 2021 Comment at 1 ("encourage[ing] the

of Public Law 117-169, the Inflation Reduction Act, which directs nearly $400 billion in tax credits and spending to fund clean energy and transmission resilience investments, "shifts the landscape for utility resource planning" such that CenterPoint could pursue different resources in lieu of the two gas-fired CTs to help integrate CenterPoint's planned renewables.[32]

25.    CenterPoint and its state regulatory agency, the Indiana Utility Regulatory Commission (IURC), are responsible for determining the portfolio of generation resources to replace CenterPoint's retiring coal-fired units, not the Commission.  As an Indiana public utility,[33] CenterPoint is subject to the regulation of the IURC[34] and received authorization from IURC to construct the two CTs on June 28, 2022.[35] CenterPoint expects the CTs will be available by the fourth quarter of 2024. Accordingly, CenterPoint entered into a precedent agreement with Texas Gas to secure capacity to supply the authorized CTs.  Any concerns regarding the need for or authorization of the two CTs should be raised with the IURC.

---

Commission to consider the positive benefits to the electric grid that a reliable fuel delivery system can provide…[t]his is one element to ensure we collectively address and meet the electric reliability needs of customers within MISO's and other regions.").

[32] CAC Sept. 26, 2022 Comment at 2.  In response to CAC's argument, Texas Gas states that the Inflation Reduction Act does not undercut the need for the project nor affect the Commission's analysis of project alternatives.  Texas Gas Oct. 4, 2022 Answer at 2.

[33] CenterPoint is a vertically integrated retail electric utility serving retail customers in Southwestern Indiana.  CenterPoint July 30, 2021 Comment at 1.

[34] Prior to constructing new generation facilities, CenterPoint is required to obtain a certificate of public convenience and necessity (CPCN) from the IURC.  CenterPoint July 30, 2021 Comments at 5 (citing Ind. Code § 8-1-8.5-2 (2020)).

[35] Indiana Utility Regulatory Commission, Cause No. 45564 (June 28, 2022) (issuing CenterPoint a certificate of public convenience and necessity); *see also* CenterPoint Oct. 5, 2022 Comment at 1 (stating that the state court challenges to IURC's June 28 certificate have been dismissed and that the certificate is now final); State of Indiana Sept. 30, 2022 Comment at 1-2 (noting that CenterPoint's gas-fired CTs were approved by the IURC and that the CTs are "necessary for CenterPoint to meet its goals contained within their most recent plan, which will also further promote the State's policy of maintaining a diverse mix of resources to ensure safe and reliable service and further mitigate customer vulnerability to pricing volatility and overreliance of the market for both energy and capacity services").

### 2.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

26.    We find that the Henderson County Expansion Project will not adversely affect service to Texas Gas' existing customers.  Texas Gas has designed the project to provide the new service without impacting services to existing customers.  We also find that there will be no adverse impact on other pipelines in the region or their captive customers because the project will not displace existing service on other pipelines.

27.    The proposed project will have minimal impacts on landowners and communities. The new lateral will parallel existing utility rights-of-way for approximately 10.7 miles, or approximately 47.5%, of the route and the siting of the new compressor unit will be entirely within the existing Slaughters Compressor Station.  Construction of the project will impact 403.07 acres of land and project operations will permanently impact 154.39 acres of land.[36]

28.    Accordingly, we find that there are demonstrated benefits of the Henderson County Expansion Project, and further, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the criteria set forth in the 1999 Certificate Policy Statement and analyze the environmental impacts of the project below.[37]

### C.    Rates

#### 1.    Initial Rates

##### a.    Henderson County Lateral Service

29.    Texas Gas proposes to establish initial incremental firm recourse rates under Rate Schedule FLS (Firm Lateral Service) and an initial incremental interruptible rate under Rate Schedule ILS (Interruptible Lateral Service) using the incremental capacity created by the project on the Henderson County lateral facilities.  Texas Gas' rate structure for the Henderson County lateral service is similar to the rate structure for its other existing

---

[36] *See* Updates for the Henderson County Expansion Project at 44 (Aug. 23, 2021).

[37] *See* 1999 Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

laterals such as the Southern Indiana and Western Kentucky laterals.[38]  Under this
proposed structure, access to the Henderson County lateral service requires a new firm or
interruptible service agreement separate from an agreement to transport on Texas Gas'
mainline.  Texas Gas states that the Rate Schedule FLS recourse rates for transportation
service on the Henderson County lateral facilities will be based solely on the specific
lateral facilities' costs and only the customers using the lateral facilities will pay rates to
recover the cost of service for those facilities.

30.    Texas Gas proposes a recourse reservation charge under Rate Schedules FLS-FT
and FLS-NNS of $0.1512 per MMBtu, based on a design capacity of 220,000 MMBtu/d
and a first-year fixed cost of service[39] of $12,451,273.[40]  Texas Gas proposes an FLS
Winter Season reservation charge under Rate Schedule FLS-WNS of $0.2262 per
MMBtu and an FLS Summer Season reservation charge under Rate Schedule FLS-SNS
of $0.1512 per MMBtu.  Texas Gas proposes an ILS Winter Season rate of $0.2262 per
MMBtu and an ILS Summer Season rate of $0.0983 per MMBtu under Rate Schedule
ILS.[41]  The ILS rates are based on the 100% load factor FLS rates, with a 35% reduction
to the summer rate and a corresponding increase to the winter rate.  Texas Gas' cost of
service reflects a 35-year depreciation life as reflected in the proposed depreciation rate
of 2.86%[42] and reflects Texas Gas' last approved return on equity of 11.5% with a capital
structure consisting of 41.03% debt and 58.97% common equity.[43]

---

[38] *See* Texas Gas Transmission, LLC, Tariffs, § 4.20.1 (Currently Effective
Rates- FLS- So IN Customer Lateral) (0.0.0) and § 4.20.2 (Currently Effective
Rates- FLS- W KY Customer Lateral) (0.0.0).

[39] Texas Gas notes that because the Henderson County lateral does not have
compression, there are no variable costs.  All costs are allocated to the reservation charge.
Application Ex. N at 1 (Henderson County Lateral).

[40] *Id*.

[41] *Id*.

[42] Application at 22 (citing *Tex. Gas Transmission, LLC*, 123 FERC ¶ 61,118
(2008); *Tex. Gas Transmission, LLC*, 153 FERC ¶ 61,323 (2015); and *Tex. Gas
Transmission, LLC*, 154 FERC ¶ 61,032 (2016)).

[43] The capital structure percentages were stipulated to in the settlement reached in
Docket No. RP90-104 (*Tex. Gas Transmission, LLC*, 57 FERC ¶ 61,236 (1991)) and the
ROE percentage was stipulated to in the settlement reached in Docket No. RP97-344
(*Tex. Gas Transmission,* LLC, 84 FERC ¶ 61,019 (1998)).

31.     We have reviewed Texas Gas' proposed cost of service and rate design used to develop the initial incremental rates and find that they reasonably reflect current Commission policy.  Therefore, we approve Texas Gas' proposed charges and rates as the initial recourse charges and rates for the Henderson County lateral facilities.

### b.     Mainline Facilities Service

32.     Texas Gas proposes to charge its existing summer no-notice service rate under Rate Schedule SNS of $0.4033 per MMBtu for Zone 3 and its existing winter no-notice service rate under Rate Schedule WNS of $0.5790 per MMBtu for Zone 3 for the mainline facilities.[44]  For comparison purposes, Texas Gas calculated illustrative incremental rates for Rate Schedule SNS of $0.2158 per MMBtu and Rate Schedule WNS of $0.3224 per MMBtu.  Texas Gas states that in determining the cost of service for the mainline facilities, Texas Gas used its last approved capital structure consisting of 41.03% debt and 58.97% common equity and a return on equity of 11.5%, along with the existing mainline system depreciation rate of 1.80%, inclusive of a 0.20% negative salvage rate.

33.     The Commission has generally held that the applicable system recourse rate is appropriate for a project if the estimated cost-based rate is less than the current system rate.  Otherwise, the pipeline is required to establish an incremental rate to ensure that there is no subsidization from existing shippers.[45]  We have reviewed Texas Gas' proposed cost of service and initial rates and find that they reasonably reflect current Commission policy.  As shown above, Texas Gas' illustrative incremental rates are lower than the currently effective system recourse rates for comparable services.  Because Texas Gas' rate analysis demonstrates that its maximum system recourse rates are greater than the illustrative incremental rates we will approve Texas Gas' request to use its existing system rates under Rate Schedules SNS and WNS as the initial recourse rates for the mainline facilities.

### 2.     Mainline Fuel

34.     Texas Gas proposes to use its existing Middle Zone fuel rate of 0.98% for service on the mainline facilities and requests a predetermination for rolled-in rate treatment for fuel and lost and unaccounted for gas.[46]  Texas Gas states that based on operational expectations, Texas Gas has compared the projected Middle Zone fuel rate for the

---

[44] These existing mainline recourse rates include both the applicable reservation charge and usage charge associated with each rate schedule.

[45] 1999 Certificate Policy Statement, 88 FERC at 61,746.

[46] Application at 27.

mainline facilities of 0.65% against the existing Middle Zone fuel rate of 0.98% for service on the mainline facilities and demonstrates that the mainline facilities will effectively reduce the applicable Middle Zone fuel rate for the benefit of the applicable zone shippers.[47]  Therefore, we approve Texas Gas' use of its existing fuel rate for the mainline facilities and grant a predetermination of rolled-in rate treatment, absent a significant change in circumstances.

### 3.     Pre-Determination of Rolled-in Rates for Mainline Facilities

35.     Texas Gas requests a pre-determination of rolled-in treatment of rates for the mainline facilities in accordance with the Commission's 1999 Certificate Policy Statement.[48]  In support of its request, Texas Gas asserts that for the mainline facilities, incremental revenues will exceed incremental costs.

36.     To support a request for a pre-determination that a pipeline may roll the costs of a project into its system-wide rates in its next NGA general section 4 rate proceeding, a pipeline must demonstrate that rolling in the costs associated with the construction and operation of new facilities will not result in existing customers subsidizing the expansion. In general, this means that a pipeline must demonstrate that the revenues to be generated by an expansion project will exceed the costs of the project.  For purposes of determining in a certificate proceeding whether it would be appropriate to roll the costs of a project into the pipeline's system rates in a future NGA section 4 proceeding, we compare the cost of the project to the revenues generated using actual contract volumes and the maximum recourse rate (or the actual negotiated rate if the negotiated rate is lower than the recourse rate).[49]

37.     Texas Gas states that for the mainline facilities, the incremental negotiated rate revenue of $15,201,097 exceeds the incremental cost of service of $5,385,132 by $9,815,965 in the first year of operation.[50]  In evaluating the project, we find that the incremental revenue from Texas Gas' mainline facilities exceeds the incremental cost of service.  Therefore, we will approve a presumption of rolled-in rate treatment for the cost of the mainline facilities, absent a significant change in circumstances.

---

[47] *Id.*

[48] 1999 Certificate Policy Statement, 88 FERC at 61,746.

[49] *Tenn. Gas Pipeline Co., L.L.C.*, 144 FERC ¶ 61,219, at P 22 (2013).

[50] *See* Application Ex. N (Mainline Facilities) at 2, 7.

Docket Nos. CP21-467-000                                                        - 16 -

### 4.    **Reporting Incremental Costs**

38.     We require Texas Gas to keep separate books and accounting of costs and revenues attributable to the Henderson County lateral facilities' capacity created by the project and internally for the mainline facilities' capacity created by the project in the same manner as required by section 154.309 of the Commission's regulations.[51]   The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[52]

### 5.    **Negotiated Rates**

39.     Texas Gas proposes to provide service to CenterPoint under negotiated rate agreements.  Texas Gas must file either the negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the Alternative Rate Policy Statement[53] and the Commission's negotiated rate policies.[54]

---

[51] 18 C.F.R. § 154.309 (2021).  *See Gulf S. Pipeline Co., LLC*, 173 FERC ¶ 61,049, at P 6 (2020) (for projects that use existing system rates for the initial rates, the Commission's requirement for separate books and accounting applies only to internal books and records).

[52] *See Revisions to Forms, Statements, & Reporting Requirements for Natural Gas Pipelines*, Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).  In *Gulf South*, the Commission clarified that a pipeline charging its existing system rates for a project is not required to provide books and accounting consistent with Order No. 710.  However, a pipeline is required to maintain its internal books and accounting such that it would have the ability to include this information in a future FERC Form No. 2 if the rate treatment for the project is changed in a future rate proceeding.

[53] *Alts. to Traditional Cost-of-Service Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transp. Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *clarification granted*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom.  Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[54] *Nat. Gas Pipelines Negotiated Rate Policies & Practices; Modification of Negot. Rate Pol'y*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304 (2006).

### D.    <u>Environmental Analysis</u>

40.    On July 29, 2021, the Commission issued a Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Henderson County Expansion Project (NOS). The NOS was published in the *Federal Register*[55] on August 5, 2021 and opened a 30-day scoping period. The NOS was mailed to federal and state resource agencies; elected officials; environmental groups and non-governmental organizations; Native American Tribes; potentially affected landowners; local libraries and newspapers; and other stakeholders who had indicated an interest in the project (i.e., project stakeholders). The Commission received comments in response to the NOS from the FWS, U.S. Department of Agriculture – Natural Resources Conservation Service (NRCS), Indiana Department of Natural Resources, the Pokagon Band of Potawatomi Indians, CAC, Sierra Club, Consumer Energy Alliance, and three members of the public.

41.    Following the NOS comment period, the Commission issued a Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Henderson County Expansion Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review (NOI) on October 7, 2021. The NOI was published in the *Federal Register*[56] on October 14, 2021 and mailed to the project stakeholders. The NOI opened an additional 30-day scoping period. The Commission received comments on the NOI from the U.S. Environmental Protection Agency (EPA), Kentucky Department of Environmental Protection – Energy and Environment Cabinet, MISO, Sierra Club, CAC, and two members of the public.

42.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[57] Commission staff prepared a draft EIS, which was issued on April 14, 2022, with EPA participating as a cooperating agency. The draft EIS addressed all substantive environmental comments received during the scoping periods and otherwise prior to EIS issuance. It was filed with the EPA and the Commission issued a Notice of Availability (NOA) of the draft on April 14, 2022. The draft EIS was noticed in the *Federal Register*[58] on April 20, 2022, establishing a 45-day comment period that ended on June 6, 2022. The NOA was also mailed to the project stakeholders. In response to the draft EIS, the Commission received comments from Texas Gas, EPA, FWS, NRCS, Kentucky Department of Environmental Protection – Energy and Environment Cabinet,

---

[55] 86 Fed. Reg. 42,820 (Aug. 5, 2021).

[56] 86 Fed. Reg. 57,130 (Oct. 14, 2021).

[57] 42 U.S.C. §§ 4321 *et seq*. *See also* 18 C.F.R. pt. 380 (2021) (Commission's regulations implementing NEPA).

[58] 87 Fed. Reg. 24,158 (Apr. 22, 2022).

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

Indiana Department of Natural Resources, the Posey County Board of Commissioners, CAC, Sierra Club, Teamsters National Pipeline Labor Management Cooperation Trust, and nine individuals, plus form letters and petitions signed by members of the public. Overall, comments concerned alternatives, soils, water resources (including groundwater protection, water use, and wetlands), aquatic resources, vegetation, wildlife, threatened and endangered species, cultural resources, environmental justice, air emissions, noise, and pipeline safety.

43.     Commission staff issued the final EIS for the project on August 25, 2022, and a NOA was published in the *Federal Register* on August 31, 2022.[59]   The final EIS addresses geology; soils; groundwater; surface water; wetlands; fisheries and aquatic resources; vegetation and wildlife (including threatened, endangered, and other special-status species); land use and visual resources; cultural resources; socioeconomics (including environmental justice); air quality and noise; GHG and climate change; reliability and safety; and alternatives.  It addresses all substantive environmental comments received on the draft EIS and concludes that most adverse environmental impacts would be temporary or short-term during construction, but some long-term and permanent environmental impacts would occur on some forested lands, including forested wetlands.  With the exception of potential impacts on climate change, the EIS concludes that impacts would be reduced to less than significant levels through implementation of Texas Gas' proposed avoidance, minimization, and mitigation measures and Commission staff recommendations, which we have adopted herein as conditions.[60]  With regard to climate change impacts, the final EIS does not characterize the project's GHG emissions as significant or insignificant but we provide information about these emissions below, based on the information on file in the proceeding and as disclosed in the final EIS.[61]

44.     In response to the final EIS, the Commission received comments from: U.S. Department of the Interior (Interior), on behalf of the FWS, regarding federally listed species and section 7 Endangered Species Act (ESA) consultation, and EPA regarding water use for hydrostatic testing, noise, environmental justice, and GHG and climate change.  The Commission also received comments from CAC regarding the enactment of the Inflation Reduction Act.  Interior's and EPA's environmental comments

---

[59] 87 Fed. Reg. 53,470 (Aug. 31, 2022).

[60] Final EIS at 5-1.

[61] *Infra* PP 46-50.

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

are addressed below and CAC's comments regarding the Inflation Reduction Act are addressed in the "No Subsidy Requirement and Project Need" section above.[62]

45.     On October 7, 2022, the Kentucky Department for Environmental Protection filed comments noting certain permits and construction plans might be necessary for the project, e.g. stormwater and floodplain permits and certain construction plans such as groundwater protection plans.  Table 1.4-1 in the final EIS lists all applicable permits, approvals, and consultations for the project, including those listed in the Kentucky Department's comments.[63]  As stated in the final EIS, Texas Gas is responsible for obtaining all permits and approvals required to construct and operate the project.[64]  The Kentucky Department of Environmental Protection also noted that the project is within the Morganfield Water Works designated Source Water Protection Areas and 17 miles upstream from the Morganfield Water Works intake, and asks that the applicant contact Morganfield Water Works in the case of any spill that may affect water quality.[65]  Texas Gas has committed to do this and has updated its Horizontal Directional Drill Monitoring, Inadvertent Return Response, and Contingency Plan and the Spill Prevention and Response Procedures Plan to reflect that it will notify the Morganfield Waterworks and Alcan Ingot Source Water Protection Areas in the event of an inadvertent release of drilling fluids and fuels or any other construction or pipeline operation activities that may impact water quality within these areas.[66]

### 1.      Greenhouse Gas Emissions and Climate Change

46.     The Council on Environmental Quality (CEQ) defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects "that occur at the same time and place" and those "that are later in time or farther removed in distance, but are still reasonably foreseeable."[67]  An impact is reasonably foreseeable if it is "sufficiently likely

---

[62] *See supra* PP 24-25.

[63] Final EIS at 1-9 – 1-10.

[64] *Id.* at 1-9; *c.f. supra* at P 74 and n.132.

[65] Kentucky Department for Environmental Protection October 7, 2022 Letter.

[66] Texas Gas July 7, 2022 Supplemental Data Responses at 12 and Attachment 2.

[67] 40 C.F.R. § 1508.1(g) (2022).

to occur such that a person of ordinary prudence would take it into account in reaching a decision."[68]

47.    For the Henderson County Expansion Project, we find that the construction emissions, direct operational emissions, and the emissions from the downstream combustion of the gas transported by the project are reasonably foreseeable emissions.[69] With respect to downstream emissions, the record in this proceeding demonstrates that the natural gas to be transported by the project will be combusted at CenterPoint's A.B. Brown Plant.[70]  The final EIS explains that the project will result in a net reduction of downstream GHG emissions due to CenterPoint's retirement of coal-fired generation at the A.B. Brown Plant.[71]  Specifically, CenterPoint plans to retire two coal-fired units and replace their generating capacity with a combination of solar and wind energy generation and the two new natural gas turbines.[72]  This will have a net effect of reducing GHG emissions associated with CenterPoint's power generation portfolio.  Assuming the natural gas-fired generation operates at a 100% load factor, replacing the two coal-fired units would result in a net reduction of 2,075,603 tons carbon dioxide equivalent ($CO_2e$) of GHG emissions per year.[73]  This represents one potential estimate of the GHG emission offset from the replacement of the coal units with the gas-fired units and does

_____

[68] *Id.* § 1508.1(aa).

[69] *See Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[70] Application at 34.  *See also* Final EIS at 4-117 (detailing that the natural gas delivered by the project to CenterPoint's A.B. Brown Plant would provide fuel for two new natural gas turbines [460 MW] at the plant).

[71] Final EIS at 4-117.

[72] The planned gas-fired units' natural gas-fired turbines are intended to operate as back-up power generation to support intermittent renewable generating resources and to provide a diversity of generation resources.  Accordingly, the planned gas-fired units are projected to be operational between two and seven percent of available hours per year. *Id.* at 4-117 - 4-118; *see also id.* at 1-2 (detailing the role the gas-fired units play in CenterPoint's 2020 Integrated Resource Plan (IRP), which plans to use flexible natural gas CTs to support CenterPoint's new intermittent renewable resources, which would replace retiring coal-fired units).

[73] Final EIS at 4-118.

not reflect that in 2020 the actual emissions from operation of the two coal-fired generators was about 52% of the units' potential emissions,[74] nor does it reflect that, as noted in footnote 64, CenterPoint anticipates operating the planned gas-fired units only two to seven percent of available hours.[75]  Accordingly, the actual emissions reductions during future operation of CenterPoint's modified A.B. Brown Plant would depend upon actual energy use and the frequency with which the natural gas turbines operate, but overall, would have a beneficial effect on GHG emissions and air quality.[76]

48.      CAC and Sierra Club argue that the coal units' retirement would have occurred regardless of whether the proposed gas units are built or not, and that the emissions reductions from the retirement of the coal plant should not be considered.[77]  Thus, they ask that the Commission revise the EIS to assess the GHG impacts of the proposed project without assuming any emission reductions due to the retirement of the A.B. Brown coal-fired units.[78]  We find that the record supports a finding that the coal units are being retired as part of CenterPoint's 2020 Integrated Resource Plan, which calls for the replacement of the coal units generating capacity with a combination of

---

[74] Accounting for a 52% load factor for the coal-fired units, the project would result in a net reduction of approximately 1,079,314 tons $CO_2$e.  *Id.* at 4-118 (Table 4.9.4-2).

[75] *Id.* at 4-118.  For example, Texas Gas purports that based on CenterPoint's 2020 IRP, the fuel switch from coal to natural gas and renewables planned across CenterPoint's system (not just at the A.B. Brown Plant) would result in a projected net GHG emissions reduction of 7.2 million tons (6.5 million metric tons) of $CO_2$e annually when compared against CenterPoint's pre-project emissions baseline.  *Id.* at 4-119.

[76] *See id.*

[77] Sierra Club June 6, 2022 Comments at 10-11 (claiming that CenterPoint intends to retire the A.B. Brown coal units before the proposed gas CT units go into service and that the coal units could not operate economically).

[78] *Id.* at 13.

renewable resources and the two gas-fired CTs to be sited at the A.B. Brown plant.[79] Nonetheless, the EIS disclosed the information that Sierra Club and CAC requests.[80]

49.     The final EIS estimates that construction of the project may result in emissions of up to 9,385 metric tons of $CO_2e$.[81]   The project's estimated operational GHG emissions are 11,180 metric tons per year (tpy) $CO_2e$.[82]

50.     EPA recommends that the Commission avoid expressing project-level emissions as a percentage of national or state emissions because conveying that information "diminishes the significance of project-level greenhouse gas (GHG) emissions."[83]  As we have previously explained, we compare estimated project GHG emissions to the total GHG emissions of the United States as a whole and at the state level, which allows us to contextualize the project's projected emissions.[84]  As discussed in the final EIS, 5,222.4 million metric tons of $CO_2e$ were emitted at a national level in 2020 (inclusive of $CO_2e$ sources and sinks).[85]  At the state level, Kentucky's energy-related carbon dioxide emissions in 2019 were 115.4 million metric tons, while Indiana's emissions were

---

[79] CenterPoint states that construction of these gas-fired units is an integral part of its plan, detailed in its 2020 Integrated Resource Plan, to transition its coal-fired generation facilities to a generation fleet composed of 700 to 1,000 megawatts of new renewable resources and 460 MWs from the proposed new CTs.  Center Point July 30, 2021 Comments at 1-2.  CenterPoint explained that state approval of the CT units, as well as Commission approval of the Henderson County Expansion Project, were critical to allow it to retire the coal units by October 2023, which CenterPoint sought to do "to avoid making significant capital investments to bring the facility into compliance with environmental regulations—capital investments that CenterPoint's modeling indicates will be more costly to its retail customers than transitioning to renewables supported by quick start and fast ramping CTs." *Id.* at 2.  *See also supra* at n.27, P 25, n. 35 and n.73.

[80] *See* Final EIS at 4-125.

[81] *Id.* at 4-111 (Table 4.9.3-1).

[82] *Id.* at 4-115 - 4-116 (Table 4.9.4-1).

[83] EPA Oct. 3, 2022 Comments at Enclosure at 2.

[84] *See Tex. E. Transmission, LP*, 180 FERC ¶ 61,186, at P 28 (2022) and *Golden Pass Pipeline, LLC*, 180 FERC ¶ 61,058, at P 21 (2022).

[85] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks:  1990-2020* at ES-4 (Table ES-2) (April 2022), https://www.epa.gov/system/files/documents/2022-04/us-ghg-inventory-2022-main-text.pdf.

176.1 million metric tons.  If all emissions from the project were to occur in Kentucky, construction could potentially increase $CO_2$e emissions based on the Kentucky 2019 levels by 0.008%; in subsequent years, project operations could increase emissions by 0.01%.[86]  If all emissions from the project were to occur in Indiana, construction could potentially increase $CO_2$e emissions based on the Indiana 2019 levels by 0.005%; in subsequent years, project operations could increase emissions by 0.006%.[87]  Finally, we note that when states have GHG emissions reduction targets, we will compare the project's GHG emissions to those state goals to provide additional context, however, neither Kentucky nor Indiana have set statewide goals for GHG emissions reduction targets.[88]  Further, by adopting the climate impact analysis in the EIS, we recognize that the project's contributions to GHG emissions globally contributes incrementally to future climate change impacts,[89] and have identified climate change impacts in the region.[90]  In light of this analysis, and because we are conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations for GHG emissions going forward, the Commission is not herein characterizing these emissions as significant or insignificant.[91]

## 2.  **Environmental Justice**

51.     In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12898, *Federal Actions to Address Environmental Justice in*

---

[86] Final EIS at 4-126.

[87]*Id.*

[88] *Id.* at 4-127.

[89] *Id.* at 4-125.

[90] *Id.* at 4-122 to 4-124.

[91] On February 18, 2022, the Commission issued the Updated Certificate Policy Statement and an Interim GHG Policy Statement.  *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022).  The Interim GHG Policy Statement established a NEPA significance threshold of 100,000 tons per year of carbon-dioxide-equivalent (CO2e) as a matter of policy, which was meant to serve as interim guidance for project applicants and stakeholders and the Commission sought public comment on the statement.  On March 24, 2022, the Commission, upon further consideration, made both statements draft and stated that it would not apply either statement to pending or new projects until the Commission issues any final guidance after public comment.  Interim GHG Policy Statement, 178 FERC ¶ 61,197 at P 2.

*Minority Populations and Low Income Populations*, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[92]  In addition, Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[93]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[94]

---

[92] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.  15 U.S.C. § 717f; *see also* 18 C.F.R. § 380.12(g) (2021) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[93] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Feb. 1, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7,629.  The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples.  *See* EPA, *EJ 2020 Glossary* (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[94] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Sept. 6, 2022).  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

52.     Consistent with the CEQ[95] and EPA[96] guidance, the Commission's methodology for assessing environmental justice impacts considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[97] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in the Interagency Work Group for Environmental Justice's *Promising Practices for Environmental Justice Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*), the Commission uses the fifty percent and the meaningfully greater analysis methods to identify minority populations.[98]  Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[99]  CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau.  Using *Promising Practices'* low-income threshold criteria method, low-income populations are identified as block groups where the percent of low-income population in the identified block group is equal to or greater than that of the county.

---

[95] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (*CEQ's Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.

[96] *See generally* Interagency Working Group for Environmental Justice, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[97] *See generally* Exec. Order No. 12,898, 59 *Fed. Reg.* 7629 (Feb. 16, 1994). Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[98] See *Promising Practices* at 21-25.

[99] The final EIS used Johnson and Posey Counties, Indiana, and Henderson and Webster Counties, Kentucky, as the comparable reference communities to ensure that affected environmental justice communities were properly identified.  A reference community may vary according to the characteristics of the particular project and the surrounding communities.

53.     To identify potential environmental justice communities in the project area, the final EIS used 2019 U.S. Census American Community Survey data[100] for the race, ethnicity, and poverty data at the state, county, and block group level.[101]  Additionally, in accordance with *Promising Practices*, Commission staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations, potential environmental quality issues, environmental and demographic indicators, and other important factors.

54.     Once Commission staff collected the block group level data,[102] staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards; the natural physical environment; and associated social, economic, and cultural factors to determine whether impacts to environmental justice communities are disproportionately high and adverse.  The final EIS considered whether impacts were disproportionately high and adverse on environmental justice populations consistent with EPA's recommendations in *Promising Practices*[103] and also whether those impacts were significant.[104]

55.     Additionally, based on public scoping comments expressing concern for impacts on school age children, Commission staff collected and identified data for the total

---

[100] U.S. Census Bureau, American Community Survey 2019 ACS 5-Year Estimates Detailed Tables, File# B17017, Poverty Status in the Past 12 Months by Household Type by Age of Householder, https://data.census.gov/cedsci/table?q=B17017; File #B03002 Hispanic or Latino Origin By Race, https://data.census.gov/cedsci/table?q=b03002.

[101] *See* final EIS at 4-81.

[102] *See id.* at 4-82, Table 4.7.2-1 (Minority Populations by Race and Ethnicity and Low-Income Populations in the Project Area).

[103] *Promising Practices* at 44-46 (explaining that there are a number of factors used to determine whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[104] *Id.* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

percentage of population that are children 17 years of age or younger within the project's area of review.[105]

56.     Staff identified two block groups near the project facilities that exceed the defined thresholds for minority and low-income communities and are, therefore, environmental justice communities.  Staff identified that the tie-in facility and 4.9 miles of the Henderson County Lateral are located in one environmental justice block group with a minority population in Henderson County, Kentucky (Census Tract 208, Block Group 1). For 1.1 miles of Henderson County Lateral, staff identified one environmental justice block group with a low-income population in Posey County, Indiana (Census Tract 404, Block Group 3).[106]  The A.B. Brown M&R Station, Point of Demarcation, and A.B. Brown Interconnecting Pipe are also within Census Tract 404, Block Group 3, a low-income population.  No other census block groups crossed by the remainder of the Henderson County Lateral (between MPs 4.9 and 22.3) or within 1 mile of the Slaughters Compressor Station, or the existing M&R Station, were identified as having minority or low-income populations.  The final EIS determined that potential impacts on the identified environmental justice communities may include visual impacts, socioeconomic impacts, traffic impacts, increased demand for temporary housing and public services, and noise and air impacts from construction and operation of the project.  Environmental justice concerns are not present for other resource areas such as geology, groundwater, surface water, wetlands, wildlife, or cultural impacts due to the minimal overall impact the project would have on these resources.

57.     For visual impacts, the project area is predominately characterized as open and rural with much of the area in agricultural use for cultivated crops, hay, and pastureland. The area north of the Ohio River (in Indiana) is characterized as industrial with a variety of uses, including the A.B. Brown Plant and the Green Plains Mt. Vernon fuel supplier.

---

[105] Staff identified that five block groups out of seven total block groups crossed by the pipeline or within 1 mile of the aboveground facilities have populations with a larger percent of minors (17 years or younger) as compared to the county (Census Tract 208, Block Group 1; Census Tract 209, Block Group 1; Census Tract 209, Block Group 3; Census Tract 209, Block Group 5; and Census Tract 404, Block Group 3).  *See* U.S. Census Bureau, American Community Survey 2019 ACS 5-Year Estimates Detailed Tables, File# S0101, Age and Sex, https://data.census.gov/cedsci/table?q=S0101.

[106] Census Tract 404, Block Group 3 was inadvertently missed as an identified block group crossed by the Henderson County Lateral pipeline segment in Table 4.7.2-1 in the final EIS, but was nevertheless identified and included as part of Commission staff's analysis and review of overall project impacts on environmental justice communities.  *See* final EIS at 4-83, Table 4.7.2-1 (Minority Populations by Race and Ethnicity and Low-Income Populations in the Project Area).

The closest residences within the identified environmental justice communities are 0.1 mile north of the new tie-in facility, 0.3 mile southwest of the A.B. Brown M&R Station, and about 300 feet east of the Henderson County Lateral near milepost 22.4. The final EIS determined that visual impacts associated with construction and operation of these facilities would be predominately borne by environmental justice communities, as there would be limited visibility of the tie-in facility and partial visibility of the A.B. Brown M&R Station and Point of Demarcation, dependent on seasonal vegetation and tree foliage during winter months. However, these impacts would not be significant, given that the project facilities would be installed adjacent to existing industrial facilities, would be similar in size or substantially smaller than other components at these sites, and would not be readily visible from the nearby residences.[107]

58.     Regarding socioeconomic project impacts, the final EIS concludes that construction activities will result in a nominal and temporary non-local workforce. Additionally, the final EIS concludes that no new operational workforce would be required to operate the facilities and, thus, socioeconomic impacts on identified environmental justice communities would be minor and temporary.[108]  For traffic impacts, the final EIS acknowledges that movement of construction personnel, equipment, and materials would result in short-term impacts on roadways. Environmental condition 1 in the appendix of this order requires Texas Gas to employ traffic control measures and work with local school districts to identify school routes and commute times with the goal of minimizing construction traffic along these routes during peak use periods.  With these mitigation measures, the final EIS concludes that traffic would not be expected to significantly impact identified environmental justice communities.[109]

59.     The final EIS concludes that air quality impacts from construction and operation of the project facilities would not result in a significant impact on local or regional air quality for environmental justice communities.[110]  During construction, exhaust emissions and fugitive dust would result in short-term, localized impacts in the immediate vicinity of construction work areas.  Environmental condition 1 in the appendix of this order requires Texas Gas to comply with applicable state fugitive dust requirements and generally limit the areas of ground disturbance.  Texas Gas also commits to reduce vehicle and equipment speed in construction work areas and on access roads to account for adverse weather conditions (e.g., high wind velocities, dry soil

---

[107] *Id.* at 4-90.

[108] *Id.*

[109] *Id.* at 4-91.

[110] *Id.*

conditions, etc.), use water for control of dust, cover open-bodied trucks, clean tracked soil from roads, and by limiting vehicle and equipment idling. During operation, emissions at the project facilities within environmental justice communities would be limited to fugitive releases from operation of a condensate storage tank at the A.B. Brown M&R Station, pigging activities, and new piping components and are not expected to cause or contribute to an exceedance of the National Ambient Air Quality Standards. Further, Texas Gas completed air quality dispersion modeling for the Slaughters Compressor Station (which is not within an environmental justice community) that demonstrated compliance with the National Ambient Air Quality Standards. Overall, the construction and operational emissions from the project would not have significant adverse air quality impacts on the environmental justice populations in the project area.[111]

60.    Regarding noise impacts, the closest defined noise sensitive areas are about 0.1 mile away from proposed aboveground project components within environmental justice communities. Texas Gas proposes horizontal directional drill (HDD) construction within about 300 feet of residences within an environmental justice community. Texas Gas states that HDD construction would typically occur from 7:00 a.m. to 10:00 p.m., but notes that conditions may require 24-hour HDD construction.[112] Texas Gas states that other construction activities would generally occur from 7:00 a.m. to 7:00 p.m.[113] Texas Gas will also restrict equipment deliveries to daytime hours, and construction crews working at aboveground facility sites during nighttime hours would be restricted to specific activities and use handheld tools and pipe-lifting equipment (forklifts).

61.    In its October 3, 2022 comments on the final EIS,[114] EPA recommends avoiding 24-hour HDD construction near residential areas. Environmental condition 19 in the appendix of this order requires Texas Gas to file a noise mitigation plan prior to the installation of any portion of the Henderson County Lateral if noise attributable to HDD construction is projected to exceed a day-night sound level ($L_{dn}$) of 55 decibels on the A-weighted scale (dBA) at any noise sensitive area to reduce noise to below those levels. Texas Gas is required to implement the approved plan, monitor noise levels, and document the noise levels in weekly status reports. Residential areas are considered noise sensitive areas and HDD construction near these areas is covered by the requirements of environmental condition 19. The final EIS explains that the day-night sound level, or $L_{dn}$ takes into account the time of day or night the noise is encountered,

---

[111] *Id.* at 4-92.

[112] *Id.* at 4-136.

[113] *Id.*

[114] EPA Oct. 3, 2022 Comment at Enclosure at 1.

recognizing that people perceive noise levels differently depending on the time of day. Specifically, the $L_{dn}$ adds a 10 dBA penalty to account for people's greater sensitivity to sound levels during the late night and earlier morning hours (10:00 p.m. to 7:00 a.m.).[115] In EPA's 1974 publication, *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*, EPA indicated that an $L_{dn}$ of 55 dBA protects the public from indoor and outdoor activity interference, and the Commission has adopted this criterion to evaluate potential project-related noise impacts at noise sensitive areas.[116]    Based on the projected noise levels, and the requirements in environmental condition 19 in the appendix of this order, we conclude that the temporary HDD construction activities would not result in significant noise impacts on any NSA, including those in environmental justice communities.[117]

62.    For operational noise impacts, noise levels associated with operation of the A.B. Brown M&R Station are estimated to increase by 0.1 decibel, which is less than a perceptible increase in existing noise levels (3 decibels) at the closest NSAs within the identified environmental justice community and the tie-in facility is not expected to affect ambient sound levels.[118]    Additionally, environmental condition 21 in the appendix of this order requires Texas Gas to file noise surveys with the Commission to verify the actual operational noise levels of the A.B. Brown M&R Station at full-load complies with Commission noise standards.  Overall, the project would not cause a perceptible change in noise during operations in the vicinity of the identified environmental justice communities.

63.    The final EIS concluded that impacts associated with the construction and operation of new tie-in facility, the A.B. Brown M&R Station, Point of Demarcation, and A.B. Brown Interconnecting Pipe on environmental justice communities would be disproportionately high and adverse as they would be predominately borne by an environmental justice community.  The final EIS concludes that impacts associated with the construction and operation of all other proposed facilities would not be disproportionately high and adverse.[119]  We agree with respect to both conclusions.  The final EIS concluded that all direct and cumulative impacts on environmental justice

---

[115] Final EIS at 4-134.

[116] *Id.*

[117] Final EIS at 4-139.

[118] *Id.* at 4-142.

[119] *Id.* at 4-99.

communities from the construction and operation of the proposed facilities would be less than significant.[120]  We agree.

64.     EPA recommends that the Commission implement community engagement activities targeted to the potentially affected minority and low-income communities prior to construction and operation of the facilities.[121]  There were opportunities for public involvement for environmental justice communities during the Commission's environmental review processes, though the record does not demonstrate that these opportunities were specifically targeted at engaging environmental justice communities.[122]  Commission staff hosted a public telephonic scoping meeting for the project on May 18, 2022.[123]  Texas Gas states that it held a virtual open house on June 3, 2021, that was publicized by mail to property owners and stakeholders directly impacted by the project.[124]  Texas Gas states that the open house provided an overview of project construction and safety, the regulatory process, environmental protection, and community benefits.  Additionally, Texas Gas states that it has created an informational project-specific website that includes a project email address and phone number for landowners and other stakeholders to submit questions or express concerns.  Moreover, in 2021, the Commission established the Office of Public Participation (OPP) to support meaningful public engagement and participation in Commission proceedings.  OPP provides members of the public, including environmental justice communities, with assistance in Commission proceedings—including navigating Commission processes and activities relating to the project.

### 3.     Federally Listed Species and Endangered Species Act Consultation

65.     In response to the final EIS, the Commission received comments from Interior, on behalf of the FWS, regarding the Indiana bat, northern long-eared bat, and tricolored bat.[125]  With respect to the tricolored bat, on September 14, 2022, after the issuance of the

---

[120] *Id.* at 4-97.

[121] EPA Oct. 3, 2022 Comment at Enclosure at 2.

[122] *See supra* P 9.

[123] The Commission conducted telephonic meetings in lieu of in-person meetings in response to the pandemic.

[124] Application at 38-39.

[125] Interior Sept. 26, 2022 Comments.

final EIS, FWS proposed to list the tricolored bat as endangered under the ESA.[126]  FWS has up to 12 months from the date the proposal is published to make a final determination, either to list the tricolored bat under the ESA or to withdraw the proposal.[127]  Species proposed for listing are not afforded protection under the ESA; however, if a final rule listing a species becomes effective, the prohibitions against jeopardizing its continued existence and "take" apply.[128]  Accordingly, FWS recommends that the Commission review the September 14, 2022 proposal to list the tricolored bat as endangered and if the Henderson County Expansion Project has the potential to adversely affect tricolored bats, analyze potential project impacts on tricolored bats and their habitat.[129]

66.     Interior's comment notes that since issuance of the final EIS, Texas Gas has completed their habitat assessment and determined there is suitable habitat for the Indiana bat and asks that the Commission confirm that, as stated in the final EIS, the Commission will initiate formal consultation on the Indiana bat.[130]  The FWS also requests that because FWS anticipates reclassifying the northern long-eared bat from threatened to endangered prior to the proposed construction period for the project, that the Commission also reinitiate formal consultation for the northern long-eared bat.[131]

---

[126] *Id.* at 2.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*; *see also* final EIS at ES-6.  As detailed in the final EIS, project construction will require clearing of forested habitat during the active period for the Indiana bat and northern long-eared bat, thus the project is likely to adversely affect the Indiana bat and northern long-eared bat.  In correspondence dated June 13, 2022, FWS's Kentucky Field Office confirmed that, with implementation of appropriate conservation measures, any incidental take of Indiana bats resulting from forested habitat removal is not prohibited and is not likely to jeopardize the continued existence of the Indiana bat in Kentucky but that coordination with the Indiana Field Office is ongoing for the clearing of suitable habitat in Indiana.  *Id.*; *see also id.* at 4-53 – 4-56 (analysis of Indiana bat).

[131] Interior Sept. 26, 2022 Comments at 3.  *See also* final EIS at ES-6 (concluding that while the project is likely to adversely affect the northern long-eared bat, any incidental take would not be prohibited by the current 4(d) rule).  As stated in the final EIS, because FWS anticipates reclassifying the northern long-eared bat as endangered consultation is ongoing for this species.  *Id.*

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

67.     As noted in the final EIS, Commission staff is continuing consultation under section 7 of the ESA for the Indiana and northern long-eared bats, and to that end, has requested initiation of formal consultation with FWS for the Henderson County Expansion Project.[132]  Staff is also analyzing any potential impacts of the project on the tricolored bat and has determined that tricolored bat may also be present in Henderson County, Kentucky, where trees could be cleared for construction during the active period for bats.[133]  Staff has requested to initiate an informal conference with the FWS to confirm that the project is not likely to jeopardize the tricolored bat in the event that construction activities extend beyond the currently planned end date of August 2023.[134] Further, to ensure compliance with our responsibilities under ESA section 7(a)(2), FERC staff recommended in the final EIS that Texas Gas not begin construction of the project until consultation with the FWS is completed,[135] and this recommendation has been included as environmental condition 16 in the appendix of this order.

68.     Last, Interior notes that Texas Gas has agreed to make a voluntary contribution to the Imperiled Bat Conservation Fund to address Indiana bat habitat loss and recommends additional coordination with FWS's Kentucky Field Office, the Commission, and Texas Gas to implement this measure.[136]  The Commission does not require or facilitate voluntary mitigation funding for Commission-jurisdictional projects.[137]

## 4.     Water Usage

69.     EPA, in its October 3, 2022 comments on the final EIS, reiterated its concerns over potential water withdrawals for hydrostatic testing, dust suppression and HDD operations from Pond Bayou due to this waterbody being a "regionally important natural resource."[138]  The final EIS noted this concern and recommended that Texas Gas either

---

[132] Commission Staff's October 3, 2022 Letter to FWS' Kentucky and Indiana Field Offices at 3 (initiating consultation based on staff's determination that the project is likely to adversely affect for the Indiana bat and the northern long-eared bat).

[133] *Id.*

[134] *Id.*

[135] Final EIS at 4-54.

[136] Interior Sept. 26, 2022 Comment at 2; *see also* final EIS at 4-55.

[137] *Columbia Gas Transmission, LLC*, 158 FERC ¶ 61,046, at P 79 (2017).

[138] EPA Oct. 3, 2022 Comment at Enclosure at 1.

consult with the Kentucky Energy and Environment Cabinet, Division of Water (KDOW) regarding site-specific mitigation measures related to water withdrawals from Pond Bayou, or use an alternate water source. EPA acknowledges this recommendation and further recommends that Texas Gas provide an environmental evaluation of "other feasible options" for acquiring water.[139]

70. Texas Gas has not yet indicated whether it still intends to withdraw water from Pond Bayou or if it has identified an alternate water source. We have revised staff's proposed condition (included as environmental condition 14 in the appendix to this order), to require Texas Gas to file revised water use plans that exclude withdrawals from Pond Bayou. Alternatively, if Texas Gas obtains approval from the Kentucky Energy and Environment Cabinet, Division of Water (KDOW) to use water from Pond Bayou as a water source, the revised condition requires Texas Gas to file the results of the consultation with KDOW and any proposed mitigation for Commission review and approval.

### 5.  **Environmental Impacts Conclusion**

71. We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the project, as well as the other information in the record. We are accepting the environmental recommendations in the final EIS and are including them as conditions in the appendix to this order. Based on our consideration of this information and the discussion above, we agree with the conclusions presented in the final EIS and find that the project, if implemented as described in the final EIS, is an environmentally acceptable action.

## IV.  **Conclusion**

72. The proposed project will enable Texas Gas to provide up to 220,000 MMBtu/d of new firm transportation service to CenterPoint's new natural gas-fired electric generation turbines at the A.B. Brown Plant. We find that Texas Gas has demonstrated a need for the Henderson County Expansion Project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities. We have analyzed the technical aspects of the project and conclude that it has been appropriately designed to achieve its intended purpose. Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires approval of Texas Gas' Henderson County Expansion Project, subject to the conditions in this order.

---

[139] *Id.*

73.     Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analysis.  Thus, Commission staff carefully reviews all information submitted.  Only when staff is satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during abandonment, construction, and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

74.     Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[140]

75.     At a hearing held on October 20, 2022, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, as supplemented, and exhibits thereto, and all comments, and upon consideration of the record,

The Commission orders:

    (A)     A certificate of public convenience and necessity is issued to Texas Gas authorizing it to construct and operate the proposed facilities, as described and conditioned herein, and as more fully described in the application and subsequent filings by the applicant, including any commitments made therein.

    (B)     The certificate authority granted in Ordering Paragraph (A) is conditioned on Texas Gas':

---

[140] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

    (1)     completion of construction of the proposed facilities and making them available for service within three years of the issuance of this order pursuant to section 157.20(b) of the Commission's regulations;

    (2)     compliance with all applicable Commission regulations, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations;

    (3)     compliance with the environmental conditions listed in the appendix to this order; and

    (4)     making a filing affirming that the parties have executed a firm service agreement for volumes and service terms equivalent to those in the precedent agreement before commencing construction.

(C)    Permission for and approval of Texas Gas' abandonment of the subject facilities, as described in this order and more fully in the application, is granted, subject to compliance with Part 154 of the Regulations.

(D)    Texas Gas shall notify the Commission of the effective date of the abandonment authorized in Paragraph (C) within 10 days thereof.

(E)    Texas Gas' proposed initial incremental recourse reservation charges and interruptible rates are approved as the initial recourse charges and rates for the Henderson County lateral facilities.

(F)    Texas Gas' proposal to use its existing applicable mainline rates as the initial recourse rates for firm transportation service on the mainline facilities is approved.

(G)    Texas Gas' proposal to use its existing Middle Zone fuel rate for service on the mainline facilities and request for a predetermination for rolled-in rate treatment for fuel and lost and unaccounted for gas for the mainline facilities are approved.

(H)    Texas Gas shall keep separate books and accounting of costs attributable to the proposed service, as more fully described above.

(I)    A pre-determination is granted for Texas Gas to roll the mainline facilities' costs into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

(J)    Texas Gas shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local

Document Accession #: 20221020-3118     Filed Date: 10/20/2022

agencies on the same day that such agency notifies Texas Gas.  Texas Gas shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.   Chairman Glick and Commissioner Clements are concurring
                            with a joint separate statement attached.
                            Commissioner Danly is concurring in part with a separate
                            statement attached.

( S E A L )

Kimberly D. Bose,
Secretary.

## Appendix

### Environmental Conditions

As recommended in the final environmental impact statement (EIS), this authorization includes the following conditions.

1.  Texas Gas shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order.  Texas Gas must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Project.  This authority shall allow:

    a.  the modification of conditions of the Order;

    b.  stop-work authority; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Project construction and operation.

3.  **Prior to any construction**, Texas Gas shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel would be informed of the EI's authority and have been or would be trained on the implementation of the

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

environmental mitigation measures appropriate to their jobs before becoming involved with construction and restoration activities.

4.      The authorized facility locations shall be as shown in the EIS.  **As soon as they are available, and before the start of construction**, Texas Gas shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order.  All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Texas Gas' exercise of eminent domain authority granted under Natural Gas Act Section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations.  Texas Gas' right of eminent domain granted under Natural Gas Act Section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.      Texas Gas shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary.  Approval for each of these areas must be explicitly requested in writing.  For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area.  All areas shall be clearly identified on the maps/sheets/aerial photographs.  Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.      implementation of cultural resources mitigation measures;

    b.      implementation of endangered, threatened, or special concern species mitigation measures;

    c.      recommendations by state regulatory authorities; and

    d.      agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.      **Within 60 days of the acceptance of the authorization and before construction begins**, Texas Gas shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee. Texas Gas must file revisions to the plan as schedules change.  The plan shall identify:

    a.      how Texas Gas would implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

    b.      how Texas Gas would incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

    c.      the number of EIs assigned, and how the company would ensure that sufficient personnel are available to implement the environmental mitigation;

    d.      company personnel, including EIs and contractors, who would receive copies of the appropriate material;

    e.      the location and dates of the environmental compliance training and instructions Texas Gas would give to all personnel involved with construction and restoration (initial and refresher training as the Project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

    f.      the company personnel (if known) and specific portion of Texas Gas' organization having responsibility for compliance;

    g.      the procedures (including use of contract penalties) Texas Gas would follow if noncompliance occurs; and

    h.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

          i.     the completion of all required surveys and reports;

          ii.     the environmental compliance training of on-site personnel;

          iii.     the start of construction; and

          iv.     the start and completion of restoration.

7.     Texas Gas shall employ at least one EI per construction spread.  The EI shall be:

    a.     responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

    b.     responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.     empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

    d.     a full-time position, separate from all other activity inspectors;

    e.     responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.     responsible for maintaining status reports.

8.     Beginning with the filing of its Implementation Plan, Texas Gas shall file updated status reports with the Secretary on a **weekly** basis until all construction and restoration activities are complete.  On request, these status reports would also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.     an update on Texas Gas' efforts to obtain the necessary federal authorizations;

b.      the construction status of the Project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

c.      a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d.      a description of the corrective actions implemented in response to all instances of noncompliance;

e.      the effectiveness of all corrective actions implemented;

f.      a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

g.      copies of any correspondence received by Texas Gas from other federal, state, or local permitting agencies concerning instances of noncompliance, and Texas Gas' response.

9.      Texas Gas shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP, or the Director's designee.  The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the Project and restoration of the right-of-way.  **Prior to construction**, Texas Gas shall mail the complaint procedures to each landowner whose property would be crossed by the Project.

In its letter to affected landowners, Texas Gas shall:

a.      provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

b.      instruct the landowners that if they are not satisfied with the response, they should call Texas Gas' Hotline; the letter should indicate how soon to expect a response; and

     c.      instruct the landowners that if they are still not satisfied with the response from Texas Gas' Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

In addition, Texas Gas shall include in its weekly status report a copy of a table that contains the following information for each problem/concern:

     a.      the identity of the caller and date of the call;

     b.      the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

     c.      a description of the problem/concern; and

     d.      an explanation of how and when the problem was resolved, would be resolved, or why it has not been resolved.

10.    Texas Gas must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Project facilities**. To obtain such authorization, Texas Gas must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.    Texas Gas must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project into service**. Such authorization would only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

12.    **Within 30 days of placing the authorized facilities in service**, Texas Gas shall file an affirmative statement with the Secretary, certified by a senior company official:

     a.      that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities would be consistent with all applicable conditions; or

     b.      identifying which of the conditions in the Order Texas Gas has complied with or would comply with. This statement shall also identify any areas affected by the Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

JA289

13. **Within 5 days of the final determination of the use of the Nationwide Permit 12 issued by the U.S. Army Corps of Engineers**, Texas Gas shall file the complete water quality certification issued categorically by the Kentucky Department of Environmental Protection – Energy and Environment Cabinet and Indiana Department of Environmental Management, including all conditions.  All conditions attached to the water quality certification constitute mandatory conditions of this Certificate Order.  Prior to construction, Texas Gas shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its Project design necessary to comply with the water quality certification conditions.

14. **Prior to construction**, Texas Gas shall file with the Secretary for review and written approval by the Director of OEP or the Director's designee, a revised water use plan for hydrostatic testing, dust suppression, and HDD operations to exclude withdrawals from Pond Bayou (wetland WP7012).  Alternatively, if Texas Gas obtains approval from the Kentucky Energy and Environment Cabinet, Division of Water (KDOW) for water withdrawals from Pond Bayou, Texas Gas shall file with the Secretary, for review and written approval by the Director of OEP or the Director's designee, documentation of its revised water use plans and the results of the consultation with KDOW and the mitigation measures it will adopt to minimize impacts on Pond Bayou.

15. **Prior to construction**, Texas Gas shall file with the Secretary records of updated consultation with the U.S. Fish and Wildlife Service (FWS) regarding its review of Texas Gas' pedestrian survey protocols for nesting birds, including any FWS recommendations for modifications to the survey protocols for birds of conservation concern protected under the Migratory Bird Treaty Act.  In addition, if construction clearing activities occur within the FWS' recommended exclusion window, Texas Gas shall identify any FWS-recommended measures that it does or does not propose to implement based on the results of this consultation.

16. Texas Gas shall **not begin construction** of the Project **until**:

    a. FERC staff completes Section 7 Endangered Species Act consultation with the FWS; and

    b. Texas Gas has received written notification from the Director of OEP, or the Director's designee, that construction and/or use of mitigation (including implementation of any conservation measures) may begin.

17. **Prior to construction**, Texas Gas shall file with the Secretary documentation that its proposed Imperiled Bat Conservation Fund conservation measures are complete for incidental take of the federally endangered Indiana bat in Kentucky.

18. **Prior to construction**, Texas Gas shall file documentation with the Secretary regarding Texas Gas' consultation with the U.S. Department of Agriculture – Natural Resources Conservation Service (NRCS) on any applicable restrictions or special mitigation measures required by the NRCS for the Conservation Reserve Project parcels crossed by the Project to maintain enrollment in the conservation easements. Texas Gas shall identify, for review and written approval by the Director of OEP or the Director's designee, the specific restrictions and measures it would implement when crossing the conservation easements.

19. **Prior to installation of any portion of the Henderson County Lateral via horizontal directional drill**, if noise attributable to the horizontal directional drill is projected to exceed a day-night sound level ($L_{dn}$) of 55 decibels on the A-weighted scale (dBA) at any noise sensitive area (NSA) (either for daytime-only or 24-hour construction) , Texas Gas shall file with the Secretary, for review and written approval by the Director of OEP or the Director's designee, a mitigation plan incorporating the final design of noise mitigation measures to reduce the projected noise levels to no more than an $L_{dn}$ of 55 dBA at the NSAs. During drilling operations, Texas Gas shall implement the approved plan, monitor noise levels, and document the noise levels in the weekly status reports.

20. Texas Gas shall file a noise survey with the Secretary **no later than 60 days** after placing the authorized unit at the Slaughters Compressor Station in service. If a full-load condition noise survey is not possible, Texas Gas shall provide an interim survey at the maximum possible horsepower load and file the full-load survey **within 6 months**. The survey(s) shall demonstrate that noise from the modified compressor station under interim or full horsepower load conditions does not exceed the previously existing noise levels that are at or above an $L_{dn}$ of 55 dBA at any nearby NSA. If any of these noise levels are exceeded, Texas Gas shall file a report with the Secretary on what changes are needed to reduce the operating noise level at the NSAs to or below the previously existing noise level and install additional noise controls to meet that level **within 1 year** of the in-service date. Texas Gas shall confirm compliance with this requirement by filing a second full power load noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

21. Texas Gas shall file noise surveys with the Secretary **no later than 60 days** after placing the new A.B. Brown Meter and Regulator Station and modified existing receipt meter and regulator station into service. If a full-load condition noise survey is not possible, Texas Gas shall provide an interim survey at the maximum possible power load and provide the full power load survey **within 6 months**. If the noise attributable to the operation of the meter stations at interim or full power load conditions exceeds 55 dBA $L_{dn}$ at any nearby NSAs, Texas Gas shall file a

report with the Secretary on what changes are needed and install additional noise controls to meet that level **within 1 year** of the in-service date.  Texas Gas shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC                              Docket No.  CP21-467-000

(Issued October 20, 2022)

GLICK, Chairman, and CLEMENTS, Commissioner, *concurring*:

1.       We concur with the decision to issue a certificate of public convenience and necessity to Texas Gas Transmission, LLC (Texas Gas) for its proposed Henderson City Expansion Project.  We write separately because today's order does not assess the significance of the climate impacts from the project's greenhouse gas (GHG) emissions.[1] Both Commission precedent and common sense support the conclusion that the project's GHG emissions will not "significantly" affect the environment within the meaning of the National Environmental Policy Act (NEPA).[2]  Indeed, the proposed project will result in a net *reduction* in GHG emissions when the reasonably foreseeable downstream emissions are factored in.  Where, as here, it is obvious that climate impacts cannot be deemed significant under *any* framework for assessing significance that the Commission may ultimately adopt, the Commission should just say so.

2.       In *Northern Natural Gas Co.*, the Commission found that it could determine the significance of GHG impacts for NEPA purposes using best available quantitative and qualitative evidence and applying its expertise and judgment.[3]  The courts have long

---

[1] *See Texas Gas Transmission, LLC,* 181 FERC ¶ 61,049, at P 43 (2022) (Order). We agree with one another that (1) the Commission is fully capable of determining the significance of GHG emissions, and (2) there is no reason to wait for a final GHG Policy Statement to find the emissions here insignificant when they would be deemed so under any reasonable framework for assessing significance.  However, as reflected in our separate concurring statements in recent certificate orders, our approaches differ when emissions levels are potentially significant.  *See, e.g., Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041 (2022) (Glick, concurring, at P 7) ("I would have found this project's GHG emissions to be significant") (Clements, concurring, at P 3) (appropriate to decline to label emissions or significant or insignificant while Commission considers comments on Draft GHG Policy Statement).

[2] NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C).

[3] *See N. Nat. Gas Co.*, 174 FERC ¶ 61,189, at PP 32, 33 (2021).

construed NEPA based on a "common sense" understanding of its terms.[4]  The Commission has appropriately decided it will not make significance findings in cases involving potentially significant GHG emissions while we are considering comments on the draft GHG Policy Statement.  However, that does not compel us to abandon applicable Commission precedent – or our common sense – in determining whether the GHG emissions in this case would "significantly" affect the environment.

3.     The Henderson City Expansion Project would result in a substantial net *decrease* in GHG emissions when reasonably foreseeable downstream emissions reductions are considered.  The modifications authorized in the order would generate 9,385 metric tons of carbon dioxide equivalent ($CO_2e$) in construction-related GHG emissions and an increase of 11,180 metric tons per year in direct operational emissions.[5]  These direct project emissions will be dwarfed by the decrease in downstream emissions that will be made possible by CenterPoint Energy's replacement of its coal-fired units with a combination of wind and solar generation, backed up by its new gas-fired units that will be supplied by the Henderson City Expansion Project.[6]  Accordingly, the Commission should apply our precedent, as well as our common sense, to find that the GHG emissions here are not significant.

----

[4] *See, e.g., Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 551 (1978) ("common sense" teaches NEPA requirement for "detailed statement of alternatives" does not include every conceivable alternative).

[5] Order at P 49.

[6] *Id.* at P 47 (net reduction of downstream GHG emissions would be up to 2,075,603 metric tons per year at 100% load factor, although actual amount will depend on frequency with which new natural gas units operate).  We acknowledge Sierra Club's contention that we should use a "no coal baseline" in calculating net downstream GHG emissions.  Sierra Club argues that CenterPoint's coal-fired units will have to close irrespective of whether the proposed new gas-fired units are built or gas is supplied to them by virtue of the Commission approving the Henderson City Expansion Project.  *Id.* at P 48.  Texas Gas disputes that the coal-fired units would be shut down, explaining that CenterPoint instead would enter into bilateral capacity arrangements in the MISO market, where approximately 70% of generation capacity is fossil-fired.  Texas Gas Reply Comments on Draft EIS at p. 4, Docket No. CP21-467-000 (June 22, 2022).  CenterPoint also states that it could invest in upgrades to the coal-fired units to meet air quality regulations if the Henderson City Expansion Project were not built and it therefore could not obtain fuel for the new gas-fired units.  *See* Comments of CenterPoint Energy Indiana South at p. 7, Docket No. CP21-467-000 (July 30, 2021).  On balance, the record evidence supports the conclusion that the Henderson City Expansion Project will result in a net reduction of downstream GHG emissions.

For these reasons, we respectfully concur.


_____          _____
Richard Glick                          Allison Clements
Chairman                               Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC                          Docket No.  CP21-467-000

(Issued October 20, 2022)

DANLY, Commissioner, *concurring in the judgment*:

1.      I concur in the decision to grant Texas Gas Transmission, LLC's (Texas Gas) requested Natural Gas Act (NGA) section 7 authorizations.[1]  I write separately to highlight several aspects of this order and the Commission's recent NGA sections 3 and 7[2] authorizations more broadly.

2.      *First*, although I agree that the Commission must act "in accordance with our . . . statutory duties,"[3] we must first examine the scope of our inquiry under the public convenience and necessity standard.  The Supreme Court has found that NGA section "7(e) requires the Commission to evaluate all factors bearing on the public interest."[4]  This obligation, however, is not unlimited in scope and this requirement cannot be read in a vacuum.  The Supreme Court has explained that the inclusion of the term "public interest" in our statute is not "a broad license to promote the general public welfare"—instead, it "take[s] meaning from the purposes of the regulatory legislation."[5]  The purpose of the NGA, as the Supreme Court has instructed us, is "to encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices."[6]  To the extent

---

[1] 15 U.S.C. § 717f.

[2] *Id*. § 717b; *id*. § 717f,

[3] *Tex. Gas Transmission, LLC*, 181 FERC ¶ 61,049, at P 49 n.92 (2022) (*Texas Gas*) ("While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.") (citing 15 U.S.C. § 717f; 18 C.F.R. § 380.12(g) (2021); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf).

[4] *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959).

[5] *NAACP v. FPC*, 425 U.S. 662, 669 (1976) (*NAACP*).

[6] *Id.* at 669-70; *accord Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015) (*Myersville*) (quoting *NAACP*, 425 U.S. at 669-70).  I

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

to which any Commission issuance attempts to expand the range of subjects we consider in our inquiry under the public convenience and necessity standard (as, for example, is contemplated by the now-draft Updated Certificate Policy Statement),[7] I reiterate my view that any regime we institute must "take meaning" from the purpose of the NGA.

3.      *Second*, I would like to take a moment to address the Commission's assertion that "the emissions from the downstream combustion of the gas transported by the project are reasonably foreseeable emissions."[8] I recognize that the Commission's determination is based on the U.S. Court of Appeals for the District of Columbia Circuit's decision in *Sabal Trail*.[9] And I also acknowledge that, recently, the D.C. Circuit recognized the court's conclusion in *Sabal Trail*, stating that "[g]reenhouse gas emissions are reasonably foreseeable effects of a pipeline project when the project is known to transport natural gas to particular power plants."[10] I would be remiss, however, if I failed to point out that both the partial dissent in *Sabal Trail*,[11] and a case from the U.S. Court of Appeals for the

---

note that the Supreme Court has also recognized the Commission has authority to consider "other subsidiary purposes," such as "conservation, environmental, and antitrust questions." *NAACP*, 425 U.S. at 670 & n.6 (citations omitted). But all subsidiary purposes are, necessarily, subordinate to the statute's primary purpose.

[7] *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Updated Certificate Policy Statement); *see Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022) (Order on Draft Policy Statements) (converting the two policy statements issued on February 18, 2022, Updated Certificate Policy Statement, 178 FERC ¶ 61,107, and *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) (Interim GHG Policy Statement), to "draft" policy statements).

[8] *Texas Gas*, 181 FERC ¶ 61,049 at P 47 (citing *Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.")).

[9] 867 F.3d 1357.

[10] *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109 (D.C. Cir. 2022) (citing *Sabal Trail*, 867 F.3d at 1371-74).

[11] *See* 867 F.3d at 1379-83 (Brown, J., concurring in part and dissenting in part).

Eleventh Circuit cast serious doubt on *Sabal Trail's* holding.[12]  *Sabal Trail* is also in obvious conflict with the Supreme Court's holding in *Public Citizen*.[13]

4.      *Third*, as I have explained in recently-issued certificate orders,[14] while not fatal to the durability of the order, I would have explicitly repudiated *Northern Natural Gas Company* (*Northern*)[15] and reaffirmed the Commission's prior position that "[w]ithout an accepted methodology, the Commission cannot make a finding whether a particular quantity of greenhouse gas [(GHG)] emissions poses a significant impact on the environment, whether directly or cumulatively with other sources, and how that impact would contribute to climate change."[16]  This is because, as the Commission has stated, it is unable to connect a particular project's GHG emissions to discrete, physical effects on the environment.[17]  Instead, the Commission does not even acknowledge its *Northern* precedent in today's order.  And while it has, in recent proceedings, acknowledged the precedent and stated that "the Commission has previously assessed the 'significance' of GHGs,"[18] it neither acknowledges that precedent nor announces a departure in today's

---

[12] *See Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1299-1300 (11th Cir. 2019) (referring to *Sabal Trail* as "questionable").

[13] *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ( "[The National Environmental Policy Act (NEPA)] requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause.  The Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law.'") (citation omitted) (*Public Citizen*).

[14] *See, e.g.*, *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198 (2022) (Danly, Comm'r, concurring in the judgment at PP 2-4) (*Columbia Gulf*).

[15] 174 FERC ¶ 61,189 (2021).  In *Northern*, a majority of my colleagues established what has been referred to (by some) as the "eyeball" test.  *See* Catherine Morehouse, *Glick, Danly spar over gas pipeline reviews as FERC considers project's climate impacts for first time*, UTIL. DIVE, Mar. 19, 2021, https://www.utilitydive.com/news/glick-danly-spar-over-gas-pipeline-reviews-as-ferc-considers-projects-cli/597016/ ("'We essentially used the eyeball test,' [Chairman Glick] said, adding that based on that analysis, 'it didn't seem significant in terms of the impact of those emissions on climate change.'").

[16] *Dominion Transmission, Inc.*, 163 FERC ¶ 61,128, at P 67 (2018) (footnote omitted).

[17] *See, e.g.*, *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145, at P 188 (2017).

[18] *See, e.g.*, *Tex. E. Transmission, LP*, 180 FERC ¶ 61,186, at P 27 n.42 (2022) ("We acknowledge that the Commission has previously assessed the 'significance' of

order. There is, however, no standard by which the Commission could, consistent with
our obligations under the law, ascribe significance to a particular rate or volume of GHG
emissions.[19] The Commission's recent attempts to do so, absent the expertise to make
such a determination and the statutory authority to impose it, have amounted to little
more than picking arbitrary numbers.[20]

5.     Therefore, it is no surprise that the Commission asserts in today's order that
"because we are conducting a generic proceeding to determine whether and how the
Commission will conduct significance determinations for GHG emissions going forward,
the Commission is not herein characterizing these emissions as significant or
insignificant."[21] My colleagues are trying to preserve the option to employ a new version
of their flawed "eyeball" test, perhaps with a new arbitrary threshold. We have no
authority to establish arbitrary significance thresholds. We also have no expertise. How
exactly would my colleagues propose to establish such a threshold and then support it
with the substantial evidence and reasoned decision making required to survive judicial
review?

6.     As I have said before, we have a mess on our hands because of changing,
inconsistent practice and because the Commission has been picking numbers out of thin
air. Any process in which we declare arbitrary, unsupported thresholds will subject our
issuances to significant—and wholly unnecessary—legal risk.[22] Recently, Commission

GHGs, *see N. Nat. Gas Co.*, 174 FERC ¶ 61,189 (2021). However, we do not do so here
because the Commission is considering approaches for assessing significance in a
pending proceeding.") (citation omitted).

[19] *See, e.g.*, *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197, at P 292 (2018).

[20] *See* Interim GHG Policy Statement, 178 FERC ¶ 61,108 at PP 79-81
(establishing a significance threshold of 100,000 metric tons per year (tpy) of $CO_2e$); *id.*
(Danly, Comm'r, dissenting at PP 32-36) (explaining why the majority's presumptive
significance threshold is illogical); *see also Northern*, 174 FERC ¶ 61,189 (Danly,
Comm'r, concurring in part and dissenting in part at P 16) (comparing the *Northern* test
to "like posting a speed limit sign with a question mark instead of a number, leaving it to
the police officer to decide arbitrarily whether you were speeding").

[21] *Texas Gas*, 181 FERC ¶ 61,049 at P 50.

[22] The Commission is authorized to make a "'rational legislative-type judgment'"
but may not "pluck a number out of thin air when it promulgates rules." *WJG Tel. Co.,
Inc. v. FCC*, 675 F.2d 386, 388-89 (D.C. Cir. 1982) (quoting *FCC v. Nat'l Citizens
Comm. for Broad.*, 436 U.S. 775, 814 (1978)); *see also LeMoyne-Owen Coll. v. NLRB*,
357 F.3d 55, 61 (D.C. Cir. 2004) ("In the absence of an explanation, the 'totality of the
circumstances' can become simply a cloak for agency whim—or worse.") (citation

JA299

staff has made significance determinations in NEPA documents[23] published *after* the issuance of the Commission's Interim GHG Policy Statement[24] but *before* the policy statement was changed into a draft policy statement.[25] In three of those cases, the Commission's order neither acknowledged nor adopted staff's significance determination.[26] In one order, the Commission acknowledged that staff had assessed

---

omitted).

[23] *See, e.g.*, Commission Staff, Environmental Assessment for Golden Pass LNG Terminal LLC Variance Request No. 15, Docket No. CP14-517-001, at 25 (Mar. 22, 2022) ("In order to assess impacts on climate change associated with the Project, we applied the Commission's Interim Policy Statement on 'Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews' issued on February 18, 2022 in Docket No. PL21-3-000 that established a significance threshold of 100,000 metric tpy of $CO_2e$. The Amendment's construction emissions of 93,642 metric tpy of $CO_2e$ would not exceed the Commission's presumptive significance threshold.") (citing Interim GHG Policy Statement, 178 FERC ¶ 61,108); Commission Staff, Environmental Assessment for Equitrans L.P. Truittsburg Well Conversion Project, Docket No. CP22-24-000, at 29 (Mar. 7, 2022) (finding that the "Project's construction and operation emissions would fall below the Commission's presumptive [100,000 metric tpy] significance threshold"); Commission Staff, Final Environmental Impact Statement for Kern River Transmission Company Delta Lateral Project, Docket No. CP21-197-000, at 4-75 (Feb. 25, 2022) (finding that "[t]he Project operations and downstream combustion of gas transported by the Project could potentially increase emissions by over 2.7 million metric tpy of $CO_2e$, which exceeds the Commission's presumptive threshold of significance").

[24] Interim GHG Policy Statement, 178 FERC ¶ 61,108.

[25] *See* Order on Draft Policy Statements, 178 FERC ¶ 61,197 at P 2.

[26] *Compare ANR Pipeline Co.*, 179 FERC ¶ 61,122, at P 35 (2022) ("The Commission is not herein characterizing these emissions as significant or insignificant because we are conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations going forward."), *and id.* P 35 n.42 ("Although we acknowledge that the Commission has previously assessed the 'significance' of GHGs, *see N. Nat. Gas Co.*, 174 FERC ¶ 61,189 (2021), we do not do so here. The Commission is considering approaches for assessing significance in a pending proceeding.") (citing Order on Draft Policy Statements, 178 FERC ¶ 61,197), *with* Commission Staff, Final Environmental Impact Statement for ANR Pipeline Co. Wisconsin Access Project, Docket No. CP21-78-000, at 53-54 (Mar. 18, 2022) ("In order to assess impacts on climate change associated with the Project, Commission staff applied the Commission's Interim Policy Statement on 'Consideration of Greenhouse

significance, and then declined to adopt staff's determination.[27]  We should stop issuing
confusing, inconsistent statements and we should no longer attempt to preserve our
ability to set arbitrary thresholds.  We should never have articulated the 100,000 metric
tons per year significance threshold in the now-draft Interim GHG Policy Statement.[28]
That was a mistake, and we should not repeat it.

7.      Aside from the legal risk that would attend the establishment of any unsupported,
arbitrary threshold, we have recently been reminded by the Supreme Court that caution is
necessary when contemplating the regulation of subjects that have not been clearly placed
within our jurisdiction by Congress, especially when our actions could have a profound
effect on an industry that is critical to the wellbeing of all Americans.  *West Virginia v.*

---

Gas Emissions in Natural Gas Infrastructure Project Reviews' issued on February 18,
2022 in Docket No. PL21-3-000 that established a significance threshold of
100,000 metric tpy of $CO_2e$.  The Project's operational and downstream emissions would
exceed the Commission's presumptive significance threshold based on 100 percent
utilization.") (citing Interim GHG Policy Statement, 178 FERC ¶ 61,108).  *See also
Golden Pass LNG Terminal LLC*, 180 FERC ¶ 61,058, at P 20 (2022) (stating that "[t]he
Commission is not herein characterizing these emissions as significant or insignificant
because we are conducting a generic proceeding to determine whether and how the
Commission will conduct significance determinations going forward" even though staff
previously applied a significance threshold in the Environmental Assessment); *Rover
Pipeline LLC*, 179 FERC ¶ 61,043, at P 18 (2022) (same).

[27] *See Spire Storage W. LLC*, 179 FERC ¶ 61,123, at P 52 n.106 (2022)
("acknowledg[ing] that the Commission has previously assessed the 'significance' of
GHGs, *see N. Nat. Gas Co.*, 174 FERC ¶ 61,189 (2021), and Commission staff assessed
the significance of GHGs for the project in the final EIS by applying the Commission's
February 17, 2022 Interim Policy Statement").

[28] *But see Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198 (2022) (Glick,
Chairman, concurring at P 5 n.14) ("I recognize the now-draft GHG policy statement
proposes 100,000 metric tons as a threshold over which a project's GHG emissions
would be presumed significant.  In my view, *that is a deliberately conservative number*
intended to ensure that the Commission did not lead projects developers down the path of
an environmental assessment, only to subsequently change course and require an
environmental impact statement *in the event that the Commission were to establish a
lower threshold* in a final GHG policy statement than it did in the then-interim, now-draft
policy statement.  I remain open to reviewing the comments submitted in response to that
draft statement, as well as guidance we may receive from other federal agencies, in
considering what threshold would be appropriate in a final policy statement.") (emphasis
added) (citation omitted).

Document Accession #: 20221020-3118          Filed Date: 10/20/2022

*Environmental Protection Agency* (*West Virginia*)[29] perfectly reinforces Commissioner Christie's dissent regarding the major questions doctrine in the Interim GHG Policy Statement proceeding.[30]  The Commission is charged under the NGA with "encourag[ing] the orderly development of plentiful supplies of . . . natural gas at reasonable prices."[31]  The NGA's purpose, established by Congress and articulated by the Supreme Court, is for the Commission to *promote* the development of natural gas infrastructure.  It is not an environmental statute and to adopt mitigation policies or establish thresholds, the effect of which would be to frustrate the primary purpose of the statute, in order to pursue policy goals in an arena not delegated by Congress, invites challenges under *West Virginia*.  "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body."[32]  In light of the Supreme Court's reinvigoration of the major questions doctrine, we should abandon a project that clearly exceeds the boundaries of our delegated authority and proceed by simply terminating Docket No. PL21-3-000 (Consideration of GHG Emissions in Natural Gas Infrastructure Project Reviews).

8.      *Fourth*, I object to staff's inclusion of a Social Cost of GHGs calculation based on the estimated emissions from the project's construction and operation in this proceeding's Final Environmental Impact Statement (Final EIS).[33]  The Commission has often—and extensively—discussed why the Social Cost of Carbon is ill-suited to project-level NEPA review, and why the Social Cost of Carbon cannot meaningfully inform the Commission's decision to approve or disapprove natural gas infrastructure projects under the NGA.[34]  No valuable information can be gleaned from the numbers included in

---

[29] *West Virginia v. EPA*, 142 S. Ct. 2587 (2022) (*West Virginia*).

[30] *See* Interim GHG Policy Statement, 178 FERC ¶ 61,108 (Christie, Comm'r, dissenting at PP 3, 22-28); Updated Certificate Policy Statement, 178 FERC ¶ 61,107 (2022) (Christie, Comm'r, dissenting at PP 3, 22-28).

[31] *NAACP*, 425 U.S. at 669-70 (citation omitted); *accord Myersville*, 783 F.3d at 1307 (quoting *NAACP*, 425 U.S. at 669-70).

[32] *West Virginia*, 142 S. Ct. at 2616.

[33] *See* Commission Staff, Final Environmental Impact Statement for the Henderson County Expansion Project, Docket No. CP21-467-000, at 4-129, 4-130 (Aug. 25, 2022).

[34] *See, e.g.*, *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296 (2017), *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-97 (2018), *aff'd sub nom. Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. 2019) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change

Commission staff's Final EIS and they serve merely to confuse the matter—they should be omitted from future issuances.[35]

9.      *Fifth*, I disagree with the part of the Commission's Environmental Condition 14 that requires that "Texas Gas . . . file with the Secretary, for review and written approval by the Director of OEP or the Director's designee, documentation of its revised water use plans and the results of the consultation with [Kentucky Energy and Environment Cabinet, Division of Water (KDOW)] and the mitigation measures it will adopt to minimize impacts on Pond Bayou."[36]  This condition suggests, that "if Texas Gas obtains approval from the . . . [KDOW] for water withdrawals from Pond Bayou," that the Commission is reserving authority to determine whether additional mitigation measures are needed.[37]  Texas Gas will need to adhere to the requirements of the authorization from KDOW for any water withdrawals from the Pond Bayou.  I do not see the need for the Commission to weigh in on the adequacy of any mitigation measures that may be part of that authorization and disagree to the extent to which the condition suggests that Texas Gas should propose mitigation measures for the Commission's approval.  NEPA "not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any."[38]

10.      *Finally*, I would like to end this statement on a positive note.  I am pleased that the timing of the issuance of this order is much improved compared to many other recent

---

impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes.").

[35] Because the Social Cost of Carbon was not developed for project-level review, its use is not required for the evaluation of impacts under section 1502.21 of the CEQ's regulations.  40 C.F.R. § 1502.21(c).  This reasoning is consistent with *Florida Southeast Connection, LLC* where the Commission stated, "[a]nd we do not dispute that [the Social Cost of Carbon] is generally accepted in the scientific community and can play an important role *in different contexts, such as rulemaking proceedings*."  164 FERC ¶ 61,099, at P 35 (2018) (emphasis added) (footnote omitted).

[36] *Texas Gas*, 181 FERC ¶ 61,049 at Environmental Condition 14.

[37] *Id.*

[38] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) (citation omitted).

NGA authorizations.[39]  Consistent with our regulations,[40] the Commission issued the notice of intent to prepare an environmental impact statement (EIS) on October 7, 2021,[41] *i.e.*, 90 days after the July 9, 2021 issuance of the notice for this application.  In my view, an Environmental Assessment would have sufficed for this proceeding and perhaps would have even allowed the Commission to have met the applicant's requested action date, *i.e.*, September 16, 2022.[42]  The Commission is acting on this application a little more than a month after the date requested by Texas Gas.[43]  It is my hope that the remaining NGA authorizations pending before the Commission are similarly spared what have unfortunately become common delays.

For these reasons, I respectfully concur in the judgment.

_____

James P. Danly
Commissioner

_____

[39] *See, e.g.*, *LA Storage, LLC*, 180 FERC ¶ 61,188 (2022) (Danly, Comm'r, concurring at PP 9-11) (disagreeing with the delay in the issuance of the authorization for a proposed project that went through the Commission's pre-filing process and explaining the costs that may attend delay in Commission action).

[40] *See* 18 C.F.R. § 157.9(b) ("For each application that will require an environmental assessment or an environmental impact statement, notice of a schedule for the environmental review will be issued within 90 days of the notice of the application, and subsequently will be published in the *Federal Register*.").

[41] *See* Commission October 7, 2021 Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Henderson County Expansion Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review re Texas Gas Transmission, LLC under CP21-467.

[42] I pause to note that my colleagues can point to no court decision finding that the Commission should have determined the significance of the GHG emissions or that the Commission should have prepared an EIS due to its inability to determine the significance of GHG emissions.  No such judicial decision exists.  We therefore have no such obligation.  Nor has there *ever* been a remand or vacatur of a certificate order on that basis.

[43] Application at 5 ("Texas Gas requests that the Commission complete its review of the Application and grant the requested authorizations in this Application on or before September 16, 2022.").

Document Content(s)

CP21-467-000.docx......................................................1

JA305

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |
|---|---|---|
| Texas Gas Transmission, LLC | ) ) ) | Docket No. CP21-467-000 |

## REQUEST FOR REHEARING OF
## CITIZENS ACTION COALITION OF INDIANA

Pursuant to Section 19(a) of the Natural Gas Act ("NGA")[1] and Rule 713 of

the Federal Energy Regulatory Commission's ("FERC" or "Commission") Rules of

Practice and Procedure,[2] Citizens Action Coalition of Indiana ("CAC") hereby

requests rehearing and rescission of the Commission's October 20, 2022 Order

("Certificate Order" or "Order") granting a Certificate of Public Convenience and

Necessity ("Certificate") to Texas Gas Transmission, LLC ("Texas Gas," "TGT," or

"Applicant") conditionally authorizing construction and operation of the proposed

Henderson County Expansion Project ("Project").[3] CAC's motion to intervene in this

proceeding was automatically granted by operation of law, as discussed below.

Thus, CAC is a "party" to this proceeding and has standing to file this request for

rehearing.[4] Furthermore, this request for rehearing is timely filed within 30 days of

FERC's October 20, 2022 Order.[5]

---

[1] 15 U.S.C. § 717r(a).

[2] 18 C.F.R. § 385.713.

[3] *Texas Gas Transmission, LLC,* 181 FERC ¶ 61,049 (Oct. 20, 2022).

[4] *See* 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713(b).

[5] 15 U.S.C. § 717r(a). Thirty days from October 20, 2022, was Saturday, November 19, 2022; under the Commission's Rule 2007 ("Time"), 18 C.F.R. § 385.2007, the end of the 30-day rehearing request period is Monday, November 21, 2022.

JA306

CAC, a non-profit corporation chartered under the laws of Indiana, is a coalition of organizations and more than 40,000 individual members and contributors throughout the State of Indiana. Founded in 1974, CAC has a mission to empower citizens, promote economic and environmental justice, and advocate public policies protective of consumers and the environment. CAC has several individual members in the Evansville, Indiana area who would bear the environmental burdens and harms of a new gas pipeline and new gas power plant in their locality.

CAC seeks rehearing and rescission of the Commission's Order because the Order and the Final Environmental Impact Statement[6] do not comply with the requirements of the NGA and the National Environmental Policy Act ("NEPA") in three important ways. First, the Order and FEIS' analysis of purpose and need unlawfully fails to consider alternatives to the Project, including non-gas alternatives, that could meet the Applicant's stated purpose. Second, the FEIS unlawfully considers as part of the Project's environmental effects a coal power plant retirement that is not causally connected to the Project. Third, the Commission's analysis in the FEIS and Order unlawfully fails to adequately analyze the Project's greenhouse gas emissions ("GHGs"). By inappropriately refusing to determine whether the Project's GHG emissions are significant in its NEPA review, FERC then arbitrarily fails to meaningfully consider the Project's

---

[6] Final Environmental Impact Statement for Texas Gas Transmission, LLC's Henderson County Expansion Project under CP21-467, Docket No. CP21-467-000 (Aug. 25, 2022), Accession No. 20220825-3038 ("FEIS").

2

contributions to climate change in its determination to approve the Project under the NGA. As part of this request for rehearing, CAC incorporates all its protests, comments, and replies filed in this proceeding prior to issuance of the Certificate Order.

# Table of Contents

I. STATEMENT OF RELEVANT FACTS ............................................................. 4

II. BASIS FOR REHEARING ........................................................................... 8

III. STATEMENT OF ISSUES AND ARGUMENT ................................................. 9

    A.    The Commission Violated NEPA by Failing to Evaluate Reasonable Non-Gas Energy Alternatives. .................................................. 10

    B.    The Commission's Order and FEIS Are Arbitrary, Capricious, and Violate NEPA by Attributing Reductions in Coal Generating Emissions to the Project. ................................................................................... 33

    C.    The Order's Failure to Adequately Consider the Significance of the Project's Greenhouse Gas Emissions Violates NEPA and the NGA…………….. ............................................................................ 41

IV. CONCLUSION ................................................................................... 48

JA308

## I.  STATEMENT OF RELEVANT FACTS

Texas Gas applied on June 25, 2022, under Section 7(c) of the NGA, 15 U.S.C.

§ 717f(c), for a required Certificate to construct its proposed Henderson County

Expansion Project.  The Project would, according to Texas Gas, consist of:

> (i) approximately 24 miles of new 20-inch diameter natural gas lateral which will parallel an existing Texas Gas pipeline for approximately 47.5% of the route, and auxiliary appurtenant facilities (i.e. tie-in and mainline valve facilities) located in Henderson County, Kentucky and Posey County, Indiana; (ii) a new delivery meter and regulator ("M&R") station with 0.08 miles of new 16-inch interconnecting pipe located in Posey County, Indiana; (iii) upgrades to an existing receipt M&R station located in Johnson County, Indiana; and (iv) a new C50 turbine compressor unit with approximately 4,863 horsepower ("HP"), piping modifications, and other associated auxiliary appurtenant facilities to be installed at Texas Gas' existing Slaughters Compressor Station in Webster County, Kentucky.[7]

According to Texas Gas, the Project will supply gas to support a proposed

new gas-fired power plant to be built in Evansville, Indiana, at the site of the

existing coal-fired A.B. Brown Generating Station, which is planned to be retired in

2023.[8]  The sponsor of the new gas power plant, Southern Indiana Gas and Electric

Company d/b/a CenterPoint Energy Indiana South ("CenterPoint"), applied to the

Indiana Utility Regulatory Commission ("IURC") on June 17, 2021, for state

regulatory approval to build the new gas combustion turbines ("CTs"), which it

received from the IURC in June of this year.[9]   CenterPoint has contracted under a

---

[7] Texas Gas Transmission, LLC, Abbreviated Application for a Certificate of Public Convenience and Necessity, Abandonment Authorization and Related Authorizations, at 3–4, Docket No. CP21-467-000 (June 25, 2021), Accession No. 20210625-5123 ("Application").

[8] Application at 1, 4, 10.

[9] IURC, Order of the Commission, Cause No. 45564 (Jun. 28, 2022), included as Attachment 1 to TGT's July 7, 2022 Response to June 27, 2022 Data Request, Accession No. 20220707-5164 ("IURC Order").

Precedent Agreement with TGT for the entire pipeline capacity of the Project, 220,000 dekatherms per day.[10]  Gas traveling along the Project would originate in equal parts from Texas Gas's northern region, southern region, and storage.[11]

In accordance with 18 C.F.R. §§ 157.10(a) and 385.214(b) and the Notice of Application Establishing Intervention Deadline dated July 9, 2021,[12] CAC filed a Motion to Intervene on July 12, 2021.[13]  As CAC's motion was not opposed, CAC's intervention as a party was automatically granted by operation of law fifteen days later.[14]  The Commission issued a Notice of Scoping Period Requesting Comments on Environmental Issues on July 29, 2021.[15]  CAC filed a Protest on July 30, 2021;[16] Environmental Scoping Comments on August 30, 2021;[17] a Reply on September 28,

---

[10] Application at 11–12, 17, 20.

[11] *Id.* at 20.

[12] Notice of Application and Establishing Intervention Deadline, Docket No. CP21-467-000 (July 9, 2021), Accession No. 20210709-3020.

[13] Motion to Intervene of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (July 12, 2021), Accession No. 20210712-5096.

[14] 18 C.F.R. § 385.214(c).

[15] Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Henderson County Expansion Project, Docket No. CP21-467-000 (July 29, 2021), Accession No. 20210729-3019.

[16] [CAC] Protest and Comment, Docket No. CP21-467-000 (July 30, 2021), Accession No. 20210730-5268 ("CAC Protest").

[17] Scoping Comments on Environmental Issues for the Proposed Henderson County Gas Pipeline Expansion Project Submitted by Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Aug. 30, 2021), Accession No. 20210830-5179 ("CAC Scoping Comments").

JA310

2021[18] to Texas Gas's Answer of September 21, 2021;[19] Additional Scoping

Comments on November 8, 2021;[20] and a Reply on February 1, 2022[21] to Texas

Gas's Answer of December 7, 2021.[22]  The Commission Staff issued a Draft

Environmental Impact Statement ("DEIS") on April 14, 2022,[23] in response to which

CAC submitted Comments on June 6, 2022.[24]

In its DEIS Comments, CAC emphasized several issues, including: (a) the

DEIS's failure to consider alternatives with significant environmental advantages

to the Project as proposed; (b) the DEIS's faulty assumption, in calculating

emissions effects of the Project, that the A.B. Brown coal plant's closure is causally

related to the Project; and (c) the DEIS's failure to evaluate the Project's reasonably

foreseeable impacts to climate change and the required significance determination.

CAC also submitted a Comment on August 9, 2022, in relation to recent approval by

[18] Motion for Leave to Reply and Reply of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Sept 28, 2021), Accession No. 20210928-5080 ("CAC Reply of Sept. 28, 2021").

[19] Motion for Leave to Answer and Answer of Texas Gas Transmission, LLC, Docket No. CP21-467-000 (Sept. 21, 2021), Accession No 20210921-5089 ("TGT Answer of Sept. 21, 2021").

[20] Additional Scoping Comments on the Environmental Impact Statement of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Nov. 8, 2021), Accession No. 20211108-5182 ("CAC Additional Scoping Comments").

[21] Motion for Leave to Reply and Reply of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Feb. 1, 2022), Accession No. 20220201-5201 ("CAC Reply of Feb. 1, 2022").

[22] Answer of Texas Gas Transmission, LLC to Comments of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Dec. 7, 2021), Accession No. 20211207-5145 ("TGT Answer of Dec. 7, 2021").

[23] Henderson County Expansion Project Draft Environmental Impact Statement, Docket No. CP21-467-000 (Apr. 14, 2022), Accession No. 20220414-3004.

[24] Comments on the Draft Environmental Impact Statement of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (June 6, 2022), Accession No. 20220606-5203 ("CAC DEIS Comments").

JA311

the Midcontinent Independent System Operator ("MISO") of building new electric transmission lines across the region.[25]

The Commission Staff issued its FEIS on August 25, 2022. The FEIS largely retained the flaws of the DEIS, including, as the Commission Staff noted in responses to comments, an explicit refusal to consider non-gas alternatives to the Project,[26] and an explicit refusal to characterize the Project's resulting GHG emissions as significant or insignificant.[27]

CAC submitted another Comment on September 26, 2022,[28] in relation to enactment in August 2022 of Public Law 117-169, the "Inflation Reduction Act," which, through amendments to federal tax law, will affect the cost of renewable energy resources. Finally, CAC submitted a Reply on October 14, 2022[29] to Texas Gas's Answer of October 4, 2022.[30] The Commission issued its Certificate Order granting the requested Certificate to Texas Gas for the Henderson County Expansion Project on October 20, 2022.

---

[25] Comment of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Aug. 9, 2022), Accession No. 20220809-5051 ("CAC Comments of Aug. 9, 2022").

[26] FEIS, Appx. S at S-40, S-137, S-153.

[27] *Id.* at S-74, S-95, S-130.

[28] Comment of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Sept. 26, 2022), Accession No. 20220926-5156 ("CAC Comments of Sept. 26, 2022").

[29] Motion for Leave to Reply and Reply of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Oct. 14, 2022), Accession No. 20221014-5200 ("CAC Reply of Oct. 14, 2022").

[30] Answer of Texas Gas Transmission, LLC to Comments of Citizens Action Coalition of Indiana, Docket No. CP21-467-000 (Oct. 4, 2022), Accession No. 20221004-5151 ("TGT Answer of Oct. 4, 2022").

## II.   BASIS FOR REHEARING

Pursuant to Rule 713(c)(1),[31] CAC submits that the Certificate Order is contrary to the NGA and NEPA and is also arbitrary and capricious and not based on reasoned decision-making.[32]  Specifically, the Order contains the following errors and infirmities that the Commission should reconsider on rehearing:

(1)   *The Order and FEIS violate NEPA and the NGA by failing to evaluate reasonable non-gas energy alternatives.*

(a)   *The Order and FEIS ignore NEPA's clear command to evaluate non-gas energy alternatives to the Project that would meet part or all of the Project's purpose and need.*

(b)   *The Commission arbitrarily and without reasoned explanation broke with its past pattern and practice of evaluating non-gas energy alternatives.*

(c)   *In the alternative, the Commission was required under NEPA to evaluate non-gas energy alternatives under its no-action alternative analysis.*

(d)   *The Commission's public convenience and necessity decision for the Project under the NGA required evaluation of reasonable non-gas energy alternatives.*

---

[31] 18 C.F.R. § 385.713(c)(1).

[32] Agency action is arbitrary and capricious if the agency has "failed to consider an important aspect of the problem," or where the agency explained its decision in a way "that runs counter to the evidence."  5 U.S.C. § 706(2)(A); *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

JA313

(2)     *The Order and FEIS are arbitrary and capricious and violative of NEPA in deducting coal generating emissions from the effects of the Project.*

 (a) *The Order acknowledges that the closure of the A.B. Brown coal power plant is already unavoidable, but elsewhere treats the A.B. Brown retirement as causally intertwined with the Project.*

 (b) *The Order ignores extensive record evidence showing that the A.B. Brown coal plant will retire regardless of whether the Project is built.*

 (c) *The FEIS wrongly deducts avoided emissions of the A.B. Brown coal generating units from the Project's resulting downstream emissions, in violation of NEPA.*

(3)     *The Order and FEIS violate NEPA and the NGA by failing to adequately consider the significance of the Project's greenhouse gas emissions.*

 (a) *The Order and FEIS fail to determine whether the Project's contributions to climate change are significant, as required by NEPA and implementing regulations.*

 (b) *The Commission's public convenience and necessity decision for the Project under the NGA required a weighing of the Project's climate change costs.*

## III. STATEMENT OF ISSUES AND ARGUMENT

Pursuant to Rule 713(c)(2),[33] CAC offers the following more detailed discussion of the issues and errors in the Commission's Order.

---

[33] 18 C.F.R. § 385.713(c)(2).

JA314

## A.      The Commission Violated NEPA by Failing to Evaluate Reasonable Non-Gas Energy Alternatives.

As noted in CAC's comments on the DEIS[34] and elsewhere in the docket,[35] there is detailed record evidence outlining a wide variety of non-gas energy alternatives that must be evaluated pursuant to the Commission's NEPA analysis. The Commission's failure to evaluate *any* non-gas energy alternatives in the DEIS, FEIS, or Order Issuing Certificate and Granting Abandonment is arbitrary, capricious, or otherwise not in accordance with law for at least three reasons.[36] First, the Commission is obligated to evaluate non-gas energy alternatives that meet the purpose and need of the Project, or part of the purpose and need of the Project.  Second, even if the non-gas energy alternatives do not meet the purpose and need of the Project, or parts of the purpose and need of the Project, they still must be evaluated under the no-action alternative analysis.  Third, the Commission broke its historic pattern and practice of including an evaluation of non-gas energy alternatives in its NEPA analysis without reasoned explanation.

### 1.      NEPA Demands that the Commission Evaluate Non-Gas Energy Alternatives that Meet Part of, or All of, the Purpose and Need of the Project.

The Commission is required to examine alternatives to the proposed Project where, *inter alia*, the alternatives are reasonable and meet the purpose and need of

---

[34] CAC DEIS Comments at 12–24.

[35] *See, e.g.*, CAC Additional Scoping Comments, at 1–4.

[36] Specifically, the Commission states that "The concerns expressed by commentors about the use of renewable energy sources, or for assessing other possible mechanisms for addressing U.S. energy needs, are beyond the scope of this environmental document." FEIS, at 3-3.

JA315

the Project. Here, the Commission has clearly recognized a broad interpretation of the purpose and need for the Project but failed to examine the plethora of reasonable non-gas energy alternatives that could meet this stated purpose and need. The Commission's stated position is that the "assess[ment] [of] other possible mechanisms for addressing U.S. energy needs [is] beyond the scope of this environmental document."[37] However, as described below, this statement conflicts with the overwhelming weight of case law, breaks with the Commission's own guidance, and defies basic common sense.

The Commission is required to consider alternatives to the proposed federal action, here the issuance of a Certificate, for the proposed pipeline infrastructure as part of the environmental impact statement ("EIS") pursuant to NEPA.[38] The Council on Environmental Quality's ("CEQ") NEPA regulations require an agency to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources as provided by [] NEPA,"[39] and that an EIS include consideration of other reasonable courses of action, and mitigation measures not in the proposal.[40] The Commission's own NEPA rules require that an EIS describe "[a]ny alternative to the proposed action that would have a less severe

---

[37] *Id.*
[38] 42 U.S.C. § 4332(C)(iii).
[39] 40 C.F.R. § 1501.2(b)(3).
[40] 40 C.F.R. § 1501.9(e)(2).

JA316

environmental impact or impacts."[41]  "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."[42]

An avalanche of case law has established the principle that reasonable alternatives not within the direct jurisdiction of the lead agency still must be examined in the NEPA analysis.[43]  These cases are consistent with the CEQ's most recent revisions to its NEPA regulations, where CEQ states that it is appropriate to consider alternatives "that are beyond the goals of the applicant or *outside the agency's jurisdiction* . . . ."[44]  FERC itself has engaged in alternatives analysis that

---

[41] 18 C.F.R. § 380.7(b).

[42] *Simmons v. U. S. Army Corps of Eng'rs*, 120 F.3d 664, 670 (7th Cir. 1997).

[43] *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 835–36 (D.C. Cir. 1972) (holding that the agency's environmental impact statement violated NEPA because it failed to consider alternatives outside of the Department of the Interior's jurisdiction); *Sierra Club v. Lynn*, 502 F.2d 43, 62 (5th Cir. 1974) ("The agency must consider appropriate alternatives which may be outside its jurisdiction or control, and not limit its attention to just those it can provide"); *Env't Defense Fund v. Froehlke*, 473 F.2d 346, 351 (8th Cir. 1974) (acquisition of land to mitigate loss of land from river channel project must be considered even though it would require legislative action); *Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1454 (9th Cir. 1984) ("In some cases an alternative may be reasonable, and therefore required by NEPA to be discussed in the EIS, even though it requires legislative action to put it into effect."); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 235 F. Supp. 2d 1143, 1153-56 (W.D. Wash. 2002) ("The Corps' argument that it did not fully consider the sediment reduction strategy due to a present lack of authority to implement such a strategy does [violate] NEPA regulations and caselaw"); *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 813–14 (9th Cir. 1999) (Ninth Circuit explicitly found that the Forest Service should have examined an alternative that would have relied on funding to purchase the non-Federal parcel in that case with funds from the Federal Land and Water Conservation Fund); *Mason Cty. Med. Ass'n v. Knebel*, 563 F.2d 256, 262–63 (6th Cir.1977) (federal loan guarantee for building a coal-fired steam electric generator; alternatives considered in EIS included nuclear, geothermal, conservation, purchased power, and others); *Libby Rod & Gun Club v. Poteat*, 457 F. Supp. 1177 (D. Mont. 1978), judgment aff'd in part, rev'd in part on other grounds, 594 F.2d 742 (9th Cir. 1979); *Env't Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 492 F.2d 1123 (5th Cir. 1974) (railroad transportation as alternative to waterway); *Atchison, T. & S. F. Ry. Co. v. Callaway*, 382 F. Supp. 610 (D.D.C. 1974) (other modes of transportation as alternative to improvement of river navigation).

[44] National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23,453, 23,459 (Apr. 20, 2022) (emphasis added).

JA317

includes non-jurisdictional alternatives.  For example, for the Mountain Valley pipeline project, the Commission examined no less than three extra-jurisdictional alternatives for the project, including: transporting the natural gas via "LNG vessels," transporting the natural gas via "truck delivery," and transporting the natural gas by "railroad delivery."[45]  Furthermore, as more fully described below, the Commission has also examined numerous non-gas energy alternatives in other pipeline project NEPA documents.[46]

Such analysis is appropriate because one of NEPA's primary purposes is information sharing in nature, which includes the goal of helping to inform the public, other agencies, and the executive branch, and to foster interagency discussions concerning the range of potential alternatives.[47]  FERC directly echoes these goals in its FEIS, where it states that the "purpose" of the FEIS is to "encourage and facilitate involvement by the public and interested agencies in the environmental review process."[48]

The range of alternatives is largely determined by the agency's description of the purpose and need of the proposed Project.[49]  A failure to properly define a project's purpose and need potentially precludes the consideration of reasonable

---

[45] Final Environmental Assessment Mountain Valley Pipeline, at 3-5–3-7, Docket No. CP16-10 (Sept.22, 2022), Accession No. 20220922-5187.

[46] *See infra*, at 25–27.

[47] *See, e.g.*, *Morton*, 458 F.2d at 837 ("NEPA was intended to provide a basis for consideration and choice by the decisionmakers in the legislative as well as the executive branch").

[48] FEIS, at 1-3.

[49] *See, e.g.*, *League of Wilderness Defs.–Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012).

alternatives.[50]  A narrow range of alternatives renders it impossible for the agency to meaningfully analyze and compare impacts.[51]  The alternatives considered may not be entirely driven by a private applicant's preferences, as "blindly adopting the applicant's goals is 'a losing proposition' because it does not allow for the full consideration of alternatives required by NEPA."[52]  NEPA requires an agency to "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" and to look at the general goal of the project, rather than only those alternatives by which a particular applicant can reach its own specific goals.[53]

As the CEQ has said, "[r]easonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, *rather than simply desirable from the standpoint of the applicant.*"[54]  In its most recent revisions, the CEQ regulations state, "[a]lways tailoring the purpose and need to an applicant's goals . . . could prevent an agency from considering alternatives that do not meet an applicant's stated goals, but better meet the policies and requirements set forth in NEPA and the agency's statutory authority

---

[50] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1069–72 (9th Cir. 2010).

[51] *See Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1088–89 (E.D. Cal. 2004) (holding the agency did not take a hard look at reasonable alternatives when it "dismissed out of hand any proposal which would have reduced the amount of timber harvest").

[52] *Env't Law & Policy Ctr. v. NRC*, 470 F.3d 676, 683 (7th Cir. 2006); *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d at 669.

[53] *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d at 669.

[54] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (emphasis added).

JA319

and goals."[55]  Moreover, the CEQ has provided, "court decisions have deferred to agencies' purpose and need statements . . . that put weight on multiple factors rather than just an applicant's goals, recognizing those factors as appropriately within the scope of the agency's consideration."[56]  This is reflected in the text of the NEPA regulations themselves, which state that the agency must specify the "*underlying* purpose and need to which the agency is responding."[57]  While CEQ pronouncements are not necessarily binding, courts "may rely on the interpretive guidance offered by the CEQ."[58]

Here, FERC has not exercised even a modicum of "skepticism" and instead has blindly adopted Texas Gas' self-serving desires, which has had the effect of unlawfully limiting the NEPA alternatives analysis.  Despite recognizing the broad purpose of the Project in the FEIS,[59] FERC states that it relied *only* on "the applicant's stated purpose and need . . . to define the scope of the NEPA analysis and range of alternatives to consider."[60]  Under this narrow purpose of merely transporting natural gas from point A to point B, there are only two options, either 1) build a pipeline, or 2) no action.  At no point would any non-gas energy alternatives be considered under this framework, thereby rendering decades of

---

[55] National Environmental Policy Act Implementing Regulations Revisions, at 87 Fed. Reg. 23,459.

[56] *Id.* (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991)).

[57] 40 C.F.R. § 1502.13 (emphasis added).

[58] *See Ass'ns Working for Aurora's Residential Env't v. Colorado Dep't of Transp.*, 153 F.3d 1122, n.4 (10th Cir. 1998).

[59] *See infra* at 15-16.

[60] FEIS, at 3-1; *id.* at 1-8.

JA320

FERC analysis of these types of alternatives and FERC's own guidance manual utterly superfluous.[61] The D.C. Circuit, among others, is quite clear that a "reasonable" purpose and need statement cannot be so narrow that only one alternative will suffice.[62] This point was clearly raised by CAC within this proceeding,[63] and the Commission arbitrarily failed to address it in the FEIS or its Order.[64]

Furthermore, one does not merely move gas from point A to point B for no reason; here, the shipper proposes to transport that gas to address a very specific issue that is well documented in the record—to fuel back-up electric generation to support variable renewable generating resources. The narrow definition adopted by the Commission pursuant to the consideration of alternatives is irreconcilable with numerous other statements made by the Commission in the FEIS identifying this broader underlying common purpose for the Project. For example, the Commission clearly provides that "[t]he *stated purpose* of the Project is to provide a reliable back-

---

[61] *See infra* at 25–28.

[62] *See, e.g.*, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013) (noting that the court questions "how an agency can make an informed decision on a project's environmental impacts when each alternative considered would authorize the same underlying action"); *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) ("we will reject an 'unreasonably narrow' definition of objectives that compels the selection of a particular alternative" (citing *Citizens Against Burlington*, 938 F.2d at 196)).

[63] *See* CAC Reply of Feb. 1, 2022, at 4–6.

[64] *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 48, 52 (1983) (agency action is arbitrary and capricious if it "entirely failed to consider [] important aspect[s] of the problem," or if agency fails to "cogently explain" the action, or to show it "was the product of reasoned decisionmaking."); *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (agency "failure to respond meaningfully" to legitimate comments and objections renders resulting decision arbitrary and capricious).

up source of power generation."[65]  The Commission further articulates, "Texas Gas states that the Project was developed to increase CenterPoint's diversity of supply sources in order to improve reliability of supply and achieve an operationally superior peak-shaving strategy."[66]  The Commission's conclusion regarding this broad purpose is consistent with numerous statements from the applicant itself; including, but not limited to, the following:

- The very first sentence of the Purpose and Need Section of Texas Gas' application describes the 2020 Integrated Resource Plan of Southern Indiana Gas and Electric Company, which calls for "the addition of significant solar and wind resources . . ."[67]

- Texas Gas explains that the purpose of the Project is to "support CenterPoint's new intermittent renewable resources . . ."[68]

- Later in the Purpose and Need section, Texas Gas reiterates that "[t]his Project supports CenterPoint's 2020 IRP[69] by providing the reliability of intermittent natural gas to support renewable resources and the diversity of generation resources."[70]

---

[65] FEIS, at 3-3 (emphasis added).

[66] *Id.*

[67] Texas Gas Transmission, LLC, Resource Report No. 1: General Description, Henderson County Expansion Project, at 1-3–1-4, Docket No. CP21-467-000 (June 2021), Accession No. 20210625-5123 ("Texas Gas Resource Report No. 1").

[68] Texas Gas Resource Report No. 1, at 1-4.

[69] "IRP" stands for Integrated Resource Plan.

[70] Texas Gas Resource Report No. 1, at 1-4.

JA322

- In the General Project Description, Texas Gas provides that the Project will "support the electric grid during periods when CenterPoint's new intermittent resources are unavailable due to natural fluctuations in wind and solar availability."[71]

- Texas Gas states that "[s]upport of the electricity infrastructure reliability is the *cornerstone* of the Project's purpose and need . . ."[72]

- Texas Gas further clarified that "[t]he Project is intended to allow CenterPoint to maintain electric system reliability while also transitioning its generation portfolio to include more renewable resources."[73]

- Texas Gas has also stated that the Project will "facilitat[e] CenterPoint's energy transition" through addition of new renewable resources.[74]

- Even as late as October of 2022, Texas Gas was still averring that "Texas Gas' Project *is needed* to allow CenterPoint to support the integration of renewables and maintain electric reliability on its system . . ."[75]

These are not cherry-picked statements from a single document; rather, they collectively reflect Texas Gas' habitual description of the overarching purposes of the Project across the entirety of the docket.

---

[71] *Id.* at 1-1.

[72] Texas Gas Resource Report No. 10 at 10-5, Docket No. CP21-467-000 (June 25, 2021), Accession No. 20210625-5123.

[73] TGT Answer of Sept. 21, 2021, at 2.

[74] TGT Answer of Dec. 7, 2021, at 6.

[75] TGT Answer of Oct. 4, 2022, at 4.

JA323

In addition to Texas Gas, other entities have also identified these overarching purposes. For example, Indiana Governor Eric Holcomb has described that the project was designed to "meet [CenterPoint's] goals contained within their most recent plan, which will also further promote the State's policy of maintaining a diverse mix of resources to ensure safe and reliable service and further mitigate customer vulnerability to pricing volatility . . ."[76] The IURC has also made clear that the Project will have the general purpose of "support[ing] the intermittent nature of the renewable generation in [CenterPoint's] Preferred Portfolio to ensure system reliability."[77] Similarly, the United States Environmental Protection Agency ("EPA") interprets the "purpose and need for the project" to be supporting the "implementation of new intermittent renewable resources (i.e., solar and wind) by providing the reliability of intermittent natural gas service during natural fluctuations in wind and solar availability."[78] Considering that the purpose and need of a proposed Project must "look at the general goal of an action, rather than a specific means to achieve that goal,"[79] the Commission was duty bound to evaluate alternatives that meet these broader purposes.

The record is replete with reasonable alternatives that the CAC and others have identified that could have accomplished the broad purposes identified above.

---

[76] Letter from Eric J. Holcomb, Governor of Indiana, to FERC, Docket No. CP21-467-000 (Sept. 29, 2022), Accession No. 20220930-5020.

[77] IURC Order, at 13.

[78] EPA Comments on the Notice of Intent for the Henderson County Expansion Project, at º2, Docket No. CP21-467-000 (Nov. 9, 2021), Accession No. 20211109-5035.

[79] *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, 580 F. Supp. 3d 588, 611 (W.D. Wis. 2022) (*citing Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986)).

In particular, CAC has introduced into the administrative record sworn testimony and concrete alternatives that the Commission should have reviewed. For example, CenterPoint's Integrated Resource Plan provides details on many of these alternatives. The "Renewables + Flexible Gas" portfolio in CenterPoint's 2019-2020 IRP entails construction of one new gas combustion turbine ("CT") in 2024 and the second CT in 2033, and capacity market purchases of around 135 MW.[80] As demonstrated by CenterPoint, this alternative is able to meet the objectives of the Project; is technologically feasible and practical; is economically advantageous; and is capable of providing environmental advantage relative to the proposed Project.

Another alternative to the new pipeline in CenterPoint's 2019-2020 IRP is what CenterPoint calls the "Renewables 2030" portfolio, which entails no new gas CTs; more aggressive energy efficiency measures starting in 2027; 1,150 MW of additional solar installations starting in 2033; 170 MW of annual capacity market purchases; and around 600 MW more storage deployment.[81]

Additionally, an alternative resource portfolio called the "CAC High Technology" portfolio, which adjusts capital costs of different resource types based on market surveys, and also relaxes inappropriately tight modeling constraints on annual renewable installations was also put before the Commission, yet was not

---

[80] CAC Additional Scoping Comments, at 3 (citing CenterPoint 2019-2020 IRP, Att. 3.1, June 15, 2020 Stakeholder Meeting, at 34 (373rd PDF page), https://www.in.gov/iurc/files/Public-2019-2020-Vectren-IRP-Volume-2-part-1-Redacted-030121.pdf).
[81] *Id.*

JA325

acknowledged or included in the Commission's analysis.[82]  This portfolio, as

constructed by the modeling software, consists mainly of new solar, storage, and

demand response (with some wind) resources, with no new gas additions, and clocks

in at *lower* long-term cost than CenterPoint's preferred portfolio, while still meeting

the broad needs of the Project.[83]

CAC also submitted additional evidence to the Commission on non-gas

alternatives identifying additional demand response potential in CenterPoint's

service territory that could potentially meet the underlying purposes of the Project.

Expert witness Josh Keeling showed almost 250 MW of untapped demand response

potential as an alternative to new gas infrastructure.[84]  Witness Keeling testified to

the IURC that according to recent studies by demand response analysts,

CenterPoint has cost effective maximum achievable potential of 123 MW for

residential and commercial customers; and the implied demand response potential

for the whole CenterPoint customer base including industrial customers (prorated

from a statewide study) is 227 MW.[85]  It is important to note that the IURC *did not

do any examination* of the environmental impacts of any of these proposals; as such,

FERC's review would be the only opportunity for any entity to perform the critical

---

[82] CAC DEIS Comments, at 16 n.38 (citing IURC Cause No. 45564, Ex. C, Direct Test. of Anna Sommer, CAC Exhibit 2 at 23–25).

[83] *Id.* n.39 (citing IURC Cause No. 45564, Ex. C, Direct Test. of Anna Sommer, CAC Exhibit 2 at 27–29).

[84] *Id.* n.41 (citing IURC Cause No. 45564, Ex. D, Direct. Test. of Josh Keeling, CAC Exhibit 3, at 9–10 (Nov. 19, 2021).

[85] *Id.*

analysis of the environmental ramifications of these alternatives.[86]  Therefore,

FERC's review pursuant to NEPA's alternatives analysis would be informative,

meaningful, and would have provided new data to both the public and other

agencies and decision-makers.

Additionally, as noted by several comments by CAC, the passage of the

Inflation Reduction Act[87] ("IRA") and MISO's[88] historical transmission portfolio

approval—both effectuated *after* the IURC's IRP process and the issuance of the

FEIS—have completely changed the landscape for renewable resources in the

region by creating additional compelling financial incentives for precisely those

resource types identified above as alternatives.[89]  Indeed, these developments have

caused CenterPoint to request updated bids for its All-Source Request for Proposals,

and the new bids reflect significant reductions of up to fifteen percent in average

prices.[90]  These significant changes alone render the Commission's FEIS legally

deficient for its failure to supplement its analysis,[91] and provides yet additional

evidence demonstrating how reasonable the non-gas alternatives that were offered

by CAC are.

---

[86] *See generally*, IURC Order.

[87] Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818 (Aug. 16, 2022).

[88] MISO is the operator of the regional electric transmission grid that includes most of Indiana.

[89] *See* CAC Comments of Aug. 9, 2022; *see also* CAC Comments of Sept. 26, 2022.

[90] CAC Reply of Oct. 14, 2022, at 3.

[91] *See, e.g.*, CAC Comments of Aug. 9, 2022, at 2 (*citing* 40 C.F.R. § 1502.9(d)(1)(ii) and *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1463–64 (9th Cir. 1984)).

JA327

The IURC alternative portfolios discussed above are merely a subset of the potential alternatives that could have been independently assessed by FERC. Indeed, the combination of potentially available low- or no-carbon alternatives that could meet the purpose and need of this Project go well beyond what was even considered in the Indiana IRP. As stated by CAC, the broad goals of the Project could reasonably be accomplished through a variety of different alternatives that were not considered in that proceeding, including any number of combinations between: increased demand response, energy efficiency, distributed energy resources, energy storage including batteries, hybrids, solar, wind, and capacity purchases on the wholesale market.[92]

Even if we accept the unlawfully narrow way in which the Commission has circumscribed the alternatives analysis, that still does not absolve the Commission of its error. It is well-established that alternatives that meet *some* of the goals of a project are appropriate for consideration in the EIS.[93] The D.C. Circuit has long understood that it is inappropriate for the Commission "to disregard alternatives

---

[92] *See* CAC DEIS Comments, at 14–17.

[93] *See, e.g.*, *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542 (11th Cir. 1990), (*citing Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975) ("Appellants cite various authorities for the proposition that NEPA requires a full assessment of alternatives that only meet a portion of the stated need and purpose of a project . . . . [A] discussion of alternatives that would only partly meet the goals of the project may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the tradeoff with a preferred alternative that has greater environmental impact. This argument is well taken . . .") (emphasis added); *see also Morton*, 458 F.2d at 836 (an agency may not "disregard alternatives merely because they do not offer a complete solution to the problem"); *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975) (an EIS must discuss "such alternatives to the proposed action as may partially or completely meet the proposal's goal").

JA328

merely because they do not offer a complete solution to the problem. If an alternative would result in supplying only part of the energy . . . , then its use might possibly reduce the scope of the [] program and thus alleviate a significant portion of the environmental harm."[94] There is no question that some of the goals must be derived from the numerous broad statements identified above. Therefore, even if the Commission believes that the alternative electric resource portfolios described by CAC fail to meet the overly narrow purpose and need as self-servingly and solely defined by Texas Gas,[95] there is no question that the alternatives identified by CAC meet at least "some" of the broader goals as described by the Commission, Texas Gas, the Governor of Indiana, and the EPA.

Moreover, FERC does not even have the feeble excuse that it need not perform a non-gas energy alternative analysis, because it has not bothered to try to determine the exact final destination and end use of the gas. The Commission is well-aware that the final destination and end use of the gas here are clearly defined—to fuel two proposed new gas CTs at the existing A.B. Brown site near Evansville, Indiana. FERC, therefore, cannot justify limiting its assessment of alternatives here based on some deficiency in the record.

Lastly, CAC is not asking the Commission to redefine CenterPoint's Project or arguing that Texas Gas' goals play no role in the definition of the purpose and need of the project; rather, CAC is asking the Commission to fulfill its statutory

---

[94] *Morton*, 458 F.2d at 836.

[95] Which is separately unlawful, as it is overly narrow. *See supra* at 15–16.

JA329

duty to review all the reasonable alternatives that serve the Project's underlying purpose and need as required by NEPA. While the Commission has no ability to overrule state regulators' generation planning choices—and CAC is not asking the Commission to do so—that type of state decision does not render moot, narrowed, or unnecessary the Commission's vital responsibilities under NEPA to consider reasonable alternatives. The evidence in the administrative record shows that there are feasible non-gas energy options that would cause less environmental and climate impacts and would meet the purpose and need of the proposed Project.

> 2. **The Commission Arbitrarily Broke with Its Past Pattern and Practice of Evaluating Non-Gas Energy Alternatives Without Reasoned Explanation.**

The Commission has a well-established history, reaching back decades, of evaluating non-gas energy alternatives and other alternative forms of energy in its NEPA documents. The Commission's novel break with this historic practice, without explanation, is itself arbitrary and capricious, or otherwise not in accordance with law. The Commission ignoring its prior practice is particularly troubling here, where CAC provided record evidence of particularized and specific non-gas energy alternatives for the Project.

The list of natural gas pipeline projects that have included a non-gas energy alternatives analysis in its corresponding EIS or Environmental Assessment ("EA") is too exhaustive to list in full here, so below is a brief list of examples where the Commission has done such an analysis in both EIS and EA NEPA documents:

- Constitution Pipeline Project: Includes a Section titled "*Non-Gas Energy Alternatives*," which includes a review of "nuclear energy," "wind,"

"geothermal power," "fuel cells," "hydroelectric generation," "biomass,"

"photovoltaic," "tidal and wave power," and a summary of "renewable

energies."[96]

- New Jersey – New York Expansion Project: Includes a Section titled "*Non-Gas Energy Alternatives*," which includes a review of "nuclear energy," "wind," "hydroelectric," "biomass," "photovoltaic," "tidal and wave," and a summary of "renewable energies."[97]

- Rover Pipeline Project: Includes a section on "*Non-gas energy alternatives*," which includes a review of "energy conservation and energy efficiency," "combined heat and power," and "renewable energies."[98]

- Dominion Cove Point LNG: This FEIS includes alternatives analysis sections dedicated to "conservation and other sources of energy" and "nuclear power energy."[99]

- Leidy Southeast Expansion Project: This EA includes a section on "Energy Conservation and Energy Alternatives," where the Commission "considered whether energy conservation or other sources of energy, including other fossil

---

[96] Constitution Pipeline Final Environmental Impact Statement, at 3-6–3-13, Docket No. CP13-499 (Oct. 24, 2014), Accession No. 20141024-4001 (emphasis added).

[97] New Jersey – New York Expansion Project Final Environmental Impact Statement, at 3-5-3-13, Docket No. CP11-56 (Mar. 16, 2012), Accession No. 20120316-4001 (emphasis added).

[98] Rover Pipeline, Panhandle Backhaul, and Trunkline Backhaul Projects Final Environmental Impact Statement, at 1-10, 3-4–3-6, Docket No. CP15-93 (July 29, 2016), Accession No. 20160729-4001 (emphasis added).

[99] Dominion Cove Point LNG Environmental Impact Statement, at 3-3, Docket No. CP05-130 (Apr. 28, 2006), Accession No. 20060428-4000.

JA331

fuels, nuclear energy, or renewable technologies, could meet the equivalent

energy that would be provided by the Project."[100]

- Northeast Supply Link Project: This EA includes a section on "Energy

   Conservation and Energy Alternatives," where the Commission "considered

   whether energy conservation or other sources of energy, including other fossil

   fuels, nuclear energy, or renewable technologies, could meet the equivalent

   energy that would be provided by the Project."[101]

- Gallery 2 Expansion Project: This EA included an analysis of "Energy

   conservation and energy alternatives."[102]

Moreover, beyond pipeline applications, the Commission has also performed

alternatives analysis that includes non-jurisdictional alternatives.  For example, in

*Friends of the River v. FERC*, the project applicant sought a permit to operate a

hydroelectric plant, and the Commission examined the alternative of purchasing

power from other producers.[103]

The Commission has failed to explain why it has conducted this analysis in

these matters, but not for the proposed Project.  An "agency action is arbitrary and

---

[100] Leidy Southeast Expansion Project Environmental Assessment, at 197, Docket No. CP13-551 (Aug. 11, 2014), Accession No. 20140811-4003.

[101] Northeast Supply Link Environmental Assessment, at 3-1, Docket No. CP12-30 (Aug. 1, 2012), Accession No. 20120801-4001.

[102] Gallery 2 Expansion Project Environmental Assessment, at 45, Docket No. CP13-83 (Sept. 13, 2013), Accession No. 20130913-4003.

[103] *Friends of the River v. FERC*, 720 F.2d 93, 104–05 (D.C. Cir. 1983); *see also North Carolina v. FPC*, 533 F.2d 702, 707 (D.C. Cir. 1976), (permit to build hydroelectric plant; alternative of conservation), *vacated on other grounds*, 429 U.S. 891, 97 S. Ct. 250, 50 L.Ed.2d 174 (1976).

capricious if it departs from agency precedent without explanation."[104]  Agencies are free to change course as their expertise and experience may suggest or require, but when they do so, they must provide a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."[105]  An agency's failure to come to grips with conflicting precedent constitutes "an inexcusable departure from the essential requirement of reasoned decision-making."[106]  A "[d]ivergence from agency precedent demands an explanation."[107]

The Commission's failure to provide any reasoned explanation for its departure from past practice reflects arbitrary and capricious decision-making.

### 3.  In the Alternative, NEPA Demands the Commission Evaluate Non-Gas Energy Alternatives Under Its No Action Alternative Analysis.

Regardless of whether the non-gas energy alternatives meet the purpose and need of the Project, the Commission is still required to evaluate these alternatives at least under the no-action alternatives analysis.

Every EIS must include a "no action" or status quo alternative.[108]  "'[T]he no action alternative generally does not satisfy the proposed action's purpose and need; its inclusion in the Environmental Impact Statement is required by NEPA as a

---

[104] *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

[105] *Greater Bos. Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C. Cir. 1970); *see also Philadelphia Gas Works v. FERC*, 989 F.2d 1246, 1250–51 (D.C. Cir. 1993).

[106] *Columbia Broad. Sys. v. F.C.C.*, 454 F.2d 1018, 1027 (D.C. Cir. 1971).

[107] *Cross–Sound Ferry Servs., Inc. v. I.C.C.*, 873 F.2d 395, 398 (D.C. Cir. 1989) (citations omitted).

[108] 40 C.F.R. § 1502.14(c).

JA333

basis for comparison.'"[109]  "A no action alternative in an EIS allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action.  The no action alternative is meant to 'provide a baseline against which the action alternative[s]' . . . [are] evaluated."[110]

Furthermore, as part of the no-action alternative, numerous cases have required federal agencies to consider "primary alternatives" in the no-action alternative discussion, which are "alternative[s] [that] would make the agency's proposed action unnecessary."[111]  For example, in one case the court held that an agency was required to consider improvements in agricultural production as an

[109] *California ex rel. Lockyer v. U.S. Dept of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006) (quoting Ronald E. Bass, Albert I. Herson & Kenneth M. Bogdan, *The NEPA Book: A Step–by–Step Guide on How to Comply with the National Environmental Policy Act* 95 (2d ed. 2001)).

[110] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir.1998)).

[111] Mandelker *et al.*, *Alternatives that must be considered*, NEPA Law and Litig. § 9:31 (2022); *see also New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) (alternative closing extraordinarily fragile public land to all oil and gas development); *Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) (no-action alternative); *Trinity Episcopal Sch. Corp. v. Romney*, 523 F.2d 88 (2d Cir. 1975) (broad range of alternatives to site for housing project); *League of Wilderness Defs. v. Marquis-Brong*, 259 F. Supp. 2d 1115 (D. Or. 2003) (unreasonably excluded consideration of any alternative that provided for restoration of the burned area without salvage logging); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143 (W.D. Wash. 2002) (sediment reduction and other alternatives to Dredge Material Management Plan); *Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052 (D. Ariz. 2001), dismissed, 55 Fed. Appx. 411 (9th Cir. 2002) (numerous reasonable alternatives to land exchange); *Friends of Bitterroot, Inc. v. U.S. Forest Serv.*, 900 F. Supp. 1368 (D. Mont. 1994) (maintaining area as roadless area not subject to timber sales); *Nat. Res. Def. Council v. Duvall*, 777 F. Supp. 1533 (E.D. Cal. 1991) (water conservation alternative to Reclamation Reform Act regulations); *Montgomery v. Ellis*, 364 F. Supp. 517, 526 (N.D. Ala. 1973) (flood insurance as alternative to river channel project); *Keith v. Volpe*, 352 F. Supp. 1324 (C.D. Cal. 1972), aff'd on other grounds 506 F.2d 696 (9th Cir. 1974).

alternative to a dam and reservoir that would provide more water for irrigation.[112]

Another case admonished an agency's failure to consider an alternative that would

improve existing ferry services from Juneau to other Alaskan communities without

the construction of new roads, ferries, or terminals.[113]

In addition to this line of case law, the Commission has developed a detailed

guidance manual that provides, among other things, a description of what should be

included in a no-action alternatives analysis for Natural Gas Act pipeline projects.

This manual states that, at a minimum, the no-action alternative must "[a]ddress

the consequences of not constructing the project."[114]  Specifically, "[i]n addition to

avoiding the impacts directly associated with the construction of the project . . . the

no-action alternative discussion should discuss *what other options may be pursued*

*by customers of the proposed project to satisfy the need for the proposed project*."[115]

The manual then provides a non-exhaustive list of the types of alternatives that

should be included in the no-action alternatives analysis, including "the use of . . .

*non-gas energy alternatives*, and/or energy conservation or efficiency . . . ."[116]

---

[112] *Save the Niobrara River Ass'n, Inc. v. Andrus*, 483 F. Supp. 844 (D. Neb. 1977).

[113] *Se. Alaska Conservation Council v. Federal Highway Admin.*, 649 F.3d 1050 (9th Cir. 2011).

[114] FERC, Guidance Manual for Environmental Report Preparation, at 4-135 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf ("FERC Guidance").

[115] *Id.*

[116] *Id.* at 4-136.  Notably in some other dockets the Commission has stated that it will not consider non-gas alternatives because "[t]he consumption of natural gas for activities such as building heating and electricity generation may be the proposed action of the downstream entities; however, alternatives that do not also facilitate the transportation of natural gas cannot be a function surrogate."  Regional Energy Access Expansion Project

Here, there is no question that the no-action alternative analysis in the FEIS did not provide a description of "what other options," apart from the proposed project, may be pursued "to satisfy the need" for the Project.[117]  The Commission never attempted to address its failure to follow its own guidance manual and forego any analysis of non-gas energy alternatives for the proposed Project in the FEIS or Order.

    **4.**    **The Commission Violated the NGA by Failing to Evaluate Reasonable Non-Gas Energy Alternatives.**

Finally, the range of alternatives appropriate for the Commission's consideration under the NGA is not limited to only those options that may be considered under NEPA.  Even if review of CAC's alternatives was not required under NEPA,[118] consideration of these alternatives would be necessary under the NGA and the Commission's public convenience and necessity standard.  The NGA is clear: anything that renders the proposed project not required by the public convenience and necessity mandates that the Commission deny the project.[119]

Here, the Commission asserts—wrongly—that consideration of non-gas energy alternatives is "outside the scope" of the NEPA process.[120]  Even accepting this deeply flawed argument as true, this implies that such a review would at least

---

Final Environmental Impact Statement, at 3-3, Docket No. CP21-94 (July 29, 2022), Accession No. 20220729-3005.  However, this position is clearly at odds with case law and the Commission's own guidance; nevertheless, the Commission offered no such flimsy excuse here.

[117] FERC Guidance, at 4-135.

[118] Which they were.

[119] 15 U.S.C. § 717f(e).

[120] FEIS, at 1-8.

JA336

need to occur in the context of the Commission's Order, where an alleged different evaluation of Project "need"[121] is performed under the public convenience and necessity standard of section 7(c) of the NGA.  Indeed, the Commission committed to doing exactly that: "the overall need for the Project is a policy issue that would be addressed by the Commission in the Order."[122]

In the Order, the Commission was required to decide whether and under what terms to issue its certificate by balancing the public benefits, including project need, against project impacts.[123]  The Commission cannot reasonably make a determination regarding the necessity of the Project, absent an understanding of what the possible alternatives are that service its proposed underlying need.  If existing or planned infrastructure, including non-gas alternatives, can eliminate the need for the proposed project, the authorization of the project would violate the NGA, particularly considering that under NGA section 7(e), the Commission considers whether a project is required by the "present or future" public convenience and necessity.[124]

---

[121] The Commission has not explained how its review of project need in the Order is different from the evaluation of the "purpose and need" of the Project under NEPA. The Commission has also not explained standards or authorities the Commission specifically relies on to make the distinction.

[122] FEIS, at 1-8.

[123] Certification of New Interstate Nat. Gas Pipeline Facilities, 88 FERC ¶ 61,227, 61,749 (1999), clarified in 90 FERC ¶ 61,128 (2000), and further clarified in 92 FERC ¶ 61,094 (2000) (Assessing Public Benefits and Adverse Effects).

[124] *See City of Oberlin, Ohio v. FERC*, 39 F.4th 719, 728 (D.C. Cir. 2022) (citing 15 U.S.C. § 717f(e) (emphasizing that NGA section 7(e) "allow[s] FERC to grant a certificate when the facility 'is *or will be* required by the present or *future* public convenience and necessity'" (emphasis in original)).

JA337

Here, the Commission failed to undertake this analysis in the Order and did not reach a conclusion related to overall project need, particularly in the context of the existence of numerous reasonable non-gas energy alternatives. The Commission's Order is utterly silent on non-gas energy alternatives and the relationship between those potential alternatives and the public need for the Project pursuant to Section 7(c) of the NGA. Considering the Commission's lack of reasoning under the applicable standards of both NEPA and the NGA, the Commission's Order is arbitrary, capricious, or otherwise not in accordance with law.

**B.      The Commission's Order and FEIS Are Arbitrary, Capricious, and Violate NEPA by Attributing Reductions in Coal Generating Emissions to the Project.**

As the Commission acknowledged in the Order,[125] FERC is required under NEPA and binding appellate precedent to consider, among other reasonably foreseeable effects, the GHG emissions made possible by the proposed Project.[126] The Commission correctly concluded that the reasonably foreseeable emissions must, at least, include downstream emissions.[127] Here, the Project's downstream emissions are those that will be caused by CenterPoint's proposed new gas power plant to be built at the site of the retiring A.B. Brown coal generating units in Evansville, Indiana. While the FEIS does consider reasonably foreseeable

---

[125] *Texas Gas Transmission, LLC*, 181 FERC ¶ 61,049 (Oct. 20, 2022) at P 47 n.69.

[126] *Sierra Club v. FERC*, 867 F.3d 1357, 1371–72 (D.C. Cir. 2017); 40 C.F.R. §§ 1501.3(a)–(b), 1508.1(g) (implementing NEPA).

[127] *Texas Gas Transmission, LLC*, 181 FERC ¶ 61,049, Order at P 47.

JA338

emissions from the new gas CTs, it directly and inexplicably contradicts record evidence by then *subtracting* future emissions reductions that will result from the closure of the existing A.B. Brown coal generators.[128] The closure of the A.B. Brown coal units, however, is not a reasonably foreseeable effect of the Project, because there is no causal connection between the retirement of the A.B. Brown coal units and construction of the gas power plant that the Project will fuel. FERC thus violated NEPA.

CAC has provided the Commission with abundant evidence that CenterPoint intended to close the coal units whether or not the Project and its related gas plant went forward. In its Protest filed on July 30, 2021, CAC explained why A.B. Brown emissions cannot lawfully be included in any analysis of the downstream emissions effects resulting from the Project, using all available and relevant evidence as of that time:[129]

> Texas Gas correctly states that retirement of CenterPoint's two A.B. Brown coal-fired generating units will reduce the utility's greenhouse gas emissions.[130] But the proposed Texas Gas pipeline will not "cause,"[131] "result in,"[132] or "allow for"[133] this emissions reduction. As discussed below, CenterPoint made the decision to retire the A.B. Brown units completely independently of this pipeline—those retirements are happening with or without this pipeline. The retirements would certainly not be the result of this pipeline. FERC's required climate analysis under NEPA in this proceeding, therefore, should not credit

---

[128] FEIS, at 4-118 (Tbl. 4.9.4-2).

[129] The footnotes' text in this excerpt have been preserved exactly as they appeared in CAC's Protest at 7–10 and replicated in this document's ns.132–144.

[130] Application at pp. 2, 37.

[131] *Id.* p. 3.

[132] *Id.* pp. 33, 34.

[133] *Id.* p. 44.

JA339

Texas Gas with the emissions reductions from those retirements. Texas Gas's proposed approach would encourage any pipeline [certificate] applicant at FERC to net previous or untethered fossil fuel infrastructure retirements or curtailments against its own situation, adulterating the important GHG analysis that NEPA mandates.

In the currently pending IURC proceeding, CenterPoint witness Angila M. Retherford,[134] CenterPoint's Vice President of Environmental and Corporate Responsibility, explains that "[c]ompliance with the [Coal Combustion Residuals[135]] rule," and not this pipeline, "is forcing the closure of Petitioner's A.B. Brown Generating Station, because the current cease disposal date [April 11, 2021] for bottom ash and fly ash has come and gone . . ."[136] and, at most, that date might be extended to October 2023 under the CCR Rule.[137] Ms. Retherford explains that it is impossible for CenterPoint to run the A.B. Brown coal units past the October 2023 "hard-stop" compliance deadline established by the CCR Rule, due to the combination of the CCR Rule's forcing the cessation of waste receipt at Brown's ash pond, twinned with requirements imposed by the federal Effluent Limitations Guidelines ("ELG") Rule under the Clean Water Act.[138,139] In order to demonstrate the impossibility, Ms. Retherford lists the numerous environmental retrofits[140] that would be

---

[134] The direct testimony of Ms. Retherford on behalf of CenterPoint in IURC Cause No. 45564 is attached as Exhibit A to this Protest and also can be found at https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/9cf16f37-b5cf-eb11-bacf-001dd801c642/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45564%20CEIS%20Petitioners%20Exhibit%20No%2004%20Direct%20Testimony%20of%20Angila%20Retherford.pdf.

[135] The Coal Combustion Residuals or "CCR" Rule is found at 40 C.F.R. Part 257, Subpart D. It was promulgated by the U.S. Environmental Protection Agency ("EPA") in April 2015 (80 Fed. Reg. 21,302) and subsequently amended in 2016, 2018, and twice in 2020.

[136] Retherford testimony at 3:23.

[137] In November 2020, CenterPoint submitted a demonstration to the U.S. EPA for an alternative "cease receipt" deadline (to no later than October 15, 2023) for the A.B. Brown coal ash surface impoundment under the CCR Rule, 40 C.F.R. § 257.103(f)(1). *See* https://www.vectren.com/assets/downloads/planning/ccr/Brown-Ash-Pond-Site-Specific-Alternative-to-Initiate-Closure_FINAL.pdf. As of the date of this Protest (July 30, 2021), EPA had not yet issued a proposed decision on that demonstration.

[138] Retherford testimony at 4:30, 11:14.

[139] The ELG Rule was promulgated in November 2015 at 80 Fed. Reg. 67,838 (amending 40 C.F.R. §§ 423.10 - 423.17).

[140] "In order to continue to operate Units 1 and 2 of the A.B. Brown Generating Station, Petitioner would be required to make the following environmental compliance investments by October 2023:

necessary to run the A.B. Brown units past October 2023, costing at least one hundred million dollars—and then concludes "it cannot be done."[141]

To be clear—Ms. Retherford is stating that the retirement of the A.B. Brown units is a certainty, not contingent on the construction of this pipeline.[142] Texas Gas cannot take credit for the GHG emissions reduction from those retirements. Quite the opposite: Texas Gas must account for the new pipeline's contribution to global GHG emissions—which this pipeline will enable by serving two new gas combustion turbines.

Notably, the IURC testimony of Ms. Retherford, quoted above, was filed on June 17, 2021—several days *before* Texas Gas filed its Application with the Commission. Ms. Retherford's sworn assertions about retiring the A.B. Brown coal plant were in no way contingent upon construction of the Project or the new gas CTs. CAC reiterated the argument from its Protest and added additional relevant information and argument in its Environmental Scoping Comments filed one month after its Protest:

> [T]he A.B. Brown coal power plant will retire in October 2023 regardless of the outcome of this proceeding, or regardless of whether CenterPoint builds the new gas power plant. CenterPoint has planned the retirement of the A.B. Brown coal plant dating back to its 2016

---

- Dry bottom ash conversion
- Dry fly ash conversion
- New water treatment system for continued NPDES compliance (driven by closure of the ash pond)
- Landfill expansion"

Retherford testimony at 4:13.

[141] *Id.* at 12:19. Moreover, the federal government has already set more stringent NOx ozone season limitations for Indiana coal units, and will likely soon create a new, more stringent National Ambient Air Quality Standard for fine particulate matter (PM2.5). Ms. Retherford makes it clear that continued operation of the A.B. Brown coal units past October 2023 is impossible, and these two new rules underscore that impossibility. pp. 13-14.

[142] In fact, Ms. Retherford's testimony, which describes the reasoning for the A.B. Brown coal unit retirements in great detail, never even mentions the Texas Gas pipeline.

Integrated Resource Plan submitted to Indiana authorities; CenterPoint also stated its plans to retire A.B. Brown in 2023 in an Indiana Utility Regulatory Commission ("IURC") proceeding in 2018-2019 and again in testimony filed this year at the IURC. In this year's testimony, CenterPoint's Vice President of Environmental Compliance and Corporate Responsibility explained that federal environmental requirements are forcing CenterPoint to close A.B. Brown to close [sic] in October 2023 and that the retrofits required to comply with those federal rules "cannot be done." Moreover, the Commission has no authority over the decision of a local Indiana electric utility such as CenterPoint to retire a generating resource. The retirement of the A.B. Brown coal power plant will occur regardless of the outcome of this proceeding. For these reasons, the Commission is prohibited under federal regulations from considering any greenhouse gas effects associated with the retirement of A.B. Brown.[143]

CAC subsequently introduced additional pieces of evidence for the record of this proceeding as they became available: first, an IURC discovery response from CenterPoint dated Sep. 9, 2021, asserting that "the [A.B. Brown coal] plant must retire no later than October 2023";[144] and second, evidence showing that CenterPoint already began moving forward in May 2022, in an IURC proceeding[145]

---

[143] CAC Scoping Comments, at 9–10 (original footnotes omitted) (citing, inter alia, Direct Testimony of Ms. Angila M. Retherford in IURC Cause No. 45564, attached as Exhibit A to CAC's Protest dated July 30, 2021, in this proceeding).

[144] Exhibit A, CAC Reply of Sept. 28, 2021 (CenterPoint Energy Indiana South's Response to Sunrise Coal's Second Set of Data Requests to CenterPoint Energy Indiana South, at 25, Response to 2-22 (Sept. 9, 2021)).

[145] *Petition of Southern Indiana Gas and Electric Company D/B/A Centerpoint Energy Indiana South Pursuant to Indiana Code Ch. 8- 1-40.5 for (1) Authority to (A) Issue Securitization Bonds; (B) Collect Securitization Charges; and (C) Encumber Securitization Property with a Lien and Security Interest; (2) A Determination of Total Qualified Costs And Authorization of Related Accounting Treatment; (3) Authorization of Accounting Treatment Related to Issuance Of Securitization Bonds and Implementation of Securitization Charges; (4) Approval of Proposed Terms and Structure for the Securitization Financing; (5) Approval of Proposed Tariffs to (A) Implement the Securitization Charges Authorized by the Financing Order in this Proceeding, (b) Reflect a Credit for Accumulated Deferred Income Taxes, and (C) Reflect a Reduction in Petitioner's Base Rates and Charges to Remove Any Qualified Costs from Base Rates; and (6) Establishment of a True-Up Mechanism Pursuant*

JA342

as well as federally-regulated statements to investors, with executing on a new bond securitization option for its retiring A.B. Brown coal plant.[146]  Third, with its comments on the DEIS, CAC attached a transcript of cross-examination in an IURC proceeding in January 2022, in which CenterPoint's senior environmental compliance official explained how the A.B. Brown coal plant, already noncompliant with multiple federal environmental regulations, could not possibly timely install compliance upgrades required by law, and could not avoid closing the coal generators.[147,]

Neither CenterPoint nor Texas Gas has rebutted the evidence put forward by CAC that the A.B. Brown coal plant will retire with or without the Project. CenterPoint provided a single statement by counsel in July 2021, without citation or support, speculating that without the Project, "CenterPoint *may* be forced to invest in the A.B. Brown Plant to keep it operating beyond the 2023 deadline."[148] Texas Gas piggybacked on that statement in its September 21, 2021 Answer to Scoping Comments, with its own self-serving speculation that the absence of the

---

*to Indiana Code § 8-1-40.5-12(c)*, IURC Cause No. 45722 (May 10, 2022), as referenced in CAC DEIS Comments at 29–30, n.86.

[146] CAC DEIS Comments, at 30.  The same CAC DEIS Comments (at 29, n.85) quoted a news article stating that the new securitization law (Indiana Public Law 80 of 2021), when originally introduced in the state legislature, was intended as a pilot meant only to affect one utility, CenterPoint. Notably, new Ind. Code § 8-1-40.5-3(3), part of the enacted law, applies the new law to utilities with no more than 200,000 retail electric customers.

[147] Exhibit F to CAC DEIS Comments (IURC Cause No. 45564, Transcript Excerpts of January 27, 2022, Evidentiary Hearing at F-18–F-27).  For additional discussion of the A.B. Brown coal retirements, *see* CAC Reply of Feb. 1, 2022, at 10–11, and CAC DEIS Comments, at 25–32.

[148] Comments of CenterPoint Energy Indiana South, at 7, Docket No. CP21-467-000 (July 30, 2021), Accession No. 20210730-5261 (emphasis added).

Project "*could* force CenterPoint to make investments to keep the coal generation assets operating beyond their proposed retirement date."[149]  These two statements by counsel fall far short of undermining the concrete proof CAC has offered demonstrating that the A.B. Brown units' retirement is not contingent on the Project.

Despite the almost entirely one-sided evidentiary record, the Commission declined to address any of these data points.  The Commission's Order purports to justify the FEIS's netting of A.B. Brown coal plant emissions from the Project's environmental effects, by simply concluding that "the record supports a finding that the coal units are being retired as part of CenterPoint's 2020 Integrated Resource Plan, which calls for the replacement of the coal units generating capacity with a combination of renewable resources and the two gas- fired CTs to be sited at the A.B. Brown plant."[150]  The footnote supporting that assessment cites only to CenterPoint's own conclusory statements and fails entirely to address the evidence CAC put before the Commission.[151]  The Commission's decision also states that

---

[149] TGT Answer of Sept. 21, 2021, at 6 (emphasis added).

[150] *Texas Gas Transmission, LLC*, 181 FERC ¶ 61,049, Order at P 48 (footnotes omitted).

[151] *Id.* at P 48, n.79 ("CenterPoint states that construction of these gas-fired units is an integral part of its plan, detailed in its 2020 Integrated Resource Plan, to transition its coal-fired generation facilities to a generation fleet composed of 700 to 1,000 megawatts of new renewable resources and 460 MWs from the proposed new CTs.  Center Point July 30, 2021 Comments at 1-2.  CenterPoint explained that state approval of the CT units, as well as Commission approval of the Henderson County Expansion Project, were critical to allow it to retire the coal units by October 2023, which CenterPoint sought to do 'to avoid making significant capital investments to bring the facility into compliance with environmental regulations—capital investments that CenterPoint's modeling indicates will be more costly to its retail customers than transitioning to renewables supported by quick start and fast ramping CTs.'  *Id.* at 2.").

JA344

"CenterPoint plans to retire two coal-fired units and replace their generating capacity with a combination of solar and wind energy generation and the two new natural gas turbines,"[152] but cites to nothing to demonstrate that retirement of the coal units will occur because of the new gas plant and the Project. And although the FEIS acknowledged[153] that CAC and others argued that the coal plant's retirement is not linked to the Project, it also does little more than parrot CenterPoint's unsupported and conclusory claims.[154] The Commission never expressly passes judgment on the position of CAC and other parties that the A.B. Brown coal generators are destined for retirement regardless of what new electric generation (or other electric resources) CenterPoint may choose to procure.[155]

In light of the Brown coal units' status, there is no reasoned basis for concluding that the coal units would retire because of the Project and, thus, no justification for crediting the Project with the saved emissions from the coal units' retirement as part of the analysis of net downstream emissions caused by the Project. The FEIS' reduction of the Project's emissions by the 4.6 million tons per

---

[152] *Id.* at P 47.

[153] FEIS at 4-117; *see also* similar statements at 4-126 and 4-127.

[154] FEIS, at 4-117 ("[M]odifications to the AB Brown Power Plant are outside the Commission's jurisdiction and are subject to separate authorizations (including for any new emissions sources, as applicable). As stated in section 3.2, CenterPoint plans to retire the existing coal-powered boiler units, and Texas Gas has stated that CenterPoint would likely continue to produce electricity by other means of fossil-fuel generation if the proposed Project were not constructed, which could result in higher emissions of certain types, as well as other environmental impacts. However, the specific sources of energy replacement have not been identified as it was determined that natural gas was the better option to provide a source of reliable back-up power generation, as approved by the IURC.").

[155] *See, generally, Texas Gas Transmission, LLC*, 181 FERC ¶ 61,049, Order at PP 24–25 and 47–48.

JA345

year saved from the retirement of the A.B. Brown coal units, and conclusion that those reductions would outweigh the new emissions from the gas plant the Project would fuel, therefore, is without support and arbitrary.[156]  Likewise, the Order's conclusion that the Project would result in a net reduction of greenhouse gas emissions is arbitrary.[157]  The same conclusion also violates the NEPA statutory and regulatory provisions requiring the Commission to evaluate a project's environmental effects.  This portion of the Order should be reversed on rehearing.

    **C.**    **The Order's Failure to Adequately Consider the Significance of the Project's Greenhouse Gas Emissions Violates NEPA and the NGA.**

FERC violated NEPA by arbitrarily and capriciously failing to conduct an adequate review of the Project's effects on climate change.  As a result of its reliance on the deficient analysis in the FEIS, and FERC's failure in the Order to consider the information the FEIS did provide on the climate change costs the Project would create, the findings in the Order do not form a reasoned basis to support the Commission's conclusion that the Project is in the public convenience and necessity under the NGA.

    **1.**  **The Commission Violated NEPA by Failing to Assess the Significance of the Project's Contributions to Climate Change.**

The Commission's analysis of the potential significance of the Project's GHG emissions is deficient for two reasons.  First, in direct contravention of EPA's

---

[156] *See* FEIS at 4-118 (Tbl. 4.9.4-2).  Although the FEIS also calculates the social cost of greenhouse gases for the Project without offsetting those emissions, as is discussed in more detail below, the Commission fails entirely to make any meaningful use of that social cost of greenhouse gas figure.

[157] *See* Order, at P 47.

JA346

repeated recommendations,[158] as well as the weight of science and an appreciation for the collective action problem posed by global GHG emissions, the Commission limits its analysis of the Project's emissions to comparing those emissions to national and state totals.[159]  Although FERC claims that approach "allows us to contextualize the project's projected emissions,"[160] the Commission is wrong. Indeed, as most reputable authorities on climate change have noted, comparing a single project's emissions to national and state emissions totals "offers limited insights about [a] [p]roject's climate impacts (particularly compared to using the social cost of greenhouse gases) and can misleadingly trivialize those impacts."[161] Federal courts have recognized that "[t]he global nature of climate change and greenhouse-gas emissions means that any single . . . project likely will make up a negligible percent of state and nation-wide greenhouse gas emissions."[162]  Thus, by limiting its analysis to this comparison, FERC is, in fact, allowing itself to minimize and largely ignore the incremental contributions made by projects to the climate crisis.

---

[158] *See, e.g.,* EPA Comments on the Final Environmental Impact Statement (FEIS) for the Henderson County Expansion Project, at 2, Docket No. CP21-467-000 (Oct. 3, 2022), Accession No. 20221003-5330 ("EPA recommends the FERC reconsider the EPA's suggestion to avoid expressing project-level emissions as a percentage of national or state emissions.").

[159] *Texas Gas Transmission, LLC*, 181 FERC ¶ 61,049, Order at P 50.

[160] *Id.*

[161] *See, e.g.,* Comments of the Institute for Policy Integrity at New York University School of Law, at 12, Docket No. CP20-493-000 (Aug. 23, 2021) Accession No. 20210823-5077.

[162] *WildEarth Guardians v. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 894 (D. Mont. 2020).

The Intergovernmental Panel on Climate Change has made clear that radical reductions in GHG emissions—43% by 2030—are required to stave off more than 1.5º Celsius of warming to avoid disastrous global climate change impacts.[163]  And, even though neither Indiana nor Kentucky has reduction requirements or targets, the Biden Administration has set the target of reducing national emissions by 50–52% by 2030, compared to 2005 levels.[164]  The Commission must incorporate these realities into its decision-making and stop allowing projects that will contribute to climate change over multiple decades to proceed with so little scrutiny.

Second, FERC contends that it is essentially absolved from assessing the significance of the Project's emissions, because it is undergoing a review of how to make that significance determination in its broader Policy Statement process.  As a long list of commentators have pointed out to FERC, however, an ongoing broader review—which now has stretched multiple years with no end in sight —does not relieve the Commission of its ongoing statutory obligations to evaluate significant environmental effects in individual permitting determinations.[165]  The lack of

---

[163] *See, e.g.*, Intergovernmental Panel on Climate Change, *The evidence is clear: the time for action is now. We can halve emissions by 2030* (Apr. 4, 2022), https://www.ipcc.ch/2022/04/04/ipcc-ar6-wgiii-pressrelease.

[164] White House, Fact Sheet: President Biden Sets 2030 Greenhouse Gas Pollution Reduction Targets Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies (Apr. 22, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies.

[165] *See, e.g.*, Food & Water Watch Request for Rehearing, at 14–15, Docket No. CP20-493-000 (May  19, 2022), Accession No. 20220519-5068; *see also* 40 C.F.R. § 1502.16(a)(1) (requiring the significance of environmental impacts to be discussed within an EIS); 18 C.F.R. § 380.7(a), (d) (requiring a FERC-prepared EIS to include the significant environmental impacts, including those that cannot be mitigated, of the proposed action).

JA348

certainty as to what methodology FERC may adopt more broadly at some unknown future date does not provide FERC with the ability to simply throw its hands up in the air and refuse to comply with NEPA and its implementing regulations.[166]  Many of the environmental effects the Commission and all other federal agencies are required to review under NEPA lack bright-line tests for determining significance, and that has never been the basis for treating those effects as if they do not exist.[167] Indeed, CEQ regulations require that the Commission consider environmental effects in terms of the context in which they occur and the intensity of the effect, and provide no basis whatsoever for failing to determine significance in the absence of a threshold or universally-accepted methodology for evaluating significance.[168] Further, FERC's refusal to complete a review of the Project's climate change

---

[166] *Scientists' Inst. for Pub. Info., Inc. v. U.S. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

[167] *See, e.g.*, FERC, *Final Environmental Impact Statement – Mountain Valley Project and Equitrans Expansion Project*, at ES–5–7, Docket Nos. CP16-10-000 and CP16-13-000 (June 23, 2017), Accession No. 20170623-4000, https://cms.ferc.gov/sites/default/files/2020-05/Final-Environmental-Impact-Statement_1.pdf (determining whether a project's impacts to forests were significant without relying on a set baseline or universally-adopted methodology); *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (holding that agencies cannot overlook a single environmental consequence, if it is even "arguably significant"); *Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.") (internal quotation marks omitted).

[168] *See* 40 C.F.R. § 1501.3(b).

JA349

impacts is inconsistent with CEQ's recent amendments to NEPA regulations[169] and multiple recent Executive Orders.[170]

Moreover, FERC failed to adequately explain why it did not make use of the social cost of greenhouse gases tool to meaningfully consider the significance of the Project's climate change impacts. Although much-maligned by industry, this tool is, in fact, widely-accepted across the scientific and economic communities and commonly used in federal, state, and international proceedings, including permitting proceedings.[171] Indeed, the FEIS calculated—using the social cost of greenhouse gases rubric—that the Project will cause $12,247,770,730 (in 2020 dollars) worth of damage to the climate over the Project's lifetime.[172] While the Commission may not have adopted a set dollar amount as a significance threshold, the FEIS and Order are devoid of the required analysis of whether, given their

---

[169] *See National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23,453, 23,456 (April 20, 2022) (CEQ regulations are "intended to ensure that the NEPA process provides for efficient and effective environmental reviews that are guided by science and are consistent with the statute's text and purpose; enhance clarity and certainty for Federal agencies, project proponents, and the public; inform the public about the potential environmental effects of Federal Government actions and enable full and fair public participation; and ultimately promote better informed Federal decisions that protect and enhance the quality of the human environment and advance environmental, *climate change mitigation and resilience*, and environmental justice objectives" (emphasis added)); *id.* at 23,466 (stating CEQ's goal to prevent agencies from "omit[ting] . . . effects [from review] . . . such as climate effects," which would "frustrat[e] NEPA's core purpose and Congressional intent").

[170] *See, e.g.*, Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021); Exec. Order No.14008. 86 Fed. Reg. 7169 (Jan. 27, 2021).

[171] For a more detailed explanation of why criticisms of the social cost of greenhouse gases are exaggerated and often unfounded, *see, e.g.*, New Information and Additional Perspectives on Using the Social Cost of Greenhouse Gases to Weigh Climate Impacts in the Certification of New Interstate Natural Gas Facilities, Docket No. PL18-1 (May 26, 2021), Accession No. 20210526-5241, and the authorities cited therein.

[172] FEIS, at 4-130.

JA350

context and intensity, more than $12 billion in damage to the climate is or is not significant. And the apparent justification for not making full use of the social cost of greenhouse gases in the FEIS does not provide the required compelling justification for failing to meaningfully employ this tool.[173] The FEIS references a variety of uncertainties around the use of the social cost of GHGs, including pending litigation, the potential for CEQ to issue additional guidance, and FERC's own failure to date to determine how it might wish to modify the tool for project-level analyses.[174] But as is discussed above, NEPA reviews are often replete with uncertainties and cannot be foregone because the state of the science or policymaking is in flux.[175] That rationale would allow projects to move forward with NEPA reviews that ignore, for example, impacts to species when new data is emerging on habitat or population health, or impacts to human health from air emissions, because EPA is updating its Clean Air Act standards. And, as FERC is well-aware, pending litigation without any injunctive effect—as is the case with the litigation cited in the FEIS—also does not serve as a basis to paralyze the regulatory process or allow an agency to shirk its statutory responsibilities. The Commission's refusal to use the social cost of GHGs tool to assess the Project's significance, therefore, is without explanation or justification and is arbitrary and capricious.

---

[173] *Vecinos Para El Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021).

[174] FEIS, at 4-129–4-130.

[175] *See, e.g.*, *Scientists' Inst. for Pub. Info., Inc. v. U.S. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

## 2. The Commission Violated the NGA by Failing to Weigh the Project's Climate Change Costs in Determining Whether the Project Is in the Public Convenience and Necessity.

For similar reasons as those discussed above, the Commission's failure to account for and consider the costs of the Project's contributions to climate change violate the NGA. Section 7 of the NGA requires FERC to consider all relevant factors bearing on the public interest, including the environmental costs associated with a project's GHG emissions.[176] While FERC is eager to tout the Project's benefits of ostensibly causing a shift from coal to gas use as a justification for approving the Project, it provides no justification for failing to equally weigh the Project's costs, as is required by the NGA. The Commission has before it a firm figure that would allow an apples-to-apples comparison between the alleged economic benefits of the Project and its $12 billion-worth of climate costs. The Order does not dispute the accuracy of the Project's total costs;[177] it fails to address them entirely. This one-sided view of the Project's effects on climate is, therefore, arbitrary and cannot support a finding that the Project is in the public convenience and necessity.

---

[176] *See, e.g., Food & Water Watch v. FERC*, 28 F.4th 277 (D.C. Cir. 2022); *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017); *see also* 15 U.S.C. § 717f(c)–(e).

[177] To the extent that the Commission believes that the total social cost of greenhouse gases calculated in the FEIS should be reduced based on alleged offsets from a reduction in coal consumption, that calculation is well-within FERC's power to undertake (*if* the coal retirement offset were otherwise justified). *See* FEIS, at 4-130. While CAC has put forth evidence that the reduction of coal consumption would occur with or without the Project and disputes FERC's findings on this issue, the failure to date to include those offsets in the social cost of greenhouse gas calculation is not a basis for refusing to use that tool entirely; it is merely a reason to (if the coal retirement offset were justified) update the calculation to reflect the alleged offsets.

JA352

## IV.    CONCLUSION

The Commission granted a Certificate of Public Convenience and Necessity to Texas Gas for its proposed Project while failing to complete the full analyses required under the National Environmental Policy Act and Natural Gas Act as a predicate to issuing such a Certificate.  The Commission failed to evaluate reasonable non-gas energy alternatives to the Project as required in NEPA's implementing regulations and by the NGA's public convenience and necessity standard; the Commission wrongly applied NEPA's regulatory standard for environmental effects when it netted existing air emissions of the retiring A.B. Brown coal power plant from the Project's downstream emissions; and the Commission failed to properly consider the significance and weight of the Project's greenhouse gas emissions, as required by NEPA and the NGA.  What's more, in each of these areas of analysis, the Commission arbitrarily and capriciously ignored substantial record evidence and argument that would have pointed it to a different determination, and/or failed to offer an adequate explanation for its conclusion.

For all these reasons, Citizens Action Coalition of Indiana respectfully requests that the Commission grant rehearing of the Certificate Order.

[The remainder of this page is intentionally left blank.]

JA353

DATED: November 21, 2022

Respectfully submitted,

Aaron Stemplewicz
Senior Attorney, Clean Energy Program
Earthjustice
1617 John F. Kennedy Blvd., Suite 1130
Philadelphia, PA 19103
T: 215-717-4524
astemplewicz@earthjustice.org

*Counsel for Citizens Action Coalition of Indiana*

Kerwin L. Olson
Executive Director
Citizens Action Coalition of Indiana
1915 W. 18th Street, Suite C
Indianapolis, Indiana 46202
(317) 735-7727
kolson@citact.org

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I electronically filed the original request for rehearing with:

Kimberly D. Bose, Secretary
Nathaniel J. Davis, Sr., Deputy Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

I further certify that I served this request for rehearing on behalf of Citizens Action Coalition of Indiana on all parties listed on the service list compiled by the Secretary in this proceeding electronically.

DATED: November 21, 2022

Aaron Stemplewicz
Senior Attorney, Clean Energy Program
Earthjustice
1617 John F. Kennedy Blvd., Suite 1130
Philadelphia, PA 19103
T: 215-717-4524
astemplewicz@earthjustice.org

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC         )          Docket No. CP21-467-001

**MOTION FOR LEAVE TO ANSWER AND ANSWER OF TEXAS GAS
TRANSMISSION, LLC TO REQUEST FOR REHEARING
OF CITIZENS ACTION COALITION OF INDIANA**

Pursuant to Rules 212 and 213 of the Federal Energy Regulatory Commission's ("FERC" or "Commission") Rules of Practice and Procedure,[1] Texas Gas Transmission, LLC ("Texas Gas") submits this Motion for Leave to Answer and Answer to the Request for Rehearing of Citizens Action Coalition of Indiana ("CAC"),[2] which seeks rehearing of the Commission's order authorizing Texas Gas' Henderson County Expansion Project ("Project").[3]

Texas Gas' Project is designed to provide transportation service to two new natural gas-fired combustion turbines ("CTs") to be constructed by Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("CenterPoint") at its A.B. Brown Generating Station ("A.B. Brown Plant") in Posey County, Indiana.[4] Texas Gas' Project will help CenterPoint implement its generation transition initiative, under which CenterPoint plans to substantially reduce greenhouse gas ("GHG") emissions by, among other things, retiring existing coal-fired generating facilities located at the A.B. Brown

---

[1] 18 .C.F.R. §§ 385.212, 385.213 (2022).

[2] Request for Rehearing of Citizens Action Coalition of Indiana, Docket No CP21-467-001 (Nov. 21, 2022) ("Rehearing Request" or "CAC Rehearing Request").

[3] *Texas Gas Transmission, LLC*, 181 FERC ¶ 61,049 (Oct. 20, 2022) ("Certificate Order").

[4] *See* Texas Gas Transmission, LLC, Abbreviated Application for a Certificate of Public Convenience and Necessity, Abandonment Authorization and Related Authorizations, Docket No. CP21-467-000 (June 25, 2021) ("Application").

1

need" of Texas Gas' Project "is to provide up to 220,000 dekatherms per day of new firm transportation service to [CenterPoint] to serve its AB Brown Generating Station (AB Brown Power Plant) in Posey County, Indiana."[11] The FEIS recognized that the IURC has approved CenterPoint's plans to construct the CTs at the A.B. Brown Plant, and explained that "[d]etailed evaluation of other power generation alternatives like the use of wind and solar power or increased energy efficiency are entirely separate questions from evaluating alternatives that meet the defined purpose and need for the Project."[12] The FEIS appropriately included a brief discussion of non-gas alternatives in its presentation of the "no action alternative" and "energy alternatives" and explained that such non-gas alternatives would not meet the purpose and need of Texas Gas' Project.[13] The Commission's treatment of non-gas alternatives is fully consistent with the Council for Environmental Quality's ("CEQ") NEPA regulations, which provide that "for alternatives that the agency eliminated from detailed study," the EIS need only "briefly discuss the reasons for their elimination."[14]

The Certificate Order explained that "CenterPoint and its state regulatory agency, the [IURC], are responsible for determining the portfolio of generation resources to replace CenterPoint's retiring coal-fired units, not [this] Commission," and that "[a]ny concerns regarding the need for or authorization of the two CTs should be raised with the IURC."[15] The Certificate Order further recognized that that the IURC has approved CenterPoint's

---

[11] Final Environmental Impact Statement for Texas Gas Transmission, LLC's Henderson County Expansion Project under CP21-467, Docket No. CP21-467-000 (Aug. 25, 2022) ("FEIS") at ES-1.
[12] Id. at 3-3.
[13] Id. at 3-2, 3-3 ("Detailed evaluation of other power generation alternatives like the use of wind and solar power or increased energy efficiency are entirely separate questions from evaluating alternatives that meet the defined purpose and need for the Project").
[14] 40 C.F.R. § 1502.14(a).
[15] Certificate Order at P 25. CAC is notably not challenging the IURC's approval of CenterPoint's CTs.

4

project to construct the CTs[16] and that the goal of Texas Gas' Project is to serve CenterPoint's CTs.[17] The Commission appropriately used this goal to determine the scope of its alternatives analysis. This is consistent with judicial holdings that an agency's alternatives analysis involves looking at "the range of projects that could achieve the same goal as the proposed project."[18] The D.C. Circuit has explained that "[a]n agency cannot redefine the goals of the proposal that arouses the call for action . . . it must evaluate alternative ways of achieving its goals, shaped by the application at issue and by the function that the agency plays in the decisional process."[19] This precedent requires the Commission to reject CAC's contention that the Commission should have considered non-gas alternatives that would be inconsistent with the IURC's approval of CenterPoint's project, which the Commission has no jurisdiction to do. The Commission appropriately considered only alternative methods by which natural gas can be transported to CenterPoint's natural gas-fired CTs. As stated by the Ninth Circuit, "[w]hen the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved."[20]

The Commission should reject CAC's misleading partial quotation from the Council on Environmental Quality's ("CEQ") recent rulemaking proceeding to revise its NEPA regulations. CAC claims that "CEQ states that it is appropriate to consider

---

[16] *Id.* The IURC's approval of the CenterPoint's CT entirely refutes CAC's contention that the Commission allowed "Texas Gas' self-serving desires" to define the purpose of Texas Gas' Project. CAC Rehearing Request at 15. The purpose of Texas Gas' project is not to meet Texas Gas' "desire" but to meet CenterPoint's demand for natural gas transportation to serve the IURC-approved CTs.

[17] *See* Certificate Order at P 72 (finding that Texas Gas' Project "will enable Texas Gas to provide up to 220,000 MMBtu/d of new firm transportation service to CenterPoint's new natural gas-fired electric generation turbines at the A.B. Brown Plant.").

[18] *Delaware Riverkeeper Network v. U.S. Army Corps of Eng'rs,* 869 F.3d 148, 157 (3d Cir. 2017).

[19] *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 199 (D.C. Cir. 1991).

[20] *City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir. 1986) (per curiam).

5

alternatives 'that are beyond the goals of the applicant or outside the agency's jurisdiction . . . .'"[21]  The full quotation reads: "There may be times when an agency identifies a reasonable range of alternatives that includes alternatives—other than the no action alternative—that are beyond the goals of the applicant or outside the agency's jurisdiction *because the agency concludes that they are useful for the agency decision maker* and the public *to make an informed decision*."[22]  A discussion of non-gas alternatives to CenterPoint's A.B. Brown Project would not be useful to this Commission's decisionmaking because the IURC, not this Commission, is the decisionmaker regarding CenterPoint's selection of electric resources.[23]  As CAC itself acknowledges, NEPA requires the Commission "to consider alternatives to the proposed *federal action*."[24]  The Commission should conclude that it is not required to consider alternatives to state action regarding the selection of electric resources over which this Commission has no jurisdiction.[25]

The Commission should further reject CAC's contention that the Commission's alternatives analysis of Texas Gas' Project represents a "break" with "historic practice."[26] CAC lists several projects for which the Commission analyzed non-gas energy alternatives in its EIS or environmental assessment ("EA").[27]  CAC ignores that none of the listed

---

[21] CAC Rehearing Request at 12 (quoting National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23,453, 23,459 (Apr. 20, 2022) (emphasis removed).
[22] 87 Fed. Reg. at 23,459 (emphasis added).
[23] None of the cases cited by CAC in support of its position would require a federal agency to conduct an alternatives analysis that would redefine a project that has been approved by a state agency with appropriate jurisdiction.  *See* CAC Rehearing Request at 12 n. 43 (citing cases).
[24] CAC Rehearing Request at 11 (emphasis added).
[25] The Commission's FEIS appropriately considered alternatives to Texas Gas' Project that are within the Commission's jurisdiction, including compressor alternatives, system alternatives, and lateral route alternatives.  *See* FEIS at Section 3.0.
[26] CAC Rehearing Request at 25.
[27] *Id.* at 26-27.

projects were designed for the express purpose of serving specific electric generation facilities that had been approved by a state commission with appropriate jurisdiction. The Commission should determine that it would be pointless to consider non-gas alternatives to CenterPoint's A.B. Brown Project because the IURC, not this Commission, is responsible for selecting CenterPoint's generation resources and consideration of non-gas resources to CenterPoint's project would not be relevant to this Commission's decisionmaking.

2.      **The Commission Should Reject CAC's Contention That Texas Gas' Project Will Not Facilitate the Retirement of CenterPoint's Coal-Fired Generation Resources.**

CAC challenges the Certificate Order's determination that "the record supports a finding that the coal units are being retired as part of CenterPoint's 2020 Integrated Resource Plan [("2020 IRP")], which calls for the replacement of the coal units generating capacity with a combination of renewable resources and the two gas-fired CTs to be sited at the A.B. Brown plant."[28] CAC argues that "[t]he closure of the A.B. Brown coal units, however, is not a reasonably foreseeable effect of the Project, because there is no causal connection between the retirement of the A.B. Brown coal units and construction of the gas power plant that the Project will fuel."[29] CAC ignores that CenterPoint's decision to retire the A.B. Brown coal units has always been dependent upon the availability of new electric resources to replace the retiring coal units and that CenterPoint's CTs are a key part of the resource mix that CenterPoint and the IURC selected to replace the retiring coal units.

---

[28] Certificate Order at P 48.
[29] CAC Rehearing Request at 34.

CenterPoint's use of the CTs to replace the retiring coal units is plainly described in the 2020 IRP, which states: "The Preferred Portfolio recommendation is to retire or exit 730 MWs of coal generation and replace with 700-1,000 MWs of solar generation (some connected to battery storage), add 300 MWs of wind *backed by dispatchable generation that consists of 2 new Combustion Turbine (CT) gas units* and maintaining Culley 3 (coal unit)."[30] The IURC's order approving the CTs further explains how CenterPoint is using the CTs to facilitate the coal retirements as contemplated in the 2020 IRP:

> The Preferred Portfolio identified through the [2020 IRP] *called for the retirement or exit of energy provided by coal-burning units at the Brown and Culley generating stations. . . . The Preferred Portfolio mapped a shift from a generating fleet of predominantly coal-burning resources to one of intermittent renewable resources supported by gas generation to ensure reliability*. One early step in implementing the Preferred Portfolio was the addition of solar generating resources approved by the Commission in Cause Nos. 45501 on October 27, 2021 and 45600 on May 4, 2022. *A next step is the addition of the two new CTs requested in this Cause*.[31]

The Commission should conclude that the record in this proceeding amply supports its conclusion that coal units are being retired and replaced by the CTs in addition to other electric resources as contemplated by CenterPoint's 2020 IRP.[32] CAC's contention that "there is no causal connection between the retirement of the A.B. Brown coal units and construction of the gas power plant that [Texas Gas'] Project will fuel" is simply incorrect and should be rejected.

---

[30] CenterPoint, 2020 Integrated Resource Plan at 50, available at https://tinyurl.com/22u3mwxs (emphasis added)..

[31] IURC, Order of the Commission at 16, Cause No. 45564 (Jun. 28, 2022) ("IURC Order").

[32] The record in this proceeding is replete with evidence supporting the Commission's conclusion. *See, e.g.,* Texas Gas Transmission, LLC, Abbreviated Application for a Certificate of Public Convenience and Necessity, Abandonment Authorization and Related Authorizations, Docket No. CP21-467-000 at 6-10 (June 25, 2021); Texas Gas September 21 Answer at 13; October 4 Comments at 4-5; Comments of CenterPoint Energy Indiana South at 2-6, Docket No. CP21-467-000 (Jul. 30, 2021).

JA361

181 FERC ¶ 62,197
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC                                    Docket No. CP21-467-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(December 22, 2022)

Rehearing has been timely requested of the Commission's order issued on
October 20, 2022, in this proceeding.  *Tex. Gas Transmission, LLC*, 181 FERC ¶ 61,049
(2022).  In the absence of Commission action on a request for rehearing within 30 days
from the date it is filed, the request for rehearing may be deemed to have been denied.
15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2021); *Allegheny Def. Project v. FERC*,
964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section.  As also provided in 15 U.S.C. § 717r(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Kimberly D. Bose,
Secretary.

JA362

FERC Docket No. CP21-467-000


Comment to Supplement
by Citizens Action Coalition of Indiana


Exhibit B

JA363

2019/2020
# Integrated Resource Plan



VECTREN
A CenterPoint Energy Company

JA364

## I.    Introduction

Southern Indiana Gas and Electric Company d/b/a Vectren a CenterPoint Energy Company's ("Vectren") 2019/2020 Integrated Resource Plan is submitted in accordance with the requirements of the Indiana Utility Regulatory Commission (IURC or Commission) and the guidance provided in the Commission's recent orders related to the preferred portfolio described in Vectren's previous 2016 Integrated Resource Plan ("IRP"). The preferred portfolio in Vectren's previous 2016 IRP contemplated replacement of some of Vectren's coal fleet by the end of 2023 with a mix of renewable, energy efficiency and gas resources while retaining other coal resources. To implement this plan, Vectren filed two cases seeking Certificates of Public Convenience and Necessity ("CPCN") to (1) own and operate a 50 MW solar project located on its system (the "Troy Solar Project"), (2) install equipment designed to achieve compliance with environmental regulations in order to continue operation of its 270 MW Culley Unit 3 beyond 2023 and construct a 700-850 MW Combined Cycle Gas Turbine ("CCGT"). The Commission approved issuance of CPCNs authorizing the construction of the Troy Solar Project and Culley Unit 3 compliance projects. The Commission order denying a CPCN for the 700-850 MW CCGT urged Vectren to:

- Focus on outcomes that reasonably minimize the potential risk of an asset becoming uneconomic in an environment of rapid technological innovation;
- Fully consider options that provide a bridge to the future;
- Utilize a request for proposals ("RFP") to determine the price and availability of renewables; and
- Consider resource diversity and alternatives that provide off ramps that would allow Vectren to react to changing circumstances.

Vectren began its 2019/2020 IRP process in April 2019 with the objective of engaging in a generation planning process responsive to the Commission's guidance and seeking input from a variety of stakeholders. As part of its 2019/2020 IRP process, Vectren's evaluation has focused on exploring all new and existing supply-side and demand side resource options to reliably serve Vectren customers over the next 20 years. While the



*June 2020*

fundamentals of integrated resource planning were adhered to in developing the 2016 IRP, Vectren has enhanced its process and analysis in several ways. These enhancements include, but are not limited to the following:

- Issuance of an All-Source RFP to provide current market project pricing to be utilized in IRP modeling and potential projects to pursue, particularly for renewable resources such as wind and solar;

- An exhaustive review of reasonable options that leverage existing coal resources;

- increased participation and collaboration from stakeholders on all aspects of the analysis, inputs and resource evaluation criteria, with specific considerations and responses from Vectren;

- An encompassing analysis of wholesale market dynamics that accounts for MISO developments and market trends;

- The use of a more sophisticated IRP modeling tool, Aurora, which provided several benefits (simultaneous evaluation of many resources, evaluation of portfolios on an hourly basis and consistency in modeling, including least cost long-term capacity expansion planning optimization, simulated dispatch of resources and probabilistic modeling); and

- A more robust risk analysis, which encompasses a broad consideration of risks and an exploration of resource performance over a wide range of potential futures.

Based on this planning process and detailed analysis, Vectren has selected a preferred portfolio plan that significantly yet prudently diversifies the resource mix for its generation portfolio with the addition of significant solar and wind energy resources, the retirement or exit of four coal units, and continued investment in energy efficiency. These resources are complemented with dispatchable resources including continued operation of Culley Unit 3 and the addition of two flexible natural gas Combustion Turbines (CTs). The gas units represent a much smaller portion of Vectren's generation portfolio as compared to the 2016 IRP preferred portfolio while still providing reliable capacity and energy. The highly dispatchable and fast-ramping gas units are an important match with the significant renewable investment, enabling Vectren to maintain constant electric supply during



potentially extended periods of low output from renewable energy sources. The units ramp quickly and provide load following capability, complimenting renewable energy production, which is expected to grow throughout the MISO footprint. Vectren's preferred portfolio reduces its cost of providing service to customers over the next 20 years by more than $320 million as compared to continuing with its existing generation fleet. Additionally, the preferred portfolio reduces carbon dioxide output by approximately 67% by 2025 and 75% by 2035 when compared to 2005 levels, which helps Vectren's parent company, CenterPoint Energy, achieve its commitments to environmental stewardship and sustainability, while meeting customer expectations for clean energy that is reliable and affordable.

Vectren's preferred resource plan reduces risk through diversification, reduces the cost to serve load over the next 20 years and provides the flexibility to continue to evaluate and respond to future needs through subsequent IRPs. The preferred portfolio has several advantages: including: 1) Energy supplied by this portfolio is generated primarily through a significant amount of near-term renewable solar and wind projects that take advantage of the Investment Tax Credit and the Production Tax Credit. This lowers portfolio costs and takes advantage of current tax-advantaged assets. 2) Two new, low-cost gas combustion turbines, continued use of Vectren's most efficient coal unit (Culley 3) and new battery storage resources, provide resilient, dispatchable power to Vectren's system that is complementary to significant investment in new intermittent renewable resources. This is very important, as coal plants, which have provided these attributes in the past, continue to retire in MISO Zone 6. 3) The portfolio provides flexibility to adapt to and perform well under a wide range of potential future legislative, regulatory, and market conditions. The preferred portfolio performed well under $CO_2$, methane constraints, and other related regulations such as a fracking ban. The cost position of this portfolio that is backed up by the two combustion turbine capacity resources does not change because the gas turbines predominantly run during peak load conditions. This provides a financial hedge against periodic instances of high market energy and capacity prices, while also providing reactive reserves and system reliability in times of extended renewable



generation droughts, i.e., cloud cover and low wind. 4) It reasonably balances energy sales against purchases to remain poised to adapt to market shifts. 5) It includes new solar capacity when it is most economic to the portfolio. 6) Finally, it is timely. New combustion turbines can come online quickly to replace coal generation that retires by the end of 2023, minimizing in-service lag and reducing exposure to the market.

The resource options selected in this plan provide a bridge to the future. For example, CT's allow time for battery storage technology to continue to become more competitive in price and further develop longer duration storage capabilities. Further, should there be a need for new baseload generation in the future to accommodate a large load addition or to replace Warrick 4 and Culley 3, one or both CT's could be converted to a CCGT, a highly efficient gas energy resource. Even with the large commitment in the near term to renewable resources, additional renewable resources can be added over time.

The preferred portfolio also provides several off-ramps (future transitional inflection points) should they be needed. 1) Vectren continues to speak with Alcoa about a possible extension of Warrick 4 (W4) joint operations through 2026. This option could provide additional time and shield Vectren customers from capacity purchases at a time where the market is expected to be tight, causing much higher projected prices than today. Additionally, time may be needed to allow Vectren to secure the level of renewable resources identified in the preferred portfolio and to allow for contingency for permitting and construction of new combustion turbines. 2) While Culley 3 is not scheduled to be retired within the timeframe of this analysis, including thermal dispatchable generation in this portfolio will allow Vectren flexibility to evaluate this option in future IRPs. 3) Vectren will work to secure attractive renewables projects from the recent All-Source RFP but will likely require a second RFP to fully secure 700-1,000 MWs of solar on multiple sites and 300 MWs of wind constructed over a span of several years. Issuing a second RFP provides two main benefits. It allows more local renewable options to select from, as some offered proposals are no longer available. Second, it provides additional time to better understand how MISO intends to move forward with market adjustments, such as



*June 2020*

capacity accreditation and energy price formation. MISO's wholesale market is adapting to fleet transition that is moving toward intermittent renewable resources.

What follows is a summary of Vectren's process to identify this portfolio, focusing on Vectren's operations, an explanation of the planning process and a summary of the preferred portfolio.

## II.    Vectren Overview

Vectren provides energy delivery services to more than 146,000 electric customers located near Evansville in Southwestern Indiana. In 2018, approximately 44% of electric sales were made to large (primarily industrial) customers, 30% were made to residential customers and 26% were made to small commercial customers.



**Vectren's Electric Service Area**

The table below shows Vectren generating units. Since the last IRP, Vectren has formally retired four, older small natural gas units[1] rather than investing significant capital dollars to ensure safety and reliability. Note that Vectren also offers customers energy efficiency programs to help lower customer energy usage and bills.

| Unit | Installed Capacity ICAP (MW) | Primary Fuel | Year in Service | Unit Age | Coal Unit Environmental Controls[2] |
|---|---|---|---|---|---|
| A.B. Brown 1 | 245 | Coal | 1979 | 41 | Yes |
| A.B. Brown 2 | 245 | Coal | 1986 | 34 | Yes |
| F.B. Culley 2 | 90 | Coal | 1966 | 54 | Yes |
| F.B. Culley 3 | 270 | Coal | 1973 | 47 | Yes |

---

[1] In 2018, Vectren retired BAGS 1 (50 MW). In 2019, Vectren retired Northeast 1&2 (20 MW) and BAGS2 (65 MW)

[2] All coal units are controlled for Sulfur Dioxide ($SO_2$), Nitrogen Oxide ($NO_X$), Particulate Matter (dust), and Mercury. All coal units are controlled for Sulfur Trioxide ($SO_3$) and Sulfuric Acid ($H2SO_4$) except F.B. Culley 2.



*June 2020*

bookend with a natural gas fracking ban (sustained high price), a social cost of carbon fee starting at $50 per ton in 2022 and lower renewables cost trajectory than what is expected. Additionally, an evaluation measure was adjusted based on direct stakeholder input. Vectren included the life cycle of carbon emissions for all resources in response to the ICC and environmental stakeholders. The table below shows key stakeholder requests made during the process and Vectren's response.

| Request | Response |
|---|---|
| Update the High Regulatory scenario to include a carbon fee and dividend | Included a fee and dividend construct which assumed a balanced impact on the load (the economic drag from a carbon fee is neutralized by the economic stimulus of a dividend) |
| Lower renewables costs in the High Regulatory and 80% $CO_2$ Reduction scenarios | Updated scenario to include lower costs for renewables and storage than the Reference scenario |
| Consider life cycle emissions using $CO_2$ equivalent | Included a quantitative measure on the risk scorecard based on National Renewable Energy Lab (NREL) Life Cycle Greenhouse Gas Emissions ($CO_2e$) from Electricity Generation by Resource |
| Include a measure within the risk score card that considers the risk that assets become uneconomic | Included an uneconomic asset risk as a consideration in the overall evaluation. Not included in the scorecard. |
| Include a scenario with a carbon dividend modeled after HB 763 with a $CO_2$ price that was approximately $200 by the end of the forecast | Utilized a scenario with these prices to create an additional portfolio. Ultimately, this portfolio was not selected for the risk analysis, as the amount of generation built |



| Request | Response |
|---|---|
| | within modeling vastly exceeded Vectren's need and resulted in large energy sales |
| Reconsider the use of a seasonal construct for MISO resource accreditation | Reviewed calculation for solar accreditation in winter and utilized an alternate methodology, increasing accreditation in the winter |
| Include a $CO_2$ price in the reference case | Included mid-range $CO_2$ prices 8 years into the forecast. The Low Regulatory scenario did not include a $CO_2$ price, thus becoming a boundary condition |

Meeting materials of each meeting can be found on www.vectren.com/irp and in Technical Appendix Attachment 3.1 Stakeholder Materials.

## VI.    The Preferred Portfolio

The Preferred Portfolio recommendation is to retire or exit 730 MWs of coal generation and replace with 700-1,000 MWs of solar generation (some connected to battery storage), add 300 MWs of wind backed by dispatchable generation that consists of 2 new Combustion Turbine (CT) gas units and maintaining Culley 3 (coal unit).





This preferred portfolio:

- Allows customers to enjoy the benefits of low-cost renewable energy, while ensuring continued reliable service as Vectren moves toward higher levels of intermittent renewable energy in the future.

- Saves customers over $320 million over the next 20 years when compared to continued operation of Vectren's coal fleet. The preferred portfolio is a low-cost portfolio in the near, mid and long term.

- Reduces lifecycle greenhouse gas emissions, which includes methane, by nearly 60% over the next 20 years. Direct carbon emissions are reduced 75% from 2005 levels by 2035.



- Includes a diverse mix of resources (renewables, gas and coal), mitigates the impacts of extended periods of limited renewable generation and protects against overreliance on the market for energy and capacity.

- Maintains future flexibility with several off ramps to accommodate a rapidly evolving industry, includes a multi-year build out of resources on several sites and maintains the option to extend the contract with Alcoa for Warrick 4 for a few years and maintains the option to consider the replacement of Culley 3 in the future when appropriate based on continual evaluation of changing conditions. These options will be revaluated in future IRPs.

- Provides the flexibility to adapt to future environmental regulations or upward shifts in fuel prices relative to Reference Case assumptions. The preferred portfolio performed consistently well across a wide range of potential future environmental regulations, including $CO_2$, methane and fracking.

- Adds some battery energy storage in the near term, paired with solar resources to provide clean renewable energy when solar is not available. Provides time for technological advances that will allow for high penetration of renewables across the system, further cost declines and further Vectren operational experience to meet Vectren's customers' energy needs.

- Continues Vectren's energy efficiency programs with near term energy savings of 1.25% of eligible sales and further long-term energy savings opportunities identified over the next 20 years. Vectren is committed to Energy Efficiency to help customers save money on their energy bills and will continue to evaluate this option in future IRPs.



**2020 Resource Mix Installed Capacity (MWs)**

Renewables & DR, 10%
Storage, 0.1%
Natural Gas, 12%
Coal, 78%

**2025 Resource Mix Installed Capacity (MWs)**

Wind, 15%
Coal, 12%
DR, 2%
Solar+Storage, 16%
Natural Gas, 24%
Solar, 31%

## VII.    Next Steps

The preferred portfolio calls for Vectren to make changes to its generation fleet. Some of these changes require action in the near term. First, Vectren will finalize the selection process to secure renewable projects from the All-Source RFP and seek approval from the IURC for attractive projects. Second, the IRP calls for continuation of energy efficiency. Vectren filed a 2021-2023 plan with the IURC in June of 2020, consistent with the IRP.  Third, Vectren intends to pursue two natural gas combustion turbines to provide dispatchable support to the large renewables based preferred portfolio. These filings will be consistent with the preferred portfolio. However, the assumptions included in any IRP can change over time, causing possible changes to resource planning. Changes in commodities, regulations, political policies, customer need and other assumptions could warrant deviations from the preferred plan.

Vectren's plan must be flexible; as several items are not certain at this time.

- The timing of exiting joint operations of the Warrick 4 coal plant could change. The plant is jointly owned with Alcoa. Without incremental investment, the plant does



not comply with the ELG and other water discharge control requirements. Vectren therefore continues to talk to Alcoa about its plans.

- The availability of attractive renewable projects is currently being evaluated. Negotiations for resources must take place to finalize availability and cost of projects. The Coronavirus has put pressure on supply chains and put in jeopardy the ability of full utilization of the Production Tax Credit and Investment Tax Credit for some projects. Competition for these projects is steep, with multiple, on-going RFP processes in the state of Indiana.

- Finally, MISO continues to evaluate the accreditation of resources. Vectren will continue to follow developments to determine the right amount of renewable resources to pursue in the near term.



## 1.1    COMPANY BACKGROUND

Vectren is a wholly owned subsidiary of CenterPoint Energy, Inc. On February 1, 2019, CenterPoint Energy, Inc. (NYSE: CNP) and Vectren Corporation (NYSE: VVC) completed a merger. The combined company, which is named CenterPoint Energy and headquartered in Houston, has regulated electric and natural gas utility businesses in eight states that serve more than 7 million metered customers.

Operation of Vectren's electric transmission and distribution services, including its power generation and wholesale power operations now fall into CenterPoint's Indiana Electric business. Vectren serves approximately 146,000 customers in Southern Indiana.

## 1.2    INTEGRATED RESOURCE PLANNING

Vectren takes integrated resource planning very seriously. The IRP is used as a guide for how Vectren will serve existing and future customers over the next 20 years in a reliable and economic manner. The integrated resource plan can be thought of as a compass setting the direction for future generation and Demand Side Management (DSM) options. It is not a turn-by-turn GPS. Future analyses of changing conditions, filings and subsequent approvals from the IURC are needed to chart the specific course.

Vectren is required to submit its Integrated Resource Plan (IRP) to the Indiana Utility Regulatory Commission (IURC) every three years and last submitted it in 2016 with a plan to transition its generation fleet away from a majority reliance on coal. Vectren began this IRP process by gathering feedback from stakeholders on the last IRP, the Final Director's Report for 2016 Integrated Resource Plans and the Indiana Utility Regulatory Commission's Order in 45052 (Vectren's 2018 generation transition filing). Additionally, Vectren worked more closely with IRP stakeholders than ever before to listen, inform and consider updates to the process, as discussed in Chapter 3 Public Participation Process.

The future is uncertain; several factors have helped to set the stage for this analysis. Gas prices remain historically low and are projected to be stable over the long term. Shale gas



has revolutionized the industry, driving these low gas prices. This has fueled a surge in gas generation investment, due to its low-cost energy and capacity value that it brings to the grid.

Renewable costs continue to decline and are producing competitively priced energy in the Midwest region, but still require backup for times when the wind is not blowing and the sun is not shining (on a daily and seasonal basis). Based on expectations of increasing penetration of renewables, particularly solar, MISO (Midcontinent Independent System Operator), Vectren's regional transmission operator, continues to evaluate rules and mechanisms that are needed now and in the future to maintain reliability. Vectren continues to monitor developments within MISO; the outcomes of two major studies are important for resource planning. 1) MISO is conducting a Renewable Integration Impact Assessment (RIIA) related to impacts of renewable energy growth in MISO over the long term. This study will assess implications to MISO's transmission needs and ability to effectively dispatch its members' generation fleet. 2) MISO is simultaneously conducting the Resource Availability and Need (RAN) initiative, which looks at more granular planning and accreditation of generation resources to account for a changing generation mix and resulting attributes, both of which are discussed in detail below.

In order to better evaluate renewable, energy storage and energy efficiency resources within the IRP analysis, Vectren chose to move to a more sophisticated IRP modeling tool than was used in the 2016 IRP, the Aurora modeling platform. It provided several benefits: 1) simultaneous evaluation of many resources, 2) evaluation of portfolios on an hourly basis and 3) consistency in modeling, including optimization, simulated dispatch of resources and probabilistic modeling. The output from this model provides quantitative data to help evaluate portfolios within a robust risk analysis, designed to understand performance over a wide range of futures.



### 1.2.1 IRP Objectives

Vectren's IRP strategy is designed to accommodate the ongoing changes and uncertainties in the competitive and regulated markets. The main objective is to select a preferred portfolio[8] of supply and demand resources to best meet customers' needs for reliable, reasonably priced, environmentally acceptable power over a wide range of future market and regulatory conditions, taking into account risk and uncertainty. Specifically, Vectren's objectives are as follows:

- Safe Reliable Service (a requirement for all portfolios)
- Affordability (reflected in the balanced scorecard)
- Environmental Risk Minimization (reflected in the balanced scorecard)
- Cost Uncertainty Risk Minimization (reflected in the balanced scorecard)
- Avoiding Overreliance on Market Risk for capacity and energy (reflected in the balanced scorecard)
- Future Flexibility (reflected in both offramps and "other considerations")
- Resource Diversity (reflected in "other considerations")
- System Flexibility (operational flexibility to back up renewable resources)

### 1.2.2 IRP Development

As mentioned above, Vectren incorporated feedback from IRP stakeholders, IURC staff and the Commission in developing the 2019/2020 IRP. Detailed feedback was provided to IRP stakeholders on August 15, 2019, in Vectren's first of four public stakeholder meetings in a presentation titled "2019/2020 IRP Process." This presentation provided the backdrop for several Vectren commitments to improve and strengthen the analysis, most notably with the addition of an All-Source RFP, but also other improvements, including but not limited to the following:

- Additional stakeholder input,
- More consistency in modeling,
- More comprehensive analysis and

---

[8] A portfolio is a mix of future supply and demand side resources to meet expected future demand for electricity.



- The evaluation of a wider mix of resources, including an exhaustive evaluation of existing resources.

Vectren worked closely with industry experts to develop a comprehensive analysis. Burns and McDonnell, now known as 1828 and Company, managed all aspects of the All-Source RFP. This analysis was utilized to provide current market pricing for resources and an opportunity for Vectren to pursue individual projects to help serve Vectren customers following the conclusion of the IRP.  Pace Global, now known as Siemens Energy Business Advisory, worked with Vectren to conduct scenario development, modeling and a comprehensive risk analysis, which included both scenario based and probabilistic modeling.

## 1.3    CHANGES SINCE THE 2016 IRP

Several developments have occurred since the last IRP was submitted in 2016, which helps to illustrate the dynamic nature of integrated resource planning. The IRP analysis and subsequent write up represent the best available information at a point in time. The following sections discuss some of the major changes that have occurred over the last three years. Vectren realizes that conditions will change, and tis analysis was designed to test portfolios under a wide range of plausible futures.

### 1.3.1  Generation and Storage Filings

### 1.3.1.1  Generation Transition Plan

Following the conclusion of the 2016 IRP, Vectren began a generation transition plan to replace the majority of its coal fleet with a highly efficient, large, natural gas plant and a 50 MW universal solar plant. Vectren also proposed to continue operation of its most efficient coal unit by installing certain environmental compliance equipment. This was done through two separate filings in Cause numbers 45052 and 45086.



Each of the remaining candidate portfolios was then subjected to two different forms of a risk analysis. One was scenario-based and one was based on probabilistic modeling (200 iterations), which serves as the basis for the balanced scorecard.

### 8.2.1  Scenario Risk Analysis

The IRP requires scenario-based modeling be performed as a part of the risk analysis be performed. In the Scenario Based risk analysis, the remaining ten candidate portfolios that were selected for further analysis were each modeled under each of the four scenarios with their respective market inputs. The following provides a summary of the results of this scenario risk analysis. The results of the deterministic scenario-based Risk Analysis are shown in Figures 8-2 – 8.5 below

**Figure 8-2 – Portfolio NPVRR (million $)**

| | Reference | Low Regulation | High Technology | 80% Reduction of $CO_2$ by 2050 | High Regulation |
|---|---|---|---|---|---|
| | | | **Scenarios** | | |
| Reference Case | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Business as Usual to 2039 | 119.7% | 101.2% | 120.7% | 117.1% | 112.5% |
| Business as Usual to 2029 | 108.0% | 100.9% | 108.5% | 106.4% | 104.8% |
| ABB1 Conversion + CCGT | 112.6% | 112.6% | 111.5% | 111.2% | 107.4% |
| ABB1 Conversion | 103.9% | 104.5% | 104.5% | 103.9% | 102.0% |
| ABB1 + ABB2 Conversions | 110.0% | 110.0% | 110.1% | 109.9% | 105.5% |
| Diverse Small CCGT | 105.3% | 105.3% | 104.2% | 103.5% | 102.7% |
| Renewables + Flexible Gas | 98.4% | 101.4% | 98.2% | 98.1% | 97.7% |
| All Renewables by 2030 | 101.4% | 108.2% | 105.0% | 100.5% | 94.3% |
| High Technology | 102.3% | 102.6% | 101.3% | 102.1% | 102.2% |



A summary of how the ten candidate portfolios performed against each of the above metrics is provided in the table below:

**Figure 8-8 - IRP Portfolio Balanced Scorecard Color-Coded Comparison (NPVRR in millions of dollars)**

| | Stochastic Mean 20-Year NPVRR | 95th Percentile Value of NPVRR | % Reduction of CO2e (2019-2039) | Purchases as a % of Generation | Sales as a % of Generation | Purchases as a % of Peak Demand | Sales as a % of Peak Demand |
|---|---|---|---|---|---|---|---|
| Reference Case | $2,538 | $2,921 | 58.1% | 16.8% | 26.8% | 9.7% | 1.2% |
| BAU to 2039 | $2,914 | $3,308 | 35.2% | 12.0% | 36.5% | 0.1% | 11.1% |
| Bridge BAU 2029 | $2,691 | $3,094 | 61.9% | 15.2% | 31.4% | 7.1% | 4.3% |
| Bridge ABB1 Conversion+CCGT | $2,875 | $3,269 | 47.9% | 6.6% | 31.8% | 1.3% | 10.1% |
| Bridge ABB1 Conversion | $2,677 | $3,048 | 61.5% | 19.2% | 26.4% | 1.2% | 9.3% |
| Bridge ABB1+ABB2 Conversion | $2,836 | $3,215 | 61.5% | 18.5% | 27.6% | 4.0% | 5.6% |
| Diverse Small CCGT | $2,681 | $3,072 | 47.9% | 6.4% | 31.1% | 1.7% | 3.7% |
| Renewables Peak Gas | $2,528 | $2,927 | 77.4% | 21.5% | 27.7% | 9.4% | 1.2% |
| Renewables 2030 | $2,614 | $3,003 | 79.3% | 26.1% | 31.9% | 11.9% | 1.7% |
| High Technology | $2,592 | $2,978 | 59.8% | 16.7% | 26.9% | 0.4% | 4.6% |

A color-coded comparison (conducted automatically by the spreadsheet) of the balanced scorecard is shown above in Figure 8-8. Green indicates scoring well relative to its peers in a metric and red indicates scoring poorly relative to its peers. The color scheme is purely for illustrative purposes to show where differences between the best performing portfolio and the worst performing for that attribute is displayed.

The Mean of the Net Present Value is clearly one of the most important attributes, as it was the basis on which each of the portfolios were selected in the first place. Under both reference case conditions and also considering the mean of the distribution, the Renewables Peak Gas Portfolio, which retired Culley 3 early, was the lowest cost Portfolio but by less than half of one percent relative to the reference portfolio. Since Culley provides greater reliability, resilience and diversity to the portfolio and the flexibility to retire the plant early, Vectren did not consider this to be a significant difference.

The next two lowest cost portfolios were the Reference portfolio and the High Technology portfolios whose NPVRRs were within two percent of each other. Once again, Vectren



## 9.1    PREFERRED PORTFOLIO RECOMMENDATION

Based upon several factors, Vectren's preferred portfolio is the High Technology Portfolio.

### 9.1.1  Description of the Preferred Portfolio

The new and existing supply and demand resources in the preferred portfolio (High Technology) include 300 MW of wind resources selected in 2022, approximately 746 MW of solar selected in 2023 and 2024, the selection in 2023 of paired solar+storage resources (400 MW solar; 126 MW storage[43]) and two new 236.6 MW CT units selected in 2024 and 2025, all of which replace the A B Brown 1 and 2, F B Culley 2 and Warrick 4 coal units when they retire or exit at the end of 2023. An additional 50 MW of storage is selected in the final year of the forecast for reserve margin purposes. Approximately 1.25% of energy efficiency blocks are included in the near-term time period (2021-2023), approximately 0.75% of energy efficiency blocks are selected in the mid-term (2024-2026) and approximately 0.50% of energy efficiency blocks are selected in the long-term (2027-2039). In addition, low Income energy efficiency is included in all periods. The optional demand response bin is selected in the time periods 2024-2026 and 2027-2039, while a Direct Load Control (DLC) program called Summer Cycler is transitioned to Wi-Fi thermostats over time. F B Culley 3 operations continue throughout the forecast period. The only shortfall in capacity occurs in 2024 and is met through 70.9 MW of capacity market purchases.

The preferred portfolio (High Technology) performs well across a range of metrics, both in absolute terms and relative to the other candidate portfolios. The preferred portfolio (High Technology) was within 2.5 percent of the lowest cost portfolio and ranked 2 out of 10 (second best) in the 95th percentile cost risk metric. It did not over-rely on either purchases or sales of energy or capacity.

---

[43] Modeled as 3-hour battery.  Equates to a ~90MWs for 4-hours



Importantly it provides the flexibility and optionality to move quickly to a more renewable future as the reliability of the MISO system adapts to higher levels of renewables across the system. By having the option to retire Culley, Vectren can move when needed to a portfolio more like the Renewable + Flexible Gas portfolio.

Another distinguishing factor in this portfolio is the selection of two CTs. The two CT's provide the following benefits:

- They eliminate the reliance on for capacity in the near term at a time when MISO suggests that there could be shortages
- They provide the capability to convert to a combined cycle if needed for reliability in the future
- They are primarily used for peaking and fast ramping, which provides more room for renewables in the future
- They are relatively inexpensive to build and save customers ~$50M in design and construction costs by building two units at the same time vs. waiting to build the 2nd
- Maintains interconnection rights should units be built at the Brown site, shielding customers from future transmission upgrade costs

The High Technology portfolio provides a number of additional benefits to Vectren customers and other stakeholders, including that it:

- Is among the best performing portfolios across multiple measures on the balanced scorecard
- Is a low cost portfolio (within 2.5% of the lowest cost portfolio and 2.2% of the Reference Case (the latter of which is the more appropriate comparison due to the same assumption that F B Culley 3 is operational through the forecast period)
- Leads to a lower carbon future – Achieves almost 60 percent reduction in life cycle carbon emissions ($CO_2e$) during the period 2019-2039 and achieves a nearly 75%



reduction in $CO_2$ (base year 2005) by 2035 with the flexibility to achieve even more if needed

- Brings a significant volume of renewables into the portfolio beginning in 2022. Renewable resources and ongoing energy efficiency account for more than 72% of total installed capacity by 2024 (more than 42% in terms of UCAP)

- Provides dispatchable generation that enhances opportunities for economic development and wholesale sales without overexposure to market risk relative to other candidate portfolios, which lowers customer bills

- Provides fast ramping generation to help manage the intermittency of renewables, including extended periods of complete cloud cover that can reduce solar generation by up to 75%[44]

- Avoids reliance on a single fuel and provides a balanced and diversified mix of renewables, DSM, gas and coal.

- Provides the optionality of converting to a combined cycle unit in the future if market, regulatory, technological and/or economic conditions necessitate

- Reduces dependence on coal-fired generation in a prompt timeframe yet provides the flexibility to adapt to changes in technology in the future

- Takes advantage of tax incentives for new solar power plants and for new wind resources

### 9.1.2 Affordability

Affordability is a key objective in the balanced scorecard and that is measured as part of the stochastic analysis. The measure for affordability is the 20-year Net Present Value of Revenue Requirements (NPVRR), which comes from the stochastic mean (average) of 200 iterations of a portfolio as it is run in the dispatch model under varying market

---

[44] NASA, Cloud Cover and Solar Irradiation, (source: https://scool.larc.nasa.gov/lesson_plans/CloudCoverSolarRadiation.pdf) using the formula shown below:

$$P = 990 \ (1-0.75F^3) \quad watts/m^2$$

where F is the fraction of sky cloud cover on a scale from 0.0 (0% no clouds) to 1.0 (100% complete coverage).



183 FERC ¶ 62,135
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC                    Docket No. CP21-467-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW

(June 8, 2023)

Rehearing has been timely requested of the Commission's order issued on October 20, 2022, in this proceeding. *Tex. Gas Transmission, LLC*, 181 FERC ¶ 61,049 (2022). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

On December 22, 2022, the Commission issued a Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, which provided that the rehearing request would be addressed in a future order, consistent with the provisions of 15 U.S.C. § 717r(a).[1] The purpose of this Notice is to state that the rehearing request of the above-cited order filed in this proceeding will not be addressed in a future order.

Debbie-Anne A. Reese,
Deputy Secretary.

---

[1] *Tex. Gas Transmission, LLC*, 181 FERC ¶ 62,197 (2022).

JA385

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC                        Docket No.  CP21-467-001

STATEMENT OF JAMES P. DANLY

(Issued June 8, 2023)

1.     This is a clear case of regulatory failure.  Today, the Commission issued a notice stating that we would not be issuing an order on rehearing in the above-captioned docket.[1]  This, despite an earlier notice declaring that, though rehearing may be deemed denied by operation of law, the Commission would issue a subsequent merits order.[2]

2.     Citizens Action Coalition of Indiana (CAC) filed a rehearing request, raising a well-pleaded and unambiguous criticism of the Commission's underlying Certificate Order,[3] which included the following claim:  having calculated the Social Cost of Greenhouse Gases (Social Cost of GHGs), the Commission is now obligated to consider those calculations when conducting its balancing under the Natural Gas Act's (NGA) public convenience and necessity standard.[4]  Of course, we are not obligated to do

---

[1] FERC Office of the Secretary, Notice of Denial of Rehearing by Operation of Law, Docket No. CP21-467-001 (June 8, 2023) ("The purpose of this Notice is to state that the rehearing request of the above-cited order filed in this proceeding will not be addressed in a future order.").

[2] FERC Office of the Secretary, Notice of Denial of Rehearing by Operation of Law & Providing for Further Consideration, Docket No. CP21-467-001 (Dec. 22, 2022) (explaining that "[i]n the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied") (citations omitted); *id.* ("As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section.  As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.").

[3] *Tex. Gas Transmission, LLC*, 181 FERC ¶ 61,049 (2022) (Certificate Order).

[4] CAC November 21, 2022 Rehearing Request at 47 (arguing that the Commission was required under the NGA to "weigh the Project's costs" and, also arguing, in referencing the calculation of the Social Cost of GHGs, that "[t]he Commission has

anything of the kind.  While the Supreme Court has found that NGA section "7(e) requires the Commission to evaluate all factors bearing on the public interest,"[5] the Supreme Court has also explained that the inclusion of the term "public interest" in our statute is not "a broad license to promote the general public welfare"—instead, it "take[s] meaning from the purposes of the regulatory legislation."[6]  As to the "meaning and purposes" of the NGA, the Supreme Court has instructed us in unambiguous terms that the purpose of the NGA is "to encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices."[7]  Accordingly, when the Commission applies the public convenience and necessity standard, its balancing under that standard must "take meaning" from the purpose of the NGA.  How the Commission chooses to conduct that balancing, provided it is in accordance with the "meaning and purposes" of the statute, is afforded deference.[8]

3.      I am not aware of any case where the Commission employed the Social Cost of GHGs, or a similar tool, to make substantive determinations under the NGA.  In fact, to the extent to which the Commission has disclosed it at all, it has been offered solely for informational purposes.  CAC suggests that we now import that disclosure into our substantive NGA public interest balancing.  Such a suggestion not only violates the Commission's longstanding (and repeatedly upheld) decision not to employ the Social

---

before it a firm figure that would allow an apples-to-apples comparison between the alleged economic benefits of the Project and its $12 billion-worth of climate costs").

[5] *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959).

[6] *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) (*NAACP*).

[7] *Id.* at 669-70 (citations omitted); *accord Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015) (quoting *NAACP*, 425 U.S. at 669-70) (*Myersville*).  I note that the Supreme Court has also recognized the Commission has authority to consider "other subsidiary purposes," such as "conservation, environmental, and antitrust questions."  *NAACP*, 425 U.S. at 670 & n.6 (citations omitted).  But all subsidiary purposes are, necessarily, subordinate to the statute's primary purpose.

[8] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.") (footnote omitted); *see also Myersville*, 783 F.3d at 1308 ("Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter 'peculiarly within the discretion of the Commission,' *Okla. Natural Gas Co. v. Fed. Power Comm'n,* 257 F.2d 634, 639 (D.C. Cir. 1958), this court does not 'substitute its judgment for that of the Commission,' *Nat'l Comm. for the New River v. FERC,* 373 F.3d 1323, 1327 (D.C. Cir. 2004).").

Cost of GHGs for project-level review, it also fails to comport with the Supreme Court's long-held view that NEPA is merely procedural. NEPA is not a means of "mandating that agencies achieve particular substantive environmental results";[9] rather, it is a procedural statute that "prescribes the necessary process."[10] And while the Commission did disclose the Social Cost of GHGs in the Final Environmental Impact Statement (EIS),[11] the Final EIS explained that "[t]he Commission has not determined which, if any, modifications are needed to render the [Social Cost of GHGs] tool useful for project-level analyses."[12]

4.      In other words, the numbers cannot inform the Commission. And the Commission's recent NGA issuances, voted on at the April 20, 2023 Commission meeting, underscore that point.[13] In two of those orders, the Commission explained that

---

[9] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.") (*Methow Valley*).

[10] *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022) ("NEPA is a purely procedural statute that 'does not mandate particular results, but simply prescribes the necessary process.'") (quoting *Methow Valley*, 490 U.S. at 350); *see also Methow Valley*, 490 U.S. at 351 (explaining that "it would not have violated NEPA if the Forest Service, after complying with [NEPA's] procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd" and also explaining that "[o]ther statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action") (footnote omitted).

[11] *See* Commission Staff, Final Environmental Impact Statement for the Henderson County Expansion Project, Docket No. CP21-467-000, at 4-129, 4-130 (Aug. 25, 2022).

[12] *Id.* at 4-129.

[13] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (explaining the disclosure was "[f]or informational purpose," finding "that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change," and explaining that "[c]urrently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria") (footnotes omitted); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, at

the Social Cost of GHGs calculations are not required under NEPA, stating that
"[a]lthough we are including the social cost of GHG figures for informational purposes,
we find that because the social cost of GHGs tool was not developed for project level
review and, as discussed below, does not enable the Commission to credibly determine
whether the GHG emissions are significant, section 1502.21 of the CEQ regulations does
not require its use in this proceeding."[14]

5.      The courts have repeatedly and unfailingly upheld our decision not to employ the
Social Cost of GHGs in our NEPA and NGA analyses.[15]  The most recent of these cases,
*Alaska LNG*,[16] definitively stated that we have no obligation of the sort that has been
advanced by CAC.  Specifically, the D.C. Circuit affirmed the Commission's decision to
not analyze the Social Cost of Carbon in its NEPA analysis, rejected the suggestion that it
was required to do so, found that the petitioner's arguments "fare no better when framed
as NGA challenges," and then, in the very same paragraph, sustained the Commission's
public interest determination as "reasonable and lawful."[17]  That opinion issued not four
weeks ago.

6.      But all of this is beside the point.  Assuming standing, CAC was entirely within its
rights to seek rehearing on any substantive issue it wished.[18]  On rehearing, we are

---

PP 93-94, 101 (2023) (same); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047, at PP 20-
21, 25 (2023) (same).

[14] *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 at P 92; *Tex. LNG Brownsville
LLC*, 183 FERC ¶ 61,047 at P 20.

[15] *See, e.g.*, *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir.
2023) (*Alaska LNG*) (holding that the Commission "had no obligation . . . to consider the
social cost of carbon" under NEPA or the NGA and that the Commission acted
reasonably in declining to do so); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C.
Cir. 2016) (upholding the Commission's decision not to use the Social Cost of Carbon);
*see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296 (2017), *order on
reh'g*, 163 FERC ¶ 61,197, at PP 275-97 (2018), *aff'd sub nom. Appalachian Voices v.
FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. 2019) ("[The Commission] gave
several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon
tool, is not an appropriate measure of project-level climate change impacts and their
significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA
purposes.") (citation omitted).

[16] *Alaska LNG*, 67 F.4th 1176.

[17] *Id.* at 1188.

[18] 15 U.S.C. § 717r(a) ("Any person, State, municipality, or State commission

obligated to respond to every well-pleaded, substantive argument that is placed before us, and we have failed to do so here.

7.      Not only have we deprived CAC of the benefit of the Commission's thinking on the matter raised before us, but we have deprived Texas Gas Transmission, LLC (Texas Gas), and the court of that benefit as well.  Now, appeal rights having been perfected, CAC can raise an unrebutted, unresponded-to argument before the appellate court.

8.      What happens now?  The record will be filed with the court.  The Commission will then lose jurisdiction.  The Court will be faced with a simple and easily resolved Administrative Procedure Act violation:  failure to respond to an argument.[19]  The case will be remanded to FERC,[20] and we will go through the whole process before the Commission once again.  And all the while, Texas Gas will be trying to develop critical, capital-intensive infrastructure, under a cloud of uncertainty, that the Commission has already found to be in the public convenience and necessity, awaiting court and Commission action for who-knows-how-long.

---

aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. . . .").

[19] *See New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 211 (D.C. Cir. 2018) (finding "that FERC did not engage in the reasoned decisionmaking required by the Administrative Procedure Act" because it "failed to respond to the substantial arguments put forward by Petitioners and failed to square its decision with its past precedent").

[20] And, given what I view as the erosion of the standards in *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) (*Allied-Signal*), possibly vacated. *See, e.g.*, *Envtl. Def. Fund v. FERC*, 2 F.4th 953, 976-77 (D.C. Cir. 2021), *cert. denied sub nom. Spire Missouri Inc. v. Envtl. Def. Fund*, 142 S. Ct. 1668, 212 L. Ed. 2d 578 (2022) ("applying" *Allied-Signal*, 988 F.2d at 150-51); *see Spire STL Pipeline LLC*, 176 FERC ¶ 61,160 (2021) (Danly, Comm'r, dissenting at P 9) ("[T]he Commission should have sought rehearing of the court's vacatur of Spire's certificate order.  Vacatur is an extraordinary remedy and, while the court was correct to instruct the Commission regarding its failure to properly explain its decisions, the court misapplied [*Allied-Signal*], and we should have sought rehearing.  But, despite support among a majority of my colleagues to seek rehearing, the Chairman declined to do so.  Had the Commission itself sought rehearing, the court may have reversed its decision to vacate the Commission's order and the Commission could have taken the time it needed on remand to either justify its decision to the court's satisfaction or taken any other steps it deemed necessary.") (footnotes omitted).

9.     All that was required was a simple response to a simple question:  Is the
Commission *required* to use the Social Cost of GHGs?  The Commission has repeatedly
said no.  The courts have repeatedly affirmed the Commission.  We should have said no
(again) and allowed CAC to pursue its appeal with a merits order on rehearing.  I must
also point out that the notice issued by the Office of the Secretary was not a Commission
action.  That is to say, it was not issued at the direction of the Commission as a body.
Instead, this notice was issued by the Office of the Secretary at the direction of one
individual, the Chairman, who, as the executive head of the agency, has, and has
exercised, the authority to direct today's notice unilaterally.[21]

10.     Though it may be convenient for some to sidestep questions, our agency is
*obligated* to respond to arguments raised before us.  There is no excuse for our failure to
issue a merits order when the Commission's position has been unwavering and the courts
have consistently (and recently) upheld the Commission's position.

For these reasons, I respectfully issue this statement.


_____

James P. Danly
Commissioner


---

[21] *See* 42 U.S.C. § 7171(c) ("The Chairman shall be responsible on behalf of the
Commission for the executive and administrative operation of the Commission, including
functions of the Commission with respect to (1) the appointment and employment of
hearing examiners in accordance with the provisions of Title 5, (2) the selection,
appointment, and fixing of the compensation of such personnel as he deems necessary,
including an executive director, (3) the supervision of personnel employed by or assigned
to the Commission, except that each member of the Commission may select and
supervise personnel for his personal staff, (4) the distribution of business among
personnel and among administrative units of the Commission, and (5) the procurement of
services of experts and consultants in accordance with section 3109 of Title 5.").

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Texas Gas Transmission, LLC                          Docket No.      CP21-467-001

STATEMENT OF COMMISSIONER MARK C. CHRISTIE

(Issued June 8, 2023)

1.      Because the Commission issued a Notice in this proceeding stating that under 15 U.S.C. § 717r(a) the request for rehearing in this matter "will be addressed in a future order to be issued consistent with the requirements of such section"[1] and has now failed to do so, I am issuing this statement to be included in the record of this proceeding.

2.      To get vitally needed natural gas transportation and other infrastructure facilities actually built and put into service to consumers, it is not enough for this Commission simply to issue an order stating that a permit for a facility, such as a Certificate of Public Convenience and Necessity (CPCN), is approved.  The Commission has another job under the Administrative Procedure Act (APA) that must be done to get these projects actually built.  It must answer – clearly, completely and directly – the arguments raised by parties that *oppose* a facility's construction.  The Commission must do so in original orders when it finds a facility is needed, in orders on petitions for rehearing challenging the permits if those arguments are not otherwise sufficiently addressed in the underlying order, and in the inevitable appeals to the federal appellate courts.  If the Commission fails to do so the order approving a permit goes to the appellate court highly vulnerable to remand or reversal, which could delay construction – possibly for years – or even prevent the project from ever being built and put into service.

3.      In this proceeding a party opposed to the facility has explicitly claimed, *inter alia*, that the Commission failed to consider, as part of its review under the Natural Gas Act (NGA), the potential effect of the facility's GHG emissions on the global climate, as measured by a "social cost of carbon" formulation.[2]  Because this claim was explicitly

---

[1] *Texas Gas Transmission, LLC*, 181 FERC ¶ 62,197 (Dec. 22, 2022).

[2] *See, e.g.*, Rehearing Request at 47 ("[T]he Commission's failure to account for and consider the costs of the Project's contributions to climate change violate the NGA. Section 7 of the NGA requires FERC to consider all relevant factors bearing on the public interest, including the environmental costs associated with a project's GHG emissions. . . . FERC . . . provides no justification for failing to equally weigh the

raised, under the APA it *must* be addressed adequately.  It cannot be dodged or avoided.  We could have answered this claim by explaining that the NGA does *not* require us to do what the party wants us to do, and the courts have upheld similar refusals in prior cases.[3]  In a broader sense, because the party explicitly claimed that the NGA requires us to consider global climate effects of a single project by using a social cost of carbon formulation, we could have addressed more completely that fundamental issue with this simple and straightforward answer:  *Congress has never given us such authority in the NGA*.  The authority to *consider* a facility's GHG impact on global climate inextricably would include the authority to *reject* a permit for the facility on that very basis, notwithstanding all other evidence of need for the facility.[4]  The power to reject an otherwise needed facility's CPCN on the basis of its purported impact on global climate change unquestionably represents a major question of public policy, as I pointed out in my dissent to the then-majority's proposed and now suspended GHG Policy Statement last year,[5] an analysis that was wholly consistent with the Supreme Court's ruling in *West Virginia v. EPA* a few months later.[6]

---

Project's costs, as is required by the NGA.  The Commission has before it a firm figure that would allow an apples-to-apples comparison between the alleged economic benefits of the Project and its $12 billion-worth of climate costs [referencing social cost of greenhouse gas number].  The Order does not dispute the accuracy of the Project's total costs; it fails to address them entirely.  This one-sided view of the Project's effects on climate is, therefore, arbitrary and cannot support a finding that the Project is in the public convenience and necessity.") (footnotes omitted).

[3] *See* n.7 *infra*.

[4] To claim that the power to "consider" GHG global impacts in an NGA merits determination does not necessarily include the power to "reject" is a logical *non sequitur*, akin to trying to take a shower and not get wet.  The former establishes the legal predicate for the latter and there is no way to draw a credible red line between the power to "consider" and the power to "reject."

[5] *See, e.g.*, *Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022) (Christie, Comm'r, dissenting at PP 21-28) (available at https://www.ferc.gov/news-events/news/items-c-1-and-c-2-commissioner-christies-dissent-certificate-policy-and-interim).  This policy statement was subsequently suspended in *Certification of New Interstate Natural Gas Facilities and Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 179 FERC ¶ 61,012 (2022).

[6] *West Va. v. EPA*, 142 S. Ct. 2587 (2022).

Document Accession #: 20230608-4005     Filed Date: 06/08/2023

4.      Until the Commission squarely and forthrightly addresses such claims when they are raised specifically in cases by parties, and acknowledges the limits on our authority under the NGA to consider global climate impacts of a single project, the cloud over investment in such facilities caused by the GHG and Certificate policy statements issued by this Commission's majority last year will remain a huge disincentive to investment in construction at a time when natural gas transportation facilities are needed more than ever to provide a dependable supply of natural gas to electric power generating units that are critically important to the reliability of our nation's power grid, as well as providing consumers with the fuel needed to heat their homes and operate their businesses.


_____
Mark C. Christie
Commissioner

 **TEXAS GAS** TRANSMISSION, LLC

9 Greenway Plaza
Suite 2800
Houston, TX 77046
713.479.8000

December 8, 2023

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Re:** **Texas Gas Transmission, LLC**
**Henderson County Expansion Project**
**Docket No. CP21-467-000**
**Weekly Construction/Environmental Progress Report**

Dear Ms. Bose:

On October 20, 2022, the Federal Energy Regulatory Commission ("Commission" or "FERC") issued an "Order Issuing Certificate and Granting Abandonment" in the above-captioned proceeding ("October 20 Order")[1]. In the October 20 Order, the Commission granted Texas Gas Transmission, LLC ("Texas Gas") authorization to construct and operate the Henderson County Expansion Project ("Project"). On October 28, 2022, Texas Gas filed its acceptance of the October 20 Order certificate and on March 31, 2023, filed its Responses to Environmental Conditions along with its Project Implementation Plan. On June 16, 2023, the Commission approved Texas Gas's request to commence construction of the Project's Storage Yard and on July 7, 2023, granted Texas Gas's request for commencing full Project construction.

Texas Gas' Henderson County Lateral is targeted to be mechanically complete on or about December 22, 2023. CenterPoint Energy Indiana South's construction of the combustion turbine units at the former A.B. Brown Generating Station site is progressing on schedule and test gas is expected in the fourth quarter of 2024.

Pursuant to Environmental Condition No. 8 of the October 20 Order, as modified by the FERC staff's April 10, 2023, variance approval, Texas Gas was required to file weekly status reports ("Report") until all construction activities are completed. Texas Gas hereby submits the Project Report for work performed between November 25, 2023, and December 1, 2023.

If you have any questions concerning this Report, please contact me at (225) 282-0389 or by email to cale.leblanc@bwpipelines.com.

Sincerely,

Cale L. LeBlanc

Cale LeBlanc
Director, Environmental

Attachments
cc: J. Keith Rodgers (FERC)

---

[1] *Texas Gas Transmission, LLC*, 181 FERC 61,049 (2022), *reh'g denied by operation of law and providing for further consideration*, 181 FERC ¶ 62,197 (2023). On June 8, 2023, FERC issued a Notice of Denial of Rehearing by Operation of Law stating, "the rehearing request of the above-cited order filed in this proceeding will not be addressed in a future order." *Texas Gas Transmission, LLC*, 183 FERC ¶ 62,135 (2023).

## Update on Efforts to Obtain Federal Authorizations:

There are no updates on efforts to obtain Federal authorizations.

## Summary of Construction Activities:

Texas Gas will continue environmental training for all personnel that arrive on-site to ensure all are trained and knowledgeable about the Project's environmental requirements.

**Henderson County Lateral and M&R Stations** – Backfilling and restoration continued. Contractor completed hydrotesting and began drying the lines. Contractor continued electrical and pipe installation, as well as pipe coating at the AB Brown Meter Station. At the REX Franklin Meter Station, the contractor continued grading, civil work, and electrical work. A Routine Storm Water Best Management Practice ("BMP") Inspection was conducted on November 26, 2023, with erosion control devices ("ECDs") intact and functional with no repairs required. Survey crews continued staking the pipeline right-of-way ("ROW").

Texas Gas's Henderson County Lateral is targeted to be mechanically complete on or about December 22, 2023. CenterPoint Energy Indiana South's construction of the combustion turbine units at the former A.B. Brown Generating Station site is progressing on schedule and test gas is expected in the fourth quarter of 2024.

The Henderson County Lateral site received .75-inches of rainfall during this reporting period. Rainfall total is 16.15-inches since the beginning of the Project.

**Slaughters Compressor Station** – Continued with earthwork, welding, coating, concrete placement, setting equipment along with electrical and instrumentation activities at the Slaughters Compressor Station. Completed turbine compressor preliminary alignment and grouting.

The Slaughters Compressor Station received 0.5-inches of rainfall during this reporting period. Rainfall total is now 6.9-inches since the beginning of the Project.

| Current Construction Activity: Henderson County Expansion Project | Estimated Completion Percent | |
|---|---|---|
| **Slaughters CS** | KY | |
| Pipe Fabrication | 72% | |
| Foundations and Grading | 55% | |
| Electrical and Instrumentation | 20% | |
| Rough Clean Up | 0% | |
| Final Clean Up | 0% | |
| Testing | 0% | |
| **Current Construction Activity: Henderson County Expansion Project** | **Estimated Completion Percent** | |
| **Henderson County Lateral** | **KY** | **IN** |
| Clearing | 100% | 100% |

| Current Construction Activity: Henderson County Expansion Project | KY Estimated Completion Percent | IN Estimated Completion Percent |
|---|---|---|
| Grading | 100% | 100% |
| Ditching | 100% | 100% |
| Stringing | 100% | 100% |
| Bending | 100% | 100% |
| Laying | 100% | 100% |
| Welding | 100% | 100% |
| Coating | 100% | 100% |
| Lowering-in | 100% | 100% |
| Tie In | 100% | 100% |
| Backfill | 99% | 90% |
| Rough Clean Up | 95% | 90% |
| Final Clean Up | 85% | 75% |
| Testing | 100% | 100% |
| **Delivery Meter & Regulator Station** | | |
| AB Brown M&R | 92% | |
| Existing Franklin Rex M&R | 40% | |
| | | |

| HDD Reference | Mile Post | Start Date | Estimated Overall % Complete |
|---|---|---|---|
| **Kentucky** | | | |
| HDD 1 - Pond Bayou | 16.93 | 9/11/2023 | 100% |
| HDD 2 - Big Pond | 21.45 | 9/30/2023 | 100% |
| **Indiana** | | | |
| HDD 3 - Ohio River | 21.97 | 9/5/2023 | 100% |
| HDD 4 - AB Brown | 23.49 | 9/2/2023 | 100% |

**Summary of Work Planned for the Next Reporting Period:**

Environmental training will continue, as necessary, to ensure all staff on-site are trained and knowledgeable about environmental requirements for the Project. FERC will be conducting an inspection on December 14, 2023.

**Henderson County Lateral and M&R Stations** – Contractor will continue restoration activities. Contractor will complete drying the pipelines and will install the mainline valve. At the AB Brown M&R Station, the contractor will continue electrical, pipe installation, and pipe coating work. At the REX Franklin Meter Station, contractor continue pipe fabrication and conduit installation.