

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

May 1, 2024

Mark Langer
Clerk of Court
E. Barrett Prettyman U.S. Courthouse and
   William B. Bryant Annex
333 Constitution Avenue, N.W.
Washington, D.C. 20001

> Re: *Citizens Action Coalition of Ind., Inc. v. FERC*, No. 23-1046
> Oral Argument Scheduled for May 7, 2024

Dear Mr. Langer:

Texas Gas writes regarding two significant developments since briefing concluded in this case.

*First*, Texas Gas agrees with FERC that the Court's recent opinion in *Alabama Municipal Distributors Group v. FERC*, No. 22-1101 (D.C. Cir. Apr. 30, 2024) (attached as Exhibit A), confirms that FERC did not need to make a "significance determination." *Cf.* Coalition Br. 57-69.

In *Alabama Municipal Distributors*, as here, the petitioners argued "FERC's refusal to pass judgment on the significance of greenhouse gas emissions" by making a significance determination was arbitrary and capricious. Final Opening Br. for Pet'rs at 56-58, *Alabama Municipal Distributors Grp. v. FERC*, No. 22-1101 (D.C. Cir. Apr. 26, 2023). There, as here, the petitioners claimed that the existence of an ongoing generic proceeding was an insufficient reason to refuse to make a significance determination. *See id.* at 57-58.

The Court rejected the petitioners' arguments. It held that FERC's analysis was sufficient where the Commission's environmental impact statement "estimated the volume of direct emissions, compared those projections against state and national emissions," and estimated and disclosed the "social cost of carbon." *Alabama Municipal Distributors*, slip op. at 11-12. As FERC's letter explains, that is the exact approach that FERC took here. *See* Texas Gas Br. 17, 20, 23-26. All parties here

Hogan Lovells US LLP is a limited liability partnership registered in the state of Delaware. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante  Amsterdam  Baltimore  Berlin  Beijing  Birmingham  Boston  Brussels  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Munich  New York  Northern Virginia  Paris  Philadelphia  Riyadh  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Warsaw  Washington, D.C.  Associated Offices: Budapest  Jakarta  Shanghai FTZ.  Business Service Centers: Johannesburg  Louisville.  For more information see www.hoganlovells.com

listed *Alabama Municipal Distributors* as a related case on this issue. *See* Coalition Br. ii; FERC Br. i; Texas Gas Br. ii. The Court should therefore reject the Coalition's significance arguments as foreclosed by *Alabama Municipal Distributors*.

*Second*, on April 30, 2024, the Commission authorized Texas Gas to place into service the Henderson County Expansion Project that is the subject of this appeal, with the authorization (attached as Exhibit B) reflecting that construction is now complete and "restoration and stabilization" of the construction area are sufficiently advanced. That the Henderson County Expansion Project is now in service confirms that vacatur is not an appropriate remedy. *See* Texas Gas Br. 38-40; *see also National Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 501 (D.C. Cir. 2019) (indicating that parties should advise the Court when construction on a project is complete).

                                                             Respectfully submitted,

                                                             /s/ Sean Marotta
                                                             Sean Marotta

                                                             *Counsel for Intervenor*
                                                             *Texas Gas Transmission, LLC*

# EXHIBIT A

United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 5, 2023      Decided April 30, 2024

No. 22-1101

ALABAMA MUNICIPAL DISTRIBUTORS GROUP, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTHERN NATURAL GAS COMPANY, L.L.C., ET AL.,
INTERVENORS

Consolidated with 22-1171, 22-1256, 22-1273

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

*Nathan Matthews* argued the cause for petitioners Sierra Club and Healthy Gulf. With him on the briefs was *Rebecca McCreary*.

*Randolph Lee Elliott* argued the cause for Municipal petitioners. With him on the briefs were *James R. Choukas-Bradley* and *Joshua L. Menter*.

*Carol J. Banta*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, *Robert H. Solomon*, Solicitor, and *Lona T. Perry*, Deputy Solicitor. *Matthew W.S. Estes*, Attorney, entered an appearance.

*Brian D. O'Neill* argued the cause for respondent-intervenors Southern Natural Gas Company, L.L.C., et al. With him on the brief were *Michael R. Pincus*, *Sandra Y. Snyder*, *Richard P. Bress*, *J. Patrick Nevins*, and *Eric J. Konopka.*

Before: SRINIVASAN, *Chief Judge*, WALKER, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: Natural gas companies must obtain "a certificate of public convenience and necessity" from the Federal Energy Regulatory Commission before they construct, operate, or expand an interstate natural gas pipeline. 15 U.S.C. § 717f(c)(1)(A). In this case, FERC certified the Evangeline Pass Expansion Project — a series of expanded pipelines, compression facilities, and meter stations in the Southeastern United States. Environmental groups challenge that certification, alleging that FERC improperly applied the National Environmental Policy Act. 42 U.S.C. § 4321 *et seq*.

FERC's certification was reasonable and reasonably explained. So was its decision to deny a windfall to a pipeline

3

owner's existing customers.  We therefore deny the petitions for review.

## I. Background

FERC and the Department of Energy share regulatory authority over natural gas.  Section 7 of the Natural Gas Act allows FERC to issue "a certificate of public convenience and necessity" to any entity that seeks to construct, operate, or expand an interstate natural gas pipeline.  15 U.S.C. § 717f(c)(1)(A).

However, Section 7 does not reach foreign commerce.  *See* 15 U.S.C. § 717f.  Foreign commerce instead falls under Section 3 of the Natural Gas Act.  *See* 15 U.S.C. § 717b.  That section grants FERC regulatory authority over the construction, operation, and expansion of export facilities.  15 U.S.C. § 717b(e).

But no section of the Natural Gas Act gives FERC authority over the exported gas itself.  Instead, the "exclusive authority" over exported gas belongs to the Department of Energy.  *Sierra Club v. FERC*, 827 F.3d 36, 40 (D.C. Cir. 2016) ("*Freeport*") (citing 42 U.S.C. § 7151(b)).

Thus, we end up with the following distinct scopes of authority mandated by Congress:

| **Interstate Pipelines** | **FERC** |
|---|---|
| **Export Facilities** | **FERC** |
| **Natural Gas Exports** | **Department of Energy** |

No matter which scope of authority is invoked, FERC (for interstate pipelines or export facilities) or the Department of Energy (for natural gas exports) must consider the National

Environmental Policy Act. 42 U.S.C. § 4321 *et seq*. Among other things, the Act requires the relevant government entity to consider a project's potential environmental impact in one of two ways — either through an environmental impact statement (the more onerous analysis) or an environmental assessment (the less onerous analysis). *See* 42 U.S.C. § 4332(2)(C). Either way, the Act requires the relevant government entity to consider any actions that are "connected" to the proposed project. *See* 40 C.F.R. § 1501.9(e)(1).[1]

In 2020, Tennessee Gas Pipeline Company and Southern Natural Gas Company applied under Section 7 of the Natural Gas Act for approval of the Evangeline Pass Expansion Project.[2] Tennessee Gas wanted to construct and replace pipelines and compression facilities. Similarly, Southern wanted to build a compression facility and meter stations. Although pipelines, compression facilities, and meter stations serve different functions, the bottom-line goal of the Evangeline Pass Project was to move more gas.

The Sierra Club protested the applications.[3] Although it asserted different arguments at different stages of the

---

[1] When certification for the Evangeline Pass Expansion Project was sought — February 2020 — the definition of "connected actions" was listed in 40 C.F.R. § 1508.25(a)(1). The definition was later moved to, and remains under, 40 C.F.R. § 1501.9(e)(1). In this opinion, we cite to the regulation as it is today.

[2] Although Tennessee Gas and Southern's projects were listed as separate projects in the FERC order, both involved the same pipeline. For simplicity, we refer to both projects as the Evangeline Pass Expansion Project.

[3] Healthy Gulf joined the Sierra Club in its protest. For simplicity, we will refer to both petitioners as the Sierra Club.

certification process, Sierra Club ultimately said FERC violated the National Environmental Policy Act by (1) not considering the environmental effects of four other natural-gas projects it thinks are connected to the Evangeline Pass Project; (2) not considering the indirect environmental effects of gas from the Evangeline Pass Project after that gas is exported; and (3) not relying on an analytical tool known as the social cost of carbon metric.[4]

In addition, a municipal customer of Southern — the Alabama Municipal Distributors Group — argued that a new lease from Southern to Tennessee Gas may mean more profits for Southern, so Alabama Municipal should receive a portion of those profits.[5]  The new lease was made possible by the Evangeline Pass Project.

FERC unanimously issued a Certificate Order to Tennessee Gas and Southern, denying all objections. *Tennessee Gas Pipeline Co., LLC*, 178 FERC ¶ 61,199, at 46-48 (Mar. 25, 2022).  It reaffirmed its determination on rehearing.  *Tennessee Gas Pipeline Co., LLC*, 180 FERC ¶ 61,205, at 43 (Sept. 29, 2022).

The Sierra Club and Alabama Municipal timely petitioned for review.  We now deny those petitions.

---

[4] The Sierra Club's initial "protest" contained only the last two of these three arguments, and that protest came as comments to the draft EIS published in the Federal Register.  Sierra Club only later made its connected actions argument after FERC issued its certification decision.

[5] Other customers of Southern also raise this challenge.  Because they make the same arguments as Alabama Municipal and are similarly situated, we will refer simply to Alabama Municipal.

**II. The Sierra Club's Petition Lacks Merit**

The Sierra Club raises the same three challenges that it made before FERC on rehearing. Each challenge arises under the National Environmental Policy Act and its implementing regulations. We review such "challenges under the familiar standards of the Administrative Procedure Act to determine whether the agency action was arbitrary and capricious or contrary to law." *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (cleaned up); *see* 5 U.S.C. § 706(2)(A). Our deferential review does "not ask whether record evidence could support the petitioner's view of the issue, but whether it supports [FERC's] ultimate decision." *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

**A. The Environmental Impact Statement Did Not Exclude Actions "Connected" To The Evangeline Pass Project**

The Sierra Club first argues that FERC failed to consider the full scope of environmental effects of the Evangeline Pass Project because FERC's environmental impact statement did not include four other natural-gas projects that the Sierra Club says are "connected actions." As described by FERC, those projects are (1) a new terminal that exports natural gas; (2) an amendment to increase the amount of gas that terminal can export; (3) a new pipeline that serves as a hub for that terminal, connecting to several spokes; and (4) two new pipelines that are spokes on that hub.[6] *See* JA 90-91. Gas from the Evangeline Pass Project will reach the hub through a *different*

---

[6] The four projects are called (1) the Plaquemines LNG Terminal; (2) the Plaquemines LNG Terminal Amendment; (3) the Gator Express Pipeline; and (4) the East Lateral XPress and Venice Extension projects.

spoke and then flow through the hub to the terminal, where it will be exported.

The standard for whether projects are connected for purposes of the National Environmental Policy Act is laid out by agency regulations that the Sierra Club does not challenge. "Actions are connected if they: (i) Automatically trigger other actions that may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1501.9(e)(1).

Because challenges to pipeline certifications are common, this court has "developed a set of factors that help clarify when natural gas infrastructure projects — which frequently involve some degree of interconnection with other projects in the area — may be considered separately under" the National Environmental Policy Act. *Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir. 2022) (cleaned up). In particular, we examine "the projects' degree of physical and functional interdependence, and their temporal overlap." *Id.* (cleaned up).

Projects lack a "physical and functional interdependence" when each has "substantial independent utility." *City of Boston Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018) (cleaned up). And projects lack a "temporal overlap" when they occur "on separate timelines." *Food & Water Watch*, 28 F.4th at 292 (cleaned up). Timelines are, of course, separate when they do not significantly overlap. But even when projects occur "near in time to one another," we still do not consider them "connected actions" so long as the timing "does not undermine the functional independence of the projects." *Id.* After all, most events that occur near in time are independent

of each other — like a hockey game played on the same day as a basketball game.

Here, substantial evidence supports FERC's finding that the various projects identified by the Sierra Club were not "connected actions." *See* 40 C.F.R. § 1501.9(e)(1).

To begin with, there's substantial evidence that each project is physically and functionally independent of the Evangeline Pass Project. The terminal (first project), through its hub (third project), can receive "upstream sources of supply gas in many different ways" — not just from the Evangeline Pass Project. JA 101. That will remain true even if FERC amends the terminal's certificate to allow additional export capacity (second project). And the two spokes on the terminal's hub (fourth project) are "different gas supply options on different pipeline systems" that do not receive gas from the Evangeline Pass Project. JA 97. Plus, none of the projects share ownership with the Evangeline Pass Project.

There's also substantial evidence that three of the four projects proceeded on quite different timelines than the Evangeline Pass Project, which was proposed in February 2020 and approved by FERC in March 2022. The first and third projects do not overlap with that timeline at all, while the second barely overlaps.[7]

True, the Evangeline Pass Project's timeline overlaps more with the timelines for the fourth project's two pipelines.[8]

---

[7] The first and third projects were proposed in 2017 and approved in 2019. The second was proposed in 2022, just two weeks before FERC's approval of the Evangeline Pass Project.

[8] One part of the fourth project was proposed in September 2020 (seven months after the Evangeline Pass Project's proposal) and the

But projects "near in time to one another" may not be "connected actions." *Food & Water Watch*, 28 F.4th at 292. Because FERC reasonably found that the fourth project will proceed even if the Evangeline Pass Project does not, the timing "does not undermine the functional independence of the projects." *Id.* That's especially true here where the fourth project constructs two spokes on a hub, neither of which is the spoke that receives gas from the Evangeline Pass Project.

We therefore hold that the record "adequately supports [FERC's] ultimate decision" that the Evangeline Pass Project was not "connected" to the other projects. *Florida Gas Transmission Co.*, 604 F.3d at 645.

### B. FERC Did Not Need To Evaluate The Environmental Effects Of Exported Natural Gas

The Sierra Club next argues that FERC erred by failing to account for the environmental impact of two ongoing authorizations (by the Department of Energy) to export gas that may include some of the gas flowing through the Evangeline Pass pipeline system. FERC determined it was not required to evaluate indirect effects of the exported gas when it authorized the Evangeline Pass Project.

We agree.

FERC's decision relied on the limits of its authority under the Natural Gas Act and on our precedents. The Natural Gas Act excludes authority over *foreign* transport from FERC's authority over *interstate* transport. 15 U.S.C. § 717f(c); *see also City of Oberlin v. FERC*, 39 F.4th 719, 725-26 (D.C. Cir.

---

other was proposed in November 2021 (a year and nine months after the Evangeline Pass Project's proposal).

2022). And as we explained in *Freeport*, "the Department of Energy, not [FERC], has sole authority to license the export of any natural gas." *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016) ("*Freeport*"). So FERC does "not have to address the indirect effects of the anticipated *export* of natural gas." *Id.*; *see also Center for Biological Diversity*, 67 F.4th at 1185 (FERC need not "consider the indirect effects of actions beyond its delegated authority").[9]

The Sierra Club responds to a precedent that's on point (*Freeport*) with a precedent that's not (*Sabal Trail*). It reads *Sabal Trail* to say that FERC must consider intrastate consumption when authorizing transportation across state lines. It then argues that FERC here must likewise consider export consumption when authorizing transportation across state lines. *See Sierra Club v. FERC*, 867 F.3d 1357, 1371-73 (D.C. Cir. 2017) ("*Sabal Trail*"). But as *Sabal Trail* explains, there's a difference between *intrastate* gas effects and *exported* gas effects.

If anything, *Sabal Trail* cuts against the Sierra Club. It reaffirmed that an "agency has no obligation to gather or consider environmental information if it has no statutory authority *to act on that information*" — and here FERC has no statutory authority over exported gas. *Sabal Trail*, 867 F.3d at 1372; *see also id.* ("when the agency has no *legal* power to prevent a certain environmental effect, there is no decision to inform, and the agency need not analyze the effect in its [National Environmental Policy Act] review").[10]

---

[9] For the same reason, FERC did not have to analyze any of the Department of Energy's export authorizations as "connected actions."

[10] Admittedly, *Freeport*, *Sabal Trail*, and *Center for Biological Diversity* involved certifications of exports under Section 3 of the

In short, Congress gave export authorization to the Department of Energy — not FERC. So FERC did not err when it declined to consider the environmental effects of exported gas that flows through Evangeline Pass.

### C. FERC Was Not Required To Use The Social Cost Of Carbon Tool

The Sierra Club's final challenge to FERC's environmental impact statement faults FERC for not using an environmental metric known as the "social cost of carbon" — a tool that puts a dollar figure on every ton of emitted greenhouse gases. Instead, FERC analyzed the Evangeline Pass Project's greenhouse gas emissions by conducting a comparative analysis. That analysis estimated the volume of direct emissions, compared those projections against state and national emissions, and then calculated the percentage amount that the Evangeline Pass Project would add to state and national emissions.

FERC did not ignore the social cost of carbon tool. Rather, FERC explained that it was not relying on the tool because of pending litigation challenging it, and because FERC had "not determined which, if any, modifications are needed to render that tool useful for project-level analyses." JA 42 n.141. But

---

Natural Gas Act, whereas this case concerns the certification of an interstate pipeline under Section 7. But in those cases, as here, the key question was, "What factors can FERC consider when regulating in its proper sphere?" *Sabal Trail*, 867 F.3d at 1373. And Congress was clear about FERC's Section 7 scope of authority: It specifically "define[d] 'interstate commerce' in a way that excludes foreign commerce." *City of Oberlin*, 39 F.4th at 726. So FERC's considerations of exports falls "outside FERC's Section 7 authority." *Id.*

even though FERC did not rely on the tool, FERC staff still estimated the social cost of carbon, publicly disclosed those estimates, and shared them in the environmental impact statement.

FERC's process here is indistinguishable from the environmental analysis we recently upheld in *Center for Biological Diversity*. 67 F.4th at 1183-84. There, FERC also analyzed the significance of a project's greenhouse gas emissions. *Id.* FERC considered using the social cost of carbon tool, but it ultimately rejected the approach because FERC had not yet identified a workable means of applying the tool. *Id.* So FERC instead provided a comparative analysis by estimating the volume of direct emissions, comparing those projections against state and national emissions, and calculating the percentage amount that the project would add to state and national emissions — just as FERC did here. *Id.*; *see also EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (FERC acted reasonably in finding the social cost of carbon tool "inadequately accurate to warrant inclusion").

To be sure, after FERC's action in *Center for Biological Diversity* but before its action in this case, FERC issued a policy statement on measuring the significance of greenhouse gas emissions. Under that 2022 policy statement, projects expected to emit 100,000 or more metric tons of greenhouse gases per year would be presumed to have a significant environmental impact. *See Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108, at 79-81 (Feb. 18, 2022). The policy statement served, to some extent, as an alternative to the use of the social cost of carbon tool to assess whether a project's emissions would be environmentally significant.

But later that year, FERC withdrew the policy statement by demoting it to "draft" form — which means FERC might never adopt the policy. And in this case, FERC cited the policy's "draft" status as a reason why it chose not to apply it. *See* Sierra Club Br. 59 (conceding that the policy was merely "draft guidance").

In light of the policy statement's conversion to draft status, the Sierra Club has not identified a meaningful distinction between this case and *Center for Biological Diversity*. As in that case, there is no final policy statement for FERC to apply here. And as there, FERC here has "not acted unreasonably in finding the social cost of carbon tool inadequately accurate to warrant inclusion under [the National Environmental Policy Act] analysis." *Center for Biological Diversity*, 67 F.4th at 1184 (cleaned up).

### III. Alabama Municipal's Petition Lacks Merit

We turn at last to Alabama Municipal's separate petition. It does not object to the Evangeline Pass Project itself. Rather, Alabama Municipal wants FERC to give it a future credit on the existing rates it pays.

The crux of Alabama Municipal's argument is as follows. As an owner of the Evangeline Pass Project, Southern expects to make money from the expansion project by leasing the increased transportation capacity to the Tennessee Gas Pipeline Company. The new revenue Southern receives from the increased leasing is "excessive" revenue for Southern, says Alabama Municipal. So FERC should prevent the excess by granting Alabama Municipal a future credit that would, in effect, revise customer rates downward.

FERC's decision to deny Alabama Municipal's requested credit was both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As FERC noted when rejecting the argument, Alabama Municipal exists outside the scope of the new lease capacity. It will not pay for the capacity. It will not use the capacity. And it will not bear any risks associated with the capacity — a finding consistent with established FERC policy. *See Gulf South Pipeline Co.*, 119 FERC ¶ 61,281 (2007).

Because Alabama Municipal will bear none of the new lease capacity's costs or risks, it is entitled to none of the benefits. To hold otherwise would provide a windfall to Alabama Municipal. And Alabama Municipal has identified no legal authority that requires FERC to award it such a windfall. *Cf.* Florence White Williams, *The Little Red Hen* (1918).

* * *

All of FERC's decisions in this case were reasonable and reasonably explained. We therefore deny the petitions for review.

*So ordered.*

# EXHIBIT B

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

**In Reply Refer To:**
OEP/DG2E/Gas Branch 5
Texas Gas Transmission, LLC
Docket No. CP21-467-000

April 30, 2024

VIA FERC Service

Juan Eligio Jr., Manager-Regulatory Affairs
Texas Gas Transmission, LLC
9 Greenway Plaza, Suite 2800
Houston, Texas 77046

**Re:  Authorization to Commence Service for Henderson County Expansion Project**

Dear Mr. Eligio:

I approve Texas Gas Transmission, LLC's (Texas Gas) April 1, 2024 request to place into service the Henderson County Expansion Project in Henderson and Webster Counties, Kentucky, and Posey and Johnson Counties, Indiana.

Your request is in compliance with environmental condition 11 of the Federal Energy Regulatory Commission's October 20, 2022 *Order Issuing Certificate and Granting Abandonment* (Order) issued to Texas Gas in the above-referenced docket. This authorization is granted on the basis of our April 3, 2024 field inspection, photo documentation in your request, and Texas Gas' recent construction status reports. We find that Texas Gas has adequately stabilized the areas disturbed by construction and that restoration and stabilization of the construction work area is proceeding satisfactorily.

I remind you that Texas Gas must comply with all applicable remaining terms and conditions of above-referenced Order. If you have any questions regarding this approval, please contact Keith Rodgers at (202) 502-6839.

Sincerely,

SHANNON JONES
Digitally signed by SHANNON JONES
Date: 2024.04.30 13:37:51 -04'00'

Shannon Jones, Acting Director
Division of Gas - Environment
  and Engineering