# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 7, 2024                    Decided January 7, 2025

No. 23-1046

CITIZENS ACTION COALITION OF INDIANA, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TEXAS GAS TRANSMISSION, LLC,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Kirti Datla* argued the cause for petitioner. On the briefs were *Moneen Nasmith*, *Ann Jaworski*, *Sameer Doshi*, *Raghu Murthy*, and *Aaron Stemplewicz*.

*Susanna Y. Chu*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *Scott R. Ediger*, Attorney Advisor, entered an appearance.

2

*Sean Marotta* argued the cause for intervenor in support of respondent. With him on the brief were *Michael E. McMahon*, *A. Gregory Junge*, and *Reedy C. Swanson*.

Before: KATSAS, RAO, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: As night follows day, an environmental challenge follows the approval of a natural gas pipeline. In this case, the State of Indiana approved a plan that would retire a coal-fired facility and replace it with wind and solar energy sources. To ensure grid reliability with the move to renewable energy, the plan also included two new natural gas turbines. The Federal Energy Regulatory Commission approved a natural gas pipeline to serve those turbines. The Citizens Action Coalition of Indiana petitions for review, alleging that FERC's environmental analysis and order were unreasonable and inconsistent with the National Environmental Policy Act and the Natural Gas Act.

Citizens Action alleges numerous errors, but its core claim is that FERC was required to analyze non-gas alternatives before approving the natural gas pipeline. We disagree. Congress gave FERC authority to promote the development of interstate natural gas pipelines, but it left the choice of energy generation to the States. The purpose of the pipeline was to support Indiana's energy plan, and FERC has no statutory authority to consider non-gas alternatives already rejected by the State. Because FERC acted lawfully and reasonably when conducting the environmental analysis and assessing the public convenience and necessity for the pipeline, we deny the petition for review.

3

I.

A.

The Natural Gas Act ("NGA") empowers FERC to approve the development of interstate natural gas pipelines. Pub. L. No. 75-688, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. § 717 *et seq.*). FERC must issue a certificate approving a pipeline if it determines the project is "required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). When making this determination, FERC must consider "all factors bearing on the public interest," *Food & Water Watch v. FERC*, 104 F.4th 336, 341 (D.C. Cir. 2024) (cleaned up), and may "approve a project only where the public benefits outweigh the project's adverse impacts," *Minisink Residents for Env't Preservation & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014) (cleaned up).

If FERC determines that approval of a pipeline would constitute a "major federal action significantly affecting the quality of the human environment," FERC must prepare an environmental impact statement. National Environmental Policy Act ("NEPA"), Pub. L. No. 91-190, § 102(2)(C), 83 Stat. 852, 853 (1970) (codified as amended at 42 U.S.C. § 4332(2)(C)). NEPA requires an agency to "identify the reasonable alternatives to the contemplated action and look hard at the environmental effects of its decision." *Minisink*, 762 F.3d at 102 (cleaned up). NEPA is a purely procedural statute, however, and does not require an agency "to take one type of

4

action or another." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991).

B.

Citizens Action challenges FERC's approval of a pipeline serving two new natural gas turbines in Indiana. We begin with Indiana's decision to approve those turbines.

CenterPoint Energy is an electric utility in southwestern Indiana. As part of the state regulatory process, CenterPoint must prepare an Integrated Resource Plan every three years. *See* IND. CODE § 8-1-8.5-3(e); 170 IND. ADMIN. CODE § 4-7 (requiring utilities to evaluate their total mix of generation resources and consider the tradeoffs between cost, reliability, and environmental impacts). In its 2016 Plan, CenterPoint proposed replacing coal-fired facilities at its A.B. Brown Generating Station with solar resources and natural gas. Because solar resources provide only intermittent power, the natural gas facility would "maintain constant electric supply during potentially extended periods of low output." CenterPoint applied to the Indiana Utility Regulatory Commission for approval of an 850-megawatt natural gas unit. *See* IND. CODE § 8-1-8.5-2. The Indiana Commission initially denied the proposal because CenterPoint failed to adequately consider alternatives to natural gas and because the proposed unit could compromise future energy flexibility.

In response, CenterPoint modified its Plan to include wind generation, in addition to solar, and applied to build two smaller gas-fired turbines, which would produce a combined 460 megawatts of power. This time, the Indiana Commission approved the application after concluding the proposed natural gas units would be "a reasonable, least-cost resource to support [CenterPoint's] Plan and meet consumers' needs for electricity."

5

C.

That brings us to the pipeline at issue here. CenterPoint contracted with Texas Gas Transmission to supply natural gas to the planned units. Texas Gas then applied to FERC for approval of a 24-mile pipeline crossing the Ohio River and connecting the A.B. Brown site to an existing pipeline system in Kentucky. Citizens Action, an environmental advocacy organization, intervened in the FERC proceeding and filed comments concerning the environmental effects of the pipeline and related infrastructure (the "Project").

After preparing an environmental impact statement, FERC approved the Texas Gas Project. Citizens Action filed a request for rehearing, raising four challenges. It argued that FERC (1) failed to consider alternatives to building gas-fired units; (2) failed to label the Project's emissions as "significant" or "not significant"; (3) erred by netting the reduction in emissions from the coal-fired units' retirement against the gross emissions from the gas-fired units; and (4) failed to properly balance environmental impacts in its public convenience and necessity determination. FERC took no action on the rehearing request, so it was denied by operation of law.

Citizens Action now petitions for review of FERC's order approving the Texas Gas Project. We have jurisdiction under 15 U.S.C. § 717r(b). We review Citizens Action's NEPA and NGA challenges under the Administrative Procedure Act to determine whether FERC's environmental assessment and order were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "We will not set aside an agency action on NEPA grounds if the [environmental impact statement] contains sufficient discussion of the relevant issues and opposing viewpoints and the agency's decision is fully informed and well considered."

6

*Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (cleaned up). We likewise review FERC's public convenience and necessity determination for whether it was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Minisink*, 762 F.3d at 106 (cleaned up).

II.

In its first set of NEPA challenges, Citizens Action broadly argues that FERC should have assessed alternatives to natural gas, instead of focusing only on the mix of generation sources chosen by CenterPoint and the Indiana Commission. But NEPA does not require FERC to consider non-gas alternatives that are outside of FERC's jurisdiction and would fail to serve the purpose of the Project. We hold that FERC properly identified the Project's purpose as supporting CenterPoint's new natural gas units and reasonably considered alternatives that would satisfy that purpose.

A.

Citizens Action first argues that FERC unlawfully and unreasonably defined the Project's purpose so narrowly that it excluded reasonable alternatives. According to the group, the point of the Project is to "support renewable resources" and CenterPoint's shift to a "diversity of generation resources." FERC therefore should have defined the purpose as "supporting a grid increasingly powered by renewable energy sources," instead of as simply supporting the new natural gas units.

For major actions significantly impacting the environment, NEPA requires an agency to discuss "alternatives

7

to the proposed action."[1] 42 U.S.C. § 4332(2)(C)(iii) (2018). In order to consider alternatives, an agency first must identify the purpose and need of the proposed agency action. *Citizens Against Burlington*, 938 F.2d at 195. The proposed agency action here is approval of the Texas Gas Project. FERC accordingly identified the purpose and need of the Project as enabling CenterPoint to "utilize flexible natural gas combustion turbines to support CenterPoint's new intermittent renewable resources."

An agency's definition of purpose is subject to a "rule of reason." *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 834 (D.C. Cir. 1972). Because FERC is considering a private proposal, it "may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project." *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (cleaned up); *see also Citizens Against Burlington*, 938 F.2d at 199 ("Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be."). In addition to the applicant's goals, FERC must also "consider the views of Congress, expressed … in the agency's statutory authorization to act, as well as in other congressional directives." *Citizens Against Burlington*, 938 F.2d at 196. FERC must identify a project's purpose in light of an applicant's goals and the agency's statutory authority, avoiding an unreasonably broad or narrow framing. *Id.*

---

[1] After FERC completed its environmental review and approved the pipeline in 2022, Congress amended NEPA. An agency now must prepare a detailed statement on "a reasonable range of alternatives to the proposed agency action … that are technically and economically feasible, and meet the purpose and need of the proposal." *See* Builder Act, Pub. L. No. 118-5, div. C, tit. III, § 321(a)(3)(B), 137 Stat. 10, 38 (2023). We cite to the statute in effect at the time of FERC's order.

8

We hold that FERC properly and reasonably identified the Project's purpose as supporting CenterPoint's new natural gas units. The project seeking certification from FERC is not the natural gas units, but *the pipeline serving those units*. Before Texas Gas applied for a certificate, CenterPoint and the Indiana Commission had already determined that the public interest would be best served by the construction of natural gas units that ensure grid reliability and support the move to wind and solar generation. FERC did not consider non-gas options when deciding whether to certify the Project because no non-gas option could serve the mix of energy resources approved by Indiana.

Citizens Action prefers non-gas alternatives and seeks to redefine the purpose of the Project as promoting solar and wind generally. But FERC correctly rejected such a broad purpose, explaining that "[d]etailed evaluation[s] of other power generation alternatives … are entirely separate questions from evaluating alternatives that meet the defined purpose and need for the Project." In deciding whether to certify the Project, FERC properly refused to reconsider the mix of electricity generation chosen by CenterPoint and the Indiana Commission.

More to the point, FERC could not lawfully define the Project's purpose as broadly as Citizens Action requests because Congress has not authorized FERC to choose between electricity generation resources. The NGA empowers FERC to approve new gas pipelines. *See* 15 U.S.C. § 717(b) ("The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce …."). It does not permit FERC to regulate the energy generation facilities those pipelines supply. *See* 16 U.S.C. § 824(b)(1) ("The Commission … shall not have jurisdiction … over facilities used for the generation of electric energy …."). Rather, the

9

States retain authority to choose their preferred mix of energy generation resources. CenterPoint's new gas-fired units, and the decision whether to build them, are thus wholly beyond FERC's jurisdiction. FERC cannot define the purpose of a project so broadly that it usurps the policy choices Congress left to the States. *See Citizens Against Burlington*, 938 F.2d at 196.

Having identified the Project's purpose as supporting CenterPoint's new gas-fired units, FERC reasonably considered alternatives that would serve that purpose. *See Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) ("If the agency's objectives are reasonable, we will uphold the agency's selection of alternatives that are reasonable in light of those objectives."). An agency may concisely reject alternatives that do not achieve a project's purpose. *Ctr. for Biological Diversity*, 67 F.4th at 1182. FERC did so here. In its comments on the draft environmental impact statement, Citizens Action asked FERC to consider non-gas alternatives like energy efficiency programs, battery storage, and additional hybrid, solar, and wind generation resources. FERC declined, explaining that these alternatives would not satisfy the purpose of transporting natural gas to CenterPoint and therefore were beyond the scope of the proposal.

Instead, FERC considered alternatives to support the mix of electricity generation already chosen by CenterPoint and the Indiana Commission. For example, FERC assessed whether existing pipeline networks could serve CenterPoint but concluded that these would require expansions that could cause greater environmental impacts than the Texas Gas pipeline. FERC also analyzed an alternative route for the pipeline but found that rerouting it would not decrease environmental impacts. FERC thus adequately considered alternatives that

10

would serve the purpose of transporting natural gas to
CenterPoint's plant.

Under NEPA and in light of FERC's limited authority
under the NGA, FERC properly rejected Citizens Action's
broad purpose and non-gas alternatives. Congress entrusted the
choice of electricity generation to the States, and FERC has no
authority to second-guess those choices on environmental or
any other grounds. FERC lawfully and reasonably identified
the purpose of the Texas Gas Project as supporting
CenterPoint's new natural gas units and then reasonably
considered alternatives to the proposed pipeline.

B.

Citizens Action alternatively argues that FERC was
required to evaluate non-gas alternatives as part of the no-
action alternative, even under its stated purpose of transporting
natural gas to CenterPoint.

When evaluating environmental impacts, an agency must
consider reasonable alternatives, including a no-action
alternative. *See Ctr. for Biological Diversity*, 67 F.4th at 1181;
42 U.S.C. § 4332(2)(C)(iii) (2018). An alternative is
reasonable if it "will bring about the ends of the federal action"
and is "in the agency's power." *Citizens Against Burlington*,
938 F.2d at 195–96. "[W]hen the agency has no legal power to
prevent a certain environmental effect, there is no decision to
inform, and the agency need not analyze the effect in its NEPA
review." *Sierra Club v. FERC* ("*Sabal Trail*"), 867 F.3d 1357,
1372 (D.C. Cir. 2017) (citing *Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752, 770 (2004)).

For reasons already explained, FERC has no jurisdiction
over the non-gas alternatives Citizens Action presses, because
FERC has no jurisdiction over a state's chosen mix of energy

11

generation resources.[2] The no-action analysis is thus limited to the alternatives that CenterPoint and the Indiana Commission will consider if FERC does not approve the Texas Gas pipeline.

There are two likely alternatives, both of which FERC concluded would be inferior to the Texas Gas Project. First, CenterPoint could seek some other means of generating backup power to support its transition to wind and solar energy. CenterPoint and the Indiana Commission assessed alternative non-gas energy sources, like battery storage, but they concluded that these alternatives would be inferior to natural gas with respect to reliability, cost, and feasibility. Therefore, as Texas Gas observes, "[u]ntil natural gas is provided (whether from Texas Gas or some other source) … CenterPoint would likely continue to produce electricity" by some other means of fossil fuel generation, which "could result in higher emissions … as well as other environmental impacts."

Second, a different company could propose a pipeline to serve CenterPoint's new units. A different pipeline, however,

---

[2] Citizens Action points to our decision in *National Resources Defense Council, Inc. v. Morton* to assert that FERC was required to consider alternatives beyond its jurisdiction. *See* 458 F.2d at 834–36. But *Morton* suggested that the agency may be required to consider some alternatives outside its jurisdiction because the action at issue was part of a broader cross-agency presidential initiative. *Id.* at 835. We later cabined *Morton* to its unique facts, explaining that it involved "a coordinated effort" by multiple federal actors "to solve a problem of national scope." *City of Alexandria v. Slater*, 198 F.3d 862, 869 (D.C. Cir. 1999). We emphasized that "[s]uch a holistic definition of 'reasonable alternatives' would … make little sense for a discrete project within the jurisdiction of one federal agency." *Id. Morton* does not support expanding FERC's consideration of alternatives beyond its statutory jurisdiction because the Project involves approval of a natural gas pipeline, a discrete action squarely within FERC's jurisdiction.

12

would result in similar environmental impacts, except it "would not meet the Project's objectives within the proposed time frames." Accepting, as it must, the mix of electricity generation chosen by Indiana, FERC reasonably concluded that the likely no-action alternatives would cause delay, fail to meet CenterPoint's needs, and/or produce environmental effects worse than those of the Texas Gas pipeline.

Citizens Action does not raise any arguments in its petition about the direct environmental effects of the pipeline, nor does it suggest an alternative route or different type of pipeline that would mitigate environmental harms. Instead, the group insists only that FERC should have considered alternatives that do not involve natural gas at all. But the proposal here is to build a natural gas pipeline. In assessing the no-action alternative, FERC reasonably declined to consider non-gas alternatives outside its jurisdiction and instead evaluated what would happen if this pipeline was not built. NEPA requires nothing more.

III.

In its next set of NEPA challenges, Citizens Action contends FERC inadequately considered the significance of the Project's foreseeable environmental effects.

NEPA requires federal agencies to prepare environmental impact statements for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). CEQ guidance, which FERC has chosen to follow, specifies that an environmental impact statement should include a "discussion of … the significance of"

13

foreseeable environmental effects.[3] 40 C.F.R. § 1502.16(a) (2022).

In the environmental impact statement, FERC included a lengthy discussion of the environmental effects of certifying the Project, including effects on climate change. For those effects, FERC estimated the greenhouse gas emissions from the Project as well as from the downstream power plant, contextualized emissions as a percentage of state and national totals, and applied various social cost of carbon metrics to estimate the cost of emissions. But FERC refrained from labeling the emissions as significant or insignificant. Citizens Action challenges the Commission's use of percentages and the absence of a significance label.

A.

Citizens Action maintains that FERC's practice of reporting "emissions as a percentage of state and national emissions totals" is arbitrary and capricious because it "inappropriately diminish[es] the significance of project-level greenhouse gas … emissions." We disagree.

Nothing in NEPA suggests it is unreasonable for FERC to disclose accurate information about environmental effects. NEPA is a purely procedural statute that requires only "fully informed and well-considered" decisions. *Ctr. for Biological Diversity*, 67 F.4th at 1181 (cleaned up). NEPA does not limit an agency's discussion of accurate information or prescribe the way in which the agency presents its analysis. CEQ guidance

---

[3] This court recently held that CEQ lacked authority to promulgate binding regulations implementing NEPA. *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 914 (D.C. Cir. 2024). Because FERC complied with CEQ guidance, we need not consider the effect of this decision on FERC's NEPA obligations.

14

counsels only that an agency discuss the significance of environmental effects. 40 C.F.R. § 1502.16(a) (2022). Using percentages to contextualize emissions from the Project is a perfectly reasonable way for FERC to present that information.

Moreover, we have repeatedly held that FERC may reasonably decline to use the social cost of carbon and may instead compare a project's emissions with state and nationwide emissions. *See Ctr. for Biological Diversity*, 67 F.4th at 1184 (holding FERC reasonably compared project emissions with state and nationwide emissions and "had no obligation … to consider the social cost of carbon" under NEPA); *Ala. Mun. Distribs. Grp. v. FERC*, 100 F.4th 207, 214 (D.C. Cir. 2024) (same); *see also EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (holding FERC reasonably concluded the social cost of carbon was "inadequately accurate to warrant inclusion under NEPA"). There was nothing unreasonable about FERC's decision to take a similar approach in assessing the Project's emissions.

## B.

Citizens Action also claims that FERC was required to label the environmental impacts as "significant" or "not significant." It claims the failure to do so violated NEPA and was arbitrary and capricious.

This NEPA challenge is now foreclosed by precedent. After oral argument, our court decided *Food & Water Watch v. FERC*, 104 F.4th 336. Presented with the identical argument "that the Commission needed to label the increased emissions and ensuing costs as either significant or insignificant," we squarely held that "NEPA contains no such mandate." *Id.* at 346. Nor does CEQ guidance counsel an agency to apply a significance label. *Id.* (quoting 40 C.F.R. § 1502.16(a), (b)). *Food & Water Watch* forecloses Citizens Action's contrary to

15

law claim. NEPA simply does not require an agency to use particular labels indicating the significance of a project's environmental impacts.

Citizens Action also attempts to rely on FERC's agency-specific NEPA regulations, which require a summary of any "significant environmental impacts."[4] 18 C.F.R. § 380.7(a), (d). This argument fails for similar reasons. A summary of significant impacts does not require a significance label or any other particular format. In reviewing the Project, FERC properly discussed and summarized significant environmental impacts, and the absence of a "significance" label does not violate NEPA, CEQ guidance, or FERC regulations.

Citizens Action also argues that FERC unreasonably failed to explain why it did not label emissions in this case when it labeled emissions as "not … significant" in *Northern Natural Gas Co.*, 174 FERC ¶ 61,189 at P 36 (Mar. 22, 2021). This argument is also foreclosed by *Food & Water Watch*. Because FERC had never claimed it was *required* to assign a significance label in *Northern Natural Gas*, and FERC had withdrawn a 2022 policy statement setting a significance threshold, we concluded it was reasonable not to assign a significance label. *Food & Water Watch*, 104 F.4th at 347; *see also Ala. Mun. Distribs. Grp.*, 100 F.4th at 214–15 (holding FERC reasonably declined to assign a significance label after withdrawing its draft policy statement).

If FERC's change in approach was reasonable, as we held it was, then FERC had no reason to distinguish *Northern Natural Gas* when conducting its NEPA review of the Texas Gas Project. Reasoned decisionmaking does not require an

---

[4] These regulations were not raised by the parties or addressed in *Food & Water Watch*. *See* 104 F.4th at 346.

16

agency to perpetually distinguish precedents and policies it has already announced it will reconsider.[5]

We recognize that after *Food & Water Watch*, two panels found FERC's failure to address *Northern Natural Gas* arbitrary and capricious. *See Healthy Gulf v. FERC*, 107 F.4th 1033, 1042 (D.C. Cir. 2024); *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 55–56 (D.C. Cir. 2024). In those cases, we concluded that FERC did "not dispute the premise that it must make a significance determination absent a sufficient explanation for not doing so in a particular proceeding." *N.J. Conservation Found.*, 111 F.4th at 56 (quoting *Healthy Gulf*, 107 F.4th at 1040 n.2). And we held that FERC did not reasonably explain why it was "*unable*" to make such a determination when it did so in *Northern Natural Gas*. *See id.*; *Healthy Gulf*, 107 F.4th at 1042–43. Here, by contrast, FERC explained it did not need to attach a significance label because it thoroughly analyzed the Project's emissions in the environmental impact statement. That explanation, keyed to NEPA's requirements, rather than to FERC's capabilities, is precisely the one we held to be sufficient in *Food & Water Watch*. *See* 104 F.4th at 346–47.

Moreover, the reasoning of *Food & Water Watch* compels a conclusion that when FERC has otherwise adequately considered a project's environmental effects, as required by

---

[5] After oral argument, FERC expressly overruled *Northern Natural Gas* in a different proceeding. *See Venture Glob. CP2 LNG, LLC*, 189 FERC ¶ 61,148 (Nov. 27, 2024). The Commission reaffirmed its view that NEPA does not require a significance label and criticized its prior decision for failing to offer a methodology for calculating whether emissions are significant. *Id.* at PP 83–89. Although FERC cannot rely on this development here, its latest decision confirms what was already apparent: the Commission no longer follows *Northern Natural Gas*.

17

NEPA, any failure to label emissions as significant would not be prejudicial error. 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). We explained that "no legal consequence" would follow from attaching a significance label and that neither policymakers nor the public "would have learned much more had FERC attached" such a label. *Food & Water Watch*, 104 F.4th at 346–47.

The APA's prejudicial error rule applies to a failure to follow NEPA procedures. *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006). We do not vacate orders when it would be a "meaningless gesture" to require additional process that is "not necessary to guarantee that the [agency] will consider environmental concerns." *Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1257 (D.C. Cir. 1988). This is consistent with the longstanding principle that courts do not "flyspeck" an agency's NEPA analysis, but rather simply "ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019) (cleaned up).

When presented with an arbitrary and capricious challenge, we must consider whether FERC reasonably explained its environmental assessment, not whether it used certain magic words. Policymakers can adequately evaluate environmental effects irrespective of whether those effects are labeled as significant. FERC thoroughly assessed the environmental impacts of the Project, and its analysis was reasonable and consistent with NEPA.

IV.

Citizens Action next argues that FERC unreasonably considered emissions reductions from the retirement of coal-fired units when approving the Texas Gas Project. Because the coal-fired units will be retired regardless of whether the gas-

18

fired units are built, Citizens Action maintains that FERC could not consider the emissions reduction from retiring the coal units when assessing the public convenience and necessity. While Citizens Action concedes that FERC also disclosed and monetized the gross emissions of the new natural gas units in the final order, it maintains that FERC ultimately, and unreasonably, relied on the net emissions. We disagree with this blinkered approach.

The Commission did not act unreasonably when considering net emissions as part of its determination of the public convenience and necessity. CenterPoint's Integrated Resource Plan included retiring coal-fired units and replacing them with a combination of solar, wind, and natural gas resources. The Plan's success depends on natural gas being provided to CenterPoint's new gas-fired units. FERC reasonably considered both the gross emissions caused by the new units and the net emissions incorporating the benefits of retiring the coal plant. The net reduction in emissions was just one part of FERC's broader public convenience and necessity analysis.[6]

Recognizing the long timeframes for infrastructure planning—not to mention litigation delays—utilities will often

---

[6] Citizens Action also raises its preferred non-gas alternatives in this context, arguing that gas units are "not the only way or a necessary precondition for the [coal-fired units'] retirement." At bottom, the environmental group simply seeks to relitigate the choices made by Indiana. We again stress that FERC's mandate is to promote natural gas development, and the Commission is explicitly prohibited from evaluating the mix of electricity chosen by a state regulator. *See* 16 U.S.C. § 824(b)(1). Given the terms of the state-approved CenterPoint Plan, it was reasonable for FERC to consider the net emissions of the gas-powered units in relation to the closure of the coal-fired units when evaluating the Project.

19

take irrevocable steps before obtaining all the necessary approvals. FERC need not blind itself to this practical reality when determining the public convenience and necessity. Contrary to Citizens Action's claims, FERC reasonably recognized the environmental benefits of CenterPoint's Plan when approving the pipeline.

V.

Finally, Citizens Action argues that FERC unreasonably failed to respond to its rehearing petition. Because FERC denied the petition by operation of law, it did not respond to Citizens Action's argument that, irrespective of the environmental impact statement, FERC did not adequately consider environmental effects when approving the Project.

Reasoned decisionmaking requires FERC to respond to significant arguments raised by the parties to a proceeding, including in a rehearing petition. *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 19–20 (D.C. Cir. 2021). But FERC need not respond to a petition for rehearing if its initial order "supplied this court with enough explanation to facilitate meaningful review." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1024 (D.C. Cir. 2022).

FERC did not respond to Citizens Action's rehearing petition in a separate order, but this was reasonable because FERC adequately considered the Project's environmental effects before granting the certificate. The Commission explained that it followed its longstanding process when making a public convenience and necessity determination.[7]

---

[7] FERC followed the process established in its 1999 Certificate Policy Statement. *See* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified*, 90

20

First, it assessed whether the economic benefits of the Project outweighed its costs. Because it found that the Project was economically beneficial, FERC then analyzed the environmental effects and determined that the Project "is an environmentally acceptable action." Based on these two findings, FERC concluded that "the public convenience and necessity requires approval of" the Project. FERC's approach of evaluating economic benefits and considering environmental effects is entirely reasonable.[8]

In its petition for rehearing, Citizens Action argued that FERC should have assigned equal weight to economic benefits and greenhouse gas emissions when deciding whether to approve the Project. We have previously recognized that FERC may deny approval based on a pipeline's direct or indirect emissions. *See Sabal Trail*, 867 F.3d at 1373. That decision, however, never specified under what circumstances FERC could deny approval based on a project's emissions, nor the weight FERC should assign to those emissions in assessing the public convenience and necessity.

The NGA instructs FERC to grant certificates when "required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). To determine the public convenience and necessity, "it is necessary to look to the

_____

FERC ¶ 61,128 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094 (July 28, 2000).

[8] This court recently determined that a similar FERC order was arbitrary and capricious because the Commission failed to "explain[] whether and how … it balanced and found [the emissions] to be outweighed by the pipeline's expected benefits." *N.J. Conservation Found.*, 111 F.4th at 63. That case, however, involved an "equivocal" environmental impact statement and "enormous" emissions, factors that are not present here. *Id.*

21

purposes for which the [NGA was] adopted." *NAACP v. FPC*, 425 U.S. 662, 669 (1976). The NGA was primarily enacted "to encourage the orderly development of plentiful supplies of … natural gas at reasonable prices." *Id.* at 669–70; *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015). The Supreme Court has recognized that conservation and environmental issues are "subsidiary purposes" that FERC *may* consider. *NAACP*, 425 U.S. at 670 & n.6. But nothing in the NGA suggests FERC can prioritize environmental concerns over the primary objective of promoting the development of natural gas markets.

Moreover, while NEPA requires FERC to consider the environmental effects of the projects it approves, it is far from clear what statutory authority FERC has, if any, to give *determinative* weight to the environmental effects of projects beyond its jurisdiction. To the extent Citizens Action argues that FERC must assess and give determinative weight to the appropriate level of emissions for projects outside its jurisdiction, like CenterPoint's plant, we see no basis for that conclusion in the NGA. Any such argument would, at a minimum, present a major question over which Congress has not clearly given FERC authority. *Cf. West Virginia v. EPA*, 597 U.S. 697, 720, 730 (2022) (holding Congress did not empower the EPA to "restructur[e] the Nation's overall mix of electricity generation" by "dictating the optimal mix of energy sources nationwide").

Contrary to Citizens Action's preferred approach, neither the Supreme Court nor this Circuit has suggested that FERC must give equal weight to economic and environmental concerns. To the contrary, considering Congress's directives in the NGA, we seriously doubt whether FERC could assess the public convenience and necessity in a manner that discourages or undermines the development of natural gas.

22

FERC's initial order provided ample explanation and analysis of the economic benefits and environmental effects of the Project, and therefore the Commission was not required to reiterate its conclusions in response to Citizens Action's rehearing petition.

\* \* \*

In its challenge to the Texas Gas Project, Citizens Action in effect seeks a judicial directive exhorting FERC to promote general environmental concerns. But such a directive would far exceed our review under the APA as well as FERC's authority under the NGA and NEPA. Congress charged FERC with the development of natural gas pipelines, not with making local energy decisions or setting national environmental policy. For the foregoing reasons, we deny the petition for review.

*So ordered.*